No. 20-15948

# In the United States Court of Appeals
## for the Ninth Circuit

ANDREW TETER AND JAMES GRELL

*Plaintiffs-Appellants*,

v.

CLARE CONNORS, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII AND AL CUMMINGS, IN HIS OFFICIAL CAPACITY AS THE STATE SHERIFF DIVISION ADMINISTRATOR

*Defendants-Appellees*.

**Appeal from a Judgment of United States District Court
For the District of Hawaii
Civ. No. 19-cv-00183-ACK-WRP
United States District Court Judge Alan C. Kay**

**Appellants' Excerpts of Record**

**Volume 1 of 1**

ALAN ALEXANDER BECK
Attorney at Law
2692 Harcourt Drive
San Diego, California 92123
Telephone: (619) 905-9105
alan.alexander.beck@gmail.com

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. Box 4008
Madison, MS 39130
Telephone: (601) 852-3440
stephen@sdslaw.us

*Attorneys for Appellants, Andrew Teter and James Grell*

INDEX

| File Date | District Court Docket Entry No. | Document | Page Nos. |
|---|---|---|---|
| 5/13/2020 | 64 | Notice of Appeal | ER001-ER003 |
| 5/13/2020 | 61 | District Court Opinion and Order | ER004-ER045 |
| 5/13/2020 | 63 | Judgment | ER046 |
| 4/28/2020 | 68 | Hearing Transcript on Motion for Summary Judgment | ER047-ER079 |
| 1/15/2020 | 37-7 | The Balisong Knife: Here is everything you need to know | ER080-ER081 |
| 1/15/2020 | 37-6 | Letter to Legislature from Ron England | ER082 |
| 1/15/2020 | 37-6 | Letter to Legislature from Ronnette M. Kawakami | ER083-ER084 |
| 1/15/2020 | 37-6 | Letter to Legislature from Honolulu PD | ER085 |
| 1/15/2020 | 37-6 | Letter to Legislature from City & County of Honolulu Prosecuting Attorney | ER086-ER087 |
| 1/14/2020 | 34-5 | Expert Report of Burton Richardson | ER088-ER099 |
| 1/14/2020 | 34-6 | Deposition Testimony of Robin Nagamine | ER100-ER108 |
| 4/10/2019 | 1-7 | Weapon Involvement and Injury Outcomes in Family and Intimate Assaults | ER109-ER113 |
| 4/10/2019 | 1-6 | Gun and Knives in New Mexico: Patterns of Penetrating Trauma, 1978-1993 | ER114-ER118 |
| 4/10/2019 | 1-5 | Civilian Penetrating Wounds of the Abdomen | ER119-ER126 |
| 4/10/2019 | 1-4 | CV of Burton Richardson | ER127-ER129 |
| 4/10/2019 | 1-3 | Declaration of Burton Richardson | ER130-ER136 |
| 4/10/2019 | 1-2 | Declaration of James Grell | ER137-ER138 |

| 4/10/2019 | 1-1 | Declaration of Andrew Teter | ER139-ER140 |
| 4/10/2019 | 1 | Complaint for Declaratory and Injunctive Relief | ER141-ER160 |
| | | District Court Docket | ER160-ER170 |

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 1. Notice of Appeal from a Judgment or Order of a
### United States District Court

Name of U.S. District Court: | United States District Court District of Hawaii

U.S. District Court case number: | 19-00183-ACK-WRP

Date case was first filed in U.S. District Court: | 04/10/2019

Date of judgment or order you are appealing: | 05/13/2020

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

⦿ Yes    ○ No    ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

Andrew Teter
James Grell

Is this a cross-appeal?  ○ Yes  ⦿ No

If Yes, what is the first appeal case number?

Was there a previous appeal in this case?  ○ Yes  ⦿ No

If Yes, what is the prior appeal case number?

Your mailing address:

Stamboulieh Law, PLLC

P.O. Box 4008

City: Madison    State: MS    Zip Code: 39130

Prisoner Inmate or A Number (if applicable):

**Signature** | /s/ Stephen D. Stamboulieh | **Date** | 5/13/2020

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Andrew Teter
James Grell

Name(s) of counsel (if any):

Alan Alexander Beck
Stephen D. Stamboulieh

Address: 2692 Harcourt Drive, San Diego, CA 92123; P.O. Box 4008, Madison, M

Telephone number(s): 619-905-9145; 601-260-3375

Email(s): alan.alexander.beck@gmail.com; stephen@sdslaw.us

Is counsel registered for Electronic Filing in the 9th Circuit?   ◉ Yes   ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Clare E. Connors
Al Cummings

Name(s) of counsel (if any):

Caron M. Inagaki
Ryan M. Akamine

Address: 425 Queen Street, Honolulu, HI  96813

Telephone number(s): 808-586-1494

Email(s): caron.m.inagaki@hawaii.gov; ryan.m.akamine@hawaii.gov

*To list additional parties and/or counsel, use next page.*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**<u>Appellants</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?  ○ Yes  ○ No

**<u>Appellees</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Form 6

*2*

**ER003**

*New 12/01/2018*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI`I

———————————————————— )
ANDREW TETER and                    )
JAMES GRELL,                        )
                                    )
            Plaintiffs,             )
                                    )
    v.                              )  Civ. No. 19-00183-ACK-WRP
                                    )
CLARE E. CONNORS, in her            )
Official Capacity as the            )
Attorney General of the State       )
of Hawaii, and                      )
AL CUMMINGS, in his Official        )
Capacity as the State Sheriff       )
Division Administrator,             )
                                    )
            Defendants.             )
———————————————————— )

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
GRANTING THE STATE'S MOTION FOR SUMMARY JUDGMENT**

A decade ago, the United States Supreme Court decided
United States v. Heller, 554 U.S. 570, 128 S. Ct. 2783, 171 L.
Ed. 2d 637 (2008), in which it recognized for the first time an
individual right under the Second Amendment to keep and bear
arms. According to the Court, the "core" right under the Second
Amendment is the "right of law-abiding, responsible citizens to
use arms in defense of hearth and home." Id. at 634-35, 128 S.
Ct. 2783. The landmark ruling did not clarify all the contours
of Second Amendment jurisprudence, and it left open many
questions for "future evaluation." Id. This case raises a
question not clearly resolved by Heller. Specifically, it asks

- 1 -

**ER004**

the Court to determine the constitutionality of Hawai`i's ban on butterfly knives.

Plaintiffs Andrew Teter and James Grell ("Plaintiffs") challenge the constitutionality of Hawai`i Revised Statutes ("HRS") § 134-53(a), which bans the sale, possession, and carrying of "butterfly knives."  Under 42 U.S.C. § 1983 and 28 U.S.C. § 2201(a), Plaintiffs seek an order (1) finding that the statute violates their Second Amendment rights and (2) enjoining the statute from enforcement.  Defendants Clare E. Connors, in her Official Capacity as the Attorney General of the State of Hawai`i, and Al Cummings, in his Official Capacity as the State Sheriff Division Administrator (collectively, the "State") contend that the statute does not implicate Second Amendment protections in the first place and that, even if it did, it would pass constitutional muster.  For the reasons detailed below, the Court finds that HRS § 134-53(a) is not an unconstitutional restriction on the right to bear arms.  The Court therefore DENIES Plaintiffs' Motion for Summary Judgment, ECF No. 33, and GRANTS the State's Motion for Summary Judgment, ECF No. 36.

## BACKGROUND

I.   **Statutory Background**

Hawai`i has banned the manufacture, sale, transfer, possession, and transport of butterfly knives for over twenty years.  The Hawai`i legislature passed HRS § 134-53 in 1999 in response to a Hawai`i Supreme Court decision, <u>In the Interest of Doe</u>, 73 Haw. 89, 828 P.2d 272 (1992), which held that butterfly knives were not encompassed in an existing ban on "switchblade knives," HRS § 134-52.  <u>See</u> Haw. Legis. S. Comm. on Judiciary, Standing Comm. Report No. 1389 (1999), ECF No. 37-6, at pp. 27–29 of 46 ("Legis. Comm. Report No. 1389"); Haw. Comm. on Conf., Conf. Comm. Report No. 88 (1999), ECF No. 37-6, at pp. 35–37 of 46 ("Conf. Comm. Report No. 88").  The legislature passed HRS § 134-53 to impose an identical ban on butterfly knives:

> (a)  Whoever knowingly manufactures, sells, transfers, possesses, or transports in the State any butterfly knife, being a knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both, shall be guilty of a misdemeanor.

HRS § 134-53(a).[1/]  <u>Compare</u> <u>id.</u>, with <u>id.</u> § 134-52(a) (banning switchblades).  When it passed the law, the legislature gathered evidence and community input supporting and opposing the law,

_____

[1/]   Subsection (b) of HRS § 134-53 makes the use or threatened use of a butterfly knife in the commission of a crime a class C felony.  Plaintiffs' challenge is limited to subsection (a), the more general ban on butterfly knives.  <u>See</u> Pls.' Mot. 1.

and made findings that butterfly knives—like switchblades—are often associated with gang activity and present a danger to the public:[2/]

- "Your Committee received testimony in support of this bill from the Honolulu Police Department, the Department of the Prosecuting Attorney for the City and County of Honolulu, and concerned individuals. Comments were received from the Office of the Public Defender." Haw. Legis. S. Comm. on Judiciary, Standing Comm. Report No. 731 (1999), ECF No. 37-6, at pp. 13-16 of 46 ("Legis. Comm. Report No. 731").

- "Your Committee finds that particular attention needs to be given to butterfly knives by setting them apart from other deadly or dangerous weapons. In particular, the prohibitions against butterfly knives should be similar to that of switchblade knives." Conf. Comm. Report No. 88; see also Legis. Comm. Report No. 731.

- "Your Committee finds that certain types of knives, particularly switchblade and butterfly knives, are associated with gang activity." Legis. Comm. Report No. 1389.

- "[Honolulu Police Department's] Gang Detail has noticed an increasing trend in minors and gang members armed with knives and daggers. Butterfly knives are preferred as they are easy to conceal and are more intimidating when brandished. . . . Letter from George McKeague, Captain, Criminal Investigation Div., Police Dep't for City & Cty. of Honolulu to S. Comm. on Judiciary (Mar. 16, 1999), ECF No. 37-6, at p. 25 of 46 ("HPD Letter").

- "Recently, it has been publicized that certain vendors at local flea markets and in Waikiki have been selling butterfly knives to very young minors. . . . We

---

[2/] See generally Ex. E to State's Mot., ECF No. 37-6.

- 4 -

believe there is sufficient justification
to prohibit the manufacture, sale or
transfer of such weapons to <u>anyone</u>, not just
minors."  Letters from Dep't of the
Prosecuting Attorney of the City & Cty. of
Honolulu to House Comm. on Judiciary (Feb.
5, 1999 & Mar. 16, 1999), ECF No. 37-6, at
pp. 12 & 23-24 of 46; ("Letters from Dep't
of the Prosecuting Attorney").

## II.  Butterfly Knives

A butterfly knife (sometimes call a "balisong") is a
type of folding knife that most likely originated in the
Philippines, although there is some conflicting evidence that it
originated in France.  Pls.' Mot. 2; State's Mot. 4; <u>see also</u>
Decl. of Pls.' Expert Burton Richardson, ECF No. 34-4
("Richardson Decl.") ¶ 4; Report of Pls.' Expert Burton
Richardson, ECF No. 34-5 ("Richardson Report") at p. 1; Dep. of
State's Witness Lieutenant Robin Nagamine, ECF No. 34-6
("Nagamine Dep.") at p. 26.  It is known for its interesting
appearance when opened—resembling a butterfly—and its unique
design.  Pls.' Mot. 1 n.1.  The design allows the knife to be
opened or closed with one hand, which is impressive and
intriguing to the user or observer.  Richardson Decl. p. 2.  The
same features that make the butterfly knife interesting to watch
also give it an intimidating and threatening effect.  <u>See</u> <u>Id.</u>
(indicating that manner of use is "designed to intimidate and
dissuade"); State's Mot. 3 ("Butterfly knives are . . . more
intimidating when brandished."); <u>The Art of the Butterfly Knife</u>,

- 5 -

**ER008**

Ex. I to State's Mot., ECF No. 37-10 (noting the "threatening nature and quick deployment" of a butterfly knife). At the same time, butterfly knives open slightly more slowly than other modern knives, and it typically takes some practice to use one properly. See Richardson Decl. at pp. 3–6; Richardson Report at pp. 3–5; Knives Deal, Ex. F to State's Mot. ECF No. 37-7, at p. 3.

According to Plaintiffs' expert, butterfly knives are used for self-defense, in certain martial arts circles, and sometimes as a pocket utility knife. See generally Richardson Decl. Evidence submitted by the State likewise reflects those uses. On the other hand, as detailed above, the State has also submitted evidence showing that butterfly knives are popular with minors and with criminals and gang members. See HPD Letter; Conf. Comm. Report No. 88; Legis. Comm. Report No. 731.

Butterfly knives are legal to some extent in the majority of states, but in many they are restricted or else banned altogether. Pls.' Mot. 4; see also The Art of the Butterfly Knife, supra. In some states, butterfly knives are viewed as falling within the statutory definition of a switchblade, and thus covered under those bans. State's Mot. 9–10 & n.1–2 (collecting cases). The record does not contain empirical evidence about the popularity of butterfly knives, including to what extent they are possessed on a national scale.

- 6 -

**ER009**

The record does include some, mostly anecdotal, evidence that butterfly knives are quite popular in certain villages in the Philippines, see Richardson Report at pp. 1–2; Nagamine Dep. at 26:5–18, and that knives in general are one of the most popular and most commonly-owned weapons in the United States, see Pls.' Mot. 4; Pls.' Opp. 1–2, 16.

## III. Procedural Background

On April 10, 2019, Plaintiffs sued the Attorney General of the State of Hawai`i and the State Sheriff Division Administrator challenging the constitutionality of HRS § 134-53(a). Compl., ECF No. 1. Plaintiffs are residents of Hawai`i who "wish[] to purchase a butterfly knife for self-defense and other purposes in their home and would acquire, possess, carry and where appropriate use a butterfly knife to protect themselves and their homes." Pls.' Mot. 1. Neither Plaintiff alleges that he has been charged with a crime under HRS § 134-53(a). See Compl. ¶¶ 86–93, 96–101.

Plaintiffs filed their Motion for Summary Judgment and concise statement of facts ("CSF") on January 14, 2020, and the State filed its cross-Motion for Summary Judgment and CSF the next day. See Pls.' Mot.; Pls.' CSF, ECF No. 34; State's Mot.; State's CSF, ECF No. 37. The State filed its memorandum and CSF in opposition to Plaintiffs' Motion on April 7, ECF Nos. 52 & 53, and Plaintiffs filed their reply in support of their Motion

- 7 -

**ER010**

one week later, ECF No. 58.   Meanwhile, Plaintiffs filed their
memorandum and CSF in opposition to the State's Motion on March
30, ECF Nos. 50 & 51, and the State filed its reply in support
of its Motion on April 14, ECF No. 57.   In addition to the
parties' briefing, Amicus Curiae Hawaii Firearms Coalition filed
a brief in support of Plaintiffs, ECF No. 45, and Amicus Curiae
Everytown for Gun Safety Support Fund filed a brief in support
of the State, ECF No. 47.   A telephonic hearing on the cross-
motions was held on Tuesday, April 28, 2020.

**STANDARD**

Summary judgment is proper when there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.   Fed. R. Civ. P. 56(a).   Federal
Rule of Civil Procedure 56(a) mandates summary judgment "against
a party who fails to make a showing sufficient to establish the
existence of an element essential to the party's case, and on
which that party will bear the burden of proof at trial."
Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91
L. Ed. 2d 265 (1986); see also Broussard v. Univ. of Cal., 192
F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial
burden of informing the court of the basis for its motion and of
identifying those portions of the pleadings and discovery

- 8 -

responses that demonstrate the absence of a genuine issue of material fact." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex, 477 U.S. at 323, 106 S. Ct. 2548); see also Jespersen v. Harrah's Operating Co., 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citation and internal quotation marks omitted and emphasis removed); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2509–10 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248, 106 S. Ct. at 2510). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the

- 9 -

**ER012**

nonmoving party.  Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. 1348.

## DISCUSSION

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  "Second Amendment jurisprudence has changed substantially in the wake of the Supreme Court's landmark decision in Heller."  Fyock v. Sunnyvale, 779 F.3d 991, 996 (9th Cir. 2015).  The Supreme Court decided Heller in 2008, announcing for the first time that the Second Amendment confers "an individual right to keep and bear arms" under the Second Amendment.  554 U.S. at 595, 128 S. Ct. 2783.

As noted, the parties' cross-motions ask this Court to decide the constitutionality of Hawai`i's ban on butterfly knives.  The parties not only disagree on whether the statute is lawful; they also quarrel over the appropriate inquiry to reach their respective conclusions.  Plaintiffs think that the inquiry ought to consider whether HRS § 134-53(a) is so broad as to be categorically unconstitutional.  Pls.' Mot. 12–15.  Conversely, the State maintains that the inquiry should contemplate whether the regulated activity is deserving of no Second Amendment

- 10 -

**ER013**

protection in the first place.  State's Mot. 6-12.  Assuming the case is not resolved by the answers to those questions, the parties differ on the level of scrutiny that should follow.  Plaintiffs urge the Court to apply strict scrutiny, Pls.' Mot. 15, while the State views the statute as only implicating intermediate scrutiny, State's Mot. 12.  And finally, the parties unsurprisingly disagree on whether HRS § 134-53(a) is justified under whatever level of scrutiny ultimately applies.  Compare Pls.' Mot. 20-24, with State's Mot. 13-14, and State's Opp. 15-17.

　　　　With this backdrop in mind, the Court begins by addressing a threshold issue regarding the remedy sought by Plaintiffs.  The Court then turns to applying the Second Amendment framework that has taken shape since Heller.  As detailed below, the Court holds that HRS § 134-53(a) is constitutionally sound.

## I.　Facial Versus As-Applied Challenge

　　　　Before turning to the merits, the Court finds it prudent to clarify the scope of Plaintiffs' challenge and the remedy they seek.  While they do not allege that they have been charged with violating HRS § 134-53(a), Plaintiffs purport to bring an as-applied and facial challenge.  Compl. ¶ 26; Pls.' Reply 2.  Upon the Court's questioning at the hearing, Plaintiffs reluctantly conceded that their challenge must be

- 11 -

**ER014**

facial. Yet they still insist that the Court find the statute unconstitutional only as applied to law-abiding citizens seeking to possess butterfly knives in their homes or to openly carry them in public.

The Court cannot rewrite a statute. Although Plaintiffs' primary concern is their own ability to legally use butterfly knives in certain contexts, the language of the statute is such that the Court could not salvage one part of the statute while invalidating another. HRS § 134-53(a) is one clause completely and categorically banning the manufacturing, sale, transfer, possession, and transport of butterfly knives in any context. The Court cannot write in an exception to the otherwise complete ban to allow for possession in the home or open carry, by only law-abiding citizens. Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 329-30 (2006); see also Jackson v. City & Cty. of San Francisco, 746 F.3d 953, 962 (9th Cir. 2014) (explaining that a "flat prohibition" "does not give courts the opportunity to construe the prohibition narrowly or accord the prohibition a limiting construction to avoid constitutional questions" (citation and internal quotation marks omitted)).

Thus, the Court construes Plaintiffs' claim as seeking a declaration that HRS § 134-53(a) is unconstitutional on its face. This distinction ultimately makes no practical difference

- 12 -

**ER015**

given the Court's conclusion that the statute is constitutional anyway.

## II.  Second Amendment Framework

### a. __Heller__ and Subsequent Supreme Court Cases

In __Heller__, the Supreme Court conducted an extensive textual and historical analysis of the Second Amendment from which it gleaned an individual right to keep and bear arms.  554 U.S. at 595, 128 S. Ct. 2783.  __Heller__ emphasized the "core" protection of the Second Amendment: "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." __Id.__ at 634–35, 128 S. Ct. 2783.

Alongside its landmark ruling recognizing an individual right under the Second Amendment, the Court clarified that the right is "not unlimited."  __Id.__ at 626, 128 S. Ct. 2783; see also __Fyock__, 779 F.3d at 996 ("The Supreme Court has emphasized that nothing in its recent opinions is intended to cast doubt on the constitutionality of longstanding prohibitions traditionally understood to be outside the scope of the Second Amendment.").  The Court identified several contexts where prohibitions or other regulatory measures would be "presumptively lawful."  __Id.__ at 626–27 & n.26, 28 S. Ct. 2873. For example, the Court cautioned that its opinion should not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the

**ER016**

carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27, 128 S. Ct. 2783. Of significance here, Heller also endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" Id. (citation omitted). According to the Court, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." Heller, 554 U.S. at 624-25, 128 S. Ct. 2873.

Turning more narrowly to the specific facts before the Court, Heller involved a challenge to the District of Columbia's ban on the possession of operable handguns in the home. Id. at 575-76, 128 S. Ct. 2873. The Court first held as a threshold matter that handguns are plainly "bearable arms" under the Second Amendment. Id. at 581-82, 128 S. Ct. 2873. Next, the Court explained that handguns are commonly used for lawful purposes and therefore fall within the ambit of the Second Amendment. Id. at 628-29, 128 S. Ct. 2873. From there, the Court concluded that "[u]nder any of the standards of scrutiny that [the Court] ha[s] applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." Id. (internal footnote, quotation marks, and citation omitted).

- 14 -

**ER017**

*Heller* stopped short of opining on the precise level of scrutiny courts should apply to Second Amendment challenges other than to say that rational basis is not appropriate. *Id.* at 628 n.27, 128 S. Ct. 2873. The narrow takeaway from *Heller*, then, is that "[a] law that imposes such a severe restriction on the core right of self-defense that it 'amounts to a destruction of the [Second Amendment] right,' is unconstitutional under any level of scrutiny." *Jackson*, 746 F.3d at 961 (quoting *Heller*, 554 U.S. at 629, 128 S. Ct. 2873)).

*Heller* was obviously concerned that DC's handgun ban implicated the "core" Second Amendment right to self-defense in the home, where "the need for defense of self, family, and property is most acute." 554 U.S. at 628, 128 S. Ct. 2783. Yet it was equally—if not more—concerned with another factor: the specific weapon at issue. The *Heller* Court "repeatedly made comments underscoring the status of handguns as 'the most preferred firearm in the nation to keep and use for protection of one's home and family.'" *Kolbe v. Hogan*, 849 F.3d 114, 132 (4th Cir. 2017). Here are a few examples:

- "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." *Heller*, 554 U.S. at 628, 128 S. Ct. 2783.
- "Under any of the standards of scrutiny that [the Court] ha[s] applied to enumerated constitutional rights,

- 15 -

**ER018**

banning from the home the most preferred
firearm in the nation to keep and use for
protection of one's home and family would
fail constitutional muster." Id.
(internal quotation marks and citation
omitted).

- "It is no answer to say . . . that it is
permissible to ban the possession of
handguns so long as the possession of
other firearms (i.e., long guns) is
allowed. It is enough to note . . . that
the American people have considered the
handgun to be the quintessential self-
defense weapon." Id. at 629, 128 S. Ct.
2783.

- "Whatever the reason, handguns are the
most popular weapon chosen by Americans
for self-defense in the home, and a
complete prohibition of their use is
invalid." Id.

Heller also "did not purport to clarify the entire

field of Second Amendment jurisprudence." Jackson, 746 F.3d at

959 (internal quotation marks and citation omitted). And in the

decade since Heller, the Supreme Court has not taken the

opportunity to hear many Second Amendment cases. The first of

only three cases came two years after Heller was decided. The

Court in McDonald v. City of Chicago, 561 U.S. 742, 130 S. Ct.

3020, 177 L. Ed. 2d 894 (2010), held that the Second Amendment

right is fully applicable to the states. Id. at 750, 130 S. Ct.

3020. Other than that, the case involved challenges to two

Chicago-area handgun bans and mostly echoed the same principles

established in Heller. See id. at 749-50. Several years later,

the Court decided a narrow issue in Caetano v. Massachusetts,

- 16 -

**ER019**

136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016), which involved a
challenge to a Massachusetts law banning stun guns.  The Court,
in a short per curiam opinion, reiterated a few of Heller's
points about what constitutes "bearable arms" and then remanded
the case for further consideration of whether the Second
Amendment protects stun guns.  Id. at 1027–28.  Finally, the
Court just recently issued a decision in the third post-Heller
Second Amendment case.  The case was widely anticipated to
meaningfully develop the Court's Second Amendment jurisprudence
for the first time since Heller and McDonald.  Instead, the City
amended the challenged ordinance during the litigation, which
mooted the case.  See N.Y. State Rifle & Pistol Ass'n, Inc. v.
City of N.Y., N.Y., -- S. Ct. -- 2020 WL 1978708 (Apr. 27, 2020)
(per curiam).  Aside from these three rulings, the Supreme Court
has done little to amplify Heller's Second Amendment framework.[3/]

### b. Post-Heller Framework

"In the decade since Heller, the courts of appeals
have spilled considerable ink in trying to navigate the Supreme
Court's framework."  Pena v. Lindley, 898 F.3d 969, 976 (9th
Cir. 2018), petition for cert. docketed, Jan. 3, 2019.  Most
circuits, including the Ninth, have derived a series of two-part

---

[3/]  There have, of course, been many attempts by litigants to put Second
Amendment issues before the Supreme Court.  Accordingly, some justices have
issued dissenting or concurring opinions in response to denials of
certiorari, in which they attempt to clarify or expand the scope of Heller.
The Court need not comprehensively address those opinions here.

- 17 -

tests for analyzing post-Heller Second Amendment challenges. The relevant inquiry "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir. 2013).

At the first step, whether a law burdens conduct protected by the Second Amendment depends on a "historical understanding" of the scope of the Second Amendment right and consideration of "whether the law falls within a well-defined and narrowly limited category of prohibitions that have been historically unprotected." Jackson, 746 F.3d at 960 (internal quotation marks and citations omitted). As noted above, prohibitions on the carrying of "dangerous and unusual" weapons fall within that category and are thus "presumptively lawful." Heller, 554 U.S. at 627 & n.26, 128 S. Ct. 2783. It follows that, if a weapon is dangerous and unusual, it does not implicate the Second Amendment and the analysis ends there. If, however, a weapon is not dangerous and unusual and the regulation does not fall within any of the other "presumptively lawful regulatory measures" recognized in Heller, courts proceed to the second step and apply some form of means-end scrutiny. Chovan, 735 F.3d at 1136.

To determine the appropriate level of scrutiny, the Ninth Circuit uses another two-pronged test. The degree of

- 18 -

**ER021**

scrutiny depends on (1) "how close the law comes to the core of the Second Amendment right," and (2) "the severity of the law's burden on the right." Id. at 1138 (quoting Ezell v. City of Chicago, 651 F.3d 684, 703 (7th Cir. 2011)). If the law does not implicate the core Second Amendment right or does not substantially burden that right, then courts apply intermediate scrutiny; if the law implicates the core of the Second Amendment right and severely burdens that right, then a stronger justification—something like strict scrutiny—applies. See Jackson, 746 F.3d at 961.

The Court now undertakes to conduct this multi-step analysis to decide whether HRS § 134-53(a) violates the Second Amendment.

## III. Step 1: Whether the Second Amendment Applies

The first step of the two-step inquiry described above asks whether the challenged statute burdens conduct protected by the Second Amendment. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Heller, 554 U.S. at 582, 128 S. Ct. 2783. But the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626, 128 S. Ct. 2783. Relevant here, Heller does not preclude certain "presumptively lawful regulatory measures" and

- 19 -

**ER022**

"longstanding prohibitions," including prohibitions on the carrying of "dangerous and unusual" weapons. Id. at 626-27, 627 n.26, 128 S. Ct. 2783; see also United States v. Henry, 688 F.3d 637, 640 (9th Cir. 2012). What this means here as a practical matter is that the Second Amendment does not protect butterfly knives unless they are (1) "bearable arms" and (2) not "dangerous and unusual weapons."

First, the parties seem to assume that butterfly knives are "bearable arms." See State's Mot. 6 (beginning its analysis with the first step of whether butterfly knives fall within the "dangerous and unusual weapons" exception); Pls.' Mot. 3-4 (same). In any event, the Court agrees that butterfly knives are indeed bearable arms as that term was defined in Heller and later clarified in Caetano. See Heller, 554 U.S. at 581-82, 128 S. Ct. 2783 (defining bearable arms to mean "[w]eapons of offence, or armour of defence" and to include "weapons that were not specifically designed for military use and were not employed in a military capacity"); see also Caetano, 136 S. Ct. at 1028 (clarifying that protected arms need not have been in "common use" at the time the Second Amendment was enacted).

The more difficult question is whether butterfly knives are dangerous and unusual. If they are, then they are not the type of "arms" meant to be protected by the Second

- 20 -

**ER023**

Amendment and HRS § 134-53(a)'s prohibition is "presumptively lawful." Jackson, 746 F.3d at 959 (citing Heller, 554 U.S. at 626–27, 627 n.26, 128 S. Ct. 2783). To determine if a weapon is "dangerous and unusual," courts consider "whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes."[4] Fyock, 779 F.3d at 640 (citing Henry, 688 F.3d at 640). The inquiry is conjunctive, so a weapon must be both dangerous and unusual. See Caetano, 136 S. Ct. at 1031 (Alito, J. concurring) (noting that the "relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes"); see also Fyock, 779 F.3d at 998 ("Although [the city] presented evidence regarding the increased danger posed by large-capacity magazines, it did not present significant evidence to show that large-capacity magazines are also 'unusual.'").

---

[4] Some courts have interpreted the "unusual" prong to also take into account whether a weapon is in "common use"—in other words, the popularity of the weapon. See, e.g., N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 255 (2d Cir. 2015). Others have focused not on whether weapons are commonly used, but whether they are commonly used for lawful purposes. See, e.g., Maloney v. Singas, 351 F. Supp. 3d 222, 233-34 & n.16 (E.D.N.Y. 2018); see also Kolbe, 849 F.3d at 142 (rejecting the dissent's "popularity test" for deciding whether weapons are unusual). And others still have somewhat combined the analysis to address both. See, e.g., Fyock, 779 F.3d at 998. The Court need not confront this problem because—as outlined below—even operating under the assumption that butterfly knives are protected arms under the Second Amendment, HRS § 134-53(a) survives intermediate scrutiny. Cf. Kolbe, 849 F.3d at 142 (declining to resolve the "difficult questions raised by Heller concerning the interplay of 'in common use at the time,' 'typically possessed by law-abiding citizens for lawful purposes,' and 'dangerous and unusual'" (citing Heller, 554 U.S. at 625, 128 S. Ct. 2783)).

- 21 -

<u>Heller</u> established that handguns (1) are not so dangerous that they are outside the scope of the Second amendment and (2) are weapons commonly possessed by law-abiding citizens for lawful purposes. But <u>Heller</u> does not easily answer the question now before this Court—whether butterfly knives would meet that same test. The parties offer competing evidence about the features and typical use of butterfly knives. Plaintiffs contend that they are commonly possessed for protection in the home and for some martial arts practices. Pls.' Mot. 2-4, Pls.' Opp. 1-2. The State, by contrast, characterizes them as a uniquely dangerous type of knife that is akin to a switchblade, popular in gangs, associated with street crime, and a risk to public safety. State's Mot. 8-12.

Based on the record as it stands, the Court cannot be certain whether butterfly knives are typically used for self-defense or other lawful purposes. In the absence of a stronger, more-developed factual record, the Court declines to decide one way or another whether butterfly knives are "dangerous and unusual" weapons not within the scope of the Second Amendment. The Court need not resolve that issue because, even assuming butterfly knives are the type of "arms" protected by the Second Amendment, the statute is nonetheless constitutional.[5/]

---

[5/] This is consistent with the approach taken by some other courts (Continued . . . )

Operating under that assumption allows the Court to proceed straight to the application of tiered scrutiny, which in turn leads the Court to the conclusion that HRS § 134-53(a) survives under that standard anyway.  See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 257 (2d Cir. 2015) [hereinafter, "N.Y.S.R.P.A."] ("This assumption is warranted at this stage, because . . . the statutes at issue nonetheless largely pass constitutional muster." (footnote omitted)).  To summarize, the Court assumes without deciding that butterfly knives are protected "arms" within the scope of the Second Amendment and now turns to the second step of the inquiry.

**IV.  Step 2: Scrutiny Analysis**

Having now assumed that butterfly knives fall within the scope of the Second Amendment, the Court's next task is to determine and apply the appropriate scrutiny lens through which to view the challenged law.  Plaintiffs encourage the Court to apply a threshold "categorical approach" that would bypass

---

considering the constitutionality of bans on weapons other than handguns (in other words, in cases also not clearly resolved by Heller).  See, e.g N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 257 (2d Cir. 2015) ("In the absence of clearer guidance from the Supreme Court or stronger evidence in the record, we . . . assume for the sake of argument that these 'commonly used' weapons and magazines are also 'typically possessed by law-abiding citizens for lawful purposes.'" (footnote omitted)); Heller v. District of Columbia, 670 F.3d 1244, 1260-61 (D.C. Cir. 2011) ("We need not resolve that question [whether certain semiautomatic weapons are commonly used for lawful purposes], however, because even assuming they do impinge upon the right protected by the Second Amendment, we think intermediate scrutiny is the appropriate standard of review and the prohibitions survive that standard.").

- 23 -

**ER026**

scrutiny review altogether. Pls.' Mot. 12–15. In the alternative, they assert that strict scrutiny would apply, but they maintain that the statute fails under any level of scrutiny. Id. at 20–24. As for the State, it invites—at most—intermediate scrutiny.[6/] State's Mot. 12–14.

As discussed, Heller did not specify the appropriate level of scrutiny applicable to Second Amendment challenges. All that is clear from Heller is that (1) rational basis is not appropriate, (2) some degree of heightened scrutiny applies, and (3) categorical bans on possessing operable handguns at home are so severely burdensome that they fail under any level of scrutiny. To fill the gaps in Heller, circuit courts have established a two-part test to decide the appropriate degree of scrutiny. Courts consider "(1) how closely the law comes to the core of the Second Amendment right; and (2) how severely, if at all, the law burdens that right." Fyock, 779 F.3d at 998–99 (citing Chovan, 735 F.3d at 1138).

### a. Plaintiffs' "Categorical Approach"

Plaintiffs first urge the Court to apply what they call a "categorical approach." Pls.' Mot. 13. Plaintiffs rely on Heller and a handful of other cases to advocate for an approach that would find HRS § 134-53(a) categorically

---

[6/] In fact, the State in its Opposition to Plaintiffs' Motion does not even address whether the law would pass muster under strict scrutiny.

- 24 -

unconstitutional, "without [the Court] bothering to apply tiers of scrutiny." Pl. Mot. 13–15 (collecting cases).  The Court does not read Heller and the subsequent case law this way.  And even to the extent that Heller supports an approach that would bypass the scrutiny analysis in certain cases, this is not one of those cases.

Heller does not stand for the proposition that no level of scrutiny should be applied at all.  Rather, Heller—on the particular facts at issue—viewed the handgun ban as so severely burdening the core Second Amendment right to self-defense in the home that the statute would fail under any level of scrutiny the Court might apply.  See Heller, 554 U.S. at 628–29, 128 S. Ct. 2783.  The Second Circuit made this point when declining to circumvent the scrutiny analysis in a case challenging the constitutionality of bans on semiautomatic weapons and large-capacity magazines:

> Heller's reluctance to announce a standard of review should not be interpreted as a signal that courts must look solely to the text, history, and tradition of the Second Amendment to determine whether a state can limit the right without applying any sort of means-end scrutiny.  On the contrary, Heller indicated that the typical standards of scrutiny analysis should apply to regulations impinging upon Second Amendment rights, but that D.C.'s handgun ban would fail [u]nder any of the standards of scrutiny.

N.Y.S.R.P.A., 804 F.3d at 257 n.74 (internal quotation marks and citations omitted) (alterations in N.Y.S.R.P.A.). The Second Circuit's interpretation accords with Ninth Circuit precedent. See Jackson, 746 F.3d at 961 (explaining that a law imposing "such a severe restriction" on the core Second Amendment right is unconstitutional "under any level of scrutiny"); see also Fotoudis v. City & Cty. of Honolulu, 54 F. Supp. 3d 1136, 1144 (D. Haw. 2014) (finding a statutory ban unconstitutional under any level of scrutiny). Accordingly, Plaintiffs' argument that the Court should avoid scrutiny review altogether finds no support in Heller or this circuit's case law.

Plaintiffs also argue that the butterfly knife ban in HRS § 134-53(a) is like the handgun ban in Heller and therefore fails under any level of scrutiny that might apply. The Court rejects that rubric as well. Whatever Heller left open to interpretation, it made clear that the type of weapon being regulated (there, the handgun) factors into the analysis. See Heller, 554 U.S. at 628–29, 128 S. Ct. 2783. With that in mind, the Court is not convinced that Heller's approach to analyzing a ban on handguns (i.e., concluding at the outset that it would fail under any standard of scrutiny) would apply with equal force to a ban on butterfly knives. It is true that Heller and this case both involve what are essentially categorical bans on a type of weapon. But "[t]he fact that the statute effects a

- 26 -

categorical ban is not, of itself, decisive." State v. Murillo, 347 P.3d 284, 290 (N.M. Ct. App. 2015). The Court declines to treat Heller as "containing broader holdings than the [Supreme] Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense." United States v. Skoien, 613 F.3d 638, 640 (7th Cir. 2010) (emphasis added).

Plaintiffs' theory of a categorical approach under Heller contains two fatal flaws.[7] First, HRS § 134-53(a) is not a ban on an entire "class of 'arms,'" as was the case in Heller. Heller, 554 U.S. at 628, 128 S. Ct. 2783. Second, Plaintiffs disregard Heller's unique concerns about handguns. Put another way, their theory overlooks not only that handguns are an "entire class of 'arms,'" but also that they are "an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose [of self-defense]." Heller, 554 U.S. at 628, 128 S. Ct. 2783 (emphasis added); see also Kolbe, 849 F.3d at 138-39 (declining to apply the Heller approach to invalidate a ban on assault weapons); Heller v. District of Columbia, 670 F.3d 1244, 1268 (D.C. Cir. 2011) [hereinafter, "Heller II"] ("We simply do not read Heller as foreclosing every ban on every possible sub-class of handguns

---

[7] In fact, these same flaws also apply to Plaintiffs' faulty argument that strict—rather than intermediate—scrutiny should apply, which the Court discusses infra.

- 27 -

or, for that matter, a ban on a sub-class of rifles."); Worman v. Healey, 922 F.3d 26, 38 n.6 (1st Cir. 2019) (noting its disagreement with the idea that "any law that restricts a certain type of arms is per se unconstitutional"), petition for cert. docketed, Sept. 25, 2019.

HRS § 134-53(a) only bans one variation of a type of folding knife. In that sense, only a "small subset of knives" is affected here. Murillo, 347 P.3d at 288. In Heller, on the other hand, the ban impacted an entire class of weapons within which exist varying sizes, models, and capacities. Accordingly, the Court cannot say that this case implicates the same Second Amendment concerns as Heller.

More critically, Heller made much of the fact that the banned class of weapons was a handgun—the "quintessential self-defense weapon" of choice. Heller 554 U.S. at 629, 128 S. Ct. 2783. The butterfly knife is "not nearly as popularly owned and used for self-defense as the handgun." N.Y.S.R.P.A., 804 F.3d at 258 (analyzing ban on semiautomatic weapons and large-capacity magazines); see also Amicus Br. of Everytown for Gun Safety Support Fund ("Everytown Amicus Br.") at 4 (noting that the handgun class in Heller consisted of 114 million arms) (citing William J. Krause, Gun Control Legislation, Congressional Research Service, at 8 (Nov. 14, 2012)). Plaintiffs do not even try to argue as much. See Everytown

- 28 -

**ER031**

Amicus Br. at 5 n.3 (noting that the record "contains no evidence at all as to the number of butterfly knives possessed by law-abiding citizens").  In an attempt to invoke Heller, they instead shift their focus to the popularity of knives generally.  See Pls.' Mot. 4 ("[K]nives are widely owned in every state in the Union."); Pls.' Opp. 16 ("And knives . . . are as quintessential to self-defense as handguns.").  The Court finds Plaintiffs' arguments unpersuasive.  The popularity of an all-encompassing class of weapon (the knife, or even the folding knife) is immaterial when only one narrow subset of the class (the butterfly knife) is banned here.  The Court declines to treat the ban on butterfly knives—a relatively obscure weapon—the same way the Heller Court viewed the ban on handguns—the "quintessential" self-defense weapon.  Doing so would neglect the Supreme Court's emphasis on the regulated weapon at issue—and by extension much of the Court's reasoning that led to its ultimate holding.

    This case simply does not amount to the same level of "destruction of the [Second Amendment] right" as Heller.  See Jackson, 746 F.3d at 961 (quoting Heller, 554 U.S. at 629, 128 S. Ct. 2873)).  The Court therefore declines Plaintiffs' invitation to find HRS § 134-53(a) categorically or per se

- 29 -

**ER032**

unconstitutional under Heller.  To the contrary, some form of tiered scrutiny applies.[8/]

### b. Level of Scrutiny

A recent Ninth Circuit decision summarized the appropriate circumstances for applying intermediate versus strict scrutiny in the Second Amendment context:  "We strictly scrutinize a law that implicates the core of the Second Amendment right and severely burdens that right.  Otherwise, we apply intermediate scrutiny if the law does not implicate the core Second Amendment right or does not place a substantial burden on that right."  Pena, 898 F.3d at 977 (internal quotation marks and citations omitted).  Most post-Heller decisions have landed on some form of intermediate scrutiny.  Id.; see also Murillo, 347 P.3d at 288 (collecting cases and noting that "federal circuits have developed a consensus to the extent that some form of intermediate scrutiny is appropriate").  Indeed, the Court is not aware of—and Plaintiffs have not

---

[8/] Admittedly, some courts have taken a different view and held that a categorical ban of a type of weapon automatically fails.  See, e.g. Maloney, 351 F. Supp. 3d at 238-39 (declining to decide whether intermediate or strict scrutiny applied because the ban failed under the more deferential intermediate scrutiny standard anyway); State v. Hermann, 873 N.W.2d 257, 321-22 (Wisc. Ct. App. 2015) (same).  In the Court's view, those cases have read Heller too broadly.  Absent further clarification from the Supreme Court on Heller's intended scope, this Court declines to extend the Supreme Court's reasoning for invalidating a ban on handguns to invalidate a ban on butterfly knives.  As discussed above, several state and federal decisions issued since Heller support this reading.

**ER033**

provided—any Ninth Circuit cases applying strict scrutiny in the Second Amendment context.  See Everytown Amicus Br. at 8 & n.4.

The Court begins its scrutiny analysis by contemplating how closely HRS § 134-53(a) comes to the "core" Second Amendment right.  Heller states that the Second Amendment has "the core lawful purpose of self-defense" and that "whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  Jackson, 746 F.3d at 961 (quoting Heller, 554 U.S. at 630, 635, 128 S. Ct. 2783) (alteration in Jackson); see also Fyock v. City of Sunnyvale, 25 F. Supp. 3d 1267, 1271 (N.D. Cal. 2014) (finding that a ban on possession of certain-capacity magazines was constitutional in part because the banned magazines were "hardly central to self-defense"), aff'd 779 F.3d 991 (9th Cir. 2015); Fisher v. Kealoha, Civ. No. 11-00589-ACK-BMK, 2012 WL 2526923, at *8 (D. Haw. June 29, 2012) (explaining that the Second Amendment right is "particularly acute with respect to the right to self-defense in the home").

Here, HRS § 134-53(a)'s prohibition undoubtedly extends into the home, "where the need for defense of self, family, and property is most acute."  Heller, 554 U.S. at 628, 128 S. Ct. 2783.  In that sense, the butterfly knife ban implicates the core Second Amendment right (which is also

- 31 -

**ER034**

consistent with the Court's assumption, <u>infra</u>, that the Second Amendment extends to butterfly knives).  On the other hand, Plaintiffs cannot seriously contend that butterfly knives implicate the "core" right to the same extent as the handguns <u>Heller</u>.  As the Court touched on earlier, <u>Heller</u> underscored not just that the challenged law precluded possession of a weapon in the home, but also that the ban precluded possession of the handgun—the "quintessential" self-defense weapon.  <u>Id.</u> at 628-29, 128 S. Ct. 2783.  The record does not indicate that butterfly knives are nearly as popular a choice of weapon for self-defense in the United States.  So while the Court recognizes that HRS § 134-53(a) implicates the "core" Second Amendment right to self-defense in the home (again, consistent with its earlier assumption that the Second Amendment applies to butterfly knives), it does not do so to the same extent as the laws challenged in <u>Heller</u>.  <u>See</u> <u>N.Y.S.R.P.A.</u>, 804 F.3d at 258 (holding that a ban on civilian machine guns did not implicate "core" right to the same extent as the <u>Heller</u> ban on handguns).

 For similar reasons, the Court also finds that the statute does not severely burden the core Second Amendment right.  For purposes of this prong, the Court considers the subject and scope of the regulation.  The analysis is often compared to First Amendment time-place-manner principles.  <u>See</u> <u>Jackson</u>, 746 F.3d at 960-61.  "[S]evere burdens" that "don't

- 32 -

**ER035**

leave open ample alternative channels" trigger something like strict scrutiny, while regulations that leave open such channels are "modest burdens" requiring only a "mild form of intermediate scrutiny." _Heller II_, 670 F.3d at 1262 (citation omitted); _see also_ _Jackson_, 746 F.3d at 961 (noting that regulations that "leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not"); _N.Y.S.R.P.A._, 804 F.3d at 259 ("The scope of the legislative restriction and the availability of alternatives factor into our analysis of the 'degree to which the challenged law burdens the right.'" (quoting _United States v. Chester_, 628 F.3d 673, 682 (4th Cir. 2010))).

Applying these principles, HRS § 134-53(a) is broad in the sense that it is an outright ban. It does not merely regulate the time, place, or manner of possession or use of butterfly knives. With that said, the ban does not prohibit an "entire class" of arms, let alone a class of arms that is "overwhelmingly chosen" for the "lawful purpose" of self-defense. _See_ _Heller_, 554 U.S. at 628, 128 S. Ct. 2783. HRS § 134-53(a) bans only a "small subset of knives, which are themselves a peripheral subset of arms typically used for self-defense or security." _Murillo_, 347 P.3d at 288 (applying intermediate scrutiny to assess constitutionality of ban on switchblades); _see also_ _N.Y.S.R.P.A._, 804 F.3d at 260 (applying

- 33 -

**ER036**

similar reasoning to a ban on semi-automatic weapons); <u>Kolbe</u>, 849 F.3d at 138-39 ("[T]he banned assault weapons cannot fairly be said to be a 'class' like that encompassing all handguns, in that the banned assault weapons are just some of the semiautomatic rifles and shotguns in existence."). Thus, while Plaintiffs would have the Court characterize HRS § 134-53(a) as prohibiting an entire class of arms (butterfly knives), it "might equally be characterized as a ban on a mere subset [butterfly knives] of a type of arms (knives) that is itself peripheral to self-defense or home security." <u>Murillo</u>, 347 P.3d at 290.

Likewise problematic for Plaintiffs is the same hurdle they faced in pushing their "categorical approach": <u>Heller</u>'s prominent discussion of the handgun. Unlike the ban in <u>Heller</u>, the ban here does not prohibit an "entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose of self-defense." <u>Heller</u>, 554 U.S. at 628, 128 S. Ct. 2783. <u>Heller</u> gave "special consideration" to the categorical ban on handguns because handguns are "the most popular weapon chosen by Americans for self-defense in the home." <u>United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No.: LW001804</u>, 822 F.3d 136, 144 (3d Cir. 2016) (quoting <u>Heller</u>, 554 U.S. at 629, 128 S. Ct. 2783). It simply does not follow from <u>Heller</u> that a ban on

- 34 -

**ER037**

any type of bearable arm would automatically be subject to strict scrutiny.

This conclusion is bolstered by the many alternative channels Plaintiffs have for defending themselves in their homes. Even with the butterfly knife ban in effect, Plaintiffs and other law-abiding citizens are free to arm themselves with other types of knives, or with handguns and other protected weapons. The butterfly knife ban "does not effectively disarm individuals or substantially affect their ability to defend themselves." Heller II, 670 F.3d at 1262; see also Koble, 849 F.3d at 139 (quoting the same language to hold that assault weapon and large-capacity magazine ban would be subject to intermediate scrutiny). Where that is the case, courts have regularly held that intermediate scrutiny is appropriate. See, e.g., N.Y.S.R.P.A., 804 F.3d at 260 (applying intermediate scrutiny to ban on semi-automatic rifles and large-capacity magazines because "[t]he burden imposed by the challenged legislation is real, but it is not 'severe'"); Heller II, 670 F.3d 1262 (applying intermediate scrutiny because the ban allowed for other self-defense alternatives).

What matters for determining the appropriate level of scrutiny is "(1) the degree of the burden placed on the right to keep and bear arms, which, in this case, is unsubstantial and (2) the distance from the core of the right, which, this case,

- 35 -

**ER038**

is remote." Murillo, 347 P.3d at 290. For these reasons, the Court concludes that while HRS § 134-53(a) may reach the core Second Amendment right of self-defense in the home, it is a modest infringement. That being the case, intermediate scrutiny is appropriate.

### c. Application of Intermediate Security

The Court must next determine whether HRS § 134-53(a) survives intermediate scrutiny. As detailed below, the Court finds that the State's justifications are sufficient and the ban on butterfly knives passes constitutional muster.

To survive intermediate scrutiny in the Second Amendment context, the Ninth Circuit requires "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." Chovan, 735 F.3d at 1139. Here, the State's justification for enacting HRS § 134-53(a) is "to protect public safety by reducing access to [butterfly knives] by criminal gang members." State's Mot. 13. "It is 'self-evident' that [the State]'s interests in promoting public safety and reducing violent crime are substantial and important government interests." Fyock, 779 F.3d at 1000 (citing Chovan, 735 F.3d at 1139). Thus, the Court need only decide whether HRS § 134-53(a) reasonably fits the achievement of those interests. Consistent with the discussion below, the

- 36 -

**ER039**

Court finds that the State has met its burden of establishing a reasonable fit between the butterfly knife ban and the achievements of its public safety objectives.

To establish a "reasonable fit" between a statute and the government interests, the government need not show that the statute is the least restrictive means of achieving its interest. Jackson, 746 F.3d at 966 (citing Ward v. Rock Against Racism, 491 U.S. 781, 798, 109 S. Ct. 2746, 105 L.Ed.2d 661 (1989)). Instead, it need only show that the statute "promotes a 'substantial government interest that would be achieved less effectively absent the regulation.'" Fyock, 779 F.3d at 1000 (quoting Colacurcio v. City of Kent, 163 F.3d 545, 553 (9th Cir. 1998)). As far as evidence, courts may consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." Jackson, 746 F.3d at 966 (citing Chovan, 735 F.3d at 1140). The government does not face an "unnecessarily rigid burden of proof . . . so long as whatever evidence [it] relies upon is reasonably believed to be relevant to the problem that [it] addresses." Id. at 965 (quoting City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 50-52, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986)) (first alteration in Jackson).

Courts afford "substantial deference to the predictive judgments" of the legislature. Turner Broad. Sys., Inc. v. FCC,

- 37 -

**ER040**

512 U.S. 622, 665, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994). As the Second Circuit—relying on Supreme Court First Amendment principles—has cautioned, courts must be mindful that "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." Kachalsky v. Cty. of Westchester, 701 F.3d 81, 97 (2d Cir. 2012) (quoting Turner Broad. Sys., Inc._, 512 U.S. at 665, 114 S. Ct. 2445). The Court is sensitive to these same principles in the broader Second Amendment context. See id at 100 ("State regulation under the Second Amendment has always been more robust than of other enumerated rights.").

Here, data and logic establish a reasonable fit between HRS § 134-53(a) and the State's interests in public safety and reducing gang-related crime. An independent examination of the record shows reliable evidence that butterfly knives are closely associated with crime and popular with minors and gang members. See generally Ex. E to State's Mot. (legislative history of HRS § 134-53); see also Legis. Comm. Report No. 1389 (finding that certain types of knives, including butterfly knives, "are associated with gang activity"); Letters from Dep't of the Prosecuting Attorney (supporting the ban based on evidence of increased access to butterfly knives by minors).

**ER041**

Particularly compelling is testimony from the Honolulu Police
Department indicating a noticeable uptick in the use of
butterfly knives by minors and gang members.  See HPD Letter
(noting that butterfly knives are "preferred" by minors and gang
members).  The legislators also gathered evidence showing that
butterfly knives were increasingly associated with criminal
activities, particularly by minors and young gang members.  See
generally Ex. E to State's Mot.

        The record also shows that the State tailored the
legislation to specifically address butterfly knives.  After the
Hawai`i Supreme Court in In re Doe held that Hawai`i's ban on
switchblades was more limited than the legislature had intended,
the legislature convened to address butterfly knives.  See
Legis. Comm. Report No. 1389.  The legislative history plainly
reflects the State's concern that easy access to butterfly
knives posed a public safety risk.  Id. ("Your Committee finds
that certain types of knives, particularly switchblades and
butterfly knives, are associated with gang activity.").
Accordingly, it sought to minimize those risks, and it chose to
effectuate that objective by stopping access altogether.  Legis.
Comm. Report No. 731 & Conf. Comm. Report No. 88 ("Your
Committee finds that particular attention needs to be given to
butterfly knives by setting them apart from other deadly or
dangerous weapons.").  Still, in doing so it was careful to ban

- 39 -

**ER042**

only a narrow category of weapons.  See Murillo, 347 P.3d at 289 (upholding switchblade ban under intermediate scrutiny because "[p]rohibiting the possession of this weapon is, of course, substantially related to this narrow, but important, purpose" of protecting the public from surprise violent attacks); Lacy v. State, 903 N.E.2d 486, 492 (Ind. Ct. App. 2009) (upholding switchblade ban under state constitution because the regulation only banned a narrowly defined type of knife).  Ultimately, the record here supports the State's position that HRS § 134-53(a) promotes important government interests that "would be achieved less effectively absent the regulation."  Fyock, 779 F.3d at 1000 (quoting Colacurcio v. City of Kent, 163 F.3d 545, 553 (9th Cir. 1998)).

Plaintiffs have not otherwise provided evidence sufficient to overcome the deference this Court affords to the legislature.  It is, after all, up to the legislature and not this Court to "weigh conflicting evidence and make policy judgments."  N.Y.S.R.P.A., 804 F.3d at 263 (quoting Kachalsky, 701 F.3d at 99).  The Court is also not persuaded by Plaintiffs' argument that the categorical ban automatically fails intermediate scrutiny.  See Pls.' Mot. 20-22.  The Court already addressed the problems with that argument above, and will

refrain from echoing them here.[9/]  It is enough to say that the State has provided sufficient evidence that its important interests—promoting public safety and reducing access to butterfly knives by minors and gang members—are effectively furthered by the ban.  All the State must show is a "reasonable fit" between its interests and the regulation.  It has met that burden here.

For these reasons, the Court holds that HRS § 134-53(a)'s ban on butterfly knives survives intermediate scrutiny.

## CONCLUSION

For the foregoing reasons, the Court holds that HRS § 134-53(a) is not an unconstitutional restriction on the right to bear arms under the Second Amendment.  To summarize the Court's ruling: (1) butterfly knives are bearable arms that trigger Second Amendment protections; (2) the Court assumes without deciding that butterfly knives are commonly used by law-abiding citizens for lawful purposes and therefore fall within the historical scope of the Second Amendment; (3) the ban on butterfly knives is not per se unconstitutional under Heller; (4) because the ban implicates the core right under the Second

---

[9/]  As stated, judges have had differing views of the scope of Heller within the context of bans on knives.  Compare Hermann, 873 N.W.2d at 321-22 (holding that a total ban on switchblades fails under Heller), with Murillo, 347 P.3d at 288-90 (upholding a total ban on switchblades).  On the facts here, the Court is persuaded by the rationale in Murillo and respectfully disagrees with the rationale in Hermann.

Amendment but does not severely burden that right, intermediate scrutiny applies; and (5) the statute survives intermediate scrutiny because it furthers the State's important interest to promote public safety by reducing access to butterfly knives, which leads to gang-related crime.

While recognizing that <u>Heller</u> does not cleanly resolve all the constitutional questions at play here, this analysis is faithful to <u>Heller</u>.  The Court hereby DENIES Plaintiffs' Motion for Summary Judgment and GRANTS the State's Motion for Summary Judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, May 13, 2020.



_____
Alan C. Kay
Sr. United States District Judge

<u>Teter v. Connors</u>, Civ. No. 19-00183 ACK-WRP, Order Denying Plaintiffs' Motion for Summary Judgment and Granting the State's Motion for Summary Judgment

**ER045**

AO 450 (Rev. 5/85) Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

ANDREW TETER, ET AL.,

Plaintiffs,

vs.

CLARE E. CONNORS, ET AL.,

Defendants.

JUDGMENT IN A CIVIL CASE

Case: CIVIL NO. 19-00183 ACK-WRP

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

May 13, 2020

At 3 o'clock and 00 min p.m.
LIAN ABERNATHY, CLERK

[ ]  **Jury Verdict**.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

[✓]  **Decision by Court**.  This action came for hearing before the Court.  The issues have been heard and a decision has been rendered.

On May 13, 2020, the Court issued its Order, ECF 61: "ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING THE STATE'S MOTION FOR SUMMARY JUDGMENT" (May 13, 2020 Order),

IT IS ORDERED AND ADJUDGED that JUDGMENT is entered in favor of Defendants Clare E. Connors and Al Cummings pursuant to and in accordance with the May 13, 2020 Order.

May 13, 2020

Date

LIAN ABERNATHY

Clerk

/s/ Lian Abernathy, by J.I.

(By) Deputy Clerk

**ER046**

1

```
1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAII

3

4   ANDREW TETER and JAMES GRELL,   )  CIVIL NO. 19-00183 ACK-WRP
                                     )
5              Plaintiffs,           )  Honolulu, Hawaii
                                     )
6       vs.                          )  April 28, 2020
                                     )
7   CLARE E. CONNORS, in her         )  TELEPHONIC HEARING RE:
    Official Capacity as the         )  PLAINTIFFS' MOTION FOR
8   Attorney General of the State    )  SUMMARY JUDGMENT [33] AND
    of Hawaii, and AL CUMMINGS, in   )  DEFENDANTS' MOTION FOR
9   his Official Capacity as the     )  SUMMARY JUDGMENT [36]
    State Sheriff Division           )
10  Administrator,                   )
                                     )
11             Defendants.           )
    _____ )

12

13                  TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE ALAN C. KAY
14         SENIOR UNITED STATES DISTRICT COURT JUDGE

15  APPEARANCES:

16  For the Plaintiffs:       ALAN ALEXANDER BECK, ESQ.
                              Law Office of Alan Beck
17                            2692 Harcourt Drive
                              San Diego, California 92123
18
                              STEPHEN D. STAMBOULIEH, ESQ.
19                            Stamboulieh Law, PLLC
                              P.O. Box 4008
20                            Madison, Missouri 39130

21  For the Defendants:       RYAN M. AKAMINE, ESQ.
                              Department of the Attorney
22                            General, State of Hawaii
                              425 Queen Street
23                            Honolulu, Hawaii 96813

24

25  (Continued)
```

**ER047**

```
 1   APPEARANCES (Continued):

 2   For the Amicus Curiae    KEVIN G. O'GRADY, ESQ.
     Hawaii Firearms         The Law Office of Kevin O'Grady, LLC
 3   Coalition:              1136 Union Mall, Suite 808
                             Honolulu, Hawaii 96813
 4
     For the Amicus Curiae    WENDY F. HANAKAHI, ESQ.
 5   Everytown for Gun        DENTONS US LLP
     Safety Support Fund:     1001 Bishop Street, 18th Floor
 6                            Honolulu, Hawaii 96813

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22   Official Court          ANN B. MATSUMOTO, RPR
     Reporter:               United States District Court
23                           300 Ala Moana Boulevard, C-338
                             Honolulu, Hawaii 96850
24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

**ER048**

1  TUESDAY, APRIL 28, 2020                    11:19 O'CLOCK A.M.

2           COURTROOM MANAGER:  This is Civil Case No.

3  19-CV-00183 ACK-WRP, Teter, et al. versus Connors, et al.

4           This case is called for a motion hearing regarding

5  plaintiffs' motion for summary judgment and defendants' motion

6  for summary judgment.

7           Counsel, please state your names for the record.

8  Thank you.

9           MR. BECK:  Alan Beck on behalf of the plaintiffs.

10          MR. AKAMINE:  Good morning, Your Honor.  Ryan Akamine

11 on behalf of defendants.

12          MR. STAMBOULIEH:  And Stephen Stamboulieh on behalf

13 of the plaintiffs, Your Honor.  Good morning.

14          THE COURT:  Good morning.

15          I thought Ms. Hanakahi was present also.

16          MS. HANAKAHI:  Yes.  Wendy Hanakahi on behalf of

17 Everytown for Gun Safety.

18          THE COURT:  Okay.  And I understand that Mr. O'Grady

19 of the Firearms Coalition was called, but we haven't been able

20 to reach him.  We left a message for him and he has not

21 responded, so we'll go ahead and proceed at this point.

22          And since plaintiffs filed their summary judgment

23 motion first, we'll proceed with the plaintiffs' case.  And

24 please give me your name before you start so I know exactly who

25 is speaking.

1        MR. BECK:  My name is Alan Beck, on behalf of the

2  plaintiffs, Your Honor.  The matter before this Court today is

3  the constitutionality of Hawaii's ban on butterfly knives.

4  Both the plaintiffs in this matter challenge Hawaii's ban on

5  Second Amendment grounds.  As an initial matter, butterfly

6  knives are protected by the Second Amendment.

7        We know this because in Heller, Heller stated that --

8  Heller -- the Second Amendment applies prima facie to all

9  bearable arms.  This creates a rebuttal -- rebuttable

10  presumption of constitutionality to all arms that are bearable

11  on the person.

12        And in the case of knives, there are -- they're

13  explicitly noted, as an example in Heller, as a type of knife.

14  I --

15        THE COURT:  Mr. Beck, I need to interrupt you for a

16  minute.  I do want to say that I have a lot of road

17  construction going on right outside my house.  So you'll all

18  have to bear with the difficulty in hearing on that.

19        But I want to ask you several questions first.  And

20  my first question to you, Mr. Beck, is:  If you would clarify

21  your Second Amendment challenge, whether it's limited to

22  subsection (a) of HRS 134-53; in other words, is it limited

23  just as a blanket ban and not clause (b), which prohibits the

24  use of butterfly knives in the commission of a crime?

25        MR. BECK:  Yes, Your Honor.  This is Alan Beck

**ER050**

1  speaking again.

2          We are solely challenging section (a), which

3  challenges -- our clients want to be able to own butterfly

4  knives for a variety of lawful purposes, both in the home and

5  outside the home.  And we disavow any challenge to the section

6  that deals with challenging to having butterfly knives for use

7  in a crime, Your Honor.

8          THE COURT:  Okay.  So you're not challenging

9  subsection (b)?

10          MR. BECK:  That is correct, Your Honor.

11          THE COURT:  Okay.  Thank you.

12          My next question is:  You stated in your complaint

13  and your reply brief that your clients are bringing both an

14  as-applied and a facial challenge to the law.  And most of your

15  argument hinges on the law being categorically or per se

16  unconstitutional.  So that being the case, it would seem that

17  your challenge would have to be construed as a facial

18  challenge.

19          MR. BECK:  I -- I don't see the practical difference

20  between our -- my plaintiffs' facial and my plaintiffs'

21  as-applied challenge.

22          However, based upon the -- I believe it's just the no

23  set of circumstances -- oh, we -- our clients are trying to

24  make clear that they both want the law struck as to everyone,

25  if possible, all other law-abiding citizens, if possible.  But

1    in the event that this Court would find otherwise, they

2    additionally want the law as applied to them specifically as

3    law-abiding persons that have -- that don't have any history of

4    mental illness, etc.

5              (The court reporter requested clarification and the

6    record was read.)

7              THE COURT:  Yes, we're getting an echo.

8              MR. BECK:  My apologies, Your Honor.  Let me start

9    over on that section.

10             The thrust of my plaintiffs' complaint is to strike

11   the law as to all other -- as for them and other similarly

12   situated law-abiding persons.  But if this Court finds that

13   relief -- is unwilling to grant that relief, the as-applied

14   challenge is there so the law will be struck at the very least

15   as applied to the individual client -- plaintiffs.

16             THE COURT:  Well, what's the standing as far as an

17   as-applied challenge?  There have been no charges against your

18   clients.

19             MR. BECK:  That is correct, Your Honor.  Our -- my

20   plaintiffs' claim to standing is solely because they would like

21   to purchase butterfly knives for use in -- for a variety of

22   lawful purposes, and but for the law, they are -- they are

23   unable to do so.  And so -- and to the extent that the

24   complaint should be construed as an as-applied challenge, it

25   was done so in order to -- to ensure that -- that this Court

1  understands that was -- that the relief we're seeking is to

2  simply persons such as my plaintiffs, law-abiding individuals

3  without a history of mental illness, etc., Your Honor.

4          THE COURT:  Well, aren't you simply making a facial

5  challenge then?

6          MR. BECK:  That's -- that's -- well, that's correct,

7  Your Honor.  I --

8          THE COURT:  Well, then, so I understand you're saying

9  you're only making a facial challenge and not an as-applied

10 challenge?

11         MR. BECK:  What -- yes, Your Honor.  However, I do

12 stress that we are not attempting to strike the law as applied

13 to people with a history of mental illness or felonies or

14 anything along that lines.

15         Our intent by stating that we were making an

16 as-applied challenge is to demonstrate that we wish Hawaii's

17 ban on butterfly knives to be struck as to persons such -- to

18 my plaintiffs and individuals are similarly situated to -- my

19 plaintiffs are law-abiding.

20         And so I'm just -- I'm very hesitant to completely

21 disavow the statement that we're making as -- that challenge,

22 as-applied challenge, because I don't want the Court to believe

23 that we're challenging the law on behalf of individuals that

24 might be otherwise prohibited due to a history of crime or

25 mental illness, Your Honor.

1    THE COURT:  So what's the answer to my question?

2    MR. BECK:  We are making a facial challenge, Your

3  Honor.

4    THE COURT:  Pardon me?

5    MR. BECK:  We are making a -- plaintiffs are

6  making -- my plaintiffs are making a facial challenge, Your

7  Honor.

8    THE COURT:  Okay.  Only a facial challenge and not an

9  as-applied challenge; is that right?

10    MR. BECK:  Yes, Your Honor.

11    THE COURT:  Thank you.

12    Now, another question.  You argue that a categorical

13  ban of butterfly knives should be analyzed in the same way as

14  Heller's complete ban on handguns.

15    Now, why would that approach essentially eliminate

16  Heller's focus on handguns as a quintessential self-defense

17  weapon of choice?

18    MR. BECK:  I -- Your Honor, I believe that Heller

19  should be properly construed to find that -- that it found

20  that -- that handguns, because handguns are quintessential

21  self-defense arms, they receive a -- a great deal of cause to

22  protection.

23    Heller wasn't -- I don't believe Heller was ruling

24  that it was finding that that -- it was somehow placing

25  handguns in that role.  It was the fact that -- it just simply

1   is a matter of fact that handguns are quintessential

2   self-defense arms in the United States.  And because of that

3   preexisting fact, the Court was going to grant -- give it a --

4   the largest amount of constitutional scrutiny possible.

5           So similarly, knives are quintessential self-defense

6   arms.  They are the most commonly owned arm in the United

7   States.  Every home owns at least one arm -- one knife.  So

8   because they're so commonly possessed for lawful purposes and

9   in the same manner as a handgun, if not more so, Heller's same

10  reasoning should be applied to knives, Your Honor.

11          THE COURT:  Yeah, well, we're not talking about any

12  knives.  We're talking about a specific knife.

13          MR. BECK:  Well, yes, Your Honor, I understand that.

14  But in Heller, the matter before the Court -- the litigants,

15  the -- the firearm that was possessed, the handgun that was

16  possessed by Dick Heller was an eight-round revolver, a

17  .22-caliber buttland (phonetic) -- Highland.  That was in our

18  briefing.  And yet the Court did not rule on whether that

19  particular model of handgun was typically possessed.  It just

20  simply found that as a class handguns are protected and did not

21  analyze whether -- what had to occur for a particular type of

22  handgun be protected.

23          So we know from Heller it's a more generalized

24  analysis as to a particular class of arms.  Similarly,

25  butterfly knives are a type of knife.  And it's not that knives

1   as a class are typically used for lawful purposes as the record

2   indicates, Your Honor.

3          THE COURT:  Well, you know, one of the state's

4   strongest cases is State versus Murillo.  That's M-U-R-I-L-L-O.

5   And your briefing just barely addressed that case.  In fact,

6   all you say about it is that you don't concede its reasoning.

7   That's all you say about Murillo.

8          MR. BECK:  I -- yes, Your Honor.  State v. Murillo

9   is -- is the case out of New Mexico.  And we discuss it in

10  our -- our response as part of our discussion of the Wisconsin

11  case.  And the Wisconsin case was able to both distinguish and

12  demonstrate that Murillo's reasoning is faulty.

13         The -- the court in Murillo, as a preliminary matter,

14  it is on the behalf of a criminal defendant and -- who was

15  found in a fight at a Walmart, outside his home.  And so just

16  simply the fact that he was making a challenge outside of

17  the -- outside of the home impacts allegation of criminal

18  misconduct.

19         Secondly -- and this is on page 13 to 14 is where

20  we -- they -- as we just discussed, the -- Murillo finds that

21  knives are -- are peripheral arms to the Second Amendment.  And

22  as I just discussed, that is just simply not the case.  Knives

23  are commonly owned in most homes for a variety of lawful

24  purposes.

25         And as the Wisconsin court stated, the defendant

1 Murillo did not raise the Second Amendment challenge of the

2 trial court, therefore it deprived the state of opportunity to

3 make an evidentiary showing that the challenged statute

4 withheld -- withstood intermediate scrutiny.

5          In Murillo, the litigant raised his challenge up on

6 appeal, and there was no fact-based -- there was no opportunity

7 for discovery.  The -- or any of the other things the trial

8 courts afforded.

9          Furthermore, Murillo deals with switchblades.  The

10 matter before this Court is a butterfly knife.  And to the

11 extent much of what Murillo -- Murillo found that that

12 particular knife, the switchblade, is typically used by

13 individuals for unlawful purposes.  And additionally, there's a

14 rationale to -- there's a public safety issue, because these

15 knives can open quicker.

16          Even if we take Murillo at face value, which we

17 should not, the butterfly knife is highly distinguishable from

18 switchblades.  First off, our expert has demonstrated that

19 butterfly knives are -- open slower than standard pocket

20 knives.  And --

21          THE COURT:  Yeah, maybe -- maybe by a second or two.

22          MR. BECK:  Yes, Your Honor.  I -- I mean, with --

23 within the confines of the -- of the argument, though, I mean

24 they're significantly -- switchblades, at least the Murillo

25 court found, we all concede that the Murillo court found that

1    switchblades are faster than standard knives.  And we've been

2    able to demonstrate that, you know, even if it's by a second or

3    two butterfly knives are not.  So there's any -- yeah, that

4    rationale is out -- out with now.

5        And secondly, Your Honor, both our evidence and

6    frankly much of the state's have demonstrated that unlike the

7    switchblade in Murillo, the -- butterfly knives are not weapons

8    used by criminals, typically.  They are weapons that are

9    typically used for lawful purposes, for martial arts training,

10   for -- for self-defense, for just all sorts of stuff.  I -- in

11   fact, you know, just as a generalized utility knife.  In fact,

12   you know -- go ahead, Your Honor.

13       THE COURT:  In Murillo, the court found that the

14   statute could be considered as banning an entire class of arms,

15   which were switchblades, as you mentioned.  But that then it

16   said it could also be considered as a ban on a mere subset of a

17   type of arms, namely knives, that is itself a mere peripheral

18   self-defense security.

19       And then the court went on and said the real issue

20   is, number one, the degree of burden placed on a right to keep

21   and bear arms, which it found the switchblade was an

22   unsubstantial burden; and number two, the distance from the

23   core of the right, which the court there found was remote.

24       MR. BECK:  Yes.

25       THE COURT:  How do you -- you know, you say the

1    Wisconsin court disagrees.  But doesn't Murillo make a pretty
2    sound argument?
3             MR. BECK:  Well, we as a -- just a preliminary
4    matter, the -- the part where the Murillo court finds that
5    knives are a peripheral arm is just simply untrue.  Relying
6    both upon our arguments and the arguments of the Hawaii Defense
7    Foundation's amicus brief, knives are a standard portion of --
8    a standard self-defense tool.  And they are -- you know, it's
9    just a --
10            THE COURT:  Yeah, but I think -- I think there
11   they're talking about knives in general.  They're not talking
12   about butterfly knives.
13            MR. BECK:  Well, I -- I would rely back on my prior
14   argument that we know from Heller that the -- that knives, that
15   the analysis in Heller did not rely upon what type of handgun
16   that the -- that Dick Heller wished to register.
17            In fact, the handgun he wanted to register is a very
18   unusual one, an eight-round .22-caliber revolver.  Yet that
19   was -- there was no mention of that in the Heller opinion.  Not
20   once in Heller does it refer to making analysis towards the
21   type of handgun and whether or not that particular type of
22   handgun is a -- is in common use or is typically used for
23   lawful self-defense.
24            So to the extent that Murillo relied upon that
25   proposition, then it just could be it contradicted Heller,

1  which, of course, this Court needs to abide by, Your Honor.

2  THE COURT: Well, you know, actually, in Heller as

3  well as the Ninth Circuit in Jackson ruled that regulations

4  which leave open alternative channels for self-defense are less

5  likely to place the severe burden on the Second Amendment right

6  than those that do not.

7  MR. BECK: Yes, Your Honor. Let me address Jackson.

8  In Jackson, the court in Jackson, the Ninth Circuit in Jackson

9  was dealing with a ban on the sale of hollow-point ammunition,

10  and it expressly states in -- that it was applying intermediate

11  scrutiny to that ban because -- for two reasons, Your Honor.

12  First, a person living in San Francisco that wished

13  to own hollow-point ammunition could simply go to -- right

14  across the county line, and, you know, San Francisco County is

15  not a big place to begin with, and head over to -- and buy

16  hollow-point ammunition at any of the gun stores in the

17  neighboring counties, such as Alameda.

18  And secondly, in Jackson, the Ninth Circuit found

19  that -- was dealing with a ban on a sale that expressly

20  disavowed dealing with -- you know, they strongly implied that

21  if it was dealing with a ban of possession that a high-level

22  scrutiny would apply in this matter.

23  Here, Mr. -- or my plaintiffs, the plaintiffs'

24  challenge is distinguishable from Jackson for a number of

25  reasons. It -- you know, it's just simply a complete ban on

1    possession.  So there's no avenue for the -- for the plaintiffs

2    to own a butterfly knife in any shape, way, or form.

3           So Jackson in fact supports the application of a

4    higher level of scrutiny than the one that was -- than the

5    intermediate scrutiny that it applied in dealing with that ban

6    on mere sales.

7           THE COURT:  Of course, Jackson was taking that

8    statement from Heller.

9           Another question I have is:  Are you challenging HRS

10   134-53 just as to a ban on possessing a butterfly knife in your

11   home, or are you challenging the entire statute?

12          MR. BECK:  We are -- we are challenging it in the

13   home, Your Honor.  If -- and separately -- well, we are -- we

14   would like to carry it, but we are -- we're making two separate

15   challenges, both -- both in the home and the carrying, Your

16   Honor.  But our position is if -- a complete ban outside the

17   home is unconstitutional, as well as the ban inside the home.

18   And there might be reasonable time, place, and manner

19   restrictions that --

20          THE COURT:  Well, didn't the Ninth Circuit rule

21   against you in Peruta on that?  En banc?

22          MR. BECK:  No, Your Honor.  In Peruta, the Ninth

23   Circuit ruled in -- that there's no free-standing right to

24   concealed carry.  Thus --

25          THE COURT:  Right.

1    MR. BECK:  -- the -- I (indiscernible) --

2    THE COURT:  But there's been no ruling, has there, as

3  far as the right to carry openly, correct?

4    MR. BECK:  I -- well, there was a ruling in Young v.

5  State of Hawaii.  And that -- that -- the Ninth Circuit found

6  from a three-judge panel that you have a constitutional right

7  to openly carry outside the home.  However, that opinion was --

8  was taken en banc, and Yagger's (phonetic) -- currently --

9  we're waiting for oral arguments at the en banc court, Your

10  Honor.

11    THE COURT:  I see.  Okay.

12    So your position then, I take it, is you're

13  challenging both the right to possess a butterfly knife in your

14  home, as well as the right to carry it openly in public?

15    MR. BECK:  Yes, Your Honor.

16    THE COURT:  Hello?

17    MR. BECK:  I am here, Your Honor.

18    THE COURT:  Okay.  I thought maybe I had been cut

19  off.

20    COURTROOM MANAGER:  Judge?

21    THE COURT:  Pardon me?

22    COURTROOM MANAGER:  Hi, Judge, it looks like

23  Mr. O'Grady dialed in.

24    Is that you, Mr. O'Grady?

25    MR. O'GRADY:  Yes, ma'am.

1           COURTROOM MANAGER:  Okay, thank you very much, sir.

2           THE COURT:  Another question for you, Mr. Beck.

3  Heller limits the Second Amendment right to apply to weapons in

4  common use for lawful purposes.  So what's your understanding

5  of the scope of their test, and what is your best evidence that

6  butterfly knives are the type of arms that were in common use?

7           MR. BECK:  I believe that this -- that the best

8  understanding of that test is -- and this is based to a large

9  degree on circuit precedent that is -- that there -- initial

10  matter, there is a rebuttable presumption of -- that all

11  bearable arms are protected by the Second Amendment.

12          And the burden -- this portion is made by Heller.

13  And this is the precedent of the Second Circuit as well, that's

14  adopted, I believe Heller's position to be, where there's a

15  rebuttable presumption that a bearable arm is protected.

16          So once you establish --

17           THE COURT:  I'm sorry.  I wasn't able to understand

18  the last couple of words.

19           MR. BECK:  My apologies, Your Honor.

20          The Heller and -- based upon Heller, the Second

21  Circuit has found that there's a rebuttable presumption that

22  all bearable arms are protected by the Second Amendment.  Thus,

23  once you establish that something is an arm, the burden shifts

24  to the government to demonstrate that it is not protected.  And

25  this we know -- the following we know, from circuit precedent,

1    is that it -- you simply need to -- that the -- it's not really

2    a numerical analysis per se; it's really a finding that the

3    typical use of a -- of an arm is for lawful purposes.  And

4    that's the best way to interpret the common use language,

5    commonly used for lawful purposes.

6            So rather than a numerical -- some sort of numerical

7    finding as, you know, a million arms of this particular type,

8    we look of the set of arms that are possessed, are these

9    weapons are typically used for -- for -- lawfully, or are these

10   arms like in an unpublished case, the Ninth Circuit discussed

11   regarding explosives, weapons that typically would be used and

12   possessed for unlawful purposes, Your Honor.  And --

13           THE COURT:  What was the name of the Second Circuit

14   case?

15           MR. BECK:  The Second Circuit case?  That's New York

16   Rifle & Pistol.  Let me -- yeah, let me --

17           THE COURT:  The Supreme Court --

18           MR. BECK:  I'm sorry.  New York State --

19           THE COURT:  The Supreme Court just punted on that.

20           MR. BECK:  No, no, no.  I'm sorry, Your Honor.  I --

21   New York State Rifle & Pistol Association v. Cuomo.  New

22   York's -- there's a couple ones with that plaintiff.  And this

23   was New York State Rifle & Pistol Association v. Cuomo, at 804

24   F.3d 24D -- 242, 2-d -- Second Circuit 2015.  And that case is

25   in our briefing, Your Honor.

1        The one that the -- and that dealt with the

2   constitutionality of the New York State's ban on -- on certain

3   types of rifles and high-capacity magazines as -- of course,

4   the one the Supreme Court just punted on was -- dealt with the

5   transport law out of New York City.

6        THE COURT:  All right.  All right.

7        Another question I just wanted to ask you before you

8   proceed with your opening, and that is:  Would invalidating the

9   butterfly knife statute in Hawaii -- what's your position as to

10  a state ban on switchblades, that statute?

11       MR. BECK:  You know, I -- my plaintiffs are trying to

12  get a butterfly knife.  And throughout the course of this, you

13  know, the discovery and all the evidentiary issues that have

14  been dealt with in this case have dealt with the history of the

15  butterfly knife.  And the record hasn't been -- hasn't been

16  produced on switchblades.

17       What I would say is our position is that butterfly

18  knives are, you know, commonly owned for lawful purposes.

19  Assuming without conceding that a switchblade is not owned for

20  lawful purposes, then, of course, a favorable ruling on

21  butterfly knives would not impact the constitutionality of

22  Hawaii's switchblade ban, Your Honor.

23       THE COURT:  Well, okay, thank you.

24       What else would you like to say in presenting your

25  arguments?

**ER065**

1    MR. BECK:  Yes, Your Honor.  Thank you, Your Honor.

2         The bottom line here is the state has not produced

3    any evidence that Hawaii's ban on butterfly knives actually

4    promotes any sort of public safety interest.  And under any

5    level of scrutiny that this Court would apply, the -- the state

6    needs to present a -- a strong government interest that's

7    supported by -- that's supported by actual evidence that -- you

8    know, that butterfly -- that banning butterfly knives actually

9    produces the result that they want.  And it's --

10        THE COURT:  Well, you want me to ignore the testimony

11   of the Honolulu police officers?

12        MR. BECK:  Well, the -- the deposition of Officer

13   Nagamine just does not -- they -- he has not -- he didn't

14   demonstrate in any shape, way, or form how butterfly knives --

15   how the ban on butterfly knives actually promotes public

16   safety.  I mean, he conceded that these arms are less deadly

17   than -- than handguns, for example, and he didn't offer any

18   testimony as to --

19        THE COURT:  I don't think -- I don't think anyone

20   disagrees with that.

21        MR. BECK:  Well, yes, Your Honor, but as just simply

22   a matter of law, if a handgun is -- cannot be banned, how can

23   we -- it doesn't seem to make -- there seems not to be a

24   government interest to ban an arm that is less deadly.

25        And the bottom line is --

1          THE COURT:  Assuming --

2          MR. BECK:  -- the state does not --

3          THE COURT:  Assuming it's used for a lawful purpose

4    commonly.

5          MR. BECK:  Yes.  It's -- but again, I rely on the

6    Second -- both Heller and the Second Circuit to argue that

7    again the burden was on the state to demonstrate that the

8    typical use of the butterfly knife is unlawful.  There's a --

9    the presumption is an arm is for lawful use, and it would have

10   been -- the onus would have been on the -- on the state to

11   demonstrate that these are typically arms used for something

12   other than lawful purposes.

13         In fact, a lot of the -- the evidence that the state

14   submitted to its -- its moving papers actually supports the

15   proposition that butterfly knives are typically used for -- I'm

16   sorry.  I thought you were about to raise something.

17         But that butterfly knives are typically arms used

18   for -- for martial arts endeavors and self-defense and other

19   lawful purposes.  They have -- the state has failed to present

20   evidence that shows that these arms are -- typical use is for

21   unlawful purposes.  So -- and additionally, both the expert

22   report that was submitted by the -- by us also speaks about

23   the -- about the traditional use of butterfly knives being for

24   lawful purposes, Your Honor.

25         So -- and even using the -- the state's best case as

**ER067**

1    paraphrased, this Court, even that court used intermediate

2    scrutiny.  And as I had previously mentioned, the burden was on

3    the state to both demonstrate that butterfly knives are --

4    typical usage is something other than lawful and that there's

5    actually a government interest here in -- that's supported by

6    evidence and is properly tailored to curbing that interest.

7    And yet the record is devoid of that, Your Honor.

8            In fact, as far as -- the butterfly knives, as far as

9    we can tell, is -- I mean, it's just been banned primarily

10   because it's -- for aesthetics, beyond anything else.

11           So --

12           THE COURT:  Thank you.  Did you have anything else

13   you wanted to say?  It's just that we've been going almost an

14   hour now.

15           MR. BECK:  Yeah, I --

16           THE COURT:  You've taken up most of your time.

17           MR. BECK:  Yes, Your Honor.  I would appreciate a

18   rebuttal to Mr. Akamine's argument.  But I -- I'd like to thank

19   the Court for all its time so far.

20           THE COURT:  Okay.  Thank you.

21           MR. BECK:  Thank you, Judge Kay.

22           THE COURT:  So Mr. Akamine now.

23           MR. AKAMINE:  Yes, Your Honor.  This is Ryan Akamine.

24           We filed a summary judgment motion as well requesting

25   that the Court find the statute constitutional.  We viewed the

**ER068**

23

1  plaintiffs' claim as a facial challenge and agree with the
2  Court's looking at Murillo as well as looking at the
3  legislative history in this case for testimony establishing the
4  important state interests in banning butterfly knives.
5          THE COURT:  Okay.  I have a couple of questions I
6  want to ask you too.
7          MR. AKAMINE:  Sure.
8          THE COURT:  The first one is:  Do you concede that
9  butterfly knives are bearable arms under the Second Amendment?
10         MR. AKAMINE:  No.  One of our arguments is that it's
11 dangerous and unusual, so I don't think we will concede on --
12 on that, that it's bearable arms.
13         THE COURT:  I'm sorry.  What?  You said something and
14 unusual?  I didn't hear you.
15         MR. AKAMINE:  Yes.  So one of our arguments, our
16 initial argument is that the butterfly knife is a dangerous and
17 unusual weapon.  Therefore, we do not believe it fits within
18 the Second Amendment, you know, protections of bearable arms.
19         THE COURT:  Well, can you identify any post-Heller
20 Second Amendment cases holding that knives are dangerous and
21 unusual weapons for which prohibitions are presumptively lawful
22 under Heller?
23         MR. AKAMINE:  No, I cannot.
24         THE COURT:  Can you identify any post-Heller Ninth
25 Circuit cases upholding the blanket ban on a type of weapon?

1    MR. AKAMINE:  On a type of weapon?

2    THE COURT:  Yes.  Go ahead.

3    MR. AKAMINE:  Not -- if we're looking at knives as a

4  type of weapon, no.  But a ban such as Murillo for switchblades

5  as a subset of a type of weapon -- excuse me, yeah, type -- as

6  a subset of a type of knives.

7    THE COURT:  Yeah, all right.  I concur that Murillo

8  seems to be one of your stronger cases.

9    Now, why is this blanket ban different from the

10  blanket ban in Heller and the most subsequent cases finding

11  that such bans do not pass muster under any level of scrutiny?

12    MR. AKAMINE:  This case involves butterfly knives,

13  Your Honor, for which the Hawaii legislature took in testimony

14  determining whether or not they should or should not have a ban

15  on this subset of knives.  And the legislature found, after

16  hearing testimony both for and against the ban on

17  switchblades -- I mean, excuse me -- on butterfly knives,

18  believed that butterfly knives were typically used by gang

19  members and intimidating.  They were easy to conceal and

20  intimidating when brandished.

21    And so they found that these types of weapons were

22  used by those for offensive criminal purposes and chose to ban

23  them.  This is not unlike something that plaintiffs' expert

24  mentioned, where he said -- he told a story about his -- his

25  sister or someone coming to the rescue of him when he was

**ER070**

1   confronted by some bullies and whipped out that butterfly
2   knife, and the brandishing of the knife itself was enough to
3   scare away the bullies.
4           So these -- that's what -- that's similar to what the
5   legislature found when it took in testimony by HPD.
6           THE COURT:  You know, I have trouble with this
7   argument about a butterfly knife being more concealable than
8   other knives.  Seems to me just about any knife that's -- you
9   know, a pocketknife or of that nature, or switchblade knife,
10  butterfly knife, they're all very concealable, aren't they?
11  Equally concealable?
12          MR. AKAMINE:  I would say if the size of the knife is
13  similar, that is true.  I think the concealable argument was
14  just one part of the argument for the legislature to consider
15  because they considered not only the concealable nature of it,
16  but who was using it and the ease of the use.
17          THE COURT:  What's your evidence that butterfly
18  knives are unusual?
19          MR. AKAMINE:  Well --
20          THE COURT:  In other words, that they're not
21  typically used by law-abiding citizens for lawful purposes.
22          MR. AKAMINE:  Right.  So we've -- just from the
23  testimony that was received, Your Honor, I think that
24  there's -- you know, the legislature took in testimony both for
25  and against, took in testimony by the Pedoy School of Martial

1  Arts, as well as from the prosecutor's office, public
2  defender's office and HPD.  And just from that testimony, that
3  the HPD and prosecutor's office found it being used for the
4  most part by those not law-abiding citizens, that's the
5  testimony that we have.
6       THE COURT:  Now, in your opposition to plaintiffs'
7  motion, you really didn't address whether the law would pass
8  muster under strict scrutiny.  Do you concede that it would
9  not?
10      MR. AKAMINE:  No, I don't think we would concede that
11 at all, Your Honor.  I think that -- that the intermediate
12 scrutiny is the proper constitutional review.  But we also
13 argue that it's dangerous and unusual in that sense as well and
14 isn't a bearable arm.  But in terms of it being subject to
15 strict scrutiny, I don't think any of the courts have utilized
16 that particular review for this type of case.
17      THE COURT:  You know, under Heller, how do you defend
18 a ban on possession in your own home of a butterfly knife which
19 can be used for self-defense?
20      MR. AKAMINE:  Well, I think, first of all, it's -- as
21 I said earlier, one of -- our initial argument is that it's a
22 dangerous and unusual weapon, not typically used by law-abiding
23 citizens, and therefore not subject to Second Amendment
24 protection.  That goes for in the home as well.  And it is a
25 typically -- well, the legislature found that it was being used

1   for offensive purposes as well, and not for defensive purposes.

2           THE COURT:  Okay.  Those were the questions I wanted

3   to ask you initially.  So please proceed with your

4   presentation.

5           MR. AKAMINE:  Your Honor, as I mentioned, our first

6   argument is that butterfly knives are dangerous and unusual and

7   are not subject to the protections of the Second Amendment.

8           Alternatively, other types of weapons have been

9   subjected by courts, including the Ninth Circuit, to

10  constitutional scrutiny under the intermediate scrutiny test.

11  And under that test the law provides and asks similar to what

12  Murillo did in that case, was whether the challenged law

13  burdens conduct protected by the Second Amendment and, if it

14  does, to apply the level of scrutiny.

15          And in this case, applying intermediate scrutiny, we

16  have to look at whether the government's stated objective is

17  significant, substantial, or important, then secondly, whether

18  there's a reasonable fit between the challenged regulation and

19  the asserted objective.

20          Here, Your Honor, the objective of the legislature

21  was the safety of the public after having found or having taken

22  in testimony by those for and against the ban on butterfly

23  knives.

24          And the legislature, the way they looked at it was

25  initially it believed that the butterfly knives fell within the

1    switchblade statute, the same statute mentioned -- Your Honor
2    mentioned earlier.

3           But the In re, in the Interest of Doe case, where the
4    court found that the opening of the butterfly knife wasn't by
5    inertia and gravity and found that that didn't apply.  So the
6    legislature specifically went back and said, okay, so we now
7    understand that the court is interpreting our switchblade
8    statute as not applying to butterfly knives, but we -- we want
9    to look at butterfly knives and -- and fashion a statute that
10   applies to that.

11          So in doing so, they took in testimony.  They found
12   that butterfly knives were being used by those with criminal
13   intent, gangs and other people, and then decided to -- to enact
14   the statute.

15          And that statute was specifically to address the
16   important public interest of safety.  And by banning a specific
17   subset of knives, particularly this butterfly knife, they were
18   able to then say, yes, these butterfly knives are banned in the
19   same way that switchblades are.

20          And I think in light of that reasoning, Your Honor,
21   the legislature met the intermediate scrutiny test and this
22   butterfly knife statute should be upheld as constitutional.

23          I think that the testimony provided at the time,
24   provided to the legislature at the time the statute was enacted
25   is sufficient evidence to show the important government

1  interests and the specific fit of the statute.

2       We believe that the same reasoning stated in Murillo

3  should apply to this case, and the statute should be found

4  constitutional.  That's all I have, Your Honor.

5       THE COURT:  Okay.  Thank you very much.

6       And then before we go back to Mr. Beck, I want to ask

7  either of the -- well, first off, I'll ask Ms. Hanakahi if you

8  have anything you want to say.

9       MS. HANAKAHI:  This is Wendy Hanakahi.  No, Your

10  Honor, I don't have any -- any argument or comments.

11       THE COURT:  Okay.  Thank you.

12       And Mr. O'Grady, did you have anything you wanted to

13  say?

14       MR. O'GRADY:  No, Your Honor.  Thank you.

15       THE COURT:  Thank you.

16       And back to you, Mr. Beck, do you want to say

17  something more?

18       MR. BECK:  Yes, Your Honor.  Sorry, I was -- had my

19  phone on mute.

20       Just the --

21       THE COURT:  I'm getting a real echo from you now.

22       MR. BECK:  My apologies, Your Honor.  Can you hear me

23  better now, Your Honor?

24       THE COURT:  Yes.  Thank you.

25       MR. BECK:  As a preliminary matter, the state's

1    position that butterfly knives are dangerous and unusual is

2    foreclosed by Ninth Circuit precedent in United States v.

3    Henry.

4              In Henry --

5              THE COURT:  Sorry -- I'm sorry.  Ninth Circuit case

6    in -- what's the name of the case?

7              MR. BECK:  United States v. Henry, Your Honor.

8              And that is cited to in our briefs.

9              In Henry, the -- the Ninth Circuit, while ruling on

10   the constitutionality of the federal machine gun ban, found

11   that -- that -- that machine guns are particularly dangerous,

12   and they looked at whether -- at the fact that machine guns are

13   much, much more dangerous than typical arms, and found that the

14   dangerous prong was fulfilled by that.  And here, the state by

15   its expert has conceded that knives are less dangerous than a

16   handgun.

17             So based upon Ninth Circuit precedent, the argument

18   that knife -- that butterfly knives are dangerous, unusual has

19   been foreclosed by -- by their position that knives are less

20   dangerous than handguns.

21             And the -- so with that, we have to move to the --

22   the constitutional -- under any level of scrutiny, this ban,

23   the state has not demonstrated that there's actually a -- that

24   there's actually any type of public safety benefit to a

25   complete -- to their ban on butterfly knives.

1    And now on simply the typical scrutiny analysis being
2    enough to demonstrate that, there also is a --
3    under-inclusivity argument, which also supports this position.
4    And here under-inclusivity applies because, as state's counsel
5    has just conceded, there -- other knives are just as
6    concealable.  And as are -- as some of the studies we cite to,
7    there are many types of knives that are much more dangerous
8    than a -- than a butterfly knife.
9    For example, we cite to a study that shows that a --
10   that a butcher knife is -- is roughly twice as likely to be --
11   to result in death.  Injury from a butcher knife is about -- is
12   twice likely to end in death as a switchblade, which the state
13   seems to take the position is about as dangerous as a cutting
14   instrument as a butterfly knife.
15             THE COURT:  I'm sorry --
16             MR. BECK:  So the fact that --
17             THE COURT:  If I can interrupt you, you mentioned the
18   butterfly and the switchblade knife.  You were referring to
19   another type of knife, and I didn't hear what you said.
20             MR. BECK:  A butcher knife, Your Honor.
21             THE COURT:  Oh.
22             MR. BECK:  Yeah.  Yes, Your Honor.  One of our
23   studies says --
24             THE COURT:  You're not -- you've got machetes in
25   there too.  They're not quite as feasible, are they?

1    MR. BECK:  I will concede that, Your Honor.  Yeah --

2    THE COURT:  All right.

3    MR. BECK:  Yes, Your Honor.  But --

4    THE COURT:  Getting pretty far afield.

5    MR. BECK:  Yes, I mean, I -- unless this Court -- I

6  think I've laid out my position here, Your Honor.  And so I

7  would be happy to answer any other questions that the Court may

8  have.  However -- and -- but if the Court does not have any

9  other questions, I -- I would like to submit, Your Honor.

10    THE COURT:  Okay.  Thank you.

11    And Mr. Akamine, did you have anything more you

12  wanted to say?

13    MR. AKAMINE:  No, Your Honor, I don't.

14    THE COURT:  Okay.  Well, thank you, all.  I'm going

15  to take this under submission to give it further thought.  And

16  I will issue a written decision.  So thank you, and have a good

17  day and stay safe.  Good-bye.

18    MR. AKAMINE:  Thank you, Your Honor.

19    MR. BECK:  Thank you, Your Honor.

20    MR. O'GRADY:  Thanks, Your Honor.

21    MS. HANAKAHI:  Thank you, Your Honor.

22    (The proceedings concluded at 12:23 p.m., April 28,

23  2020.)

24

25

1                 COURT REPORTER'S CERTIFICATE

2          I, Ann B. Matsumoto, Official Court Reporter, United

3  States District Court, District of Hawaii, do hereby certify

4  that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5  complete, true, and correct transcript of the stenographically

6  recorded proceedings held in the above-entitled matter and that

7  the transcript page format is in conformance with the

8  regulations of the Judicial Conference of the United States.

9          DATED at Honolulu, Hawaii, June 2, 2020.

10

11

12

                    */s/ Ann B. Matsumoto*

13                      ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25



Order online or call us 1-844-426-7240     Home   Contact Us   About Us   My Account   Blog                          Low Price Guarantee    13 Years of Excellence

🔍 Search                                SEARCH

📦 Shopping Cart   0     ❤ My Wish Lists     Log in to my account or Create Account

FREE SHIPPING ON ORDER OVER $99

**NEW ARRIVALS!**  **KNIVES** ▾  **GIFTS-NOVELTIES** ▾  **NINJA-MARTIAL ARTS** ▾  **OUTDOOR GEAR** ▾  **SELF DEFENSE** ▾  **SWORDS** ▾  **AIRSOFT GUNS** ▾

# The Balisong Knife: Here is Everything You Need to Know

Posted by Knives Deal on 1/28/2019 to *Cool Weapons*



The balisong knife, sometimes called a butterfly knife, makes an excellent pocket knife. This is a unique knife that comprises two handles which can rotate in such a way which enables them to hide the blade of the knife; thus, making it the perfect concealed carry knife.

Since balisong is a common name, butterfly knife is getting more popular as the name of this knife.



Traditionally, this amazing knife hails from the Philippines; it also holds a crucial position in some martial arts methods.

EXHIBIT  F

This spectacular blade is well known for catching the attention of everyone due to its unique built and

---

**Blog Home**

### CATEGORIES

News

Self Defense

Cosplay Weapons

Cool Weapons

### RECENT POSTS

How to Make an Assassin's Creed Hidden Blade Knife?

10 Best EDC Knives of 2020 - Buying Guide

Blanks Guns - An Astonishing Weapon to Own for Recreational Activities

Which is the Best EDC Lightweight Pocket Knife?

How to Use A Brass Knuckle? Look At These 11 Cool Uses!

10 Smart & Effective Self Defense Weapons for Women Under $10

Airsoft Guns Vs Airgun- What Is the Difference Between Them?

King Arthur Sword – History, Features, And Popularity

Brass Knuckles History and its use as Self Defense Weapon!

Brass Knuckle – Don't Miss Out On This Perfect Self defense Weapon

### ARCHIVES

January 2020

December 2019

November 2019

October 2019

September 2019

August 2019

July 2019

June 2019

May 2019

April 2019

March 2019

February 2019

January 2019

design. Not to mention the fact that the wielder of this knife can conduct a variety of amazing tricks.

Since this is one of the ancient knives, there is a lot to debate regarding its history.

If you are unaware of this knife, you will get to know everything about this knife that is essential to your knowledge. Also, we shall disclose some key butterfly knife tips. So, here is everything you need to know about the balisong knife:

November 2018
October 2018
September 2018
August 2018
May 2018
February 2018
January 2018

# The Fascinating History Behind the Balisong Knife

The Balisong knife is without a doubt one of the most popular knives today. With that being said, much of this is contributed to its amazing and unique design. Not to mention the fact that one can do some amazing tricks with this knife and draw loads of attention and admiration from family and friends.

Many historical analysts agree to the aspect of the origin of the knife which is believed to be the Philippines. Nonetheless, the origin of this amazing knife is still up for debate even today. Nothing can be stated for sure in this regard; however, the two countries to be focused at are France and the Philippines.

# The Filipino Origin of Balisong Knife

Many people cite the Philippines as being the origin and birthplace of the worldwide famous balisong knife. Legend says that it dates back to the ancient 800 AD. However, much can be debated about this as well. It is stated that the purpose of the earliest butterfly knife was utility as well as self defense.

The style and features of this knife allowed a quick knife deployment; whereas, it could be used single-handedly and with efficacy as well. The rich tradition of the this knife can be witnessed in the Philippines even today; particularly, in the province of Batangas where they sell a huge variety at different prices.

Most importantly, the terminology of the "balisong" originates from the Filipino language itself; therefore, the majority of the historians and analysts hold the viewpoint that the it originated from the Philippines.

# The Balisong Knife and its French Origin

As mentioned earlier, there are two schools of thoughts associated with the origin of the Balisong knife; one of them favors France as being the birthplace of this knife. It is claimed by some people that it was invented in the French territory during the 15th and 18th century.

The reason for this claim stems from the tool named "Pied Du Roi", which is a French term and originally translates as "Foot of the King". The "Foot of the King", or "Pied Du Roi" resembled this knife in its style and form. Therefore, many consider that the first butterfly knife was invented in France instead of the Philippines.

It is also argued that it was adapted by the Spanish merchants and sailors who then introduced it to



March 16, 1999

**LATE TESTIMONY**

The Senate
20th Legislature, Regular Session of 1999

Attention: Committee of Judiciary
Senators Chumbley and Matsunaga

Ref: HB1496

Dear Sirs,

I am providing written testimony in concern that responsible tax paying citizens of the State of Hawaii will not be allowed to own Butterfly knives or the "Balisong" as it is commonly referred to. I have studied the Filipino Martial arts for 20 years and have been an instructor for over 10 years. Our school "The Pedoy School of Escrima" was founded by the late Great Grandmaster Braulio Pedoy in 1961 in Pearl City Hawaii. The Great Grandmaster Pedoy was recognized and awarded the certificate "Escrima Expert" by the 1976 Legislature in HR 633. Over the past 30 years our school has trained hundreds of people from all walks of life in the weapons-based Filipino Martial Arts that include the Balisong. The Balisong-butterfly knife developed in the Philippines in the 1940's has earned a reputation as a weapon of mystique, but in it's simplest form it is nothing more than any other knife in that it has a point and a cutting edge. I ask that you reconsider, and withdraw the Balisong-butterfly knife as a prohibited weapon and allow those of us honest citizens to continue to use this weapon as a cultural tool as it should be. I have a copy of SB 606 and see that HB1496 is patterned after SB-606.

In SB606 the outcome was that the Balisong owner was in violation of the law by having in his or her possession a butterfly knife. I ask that you consider not taking the easy way out by merely following HB1496. Instead I hope that you will take the time to research and find a way for those of us that use the Butterfly knife as a cultural instrument can continue to do so. We advocate that stiff penalties should be in effect for those individuals that use these or any other weapon in violent crime, but let us not destroy cultural traditions enjoyed by many because of the actions of a few. Make the criminals pay, not the citizens. Mahalo for your time.

Sincerely,

Ron England
Sr. Chief Instr.
Pedoy School of Escrima
(808) 259-6564

(

Testimony of Ronette M. Kawakami
Deputy Public Defender, on behalf of
the Office of the Public Defender, State of Hawai'i
to the Senate Committee on Judiciary

March 16, 1999

## H. B. NO. 1496, H.D. 1: RELATING TO DEADLY OR DANGEROUS WEAPONS.

Chairpersons Chumbley and Matsunaga and Members of the Committee:

This bill establishes a misdemeanor offense for any person to knowingly manufacture, sell, transfer, possess or transport in the State any butterfly knife and proposes to impose a Class C felony on any person who possesses or uses a butterfly knife while engaged in the commission of a crime. In essence, the statutory provisions proposed by this bill mimics the current statutory provisions involving switchblade knives codified in HRS § 134-52.

We question the over-inclusiveness of this bill. This bill will make butterfly knives illegal per se, without any legal method of being in possession of such devices. Thus, the laws on these knives will be more restrictive than our laws on possession of firearms which may be possessed subject to permit and other licensing requirements.

Butterfly knives are commonly thought of having no other purpose but to inflict bodily injury or death. However, butterfly knives or "Balisong" are an integral part of the filipino martial art called Escrima. Like Karate, Aikido, or Tae Kwon Do, Escrima is a martial art that developed and arose out of the country's unique culture. In the case of the Philippines, the blade arts became an essential part of escrima specifically because the average filipino man needed to carry a knife for hunting, harvesting and general self-defense. Similarly, Indonesia also has a strong tradition of "blade arts." Escrima and Balisong practice were endemic through-out the Philippine Islands even before colonization first by the Spanish, and later by the U.S.. Escrima schools here in Hawaii teach Balisong as a legitimate martial art. Martial arts instructors and enthusiasts should be allowed to continue the teaching of a cultural heritage.

Butterfly knives are already prohibited from being carried concealed on the person or within any vehicle. HRS § 134-51(a). Such conduct is penalized as a misdemeanor. Moreover, if a person uses or is found in possession of a butterfly knife in the commission of a crime, the person is punished with a Class C felony penalty. HRS § 134-51(b). Thus, penal provisions are in place to prevent and prohibit the use of butterfly knifes in a dangerous manner.

The scope of this legislation should be narrowed to addressing the improper

SOH 00021

(

manufacture and sale of such knives. An absolute prohibition of these knives will impact collectors and other persons who use them legally. The current law has sufficient penal prohibitions concerning butterfly knives, such that the law may be refined if necessary, rather than implementing a wholesale prohibition. We oppose the passage of this bill in its current form.

Thank you for the opportunity to comment on this bill.

POLICE DEPARTMENT
# CITY AND COUNTY OF HONOLULU
801 SOUTH BERETANIA STREET
HONOLULU, HAWAII 96813 - AREA CODE (808) 529-3111
http://www.honolulupd.org

JEREMY HARRIS
MAYOR



LEE D. DONOHUE
CHIEF

WILLIAM B. CLARK
MICHAEL CARVALHO
DEPUTY CHIEFS

OUR REFERENCE    YB-LLC

March 16, 1999

The Honorable Avery B. Chumbley, Co-Chair
The Honorable Matthew M. Matsunaga, Co-Chair
  and Members
Committee on Judiciary
The Senate
State Capitol
Honolulu, Hawaii  96813

Dear Chairs Chumbley and Matsunaga and Members:

Subject:   House Bill No. 1496, H.D. 1, Relating to Deadly or Dangerous
           Weapons

I am George McKeague, Captain of the Criminal Investigation Division of the
Honolulu Police Department, City and County of Honolulu.

The Honolulu Police Department supports the intent of House Bill No. 1496,
H.D. 1, relating to deadly or dangerous weapons.

We would like to ask the Senate to include the transferring of a "butterfly
knife" to a minor as a class C felony. Our Gang Detail has noticed an
increasing trend in minors and gang members armed with knives and daggers.
Butterfly knives are preferred as they are easy to conceal and are more
intimidating when brandished.  Currently, these items are fairly easy for
minors to obtain at swap meets and open-air markets.  By making it a class C
felony to sell or transfer butterfly knives to a minor, you will have impacted
on the accessibility of such weapons to minors.

Thank you for the opportunity to testify.

                                   Sincerely,

                                   GEORGE McKEAGUE, Captain
                                   Criminal Investigation Division

APPROVED:

LEE D. DONOHUE
Chief of Police

SOH 00025



DEPARTMENT OF THE PROSECUTING ATTORNEY
# CITY AND COUNTY OF HONOLULU
ALII PLACE
1060 RICHARDS STREET • HONOLULU, HAWAII 96813
PHONE (808) 527-8494 • FAX (808) 527-8031

PETER B. CARLISLE
PROSECUTING ATTORNEY

THE HONORABLE AVERY CHUMBLEY, CHAIR
THE HONORABLE MATTHEW MATSUNAGA, CHAIR
SENATE COMMITTEE ON JUDICIARY
Twentieth State Legislature
Regular Session of 1999
State of Hawaii


March 16, 1999


RE:  H.B. 1496, H.D. 1;  RELATING TO DEADLY OR DANGEROUS WEAPONS.


Chair Chumbley, Chair Matsunaga and members of the Senate Committee on Judiciary, the Department of the Prosecuting Attorney of the City and County of Honolulu submits the following testimony in support of House Bill 1496, H.D. 1.

The purpose of this bill is to add a new section to chapter 134. The new section would make it a misdemeanor offense to knowingly manufacture, sell, transfer, possess or transport a butterfly knife. In addition, House Bill 1496, H.D. 1 makes it a class C felony to knowingly possess or intentionally use or threaten to use a butterfly knife while engaged in the commission of a crime.

We support this bill, but are suggesting an amendment. Recently, it has been publicized that certain vendors at local flea markets and in Waikiki have been selling butterfly knives to very young minors. Given that the knives are being sold openly, the sales are apparently not illegal since section 134-51 prohibits the concealed carrying of such knives. The possession of the butterfly knife becomes illegal when the minor purchases the knife and places it in his or her pocket. Given that deadly or dangerous weapons have been defined as instruments closely associated with criminal activity and whose sole design and purpose is to inflict bodily injury or death upon another human being. We believe there is sufficient justification to prohibit the manufacture, sale or transfer of such weapons to <u>anyone</u>. However, since some of these sales are to very young minors, we are particularly concerned. For this reason, we are asking that this bill be amended to provide that persons who knowingly or intentionally sell or transfer a

SOH 00023

(

butterfly knife or switchblade knife to a minor be guilty of a class C felony.

For this reason, we support House Bill 1496 H.D. 1 with the suggested amendment and thank you for this opportunity to testify.

SOH 00024

ER087

Balisong Report

Burton Richardson

My opinions along with facts or data I considered when forming them

I believe that all law abiding citizens should be able to defend themselves against criminal aggression. Criminals are predators who prey upon individuals that they believe to have a physical advantage over. Therefore, they target the weak or they employ weapons to create a terrifying advantage over their empty-handed victims. Then there is the multiple attacker scenario where a group descends upon an innocent person.

This means that the victim of a criminal aggression will always be at a disadvantage. An aggressor will not attack someone who appears formidable. Bullies do not want to get in a fight – they want to be able to absolutely dominate their victims. Therefore, citizens who are attacked have little recourse if not armed. They have been chosen as victims because the attacker or attackers have deemed them to be easy prey.

Using a weapon in self-defense is one of the only ways to equalize such a situation. Without a weapon, all advantage skews toward the criminal element. This actually emboldens and engenders more crime because the criminals need only worry about law-enforcement after the fact. The victim will be a pushover, especially if they are empty-handed. Giving the lawful citizen the ability to defend him or herself against criminal attack is essential in a just civilization.

I believe that the 2nd Amendment guarantees the right for citizens to keep and bear arms and that the right shall not be infringed upon.

Why the Balisong?

The Balisong (butterfly knife) is a self-defense weapon which is very popular in the Philippines, especially in the northern areas. My research in the Philippines and my 40 years of training with the weapon in the United States and abroad bear out that self-defense is its intended use. To back this up, I will recount the following story where a young lady from Batangas, the home of the Balisong gave me an impromptu demonstration and her use of the knife was 100% self-defense.

Manila, Philippines Balisong story

*Exhibit "D"*

**ER088**

Whenever I am in the Philippines I strike up conversations with local people hoping to find someone who is trained in the Filipino martial arts. I have gleaned great information and insight from such impromptu interviews from taxi drivers, clerks, and once from a lawyer.

While working on a movie in the Philippines, I was in a restaurant in the city of Marikina, Metro Manila. I was the only patron. A young lady was serving, and I asked her where she was from. She replied Batangas. I said, oh, the birthplace of the Baliosng. I asked her if she knew how to use a Balisong. Sheepishly, she replied "My father taught me, but just a little". She said it was common for Batanguenos (residents of the province of Batangas, the birthplace of the Balisong) to carry a Balisong for self-defense. So her father taught her so she would be able to arm herself in a dangerous situation. I asked her if she would mind showing me something of what she learned and, after some coaxing, she agreed.

I handed her a butter knife and stood up. I noticed that she secured the knife in the ice pick grip, which I found odd because this hold is widely considered to be a disadvantageous grip in the Filipino martial arts. A person has less reach and diminished mobility when dealing with an attacker at long range. I thought that was interesting since she had actually learned in Batangas, one of the most renowned spots in the world for knife technique.

I said, "imagine I am an attacker". I started toward her and she said oh no not like that. Sneak up and grab me from behind. I went toward her back and approached as requested. As I grabbed, she brushed my hand down, rotated to her left toward me, did a lightning fast stab towards my midsection , and moved away. I mean, this was extremely quick and shockingly powerful. It is clear that she had been drilled in this extensively. Very effective.

As I spoke to her about her training, her entire training was based on someone trying to grab her to get her into a car or drag her into an alley. Her training was to use the Balisong as a self-defense weapon so she could defend her self against a sudden attack. She commented that most of her girlfriends in Batangas were also trained and armed with a Balisong. The primary use of the Balisong is for self-defense purposes.

From a moral standpoint, the Balisong is a unique self-defense knife because it can be use closed as well as open. It has an ethical use of force continuum built-in. When the defender fights back against criminal aggression with a Balisong, he or she doesn't have to immediately go to deadly force. A closed Balisong can be used as a "pocket stick", providing less lethal blunt force. Skillful striking with the Balisong while it is still closed can possibly repel an attacker without having to resort to cutting. Morally, this is always preferable. If the situation is indeed dire, the blade can be employed to save the life of the innocent. But, unlike all the legal folders, the holder of a Balisong can choose a lower level of force if that can resolve the attack.

**ER089**

The Balisong provides the holder with the ability to use an even lower level of force to dissuade an inevitable attack. They can manipulate the Balisong to intimidate the attacker. The bully is the one who wants to intimidate his weaker victim. A Balisong practitioner can take out the knife and go through a quick series of flipping maneuvers to turn the tables and intimidate the attacker and convince them to go away. Due to the unique design of the Balisong, a potential injurious situation can be resolved without contact of any kind. I will relate the following story that my sister observed in my hometown of Carson, California where this tactic was successfully employed.

Carson, California Balisong story
I grew up in Carson, California in a house on Sepulveda Boulevard between Main Street and Figueroa. At the Figueroa end of Sepulveda is Carriage Crest Park. My sister Angela (4 years my junior) got a job there when she was in her late teens. She knew of my love of the Balisong (I had taught her a few moves), and was eager to relate the story when I came home from college for a weekend visit. This is what she told me:

She was working in the office and had seen 4 young Filipino boys, probably in their early teens, on the basketball court. They had clearly arrived very recently from the Philippines. Small in stature, heavy Filipino accent, and their clothing sense was in line with the province that they came from. New arrivals was a common occurrence in Carson, as it had a high population of Filipinos and is still a common destination for immigrants. Unfortunately, they were also targets of bigots.

They were minding their own business shooting hoops when a group of 5 older, much larger, Samoans showed up and decided they wanted the entire court to themselves. So, they just went up to the smaller Filipinos and started bullying them to make them leave.

My sister noticed this, so she left the office to intervene. She hadn't gone far when one of the Filipinos drew his Balisong and flipped it opened it in an impressive fashion. The bullies all turned tail and flew out of there, scattering in all directions as they made their escape. The problem solved without any violence. A great example of how the Balisong opening alone can intimidate and dissuade a bully or bullies from continuing.

Note also that the ==Balisong was a common self-defense weapon in Carson.== That same sister carried a butterfly knife that I gave her in 1981 during late high school years and throughout college for self-defense. She would always have it with her in case she needed to protect herself. Thankfully it was never necessary.

As to the argument against quick-opening knives being an issue, the Balisong is a folding knife that is actually less "tactical" then the majority of quick opening folding knives that are on the market today. The Balisong is an arm that is intended to be opened with one hand, and that

requires skill on the part of the person armed with the Balisong. <mark>It takes a lot of practice to be able to open the knife quickly and efficiently with one hand, and even with such training, the Balisong is still slower than the most popular self-defense knives that are available and legal to carry.</mark> We will provide a video that demonstrates this. Here are the findings:

I will also present a video of me demonstrating drawing speeds of the Balisong versus a folder with the wave feature (for faster opening) and a traditional folder. The Balisong will be in the pocket, as it has no clip. The folders will be clipped to the pocket, which is the normal carrying method. This provides for easier access. The Balisongs do not have a clip because it would interfere with manipulating the handles.

Drawing speeds of Balisong versus modern folding knives drawing and opening times.

Balisong- carried in pocket.
To draw a Balisong, you have to thrust your hand deep into your pocket, grip the knife handles, and pull the closed Balisong out. With luck, it will stay in the optimal opening orientation where you can easily get your pinky on the clip to open it. If not, the closed Balisong must be rotated to access the latch. For the video, I placed it in my pocket in the optimal orientation so I will be able to draw at the quickest speed possible.

Once out and in the proper orientation, you must perform a manipulation to open the knife. There are many methods, but I opted for showing the most common, simple, high percentage opening that is used.

Once the blade is exposed, the handles of most butterfly knives will be wobbly and unstable until clip latch is closed and the handles secured. But for the video, I did not include this in the timing, as it is possible to use the Balisong unlatched. It is just less stable.

For maximum stability, it is necessary to close the latch to stabilize the knife in the open position. This usually takes two hands on most Balisong knives.

Folder with Wave Feature – clipped to pocket
Most folders today have a clip on the side of the handle so that the knife can be clipped inside a pocket or waistband. This makes it much more accessible than carrying it inside a pocket, as is necessary with a Balisong. The design makes opening with one hand very easy.

The wave feature is a notch added to the back spine of a folding knife that catches on the pant pocket or waistband when drawing. As the handle comes out, the wave feature makes the blade rotate out. The result is that the knife opens as the draw is made. You don't need to draw and then open the latch and then make the manipulation to open the knife as you do with a Balisong. You draw and it is open. It is extremely fast.

**ER091**

Standard folding knife- clipped to pocket

A standard folding knife has no wave opening feature or other quick-opening feature such as a Spyder hole (a hole in the top of the blade that you pinch to flick the knife open) or a thumb stud (a post that allows the knife to be opened with the thumb). All of these features allows the knife to be open with one hand. The standard folding knife has none of these, so must be opened both hands. Contrary to popular belief, this is actually an extremely fast opening.

Here are the times for the openings of the three different types of blades.

Single handed Balisong in pocket draw-
2.900 seconds

Single handed wave Folding knife clipped to pocket. (Has wave opening feature)
1.467 seconds

2 hand opening, folding knife clipped to pocket.
1.200 seconds

In my opinion, it would be better for people to carry a Balisong knife for self-defense as opposed to a folding knife. The Balisong provides more choices in levels of force during a scenario where self-defense is warranted. Its design poses absolutely no extra threat compared to legal folding knives. They should be legal to carry.

Qualifications

Richardson is recognized as one of the world's leading experts on the Filipino Martial Arts (FMA). These arts are based on edged weapon expertise. From sword to short knife to Balisong, the FMA are known for exceptional blade work. Richardson teaches seminars worldwide on FMA and other arts.

Richardson began his martial arts training in 1979, than began classes the following year under Dan Inosanto, protégé of Bruce Lee and the leading exponent of the Filipino Martial Arts in the world.

Richardson was an honor student at U.S.C., majoring in Biology while completing a 4-year honors program in writing and literature. Instead of going to medical school, Richardson decided to pursue his passion for self-defense. This lead to a lifetime of constant research and development in the martial sciences.

Richardson has traveled the globe training with the greatest masters in various combat approaches. Besides training in his home town of Los Angeles for decades, Richardson trained in the Philippines (Kali/Eskrima/Arnis), Brazil (BJJ), China (San Shou), Japan (Shoot fighting), France (Savate), and even made several trips to the Zulu villages to learn their style of stick and spear fighting. He also trained extensively in MMA, especially under Team Quest headed by Randy Couture. Richardson was featured on the covers of various martial arts magazines and has authored 5 books. He wrote a monthly column for Inside Kung Fu magazine for over 10 years.

Credentials-

- Inside Kung Fu Magazine Hall Of Fame (1999)

- Inducted into the Black Belt magazine (#1 martial arts magazine in the world) Hall Of Fame (2015)
- Black Belt magazine self-defense instructor of the year (2015)

- Full Instructor (the highest rank achievable) in Jeet Kune Do under Dan Inosanto (Bruce Lee's protégé).

- Full Instructor under Dan Inosanto in the Filipino Martial Arts.

- Full Instructor in Jeet Kune Do under Larry Hartsell (student of Bruce Lee).

- 3 Stripe Black Belt in Brazilian Jiu-Jitsu under world champion Egan Inoue/Nova Uniao.

- Original member of the famous full contact stick fighting group The Dog Brothers (Lucky Dog)

- Muay Thai instructor under Thai Boxing pioneer Master Chai Sirisute.

- Indonesian Pentjak Silat instructor under Grandmaster Paul DeThouars.

- Kali Ilustrisimo instructor under Grandmaster Antonio Ilustrisimo.

- MMA coach and corner man to Super Fight World Champion Egan Inoue 1995-2004

**ER093**

- MMA coach and corner man to Shooto World Champion Enson Inoue 1995- 1998

- MMA Head Coach for UFC great Chris Leben, 2009-2012.

- BJJ coach and corner man for BJJ World Champion Baret Yoshida, ADCCs 2003, 2005, 2007, 2017.


Books Published (No self-publishing)

JKD Unlimited - Unique Publications (1993)

In The Footsteps Of Bruce Lee – Budo international (1999)

Choke Em Out – Paladin Press (2007)

Silat For The Street – Black Belt publications (2016)

Brazilian Jiu-Jitsu For The Street – Black Belt Publications (Available 2020)


Published articles over the last 25 years

Black Belt magazine

How to beat an MMA fighter 02-08

Silat clinch - the secret weapon

Silat for the MMA era

Silat open hand

Bruce lee issue interview 6-09


Blitz magazine (Australia)

BJJ for the street - weapons on the ground

JKD interview

Grappling with weapons

The JKD-MMA connection


**ER094**

Budo International magazine

(translated into 5 languages, distributed worldwide)

Bruce lee's 5 ways

A martial clairvoyance

Battlefield kali

Be a hero

Bruce lee's 5 ways of attacking

Complete approach  5-04

Details

Environmental impact

Expectations 4-07

Getting your taps out of the way

Guiding principles 9-06

JKDU MMA for street- 04-05

Lessons from the ring 6-04

Our movie 11-06

Overcoming adversity  9-04

Pummeling - a sensitivity drill

Progressive resistance

Pushing your limits

Rules of engagement 06-04

Stand up!  06-04

Street vs sport

Surprise!  8-04

**ER095**

The benefits of discipline 02-07

The fighter's perspective 1-07

The importance of the clinch

The intersection 04-07

The keys of JKD

The scientific method

The secrets of JKD

The seminar tour 07-06

The two arts

Why sparring


Immersion Labs magazine

Stick fighting- common themes oceans apart


Inside Kung Ku magazine/unique publications

A lesson from Socrates

A little each day 8-09

Absorbing the useless

Achieving self

Artificial resistance  03-03

Being the learner

Bloody mess  08-02

China hands

Choke!

Dead pattern kali    07-02


**ER096**

Eric's story  05-03

Face your fears 2006

Feedback      07-03

Fighting the big guy 2000

Fight like a girl 09-02

Finish the choke

Fun fundamentals 1996

Get in the water 1998

Ground fighting 2006

High performance

Hitting the wall

In the clinch

Isness and ifness

JKD  cutting through controversy

Kali wisdom

Lights out

Loyalty

Martial arts fantasy

Memorization versus performance  11-03

MMA moves that will get you killed in a street fight 7-10

My last offering 05-04

New and improved JKD

NHB versus JKD

Phasing out the phases   01-03

Question the answers

**ER097**

Reject what is useful  11-02

Resisting real resistance  03-03

Self-discipline

Shorite Ryu

Solo training

Stop complaining and start training

Street grappling, the JKD perspective

Street-specific training

Success through failure

The art of fighting without fighting 01-02

The complete fighter

The evolution of Bruce Lee

The evolution of Jeet Kune Do

The expert

The greatest benefit of MMA!

The JKD mish mash

The JKD test

The key to success 1996

The revolution rolls

The right to bear arms

The sculpter coach

The search for validation   08-03

The sticky subject of weaponry training 1999

The way you practice  12-02

What would Bruce Lee be doing today?

**ER098**

Wisdom of the ages 1993


Articles written for various magazines

Bubba dummy (ultimate MMA magazine)

Carlson Gracie, vale tudo training (ultimate grappling magazine)

Fight for success! 11-08 (MMA Hawaii magazine)

Interview with Rickson Gracie (ultimate grappling magazine)

"lucky dog' speaks (manila times [Philippines] interview)

Training Chris Leben (MMA Hawaii magazine)


A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition;

I have never testified as an expert at trial or by deposition


(vi) A statement of the compensation to be paid for the study and testimony in the case.

I will be compensated $200/hour, which is my normal private lesson fee.


Burton Richardson                                        12-5-19


**ER099**




**COURT REPORTING**

**LEGAL VIDEOGRAPHY**

**VIDEOCONFERENCING**

**TRIAL PRESENTATION**

**MOCK JURY SERVICES**

**LEGAL TRANSCRIPTION**

**COPYING AND SCANNING**

**LANGUAGE INTERPRETERS**





**(800) 528-3335**

**NAEGELIUSA.COM**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF HAWAII**


ANDREW TETER and JAMES GRELL,

     Plaintiffs,

vs.                        CASE NO. 152-11223

CLARE E. CONNORS, in her Official
Capacity as the Attorney General
of the State of Hawaii and AL CUMMINGS,
in his Official Capacity as the State
Sheriff Division Administrator,

     Defendants.

_____


**DEPOSITION OF**

**ROBIN NAGAMINE**


**TAKEN ON**
**MONDAY, OCTOBER 28, 2019**
**12:04 P.M.**


**ATTORNEY GENERAL'S OFFICE**
**425 QUEEN STREET**
**HONOLULU, HAWAII 96813**

*Exhibit "E"*

**ER100**

2

```
1              APPEARANCES
2
3   APPEARING ON BEHALF OF PLAINTIFF:
4   STEPHEN D. STAMBOULIEH, ESQUIRE
5   STAMBOULIEH LAW OFFICES
6   P.O. Box 4006
7   Madison, MS 39130
8   (601) 852-3440
9   stephen@sdslaw.us
10
11  ALAN ALEXANDER BECK, ESQUIRE
12  LAW OFFICES OF ALAN BECK
13  2692 Harcourt Drive
14  San Diego, CA 92123
15  (619) 905-9105
16  alan.alexander.beck@gmail.com
17
18
19
20
21
22
23
24
25
```

3

```
1          APPEARANCES CONTINUED
2
3   APPEARING ON BEHALF OF THE DEFENDANT:
4   RYAN M. AKAMINE, ESQUIRE
5   DEPARTMENT OF THE ATTORNEY GENERAL
6   425 Queen Street
7   Honolulu, HI 96813
8   (808) 586-1494
9   (808) 586-1239 Fax
10  ryan.m.akamine@hawaii.gov
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1                 INDEX
2                            Page
3
4   EXAMINATION BY MR. STAMBOULIEH          6
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
1               EXHIBITS
2   Exhibit                  Page
3
4   A    PLAINTIFFS NOTICE OF DEPOSITION    16
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

ER101

**6**

1        DEPOSITION OF
2        ROBIN NAGAMINE
3        TAKEN ON
4        MONDAY, OCTOBER 28, 2019
5        12:04 P.M.
6
7        THE REPORTER:  Mr. Nagamine, please raise
8   your right hand.
9   ROBIN NAGAMINE, was having been duly sworn, was
10  examined and testified as follows:
11       THE REPORTER:  Counsel, if you could
12  introduce yourself and state whom you represent.
13       MR. AKAMINE:  Ryan Akamine for defendants,
14  Clare Connors and Al Cummings, in their official
15  capacities.
16       MR. STAMBOULIEH:  Stephen Stamboulieh for
17  the plaintiffs, Andrew Teter and James Grell.
18       MR. BECK:  Alan Beck for the plaintiffs,
19  James Grell and Andrew Teter.
20       THE REPORTER:  Perfect, you can begin.
21  EXAMINATION
22  BY MR. STAMBOULIEH:
23       Q.  All right.  And you're Lieutenant Robin
24  Nagamine?
25       A.  Yes, that's correct.

**7**

1        Q.  My name is Stephen Stamboulieh.  This is
2   my co-counsel, Alan Beck.  We represent the
3   plaintiffs.  Have you ever given a deposition
4   before?
5        A.  Yes.
6        Q.  Okay.  Excellent.  How many have you
7   given?
8        A.  About five.
9        Q.  Oh, nice.  Okay.  I'm sure everyone has
10  their own style.  I live in Mississippi, so my style
11  might be a little bit different than what you're
12  used to.  I have just a couple of ground rules.
13  First off, we're not going to be here very long, I
14  don't think.  Some depositions last longer than
15  others, depending on what information you have for
16  us, I don't expect yours to take very long at all.
17  But just in case, I'll go over some of the ground
18  rules.
19       Anytime you need to take a break, go to
20  the restroom, get a water, whatever you need, just
21  let -- we're here at your convenience, so feel free
22  whenever you need to take a break.
23       A.  Okay.
24       Q.  The only thing that I ask is that if I
25  have a question on the table, a question presented

**8**

1   to you, is that you answer it before you take your
2   break.  If, for some reason, I talk too fast or
3   whatever, please let me know, and I'll do my best to
4   slow down.
5        If I ask a question that you don't
6   understand, please don't answer it.  I want to make
7   sure that you understand the question that I ask.
8   Because if we get to a trial and I have your
9   deposition, and you've answered a question that I've
10  asked, I'm going to assume that you understood it.
11  And there could be an issue there.  So if for any
12  reason, you don't understand my question, please
13  tell me to stop, that you don't understand, or
14  rephrase, and I'll do my best to accommodate that.
15       Other than that, those are pretty much the
16  only rules.  Did you have any questions about those?
17       A.  Oh, no, I'm fine.
18       Q.  Okay.  Great.  So can you tell me -- I
19  heard you introduce yourself as Lieutenant earlier.
20  What is your job duty?
21       A.  I'm a deputy sheriff.  I'm a Lieutenant.
22  And I'm currently in charge of the records section.
23       Q.  And what does that mean, the records
24  section?
25       A.  It's our electronic report system,

**9**

1   evidence, and the receiving desk where we book
2   people that get arrested.
3        Q.  Okay.  So you would be responsible for all
4   of the electronic records for someone who was
5   arrested and booked in the jail?
6        A.  The reports.
7        Q.  Oh, the reports.
8        A.  Yeah, the police reports.
9        Q.  So let's, hypothetically, if someone was
10  arrested for carrying a gun illegally, in your
11  territory, you would be responsible for filing that
12  report or taking that report?
13       A.  The deputies that take the case would file
14  the report.  It would come into our servers, and I
15  oversee the server.
16       Q.  I understand.  And how long have you been
17  working in that capacity over the servers?
18       A.  From 2017.
19       Q.  Okay.  What did you do prior to that?
20       A.  I was a lieutenant of the circuit court,
21  First Circuit Court.
22       Q.  Can you explain to someone that's not from
23  here what that means?
24       A.  It's the First Circuit Court building, so
25  they do all the felony cases there.  The grand jury

10

1 sits there. They do civil cases there.  I oversaw
2 patrol section, which handled uniformed deputies in
3 the courthouse and the surrounding areas.
4    Q.   Okay.
5    A.   And also deputies in the cellblock where
6 we move custodies to go to trials and hearings,
7 motions, and whatnot.
8    Q.   And you're a sworn law enforcement
9 officer?
10    A.   Yes, I am.
11    Q.   Carry a gun?
12    A.   Yes.
13    Q.   Okay.  What else would you carry,
14 typically, on a normal day?
15    A.   OC spray, a baton, radio, handcuffs, first
16 aid -- well, CPR kit.
17    Q.   Okay.
18    A.   That's about it.
19    Q.   Do you carry a Taser?
20    A.   I don't have a Taser.
21    Q.   Okay.  Did you ever carry a Taser.
22    A.   No, I did not.
23    Q.   Okay.  And you said that was Lieutenant of
24 the First Circuit Court?
25    A.   Yes.

11

1    Q.   Now, are you familiar, generally, here
2 with the subject matter of -- let me ask you this.
3 Do you know why you're here right now?
4    A.   Yes, I do.
5    Q.   Okay.  Are you familiar, generally, with
6 the subject matter of the lawsuit?
7    A.   Generally.
8    Q.   Okay.  You know it's about the butterfly
9 or balisong knife ban in Hawaii?
10    A.   Yes.
11    Q.   Are you familiar with what a balisong or a
12 butterfly knife is?
13    A.   Yes.
14    Q.   And in your own words, can you tell us
15 what a butterfly or a balisong knife is?
16    A.   It's a knife with a split handle that
17 folds over the blades and can be opened by spreading
18 it around the blades.
19    Q.   Okay.  Have you ever had the opportunity
20 to use a butterfly or balisong knife?
21    A.   I've handled it.  I wouldn't say used it.
22 But I'm familiar with it, so I know what it is when
23 I see it.
24    Q.   Okay.  I appreciate that distinction.
25 You've handled -- and I'll just say butterfly from

12

1 now on.  You've handled a butterfly knife?
2    A.   Yes.
3    Q.   Can you tell me about how long ago that
4 was?
5    A.   Oh, a while ago.  Years.  Many, many years
6 ago.
7    Q.   Okay.  Do you know that Hawaii bans the
8 butterfly knife?
9    A.   Yes, I'm aware of that.
10    Q.   Are you aware of when Hawaii banned the
11 butterfly knife?  And it's okay if you don't know.
12 It's fine to say, I don't know.
13    A.   It was -- well, it's the way the statutes
14 were written.  It was banned under different
15 statutes over time.
16    Q.   Okay.
17    A.   But it has been banned.
18    Q.   In your use -- I'm sorry, in your -- I
19 don't want to put words in your mouth, so forgive
20 me.  I'm not trying to be tricky here.  When you've
21 handled the butterfly knife, tell me a little bit
22 more about that.  Were you using it? Were you
23 flourishing it or twirling it?  Or were you just
24 carrying it?  Or what was the usage of that?
25    A.   It was when we recovered it at a scene.

13

1 To verify that it's a butterfly knife, you open it
2 to make sure that it doesn't open split
3 handles.  And if it does, it does, and it's a
4 butterfly knife.
5    Q.   Okay.  So this would have been after it
6 was banned?
7    A.   Yes.
8    Q.   Okay.  Prior to it's banning, had you ever
9 handled a butterfly knife?
10    A.   I'm not sure what that answer -- I don't
11 know when it was originally banned.
12    Q.   Okay.  That's fair enough.  That's fair
13 enough. I'll represent to you, it was in 1999 and
14 2000 that the butterfly was banned.  Do you have any
15 recollection, prior to '99 or 2000?
16    A.   Yes, prior to that, I think it was all
17 inclusive in the deadly weapon statute.
18    Q.   Okay.  All inclusive meaning that it was
19 just understood to be banned?
20    A.   No, it was listed along with a number of
21 other items, daggers, throwing stars, brass
22 knuckles, switchblades, and butterfly knives.
23    Q.   In your current position as deputy sheriff
24 of records, do you have the occasion to see a lot of
25 reports about butterfly knife arrests or --

14

1  A.  I have seen them.
2  Q.  Do you recall a number?
3  A.  Well, I think from around the time our
4  electronic record systems, 2012, till now, it was
5  around 27, 30.
6  Q.  So this is a report that you recently ran?
7  A.  I just did a query to see how many
8  butterfly knife cases we've done.
9  Q.  And when did you do that query?
10  A.  Last week.
11  Q.  These were cases where people were
12  arrested for having the butterfly --
13  A.  Either arrested, or they're issued a
14  criminal citation.
15  Q.  Okay.  And I don't want to get too far
16  into the weeds on that, but when someone's arrested,
17  obviously they're going to confiscate the butterfly,
18  right?
19  A.  Correct.
20  Q.  What happens with those butterflies?
21  A.  It gets put into evidence.
22  Q.  Okay.  From the query that you ran from
23  2012 until present, did those go to a trial?  Or do
24  you even know that information?
25  A.  I don't track it.  Once the report is

15

1  generated, it gets sent to the prosecutor's office.
2  And we don't track it after that.
3  Q.  Understood.  You said ti was approximately
4  27?
5  A.  Yeah, around there.
6  Q.  And I probably jumped too far ahead.
7  That's for just the City and County of Honolulu?  Or
8  is that statewide, Hawaii statewide?
9  A.  The record system is statewide, but I
10  didn't look into specific jurisdictions of each of
11  the cases.
12  Q.  Okay.  So that 27 encompasses the entire
13  state of Hawaii?
14  A.  Yes.
15  Q.  And I'm sorry if I asked that question
16  imprecisely.  Please tell me if I'm asking it wrong.
17  MR. STAMBOULIEH:  And just one little bit
18  of housekeeping that I forgot to do.  it's no
19  problem with you, Ryan, I'd like to just enter the
20  notices that I filed as Exhibit 1 and 2, even though
21  Lieutenant Nagamine is here for both.
22  MR. AKAMINE:  Both.
23  MR. STAMBOULIEH:  It would just make me
24  feel better to have them in the record, if we could
25  just mark that as collective "A," please.

16

1  MR. AKAMINE:  Yes.
2  THE REPORTER:  Yes.
3  (Whereupon, Exhibit A was marked.)
4  Q.  (By Mr. Stamboulieh)  Lieutenant, have you
5  had the opportunity to review any of the documents
6  in this case?
7  A.  Yes.
8  Q.  Okay.  Can you tell me what you've
9  reviewed?
10  A.  The complaint and the subpoena to Sheriff
11  Cummings.
12  Q.  Okay.  Have you reviewed any of the
13  response to plaintiff's first set of requests for
14  admissions, interrogatories, or document production?
15  A.  I think I've seen it, but I don't think I
16  went over it.
17  Q.  Okay.  Okay.  Are you familiar with the
18  term switchblade?
19  A.  Yes.
20  Q.  Do you know what a switchblade knife is?
21  A.  Yes.
22  Q.  Have you ever the opportunity to handle a
23  switchblade?
24  A.  Yes, I have.
25  Q.  Okay.  Can you tell me a little bit about

17

1  what a switchblade is?
2  A.  It's a knife that opens by a spring
3  mechanism for inertia.  And basically, you push a
4  button and the blade pops out.
5  Q.  Okay.  Is it a pretty fast opening knife?
6  A.  Yeah.
7  Q.  Do you know if it's one of the fastest
8  opening knives?
9  A.  I have no idea.
10  Q.  Okay.  Are you familiar with what a
11  folding knife is, just a regular folding knife?
12  A.  Yes.
13  Q.  And in your own words, can you tell us
14  what a folding knife is?
15  A.  It's a knife where the blade folds into
16  the handle.
17  Q.  Okay.  Is that a particularly fast knife
18  to open?
19  A.  I don't know.
20  Q.  Okay.  That's fine.  Are you familiar with
21  what a wave folder is?
22  A.  Wave folder, I am not familiar with that
23  term.
24  Q.  Are you familiar with the type of knife
25  that has a -- if you don't understand the question,

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

ER104

18

1  tell me, and I'll try to make it easier for you -- a
2  knife that when you put it into your pocket, when
3  you draw, the blade automatically comes out?
4      A.  I am not familiar with that.  I have not
5  seen it.
6      Q.  Okay.  Great.
7          MR. STAMBOULIEH:  Ryan, if it's okay with
8  you, I've got that video that Burton did that we
9  sent to you.
10         MR. AKAMINE:  Sure.
11         MR. STAMBOULIEH:  Is it okay if I show
12  that witness that?
13         MR. AKAMINE:  Yeah, go ahead.
14         MR. STAMBOULIEH:  And if you want, we can
15  just go off the record.  I've got a short video for
16  you to watch.
17         (Whereupon, a break was taken.)
18         THE REPORTER:  We're back on the record.
19     Q.  (By Mr. Stamboulieh) Lieutenant, you've
20  had the opportunity to view that video, correct?
21     A.  Yes, that's correct.
22     Q.  The person in that video, Mr. Burton
23  Richardson, do you know him?
24     A.  No, I don't.
25     Q.  Ever heard of him?

19

1      A.  No.
2      Q.  Okay.  Do you have any thoughts, overall,
3  about the video that you just watched?
4      A.  No, not really.
5      Q.  Okay.  Did you see how the wave folder --
6  which we were speaking about earlier -- did you see
7  how much faster it opened than the balisong knife?
8      A.  Yes.
9      Q.  Again, you don't have any personal
10  knowledge of the wave folder?
11     A.  No.
12     Q.  Okay.  The regular folding knife, though,
13  you do know what that is?
14     A.  Yes.
15     Q.  And did you see, in that video, how much
16  faster the regular folding knife opened than the
17  butterfly knife?
18     A.  Yes.
19     Q.  In your experience or your handling of a
20  butterfly knife, could you manipulate that butterfly
21  knife faster than what you saw in the video?
22     A.  I don't know.  I've handled it, but not in
23  that manner.
24     Q.  Okay.  Have you ever seen -- and you might
25  not, and it's okay -- anyone having opened the

20

1  butterfly knife faster than just a regular folding
2  knife?
3      A.  I'm not sure.  I mean, I've saw some
4  videos of -- who's that martial artist, Danny --
5  Filipino martial artist?
6          MR. AKAMINE:  Inosanto?
7      A.  Yeah, Inosanto.  I've seen videos of that,
8  and he seemed pretty impressive.
9      Q.  (By Mr. Stamboulieh) Okay.  Inosanto, can
10  you spell his --
11     A.  Dan Inosanto.
12     Q.  I-n-o-s-a-n-t-o?
13     A.  That's my closest guess.
14     Q.  Okay.  That sounds --
15     A.  He's a well known --
16         MR. BECK:  It's Burton's instructor.
17         MR. STAMBOULIEH:  Oh, gotcha.
18         MR. BECK:  It's Burton's instructor.
19         MR. AKAMINE:  Oh, is it?  Okay.  Yeah.
20  I've seen videos.
21         MR. BECK:  Yeah.
22     Q.  (By Mr. Stamboulieh) Perfect.  Are you
23  familiar what the term "bearable arm" is?
24     A.  No.
25     Q.  Okay.  You, in your normal course and

21

1  duty, would carry a side arm, correct?
2      A.  Correct.
3      Q.  Okay.  Would you agree with me that that's
4  an arm that's -- that's a firearm, right?
5      A.  It's a firearm.
6      Q.  Does the term "arm," when someone says, I
7  keep and bear arms -- and I'm not getting into a
8  legal distinction with you -- but do you understand
9  generally what an arm is, like a firearm?
10     A.  I see arms as a firearm.
11     Q.  Okay.  Does that mean that you don't see
12  arms as knives, batons, other things like that?
13     A.  That would be considered -- well, I'm not
14  sure, because I'm not talking about the legal terms
15  of it.
16     Q.  Okay.
17     A.  But to me, if you're armed, it could be
18  anything. If it's something that can be used as a
19  weapon to harm others -- it could be a stick.
20     Q.  Right.
21     A.  It depends on its intended use.  When I
22  think of arms, I'm thinking of a gun.
23     Q.  Okay.  So if you -- did you ever do any
24  type of patrol work on the streets?
25     A.  Yes.



22

```
 1    Q.   Okay.  So if you saw me on the streets and
 2  I had a little clip where you could see a knife in
 3  my pocket, would you consider me armed at that
 4  point, if I have just a knife in my pocket?
 5    A.   If it's in your pocket?  No.
 6    Q.   Okay.  Why is that?
 7    A.   Because it's in your pocket.
 8    Q.   Okay.
 9    A.   And it depends on the circumstances that
10  I'm dealing with.
11    Q.   Okay.  That's a good point.  So what's the
12  most typical situation where you would go to talk to
13  someone and maybe see -- you know, to arrest them or
14  something like that?
15    A.   If we're going to arrest them, then we'd
16  be concerned about that.
17    Q.   Okay.  So let's pretend that you're going
18  to arrest me, and you see that I've got something in
19  my pocket that you believe is a knife.  Would you
20  consider me armed at that point?
21    A.   Yeah.
22    Q.   Okay.  And let's say that afterwards, you
23  frisk me and all you find is a knife.  Would I be
24  considered armed with a knife at that point?
25    A.   Once I take it away from you, you're not.
```

23

```
 1    Q.   Well, of course not, once you take it away
 2  from me.  But if I was to have that knife on my
 3  person, when you did your pat down or frisk or
 4  whatever, you would --
 5    A.   We call that a SILA, Search Incident to
 6  Lawful Arrest.
 7    Q.   Okay.
 8    A.   And if I felt a knife, I would remove it
 9  from you.
10    Q.   Okay.
11    A.   And then once I remove it from you, it's
12  no longer a danger to me.
13    Q.   So you would disarm me?
14    A.   Yes.
15    Q.   Okay.  And we're not talking about
16  firearms or anything.  Same thing, if I had like a -
17  - are you familiar with a collapsable baton, like an
18  ASP?
19    A.   Yes.
20    Q.   Okay.  If I had an ASP in my pocket, would
21  you consider that to be armed as well, if you were
22  searching incident to lawful arrest?
23    A.   Yes.
24    Q.   Okay.  Just give me one second here.
25         How long ago were you on -- was it patrol
```

24

```
 1  duty?
 2    A.   Many years ago.  Over 25 years, maybe.
 3    Q.   Okay.  So what year would that be, like --
 4  '90
 5    A.   I've been in the department 34 years.
 6  I've moved from different various sections back and
 7  forth within the department.  So I was in patrol
 8  when I first graduated from the academy in 1985.
 9  And then from there, I moved in and out with
10  department patrol units until I got promoted to
11  Sergeant.
12    Q.   Okay.  And this was all in Honolulu --
13  City and County of Honolulu?
14    A.   Yes.
15    Q.   Okay.  Would you agree with me that --
16  talking about just a regular knife here -- is
17  designed to be used by a single person, either for
18  self defense or to attack?
19    A.   I'm not sure I understand the question.  A
20  knife is just a tool.  You can use it to cut meat,
21  if you wanted to.
22    Q.   Okay.  Could I also use it to defend
23  myself with?
24    A.   Yeah.
25    Q.   And could I also use it to attack someone
```

25

```
 1  with?
 2    A.   Yes, you can.
 3    Q.   Okay.  And the same is true for a
 4  butterfly knife, is it not?
 5    A.   Yes.
 6    Q.   Okay.  Do you carry -- or let me rephrase
 7  that. When you were not the lieutenant of record,
 8  but when you were -- before that, did you ever carry
 9  any type of knife as part of your duty belt or kit
10  that you carried?
11    A.   No.
12    Q.   Ever -- even on patrol, never carried a
13  knife?
14    A.   No.
15    Q.   Do you know if other law enforcement in
16  this City and County of Honolulu carry any type of
17  either fixed blade or folding blade knife?
18    A.   Some do.
19    Q.   Okay.  Do you know, typically, what those
20  officers carry?  And if you to don't know, it's
21  okay?
22    A.   I really don't know, but I know some do.
23  Usually it's just a folding knife.
24    Q.   Okay.  Do you have any knowledge --
25  personal knowledge of why they would carry that?
```

26

1    A.  I haven't had a discussion with anybody.
2    Q.  Okay.  That's fair.  Are you familiar with
3  the history of the balisong knife?
4    A.  Generally.
5    Q.  Okay.  What's your general understanding
6  of the history?
7    A.  It was created in the Philippines.
8    Q.  Okay.
9    A.  And it's a very popular knife over there.
10    Q.  Okay.  Is there like a cultural reason for
11  that, do you know?
12    A.  I don't know.
13    Q.  Okay.  So your understanding is it was
14  created by the Filipinos?
15    A.  In the Philippines, yes.
16    Q.  In the Philippines, I'm sorry.  Is there a
17  large Filipino population in Hawaii?
18    A.  Fairly.
19    Q.  Do you know percentage wise?
20    A.  I would have no idea.
21    Q.  Okay.  I just have one -- I say one last,
22  but it's never one last -- just a couple more
23  questions.  If you, being a police officer, saw me -
24  - well, let me ask you this.  Are you familiar with
25  the gun laws in Hawaii?

27

1    A.  Yes.
2    Q.  Okay.  I'm from out of state, right?  I'm
3  from Mississippi.  I live in Mississippi.  I'm not
4  from here.  I couldn't carry a gun around Hawaii and
5  walk around, correct?
6    A.  Not unless you have a permit from the
7  chief of police.
8    Q.  Okay.  Let's assume I don't have a permit,
9  because I don't.  I'm walking down the street and I
10  have a gun on my hip.  You, as a police officer,
11  would that make you uncomfortable?
12    A.  Yeah, you're violating the law.
13    Q.  Okay.  Let's take this -- you see me
14  walking down the street, and you see a little clip
15  from the knife.  It's a regular folding knife in my
16  pocket.  Would that make you as nervous as if you
17  saw me with a gun on my hip?
18    A.  No.
19    Q.  Okay.  Would you agree with me that a
20  knife is less dangerous than a handgun?
21    A.  Yes.
22    Q.  Okay.
23    MR. STAMBOULIEH:  I think that's it.  Do
24  you have any other questions?
25    MR. BECK:  I don't.  Thank you.

28

1    MR. STAMBOULIEH:  I don't have any follow
2  up -- mo further questions.  So we're good.
3    THE REPORTER:  Mr. Stamboulieh?
4    MR. STAMBOULIEH:  Stamboulieh, close
5  enough.
6    MR. BECK:  I've worked with him for five
7  years.  I've never once seen a person get it right on
8  the first try.
9    MR. STAMBOULIEH:  And if you did get it
10  right, I would correct you and I would say it
11  differently.  I did it during law school.  It was
12  funny to me only.
13    THE REPORTER:  Are you wanting the
14  original of this transcript?
15    MR. STAMBOULIEH:  Did he want to read and
16  sign?
17    MR. AKAMINE:  Yes.  Why don't you send it
18  over to me?
19    MR. STAMBOULIEH:  Yeah, send me the bill.
20    THE REPORTER:  Okay.  Perfect.  Were you
21  wanting a copy, anything like that?
22    MR. STAMBOULIEH:  Can I have an etran?
23    THE REPORTER:  Yes.
24    (Whereupon, the deposition was concluded
25  at 12:26 p.m.)

29

1    CERTIFICATE
2
3    I, Melissa Murray, do hereby certify that I reported
4  all proceedings adduced in the foregoing matter and that
5  the foregoing transcript pages constitutes a full, true,
6  and accurate record of said proceedings to the best of
7  my ability.
8
9    I further certify that I am neither related to
10  counsel or any part to the proceedings nor have any
11  interest in the outcome of the proceedings.
12
13    IN WITNESS HEREOF, I have hereunto set my hand this
14  18th day of November, 2019.
15
16
17
18
19
20  /S/  Melissa Murray
21
22
23
24
25

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

ER107

30

```
 1  Date:    November 18, 2019    Assignment #: 32180-1
 2  Attorney: Ryan Akamine, Esquire
 3  Deponent: Robin Nagamine
 4  Case:    Teter & Grell vs. Connors & Cummings
 5
 6  ATTORNEY - NO TRANSCRIPT ORDERED:  Signature of your
 7  client is required.  It will be necessary for you to call
 8  our offices and arrange for an appointment for your client
 9  to come in to read and sign their transcript.
10
11
12
13
14
15
16
17
18
19
20
21
22  CC:  Naegeli Deposition & Trial
23       Stephen Stamboulieh, Esquire
24
25
```

32

```
 1                   DECLARATION
 2  Deposition of: Robin Nagamine      Date: 10/28/19
 3  Regarding:    Teter & Grell vs. Connors & Cummings
 4  Reporter:    Murray/Fiedler
 5  _____
 6
 7  I declare under penalty of perjury the following to
 8  be true:
 9
10  I have read my deposition and the same is true and
11  accurate save and except for any corrections as made
12  by me on the Correction Page herein.
13
14  Signed at _____, _____
15  on the _____ day of _____, 2019.
16
17
18
19
20
21
22
23
24            Signature_____
25                 Robin Nagamine
```

31

```
 1            CORRECTION SHEET
 2  Deposition of: Robin Nagamine        Date: 10/28/19
 3  Regarding:    Teter & Grell vs. Connors & Cummings
 4  Reporter:    Murray/Fiedler
 5  _____
 6  Please make all corrections, changes or clarifications
 7  to your testimony on this sheet, showing page and line
 8  number.  If there are no changes, write "none" across
 9  the page.  Sign this sheet on the line provided.
10  Page  Line  Reason for Change
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24          Signature_____
25               Robin Nagamine
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM
ER108

# Weapon Involvement and Injury Outcomes in Family and Intimate Assaults

Linda E. Saltzman, PhD; James A. Mercy, PhD; Patrick W. O'Carroll, MD, MPH; Mark L. Rosenberg, MD, MPP; Philip H. Rhodes, MS

**Objective.**—To compare the risk of death and the risk of nonfatal injury during firearm-associated family and intimate assaults (FIAs) with the risks during non–firearm-associated FIAs.

**Design.**—Records review of police incident reports of FIAs that occurred in 1984. Victim outcomes (death, nonfatal injury, no injury) and weapon involvement were examined for incidents involving only one perpetrator.

**Setting.**—City of Atlanta, Ga, within Fulton County.

**Participants.**—Stratified sample (n=142) of victims of nonfatal FIAs, drawn from seven nonfatal crime categories, plus all fatal victims (n=23) of FIAs.

**Main Outcome Measures.**—Risk of death (vs nonfatal injury or no injury) during FIAs involving firearms, relative to other types of weapons; risk of nonfatal injury (vs all other outcomes, including death) during FIAs involving firearms, relative to other types of weapons.

**Results.**—Firearm-associated FIAs were 3.0 times (95% confidence interval, 0.9 to 10.0) more likely to result in death than FIAs involving knives or other cutting instruments and 23.4 times (95% confidence interval, 7.0 to 78.6) more likely to result in death than FIAs involving other weapons or bodily force. Overall, firearm-associated FIAs were 12.0 times (95% confidence interval, 4.6 to 31.5) more likely to result in death than non–firearm-associated FIAs.

**Conclusions.**—Strategies for limiting the number of deaths and injuries resulting from FIAs include reducing the access of potential FIA assailants to firearms, modifying firearm lethality through redesign, and establishing programs for primary prevention of violence among intimates.

*(JAMA. 1992;267:3043-3047)*

THE PUBLIC health approach to violence prevention incorporates strategies not only for reducing the occurrence of violent events, but also for reducing the likelihood of death or nonfatal injury when such events do occur.[1] A critical issue in the public debate over appropriate policies for preventing injuries in violent situations is the extent to which the involvement of particular weapon types alters the likelihood of injurious outcomes. Research on assault[2] has found that the involvement of firearms increases the likelihood that assault incidents will result in homicide. Research on robbery suggests, however, that although a gun's involvement in a robbery may increase the risk of homicide,[3] victims of robberies committed with guns are *less* likely to sustain nonfatal injuries than are victims of robberies in which guns are not involved.[4,5] No study to date has examined how the involvement of firearms or other weapons affects the risk of death or nonfatal injury during violence among intimates. Many investigators believe that family and intimate assaults (FIAs) are often the impulsive results of violent arguments rather than being premeditated acts. For such FIAs, access to lethal weapons may be an important determinant of the incident's outcome. We analyzed data from a study of FIAs in a large, urban community[6] to estimate (1) the probability of death resulting from FIAs, given differences in the types of weapons involved in the incidents, and (2) the probability of nonfatal injury resulting from FIAs, given differences in weapon involvement.

## METHODS

Incident reports from the Bureau of Police Services for the city of Atlanta, Ga, for 1984 were reviewed to identify fatal and nonfatal FIAs, as has been described in greater detail elsewhere.[6,7] Cases had to meet all of the following criteria: (1) the incident was classified as a homicide or as a nonfatal incident involving one or more of the following: physical contact between parties, use of a weapon, threat with a weapon, or explicit verbal threat of bodily harm; (2) the victim's residence and the site of the incident were within the city of Atlanta and within Fulton County; (3) the incident involved only one perpetrator; or (4) the victim and perpetrator were emotionally intimate when the incident

From the Division of Injury Control, National Center for Environmental Health and Injury Control, Centers for Disease Control, Atlanta, Ga.

Presented at the American Public Health Association meeting, Atlanta, Ga, on November 12, 1991.

Reprint requests to Centers for Disease Control, 1600 Clifton Rd, Mailstop F-36, Atlanta, GA 30333 (Dr Saltzman).

ER109

Downloaded From: https://jamanetwork.com/ by Alan Beck on 04/09/2019

occurred or had been at some earlier time. Emotionally intimate relationships included, for example, marriage, boyfriend-girlfriend relationships, terminated nonspousal and spousal partnerships, and other relationships among family members and relatives.

All homicides that occurred during the study period and that met the above criteria (n=23) were included. These homicides represented nearly one fifth of all homicides that occurred in Atlanta during the study period. Nonfatal FIAs (n=142) were drawn from a stratified sample of incidents from seven nonfatal crime categories (rape, robbery, assault, disorderly conduct, family and children offenses, sex offenses, and other).

Outcomes for victims were coded as death, nonfatal injury, or no injury. Weapons were considered "involved" whether the perpetrator actually used them or only brandished them. Weapon involvement was coded "firearm," "knife or other cutting instrument," or "bodily force or noncutting/nonfirearm weapon." "Bodily force or noncutting/nonfirearm weapon" included involvement of objects other than firearms or knives (eg, a blunt object or rock) or use of bodily force in the absence of other weapons. (Bodily force alone was involved in 4% [n=1] of fatal incidents and 50% [n=71] of nonfatal incidents.) Three nonfatal incidents (2%) in which perpetrators made verbal threats of bodily harm but used no weapons are also included in this category.

When incidents involved weapons in combination with bodily force (17% [n=4] of fatal incidents and 13% [n=19] of nonfatal incidents), we coded for whichever weapons were involved, since bodily force was potentially present during all incidents. For three nonfatal incidents that involved more than one weapon plus bodily force, we coded only for the most lethal weapon involved (two firearms, one knife or other cutting instrument).

We used the weapon and injury outcome data to examine two specific questions: (1) What is the risk of death (vs nonfatal injury or no injury) during FIAs involving firearms relative to other types of weapons? (2) What is the risk of nonfatal injury (vs all other outcomes, including death) during FIAs involving firearms relative to other types of weapons?

To determine the risk of nonfatal injury or of death, all nonfatal incidents in a given crime category were weighted to reflect the estimated incidence for that crime category. The weights for nonfatal victims varied from about 20 to 40; all homicides were weighted 1. Estimated variances for the probability of death also took the weights into account.

We then estimated the probabilities of death or of nonfatal injury given the involvement of different weapon types.[8] For example, for incidents involving firearms:

$$p \text{ (nonfatal injury, firearm incidents)} = \frac{\sum_{i=1}^{n} w_i d_i}{\sum_{i=1}^{n} w_i}$$

where $d_i=1$ if person $i$ suffered a nonfatal injury, $d_i=0$ if person $i$ did not suffer a nonfatal injury (ie, death or no injury), and $w_i$ = weight for person $i$.

Confidence intervals for the probabilities were computed first on a transformed scale, in this case the logit scale [ $\log(p/1-p)$ ], then transformed back to the original scale. This method provides more accurate confidence intervals than intervals computed on the original scale, especially when the estimated probability is small as was the case here for the probability of death.

When comparing two weapon categories, we estimated the relative risks by taking the ratio of the two estimated probabilities. We computed the confidence intervals for the relative risks on the log scale, that is, log [$p$(firearm)/$p$ (knife or other cutting instrument) ] and then transformed the result back to the ratio scale.

The estimated variance of the log relative risk for the two estimated probabilities $p_1$ and $p_2$ was obtained using the delta method or Taylor series[9] with the following formula:

$$\text{Var}\left( \log \frac{\hat{p}_1}{\hat{p}_2} \right) = \frac{1}{\hat{p}_1}^2 \text{Var}(\hat{p}_1) + \frac{1}{\hat{p}_2}^2 \text{Var}(\hat{p}_2)$$

## RESULTS

Weapon-specific victim outcomes are presented in Table 1. Less than 1% of all FIAs resulted in death. The percentage with fatal outcomes was greatest when firearms were involved. Death was least likely when neither firearms nor knives were involved. By contrast, nearly half the incidents involving firearms resulted

in nonfatal injury, whereas nearly two thirds of the FIAs involving knives or other cutting instruments and more than two thirds of those involving other weapons or bodily force resulted in nonfatal injuries. National Crime Survey data analysis[10,11] indicates that armed offenders do not always use their weapons to injure their victims. For example, an offender with a firearm may push, hit, or kick the victim. However, in all but two incidents in this study, the injuries sustained were those expected from the types of weapons involved (eg, a gunshot wound when a firearm was involved). The two exceptions were a nonfatal incident involving a knife in which the victim was injured but suffered no cuts and another nonfatal incident in which the victim suffered cuts although a firearm was involved.

Table 2 shows risk of death (vs nonfatal injury or no injury) and risk of nonfatal injury (vs all other outcomes including death) expressed per 1000 weapon-specific incidents, with associated 95% confidence intervals. The FIAs that involve firearms have the highest risk of death (39.0 per 1000 incidents), whereas FIAs involving bodily force or noncutting/nonfirearm weapons have the lowest risk (1.7 per 1000 incidents). However, firearm-associated FIAs have the lowest risk of nonfatal injury (452.3 per 1000 incidents), whereas FIAs involving bodily force or noncutting/nonfirearm weapons have the highest risk (692.9 per 1000 incidents).

Table 3 shows the risk of death for FIAs involving firearms, relative to FIAs involving other types of weapons. The FIAs that involve firearms are three times more likely to result in death than FIAs involving knives or other cutting instruments, and they are 23 times more likely to result in death than FIAs involving bodily force or noncutting/nonfirearm weapons. Overall, FIAs involving firearms are 12 times more likely to result in death than all nonfirearm FIAs. The confidence interval for the estimated relative risk comparing firearm-associated FIAs with FIAs that involve knives

**Table 1.—Number of Deaths and Estimated Number of Nonfatal Outcomes,\* by Weapon Type, Family and Intimate Assault, Atlanta, Ga, 1984**

| Weapon Type | Outcome, % (No.) | | | |
| --- | --- | --- | --- | --- |
| | Death | Nonfatal Injury | No Injury | Total |
| Firearm | 3.9 (14) | 45.2 (163) | 50.9 (183) | 100 (360) |
| Knife or other cutting instrument | 1.3 (5) | 62.7 (244) | 36.0 (140) | 100 (389) |
| Bodily force or noncutting/nonfirearm weapon | 0.2 (4) | 69.3 (1667) | 30.5 (735) | 100 (2406) |

\*The numbers of deaths for each weapon type are actual counts. The numbers of incidents with nonfatal injuries and the numbers of incidents with no injuries are estimates.

**ER110**

Downloaded From: https://jamanetwork.com/ by Alan Beck on 04/09/2019

Table 2.—Risk of Death or Nonfatal Injury by Weapon Type, Family and Intimate Assault, Atlanta, Ga, 1984

| Weapon Type | Risk per 1000 Weapon-Specific Incidents (95% Confidence Interval) | |
| --- | --- | --- |
| | Death | Nonfatal Injury |
| Firearm | 39.0 (19.0-76.0) | 452.3 (247.3-675.1) |
| Knife or other cutting instrument | 12.8 (5.0-34.0) | 626.9 (402.4-807.8) |
| Bodily force or noncutting/ nonfirearm weapon | 1.7 (0.6-4.5) | 692.9 (596.2-776.4) |
| Total nonfirearm weapons | 3.2 (1.6-6.4) | 683.8 (594.8-761.4) |

Table 3.—Risk of Death or Nonfatal Injury During Firearm-Associated FIAs, Relative to Non–Firearm-Associated FIAs, Atlanta, Ga, 1984*

| Weapon Types Compared | Relative Risk (95% Confidence Interval) | |
| --- | --- | --- |
| | Death | Nonfatal Injury |
| Firearms vs knives or other cutting instruments | 3.0 (0.9-10.0) | 0.7 (0.4-1.3) |
| Firearms vs bodily force or noncutting/nonfirearm weapons | 23.4 (7.0-78.6) | 0.7 (0.4-1.1) |
| Firearms vs all nonfirearms | 12.0 (4.6-31.5) | 0.7 (0.4-1.1) |

*FIA indicates family and intimate assault.

or other cutting instruments includes 1; the confidence intervals for the other relative risks do not.

The relative risk of nonfatal injury for firearm-associated FIAs relative to non–firearm-associated FIAs are also shown in Table 3. Regardless of the weapon category with which they are compared, firearm-associated FIAs have a lower risk of nonfatal injury (relative risk = 0.7). For each relative risk the confidence interval includes 1.

## COMMENT
### Weapon-Specific Differences in the Risk of Fatal FIAs

We found clear evidence that firearm-associated FIAs are much more likely to result in death than non–firearm-associated FIAs. This finding is consistent with results from studies of other types of violence: case fatality rates for assaults, robberies, and other violent altercations are much higher when the assailants use firearms than when such incidents involve cutting instruments, blunt objects, or body parts.[2,12] Our analysis of National Crime Survey data[13] and vital statistics mortality data[14] also confirms that case fatality rates are higher when firearms are involved.

Two interpretations have been advanced to explain this weapon-specific difference in the risk of death during other types of violent altercations, and these interpretations may be applied to our consideration of FIAs. First, it has been suggested that violent altercations involving firearms will result in death more frequently than altercations without firearms simply because, all other things being equal, firearms are more deadly than other weapons.[2,12] Inherent in this interpretation is the assumption that most people who kill their family members or intimates with a firearm would be unable or unwilling to exert the greater physical or psychological effort required to kill with another, typically available weapon. The implication of this first interpretation is that limiting immediate access to firearms or re-designing firearms so that they are less lethal or less easily loaded and fired might have a substantial impact on reducing mortality from such incidents.

The second interpretation is that the higher case fatality rates for violent altercations involving firearms reflect the relatively higher prevalence of assailants with a clear and sustained intent to kill among those who use firearms.[15] That is to say, people who intend to kill another person choose firearms because of their relatively greater deadliness compared with other weapons. Under this interpretation, it is conceivable that a determined assailant without a firearm but with a clear and sustained homicidal intent would exert whatever other greater efforts would be required to kill the intended victim. In contrast to the first interpretation, the implication of this interpretation is that reduced access to firearms during FIAs would not substantially reduce the number of homicides because assailants with clear and sustained intent to kill would substitute other weapons to achieve the same destructive goal.

Both interpretations grant that killing with a firearm is easier than killing with most other, typically available weapons. Therefore, the magnitude of the preventive effect of limiting ready access to firearms will depend largely on the proportion of assailants who are involved in fatal firearm-associated FIAs and who (if no firearm were available) would have such a clear and sustained homicidal intent that they would use some other weapon and still succeed in killing their victim. Unfortunately, there are no data available with which to determine that proportion.

There is no reason to believe, however, that even among people with determined homicidal intent, homicidal efforts will always be successful when other weapons must be substituted for firearms. Granting that some persons, in the absence of firearms, would commit homicide using alternate weapons, we find no evidence to suggest that a substantial proportion of fatal FIAs involve persons with such sustained, cold-blooded homicidal intent. Indeed, studies of male batterers and anecdotal reports suggest that many FIAs (fatal and nonfatal) are a spontaneous response to conflict or anger and frequently occur without premeditation or planning.[16-18]

In addition, some indirect evidence shows that assailants who use firearms are not more likely to have a clear intent to kill than those who use knives. Zimring[2] investigated a series of attacks involving guns or knives, using the location and number of wounds inflicted as a basis for judging the assailant's intent. In these attacks, which typically involved relatives and acquaintances, a greater percentage of attackers with knives than with guns appeared to be intent on killing.[2] Finally, to date, researchers have found no evidence of compensatory increases in homicides involving other weapons when firearm access is restricted.[19-22]

Regardless of which of the two interpretations dominates in explaining weapon-related patterns in the risk of death, reduced access to firearms is likely to result in fewer homicides because killing is easier with firearms. However, the magnitude of the preventive effect of reduced access would be greater for homicides committed impulsively than for those marked by sustained homicidal intent. Given the available evidence, we interpret weapon-specific differences in the risk of death from FIAs as due primarily to the first interpretation—the greater lethality of firearms. This interpretation suggests two preventive approaches.

First, if access to loaded firearms were reduced, fatal FIAs might be prevented because assailants would be forced to substitute weapons less certain to kill. Many different strategies could be used

Downloaded From: https://jamanetwork.com/ by Alan Beck on 04/09/2019

ER111

to reduce firearm access. Innovative strategies should be explored, such as police confiscation of firearms used during FIA incidents, restriction of firearm purchase or acquisition by persons subject to domestic violence restraining orders or protective orders (as is the case in California[23]), or restriction of firearm acquisition or purchase by convicted spouse abusers—both misdemeanants and felons. Strict enforcement of existing laws prohibiting threats to kill or threats with weapons and of laws prohibiting firearm ownership by convicted felons should decrease firearm access for FIA perpetrators. In addition, educational interventions might be designed to disseminate information about concrete steps to reduce immediate access, such as separate locked storage for firearms and ammunition. Public information campaigns could be designed to communicate important research findings about the danger of keeping loaded firearms in the home,[24] so that the public can make more informed decisions about owning or purchasing firearms for protection.

Second, the design of firearms could be modified to decrease their lethality.[25] For example, handguns could be designed to be less easily loaded and fired. They could also be designed to shoot something other than bullets (eg, electricity, tranquilizers, or anesthetics). In 1986, the Attorney General of the United States held the Conference on Less Than Lethal Weapons[26] to lay the groundwork for developing useful, safe technology for less than lethal weapons; efforts are still under way in this regard.

## Weapon-Specific Differences in the Risk of Nonfatal FIAs

In this study we found that the presence of a firearm lowered the risk of nonfatal injury relative to other weapons, although this effect was not statistically significant. Research on violent encounters indicates that the risk of nonfatal injury is significantly lower when firearms are involved, relative to other weapons.[4,5,10] This finding has been interpreted to suggest that when firearms are involved in a violent incident, intimidated victims may minimize their risk of injury by avoiding physical altercations with their assailants. This finding also suggests that a strategy of reducing the access of potential FIA assailants to firearms may come at the cost of increased nonfatal injuries.

## The Predominance of Nonfatal FIAs

Although intervening to reduce fatal injuries is highly desirable, expanded emphasis should also be placed on preventing FIAs from occurring in the first place. More than 99% of FIAs do not result in death, and in addition to injuries, nonfatal FIAs have other serious consequences. Battered women are at increased risk for psychosocial and other health problems, including depression, alcohol and other drug problems, suicide attempts, and child abuse.[27-32] In addition, FIAs may contribute to the intergenerational transmission of violence.[33,34] Effective primary prevention strategies will reduce not only nonfatal injuries but also fatal injuries. Such strategies may need to emphasize attitude and behavior change by potential assailants, rather than relying on environmental modifications, since FIAs frequently involve the use of readily available household objects and bodily force.

Many different preventive strategies have been proposed for reducing the incidence of FIAs.[35] These include comprehensive community-based programs; teaching children and adolescents nonviolent alternatives for dealing with stress and anger[36,37]; devising ways to prevent dating violence, which is a possible precursor to adult violence among intimates[38,39]; targeting the news and entertainment media's role in legitimizing violence[40]; and increasing training for health care providers in identifying and referring women at risk of being abused (including the use of standardized protocols),[35,41-43] because some researchers believe that a series of family violence incidents may eventually escalate to violence resulting in serious injury or death.[44] Early identification and referral of persons at risk may allow for an intervention before situations escalate.

## The Impact of Biases in Risk Estimates

Risk estimates presented in this study could be biased by our reliance on data that relate only to incidents that come to police attention. It is well known that nonfatal FIAs are underreported to police.[45,46] We have therefore overestimated, to some extent, the risk of death in both firearm and nonfirearm FIAs. Data from the National Crime Survey for the years 1979 to 1986 indicate, however, that FIA events that involve firearms are much more likely to be reported to police than those that involve other weapons, and that FIA events that involve nonfatal injuries are much more likely to be reported to police than those involving no injury.[47] These data suggest that we overestimated the risk of death to a greater extent for non–firearm-associated FIAs than for firearm-associated FIAs. Therefore, in Table 3, we have underestimated the relative risk of death comparing firearm-associated with non–firearm-associated FIAs. In addition, these underreporting patterns do not appear to have introduced any substantial bias into our estimates of the risk of nonfatal injury in firearm-associated FIAs relative to non–firearm-associated FIAs.

## CONCLUSION

We estimate that FIAs involving firearms are at least 12 times more likely to result in death than FIAs involving all other types of weapons. Reducing the access of potential FIA assailants to firearms and reducing firearm lethality through redesign represent potentially effective prevention strategies. Simultaneously, efforts to reduce the overall incidence of FIAs through primary prevention must be expanded. All three of these prevention strategies must be evaluated for efficacy.

For this report we used data from the study of Family and Intimate Assaults in Atlanta, Ga, supported under a collaborative agreement between the Centers for Disease Control and the Georgia Department of Human Resources (U50/CCU400931-01-1), with the additional collaboration of the Fulton County (Georgia) Health Department and the Atlanta Department of Public Safety. Additional support was provided through an interagency agreement (86-IJ-R-200) with the National Institute of Justice.

The following were members of the Collaborative Working Group for the Study of Family and Intimate Assaults in Atlanta: (1) Atlanta Department of Public Safety: George Napper, PhD, Ardith Peters, PhD, Guy O. Seymour, PhD, and Jack Mallory, MSW; (2) Fulton County Health Department: William R. Elsea, MD, MPH, Robert J. Finton, MSPH, and Richard F. Lyles, PhD; (3) Georgia Department of Human Resources: R. Keith Sikes, DVM, MPH, Project Director; Jane C. Carr, RN, Assistant Project Director; Sandra S. Huguley, MA, Senior Research Associate; and Anne Becker, Lois Ellison, Steve Erickson, Theresa Irby, Debbie Lester, Kathy Marth, William D. Patterson, MA, Terrie Sterling, MA, MS, and Angela Wine, Research Associates; and (4) Centers for Disease Control: Linda E. Saltzman, PhD, Project Officer; James A. Mercy, PhD; Mark L. Rosenberg, MD, MPP; Richard J. Waxweiler, PhD; and Harvey F. Davis, Jr, MPH.

We thank Garen J. Wintemute, MD, MPH, Colin Loftin, PhD, and Kenneth E. Powell, MD, MPH, for their helpful comments on a draft of this article.

## References

1. Mercy JA, O'Carroll PW. New directions in violence prediction: the public health arena. *Violence Victims.* 1988;3:285-301.
2. Zimring F. Is gun control likely to reduce violent killings? *Univ Chicago Law Rev.* 1968;35:721-737.
3. Cook PJ. Robbery violence. *Criminal Law Criminol.* 1987;78:357-376.
4. Cook PJ. The effect of gun availability on violent crime patterns. *Ann Am Acad Political Soc Sci.* 1981;455:63-79.
5. Conklin J. *Robbery and the Criminal Justice System.* Philadelphia, Pa: JB Lippincott; 1972.
6. Saltzman LE, Mercy JA, Rosenberg ML, et al. Magnitude and patterns of family and intimate assault in Atlanta, Georgia, 1984. *Violence Victims.* 1990;5:3-17.
7. Saltzman L, Mercy JA, Rhodes, PH. Identification of nonfatal family and intimate assault incidents in police data. *Am J Public Health.* In press.
8. Cochran WG. *Sampling Techniques.* 3rd ed. New York, NY: John Wiley & Sons Inc; 1977.

ER112

Downloaded From: https://jamanetwork.com/ by Alan Beck on 04/09/2019

9. Cox DR, Hinkley DV. *Theoretical Statistics*. London, England: Chapman & Hall Ltd; 1974.

10. Rand M, DeBerry M, Klaus P, Taylor B. *The Use of Weapons in Committing Crimes*. Washington, DC: US Dept of Justice; 1986. Bureau of Justice Statistics Special Report.

11. Rand MR. *Handgun Crime Victims*. Washington, DC: US Dept of Justice; 1990. Bureau of Justice Statistics Special Report.

12. Cook PJ. The technology of personal violence. In: Tonry M, ed. *Crime and Justice: A Review of Research*. 14th ed. Chicago, Ill: University of Chicago Press; 1991:1-71.

13. *Criminal Victimization in the United States, 1988*. Washington, DC: US Dept of Justice; 1990.

14. National Center for Health Statistics. *Vital Statistics Mortality Data, Compressed Mortality Files*. Hyattsville, Md: Centers for Disease Control; 1988.

15. Wolfgang ME. *Patterns in Criminal Homicide*. Philadelphia: University of Pennsylvania Press; 1958.

16. Adams DC, McCormick AJ. Men unlearning violence: a group approach based on the collective model. In: Roy M, ed. *The Abusive Partner: An Analysis of Domestic Battering*. New York, NY: Van Nostrand Reinhold Co; 1982:170-197.

17. Campbell J. Misogyny and homicide of women. *Adv Nurs Sci*. 1981;3:67-85.

18. Goetting A. Men who kill their mates: a profile. *J Fam Violence*. 1989;4:285-296.

19. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crimes, assaults, and homicide: a tale of two cities. *N Engl J Med*. 1988;319:1256-1262.

20. Hedeboe J, Charles AV, Nielsen J, et al. Interpersonal violence: patterns in a Danish community. *Am J Public Health*. 1985;75:651-653.

21. Baker SP. Without guns, do people kill people? *Am J Public Health*. 1985;75:587-588.

22. Sproule CF, Kennett DJ. Killing with guns in the U.S.A. and Canada 1977-1983: further evidence for the effectiveness of gun control. *Can J Criminol*. 1989;31:245-251.

23. Assembly Bill No. 108, 1991, Cal Stat ch 953.

24. Kellermann AL, Reay DT. Protection or peril? an analysis of firearm-related deaths in the home. *N Engl J Med*. 1986;314:1557-1560.

25. Webster DW, Chaulk CP, Teret SP, Wintemute GJ. Reducing firearm injuries. *Issues Sci Technol*. Spring 1991:73-79.

26. Sweetman S. *Report on the Attorney General's Conference on Less Than Lethal Weapons*. Washington, DC: National Institute of Justice, US Dept of Justice; 1987.

27. Stark E, Flitcraft A, Zuckerman D, Grey A, Robison J, Frazier W. *Wife Abuse in the Medical Setting: An Introduction for Health Personnel*. Washington, DC: Office of Domestic Violence; 1981. Monograph No. 7.

28. Koss MP, Koss PG, Woodruff WJ. Deleterious effects of criminal victimization on women's health and medical utilization. *Arch Intern Med*. 1991;151:342-347.

29. Stets JE, Straus MA. Gender differences in reporting marital violence and its medical and psychological consequences. In: Straus MA, Gelles RJ, eds. *Physical Violence in American Families: Risk Factors and Adaptations to Violence in 8,145 Families*. New Brunswick, NJ: Transaction Publishers; 1989:151-165.

30. Saunders DG. Family violence. *Emerg Care Q*. 1991;7:51-61.

31. Follingstad DR, Neckerman AP, Vormbrock J. Reactions to victimization and coping strategies of battered women: the ties that bind. *Clin Psychol Rev*. 1988;8:373-390.

32. Haber JD, Rogers A. Abused women and chronic pain. *Am J Nurs*. 1985;85:1010-1012.

33. Hotaling GT, Sugarman DB. An analysis of risk markers in husband to wife violence. *Violence Victims*. 1986;1:101-124.

34. Widom CS. The cycle of violence. *Science*. 1989; 244:160-166.

35. National Committee for Injury Prevention and Control. *Injury Prevention: Meeting the Challenge*. New York, NY: Oxford University Press Inc; 1989.

36. Levy B. *Skills for Violence-Free Relationships: Curriculum for Young People Ages 13-18*. Santa Monica: Southern California Coalition on Battered Women; 1984.

37. Family Violence Curriculum Project. *Preventing Family Violence: A Curriculum for Adolescents*. Boston: Massachusetts Dept of Public Health; 1984.

38. Billingham RE. Courtship violence: the patterns of conflict resolution strategies across seven levels of emotional commitment. *Fam Relations*. 1987;36:283-289.

39. Parrot A. *Acquaintance Rape and Sexual Assault Prevention Training Manual*. 2nd ed. Ithaca, NY: Dept of Human Service Studies, College of Human Ecology, Cornell University; 1986.

40. Gelles RJ, Cornell CP. *Intimate Violence in Families*. 2nd ed. Newbury Park, Calif: Sage Publications; 1990.

41. McLeer SV, Anwar RAH. The role of the emergency physician in the prevention of domestic violence. *Ann Emerg Med*. 1987;16:1155-1161.

42. *Healthy People 2000: National Health Promotion and Disease Prevention Objectives: Full Report, With Commentary*. Washington, DC: Public Health Service; 1991.

43. Centers for Disease Control. Education about adult domestic violence in U.S. and Canadian medical schools, 1987-88. *MMWR*. 1989;38:17-19.

44. Straus MA. Domestic violence and homicide antecedents. *Bull N Y Acad Med*. 1986;62:446-465.

45. Teske RHC Jr, Parker ML. *Spouse Abuse in Texas: A Study of Women's Attitudes and Experiences*. Huntsville, Tex: Survey Research Program, Criminal Justice Center, Sam Houston State University; 1983.

46. Schulman MA. *A Survey of Spousal Violence Against Women in Kentucky*. Washington, DC: US Dept of Justice; 1979.

47. US Dept of Justice, Bureau of Justice Statistics. *National Crime Surveys: National Sample, 1979-1987, Revised Questionnaire* [computer file]. 5th ICPSR ed. Ann Arbor, Mich: Inter-university Consortium for Political and Social Research [producer and distributor]; 1991. Conducted by the US Dept of Commerce, Bureau of the Census.

Family and Intimate Assaults—Saltzman et al **3047**

Downloaded From: https://jamanetwork.com/ by Alan Beck on 04/09/2019

**ER113**

# Guns and Knives in New Mexico: Patterns of Penetrating Trauma, 1978–1993

*Cameron Crandall, MD, Lenora Olson, MA, Lynne Fullerton, MA, David Sklar, MD, Ross Zumwalt, MD*

## ■ ABSTRACT

**Objective:** To identify patterns of nonfatal and fatal penetrating trauma among children and adults in New Mexico using ED and medical examiner data.
**Methods:** The authors retrospectively sampled in 5-year intervals all victims of penetrating trauma who presented to either the state Level-1 trauma center or the state medical examiner from a 16-year period (1978–1993). Rates of nonfatal and fatal firearm and stabbing injury were compared for children and adults.
**Results:** Rates of nonfatal injury were similar (firearm, 34.3 per 100,000 person-years; stabbing, 35.1). However, rates of fatal injury were significantly different (firearm, 21.9; stabbing, 2.7; relative risk: 8.2; 95% confidence interval: 5.4, 12.5). From 1978 to 1993, nonfatal injury rates increased for children ($p = 0.0043$) and adults ($p < 0.0001$), while fatal penetrating injury remained constant. The increase in nonfatal injury in children resulted from increased firearm injury rates. In adults, both stabbing and firearm nonfatal injury rates increased.
**Conclusions:** Nonfatal injury data suggest that nonfatal violence has increased; fatal injury data suggest that violent death rates have remained constant. Injury patterns vary by age, mechanism of trauma, and data source. These results suggest that ED and medical examiner data differ and that both are needed to guide injury prevention programs.
**Key words:** injury; trauma; prevention, injury; firearms; knives; wounds, penetrating; morbidity; mortality.

*Acad. Emerg. Med.* 1997; 4:263–267.

■ Penetrating injury is increasingly recognized as a public health threat. Firearms account for approximately 60% of violent deaths; knives and other sharp implements also contribute substantially to violent death.[1] This is particularly alarming for children, as increasing firearm fatality rates have been reported for this age group.[2] The epidemiology of penetrating injury comes largely from mortality data; a lack of morbidity data hinders a full understanding of the problem. Recently, ED data have been used to augment mortality data.[3]

In an effort to compare the patterns of nonfatal and

*From the Center for Injury Prevention, Research, and Education, the University of New Mexico, School of Medicine, Albuquerque, NM, Department of Emergency Medicine (CC, LO, LF, DS) and Department of Pathology (RZ); and the State Office of the Medical Investigator, Albuquerque, NM (RZ).*

*Received: June 26, 1996; revision received: September 20, 1996; accepted: October 8, 1996; updated: October 31, 1996.*

*Prior presentation: In part at the American Public Health Association annual meeting, San Diego, CA, November 1995.*

*Address for correspondence and reprints: Cameron S. Crandall, MD, Department of Emergency Medicine, Ambulatory Care Center, 4-W, University of New Mexico, School of Medicine, Albuquerque, NM 87131-5246. Fax: 505-272-6503; e-mail: ccrandall@salud.unm.edu*

fatal penetrating injury in children with that of adults, we compared a sample of children and adults who presented to an ED with penetrating injury with corresponding medical examiner data. We hypothesized that results from data sources would differ and that rates of penetrating injury, especially from firearms, would increase for children.

## ■ METHODS

**Study Design:** We retrospectively analyzed all victims of penetrating trauma (firearm or stabbing injury) who presented to either the state Level-1 trauma center or the state medical examiner over a 16-year period (1978–1993) to determine injury trends.

**Population and Setting:** We collected data from 2 sources: 1) the University Hospital ED in Albuquerque, NM (ED data), and 2) the Office of the Medical Investigator of the State of New Mexico (medical examiner data). University Hospital has been the only Level-1 trauma facility in the state since 1983. The hospital has historically served as the Bernalillo County medical center. The medical examiner investigates and certifies all injury deaths in the state and performs autopsies in circumstances in which the cause or manner of death is uncertain or a medicolegal issue is questioned.

From both sources, we selected all cases of penetrating trauma from firearms or stabbing/cutting implements for the first 6 months (January 1–June 30) of 1978, 1983, 1988, and 1993. For the medical examiner data, we selected all cases from Bernalillo County, which includes Albuquerque.

If a person presented to the ED more than once (12 persons) during the study period, we reviewed each presentation to determine whether subsequent visits were related to the initial injury. When related, we included only the first visit. One person presented twice for different injuries and we counted each visit separately.

**Measurements:** Data collected from the ED record included name, age, sex, date and time of visit, and method of injury. We defined children as patients <18 years old. Information about intent was not available from ED data. Data collected from the medical examiner records included name, age, sex, date of death, cause of death, agent of injury, and manner or intent of death.

Rates are expressed per 100,000 person-years. We used ED data to calculate nonfatal injury rates and medical examiner data to calculate fatal injury rates. We used the Bernalillo County population as the denominator for both data sets. Population denominators for rate calcula-

tions came from the 1980 U.S. Census for 1978 and 1983 and from the 1990 U.S. Census for 1988 and 1993.

**Data Analysis:** The direct method of adjustment corrected for changes in the distributions of age and sex over time, using the sum of the New Mexico 1980 and 1990 populations as the standard.[4] Relative rates were based on crude data.

We used the normal approximation to compare proportions, the $\chi^2$ test for differences in categorical data, and the unpaired t-test for differences of means.[5] The statistical package Epi-Info (version 5.01b; CDC, Atlanta, GA) provided trend analyses and confidence interval (CI) estimates for relative rates. A 2-tailed p-value $\leq 0.05$ was considered significant. Rates are reported with 95% CIs.

## ■ RESULTS

We identified 641 ED and 221 medical examiner cases with penetrating injuries (Table 1). There were more children in the ED data compared with the medical examiner data (14% vs 10%, p = 0.12). Adults presenting to the ED with penetrating trauma were significantly younger than the medical examiner subjects (mean 30.1 vs 38.5 years, $t_{743}$ = 7.99, p < 0.0001). Suicide was the most common

■ TABLE 1 Demographic Characteristics, Method of Injury, and Manner of Death of Persons Presenting with Penetrating Trauma to the ED or the State Medical Examiner, by Age, Bernalillo County, NM, 1978–1993

| | ED | | | | Medical Examiner | | | |
|---|---|---|---|---|---|---|---|---|
| | Child | Adult | Unknown | Total | Child | Adult | Unknown | Total |
| **Sex** | | | | | | | | |
| Male | 91% (81) | 86% (472) | 83% (5) | 87% (558) | 77% (17) | 79% (157) | — (0) | 82% (174) |
| Female | 9% (8) | 13% (71) | — (0) | 12% (79) | 23% (5) | 21% (42) | — (0) | 18% (47) |
| Unknown | — (0) | — (0) | 17% (1) | 1% (4) | — (0) | — (0) | — (0) | — (0) |
| **Age (years)** | | | | | | | | |
| Mean | 14.2 | 30.1 | — | 29.9 | 15.6 | 38.5 | — | 36.1 |
| Median | 15 | 28 | | 26 | 16 | 35 | | 31 |
| Range | 4–17 | 18–81 | | 4–81 | 8–17 | 18–91 | | 8–91 |
| **Method of injury** | | | | | | | | |
| Stabbing | 30% (27) | 55% (299) | 67% (4) | 51% (330) | 5% (1) | 12% (23) | — (0) | 11% (24) |
| Firearm | 70% (62) | 46% (250) | 33% (2) | 49% (314) | 95% (21) | 88% (176) | — (0) | 89% (197) |
| Handgun | | | | | 62% (13) | 69% (122) | — (0) | 69% (135) |
| Rifle | | | | | 5% (1) | 12% (21) | — (0) | 11% (22) |
| Shotgun | | | | | 10% (2) | 7% (12) | — (0) | 7% (14) |
| Non-powder | 23% (14) | 2% (5) | — (0) | 6% (19) | — (0) | — (0) | — (0) | — (0) |
| **Manner of death** | | | | | | | | |
| Total fatalities | 3% (3) | 6% (33) | 33% (2) | 6% (39) | 100% (22) | 100% (199) | — (0) | 100% (221) |
| Homicide | — (0) | 48%* (16) | — (0) | 41%* (16) | 32% (7) | 40% (80) | — (0) | 39% (87) |
| Suicide | 67%* (2) | 45%* (15) | — (0) | 44%* (17) | 59% (13) | 57% (113) | — (0) | 57% (126) |
| Unintentional | 33%* (1) | 6%* (2) | — (0) | 8%* (3) | 9% (2) | 3% (5) | — (0) | 3% (7) |
| Undetermined | — (0) | 3%* (1) | 100%* (2) | 8%* (3) | — (0) | 1% (1) | — (0) | 0% (1) |
| TOTAL | 14% (89) | 85% (546) | 1% (6) | 100% (641) | 10% (22) | 90% (199) | 0% (0) | 100% (221) |

*Percentage estimates refer to the total 39 fatalities identified in the University Hospital ED data set (see text).

ER115

■ **TABLE 2** Age- and Sex-adjusted Nonfatal and Fatal Injury Rates for Persons Presenting with Penetrating Trauma to the ED or the State Medical Examiner, by Cause, Sex, and Age, Bernalillo County, NM, 1978–1993

| | Firearm | | | | Stabbing | | | |
|---|---|---|---|---|---|---|---|---|
| | Injury Rate* | n | Mortality Rate* | n | Injury Rate* | n | Mortality Rate* | n |
| Total† | 34.3 | 314 | 21.9 | 197 | 35.1 | 330 | 2.7 | 24 |
| Males‡ | 59.6 | 266 | 35.5 | 156 | 64.2 | 295 | 4.1 | 18 |
| <18 years | 43.6 | 55 | 12.7 | 16 | 20.6 | 26 | 0.8 | 1 |
| 18+ years | 67.0 | 210 | 44.6 | 140 | 84.5 | 265 | 5.4 | 17 |
| Females‡ | 9.8 | 46 | 8.9 | 41 | 6.9 | 33 | 1.3 | 6 |
| <18 years | 5.8 | 7 | 3.3 | 4 | 0.8 | 1 | 0.8 | 1 |
| 18+ years | 11.5 | 39 | 10.9 | 37 | 9.4 | 22 | 1.5 | 5 |

*Rate per 100,000 persons.
†Adjusted for age and sex.
‡Adjusted for age.

manner of death for both children (59%) and adults (57%).

Stabbing injuries comprised half of ED cases, but only 1 in 9 medical examiner fatalities (p < 0.0001). Among ED cases, more children presented with firearm than with stab injuries, while the reverse was true for adults (p < 0.0001). In contrast, there was little difference in the method of injury between children and adults in the medical examiner data (p = 0.32). When firearm type was specified in the medical examiner data, handguns accounted for the majority of fatalities for both children and adults. Sixteen percent (95% CI: 9.1, 25.1%) of children in the ED had nonpowder (BB/pellet) firearm injuries; only 1% (95% CI: 0.3, 2.1%) of adults had this type of injury. We identified no fatality from nonpowder firearms.

Nonfatal firearm injury rates were similar to nonfatal stabbing injury rates (Table 2). Among fatal injuries, New Mexicans were 8.2 times more likely to die from firearm than stabbing injuries (95% CI: 5.4, 12.5). Longitudinal trends showed significant increases in nonfatal firearm ($\chi^2$ trend test, 15.8, p = 0.00007) and stabbing ($\chi^2$ 19.1, p = 0.00001) injury rates among adults but an increase only in nonfatal firearm injury rates ($\chi^2$ 13.3, p = 0.0003) among children. Fatal injury rates remained constant for both children and adults (Fig. 1).

■ **DISCUSSION**

Emergency department data show increasing nonfatal penetrating injury rates, but medical examiner data show constant fatal injury rates. In isolation, each data source could lead to distinct conclusions. Together, these data sets provide a better understanding of violent penetrating injury.

Until recently, children had consistently experienced low injury rates compared with adults. Consistent with other studies, we observed a disturbing increase in firearm injury rate among children.[2,3] The rapid growth of New

Mexico's population and an increase in the incidence of gang-related violence may explain in part why children's injury patterns have increased and reached the same proportions as adults. The observed increase in nonfatal firearm rates in children without a concomitant rise in fatal firearm rates may be explained by several factors: assailants may be younger, may be less accurate, or may have used a lower-caliber weapon, such as a nonpowder firearm. Although the lethality of these weapons are lower than conventional firearms, the morbidity can be substantial.[6,7] Additionally, recent efforts to improve the quality of emergency medical services (EMS) for children may have reduced mortality with better care and treatment of childhood injuries.[8]

Firearms and knives contributed equally to nonfatal injuries, but most fatal injuries involved firearms. The greater availability of knives and the greater lethality of firearms may explain this difference.[9,10] Epidemiologic evidence demonstrates a strong relationship between the presence of firearms and the probability of violent injury.[11–13] Furthermore, firearms are the predominant method of injury among suicide deaths.[1] As suicide was the most common manner of death in the medical examiner data, it is not surprising that firearms were overrepresented in this data set. While firearm violence prevention strategies have concentrated on limiting access to firearms through restrictive licensing, waiting periods, and other methods, the pervasive ownership of sharp instruments at home limits the efficacy of this strategy for stab injuries. Instead, prevention of stab injuries must alter factors surrounding the injury event, such as the use of violence to resolve conflict, and alcohol and other drug use. These strategies could also reduce firearm injuries.

We were surprised to find increasing nonfatal injury rates when fatal injury rates remained constant. Using only mortality data, we would have been unaware of the increasing rates of nonfatal penetrating injury. The non-

266                                    ACADEMIC EMERGENCY MEDICINE   APR 1997   VOL 4/NO 4



**FIGURE 1.** Nonfatal and fatal injury rates for persons presenting with penetrating trauma to the ED or the state medical examiner, by age, method, and year, adjusted for age and sex. Bernalillo County, NM, 1978–1993.

fatal trend is disturbing and highlights the importance of linking morbidity data with mortality data to provide a more detailed understanding of penetrating injury epidemiology. Morbidity data are usually more difficult to collect than mortality data and in the past have been used infrequently for public health purposes. Collection of morbidity data usually entails medical record review—a labor-intensive strategy that may deter public health professionals and other professionals from collecting these data. National and local efforts are under way to link morbidity and mortality data sources.[14,15] These efforts will provide a more comprehensive description of injury in the United States.

## ■ LIMITATIONS AND FUTURE QUESTIONS

Our nonfatal penetrating trauma injury rate estimates almost certainly underestimate the true rates. Although the hospital has been the state's only Level-1 trauma facility since 1983, several other local hospitals treat penetrating injuries. This loss of cases to other facilities may be offset by cases referred to the Level-1 trauma facility from outside the county and, occasionally, from outside the state. Changes in county and statewide referral patterns may have occurred around 1983 with the trauma center designation, but recent increases cannot be explained by these changes. The New Mexico state trauma registry has collected data describing trauma admissions since 1990. Data for 1993 suggest that the Level-1 trauma center treats a slightly larger percentage of stabbing injuries (83%) than firearm injuries (66%), compared with the other hospitals in the county. Unfortunately, data prior to 1990 are not available (Rutledge L, New Mexico State Trauma Registrar, telephone conversation, Sept 16, 1996).

The selection of the months January–June for data

sampling reflected practical sampling constraints and may introduce some bias, if patterns of penetrating injury are different in July–December with respect to children and adults. We have no information to support or negate this assumption.

Neither injury intent nor ethnicity was identified in the ED population. As a result, we could not compare the ED vs medical examiner data for these characteristics. Future studies need to focus on identifying injury intent in the ED population so that violence prevention programs can more correctly target unintentional from intentional violence and interpersonal from self-inflicted violence. A comprehensive population-based firearm injury reporting system that links nonfatal and fatal injury data sources, as suggested by Teret et al.[16] and being implemented by Hargarten et al.,[17] would obviate some of the limitations met by our study.

## ■ CONCLUSIONS

Our analyses show that ED and medical examiner data portray different patterns of penetrating injury. Our ED data suggest a higher percentage of children, stabbing, and nonpowder firearm injuries, younger age, and increasing rates of firearm and stabbing injury. Medical examiner data demonstrate the contributions of firearm injuries and manner of death to patterns of fatal penetrating injury, and show constant rates over time. Reliance on either data source alone would have led to distinct conclusions. Both fatal and nonfatal injury data are needed to obtain an accurate picture of the epidemiology of penetrating injury in a community.

Supported in part by grant #MCH 354011-2-1 from the Emergency Medical Services for Children Project.

Case: 20-15948, 08/21/2020, ID: 11798417, DktEntry: 9, Page 121 of 173
Case 1:19-cv-00183 Document 1-6 Filed 04/10/19 Page 5 of 5 PageID #: 47

# ■ REFERENCES

**1.** Baker SP, O'Neill B, Ginsburg MJ, Li G. The Injury Fact Book. Second edition. New York: Oxford University Press, 1992, p 80.

**2.** Fingerhut LA. Firearm Mortality among Children, Youth, and Young Adults, 1–34 Years of Age, Trends and Current Status: United States, 1985–90. Advance data from Vital and Health Statistics; No. 231. Hyattsville, MD: National Center for Health Statistics, 1993.

**3.** Annest JL, Mercy JA, Gibson DR, Ryan GW. National estimates of nonfatal firearm-related injuries. Beyond the tip of the iceberg. JAMA. 1995; 273:1749–54.

**4.** Kahn HA. An Introduction to Epidemiologic Methods. New York: Oxford University Press, 1983, pp 64–72.

**5.** Armitage P, Berry G. Statistical Methods in Medical Research. 2nd Edition. Palo Alto, CA: Blackwell Scientific Publications, 1987, pp 120–5.

**6.** Christoffel KK, Tanz R, Sagerman S, Hahn Y. Childhood injuries caused by nonpowder firearms. Am J Dis Child. 1984; 138:557–61.

**7.** Schein OD, Enger C, Tielsch JM. The context and consequences of ocular injuries from air guns. Am J Ophthalmol. 1994; 117:501–6.

**8.** Knapp JF. A call to action: the Institute of Medicine report on emergency medical services for children. Pediatrics. 1995; 96(1, suppl): 173–4.

**9.** Freedman W. The Privilege to Keep and Bear Arms: The Second Amendment and Its Interpretation. Westport, CT: Quorum Books, 1989.

**10.** Cheng TL, Lowe RA. Taking aim at firearm injuries [editorial]. Am J Emerg Med. 1993; 11:183–6.

**11.** Kellermann AL, Rivara FP, Rushforth NB, et al. Gun ownership as a risk factor for homicide in the home. N Engl J Med. 1993; 329: 1084–91.

**12.** Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide. A tale of two cities. N Engl J Med. 1988; 319:1256–62.

**13.** Loftin C, McDowall D, Wiersema B, Cottey TJ. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. N Engl J Med. 1991; 325:1615–20.

**14.** National Highway Traffic Safety Administration. Report to Congress on the benefits of safety belts and motorcycle helmets. Washington, DC: NHTSA Technical Report (Draft), Apr 1995.

**15.** New Mexico Department of Health, New Mexico Department of Highway and Transportation (Traffic Safety Bureau). Crash Outcome Data Evaluation System (CODES): Description and Plan Book. Santa Fe, NM: New Mexico Department of Health, Division of Epidemiology, Evaluation, and Planning, Feb 1995.

**16.** Teret SP, Wintemute GJ, Beilenson PL. The firearm fatality reporting system: a proposal. JAMA. 1992; 267:3073–4.

**17.** Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman E. Characteristics of firearms inolved in fatalities. JAMA. 1996; 275:42–5.

# Civilian Penetrating Wounds of the Abdomen *

## I. Factors in Mortality and Differences from Military Wounds in 494 Cases

HARWELL WILSON, M.D., ROGER SHERMAN, M.D.

*From the Division of Surgery, University of Tennessee, Memphis, Tennessee*

INTENSE INTEREST of surgeons in management of war wounds of the abdomen is indicated by publication of over 300 articles on this subject from January 1940 to June 1946 (World War II)[7] and further reflected by reduction in mortality of abdominal war wounds from 53.5 per cent in World War I,[18] and 25 per cent in World War II,[8] to 12 per cent in Korea.[1]

Between wars similar steady reduction in civilian mortality from wounds of the abdomen has been achieved.[9, 10] This parallel declining mortality makes comparison of results between military and civilian patients attractive.[11]

Civilian surgeons become successful military surgeons by recognition (or directive) that standards of management applicable in civilian wounds often do not effect similar results in war wounds.[10] Military surgeons, after armistice, become civilian surgeons and assume responsibility for teaching standards of management to the next generation of surgeons. It follows, that military standards of management tend to become civilian standards whether they are especially indicated for civilian wounds or not.

Mortality comparison between military and civilian patients with abdominal wounds, without emphasis of the differences, provides little useful information for improvement in management of either type of patient, as war and civilian wounds of the abdomen have almost nothing in common. Type of patient, age, wounding instrument, velocity, type of wound, locale, type of transport after injury, time lag from injury to treatment, associated injuries, facilities for preliminary, operative and postoperative care, average blood loss, number of patients requiring treatment, organs injured, cause of death, even the consistency of colon contents, are but a few of the differences.

Surgeons of large experience with both military and civilian patients have recently emphasized benefits of differences in technical management between the two groups in colon injuries.[12] Further, differences in general principles of management, e.g. less frequent laparotomy for nonconfirmed perforating abdominal wounds, has been recently urged.[14]

After 1946, most authorities agree that such general measures as adequate blood replacement, early surgical exploration, antibiotic therapy, and careful postoperative care have been responsible for the major portion of reduction in mortality of abdominal wounds both in civilian and military cases.

Excluding contributions to management of injuries of major blood vessels,[6] specific surgical technics have not changed appreciably over a number of years and are, consequently, not as influential in reduction of mortality as improvements in general measures of treatment.

Correlation of some of the variables contributing to mortality in civilian abdominal wounds, with emphasis on their differences from military wounds, is the basis of this report.

---

* Presented before the Southern Surgical Association, Boca Raton, Florida, December 6–8, 1960.

ER119

Case 2:20-15948, 08/21/2020, ID: 11798447, DktEntry: 9, Page 123 of 173

TABLE 1. *Penetrating Abdominal Wounds. Age—Sex—and Race Distribution. J.G.H.—1948–1959—452 Cases.*

| Type | Male | Female | Negro | White | Peak Age (Extremes) | Total |
|------|------|--------|-------|-------|---------------------|-------|
| Stab | 215 | 47 | 248 | 14 | 20–30 (1–64) | 262 |
| Gunshot | 152 | 38 | 172 | 18 | 20–30 (3–67) | 190 |
| Totals | 367 | 85 | 420 | 32 | 20–30 (1–67) | 452 |

## Material

From 1948 through 1959 inclusive, 494 patients with abdominal wounds were admitted to John Gaston Hospital. Twenty-seven patients with thoraco-abdominal wounds previously reported [15] and 15 with extraperitoneal perforations of the rectum to be included in a subsequent report were excluded. Mortality of 452 remaining cases alive on admission was 9.6 per cent. Fifty-eight per cent of total cases were stabbings, and 42 per cent were gunshot wounds. Ninety-three per cent of patients were Negro. Stab wounds were more common among Negroes and gunshot wounds more common in white patients. The peak age range of incidence was between 20–30 years with extremes of one to 67 years. Eighty-one per cent of patients were males, and 19 per cent were females (Table 1).

## Treated Cases

To evaluate results of treatment, 16 patients failing to survive more than one hour following admission; three transferred to other hospitals after resuscitation, and one refusing treatment were not included. Two additional patients—one, admitted seven days after exploratory laparotomy elsewhere for gunshot wounds of the aorta and iliac arteries treated by gauze pack, who died, and one admitted five days postoperative with a surgical clamp retained in the peritoneal cavity—who survived, were also excluded. Four hundred thirty (256 stab and 174 gunshot) patients with 25 deaths (5.8%) remain for analysis (Table 2). Mortality in other series of civilian abdominal wounds since the Korean War range from 6.4 to 7.8 per cent [8, 9, 14, 16] (Table 3).

## Diagnosis of Perforation

Careful evaluation of physical findings was not always sufficient to establish the diagnosis of absence of perforation. Local exploration, by enlarging wounds of entrance, was a reliable method for demonstrating penetration, but of little value in determining perforation. Probing wounds of entrance with instruments was not reliable.

Laboratory findings, useful as base line information, are of little value in aiding diagnosis of perforation. No reliable correlation of visceral injuries including those with major blood loss with white blood cell count, hematocrit, or hemoglobin determinations was demonstrated.

Three hundred twenty-seven patients (79%) had routine x-ray examination of the abdomen and 12 others had special diagnostic studies, e.g. cystogram, pyelogram, etc. X-ray findings aided (x-ray

TABLE 2. *Mortality—Treated Cases—(430 Cases)*

| Type | No. Cases | Deaths | % Mortality |
|------|-----------|--------|-------------|
| Stab | 256 | 8 | 3.1 |
| GSW | 174 | 17 | 9.8 |
| Total | 430 | 25 | 5.8 |

CIVILIAN PENETRATING WOUNDS OF ABDOMEN

TABLE 3. *Mortality—Comparison with Recent Series*

| Authors | Date | No. Cases | % Mortality |
|---------|------|-----------|-------------|
| Sherman | 1956 | 212 | 7.8 |
| McComb et al. | 1958 | 307 | 6.4 |
| Moore et al. | 1959 | 109 | 6.4 |
| Shaftan | 1960 | 180* | 6.4 |
| Present report | 1960 | 430 | 5.8 |

\* 112 Stab or GSW.

TABLE 4. *X-Ray—Value in Diagnosis—(327 Cases)*

| Diagnostic Value | No. Cases | % of Total |
|------------------|-----------|------------|
| Aided diagnosis | 27 | 8.3 |
| Hindered diagnosis | 7 | 2.1 |
| No diagnostic value | 293 | 89.6 |
| Totals | 327 | 100 |

diagnosis confirmed at laparotomy) diagnosis of perforating wounds in 27 (8.3%) of cases, hindered (x-ray diagnosis not confirmed at laparotomy) diagnosis in seven, (2.4%) of patients, and were of no diagnostic value (x-ray diagnosis negative for perforation) in 293 (89.6% of cases). Reliance on x-ray findings for establishing diagnosis of perforation in most civilian cases seems unjustified on the basis of this study (Table 4).

Effects of additional transport for x-ray examination of patients with abdominal wounds, especially those in compensated oligemic shock, should be weighed against the contribution of x-ray examination to treatment of abdominal wounds.

Ziperman[19] has emphasized the value of preoperative x-ray examination for localization of foreign bodies within the abdomen in war wounds. Since 76 per cent of penetrating wounds of the abdomen in Korea were caused by fragmentation missiles,[9] x-ray demonstration of these multiple small fragments is valuable, not so much for diagnosis of perforation, as for indicating anatomic regions of the abdomen requiring extra attention during exploration. Less than 12 per cent of civilian wounds are caused by multiple small missiles

(shotgun). Localization of the usual relatively large civilian pistol or rifle slugs prior to operation is of little value, as thorough examination of all abdominal organs is already indicated.

Early laparotomy following initial evaluation and resuscitation was the best method of establishing the presence or absence of perforating wounds of the abdomen in our patients.

One hundred twenty-four patients (93 stab and 31 gunshot) had abdominal exploration with no perforation found. One patient died post operatively from an iatrogenic 360-degree volvulus of the small bowel, which could well have occurred with or without a perforating wound. Total mortality in patients with negative findings at exploratory laparotomy was 0.8 per cent (Table 5). Much higher mortality rates following laparotomies for war wounds without perforation are reported[13] again emphasizing differences in cases.

Three stab patients and 24 gunshot wounds, believed to be nonperforating, were managed without laparotomy. One patient died with sepsis from perforating wounds of the jejunum. Mortality in patients believed to have nonperforating

TABLE 5. *Laparotomy—No Perforation Found (124 Cases)*

| Type | No. Cases | % Total Cases | Deaths | % Mortality |
|------|-----------|---------------|--------|-------------|
| Stab | 93 | 36.6 | 1 | 1.1 |
| GSW | 31 | 17.9 | 0 | 0 |
| Totals | 124 | 28.9 | 1 | 0.8 |

Case 1:19-cv-00183, Document 1-5, Filed 04/10/19, Page 4 of 8, PageID #: 38

WILSON AND SHERMAN Annals of Surgery
May 1961

TABLE 6. *No Laparotomy*—(27 Cases) Accuracy of Diagnosis and Results

| Type | No. Cases | Deaths | % Mortality |
|------|-----------|--------|-------------|
| Stab | 3 | 1 | 33.3 |
| GSW | 24 | 0 | 0 |
| Totals | 27 | 1 | 3.7 |

wounds treated without exploration was 3.7 per cent (Table 6).

Most civilian series concerned with negative exploratory laparotomy show a lower mortality than that found in military reports. Even a report which urges watchful waiting when findings of perforation are not definitely established, evidences higher mortality in cases managed without exploration than for negative laparotomies.[14] Differences in mortality support the concept that laparotomy for abdominal wounds with possible perforation is justified.

### General Measures of Treatment

Seventy-two per cent of patients were given blood prior to, during, and after operation, and intestinal decompression by Levin tube was recorded in 83% of cases. Ninety-five per cent of cases surviving operation and all patients managed without exploration received antibiotics. Seventy-four per cent of patients were treated by combinations of two antibiotics (penicillin and streptomycin 62%).

TABLE 7. *Etiology and Mortality* (266 Known Cases)

| Weapon | No. Cases | Deaths | % Mortality |
|--------|-----------|--------|-------------|
| Shotgun | 49 | 10 | 20.4 |
| Pistol | 101 | 17 | 16.8 |
| Ice pick | 14 | 2 | 14.3 |
| Butcher knife | 15 | 2 | 13.3 |
| Rifle | 26 | 2 | 7.7 |
| Switch-blade knife | 17 | 1 | 5.9 |
| Pocket knife | 44 | 0 | 0 |
| Totals | 266 | 34 | 12.7 |

### Factors Influencing Mortality

Seven factors influencing mortality from abdominal wounds, patient's age, etiology, time lag from injury to treatment, blood loss, multiplicity of organs injured, specific organ injury, and complications of treatment were evaluated.

**Age.** Forty years was selected as the age limit for evaluation of mortality to emphasize differences in ages between civilian and military cases. Less than two per cent (exclusive of Koreans) of patients with abdominal wounds treated in Korea were over age 40.[2] Seventy patients (16.3%) were 40 years or older. Mortality was 4.3 per cent in this group. Three hundred sixty patients (83.7%) were less than 40 years old. Mortality in this group was 6.1 per cent. Twelve per cent of total deaths were in patients over age 40.

**Etiology.** The etiology of wounds was known in 226 patients alive on admission. Ten of 49 patients (20%) died from shotgun wounds, and 17 of 101 (16.8%) died from wounds of pistols of various calibers.

Two of 14 patients (14.3%), third highest after shotgun and pistol, died from ice pick wounds. The high percentage of total deaths from ice pick injuries emphasizes that lethal perforating wounds of the abdomen frequently result from small diameter, low velocity weapons.

Fourteen patients had gunshot wounds of unknown caliber. However, there were clearly no injuries produced by bullets of military velocity. Nearly all (94.8%) fatalities in our series were due to wounds produced by weapons rarely seen in military combat. (Table 7).

**Time Lag—Injury to Treatment.** Forty-one per cent of patients dying were treated within four hours of injury, and 92 per cent were treated within eight hours. One patient, treated 17 hours after injury died from peritonitis secondary to delay post injury in reporting for care. There are too few patients treated more than eight hours

Case: 1:19-cv-00183  Document 1-5  Filed 04/10/19  Page 5 of 8  PageID #: 39
Case 20-16948, 08/21/2020, ID: 11798447, DktEntry: 9-5, Page 126 of 173

TABLE 8. *Multiple Organs and Mortality—(275 Cases)*

| No. Organs | Stab | GSW | Total Deaths | % Total Deaths |
|---|---|---|---|---|
| 1 | 0 | 0 | 0 | 0 |
| 2 | 4 | 1 | 5 | 23.8 |
| 3 | 1 | 5 | 6 | 28.6 |
| 4 | 1 | 3 | 4 | 19.0 |
| Over 4 | 0 | 6 | 6 | 28.6 |
| Totals | 6 | 15 | 21 | 100 |

following injury to draw conclusions. However, those patients treated within eight hours showed no significant difference in mortality when compared with those treated within 40 hours.

### Blood Loss

The importance of sufficient volume replacement in patients with abdominal wounds needs no further emphasis. Transfusion records of 430 treated cases indicate that 63.8 per cent of patients with gunshot and 69.5 per cent with stab wounds received blood transfusions. Patients with gunshot wounds received an average of 1,582 cc. of blood, and those with stab wounds an average of 937 cc.

Fifty-four per cent of patients dying received from 2,000 to 4,000 cc. Two deaths from bleeding were related to poor evaluation of blood loss and under transfusion. Military patients require over four times (average, 6,623 cc. per patient [13]) as much blood as civilian patients with abdominal wounds.

### Multiple Organ Injury

For analysis of influence of multiple organ injuries on mortality, four deaths were excluded. Two with only one organ injured (one aorta, one vena cava), one with negative laparotomy, and one dying without exploration.

Of 21 remaining deaths, no patient died from a single injury. Five deaths were in patients with two organs injured (23.8%), six with three (38.6%), four with four

(19%), and six with more than four organs injured. The percentage of total deaths in patients with two, four and over four organs injured are nearly identical. Nine of 256 surviving patients had injuries of more than four organs, a case fatality rate of 40% (Table 8).

### Individual Organ Injury and Mortality

The influence of individual organ injury on mortality reflects, in part, effectiveness of technics of management of each specific organ injury. Method of management of individual organ injuries is included for cases in which management of individual injury contributed directly to mortality. Influence of methods of management of individual organs on survival correlated with a number of variables in these cases is the basis of a separate report.

Only three of 403 patients (one death) had visceral injury missed at initial exploration. Two patients, both with multiple perforating gunshot wounds of the small bowel missed at initial exploration, survived reoperation with closure of the missed perforations.

Wounds of the aorta produced fatal hemorrhage in each of two patients. One of three patients with wounds of the vena cava also died of blood loss. The incidence of injury of aorta and vena cava in our patients is more than twice that reported in military cases.[4, 5]

Mortality from wounds of the biliary tract (gallbladder and extra hepatic ducts) were as lethal as wounds of the vena cava.

Case 1:19-cv-00183 Document 1-5 Filed 04/10/19 Page 6 of 8 PageID #: 40

TABLE 9. *Mortality—Visceral Injury—(279 Cases)*

| Injury | Type | | Cases | Wounds | Deaths | % Mortality |
|---|---|---|---|---|---|---|
| | Stab | GSW | | | | |
| Aorta | 0 | 2 | 2 | 2 | 2 | 100 |
| Vena cava | 1 | 2 | 3 | 3 | 1 | 33.3 |
| Biliary | 2 | 4 | 6 | 6 | 2 | 33.3 |
| Duodenum | 2 | 17 | 19 | 22 | 5 | 26.3 |
| Pancreas | 7 | 3 | 10 | 10 | 2 | 20 |
| Urinary bladder | 0 | 12 | 12 | 14 | 2 | 16.7 |
| Kidney | 6 | 14 | 20 | 20 | 3 | 15 |
| Vascular | 12 | 9 | 17 | 17 | 2 | 11.8 |
| Colon | 18 | 68 | 86 | 98 | 10 | 11.6 |
| Small bowel | 34 | 58 | 92 | 521 | 10 | 10.9 |
| Spleen | 9 | 10 | 19 | 19 | 2 | 10.5 |
| Stomach | 35 | 19 | 54 | 67 | 5 | 9.3 |
| Liver | 63 | 44 | 107 | 112 | 7 | 6.5 |
| Uterus | 1 | 2 | 3 | 3 | 0 | 0 |

There were no deaths in four patients with uncomplicated perforating injuries of the gallbladder or common duct. Two deaths were in patients with additional duodenal or pancreatic injury related to complications frequently seen in combined wounds of these organs.

Wounds of the colon were associated with mortality about equally as often as wounds of small bowel, spleen, blood vessels (excluding aorta and vena cava). Deaths in patients with colon wounds occurred less often than deaths in patients with eight other organ injuries. Higher mortality from abdominal wounds [17] associated with colon injury was not seen in our cases. Injury of the liver was associated with the lowest mortality excluding the uterus which was injured on three occasions (Table 9).

## Analysis of Causes of Death

There were 25 deaths in 430 treated cases, a mortality of 5.8 per cent. Deaths were classified as related to hemorrhage (primary and secondary), complications (including sepsis), massive wounds with multiple lethal factors involved (close range shotgun), deaths of undetermined cause, and others.

Seven patients (28%) died from complications not directly related to factors considered in this analysis or to methods of surgical management. It is hoped that influence on mortality and morbidity of surgical management of individual organ injuries in civilian practice will be further clarified by another study now in process of preparation.

Three of the seven deaths attributed to complications were, one from renal failure, one from cardiac arrest, and one from pulmonary embolism. Four others were due to sepsis, two associated with injuries of the pancreas and duodenum, and two related to delay in admission or diagnosis.

Nine patients (36%) died of either primary or secondary hemorrhage. Three patients treated early in the series for perforating wounds of the aorta or vena cava died following tamponade treatment with gauze packs. (Since 1959, four patients not included in this report have had successful suture of wounds of the aorta and vena cava.) Three other deaths were related to secondary hemorrhage—one, 14 days postoperative from a stab wound of the renal vein, one from the splenic pedicle following splenectomy in a patient with associated traumatic pancreatitis, and one from wounds of the abdominal wall.

Two patients died from hemorrhage prior

Case 2:20-15948, 08/21/2020, ID: 14798447, DktEntry: 9-7, Page 128 of 173
Case 1:19-cv-00183, Document 1-5, Filed 04/10/19, Page 7 of 8, PageID #: 41

to operation. In retrospect it would seem, they were probably given inadequate replacement transfusions. One patient died during laparotomy from a large hemothorax secondary to an abdomino-thoracic wound not recognized preoperatively.

Five deaths (20%) followed close range shotgun injuries productive of massive soft tissue as well as visceral wounds, in which no single factor was responsible for death. Cause of death in three patients (12%) was undetermined. One patient (4%) died with an iatrogenic 360-degree volvulus of the small bowel following negative exploratory laparotomy (Table 10).

With the exception of death from massive hemorrhage, only two patients treated by operation died of causes (peritonitis) encountered in war wounds of the abdomen.[13]

### Conclusions

So many variables influence case fatality rate in abdominal wounds, analysis of large numbers of cases becomes a necessity for valid conclusions. Large numbers of patients are readily available during war. Steady improvement in case fatality rate in war wounds of the abdomen has resulted, in part, from conclusions drawn from analysis of factors influencing case fatality rate in combat cases. Possibly because large numbers of patients with penetrating wounds of the abdomen are in general not common in civilian practice, the tendency to consider military wounds and their management as standards for civilian patients is quite prevalent.

Factors influencing mortality could be analyzed in 452 patients treated at the John Gaston Hospital during a time period short enough to have such general measures as sufficient blood, antibiotics, and facilities for early treatment available in comparable measure for all patients.

Comparison of factors influencing mortality in this civilian series with military series in which similar general measures

TABLE 10. *Mortality—Analysis of Cause (25 Cases)*

| Cause of Death | Cases | % |
|---|---|---|
| Hemorrhage (primary and secondary) | 9 | 36 |
| Complications (including sepsis) | 7 | 28 |
| Massive wounds (Close range shotgun) | 5 | 20 |
| Undetermined | 3 | 12 |
| Others (small bowel obstruction) | 1 | 4 |
| Totals | 25 | 100 |

of management were available, reveal striking dissimilarity of factors responsible for case fatality rate. Near absence of major factors in common between war and civilian wounds of the abdomen suggests that further improvement in civilian mortality will depend on measures more suited to civilian patients.

### Summary

1. Four hundred ninety-four cases of penetrating abdominal wounds admitted from 1948 through 1959 inclusive were analyzed for differences from war wounds and for factors contributing to mortality. Four hundred thirty patients, with wounds limited to the abdomen, remained for analysis after thoraco-abdominal wounds, deaths prior to treatment, and wounds not involving the peritoneal cavity, were excluded.

2. Fifty eight per cent of patients had stab and 42 per cent had gunshot wounds. Nearly all (94.8%) wounds in our patients were produced by weapons rarely used in military combat.

3. Mortality was 0.8 per cent in patients with negative laparotomy and 3.7 per cent in patients thought not to have perforating wounds treated without laparotomy. Diagnostic x-ray examination of the abdomen was inconclusive in over 85 per cent of 327 cases.

WILSON AND SHERMAN
Annals of Surgery
May 1961

4. Mortality was 5.8 per cent (25 patients) in 430 treated cases.

5. Age, etiology, time lag, blood loss, multiple organ injury, specific organ injury and complications were evaluated as factors in mortality, and compared with military cases. Influence of specific treatment on mortality and morbidity of individual organ injury was not included in this report. Factors contributing to mortality, as well as other factors evaluated in our cases were not comparable to those reported in military series.

6. Further improvement in mortality and morbidity in civilians will depend on further study of civilian cases with revision of military standards of treatment not applicable for civilian wounds.

## Bibliography

1. Artz, C. P., A. W. Bronwell and Y. Sako: Experiences in Management of Thoracic and Thoraco-abdominal Injuries in Korea. Am. J. Surg., 89:773, 1955.
2. Artz, C. P.: Personal Communication.
3. Beecher, H. K.: Surgery in World War II. Vol. II. General Surgery. Edited by, DeBakey, M. E., Office of the Surgeon General, Department of the Army, Washington, D. C.
4. Hughes, C. W.: The Primary Repair of Wounds of Major Arteries. Ann. Surg., 141:297, 1955.
5. Hughes, C. W.: Acute Vascular Trauma in Korean War Casualties: An Analysis of 180 Cases. Surg. Gynec. & Obst., 99:91, 1954.
6. Jahnke, E. J., Jr. and S. F. Seeley: Acute Vascular Injuries in the Korean War: An Analysis of 77 Consecutive Cases. Ann. Surg., 138:158, 1953.
7. Loria, F. L.: Historical Aspects of Penetrating Wounds of the Abdomen. Internat. Abst. Surg., 87:521, 1948.
8. McComb, A. R., J. E. Pridgon, W. J. Hills, R. Smith, E. E. Gregory, W. Sammis, R. R. Wright and A. Herff, Jr.: Penetrating Wounds of the Abdomen. Am. Surgeon, 24:123, 1958.
9. Moore, R. M. and A. O. Singleton, Jr.: Penetrating Wounds of the Abdomen. Am. J. Gastroent., 32:485, 1959.
10. Oberhelman, H. A. and E. R. Le Count: Peace Time Bullet Wounds of the Abdomen. Arch. Surg., 32:373, 1936.
11. Poer, H. D.: The Management of Penetrating Wounds of the Abdomen: Comparative Military and Civilian Experiences. Ann. Surg., 127:1092, 1948.
12. Roof, W. R., G. E. Morris and M. E. DeBakey: Management of Perforating Injuries to the Colon in Civilian Practice. Am. J. Surg., 99:641, 1960.
13. Sako, Y., C. P. Artz, J. M. Howard, A. W. Bronwell and F. K. Inui: A Survey of Evacuation, Resuscitation, and Mortality in a Forward Surgical Hospital. Surgery, 37:602, 1955.
14. Shaftan, G. W.: Indications for Operation in Abdominal Trauma. Am. J. Surg., 99:657, 1960.
15. Sherman, R. T. and D. T. Dodd: Penetrating Wounds of the Chest: Experience with 365 Civilian Penetrating Wounds of the Chest. J. of Trauma, In Press.
16. Ibid: Penetrating Wounds of the Abdomen. Unpublished Report: Committee on Trauma, American College of Surgeons, Cincinnati, 1956.
17. Tucker, J. W. and W. P. Fey: The Management of Perforating Injuries of the Colon and Rectum in Civilian Practice. Surgery, 35:213, 1954.
18. Wallace, C.: War Surgery of the Abdomen. London J. & A. Churchill, 1918.
19. Ziperman, H. H.: Management of Large Bowel Injuries in the Korean Campaign. U. S. Armed Forces M. J., 7:85, 1956.

---

## DISCUSSION

DR. DAVID HENRY POER: Dr. Wilson, as is his custom, has given an informative presentation in a pleasant and entertaining manner. He has left very little for any of us to say. He was kind enough to mention to me that he would present this paper at this time, knowing my interest in this particularly topic, particularly at the end of World War II, at which time we reviewed the figures for many of the field units during the war.

Up to World War II, the mortality rate for penetrating wounds of the abdomen was extremely high. In fact, one could go back a relatively short time, and find that the mortality of 90 to 95 per cent was not unusual. Prior to World

Curriculum Vitae

## TABLE OF CONTENTS

Basic Information:……………………………………………………………………1

Education:……………………………………………………………………………2

Professional Positions: ………………………………………………………………2

Honors And Awards: …………………………………..………………………………2

Books: …………………………………..……………………………………………3

Videos: …………………………………..…………………………………...………3

## BASIC INFORMATION

| | |
|---|---|
| **NAME**: | Burton Richardson |
| **OFFICE**: | Box 1252 |
| | Kailua, Hawaii 96734 |
| **VOICE**: | 808-220-3243 |
| **E-MAIL**: | burton@jkdunlimited.com |
| **CITIZENSHIP**: | United States |
| **MARITAL STATUS**: | Married, 1 child |
| **LANGUAGES**: | French (Fluent) |
| | Italian (Fluent) |
| | Spanish (Usable) |
| | Portuguese (Usable) |
| | Tagalog (Usable) |

**ER127**

**EDUCATION:**

                         1977-1980 Carson High School

                         Carson, California

                         1980-1984 University of Southern California

                         Los Angeles, California

                         1980-1992 Inosanto Academy of Martial Arts

                         Marina Del Rey, California

**PROFESSIONAL POSITIONS**

Instructor (1987-1992)

        Inosanto Academy of Martial Arts, Marina Del Rey, California

President (1992-Present)

        Jeet Kune Do Unlimited, Los Angeles, California/Honolulu, Hawaii

**HONORS AND AWARDS:**

Science Award (1980) Carson High School

Ephebian Society President (1980) Carson High School

Most Likely To Succeed (1980) Carson High School

Harbor Collegium Fellow (1980) Harbor UCLA Medical Center

Inside Kung Fu Magazine Hall Of Fame (1999)

Inducted into the Black Belt magazine (#1 martial arts magazine in the world) Hall Of Fame (2015)

Black Belt magazine self-defense instructor of the year (2015)

Has been on the cover of 10 magazines:
Black Belt
Inside Kung Fu
Masters and Styles
Secrets of the Masters
Inside Martial Arts
Budo International (Europe)
Combate (Mexico)
Hiden Budo (Japan)
Martial Arts Hawaii
Visu (France)


**BOOKS:**

JKD Unlimited - Unique Publications (1993)
In The Footsteps Of Bruce Lee – Budo international (1999)
Choke Em Out – Paladin Press (2007)
Silat For The Street – Black Belt publications (2016)


**VIDEOS:**

Jeet Kune Do For Japan (1987)

JKD Unlimited 3-video series (1988)

Defining Jeet Kune Do 6-video series (1990)

Science Of The Fight 6-video series (2001)

Choke Em Out 2-video series (2001)

MMA For The Street 5-video series (2005)

Battlefield Kali Stick 8-video series (2010)

Battlefield Kali Knife 8-video series (2012)

Battlefield Kali Sword 4-video series (2014)

Silat For The Street 8-video series (2015)


**ER129**

## DECLARATION UNDER PENALTY OF PERJURY OF
## BURTON RICHARDSON

Burton Richardson under penalty of perjury, deposes and states as follows:

*1.*     My name is Burton Richardson. I am making this declaration for submission to the United States District Court for the District of Hawaii in the case of *James Grell and Andrew Teter v. Clare E. Connors, in her official capacity as Attorney General of the State of Hawaii and Al Cummings, in his official capacity as the State Sheriff Division Administrator*.

2.     I am a competent adult over the age of 18 and have personal knowledge of the following facts.

3.     I am an expert on the balisong knives and knfe fighting due to decades of training with knives and other martial arts as fully explained in my attached CV.

4.     The balisong knife was developed on the island of Luzon, Philippines in the province of Taal/Batangas. There is a barangay (neighborhood) in Batangas by the name of Balisong, which is where this unique knife is assumed to have been created. There are varying accounts as to the time line, with some claiming that the design was created over a thousand years ago. But certainly, its presence is well documented throughout the 20th century and the epicenter of production is in Batangas.

When entering Batangas coming from Manila, you quickly come across little roadside stores similar to country fruit stands. But the merchants in Batangas are selling butterfly knives instead of mangoes. It is a local industry which the Batangeunos are very proud of.

The design is ingenious. Instead of having a folding knife which needs two hands to open or a fixed blade that needs a sheath, the sheath and handle are one. The handles encase and protect the blade and the user from accidents while allowing the knife to be opened with one hand. This attribute is important in self-defense as drawing with one hand is essential while the other hand will be occupied warding off attacks. A tool knife rarely requires a one handed opening except for convenience. To open, a latch is unlocked and

one of the handles is pinched. With a circular movement of the wrist and arm, the other handle rotates around and into position while exposing the blade. The handles are grasped together and the knife is ready for various levels of defensive action.

Defensive purposes/three levels of force

A big advantage to the balisong is that the knife can be used in along several levels of force. The first level is the flourish, where no physical contact with the assailant is made. When sufficiently threatened, the balisong user can produce the knife and go through a routine of opening and closing the knife in a very impressive manner. This flourishing is designed to intimidate and dissuade the aggressor from pursuing a physical altercation.

I grew up in the city of Carson, California which had a very large Filipino population. Around 1982, my sister was working at a park a quarter mile from my house. Four Filipinos in their late teens, who had just arrived recently in the states, were playing basketball on the outdoor court. A group of very large Polynesian kids of about the same age started playing on the other end of the court. It didn't take long for the larger boys to start bullying the small newcomers. "FOB" was a common epithet hurled at newly arrive Filipinos, and the big guys used that and others to intimidate their diminutive prey. My sister saw what was going on and was headed over to put an end to it when one of the bullys shoved one of the Filipinos. The small guys all jumped back and pulled their balisongs. They flourished them and the big guys had run off before my sister could get to the court. This is a great example of how the balisong can be used as a deterrent instead of going directly to deadly force. The next level of force is keeping the balisong closed in order to use it as a small striking or locking stick. This method is described in the book "Balisong- Iron Butterfly" (Dragon Books, 1985) by balisong master Cacoy Hernandez. In the introduction, he refers to his balisong as a "deterrent".

One incident illustrates the "Less lethal" option integrated into the balisong. In the book
Balisong- Iron butterfly, the author recounts the time he saw his instructor attacked with a machete on the docks n Manila. The master stepped in and struck the attacker with the butt of the balisong, dropping the aggressor. He countered a machete attack without using the blade of his balisong. This illustrates the defensive nature of the butterfly knife without any cutting.

Mr. Hernandez did cite times when he had to go to a higher level of force, utilizing the blade itself. But every single situation described was defensive. Never did the knife come out prior to an aggressor's formidable attack.

In Batangas, the birthplace of the butterfly knife, the use of the balisong is commonly taught to women for self-defense. Whenever I am in the Philippines I strike up conversations with local people hoping to find someone who is trained in the Filipino martial arts. I have gleaned great information and insight from such impromptu interviews from taxi drivers, clerks, and even from a lawyer.

During one visit, I questioned a young lady who was my waitress in an empty restaurant. I learned that she was from Batangas so I asked if she had learned to use the balisong. Sheepishly, she replied "My father taught me, but just a little". After some coaxing, I handed her a butter knife and got her to demonstrate her methods of self-defense on me. I approached from the front, but she said, "No, grab me from behind." I obliged and she suddenly turned, made one lightening quick non-lethal strike, and escaped. On further questioning, she made it clear that what she learned to use the balisong in a defensive nature against an abduction attempt. The goal was to use the balisong to create an opening to escape, not to take someone's life.


Speed of opening
The beauty of the balisong as a self-defense implement is that it can be used at various levels of the force continuum. The downside is that because of its design, it has the slowest speed of opening of any modern self-defense knife.
Here are the steps required to draw and open a balisong compared to opening the most popular type of folding knife that has the "wave opening" feature constructed into the knife. (The wave opening feature is a hook or protuberance which snags on the pocket as the knife is pulled out. This results in the blade opening as soon as the handle clears the pocket.)

The balisong does not clip to the top of a pocket, but instead resides at the bottom of the carrier's pocket. To go from a concealed carry to having the blade in a useable state requires to following steps pocket:
1- thrust hand deep into a pocket
2- grasp the unit
3- pull the hand completely out of the pocket.
4- feel the for the latch and rotate the still closed unit until it is in the proper orientation for opening.
5- use the pinky or thumb (depending upon orientation) to open the latch.
6- pinch one handle between the thumb and forefinger so the other handle is free to move. (This is a very precarious grip in a chaotic self-defense situation which leaves the defender susceptible to dropping the knife.)

7- make a circular motion with the hand and wrist to allow the free handle to rotate to the open position. The most common opening involves 3 distinct circular motions to get the knife open. There are lesser known methods that enable the opening in one motion.

8- With the handles now touching, the finger pinch grip transitions to a full finger grasp around both handles.

9- To ensure that the open balisong is as sturdy as possible, the latch needs to be closed. This is involves using the thumb to find and manipulate the latch into the locked position when the balisong is held in reverse grip. When held in standard grip, the free hand must be used to close the latch.

Opening a standard, modern "wave opening" pocket knife has fewer steps and is therefore much faster to deploy. Most pocket knives have a clip so that the knife can be just inside the top of the pocket for easy access. Many pocket knives have the wave opening, a hook or protrusion that snags the lining of the pocket so that the blade opens as the handle is pulled clears the pocket. The steps to opening are:

1- reach the thumb just inside of the pocket along the handle while the middle and/or finger rests along the clip outside the pocket.

2- pinch to grasp the handle.

3- pull the unit out allowing the hook to snag the pocket lining. By the time the handle has cleared the pocket, the blade is openness and locked into place.

4- adjust the grip to have a firm grasp on the handle.

Pocket knives which do not have a hook or protrusion to facilitate the opening often have a circular opening at the top of the blade. In that case, after step 3 the thumb and index finger pinch together in the hole and a snapping motion is made to send the handle away from the blade and into the locked position. Then the transition to a full grip is performed.

The balisong has a long history as a defensive implement. When I first started learning it in the late 70's, it was always for that purpose; never as an offensive weapon. The balisong is taught in a manner of starting at the lowest level of force, flourishing to dissuade an attack, then moves to striking with the closed handle as a less lethal option, then escalates to using the edge or point when absolutely necessary, and morally and legally justified. In my opinion, the balisong is the most humane self-defense knife there is because of the ability use various levels of force. I believe that it should be made available to anyone interested in self-protection.

5.     I live in Hawaii where there is a ban on switch blades and butterfly (Filipino "balisong") knives. Apparently, the reasoning behind these bans is that these types of knives are inherently more dangerous than other legal folding knives due to their rapid, one-hand deployment.

6.     I wondered if this distinction was accurate, so I tested the speed of presentation of five different blades: a Benchmade switch blade, a butterfly knife, a Spyderco Delica 4, a Cold Steel "Espada", and a common pocket knife.

7.     The switch blade was legally owned by a military officer. The butterfly knife was a legal, dull-edged training version, while the others are legal to carry in Hawaii. To deploy a folding knife, one must first pull the blade from a pocket or carrying system before unfolding the knife.

8.     The old argument is that a switch blade or balisong is too dangerous to be entrusted to the public because a citizen can pull and quickly open the blade with one hand. But do these two actually have a decisive advantage on speed of deployment? To test the speeds, I started with the knife in my pocket and my hand grasping the knife in a manner conducive to opening.

9.     The person timing gave the command "draw" while pushing the start button on the stopwatch. The timer hit stop after the blade clicked into the locked position. In reality, a little extra time would be required to achieve a functional grip, but just timing until the locked position was empirically more accurate since the timer would have to visually judge when a proper grip was achieved. Please note that there is certainly some variance due to the impossibility of having the exact same draw stroke each time, but that variance is minimal.

10.     I did only four draws for each knife as I found that the difference per draw was very slight. Also, I did not go at absolute full speed. I did smooth, efficient draw.

11.     Here are the draw times for each knife, starting in the pocket with my hand on the knife and ending when the blade was open and locked in place:

**ER134**

Switch Blade 0.9, 1.0, 0.9, 1.0 Average = 0.95 seconds

Butterfly knife 1.3, 1.4. 1.2, 1.5 Average = 1.35 seconds

Spyderco 0.9, 0.9, 1.0, 0.9 Average = 0.925 seconds

Cold Steel "Espada" 0.5, 0.7, 0.6, 0.6 Average = 0.6 seconds

Pocket Knife 1.0, 0.9, 1.0, 0.9 Average = 0.95 seconds

12.     The Cold Steel "Espada" was by far the fastest. This was due to the "thumb plate" that can catch on the pocket hem so that the blade opens as the knife is pulled. Very quick and legal.

13.     The Spyderco was second fastest. It has a ring at the top of the blade which is grasped between the thumb and forefinger. As soon as the knife clears the pocket a snap of the wrist locks opens the blade. Very fast and legal.

14.     The switch blade and the pocket knife tied for third. The pocket knife I used did have a stud in the blade so that one can push the blade open with thumb as the blade clears. The switch blade needs to be taken all the way out of the pocket before depressing the button to pop open the knife.

15.     Slowest by far is the much-maligned butterfly knife. I started with the lock open and pinched between my thumb and forefinger for the quickest type of butterfly knife draw. I drew the knife, snapped down and up, the handle swung out and upward into my hand, so I ended with a reverse grip. This is quicker than the more common 3-count opening that most people use. For fun, I timed the 3-count opening and got an average of 1.45 seconds.

   The above declaration, given under penalty of perjury, is true and correct to the best of my knowledge information and belief.

   Executed: (Oahu, Hawaii)

   Dated: April 10, 2019.



                                        Page 6 of 7

**ER135**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

JAMES GRELL and ANDREW TETER        )
                                    )
                                    )
                                    )
Plaintiffs,                         )
                                    )   Civil Action No. _____
v.                                  )
                                    )
CLARE E. CONNOR, in her             )
Official Capacity as the Attorney General  )
of the State of Hawaii and AL CUMMINGS )
in his Official Capacity as the State Sheriff  )
Division Administrator              )
                                    )
                                    )
Defendants.                         )
_____)

### Declaration of James Grell

**COMES NOW**, James Grell, and states as follows:

1. I am an adult male resident of the State of Hawaii and reside in Honolulu County.

2. I am a citizen of the United States of America.

3. I have never been convicted of any crime which would dispossess me of my Second Amendment rights. I have never been convicted of a felony or a misdemeanor crime of domestic violence and I am not prohibited from owning firearms either at the state or federal level.

4. I have also not been deemed by any mental health professionals to have a mental illness or otherwise have mental health issues.

5. I do not use illegal drugs or abuse achohol.

6. I want to purchase, own, possess and carry an butterfly knife for self-defense both in my home and outside my home.

7. Even though I am a resident of Hawaii and a lawful permanent resident of the United States of America, I may not do so because Hawaii makes the possession of butterfly knives illegal.

8. Priot to living in Hawaii, I owned a prohibited knife

9. Additionally, due to moving to Hawaii I was forced to dispose of my prohibted knife.

10. I would like to purchase this butterfly knife as a replacement for the knife I had to get rid of.

11. Because Hawaii bans these devices, I have not purchased one because I do not want to break the law and because I do not want to be prosecuted for violations of Hawaii law.

12. If Hawaii's ban were lifted I would purchase a butterfly knife.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on April 5, 2019.

James Grell

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

JAMES GRELL and ANDREW TETER   )
   )
   )
   )
Plaintiffs,   )
   )   Civil Action No. _____
v.   )
   )
CLARE E. CONNOR, in her   )
Official Capacity as the Attorney General   )
of the State of Hawaii and AL CUMMINGS )
in his Official Capacity as the State Sheriff  )
Division Administrator   )
   )
   )
Defendants.   )
_____)

### Declaration of Andrew Teter

**COMES NOW**, Andrew Teter, and states as follows:

1.  I am an adult male resident of the State of Hawaii and reside in Honolulu County.

2.  I am a citizen of the United States of America.

3.  I have never been convicted of any crime which would dispossess me of my Second Amendment rights.  I have never been convicted of a felony or a misdemeanor crime of domestic violence and I am not prohibited from owning firearms either at the state or federal level.

4.  I have also not been deemed by any mental health professionals to have a mental illness or otherwise have mental health issues.

5.  I do not use illegal drugs or abuse achohol.

6.  I want to purchase, own, possess and carry a butterfly knife for self-defense both in my home and outside my home.

**ER139**

7. Even though I am a resident of Hawaii and a citizen of the United States of America, I may not do so because Hawaii makes the possession of butterfly knives illegal.

8. Prior to living in Hawaii, I owned a prohibited butterfly knife

9. Additionally, due to moving to Hawaii I was forced to dispose of my prohibted knife.

10. I am in the business of buying and selling knives.

11. I have a large collection of knives.

12. I would additionally like to purchase a butterfly knive in order to add to my collection but I do not because I do not wish to commit a crime.

13. Because Hawaii bans these devices, I have not purchased one because I do not want to break the law and because I do not want to be prosecuted for violations of Hawaii law.

14. If Hawaii's ban were lifted I would purchase a butterfly knife.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on April _8th_, 2019.

Andrew Teter

Case: 20-15948, 08/31/2020, ID: 11798417, DktEntry: 9, Page 144 of 173

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF HAWAII**

| | |
|---|---|
| ANDREW TETER and JAMES GRELL )<br><br><br>)<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>CLARE E. CONNORS, in her )<br>Official Capacity as the Attorney General )<br>of the State of Hawaii, and AL )<br>CUMMINGS, in his Official Capacity as the )<br>State Sheriff Division Administrator, )<br>)<br>)<br>Defendants. )<br>_____) | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

COME NOW the Plaintiffs, ANDREW TETER and JAMES GRELL, ("Plaintiffs"), by and through their undersigned counsel, and complain of the Defendants as follows:

## I. PARTIES

1.      Plaintiff James Grell is an adult male resident of the State of Hawaii and resides in Hawai'i County and is a citizen of the United States.

2.      Plaintiff Andrew Teter is an adult male resident of the State of Hawaii and resides in Honolulu County and is a citizen of the United States.

3.      Defendant Clare E. Connors is the Attorney General of the State of Hawaii. She is being sued in her official capacity. She is responsible for enforcing the State of Hawaii's customs, policies, practices and laws related to the State of Hawaii's ban on butterfly knives. Defendant Connor may be served at the Office of Attorney General located at 425 Queen St, Honolulu, Hawaii 96813.

1

**ER141**

4. Defendant Al Cummings is sued in his official capacity as State Sheriff Division Administrator. Defendant Cummings is responsible for enforcing the State of Hawaii's customs, policies, practices and laws related to the State of Hawaii's ban on butterfly knives. Defendant Cummings may be served at the Department of Public Safety, Sheriff's division, located at 1177 Alakea Street, Room #418, Honolulu, Hawaii 96813.

## II.  JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

6. Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III.  STATEMENT OF FACTS

### a. The Second Amendment

7. The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

8. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 1027 (2016).

9. Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.)" They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *District of Columbia v. Heller*, 554 U.S. at 581.

2

**ER142**

10. The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1 (per curiam).

11. Under the Second Amendment, Defendants retain the ability presumptively to regulate the manner of carrying arms and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Heller,* 554 U.S. at 627.

12. Given the decision in *Heller,* Defendants may not completely ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment. *See Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016); *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (2014).

13. In a recent Fifth Circuit Court of Appeals case, the Fifth Circuit cited approvingly to *Caetano* for the proposition that stun guns are protected arms under the Second Amendment:

> In addressing whether stun guns are in common use, Justice Alito, joined by Justice Thomas, implied that the number of states that allow or bar a particular weapon is important:
>
>> [T]he number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is beside the point.... The more relevant statistic is that [200,000] ... stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States.... While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.

*Caetano*, 136 S.Ct. at 1032–33 (citations and quotation marks omitted). These two justices suggested that the 200,000 absolute number, plus that 45 states have "accepted [stun guns] as a legitimate means of self-defense," was enough to determine that the stun gun is in common use.

*Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016).

14.     Many other jurisdictions have already found complete bans on the ownership of

arms other than firearms are unconstitutional post-*Heller*.

15.     Bans on electric arms have been struck across the nation. *See People v. Yanna*, 824

N.W.2d 241, 243 (Mich. Ct. App. 2012) (striking down a Michigan statute criminalizing

possession of electronic weapons), *Second Amendment Society v. Porrino*, No. 3:16-cv-04906-

DEA (D.N.J. Nov. 16, 2016) Doc. No. 30 (consent decree where the Court found New Jersey's

complete ban on electric arms is unconstitutional), ("Pursuant to the holdings in *Heller, McDonald*

*and Caetano*, N.J. Stat. Ann . § 2C:39- 3(h), to the extent this statute outright prohibits, under

criminal penalty, individuals from possessing electronic arms, is declared unconstitutional in that

it violates the Second Amendment to the United States Constitution and shall not be

enforced"); *See, Crystal Wright v. District of Columbia*, No. 1:16-cv-01556-JEB (D.D.C. Sept. 26,

2016) Doc. No. 18 (stipulating to a stay of a motion for preliminary injunction pending new

legislation and agreeing not to enforce ban against plaintiffs); *Ford v. City of New Orleans*, No.

2:16-cv16433-MVL-KWR (E.D. La. Dec. 14, 2016) Doc. Nos. 17, 19-20 (stipulating that the city

will not enforce the ban against plaintiff and consenting to a stay of litigation pending enactment

of legislation that decriminalized possession of stun guns); *Hulbert v. Pantelides*, No. 1:16-cv-

04121-JFM (D. Md. March 3, 2017) Doc. No. 16 (letter from the City of Annapolis informing the

court that the City Council passed an emergency ordinance eliminating all restrictions on

ownership and possession of electronic weapons for personal defense); *Ramirez v. Commonwealth*

No. SJC-12340, 2018 Mass. LEXIS 237 (Apr. 17, 2018) (striking Mass. ban on stun guns).[1] *See Avitabile v. Beach*, 2019 U.S. Dist. LEXIS 47506, __ F. Supp. 3d __, 2019 WL 1302858, striking New York State's ban on electric arms. *See People v. Walker*, 2019 Ill. LEXIS 329, 2019 WL 1307950 striking Illinois's ban on taser ownership and carry.

16.    In *Maloney v. Singas*, 351 F. Supp. 3d 222 (S.D.N.Y. 2018), the United States District Court for the Southern District of New York struck the State of New York's ban on nunchucks as a violation of the Second Amendment. It found nunchucks are protected by the Second Amendment because they are bearable arms that are typically used for lawful purposes. It then struck New York's ban because the State did not have an important government interest in banning these protected arms.

17.    Specifically, many jurisdictions have already ruled on whether knives are protected by the Second Amendment.

18.    In upholding a criminal conviction for possession of a switchblade, the New Mexico Court of Appeals found that knives are protected by the Second Amendment and upheld that specific ban applying intermediate scrutiny. *See State v. Murillo*, 347 P.3d 284 (2015).

19.    In *City of Seattle v. Evans*, 366 P.3d 906 (2015), the Washington Supreme Court evaluated the conviction for carrying a paring knife (a type of kitchen knife). The Court found that paring knives are not protected by the Second Amendment because paring knives are not designed to be used for self defense. "We hold that the right to bear arms protects instruments that are designed as weapons traditionally or commonly used by law-abiding citizens for the lawful

---

[1] Since *Caetano*, electronic arms bans in Philadelphia, Pennsylvania; Tacoma, Washington and Westminster, Maryland were also rescinded. https://www.phillymag.com/news/2017/10/24/stun-guns-legal-philadelphia/ (last visited 4/6/2019); http://www.carrollcountytimes.com/news/westminster/ph-cc-westminster-stun-gun-ban-discussion-20170523-story.html; http://www.thenewstribune.com/news/politics-government/article158619749.html (last visited 4/6/2019).

purpose of self-defense. In considering whether a weapon is an arm, we look to the historical origins and use of that weapon, noting that a weapon does not need to be designed for military use to be traditionally or commonly used for self-defense. We will also consider the weapon's purpose and intended function." *City of Seattle* at 913. Then the Court went on to strongly suggest that knives designed for self-defense such as "bowie knives and swords", having been commonly used for self-defense may be considered arms. *See City of Seattle* at 906.

20.     In *State v. Deciccio*, 105 A.3d 165 (Conn. 2014), the Connecticut Supreme Court overturned the conviction for transport of a dirk knife and a baton as a violation of the litigants Second Amendment rights.  In doing so the Court found that dirk knives and batons are protected by the Second Amendment because they are weapons with traditional military utility that are "typically possessed by law-abiding citizens for lawful purposes"; *Id*. at 625; and not "dangerous and unusual weapons." (Internal quotation marks omitted.) *Id*., 627. It then applied intermediate scrutiny and held the conviction unconstitutional.

21.     The California Appeals Court has found that knives are protected by the Second Amendment. In *People v. Mitchell*, 209 Cal. App. 4th 1364 (2012), the court held "the dirk or dagger concealed carrying restriction does not entirely prohibit the carrying of a sharp instrument for self-defense; rather, it limits the manner of exercising that right by proscribing concealed carrying of a dirk or dagger unless the bearer uses a visible knife sheath or non-switchblade folding or pocketknife. Because the statute regulates but does not completely ban the carrying of a sharp instrument, we subject it to intermediate scrutiny." *Id*. at 1374. Here, since Hawaii completely bans butterfly knives, *Mitchell* supports the position that Hawaii's ban on butterfly knives is unconstitutional.

22. In *State v. Montalvo*, 162 A.3d 270 (2017), the New Jersey Supreme Court overturned the conviction for possession of a machete. In doing so, the Court found that machete-type knives are protected by the Second Amendment and that a conviction for their possession in the home was unconstitutional.

23. In *State v. Herrmann*, 2015 WI App 97, the Wisconsin Court of Appeals overturned appellant's the conviction for possession of a switchblade was unconstitutional. In doing so, the court found that switchblades are protected by the Second Amendment and that Wisconsin's complete ban on their possession was unconstitutional.

24. In *State v. Delgado*, 692 P.2d 610 (1984), the Oregon Supreme Court found that Oregon's ban on the possession of switchblades violated the Oregon Constitution's right to arms.

25. Many other state courts have likewise concluded that the right to keep and bear arms found within their state constitutions extends beyond handguns. *See State v Griffin*, 2011 WL 2083893, *7 n62, 2011 Del Super LEXIS 193, *26 n62 (Del Super Ct, May 16, 2011) (holding that the "right to keep and bear arms" under the Delaware Constitution extends to knives, and concluding that the Second Amendment right does the same); *City of Akron v Rasdan*, 663 NE2d 947 (Ohio Ct. App., 1995) (concluding that the "right to keep and bear arms" under the Ohio Constitution extends to knives*); State v Blocker*, 630 P2d 824 (1981) (same as to billy clubs), citing *State v Kessler,* 614 P2d 94 (1980); *also Barnett v State*, 695 P2d 991 (Ct App, 1985) (same as to blackjacks).

26. Plaintiffs are bringing an as-applied and facial challenge to the applicable Hawaii laws which prevent them from owning butterfly knives.

27. Plaintiffs seek an injunction preventing enforcement of the applicable Hawaii laws as applied to themselves and for declaratory relief.

7

**ER147**

28.     Additionally, Plaintiffs seek an injunction preventing enforcement of the applicable Hawaii laws as to all other law-abiding citizens.

**b.   Knives are Protected by the Second Amendment**

29.     In *Heller,* the Court ruled that the "Second Amendment extends prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of founding." *Heller*, 128 S. Ct. at 2817. In order to strike down the ban on hand guns it ruled a complete ban on a protected arm cannot withstand any level of scrutiny. *Id.*

30.     Thus, while "dangerous and unusual weapons" may likely be regulated, "the sorts of weapons protected [a]re those 'in common use at this time.'" *Id*. at 627

31. There are more knives owned in the United States for lawful purposes such as self-defense than there are handguns in the United States. Thus, knives are just as much in common use as handguns.

32.     Knives are arms protected by the Second Amendment. *See* David B. Kopel, Clayton E. Cramer & Joseph Edward Olsen, Knives and the Second Amendment, 47 U. Mich. J.L. Reform 167, 183 (Fall 2013).

33.     In *United States v. Henry*, 688 F. 3d 637 (9th Cir. 2012), the Ninth Circuit held that machine guns are not protected by the Second Amendment because they are dangerous and unusual. "A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. *See* George C. Wilson, Visible Violence, 12 NAT'L J. 886, 887 (2003)." Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns. A machine gun is "unusual" because private possession of all new machine guns, as well as all existing machine guns that were not

8

**ER148**

lawfully possessed before the enactment of § 922(o), has been unlawful since 1986. Outside of a few government-related uses, machine guns largely exist on the black market." *Id.* at 640.[2]

34.    However, unlike machineguns which have been artificially limited in ownership by § 922(o), knives are arms in common use for lawful self-defense.

35.    Butterfly knives are arms in common use for lawful self-defense.

36.    Butterfly knives are a traditional martial arts weapon of the Filipino people.

37.    It is commonly owned by Filipinos for purposes of lawful self-defense throughout the world.

38.    According to the 2010 U.S. Census Filipinos account for  24.6. percent of the population     of     Hawaii     and     is     its     second     largest     ethnic     group.     *See* http://www.ohadatabook.com/HSDC2010-5_Filipino.pdf last visited (4/8/2019)

39.    Unlike machine guns, knives and butterfly knives as a form of knife are statistically less dangerous than handguns.

40.    Gunshots are generally more lethal than knife injuries.

41.    Wilson & Sherman's 1960 study of hospital admissions for abdominal wounds found that abdominal stabbing cases ended in death 3.1 percent of the time, while 9.8 percent of gunshot abdominal wounds were lethal. *See Harwell Wilson & Roger Sherman, Civilian Penetrating Wounds to the Abdomen,* 153 ANNALS OF SURGERY 639, 640 (1961). See Exhibit"1".

42.    An examination of 165 family and intimate assaults (FIA) in Atlanta, Georgia in 1984 found similar results: firearms-associated FIAs were three times more likely to result in death than "FIAs involving knives or other cutting instruments." *See Linda E. Saltzman, James A. Mercy,*

---

[2] Plaintiffs expressly reserve the right to challenge the accuracy of the Ninth Circuit's interpretation of Heller's dangerous and unusual language at the appropriate time.

*Patrick W. O'Carroll et al., Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 JAMA 3043 (1992). See Exhibit "2".

43. Another study examined all New Mexico's penetrating traumas ("firearm or stabbing injury") "who presented to either the state Level-1 trauma center or the state medical examiner" from 1978 to 1993. This study found that while nonfatal injury rates were similar for firearms and stabbing (34.3 per 100,000 person-years for firearms, 35.1 per 100,000 person-years for stabbing), firearm fatality rates were much higher than for knives: 21.9 vs. 2.7 respectively. In other words, 39.0 percent of firearm penetrating traumas were fatal, compared to 7.1 percent of knife penetrating traumas; so firearm injuries were 5.5 times more likely to result in death than were knife injuries. But not all of the New Mexico penetrating traumas were criminal attacks; 44 percent of the firearms deaths and 57 percent of the knife deaths were suicides. While 8 percent of the firearms deaths were accidents, so were 3 percent of the knife deaths. *See* 123 Cameron Crandall, Lenora Olson, Lynne Fullerton, et al., Guns and Knives in New Mexico: Patterns of Penetrating Trauma, 1978-1993, 4 ACAD. EMERGENCY MEDICINE 265 (1997). *See* Exhibit "3". As for the remaining firearms deaths classified as "homicide," about 7-13 percent of them were probably justifiable homicides by persons who were not law enforcement officers. GARY KLECK, POINT BLANK: GUNS AND VIOLENCE IN AMERICA 114 (1991). It is unknown whether a similar percent of the knife homicides was justifiable.

44. In 2017 (the most recent year for which data is available online) information collected by the FBI collected regarding types of weapons used in violent crime showed that firearms were used in 72.6 percent of the nation's murders, 40.6 percent of robberies, and 26.3 percent of aggravated assaults. *See* https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/topic-pages/violent-crime (last visited 4/4/2019).

10

**ER150**

45.    Knives and other edged weapons accounted for approximately 10.5% of murders, 8.1% of robberies and 17.2% of aggravated assaults in 2017. *See Id; See also* https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/tables/expanded-homicide-data-table-7.xls; https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/tables/robbery-table-3.xls; https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/tables/aggravated-assault.xls.

46.    Analogous to nunchucks, butterfly knives, "as used in the martial arts, are socially acceptable and lawful behavior, especially here in Hawaii where the oriental culture and heritage play a very important role in society." *See State v. Muliufi* 643 P.2d 546, 548 (1982)

47.    Today, butterfy knives "are widely used in the martial arts to build up dexterity, timing, mind and body coordination and aids in developing a larger sphere of consciousness around an individual". *Id*. At 549.

48.    Knives and butterfly knives as a form of knife are bearable arms.

49.    Knives are a utensil, or a tool designed for cutting and/or piercing, consisting of a flat piece of hard material, usually steel or other metal (the blade), usually sharpened and attached to a handle.

50.    Butterfly knives are a type of knife.

51.    Butterfly knives are any "knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both". [3]

---

[3] Image available at https://survivallife.com/all-about-butterfly-knives/ (last visited 4/4/2019)



52.     Butterfly knives are banned in Hawaii pursuant to state law. *See* H.R.S. §134-53.

53.     The butterfly knife consists of two counter-rotating handles that open to expose a single blade. The blade is usually sharpened on one side and is made from steel.

54.     Butterfly knives are the safest form of pocketknife because the blade is entirely enclosed when folded and when open it is impossible for the blade to accidentally to close on the user's fingers.

55.     Most states that ban types of knives do not include butterfly knives in their bans on possession, and thus allow their ownership. *E.g.* in New York, the balisong – another name for a butterfly knife -- has been determined not to be a prohibited knife, and therefore legal to own. *See People v. Zuniga*, 303 A.D.2d 773 (2nd Dept. 2003). *See also State v. Strange*, 785 P.2d 563 (Alaska Ct. App. 1990) (citing Alaska Stat. 11.61.200(e)(1)(D) (1989)) finding that butterfly knives are not within that state's statutory prohibition on "switchblades" and "gravity knives."

56.     In the past few years, knife laws have been loosening nation-wide.

**ER152**

57.     Twenty-one states have repealed or liberalized their knife laws since 2010, many of them with bipartisan support, including Colorado, Michigan and Illinois. *See* https://www.chicagotribune.com/news/nationworld/ct-knife-rights-activists-nra-20180915-story.html (last visited 4/4/2019).

58.     Some of these repealed laws also repealed the ban on switchblade knives.

59.     Some of those switchblade bans were interpreted to include criminalizing the possession of butterfly knives.

60.     A number of courts have considered whether butterfly or balisong knives qualify as prohibited switchblade or gravity knives. *See, e.g., Taylor v. United States*, 848 F.2d 715 (6th Cir.1988); *Precise Imports Corporation v. Kelly*, 378 F.2d 1014 (2d Cir.1967), cert. denied, 389 U.S. 973, 88 S. Ct. 472, 19 L. Ed. 2d 465 (1967); *People v. Quattrone*, 211 Cal. App. 3d 1389, 260 Cal. Rptr. 44, 45 (1 Dist. 1989); *People v. Dolson*, 142 Misc. 2d 779, 538 N.Y.S.2d 393 (N.Y. Co. Ct. 1989); *People v. Mott*, 137 Misc. 2d 757, 522 N.Y.S.2d 429 (N.Y. Co. Ct. 1987).

61.     Upon information and belief Plaintiff believes that the only other states that completely ban butterfly knives are Washington and New Mexico.

62.     In New Mexico, possession of a butterfly knife is illegal, because the butterfly knife is a "switchblade" within the meaning of the statute making possession of switchblades unlawful *See State of New Mexico v. Riddall*, 112 N.M. 78, 811 P.2d 576 (N.M. App. 1991).

63.     During this legislative term, Washington State's "Spring Blade" Ban Repeal bill, SB 5782, was voted out of the House Civil Rights & Judiciary Committee 10-2 with a "do pass" recommendation. It is expected to be signed by the governor and if signed will repeal Washington State's ban on the possession of switchblade and butterfly knives. *See* https://kniferights.org/legislative-update/washington-state-switchblade-ban-repeal-bill-introduced/ (last visited 4/4/2019).

64.     Thus, butterfly knives are currently legal to possess in 47 states and if the Washington bill is signed, they will be legal to possess in 48 states.

65.     Unlike machine guns, butterfly knives do not rise to the level of lethality that a machine gun would be capable of and are less dangerous than the handgun that was specifically held to be protected in *Heller*.

66.     Thus, knives and butterfly knives as a type of knife are not dangerous and unusual weapons.

67.     Butterfly knives as a form of knife are arms protected by the Second Amendment.

68.     There is no government interest in banning butterfly knives in the home.

69.     Plaintiffs' expert Burton Richardson has conducted a study of a variety of blades in order to show the design of the butterfly knife makes them deploy slower than traditional knives. His study is listed below and upon information and belief Burton Richardson will be able to reproduce his findings for the Court.

70.     Mr. Richardson's study found that the butterfly knife opened significantly slower than other knives, with an averaged opening time of 1.35 second compared to a standard folding knife of 0.95 seconds.  A switch blade, for instance, opened at the same speed as a standard pocket knife and faster than a butterfly knife.

71.     Mr. Richardson's declaration is attached as Exhibit "4".

72.     Plaintiffs via their expert can and will reproduce the results of the above via an official expert report or at trial in order to demonstrate the draw time for a butterfly knife is slower than for other folding knives.

73.     Thus, they are not "designed for quick use in a knife fight." *Nick R.*, 2009-NMSC-050, ¶ 2. *See State v. Murillo*, 347 P.3d 284, 289 (N.M. Ct. App. 2015).

74.     Butterfly knives are typically produced, designed and possessed for purposes of lawful self-defense. Thus, [they are not], "by design and use, almost exclusively the weapon of the thug and the delinquent." *Id.*

75.     Thus, even assuming that this was an important governmental to ban switchblades. unlike the switchblade law evaluated by the Court in *Murrillo,* the State of Hawaii's butterfly knife ban does not "protect the public from the surprise use of a dangerous weapon utilized in large part for unlawful activity". *See Id.*

76.     *Murillo* is also factually distinguishable because, unlike Plaintiffs, the defendant in *Murillo* did not wish to possess a switchblade "in his own home for his protection. Instead, he was convicted of possessing a switchblade after using it in a fight at a Wal-Mart". *Id.* at 286. Accordingly, Murillo did not implicate the core Second Amendment right to keep and bear arms in one's own home for self-defense. *See State v. Herrmann*, 366 Wis. 2d at 324-325.

77.     Plaintiffs challenge is further distinguishable because "the defendant in Murillo did not raise his Second Amendment challenge in the trial court and therefore deprived the State of the opportunity to make an evidentiary showing that the challenged statute withstood intermediate scrutiny. *Id.* at 286, 289 n.2. The *Murillo* court nevertheless chose to address the defendant's argument, reasoning that: "[o]ther cases have addressed the issue, and, rather than remanding this case to the district court, we can address Defendant's arguments based on case law." *Id.* at 289 n.2. Thus, although the *Murillo* court purported to apply intermediate scrutiny, it did not actually hold the government to its burden of proof, choosing instead to rely on unsupported statements from pre-*Heller* case law about the dangerousness of switchblades and their frequent use by criminals." *See State v. Herrmann*, 366 Wis. 2d at 312, 326.

78.     Butterfly knives were originally designed in the Philippines.

15

**ER155**

79.     Oral histories claim that the knives were first created in the Philippines in 800 CE. However, there is no documentation or archeological evidence to back this.

80.     Regardless of the origin, the modern balisong was perfected in the Philippines, where it became much larger and were predominantly used as a weapon and not just a tool.

81.     The opening techniques ("flipping") associated with the butterfly knife were also developed in the Philippines.

82.     The handle design of the butterfly knife is so that the blade can be opened when needed one handed (such as when holding onto a tree while cutting a coconut) and to make for a stronger platform so that the knife's blade does not fall out of place.

83.     The butterfly knife is also a traditional martial arts weapon of the Filipino people.

84.     The martial arts system kali uses butterfly knives as part of their system and is widely trained by persons throughout the United States and the world.

85.     Butterfly knives are not dangerous and unusual and are lawfully owned and legal in a supermajority of States.

**c.  Plaintiff James Grell.**

86.     Plaintiff Grell desires to purchase a butterfly knife for self-defense and other lawful purposes in his home, business, whilst traveling between these locations and in all other locations.

87.     Prior to living in Hawaii, Plaintiff Grell owned a prohibited butterfly knife.

88.     He was forced to dispose of it prior moving to Hawaii due to Hawaii's ban on the knife.

89.     Plaintiff Grell is employed as an accountant on the Island of Hawaii.

90.     Plaintiff Grell has never been convicted of a crime that would disqualify him from firearms ownership under either Hawaii or federal law.

16

**ER156**

91. Plaintiff Grell has never been diagnosed with a mental disorder that would disqualify him from firearms ownership under Hawaii or federal law.

92. Plaintiff Grell does not take illegal drugs or abuse alcohol.

93. Plaintiff Grell desires to purchase a butterfly knife. However, Plaintiff fears prosecution for possessing it.

94. But for Hawaii law, Plaintiff Grell would acquire, possess, carry and where appropriate use a butterfly knife to protect himself, his home, his family and business.

95. Plaintiff Grell desires to purchase a butterfly knife for self-defense and other lawful purposes in his home, business, whilst traveling between these locations and in all other locations.

**d. Plaintiff Andrew Teter**

96. Plaintiff Andrew Teter wishes to own a butterfly and does not own one solely due to Hawaii's ban on the device.

97. Plaintiff Teter is employed in the trade of buying and selling knives.

98. Plaintiff Teter wishes to purchase a butterfly knife for lawful self-defense and does not solely due to Hawaii law.

99. Plaintiff Teter has never been convicted of a crime that would disqualify him from firearms ownership under either Hawaii or federal law.

100. Plaintiff Teter has never been diagnosed with a mental disorder that would disqualify him from firearms ownership under Hawaii or federal law.

101. Plaintiff Teter desires to purchase a butterfly knife. However, Plaintiff fears prosecution for possessing it and has therefore refrained from purchasing one.

102. But for Hawaii law, Plaintiff Teter would acquire, possess, carry and where appropriate use a butterfly knife to protect himself, his home, his family and business.

**FIRST CAUSE OF ACTION**
**U.S. CONST., AMEND. II & VIII, 42 U.S.C. § 1983**
**(AGAINST ALL DEFENDANTS)**

103.     Plaintiffs repeat and re-plead the preceding paragraphs, inclusive, and incorporates the same herein by reference.

104.     Defendants prohibit Plaintiffs from acquiring, possessing, carrying and using a defensive arm in common use, i.e., butterfly knives.  As such it violates Plaintiffs' Second Amendment rights.

105.     Defendants' laws, customs, practices and policies generally banning the acquisition, possession, carrying and use of butterfly knives violates the Second Amendment to the United States Constitution, facially and as applied against the Plaintiffs in this action, damaging Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

**SECOND CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(AGAINST ALL DEFENDANTS)**

106.     Plaintiffs repeat and re-plead the preceding paragraphs, inclusive, and incorporate the same herein by reference.

107.     The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a).

108.      Absent a declaratory judgment, there is a substantial likelihood that Plaintiffs will suffer irreparable injury in the future.

**ER158**

109.    There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

110.    This Court possesses an independent basis for jurisdiction over the parties.

111.    A judgment declaring that the State of Hawaii's ban on the ownership of butterfly knives violates the Second Amendment will serve a useful purpose in clarifying and settling the legal relations at issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

112.    Defendants' laws, customs, practices and policies generally banning the acquisition, possession, carrying and use of butterfly knives violates the Second Amendment to the United States Constitution, facially and as applied against the Plaintiffs in this action, damaging Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to a declaration declaring such laws, customs, policies, and practices unconstitutional.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.    An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing HI Rev Stat § 134-53 ban on the acquisition, possession, carrying or use of butterfly knives as applied to Plaintiffs and additionally against other similarly situated law abiding persons;

2.    An order declaring that HI Rev Stat §134-53 unconstitutional and violative of the Second Amendment to the United States Constitution as applied to Plaintiffs and to all other law-abiding citizens;

19

3.      Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988;

4.      Such other Declaratory relief consistent with the injunction as appropriate; and

5.      Such other further relief as the Court deems just and appropriate.

Dated:  April 10, 2018.

Respectfully submitted,

**JAMES GRELL AND ANDREW TETER**

/s/ Alan Beck
Counsel for Plaintiff

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS  39130
(601) 852-3440
stephen@sdslaw.us
MS Bar No. 102784
*Pro Hac Paperwork Forthcoming*

**ER160**

APPEAL

# U.S. District Court
## District of Hawaii (Hawaii)
## CIVIL DOCKET FOR CASE #: 1:19-cv-00183-ACK-WRP

Teter et al v. Connors et al                     Date Filed: 04/10/2019
Assigned to: JUDGE ALAN C. KAY                   Date Terminated: 05/13/2020
Referred to: MAGISTRATE JUDGE WES REBER PORTER   Jury Demand: None
Demand: $0                                       Nature of Suit: 440 Civil Rights: Other
Case in other court: Ninth Circuit, 20-15948     Jurisdiction: Federal Question
Cause: 42:1983 Civil Rights Act

**Plaintiff**

**Andrew Teter**                  represented by   **Alan A. Beck**
                                                   Law Office of Alan Beck
                                                   2692 Harcourt Drive
                                                   San Diego, CA 92123
                                                   (619) 905-9105
                                                   Email: ngord2000@yahoo.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Stephen D. Stamboulieh**
                                                   Stamboulieh Law, PLLC
                                                   P. O. Box 4008
                                                   Madison, MS 39130
                                                   (601) 260-3375
                                                   Email: stephen@sdslaw.us
                                                   *LEAD ATTORNEY*
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Grell**                   represented by   **Alan A. Beck**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Stephen D. Stamboulieh**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

V.

**Defendant**

## ER161

| | | |
|---|---|---|
| **Clare E. Connors**<br>*in her Official Capacity as the*<br>*Attorney General of the State of*<br>*Hawaii* | represented by | **Ryan M. Akamine**<br>Department Attorney General<br>425 Queen Street<br>Honolulu, HI 96813<br>808-586-1494<br>Fax: 808-586-1369<br>Email: ryan.m.akamine@hawaii.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Al Cummings**<br>*in his Official Capacity as the State*<br>*Sheriff Division Administrator* | represented by | **Ryan M. Akamine**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Hawaii Firearms Coalition** | represented by | **Kevin G. O'Grady**<br>The Law Office of Kevin O'Grady, LLC<br>1136 Union Mall, Ste 808<br>Honolulu, HI 96813<br>521-3367<br>Fax: 521-3369<br>Email:<br>Kevin@CriminalAndMilitaryDefenseHawaii.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Everytown for Gun Safety Support Fund** | represented by | **Pamela W. Bunn**<br>Dentons US LLP<br>1001 Bishop Street 18th Floor<br>Honolulu, HI 96813<br>524-1800<br>Fax: 524-4591<br>Email: pamela.bunn@dentons.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Wendy F. Hanakahi**<br>Dentons US LLP<br>1001 Bishop Street 18th Floor<br>Honolulu, HI 96813<br>808-524-1800<br>Fax: 808524-4591<br>Email: wendy.hanakahi@dentons.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**ER162**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/10/2019 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All ~~Plaintiffs~~ Clare E. Connors, Al Cummings ( Filing fee $ 400 receipt number 0975-2184494.), filed by andrew teter. (Attachments: # 1 Declaration of Andrew Teter , # 2 Declaration James Grell , # 3 Declaration of Burton Richardson , # 4 ~~Errata~~ Exhibit , # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Civil Cover Sheet)(Beck, Alan) Modified on 4/10/2019 (emt, ). (Entered: 04/10/2019) |
| 04/10/2019 | 2 | Summons (Proposed) (Beck, Alan) (Entered: 04/10/2019) |
| 04/10/2019 | 3 | Summons (Proposed) (Beck, Alan) (Entered: 04/10/2019) |
| 04/10/2019 | 4 | NOTICE of Case Assignment: Please reflect Civil case number CV 19-00183 ACK-RLP on all further pleadings.<br>(emt, ) (Entered: 04/10/2019) |
| 04/10/2019 | | ADVISORY ENTRY. The entry docket number 1 Complaint filed by Andrew Teter was filed incorrectly in this case. The filing party may refer to LR10.2(b), which states "The name, Hawaii bar identification number, address, telephone number, facsimile number, and e-mail address of counsel (or, if *pro se*, of the party), and the specific identification of each party represented by name and interest in the litigation (e.g., plaintiff, defendant, etc.) shall appear in the upper left-hand corner of the first page of each paper presented for filing...". Additionally, the filing party is advised that the document caption does not reference the declarations and exhibits submitted in support of the complaint. The filer may also refer to LR10.2(c) Caption, Case Numbers, and Title. (emt, ) (Entered: 04/10/2019) |
| 04/10/2019 | 5 | Summons Issued as to Clare E. Connors.<br>(emt, ) (Entered: 04/10/2019) |
| 04/10/2019 | 6 | Summons Issued as to Al Cummings.<br>(emt, ) (Entered: 04/10/2019) |
| 04/10/2019 | 7 | Order Setting Rule 16 Scheduling Conference is set for 09:00AM on 6/5/2019 before MAGISTRATE JUDGE RICHARD L. PUGLISI - Signed by CHIEF JUDGE J. MICHAEL SEABRIGHT on 4/10/2019.<br>(Attachments: # 1 Memo from Clerk Re: Corporate Disclosure Statements)<br><br>**ATTACH THE SCHEDULING ORDER TO THE INITIATING DOCUMENT (COMPLAINT/NOTICE OF REMOVAL).**<br>**THE SCHEDULING ORDER AND MEMO RE: CORPORATE DISCLOSURES MUST BE SERVED WITH THE DOCUMENT.**<br>(emt, ) (Entered: 04/10/2019) |
| 04/10/2019 | 8 | CIVIL Waiver of Service Packet ~ Notice to Parties Regarding Service Pursuant to Rule 4 of the Federal Rules of Civil Procedure.<br>(Attachments: # 1 AO 398 Notice of Lawsuit and Request to Waive Service of Summons, # 2 AO 399 Waiver of Service of Summons)<br>(emt, ) (Entered: 04/10/2019) |
| 04/15/2019 | 9 | MOTION for Pro Hac Vice Filing fee $ 300, receipt number 0975-2186179.Alan A. Beck appearing for Plaintiffs James Grell, Andrew Teter (Attachments: # 1 Exhibit) (Beck, Alan) (Entered: 04/15/2019) |

# ER163

| 04/15/2019 | 10 | First MOTION to Amend/Correct 9 MOTION for Pro Hac Vice Filing fee $ 300, receipt number 0975-2186179. Alan A. Beck appearing for Plaintiffs James Grell, Andrew Teter (Attachments: # 1 Exhibit)(Beck, Alan) (Entered: 04/15/2019) |
|---|---|---|
| 04/15/2019 | 11 | ORDER GRANTING THE AMENDED APPLICATION OF STEPHEN D. STAMBOULIEH TO APPEAR PRO HACE VICE *re*: 10 - Signed by MAGISTRATE JUDGE RICHARD L. PUGLISI on 4/15/2019. <br> STEPHEN D. STAMBOULIEH, ESQ. (Law Firm: Stamboulieh Law, PLLC) added as attorney *Pro Hac Vice* for Plaintiffs Andrew Teter and James Grell. <br> (jo) (Entered: 04/15/2019) |
| 04/22/2019 | 12 | SUMMONS Returned Executed by Andrew Teter, James Grell. All Defendants served on 4/15/2019. <br> (Attachments: # 1 Exhibit Proof of Service on Connors)(Stamboulieh, Stephen) <br> Docket Text Modified on 4/22/2019 (jo) <br> (Entered: 04/22/2019) |
| 05/08/2019 | 15 | ORDER REASSIGNING CASE. Case reassigned to MAGISTRATE JUDGE WES REBER PORTER for all further proceedings. MAGISTRATE JUDGE RICHARD L. PUGLISI no longer assigned to case. Please reflect new case number CV 19-00183ACK-WRP on all further pleadings, effective 05/13/2019 . Signed by CHIEF JUDGE J. MICHAEL SEABRIGHT on 05/08/19. (apg, ) (Entered: 05/13/2019) |
| 05/13/2019 | 13 | REPORT of Planning Meeting . (Attachments: # 1 Certificate of Service)(Stamboulieh, Stephen) (Entered: 05/13/2019) |
| 05/13/2019 | 14 | Scheduling Conference Statement . (Attachments: # 1 Certificate of Service) (Stamboulieh, Stephen) (Entered: 05/13/2019) |
| 05/13/2019 | 16 | EO: Due to a scheduling conflict, the Rule 16 Scheduling Conference set for 6/5/2019 is CONTINUED to 6/14/2019 at 9:30 a.m. in the Chambers of Magistrate Judge Wes Reber Porter. Plaintiffs shall notify Defendants. (MAGISTRATE JUDGE WES REBER PORTER)(agh) (Entered: 05/13/2019) |
| 05/28/2019 | 17 | *Defendants Clare E. Connors and Al Cummings', In Their Official Capacities,* ANSWER to Complaint *For Declaratory And Injunctive Relief* by Clare E. Connors, Al Cummings. (Attachments: # 1 Certificate of Service)(Akamine, Ryan) (Entered: 05/28/2019) |
| 06/06/2019 | 18 | Scheduling Conference Statement *Defendants Clare E. Connors and Al Cummings, In Their Official Capacities*. (Attachments: # 1 Certificate of Service)(Akamine, Ryan) (Entered: 06/06/2019) |
| 06/14/2019 | 19 | EP: Rule 16 Scheduling Conference held on 6/14/2019. Rule 16 Scheduling Conference Order to be issued. Non-Jury Trial is set for 6/16/2020 at 09:00 AM before JUDGE ALAN C. KAY. Final Pretrial Conference is set for 5/6/2020 at 10:00 AM in Chambers of Magistrate Judge Wes Reber Porter before MAGISTRATE JUDGE WES REBER PORTER. Settlement Conference is set for 2/26/2020 at 10:00 AM in Chambers of Magistrate Judge Wes Reber Porter before MAGISTRATE JUDGE WES REBER PORTER. Settlement Conference statements by 2/19/2020. Dispositive Motions filed by 1/15/2020. Discovery due by 4/17/2020. (Court Reporter In chambers - not reported. 9:35 a.m. 9:50 a.m.) (MAGISTRATE JUDGE WES REBER PORTER)(mrf) (Entered: 06/14/2019) |

**ER164**

| 06/14/2019 | 20 | CERTIFICATE OF SERVICE by James Grell, Andrew Teter *Plaintiffs' Initial Disclosures* (Stamboulieh, Stephen) (Entered: 06/14/2019) |
| 06/14/2019 | 21 | CERTIFICATE OF SERVICE by James Grell, Andrew Teter *Plaintiffs' First Set of Interrogatories* (Stamboulieh, Stephen) (Entered: 06/14/2019) |
| 06/14/2019 | 22 | CERTIFICATE OF SERVICE by James Grell, Andrew Teter *Plaintiffs' First Set of Requests for Admissions* (Stamboulieh, Stephen) (Entered: 06/14/2019) |
| 06/14/2019 | 23 | CERTIFICATE OF SERVICE by James Grell, Andrew Teter *Plaintiffs' Requests for Production of Documents* (Stamboulieh, Stephen) (Entered: 06/14/2019) |
| 06/14/2019 | 24 | RULE 16 SCHEDULING ORDER - Signed by MAGISTRATE JUDGE WES REBER PORTER on 6/14/2019.<br>(jo) (Entered: 06/14/2019) |
| 06/14/2019 | 25 | ORDER SETTING SETTLEMENT CONFERENCE - Signed by MAGISTRATE JUDGE WES REBER PORTER on 6/14/2019.<br>    Pursuant to LR 16.5(b), all parties to this matter are hereby ORDERED TO APPEAR for a settlement conference, beginning in chambers, on February 26, 2020, at 10:00 a.m.<br>(jo) (Entered: 06/14/2019) |
| 07/29/2019 | 26 | CERTIFICATE OF SERVICE by Clare E. Connors, Al Cummings *In Their Official Capacities, Response To Plaintiffs' First Set Of Request For Admissions]* (Akamine, Ryan) (Entered: 07/29/2019) |
| 07/29/2019 | 27 | CERTIFICATE OF SERVICE by Clare E. Connors, Al Cummings *In Their Official Capacities, Response To Plaintiffs' First Set Of Interrogatories To Defendants* (Akamine, Ryan) (Entered: 07/29/2019) |
| 07/29/2019 | 28 | CERTIFICATE OF SERVICE by Clare E. Connors, Al Cummings *In Their Official Capacities, Response To Plaintiffs' First Set Of Request [sic] For Production Of Documents* (Akamine, Ryan) (Entered: 07/29/2019) |
| 08/02/2019 | 29 | CERTIFICATE OF SERVICE by Clare E. Connors, Al Cummings *[Re: Defendants Clare E. Connors and Al Cummings', In Their Official Capacities, Rule 26 Initial Disclosures]* (Akamine, Ryan) (Entered: 08/02/2019) |
| 09/30/2019 | 30 | CERTIFICATE OF SERVICE by James Grell, Andrew Teter *Notice of Deposition to Al Cummings* (Stamboulieh, Stephen) (Entered: 09/30/2019) |
| 09/30/2019 | 31 | CERTIFICATE OF SERVICE by James Grell, Andrew Teter *Notice of Deposition to Clare E. Connors* (Stamboulieh, Stephen) (Entered: 09/30/2019) |
| 12/09/2019 | 32 | CERTIFICATE OF SERVICE by James Grell, Andrew Teter *Plaintiffs' Designation of Expert Witnesses* (Stamboulieh, Stephen) (Entered: 12/09/2019) |
| 01/14/2020 | 33 | MOTION for Summary Judgment Stephen D. Stamboulieh appearing for Plaintiffs James Grell, Andrew Teter (Attachments: # 1 Memorandum In Support of Motion, # 2 Certificate of Service)(Stamboulieh, Stephen)<br>Docket Text Modified on 1/14/2020 (jo)<br>(Entered: 01/14/2020) |
| 01/14/2020 | 34 | CONCISE STATEMENT of Facts re 33 MOTION for Summary Judgment filed by James Grell, Andrew Teter. (Attachments: # 1 Declaration of Counsel, # 2 Exhibit A Teter Declaration, # 3 Exhibit B Grell Declaration, # 4 Exhibit C Burton Declaration, # |

# ER165

| | | |
|---|---|---|
| | | <u>5</u> Exhibit D Burton Report, # <u>6</u> Exhibit E Deposition of Robin Nagamine, # <u>7</u> Certificate of Service)(Stamboulieh, Stephen)<br>Docket Text Modified on 1/14/2020 (jo)<br>(Entered: 01/14/2020) |
| 01/14/2020 | 35 | NOTICE of Hearing on Motion <u>33</u> MOTION for Summary Judgment . The Motion Hearing is scheduled for Tuesday, April 7, 2020 at 11:00 AM before JUDGE ALAN C. KAY.<br>(il, ) (Entered: 01/14/2020) |
| 01/15/2020 | <u>36</u> | MOTION for Summary Judgment Ryan M. Akamine appearing for Defendants Clare E. Connors, Al Cummings (Attachments: # <u>1</u> Memorandum, # <u>2</u> Certificate of Service)(Akamine, Ryan) (Entered: 01/15/2020) |
| 01/15/2020 | <u>37</u> | CONCISE STATEMENT of Facts re <u>36</u> MOTION for Summary Judgment filed by Clare E. Connors, Al Cummings. (Attachments: # <u>1</u> Declaration of Ryan M. Akamine, # <u>2</u> Exhibit A, # <u>3</u> Exhibit B, # <u>4</u> Exhibit C, # <u>5</u> Exhibit D, # <u>6</u> Exhibit E, # <u>7</u> Exhibit F, # <u>8</u> Exhibit G, # <u>9</u> Exhibit H, # <u>10</u> Exhibit I, # <u>11</u> Certificate of Service)(Akamine, Ryan) (Entered: 01/15/2020) |
| 01/15/2020 | <u>38</u> | First MOTION for Leave to File *amicus brief of Hawaii Firearms Coalition* Kevin G. O'Grady appearing for Amicus Hawaii Firearms Coalition (Attachments: # <u>1</u> Memorandum, # <u>2</u> Exhibit A Declaration of Kevin O'Grady, # <u>3</u> Exhibit B amicus brief, # <u>4</u> Certificate of Service)(O'Grady, Kevin)<br>Docket Text Modified on 1/16/2020 (jo)<br>(Entered: 01/15/2020) |
| 01/16/2020 | 39 | NOTICE of Hearing on Motions <u>33</u> MOTION for Summary Judgment and <u>36</u> MOTION for Summary Judgment are both scheduled for Tuesday, April 28, 2020 at 11:00 AM before JUDGE ALAN C. KAY. The original motion hearing date of 4/7/2020 is now canceled, both motions shall be heard on the 4/28/2020 date.<br>(il, ) (Entered: 01/16/2020) |
| 01/17/2020 | 40 | EO: The Court has reviewed Hawaii Firearms Coalition's Motion for Leave to File Amicus Curiae Brief, see ECF No. <u>38</u> , including the declaration of counsel stating that both Plaintiffs and Defendants in this action consent to filing of the brief, and GRANTS leave to file the brief submitted as Exhibit B to the Motion. (MAGISTRATE JUDGE WES REBER PORTER) (agh) (Entered: 01/17/2020) |
| 01/22/2020 | <u>41</u> | NOTICE of Appearance by Wendy F. Hanakahi on behalf of Everytown for Gun Safety Support Fund. (Hanakahi, Wendy) (Entered: 01/22/2020) |
| 01/22/2020 | <u>42</u> | NOTICE of Appearance by Pamela W. Bunn on behalf of Everytown for Gun Safety Support Fund. (Bunn, Pamela) (Entered: 01/22/2020) |
| 01/22/2020 | <u>43</u> | Corporate Disclosure Statement by Everytown for Gun Safety Support Fund. (Hanakahi, Wendy) (Entered: 01/22/2020) |
| 01/22/2020 | <u>44</u> | MOTION for Leave to File *Brief of Everytown for Gun Safety Support Fund as Amicus Curiae* Wendy F. Hanakahi appearing for Amicus Everytown for Gun Safety Support Fund (Attachments: # <u>1</u> Exhibit A)(Hanakahi, Wendy) (Entered: 01/22/2020) |
| 01/22/2020 | <u>45</u> | First Brief *of Amicus Hawaii Firearms Coalition*. (Attachments: # <u>1</u> Certificate of Service)(O'Grady, Kevin) (Entered: 01/22/2020) |

# ER166

| 01/23/2020 | 46 | EO: The Court is in receipt of the Motion for Leave to File Brief of Everytown for Gun Safety Support Fund as Amicus Curiae, ECF No. 44 . The Motion represents that all parties have consented to the filing of the aforementioned Amicus Brief, and the Court GRANTS leave to file the brief submitted as Exhibit A to the Motion.<br><br>SO ORDERED by (JUDGE ALAN C. KAY)<br>(il, ) (Entered: 01/23/2020) |
|---|---|---|
| 01/23/2020 | 47 | Brief re 46 Order on Motion for Leave to File,, Link, 44 MOTION for Leave to File *Brief of Everytown for Gun Safety Support Fund as Amicus Curiae Brief of Everytown For Gun Safety Support Fund as Amicus Curiae*. (Hanakahi, Wendy) (Entered: 01/23/2020) |
| 02/04/2020 | 48 | Letter from counsel requesting that the settlement conference set for 2/26/2020 be vacated (agh) (Entered: 02/04/2020) |
| 02/04/2020 | 49 | EO: The Court grants the parties' joint request to vacate the Settlement Conference set for 2/26/2020. See ECF No. 48 . The Court may reschedule the Settlement Conference as appropriate and encourages the parties to contact the Court at any time if settlement discussions would be productive. (MAGISTRATE JUDGE WES REBER PORTER) (agh) (Entered: 02/04/2020) |
| 03/30/2020 | 50 | CONCISE STATEMENT in Opposition re 36 MOTION for Summary Judgment filed by James Grell, Andrew Teter. (Attachments: # 1 Certificate of Service)(Stamboulieh, Stephen) (Entered: 03/30/2020) |
| 03/30/2020 | 51 | RESPONSE in Opposition re 36 MOTION for Summary Judgment filed by James Grell, Andrew Teter. (Attachments: # 1 Memorandum Memorandum in Opposition, # 2 Certificate of Service Certificate of Service)(Stamboulieh, Stephen) (Entered: 03/30/2020) |
| 04/07/2020 | 52 | MEMORANDUM in Opposition re 33 MOTION for Summary Judgment filed by Clare E. Connors, Al Cummings. (Attachments: # 1 Certificate of Service)(Akamine, Ryan) (Entered: 04/07/2020) |
| 04/07/2020 | 53 | CONCISE STATEMENT in Opposition re 33 MOTION for Summary Judgment filed by Clare E. Connors, Al Cummings. (Attachments: # 1 Declaration of Ryan M. Akamine, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Certificate of Service) (Akamine, Ryan) (Entered: 04/07/2020) |
| 04/10/2020 | 54 | EO: Pursuant to the March 23, 2020 issuance of a Temporary General Order Regarding District of Hawaii Response to Covid-19 Emergency, the Motion Hearing scheduled on April 28, 2020 at 11:00 AM will be held telephonically using the AT&T Connect Audio Conference.<br><br>The Parties are directed to follow the dialing instructions below as well as anyone who wishes to participate in this public hearing.<br><br>Participant dialing instructions:<br>1. Dial (888) 684-8852<br>2. Enter Access Code (9657219) when prompted followed by the pound(#) sign<br>3. No Participant/Security Code is needed<br>4. You will be connected |

| | | |
|---|---|---|
| | | SO ORDERED by (JUDGE ALAN C. KAY)<br>(il, ) (Entered: 04/10/2020) |
| 04/10/2020 | 55 | EO: The Final Pretrial Conference set for May 6, 2020 is CONTINUED to May 12, 2020 at 10:00 AM before MAGISTRATE JUDGE WES REBER PORTER. The Final Pretrial Conference will be held by telephone. The Court will be using AT&T Connect Audio Conference at 1-888-278-0296 / Access Code: 8224751. (MAGISTRATE JUDGE WES REBER PORTER)(mrf) (Entered: 04/10/2020) |
| 04/13/2020 | 56 | Joint MOTION to Continue *Pretrial and Trial Deadlines* Stephen D. Stamboulieh appearing for Plaintiffs James Grell, Andrew Teter (Attachments: # 1 Certificate of Service)(Stamboulieh, Stephen) (Entered: 04/13/2020) |
| 04/14/2020 | 57 | RESPONSE in Support re 36 MOTION for Summary Judgment filed by Clare E. Connors, Al Cummings. (Attachments: # 1 Certificate of Service)(Akamine, Ryan) (Entered: 04/14/2020) |
| 04/14/2020 | 58 | REPLY to Response to Motion re 33 MOTION for Summary Judgment filed by James Grell, Andrew Teter. (Attachments: # 1 Certificate of Service)(Stamboulieh, Stephen) (Entered: 04/14/2020) |
| 04/15/2020 | 59 | EO: The Court GRANTS the parties' Joint Motion to Suspend Pretrial and Trial Deadlines, ECF No. 56 . The trial date, final pretrial conference date, and all trial-related deadlines are vacated and will be reset following the court's decision on the pending motions for summary judgment. A Telephonic Status Conference before Magistrate Judge Wes Reber Porter is set for 6/18/2020 at 9:30 AM via AT&T Connect Audio Conference at 1-888-278-0296 / Access Code: 8224751. No later than 6/12/2020, the parties shall file a Status Report. (MAGISTRATE JUDGE WES REBER PORTER)(mrf) (Entered: 04/15/2020) |
| 04/28/2020 | 60 | EP: Motion Hearing held regarding Plaintiffs' Motion for Summary Judgment 33 and Defendants' Motion for Summary Judgment 36 .<br><br>Amicus Attorney Wendy F. Hanakahi, Esq. representing Everytown for Gun Safety Support Fund present.<br>Amicus Attorney Kevin G. O'Grady, Esq. representing Hawaii Firearms Coalition present.<br><br>Arguments were heard.<br><br>Both the Plaintiffs' Motion for Summary Judgment 33 and Defendants' Motion for Summary Judgment 36 is taken under advisement.<br><br>Court to prepare a written order.<br><br>(Court Reporter Ann Matsumoto.) (JUDGE ALAN C. KAY)<br>(il, ) (Entered: 04/28/2020) |
| 05/13/2020 | 61 | ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING THE STATE'S MOTION FOR SUMMARY JUDGMENT, re ECF 33 Plaintiffs' Motion, and ECF 36 State's Motion - Signed by JUDGE ALAN C. KAY on 5/13/2020. |

**ER168**

For the foregoing reasons, the Court holds that HRS § 134-53(a) is not an unconstitutional restriction on the right to bear arms under the Second Amendment. To summarize the Court's ruling: (1) butterfly knives are bearable arms that trigger Second Amendment protections; (2) the Court assumes without deciding that butterfly knives are commonly used by law-abiding citizens for lawful purposes and therefore fall within the historical scope of the Second Amendment; (3) the ban on butterfly knives is not per se unconstitutional under Heller; (4) because the ban implicates the core right under the Second Amendment but does not severely burden that right, intermediate scrutiny applies; and (5) the statute survives intermediate scrutiny because it furthers the State's important interest to promote public safety by reducing access to butterfly knives, which leads to gang-related crime.

While recognizing that Heller does not cleanly resolve all the constitutional questions at play here, this analysis is faithful to Heller. The Court hereby DENIES Plaintiffs' Motion for Summary Judgment and GRANTS the State's Motion for Summary Judgment.

(jni) (Entered: 05/13/2020)

| | | |
|---|---|---|
| 05/13/2020 | 62 | EO: Based on 61 ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING THE STATE'S MOTION FOR SUMMARY JUDGMENT, the Telephonic Status Conference set for 6/18/2020 at 9:30 AM before MAGISTRATE JUDGE WES REBER PORTER is VACATED.<br><br>(MAGISTRATE JUDGE WES REBER PORTER)(mrf) (Entered: 05/13/2020) |
| 05/13/2020 | 63 | JUDGMENT IN A CIVIL CASE entered on 5/13/2020 in favor of Clare E. Connors and Al Cummings, against Andrew Teter and James Grell, pursuant to ECF 61 ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING THE STATE'S MOTION FOR SUMMARY JUDGMENT.(jni) (Entered: 05/13/2020) |
| 05/13/2020 | 64 | **NOTICE OF APPEAL** as to 63 Clerk's Judgment, 61 Order on Motion for Summary Judgment,,,,,,,,,,, by James Grell, Andrew Teter. Filing fee $ 505, receipt number 0975-2371142. (Stamboulieh, Stephen) USCA NO. 20-15948 Modified on 5/19/2020 (jni) (Entered: 05/13/2020) |
| 05/19/2020 | 65 | USCA Case Number 20-15948 for 64 Notice of Appeal, filed by Andrew Teter, James Grell. (jni) (Entered: 05/19/2020) |
| 05/19/2020 | 66 | USCA Time Schedule Order as to 64 Notice of Appeal, filed by Andrew Teter, James Grell; USCA NO. 20-15948 (Attachments: # 1 Notice to all Parties and Counsel, # 2 Mediation Letter)(jni) (Entered: 05/19/2020) |
| 05/19/2020 | 67 | **Attorney Appeal Packet** re 64 Notice of Appeal, filed by Andrew Teter, James Grell; USCA NO. 20-15948 (Attachments: # 1 Notice of Appeal, # 2 District Court Instructions for Civil Appeals, # 3 Docket Sheet)(jni) (Entered: 05/19/2020) |
| 06/03/2020 | 68 | TRANSCRIPT of Proceedings Telephonic Hearing held on April 28, 2020, before Judge Alan C. Kay. Court Reporter/Transcriber - ANN MATSUMOTO, Telephone number - 8085412061,Email Address - am@hid.uscourts.gov. PP. - 33 **90-Day Transcript Restriction:** PACER access to filed transcripts is restricted for 90 days from the file date to permit redaction of personal identifiers. Citations to restricted transcripts in filed documents must be limited to those portions of the proceedings that |

are relevant and in need of judicial review. Attaching restricted transcripts, in their entirety, to filed documents should be limited to situations with specific need. Transcript may be viewed at the court public terminal or ordered through the Court Reporter before the deadline for Release of Transcript. Redaction Request due 6/22/2020. Redacted Transcript Deadline set for 7/1/2020. Release of Transcript Restriction set for 8/31/2020. (Matsumoto, Ann) (Entered: 06/03/2020)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/13/2020 07:35:16 | | | |
| **PACER Login:** | stamboulieh:3697460:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-00183-ACK-WRP |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

**ER170**