No. 20-15948

# In the United States Court of Appeals
## for the Ninth Circuit

ANDREW TETER AND JAMES GRELL

*Plaintiffs-Appellants*,

v.

CLARE CONNORS, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII AND AL CUMMINGS, IN HIS OFFICIAL CAPACITY AS THE STATE SHERIFF DIVISION ADMINISTRATOR

*Defendants-Appellees*.

**Appeal from a Judgment of United States District Court
For the District of Hawaii
Civ. No. 19-cv-00183-ACK-WRP
United States District Court Judge Alan C. Kay**

**BRIEF OF *AMICUS CURIAE* HAWAII FIREARMS COALITION
IN SUPPORT OF APPELLANTS AND REVERSAL**

Kevin O'Grady
The Law Office of Kevin O'Grady, LLC
1136 Union Mall, Suite 808
Honolulu, Hawaii 96813
www.KevinOGradyLaw.com
Telephone- 808-521-3367
Facsimile 808-521-3369
Paralegal1@KevinOGradyLaw.com

David T. Hardy
8987 E. Tanque Verde, No. 265
Tucson, AZ 85749
(520) 749-0241
dthardy@mindspring.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a) of the Federal Rules of Appellate Procedure, Amicus Curiae Hawaii Firearms Coalition, states that it has no parent corporations, nor has it issued shares or debt securities to the public. The Hawaii Firearms Coalition is a § 501(c)(4) non-profit corporation, and no publicly held corporation holds ten percent or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF THE *AMICUS* ................................................................. 1

ARGUMENT .................................................................................. 2

I.     Edged Weapons and the Duty to Bear Arms................................................. 2

    A.    Origins of the Duty to Bear Arms ................................................. 2

    B.    The Age of the Pike............................................................. 5

    C.    Edged Weapons in Colonial America ............................................... 7

II.    Edged Weapons as Arms During the Framing Period .................................... 8

III.   Edged Weapons in the Post-Framing Period.............................................. 11

CONCLUSION ............................................................................... 14

CERTIFICATE OF COMPLIANCE...................................................................... 15

CERTIFICATE OF SERVICE ........................................................................ 16

# TABLE OF AUTHORITIES

**Cases**

*Cockrum v. State*,
    24 Tex. 394 (1859) ......................................................................... 12, 13

**Other Authorities**

1181 Assize of Arms, (27 Hen. II c. 3) ...................................................... 3

1285 Statute of Westminister (13 Edw. I ch. 1) ........................................ 3

*A Bayonet Charge Saved a Lot of Lives During the Iraq War*, Business
    Insider, online at https://www.businessinsider.com/the-most-famous-
    bayonet-charge-of-modern-conflict-2012-10 ................................... 13, 14

BILL AHEARN & ROBERT NITTOLO, BRITISH LONG ARMS IN COLONIAL
    AMERICA (2018) ..................................................................................... 9

*An Act to Promote the Efficiency of the Militia*, 32 Stat. 775 (1903) ...................... 11

1 J. BAGLEY & P. ROWLY, A DOCUMENTARY HISTORY OF ENGLAND 1066-
    1540 (1965) ............................................................................................. 3

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE COMMON LAW OF
    ENGLAND (1765) ..................................................................................... 3

3 HANS DELBRUCK, HISTORY OF THE ART OF WAR (Walter Renfroe, tran.
    1990) ....................................................................................................... 6

2 DAVID DOUGLAS & GEORGE GREENWAY, EDS, ENGLISH HISTORICAL
    DOCUMENTS (1981) ................................................................................. 3

Robert Dowlut & Janet Knoop, *State Constitutions and the Right to Keep
    and Bear Arms*, 7 OKLA. CITY U. L. REV. 177 (1982) ......................... 11

JOHN FORTESCUE, THE GOVERNANCE OF ENGLAND (rev. ed. 1885, reprinted
    1979) ....................................................................................................... 5

iii

JEAN FROISSART, CHRONICLES (Geoffrey Brereton, trans., 1968) ............................4

JACOB DE GHEYN, THE EXERCISE OF ARMES (David Blackmore, ed., 1986) ...........7

WILLIAM HILL, THE PONY EXPRESS TRAIL (2010) ....................................................12

KERRY L. LANE, GUADALCANAL MARINE (2004) ....................................................13

ARTHUR S. LEFKOWITZ, BENEDICT ARNOLD'S ARMY (E-book, 2014).....................10

JOYCE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-
    AMERICAN RIGHT (1994) ....................................................................................2, 3

WILLIAM MANCHESTER, GOODBYE DARKNESS: A MEMOIR OF THE PACIFIC
    WAR (1980) ..............................................................................................................13

Militia Act of 1792, *An Act More Effectually to Provide for the National
    Defense by Establishing an Uniform Militia*, 1 Stat. 271 (1792).........................10

Donald Moran, *George Washington's Swords*, online at
    http://revolutionarywararchives.org/washsword.html...........................................10

GEORGE C. NEUMANN, THE HISTORY OF WEAPONS OF THE AMERICAN
    REVOLUTION (1967)...................................................................................................9

CHARLES OMAN, A HISTORY OF THE ART OF WAR IN THE SIXTEENTH
    CENTURY (1937) ........................................................................................................5

HAROLD L. PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA 1526-1783
    (1956)...........................................................................................................................8

H. EDWARD RICHARDSON, CASSIUS MARCELLUS CLAY: FIREBRAND OF
    FREEDOM (1976) ......................................................................................................11

MARTINA SPRAGUE, PIKE, HALBERD, AND BAYONET (2013) .............................. 13, 14

iv

## INTERESTS OF THE *AMICUS*[1]

*Amicus Curiae* Hawaii Firearms Coalition (HFC), a non-profit, member driven organization incorporated under the laws of the State of Hawaii with its principal place of business in Honolulu, Hawaii, submits this *amicus*, in support of Plaintiffs' Andrew Teter and James Grell.

Hawaii Firearms Coalition promotes legislative and legal action, as well as research, publishing, and advocacy, in support of people's civil liberties. Hawaii Firearms Coalition litigates arms-regulation cases, and it has consistently advocated for a principled interpretation of the United States Constitution to prevent government from violating the basic civil rights of its citizens. In this case, its interest is in ensuring orderly and lawful development of the right to arms, against an appropriate historical background.

---

[1] The parties have consented to the filing of this *amicus curiae* brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae,* its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

1

**ARGUMENT**

While a 21st century American usually thinks of the right to arms in terms of a right to firearms, the right to arms is considerably broader. Indeed, a likely explanation of the choice of the term "arms" is, during and before the Framing period, soldiers, militia, and civilians alike carried a variety of arms, largely edged ones that ranged from officers' and gentlemen's swords to Bowie knifes and utility blades.

*Amicus* will here trace the history of edged weapons in relation to the American right to arms.

## I.     Edged Weapons and the Duty to Bear Arms

### A.     Origins of the Duty to Bear Arms

Historian Joyce Malcolm points out that the right to arms has a unique origin, beginning as a *duty* to keep and bear arms, and coming to be seen as a right in the late seventeenth century:

> The right of citizens to be armed not only is unusual, but evolved in England in an unusual manner: it began as a duty. From the proverbial "time out of mind" Englishmen had a duty to be armed. Like most duties it was often resented and, in this instance, commonly regarded as onerous, if not dangerous. Yet, at a crucial moment in English history, when the governing classes seized a rare opportunity to draw up a bill of rights, this long-standing and unpopular duty was transformed into a right.

2

JOYCE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-
AMERICAN RIGHT 1 (1994). Blackstone, attributed creation of the duty to Alfred
the Great, asserting: "It seems universally agreed by all historians, that King Alfred
first settled a national militia in this kingdom, and by his prudent discipline made
all the subjects of his dominion soldiers ...." 1 WILLIAM BLACKSTONE,
COMMENTARIES ON THE COMMON LAW OF ENGLAND •409 (1765). We now know
this is an understatement. The early militia, or Fyrd, can now be traced at least to
A.D. 690; indeed, it is likely that "the obligation of Englishmen to serve in the
Fyrd or people's army is older than our oldest records." 1 J. BAGLEY & P. ROWLY,
A DOCUMENTARY HISTORY OF ENGLAND 1066-1540, at 152 (1965).

Evolving as it did centuries before firearms were invented, the duty to bear
arms revolved around edged weapons. The earliest known specification of the
weapons that must be owned comes from the 1181 Assize of Arms, (27 Hen. II c.
3), *see* 2 DAVID DOUGLAS & GEORGE GREENWAY, EDS, ENGLISH HISTORICAL
DOCUMENTS 448 (1981), and the 1285 Statute of Westminister (13 Edw. I ch. 1).
Under these, a person's property value determined the arms he was required to
own. The most-wealthy were required to have armor, helmet, shield, and lance,
*i.e.*, spear. The 1181 statute required the least-wealthy freemen to have "a wambais
[inexpensive leather and linen armor], a chaplet [skullcap] of iron, and a lance."
The 1285 enactment applied to "every man" (thus including the unfree serfs) and

required the least-wealthy to be "sworn to keep Gisarmes [pole-axes], knives and other less weapons."[2]

The 14th century saw the rise of the English longbow, which could pierce the chain mail armor then in use. The longbow's most stunning victories came at Crecy, France, in 1346 and at Agincourt in 1415. Even so, archers found edged weapons essential back-up arms. The contemporaneous French chronicler Jean Froissart mentions the English using swords and "long knives" at Crecy. JEAN FROISSART, CHRONICLES 91-93 (Geoffrey Brereton, trans., 1968). At Agincourt, the archers protected themselves with sharpened stakes driven into the ground and pointed toward the French cavalry, and were reinforced with dismounted men-at-arms using swords. Even so, the archers found themselves using axes and mallets in close range melees.

By the end of this pre-firearm period, the English came to see widespread ownership of weapons as the essence of being English and free. In his work, "The Governance of England," written sometime between 1471 and 1476, Sir John Fortescue expounded at length on the difference between the lot of the French peasant (which he considered the result of absolute monarchy or *jus regale*) as

---

[2] It is worth noting how non-feudal these measures were. The feudal system centered on the idea that military service was payment-in-kind for a grant of lands. Under these English laws, military duty was owed by everyone, regardless of land grants, and directly to the king, not to any intermediate nobleman who may have made the grant.

opposed to that of the English commoner. The French peasants, he noted, have grown feeble, "not able to fight, nor to defend the realme; nor thai haue wepen, nor money to bie thaim wepen withall.... Werthurgh, the French kynge, hath not men of his own realme able to defend it, except as nobles.... Lo, this is the frute of his *jus regale.*" JOHN FORTESCUE, THE GOVERNANCE OF ENGLAND 114-15 (rev. ed. 1885, reprinted 1979). Being armed also kept the monarchy in check. British military historian Sir Charles Oman provides a case in point--that of Henry VIII:

> More than once he had to restrain himself, when he discovered that the general feeling of his subjects was against him. As the Pilgrimage of Grace showed, great bodies of malcontents might flare up in arms, and he had no sufficient military force to oppose them. His "gentlemen pensioners" and his yeomen of the guard were but a handful, and bows and bills [a pole axe] were in every farm and cottage.

CHARLES OMAN, A HISTORY OF THE ART OF WAR IN THE SIXTEENTH CENTURY 288 (1937).

## B. The Age of the Pike

Infantry of the early period were vulnerable to being ridden down by heavy, well-armored cavalry. The Scots and the Swiss evolved a defense against this, and the Swiss example in particular spread through Europe.

Swiss infantry formed and moved in large oblong formations, standing shoulder to shoulder and initially armed with the halberd. That arm featured a pole of about eight feet topped by a head that incorporated both a spear point and broad-

5

bladed axe. With the halberd levelled, horses would refuse to charge into the forest of points. If an armored horseman somehow did penetrate, the Swiss would use the axe portion of the head to overwhelm him. At the Battle of Morgarten, in 1315, Swiss infantry annihilated an invading Austrian army. At the Battle of Laupen, in 1339, they repeated this feat. 3 HANS DELBRUCK, HISTORY OF THE ART OF WAR 551-68 (Walter Renfroe, tran. 1990).

The prowess of the Swiss enabled them to hire out as mercenary units during the incessant wars on the Italian peninsula.[3] At the Battle of Arbedo in 1422, however, the opposing armored horsemen found a counter: they dismounted and attacked on foot, with lances that outreached the Swiss halberds.

The result that the Swiss changed their armament; their principle weapon became the pike, a 16 to 18 foot spear, backed up by a sword for close-in fighting. The standard formation was about twenty men deep, with the front three ranks lowering their pikes and the remainder holding them vertical. Interspersed among the pikemen were some halberdmen, ready to cope with any enemy who somehow forced their way past the forest of points.

As muskets came into use, pikemen faced their one vulnerability; a mass of men standing shoulder to shoulder was an ideal target for musketeers who could

---

[3] The wars were fought between city-states and also between France, Spain, and the Papacy. The Swiss generally hired on with France and the Pope, while Spain hired their rivals, the Landknechs of Germany.

stay beyond reach of the pike. The pike formations evolved a counter, their own detachments of musketeers who could deploy ahead of the pikemen and take the opposing musketeers under fire. The two arms were mutually supporting; if taken under fire, the musketeers protected the pikemen, and if charged by cavalry, the musketeers would take shelter, crouching, under the pikes.

### C.     Edged Weapons in Colonial America

The pike and sword dominated European warfare over the period of America's colonization, but the Americans tended toward a greater variety of edged weapons. The sword was an important weapon. Muskets were slow to reload,[4] and the bayonet not yet invented, so the sword was essential to the musketeer's survival.

> Of all the various forms of edged weapons, the one in most widespread usage throughout the whole period was the sword. All men on military duty whether they carried a firearm or not were required to have a sword. Since all able-bodied men in a colony were normally called upon for such duty, this meant that all had to be familiar with the use of that weapon. Consequently, it is not surprising frequently to find more swords than guns listed in inventories and estates, or to learn that more have survived the ravages of time.

---

[4] In the late 18th century, using paper cartridges that contained both powder and ball, trained troops could fire three shots per minute. The matchlock musket of the 17th century was far slower, because ball and powder had to be retrieved and loaded separately, and the match – a smoldering cord – had to be adjusted and blown on to make it glow, before each shot. A 1607 drill manual gives thirty motions necessary to load, which likely took over a minute. JACOB DE GHEYN, THE EXERCISE OF ARMES 33-93 (David Blackmore, ed., 1986).

7

HAROLD L. PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA 1526-1783, at 69 (1956). Throughout the 18th century, as Americans learned the use of the tomahawk in conflict, many substituted hatchets for swords, since hatchets could be used in camp work as well as in battle. *Id.* at 87-88. There are also "many references" to daggers in colonial record. *Id.* at 89. Polearms were also in use, including pikes (which were soon found impractical), half-pikes (about 7-8 feet long), halberds, and even medieval brown bills (900 of which were sent to Jamestown in 1622). *Id.* at 93-96.

Thus the colonists would have been familiar with an extensive array of edged weapons. If asked to give examples of "arms," they would likely have named a musket first and an edged weapon – a sword, knife, or hatchet -- second.

## II.    Edged Weapons as Arms During the Framing Period

The early 18th century saw the invention and development of the bayonet, which would finally render the pikeman obsolete. The pikeman's purpose had been to protect the musketeers from being ridden down by cavalry, or attacked while they were reloading and vulnerable. With the bayonet, the musketeers had their own edged weapons and were no longer so vulnerable.

> Early eighteenth century British military muskets employed what has been termed a "plug bayonet." The tapered wooden grip of the bayonet was inserted into the musket muzzle and the blade acted as the point of a spear. The muzzles of musket barrels originally

8

> manufactured for use with plug bayonets were often found to be slightly flared, a feature that would increase the surface of the barrel wall that gripped the bayonet handle. The plug bayonet revolutionized infantry tactics, as there was no longer a need for separate forces of infantry referred to as "pikemen" and "musketeers." However, the use of this type of weapon caused a serious problem in that the musket could not be fired or reloaded without removing the plug bayonet. Also, if the bayonet was not inserted tightly into the muzzle, it could be lost during combat and if inserted too tightly it could be difficult to remove.

BILL AHEARN & ROBERT NITTOLO, BRITISH LONG ARMS IN COLONIAL AMERICA 3 (2018). These problems were solved by invention of the socket bayonet a few decades later. The bayonet became a spike affixed to an iron tube that fit around rather than in the barrel, and could be locked into place. The use of the socket bayonet made pikemen obsolete; the men with muskets now carried their own edged weapon.

By the time of the Revolution, infantry armament had become relatively uniform. An infantryman carried a musket, a bayonet, and sometimes a sword. Since officers were expected to concentrate on commanding rather than on shooting, in place of muskets commissioned officers carried a sword (curved swords known as hangers were popular) and a spontoon a/k/a espontoon – a 7-8 foot spear with a broad head. Sergeants carried a sword and a halberd. *See* GEORGE C. NEUMANN, THE HISTORY OF WEAPONS OF THE AMERICAN REVOLUTION 218-358 (1967).

This was, of course, just the required minimum. Officers usually owned at least two swords, one for use in battle and one for use with full dress uniform. George Washington at his death owned seven, including a "mortuary sword" that he wore to funerals. Donald Moran, *George Washington's Swords*, online at http://revolutionarywararchives.org/washsword.html.

Patriot forces often used riflemen as light infantry. When Benedict Arnold set out to invade Quebec in 1775, "The riflemen were an important component of the Arnold expedition. An eyewitness noted that they carried 'a rifle-barrelled gun, a tomahawk or small axe, and a long knife, called a scalping knife which served for all purposes in the woods.'" ARTHUR S. LEFKOWITZ, BENEDICT ARNOLD'S ARMY, ch. 2 (E-book, 2014).

The Militia Act of 1792, *An Act More Effectually to Provide for the National Defense by Establishing an Uniform Militia*, 1 Stat. 271 (1792), was passed a year after the Second Amendment was ratified. It gives an idea of what the Framing generation understood to be "arms." Militia infantry were required each to possess a musket and "a sufficient bayonet and belt." §1. Commissioned officers were to have "a sword or hanger, and espontoon." *Id.* Artillerymen were to be armed as were the infantry, although their officers were to have, in addition to sword, a "fusee" (carbine) with bayonet. §4. Cavalrymen were required to possess a sword and two pistols. *Id.* The 1792 Militia Act remained on the books until repealed in

10

1903. *See An Act to Promote the Efficiency of the Militia*, 32 Stat. 775, §§24, 25 (1903).

> As two authors have aptly concluded,

> Colonial militia laws reveal that smoothbore shoulder arms, carbines, rifles, pistols, ammunition, swords, bayonets, pikes, and lances are arms suitable for militia use.

> To this list may also be added the shotgun. Since all those weapons are constitutionally protected arms, all stand on an equal footing.

Robert Dowlut & Janet Knoop, *State Constitutions and the Right to Keep and Bear Arms*, 7 OKLA. CITY U. L. REV. 177, 195 (1982).

## III.    Edged Weapons in the Post-Framing Period

Edged weapons, and in particular the Bowie knife, played a major in self-defense in the early Republic. Until the revolver became popular in the 1850s and 1860s, they were the only tool that could ward off multiple attackers.

Abolitionists were particularly at risk for mob assault, and often carried the Bowie. The career of Cassius Clay, who carried one under his coat, is illustrative. In 1843, he was mobbed, and the leader of the mob (a hired killer) shot him in the chest with a revolver. The bullet was stopped by the Bowie's scabbard, and he beat and slashed his attacker until the mob retreated. In 1849, he was again mobbed, and used his Bowie to kill the mob's leader. H. EDWARD RICHARDSON, CASSIUS MARCELLUS CLAY: FIREBRAND OF FREEDOM 35-36, 69 (1976).

11

The westward expansion likewise found uses for edged weapons. When the Pony Express began in 1860,

> All the riders and station hands had weapons. A rifle, two pistols, and bowie knife were the typical arms for a rider when the Pony Express began. It seems the station keepers and hands had similar weapons.

WILLIAM HILL, THE PONY EXPRESS TRAIL 26 (2010). It was this period, incidentally, that generated a ruling on edged weapons and the right to arms. The ruling came in *Cockrum v. State*, 24 Tex. 394 (1859). The case involved a statute that provided that manslaughter committed with a Bowie-knife must be treated as murder.

The court regarded the Bowie blade as exceptionally deadly, an "exceedingly destructive weapon." "The gun or pistol may miss its aim," the "sword may be parried," but the Bowie knife "is an instrument of almost certain death." 24 Tex. at 403. Yet the court noted, "The right to carry a bowie-knife for lawful defense is secured, and must be admitted." The statute was upheld since it did not inhibit the lawful use of such a blade, but only increased the penalty for its criminal misuse. At that,

> Such admonitory regulation of the abuse must not be carried too far. It certainly has a limit. For if the legislature were to affix a punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a prohibition of the right.... The legislature has the power to put all cases of manslaughter, committed with deadly weapons, on the same

12

footing with murder, in the punishment, leaving it to the jury to affix
the degree of punishment, according to their opinion of the degree of
its atrocity. If so, it is difficult to see the reason why they may not do
this, in the case of a bowie-knife, the most deadly of all weapons in
common use.

24 Tex. at 404.

The use of knives as war (and thus militia) arms continues to the current day.
Edged weapons were used in the Pacific Theater; as but one example, a Marine
whose machine gun jammed during the battle for Guadalcanal fought and killed
three enemies with a machete. WILLIAM MANCHESTER, GOODBYE DARKNESS: A
MEMOIR OF THE PACIFIC WAR 186 (1980). On Guadalcanal, a Marine whose
machine gun jammed fought and killed three opponents with a machete. *Id.* at 186.
A Marine officer recounts the use of daggers by Marine patrols infiltrating enemy
lines. KERRY L. LANE, GUADALCANAL MARINE 231, 236 (2004).

In the Korean War, "a particularly aggressive and effective U.S. Army
battalion assaulted a Chinese Communist position and inflicted most of the fatal
wounds with the bayonet." MARTINA SPRAGUE, PIKE, HALBERD, AND BAYONET
59 (2013).

The bayonet continues to be used in fighting in Iraq. In 2004, six British
soldiers used bayonets to fight their way out of an al-Qaeda ambush. *A Bayonet
Charge Saved a Lot of Lives During the Iraq War*, Business Insider, online at
https://www.businessinsider.com/the-most-famous-bayonet-charge-of-modern-

conflict-2012-10. In 2014, the Argyll and Sutherland Highlanders assaulted an insurgent position with the bayonet. MARTINA SPRAGUE, *supra*, at 61.

## CONCLUSION

To the Framers, "arms" was a far broader description than "guns." They included under arms the musket, the rifle, the bayonet, the sword, and pole weapons. The use of edged weapons as arms continued into the age of the Bowie knife and, indeed, extends to the current day.

Respectfully submitted this the 28th day of August 2020.

<u>/s/KEVIN O'GRADY</u>
Kevin O'Grady
The Law Office of Kevin O'Grady, LLC
1136 Union Mall, Suite 808
Honolulu, Hawaii 96813
Telephone 808-521-3367
Facsimile 808-521-3369
www.KevinOGradyLaw.com
Paralegal1@KevinOGradyLaw.com

David T. Hardy
8987 E. Tanque Verde, No. 265
Tucson, AZ 85749
(520) 749-0241
dthardy@mindspring.com

*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 3,302 words, including footnotes, but excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.


Dated: August 28, 2020                    Respectfully submitted,

                                          <u>/s/KEVIN O'GRADY</u>
                                          Kevin O'Grady

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 28, 2020, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

<u>/s/KEVIN O'GRADY</u>
Kevin O'Grady

16