No. 20-15948

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ANDREW TETER and JAMES GRELL,
*Plaintiff-Appellants*,

v.

CLAIR E. CONNORS, in her Official Capacity as the Attorney
General of the State of Hawaii, and AL CUMMINGS, in his Official
Capacity as the State Sheriff Division Administrator,
*Defendant-Appellees*.

On Appeal from the United States District Court for the District of Hawaii
Civ. No. 19-00183-ACK-WRP, The Honorable Alan C. Kay

*AMICUS CURIAE* MOUNTAIN STATES LEGAL FOUNDATION'S
BRIEF IN SUPPORT OF PLAINTIFF-APPELLANTS

Cody J. Wisniewski
MOUNTAIN STATES
  LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
cody@mslegal.org

*Attorney for Amicus Curiae
Mountain States Legal Foundation*

## CORPORATE DISCLOSURE STATEMENT[1]

The undersigned attorney certifies that *amicus curiae* Mountain States Legal Foundation ("MSLF") is a non-profit corporation, formed and in good standing in the State of Colorado under Section 501(c)(3) of the Internal Revenue Code. MSLF is not publicly traded and has no parent corporation. There is no publicly held corporation that owns ten percent or more of its stock.

---

[1] Pursuant to Fed. R. App. P. 29, both parties have consented to the filing of this *amicus curiae* brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), the undersigned affirms that no counsel for a party authored this brief in whole or in part, and no person or entity other than Mountain States Legal Foundation, or its counsel, made a monetary contribution specifically for the preparation or submission of this brief.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ................................................. ii

TABLE OF AUTHORITIES ............................................................. v

IDENTITY AND INTEREST OF *AMICUS CURIAE* ..................................... 1

INTRODUCTION ..................................................................... 2

STATEMENT OF THE CASE........................................................... 3

I.    Historical Background ...................................................... 3

II.   Statutory Background ....................................................... 5

III.  Procedural Background ...................................................... 6

SUMMARY OF THE ARGUMENT ................................................... 7

ARGUMENT ......................................................................... 9

I.    The Supreme Court Set Forth The Text, History, and Tradition Test
      to Uphold the Original Public Meaning of the Second Amendment ..... 9

II.   This Case Presents an Ideal Opportunity for This Circuit to Adopt the
      Text, History, and Tradition Test Prescribed by the Supreme Court..... 12

III.  A Complete Prohibition of Butterfly Knives, Which are Protected
      Arms Under the Second Amendment, is Unconstitutional ................... 17

      A.    Bladed Weapons, Including Knives, are and have Always Been
            Considered Protected Arms under the Broad Text of the Second
            Amendment ................................................................. 17

      B.    The History and Tradition of Bladed Weapon Regulation in the
            United States Includes No Prohibition on the Ownership or
            Possession of Particular Knives .................................... 20

            i.    English Common Law: 1285–1749 ................................... 20

            ii.   Colonial and Early Republic: 1750–1791........................... 23

iii.    Post-Ratification of the Bill of Rights: 1791–1800 ........... 24

C.    The Post-Founding Era Tradition of Bladed Weapon Regulation Evidences a Complete Prohibition on Possession of Knives is Unconstitutional ............................................................ 27

i.    Post-Founding Era: 1801–1868 ........................................ 27

CONCLUSION ................................................................................. 30

CERTIFICATE OF SERVICE .......................................................... 32

CERTIFICATE OF COMPLIANCE ................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Binderup v. Attorney General United States of America*,
   836 F.3d 336 (3d Cir. 2016)............................................................... 14

*Bliss v. Commonwealth*,
   12 Ky. 90 (1822)................................................................................ 28

*Bonidy v. U.S. Postal Serv.*,
   790 F.3d 1121 (10th Cir. 2015) ......................................................... 1

*Caetano v. Massachusetts*,
   136 S. Ct. 1027 (2016)................................................................. *passim*

*Caldara v. City of Boulder*,
   955 F.3d 1175 (10th Cir. 2020) ......................................................... 1

*Cotting v. Godard*,
   183 U.S. 79 (1901)............................................................................. 3

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)..................................................................... *passim*

*Duncan v. Becerra*,
   No. 19-55376, 2020 WL 4730668 (9th Cir. Aug. 14, 2020)............... 7–8

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011).................................................... 10, 11

*In the interest of Doe*,
   828 P.2d 272 (Haw. 1992)................................................................. 5

*Jackson v. City & Cty. of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) ........................................................ 14, 15

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010)...................................................................... 1, 11

*Nesbitt v. U.S. Army Corps of Engineers,*
   No. 14-36049 (9th Cir. Dec. 15, 2017) ................................................. 1

*New York State Rifle & Pistol Ass'n v. City of New York*,
   1139 S. Ct. 939 (2019) ........................................................................ 1

*Nunn v. State,*
   1 Ga. 243 (1846) ................................................................................. 29

*Parker v. District of Columbia*,
   478 F.3d 370 (D.C. Cir. 2007) ............................................................. 10

*Ramirez v. Commonwealth*,
   94 N.E.3d 809 (Mass. 2018) ................................................................ 17

*Rex v. Knight*,
   87 Eng. Rep. 75 (K.B. 1686) ............................................................... 21

*Robertson v. Baldwin*,
   165 U.S. 275 (1897) ............................................................................ 10

*Rogers v. Grewal*,
   140 S. Ct. 1865 (2020) ........................................................................ 13

*Simpson v. State*,
   13 Tenn. 356 (1833) ............................................................................ 28

*State v. DeCiccio*,
   105 A.3d 165 (Conn. 2014) ................................................................. 17

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013) ............................................ 7, 12, 13, 14

## Constitutional Provisions

THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) ..................... 3

U.S. CONST. AMEND. II .......................................................... *passim*

**Historical Statutes (Chronological)**

*Statute of Winchester*, 13 Edward I, at § 5 (1285)...................................  20

*Statute of Northampton*, 2 Edward III, at § 3 (1328)..............................  21

1749–1751 Mass. Acts 339, Ch. 17 § 1 (1751) .....................................  23

Sugar Act of 1764, 4 Geo. III, c. 15......................................................  4

Stamp Act of 1765, 5 Geo. III, c. 12.....................................................  4

The New York Restraining Act of 1767, 7 Geo. III, c. 59 ....................  4

The Intolerable Acts of 1774, 14 Geo. III, c. 19, 39, 45, 54..................  4

1786 Va. Laws 33, Ch. 21......................................................  21, 24

1791 S.C. Acts 16 .....................................................................  19

Militia Act of 1792, 1 Stat. 271, § 1 (May 8, 1792) .............................  5, 18, 25

1794 R.I. Pub. Laws 21 § 10.................................................................  19

1795 Mass. Laws 436, Ch. 2.................................................................  25

2 Stat. 1 §§ 1–5 (1797)..........................................................................  19

1799 Conn. Acts 511, § 4......................................................................  19

1813 Ky. Acts 100, Ch. 89 § 1..............................................................  28

1813 La. Acts 172 .................................................................................  29

1819 Ind. Acts 39 ..................................................................................  29

1821 Tenn. Pub. Acts 15–16.................................................................  28

1837 Ga. Acts 90 § 1–4.........................................................................  29

1837-38 Tenn. Pub. Acts 200-01, Ch. 137 § 2 ..................................... 29

1838 Wisconsin, An Act to Prevent the Commission of Crimes, § 16 .. 25

1841 Me. Laws 709, Ch. 169 § 16 ........................................................ 25, 30

1847 Va. Laws 127, Ch. 14 § 16 ........................................................... 25, 30

1853 Or. Laws 220, Ch. 16 § 17 ........................................................... 25, 30

**Modern Statutes**

H.R.S. § 134-53(a) ............................................................................... 5, 6

H.R.S. § 154-53 .................................................................................... 7

H.R.S. § 707-715 .................................................................................. 26

H.R.S. § 134-52 .................................................................................... 5

**Rules**

Fed. R. App. P. 29 ................................................................................ ii

Fed. R. App. P. 29(a)(4)(E) ................................................................. ii

Fed. R. App. P. 29(a)(5) ...................................................................... 33

Fed. R. App. P. 32(a)(5) and (6) ......................................................... 33

Fed. R. App. P. 32(f) ........................................................................... 33

**Other Authorities**

1 PRIVATE AND SPECIAL STATUTES OF THE COMMONWEALTH OF
MASSACHUSETTS FROM 1780–1805 (1805) ............................................. 14

1 W. & M., 2d sess. (Eng. Dec. 16, 1689) ............................................. 22

AARON LEAMING & JACOB SPICER, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 78 (2d ed., Honeyman & Co. 1881) .................................................................. 19, 22

CLAYTON E. CRAMER, ARMED AMERICA: THE REMARKABLE STORY OF HOW AND WHY GUNS BECAME AS AMERICAN AS APPLE PIE 10 (2006) .............................................................................................................. 15

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020) .................................................................................................. 14

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION 3 § 1890 .......... 3

Nathanial B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England: Printed by Order of the Legislature*, vol. I and vol. II (Boston 1853–54) .................................... 15

SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE 106 (4th ed. 1773)................................................................................................ 18

TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY 174 (Vol. 1 1771) ................................................................................. 18

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

**Mountain States Legal Foundation ("MSLF")** is a nonprofit, public interest legal foundation organized under the laws of the State of Colorado. MSLF is dedicated to bringing before the courts issues vital to the defense and preservation of individual liberties, the right to own and use property, the free enterprise system, and limited and ethical government. MSLF has represented several individuals, nonprofits, and other organizations challenging government actions that infringe on the constitutionally protected right to keep and bear Arms. *See, e.g.*, *Caldara v. City of Boulder*, 955 F.3d 1175 (10th Cir. 2020); *Nesbitt v. U.S. Army Corps of Engineers*, No. 14-36049 (9th Cir. dismissed Dec. 15, 2017); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015). MSLF's history of involvement also includes filing *amicus curiae* briefs with various courts across the nation. *See, e.g.*, *New York State Rifle & Pistol Ass'n v. City of New York*, 1139 S. Ct. 939 (2019) (representing *amicus curiae* MSLF on the merits); *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (representing *amici curiae* Rocky Mountain Gun Owners and National Association for Gun Rights); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (representing *amicus curiae* MSLF). This Court's ultimate decision in this case could have a direct impact on MSLF's current and future clients and litigation.

**INTRODUCTION**

Andrew Teter and James Grell are law-abiding citizens who seek to own folding pocket-knives with split handles. But, because these particular knives have been demonized by association (or due to cinematic effect), the State of Hawaii prevents Andrew and James from buying, owning, or otherwise possessing them. Hawaii's prohibition derives from the premise that folding pocket-knives with split handles, more commonly known as butterfly knives, are only associated with ne'er-do-wells and criminals; not because the knives themselves are inherently more dangerous or actually more commonly used in crime than other weapons. Hawaii's position is, essentially, that the split handle on a butterfly knife makes it more injurious to public safety than other, commonly owned knives, or even firearms. While Hawaii has broad power to make policy decisions for its residents; Hawaii lacks the authority to completely ban the manufacture, sale, transfer, possession, or transportation of butterfly knives.

Rather than looking to Hawaii's asserted justifications for its regulatory scheme, this Court can and should address the ultimate question of legality by looking to the text of the Second Amendment, and to historical and traditional analogues to knife regulations—if any—to determine the constitutionality of Hawaii's prohibition. This method not only prevents this Court from having to engage in the unnecessary, difficult, and inconsistent policy considerations advanced

by Hawaii, but allows this Court to uphold the original public meaning of the Second Amendment and to utilize legal standards in line with the Supreme Court. Using this method, the question of constitutionality is much more easily answered.

## STATEMENT OF THE CASE

### I.      HISTORICAL BACKGROUND

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II.

Adopted and ratified in 1791, the Second Amendment, and more importantly the natural rights it protects, lay as a cornerstone of our Founding. JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION 3 § 1890 ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic . . . ."). The Founders' philosophically potent belief that natural rights are inherent in all people served as the basis for the Revolution and the formation of our Republic. *See* THE DECLARATION OF INDEPENDENCE PARA. 2 (U.S. 1776) ("WE hold these truths to be *self-evident*, that all Men are created equal, that they are endowed by their Creator with certain *unalienable Rights*, that among these are Life, Liberty and the pursuit of Happiness.") (emphasis added); *Cotting v. Godard,* 183 U.S. 79, 107 (1901) ("[I]t is always safe to read the letter of the Constitution in the spirit of the Declaration of Independence.").

3

By the time consideration of the Bill of Rights was at hand, the colonies-turned-states were familiar with the dangers of a tyrannical government and what was required to successfully repel one. From suffering financial oppression through egregious taxation,[2] to political oppression revoking colonial self-governance,[3] to the attempted disarmament of the colonies in the 1760s and 1770s culminating in Lexington, Concord, and the Shot Heard 'Round the World, the Framers were all too familiar with the importance of individual ownership of Arms.

Armed with their knowledge of the English common law, and the immediate experience of the American Revolution, the Framers drafted and the states ratified the Second Amendment to ensure that no government could unilaterally eliminate individuals' right to keep and bear Arms for self-defense—from both man and tyranny.

While many associate the Second Amendment solely with firearms, it protects other Arms. The Framers drew much of their inspiration from English common law tenets, which were created at a time when bows and bladed weapons were the most commonly owned Arms. Additionally, during the Revolution, everyday Americans relied on, and were required to possess, bladed weapons, such as bayonets, hatchets,

---

[2]    *See, e.g.*, Sugar Act of 1764, 4 Geo. III, c. 15 (taxing sugar); Stamp Act of 1765, 5 Geo. III, c. 12 (taxing paper).

[3]    *See, e.g.*, The New York Restraining Act of 1767, 7 Geo. III, c. 59 (suspending colonial self-governance in New York); The Intolerable Acts of 1774, 14 Geo. III, c. 19, 39, 45, 54 (series of acts revoking colonial self-governance in Massachusetts).

or knives. *See* Militia Act of 1792, 1 Stat. 271, § 1 (May 8, 1792) ("Second Militia Act of 1792") (requiring those of militia age to own a sufficient bayonet). The history of the Second Amendment is one focused on the individual ownership of a wide variety of Arms and the natural right of self-defense.

## II.    STATUTORY BACKGROUND

Just over 200 years later, in 1992, after a Hawaiian minor was charged with unlawfully possessing a butterfly knife, the Hawaii Supreme Court held butterfly knives were not encompassed within Hawaii Revised Statute ("H.R.S.") § 134-52, which bans "switchblade knives." *In the interest of Doe*, 828 P.2d 272, 275–76 (Haw. 1992). Rather than allowing residents of Hawaii to lawfully purchase and possess butterfly knives, the legislature passed a ban similar in scope to H.R.S. § 134-52 and included butterfly knives within the state's prohibited Arms:

> Whoever knowingly manufactures, sells, transfers, possesses, or transports in the state any butterfly knife, being a knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both, shall be guilty of a misdemeanor.

H.R.S. § 134-53(a). Hawaii maintains this prohibition is intended to impede criminals' access to butterfly knives—although butterfly knives are both slower and more difficult to use than other, legal knives. ER005–07 ("At the same time, butterfly knives open slightly more slowly than other modern knives, and it typically

takes some practice to use one properly.").[4]  Regardless, Hawaii maintains its prohibition is so necessary to public safety that it outweighs the natural, fundamental, and constitutionally protected rights of Hawaiian residents to possess knives for the lawful purpose of self-defense.

## III.  PROCEDURAL BACKGROUND

Plaintiff-Appellants Andrew Teter and James Grell are law-abiding citizens who would like to "purchase a butterfly knife for self-defense and other purposes in their home and would acquire, possess, carry and where appropriate use a butterfly knife to protect themselves and their homes."  ER007.  On April 10, 2019, they sued the Attorney General of the State of Hawaii and the State Sheriff Division Administrator (collectively, "Defendants") challenging the constitutionality of H.R.S. § 134-53(a).  ER007.

The U.S. District Court for the District of Hawaii granted Defendants' motion for summary judgment, holding that Hawaii's ban on butterfly knives is constitutionally sound.  ER042.  The district court first considered whether the challenged statute infringed rights protected by the Second Amendment, ER019–

---

[4]     Hereinafter, all citations to "ER###" refer to Appellants' Excerpts of Record, ECF No. 9, cited by the internal Bates numbering.

23,[5] and then determined that Hawaii's justification, balanced against the degree of infringement on the protected rights, passed intermediate scrutiny, ER030–40.

Andrew and James appealed to this Court seeking an order that the district court erred in finding H.R.S. § 154-53 constitutionally sound and instead recognizing that the statute violates their, and all Hawaiian residents', Second Amendment protected rights. *Amicus curiae* Mountain States Legal Foundation elucidates historical information about the use and regulation of bladed Arms and, based on that information, urges this Court to decide in favor of Andrew and James.

## SUMMARY OF THE ARGUMENT

In 2008, the Supreme Court set forth the proper test to analyze Second Amendment challenges—using text, history, and tradition to determine the Second Amendment's original public meaning, the scope of permissible regulations, and instructing the lower courts to draw modern analogies thereof in deciding the constitutionality of a statute. *District of Columbia v. Heller*, 554 U.S. 570, 567–628 (2008).

The Ninth Circuit, however, has regularly employed a two-step test, utilizing interest-balancing, to analyze Second Amendment challenges. *United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013); *see Duncan v. Becerra*, No. 19-

---

[5]    The district court "assume[d] without deciding that butterfly knives are protected 'arms' within the scope of the Second Amendment . . . ." ER023.

55376, 2020 WL 4730668, at *6 (9th Cir. Aug. 14, 2020) (citing *Chovan*). Under this test, the interest-balancing done by the People in adopting and ratifying the Second Amendment becomes secondary to a modern rebalancing of interests. *See Heller*, 554 U.S. at 634–35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.") (emphasis in original). This Circuit can and should cement consistency with the Supreme Court by adopting the text, history, and tradition test to determine the constitutionality of Hawaii's butterfly knife prohibition.

According to the text, history, and tradition of the Second Amendment, butterfly knives are protected under the broad definition of Arms used by the those who drafted, adopted, and ratified the Second Amendment—as recognized by the Supreme Court. *See Heller*, 554 U.S. at 581 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). Never in the early history of our Republic did any state or the federal government prohibit the manufacture, sale, possession, transfer, or transportation of a particular type of knife, without that prohibition being struck down by a court. Instead, a survey of early English, colonial, and state law

8

demonstrates a consensus around permissive peaceable open carry of Arms, including bladed weapons, thereby recognizing individual ownership of the same.

Hawaii's complete prohibition on butterfly knives is therefore unconstitutional.

## ARGUMENT

This Court has the opportunity to employ the text, history, and tradition test when evaluating whether a prohibition on bladed Arms is constitutional—in this case Hawaii's prohibition on butterfly knives. Employing this test will unify this Circuit's analysis with the Supreme Court's and focus judges' analysis to established historical precedence. In so doing, this Court will find not only that butterfly knives are protected Arms, but that Hawaii's prohibition does not comport with the history and tradition of the Second Amendment.[6]

## I. THE SUPREME COURT SET FORTH THE TEXT, HISTORY, AND TRADITION TEST TO UPHOLD THE ORIGINAL PUBLIC MEANING OF THE SECOND AMENDMENT

Employing the Supreme Court's precedent, courts must first look to the text and history of the Second Amendment to determine the "scope of the right." *Heller*,

---

[6] Plaintiff-Appellants advocate, as they did below, that this Court take a categorical approach to Second Amendment challenges, instead of the two-step test commonly used in the Ninth Circuit. *Appellants' Opening Brief*, ECF No. 10, at 26–29 (internal pagination). While the district court rejected that argument, should this Court not employ the text, history, and tradition test, the categorical approach is a similarly appropriate test that abides by the proscription on interest-balancing set forth in *Heller*. ER024–30; *Heller*, 554 U.S. at 634.

554 U.S. at 652. While the pure textual analysis allows the court to partially determine the scope of the right, the Supreme Court recognized looking to the historical landscape is necessary because "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Id.* at 599 (alterations in original) (citing *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). Once the scope of the right is established, the court then looks to traditional regulation, which represents "the public understanding of [the] legal text in the period after its enactment or ratification." *Id.* at 605. Finally, the court must parse the challenged statute to determine if it fits within the history and tradition of Second Amendment regulations. *See id.* at 631–35 (analyzing traditional regulation of firearms against D.C.'s restrictive handgun regulations).

Those restrictions that comport with or reasonably analogize to the historical and traditional regulation of Arms in our early history pursuant to the Second Amendment are considered constitutional. *See Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) ("Nor does it mean that the government is powerless to address those new weapons or modern circumstances. Rather, in such cases, the proper interpretive approach is to reason by analogy from history and tradition.") (citing *Parker v. District of Columbia*, 478 F.3d 370, 398 (D.C. Cir. 2007)).

Sections II and III of the *Heller* majority opinion operate as a roadmap of how courts should apply this text, history, and tradition test. 554 U.S. at 576–628. The *McDonald* Court engaged in a similar analysis. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010) (incorporating the Second Amendment's protections against the states and applying the text, history, and tradition test in reviewing Chicago's firearm prohibition). "*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." *Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting).

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35. The text, history, and tradition test set forth by the Supreme Court is the most effective way to uphold the original public meaning of the Second Amendment. *McDonald*, 561 U.S. at 804 (Scalia, J., concurring). This "historical method," by limiting sources to those contemporaneous with the Second Amendment, limits reliance on "vague ethico-political First Principles" that "point in any direction the judges favor." *Id.*

The text, history, and tradition test also prevents judges from imparting their own subjectivity on the preemptive interest-balancing done by the People in adopting and ratifying the Second Amendment. *Heller*, 554 U.S. at 634 ("The very

enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.") (emphasis in original).

When the idiosyncrasies of individual judges can revise the will of the People, with judicial force, by rebalancing the People's interests on a case-by-case basis, the People are hamstrung in their ability to protect their rights—a situation intolerable to our republican form of government. This Circuit should employ the text, history, and tradition test to ensure there is certainty and clarity in its application of Second Amendment jurisprudence to bladed weapons.

## II. THIS CASE PRESENTS AN IDEAL OPPORTUNITY FOR THIS CIRCUIT TO ADOPT THE TEXT, HISTORY, AND TRADITION TEST PRESCRIBED BY THE SUPREME COURT

While the Ninth Circuit's oft-employed two-step Second Amendment test runs contrary to Supreme Court precedent, this Circuit could easily and efficiently adopt and employ the text, history, and tradition test without significantly upsetting established precedent, as can be demonstrated by an examination of some of this Circuit's major recent precedents.

First, in *Chovan*, this Circuit considered whether a law preventing a violent criminal from possessing an Arm implicated a "core right" of the Second Amendment, eventually holding that while the defendant was "entitled to some measure of Second Amendment protection to keep and possess firearms in his home

for self-defense," that possession did not implicate a "core right," because defendant was not a "law-abiding, responsible citizen." 735 F.3d at 1136–38 (citations omitted).[7] The panel then applied intermediate scrutiny in reviewing the challenged statute, comparing the state's interest in "keeping firearms away from those most likely to misuse them" with defendant's interest in his natural right to self-defense, and determined the statute to be constitutional. *Id.*

While the *Chovan* panel attempted to look to historical analogues, it unnecessarily limited its focus.[8] The panel correctly concluded that the defendant was entitled to protection under the Second Amendment and that "[t]he first federal firearm restrictions regarding *violent offenders* were not passed until 1938, as part of the Federal Firearms Act." 735 F.3d at 1137 (emphasis added). But, by focusing on the specific term violent offender, the panel too narrowly limited itself. The panel, instead, should have looked to English common law and Founding Era analogues that explicitly prohibited individuals from providing Arms to known and actively dangerous persons, and prevented those same persons from possessing

---

[7]    The *Chovan* court articulates the "core" of the Second Amendment's protections to be "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 735 F.3d at 1138 (quoting *Heller*, 554 U.S. at 635). Such distinction, however, is not made in *Heller*, nor was it made by the Founders and Framers.

[8]    Additionally, some members of the Supreme Court have cautioned against the "core" analysis used by the *Chovan*, and other, courts. *See Rogers v. Grewal*, 140 S. Ct. 1865, 1867 (2020) (Thomas, J., dissenting from denial of *certiorari*) ("The Second Amendment provides no hierarchy of 'core' and peripheral rights.").

certain Arms, in order to determine if the law at issue in *Chovan* would constitute a modern analogue of those historical laws.  *See, e.g.*, Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 257–65 (2020) (collecting laws related to the English and colonial tradition of Arms prohibitions for actively dangerous persons); 1 PRIVATE AND SPECIAL STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS FROM 1780–1805, 146–47 (1805) (1787 Massachusetts law preventing persons "who have been or may be guilty of treason, or giving aid or support to the present rebellion . . ." from bearing Arms for three years).  Section II(A) of Judge Hardiman's partial concurrence in *Binderup v. Attorney General United States of America*, operates as a clear example of such an analysis.  836 F.3d 336, 367–70 (3d Cir. 2016) (Hardiman, J., concurring in part) ("The most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms.").

Second, in *Jackson*, this Circuit examined the constitutionality of a statute that prohibits individuals from keeping an unlocked firearm within the home unless the firearm is carried by an individual over eighteen years of age.  *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014).  The panel, using this Circuit's two-step test, assessed the degree of burden caused by requiring Arms to

be locked unless they are carried by an individual in the home against plaintiff's Second Amendment protected right to self-defense, particularly in the home. *Id.* at 964–65. The panel applied intermediate scrutiny and upheld San Francisco's regulation as constitutional. *Id*. at 965–66.

Again, the panel first should have looked to historical laws surrounding the right, and even requirement, to keep Arms in the home for self- and national-defense. *See Heller*, 554 U.S. at 581–91 (analyzing the meaning of "keep and bear"), at 600–03 (collecting historical sources in concluding the Second Amendment "secured an individual right to bear arms for defensive purposes"); *see also*, *infra*, Section III (detailing historical requirements that individuals own particular Arms). Then, the panel should have looked to historical regulations requiring individuals to secure their Arms to prevent theft. *See* CLAYTON E. CRAMER, ARMED AMERICA: THE REMARKABLE STORY OF HOW AND WHY GUNS BECAME AS AMERICAN AS APPLE PIE 10 (2006) (detailing 1643 Massachusetts law requiring individuals to bring their Arms to church "to prevent theft of arms while the inhabitants were attending church," specifically from Native American raids) (citing Nathanial B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England: Printed by Order of the Legislature*, vol. I, p. 210, and vol. II, p. 38 (Boston 1853–54)).

The case before this Court presents an ideal opportunity for the Ninth Circuit to adjust its course and adopt the text, history, and tradition test for Second Amendment inquiries. Despite arguments to the contrary, courts are well suited to engage in this form of historical statutory analysis. Especially here, where knives—unlike firearms—have changed little since the Founding era, making any analogies to past regulation of knives more easily relatable to modern regulations. Further, not only are knives inherently less dangerous than guns, butterfly knives are less dangerous still than other legal, modern knives, given the uncontroverted fact that butterfly knives, "open slightly more slowly than other [legal] modern knives." ER006.

The minimal disturbance of Ninth Circuit precedent allows future application of this logical rule to be relatively seamless, bringing the Ninth Circuit in line with Supreme Court precedent and preventing future judicial revision—no matter how well intentioned—of the Founders', Framers', and People's will as encapsulated in the text, history, and tradition of the Second Amendment. The Ninth Circuit should adopt the text, history, and tradition test in evaluating the constitutionality of Hawaii's prohibition on butterfly knives.

## III. A COMPLETE PROHIBITION OF BUTTERFLY KNIVES, WHICH ARE PROTECTED ARMS UNDER THE SECOND AMENDMENT, IS UNCONSTITUTIONAL

### A. Bladed Weapons, Including Knives, are and have Always been Considered Protected Arms under the Broad Text of the Second Amendment

The term "Arms," as used in the Second Amendment, is given a broad meaning that includes bladed weapons, such as the butterfly knives at issue in this case, based not only on the text of the Amendment, but historical and traditional sources as well as the Supreme Court's interpretation.

Courts regularly employ a broad construction when the question of the meaning of "Arms" arises. *See, e.g.*, *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1027–28 (2016) ("The [Supreme] Court has held that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'") (quoting *Heller*, 554 U.S. at 582); *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018) ("[S]tun guns are 'arms' within the protection of the Second Amendment."); *State v. DeCiccio*, 105 A.3d 165, 197 (Conn. 2014) ("[T]he dirk knife that [defendant] was transporting . . . falls within the term '[a]rms' for purposes of the [S]econd [A]mendment.") (some alteration in original). Knives have a robust history of use sufficient to demonstrate that public understanding of the word "Arms" included

17

knives at the time the Second Amendment was drafted, adopted, and ratified—and continues to include them now.

Dictionaries contemporaneous to the Second Amendment's adoption are informative to discern its original public meaning. *See Heller*, 554 U.S. at 581 (employing this same analysis). A widely-used legal dictionary from the 1770s defined "Arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY 174 (Vol. 1 1771). Additionally, one of the most influential dictionaries of the English language defined "Arms" as "[w]eapons of offence, or armour of defense." SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE 106 (4th ed. 1773) (reprinted 1978). These definitions cast no doubt that bladed weapons—including knives—land firmly within the definition of Arms. *See Heller*, 554 U.S. at 634–35 (reasoning that original public meaning governs the scope of constitutionally protected rights).

This broad understanding is also found in early federal and state statutes. In 1792—nearly contemporaneous with adoption of the Second Amendment—Congress passed the Second Militia Act of 1792. This Act *required* individuals who qualified as members of the militia to possess certain Arms, including "a sufficient bayonet and belt"—a contemporaneous demonstration that bladed weapons were Arms intended for private individual ownership. Second Militia Act of 1792, § 1.

Some colonies, like New Jersey, passed similar laws mandating the ownership of Arms over a century earlier, while some states would pass them shortly after.[9] Further, in 1797, Congress banned the export of Arms and ammunition while incentivizing their import by waiving import taxes. *An Act prohibiting, for a limited time, the Exportation of Arms and Ammunition, and for encouraging the Importation thereof*, 2 Stat. 1 §§ 1–5 (1797). The Arms referenced in both exportation and importation included, "bayonets, swords, [and] cutlasses . . ." among others. *Id*.

The definition of "Arms" in the Second Amendment should be construed broadly—as it was when the Second Amendment was ratified—and not limited by the temporal existence or prevalence of a particular Arm. *Caetano*, 136 S. Ct. at 1027–28. A bladed weapon, even the modern evolution of a knife such as the butterfly knife, fits within this broad definition of Arms. Accordingly, the butterfly knives at issue in this matter are protected Arms within the original public meaning of the Second Amendment.

---

[9]     *See e.g.*, AARON LEAMING & JACOB SPICER, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY ("LEAMING") 78 (2d ed., Honeyman & Co. 1881) (every male in New Jersey aged sixteen to sixty must have "a sword and belt"); 1791 S.C. Acts 16 (South Carolina required a "sufficient small sword, broad sword, cutlass or hatchet" for militia service); 1794 R.I. Pub. Laws 21 § 10 (Rhode Island enacted a fine for appearing to militia duty "without bayonet and belt [of] six pence"); 1799 Conn. Acts 511, § 4 (Connecticut enacted a fine "for [appearing to militia duty without] Sword, Bayonet or Cartridge Box, each Fifty Cents"); 1799 An Act establishing and regulating the militia (Ohio) (Ohio required militia members to provide themselves with "a good musket, a sufficient bayonet and belt . . .").

**B.** **The History and Tradition of Bladed Weapon Regulation in the United States Includes No Prohibition on the Ownership or Possession of Particular Knives**

When looking to determine permissible regulations under the Second Amendment, courts should then look beyond the text to evaluate historical and traditional regulations and draw the appropriate modern analogues. Here, whether this Court looks to the United States' colonial history or the early Republic, there are no analogous historical or traditional regulations to Hawaii's complete prohibition on a particular category of knives. Based on history and tradition, Hawaii's complete ban on butterfly knives is unconstitutional.

### i. English Common Law: 1285–1749

Through our colonial period, no colony completely prohibited the possession of particular knives. While some prohibited carrying Arms in a terrifying manner, and in one case broadly prohibited a concealed manner of carriage, such restrictions never questioned an individual's right to own or possess bladed weapons. In fact, the regulations, by prohibiting carrying in a terrifying manner, reinforced the understanding that individuals could and did own such Arms.

The first, and most famous example, the Statute of Winchester, stated "[i]t is likewise commanded that every man have in his house arms for keeping the peace in accordance with the ancient assize . . . ." *Statute of Winchester*, 13 Edward I, at § 5 (1285). This mandate existed when the most commonly owned Arms consisted

of bows and bladed weapons. Shortly thereafter, the Statute of Northampton provided that an individual shall "bring no force in affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets . . ." *Statute of Northampton*, 2 Edward III, at § 3 (1328). In 1686, *Rex v. Knight* interpreted the Statute of Northampton to only prohibit carriage of Arms that caused "an affray[.]" 87 Eng. Rep. 75, 76 (K.B. 1686). While the defendant was charged with simply going armed in violation of the statute, the English court held unless one traveled "armed *to terrify* the King's subjects," there was no violation of the statute. *Id.* (emphasis added). This holding informed the Founders' and Framers' understanding of the regulation of Arms under the English system, eventually causing states to enact analogues allowing for peaceable carry while prohibiting a terrifying manner of carriage. *See* 1786 Va. Laws 33, Ch. 21 (prohibiting carriage only "to the terror of the county" and allowing peaceable carriage). Importantly, these laws never called into question private ownership of bladed weapons—instead implying there was a clearly protected right and tradition of owning bladed weapons. While that right may be impacted when those weapons are carried in public in a terrifying manner, mere ownership was never in question.

Quite the contrary, statutes throughout our relatively short history have instead *required* private ownership of bladed weapons. In 1668, New Jersey—the most restrictive colony when it came to the right to bear Arms—*required* every male

from age 16 to 60 to furnish themselves with "good and sufficient arms" including "a good serviceable gun" and "a sword and belt." LEAMING, 78. In 1682, a new enactment not only required a good sword for mandatory militia duty, but also fined those ill-equipped. *Id.* at 276. In 1693, a clarifying enactment stated, "that a hatchet shall supply the want of a sword." *Id.* at 330. Bladed weapons were intended and required to be privately kept and born by law-abiding citizens.

In 1686, New Jersey passed the first concealed carry ban in the colonies. *Id.* at 289–90. New Jersey prohibited, with some exception, concealment of small Arms, grouping pocket pistols with some bladed weapons. *Id*. Yet again, while the issue of carriage came up, the question of individual possession or ownership did not.

Three years later, across the Atlantic Ocean, the English Bill of Rights was codified. 1 W. & M., 2d sess., c.2 (Eng. Dec. 16, 1689) ("English Bill of Rights"). It provided "[t]hat the subjects . . . may have arms for their defence suitable to their conditions, and as allowed by law." *Id.* The English Bill of Rights would inform the Framers in drafting our broader protection of the natural rights to keep and bear Arms; and the choice to recognize that right in the People rather than the impulses of the king.

By the middle of the eighteenth century, no law completely prohibited the manufacture, sale, ownership, possession, transfer, or public carriage of bladed

weapons. Only New Jersey would regulate the manner of carriage of Arms. While New Jersey also regulated ownership during this time, it was to mandate—not prohibit—ownership of "good and sufficient arms" including "a good serviceable gun" and "a sword and belt[]" as part of mandatory militia service. LEAMING, at 78. Accordingly, nothing in our colonial history provides an analogue to Hawaii's restrictive butterfly knife ban.

### ii.     Colonial and Early Republic: 1750–1791

As time drew closer to the adoption of the Second Amendment, the definition of Arms continued to include a broad range of weapons, while Northampton analogues would more expressly provide for peaceable carriage of Arms in the states. Even with the increase in regulation, no outright prohibition on the manufacture, sale, ownership, or possession of bladed weapons was enacted.

In 1751, Massachusetts passed a law intended to suppress riots. 1749–1751 Mass. Acts 339, Ch. 17 § 1 (1751). The statute allowed for carriage of Arms unless one is "riotously assembled" in a group of "twelve or more."[10]  *Id*. While the act sought to prohibit armed riots, it did not prohibit an armed legal assembly, an individual from going about armed, and certainly not mere possession of Arms, including bladed weapons, by an individual.

---

[10]     Notably, the statute also exemplifies a broad definition of arms, by including makeshift weapons, such as "clubs," within the meaning of Arms. *Id*.

Virginia followed suit in 1786 when it prohibited carriage that invoked terror, while allowing for peaceable carriage. 1786 Va. Laws 33, Ch. 21 ("[N]or go nor ride armed . . . in terror of the Country."). Again, while this law did regulate the manner of carriage, it did not prohibit peaceable carry, nor concealed carry, nor mere possession.

Though starting well before the drafting, adoption, and ratification of the Second Amendment, the groundwork for protecting the right to keep and bear bladed weapons took shape through early English and colonial law, as well as in the early Republic. Even in this distant past, there were no regulations prohibiting the manufacture, sale, ownership, or possession of any bladed weapons, let alone of knives, that would inform this Court's analysis of the Second Amendment. The only regulations surrounding possession of bladed weapons prior to the adoption and ratification of the Second Amendment *required* individuals to possess certain Arms. Hawaii's complete prohibition on butterfly knives finds no support in our Republic's pre-Bill of Rights history.

### iii.     Post-Ratification of the Bill of Rights: 1791–1800

As the last era to inform the original public meaning of the Second Amendment, the period after adoption reaffirmed the broad definition of the Arms and the limited permissible regulations on possession of bladed weapons. Some states relaxed restrictions on public carriage, while many followed the federal

24

government's established example to require bladed weapons to be privately kept and borne for militia use.

Nearly contemporaneous with adoption of the Second Amendment, Congress passed the Second Militia Act of 1792, requiring "a sufficient bayonet and belt," along with "a good musket" for mandatory militia service. Second Militia Act of 1792, § 1. As addressed above, between 1791 and 1799, four states enacted similar, militia-related regulations requiring individuals to keep and bear bladed weapons for militia service.[11] These statutes demonstrate the importance, and legal necessity, of individual possession of bladed weapons.

In 1795, Massachusetts became the next state to restrict the manner of carriage. 1795 Mass. Laws 436, Ch. 2. This Northampton-like statute provided an important relaxation of the penalty; upon being accused of carrying to cause "fear or terror [to] the good citizens of this Commonwealth" one may provide "sureties for his keeping the peace, and being of the good behavior . . ." in lieu of prison. *Id.* The concept of sureties would be influential on statutes enacted in the early-to-mid-nineteenth century.[12] This development shows a shift away from, not towards, restrictive regulations on the possession of Arms.

---

[11]     *See*, *supra*, note 9.

[12]     1838 Wisconsin, An Act to Prevent the Commission of Crimes, § 16 (requiring Sureties upon complaint); 1841 Me. Laws 709, Ch. 169 § 16; 1847 Va. Laws 127, Ch. 14 § 16; 1853 Or. Laws 220, Ch. 16 §17.

The original public meaning of the Second Amendment—recognized in *Heller* to include protections for possession and self-defense—did not allow governments to prohibit individuals from owning select types of bladed weapons. There is no evidence of the English, colonial, or state governments regulating knives outside regulating the manner of carriage or *requiring* ownership of more deadly bladed weapons for militia service. If Hawaii wished to prohibit the carriage of butterfly knives "to the terror of the public," this Court's inquiry would be different.[13] But there is no historical analogue for a complete prohibition on the manufacture, sale, ownership, or possession of a particular type of knife. Such a prohibition falls outside of permissible regulations under the Second Amendment and constitutes an unconstitutional infringement. Accordingly, Hawaii's complete prohibition on the manufacture, sale, transfer, possession, or transportation of butterfly knives does not comport with the text, history, and tradition of the Second Amendment and is thus unconstitutional.

---

[13] Hawaii already has some statutory prohibitions on terroristic threats. *See* H.R.S. § 707-715 (defining terroristic threats).

26

C.   **The Post-Founding Era Tradition of Bladed Weapon Regulation Evidences a Complete Prohibition on Possession of Knives is Unconstitutional**

i.     **Post-Founding Era: 1801–1868**

Even if this Court extends its analysis outside of the Founding era and into the nineteenth century, it remains evident that a complete prohibition on the possession of a bladed weapon does not have any basis in tradition and is thus unconstitutional.

When conducting the text, history, and tradition test, the inquiry must be restricted to the original public meaning of the Second Amendment.  Although a review of the period immediately after adoption of the Second Amendment aids in understanding historically permissible regulations, such understanding must be confined to what an ordinary person *at the time the Second Amendment was adopted* would think it meant.  While the opinion of those Framers who adopted the text— often in the form of legislation they and their colleagues passed contemporaneously and shortly thereafter—is instructive, later legislatures no longer inform the original public meaning of the Second Amendment.

Here, however, the case remains clear.  Even the increasingly less faithful application of the Second Amendment supports the proposition that a state cannot completely prohibit the possession of a bladed weapon, as no statute validly regulated the mere possession of those Arms, especially not in the home.  Additionally, as a permissive attitude toward peaceful open carry was the societal

norm, those states continued to implicitly recognize that individuals could and did own such Arms.

Regulating the manner of carriage became the most common form of regulation. In 1813 and 1821, respectively, Kentucky and Tennessee both prohibited concealed carriage of pocket pistols, dirks, swords in a cane, and other various Arms, *unless* traveling on a journey. 1813 Ky. Acts 100, Ch. 89 § 1; 1821 Tenn. Pub. Acts 15–16. Both statutes, however, were eventually held unconstitutional by their respective state courts. Kentucky's because a complete prohibition on carriage was deemed a violation of the right to bear Arms. *Bliss v. Commonwealth*, 12 Ky. 90, 91 (1822).[14] And Tennessee's because the right to bear Arms protected by the Tennessee Constitution provided "all free citizens of the State to keep and bear arms for their defense, without any qualification whatever as to their kind or nature." *Simpson v. State*, 13 Tenn. 356, 360 (1833).

What these two statutes shared, despite their unconstitutionality, was a recognition that possession of certain bladed weapons was unquestionably lawful. Both Kentucky's and Tennessee's exemptions allowing for travel with dirks, knives, or swords in canes demonstrate that those states recognized individuals could lawfully own and possess such bladed weapons. Instead of preventing possession,

---

[14]    Bliss brought his challenge pursuant to the Kentucky State Constitution, which read: "the right of the citizens to bear arms in defense of themselves and the state, shall not be questioned." *Id*. at 90.

Kentucky and Tennessee recognized the need to possess bladed weapons, especially during travel, and merely prohibited the concealed carriage of those Arms while not on a journey.

In 1837, Georgia enacted the broadest prohibition on Arms to date, both in the variety of Arms prohibited and the degree to which they were prohibited. 1837 Ga. Acts 90 § 1–4. The act prohibited any person from having or keeping about their person or elsewhere, certain enumerated weapons. *Id.* at § 1. The Georgia Supreme Court, in reviewing the law, held:

> [T]hat so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void, . . . .*

*Nunn v. State*, 1 Ga. 243, 251 (1846) (emphasis in original). In so holding, the court recognized the protection on both open carry and individual possession of those same Arms—a necessity of the "natural right of self-defense, or of [Nunn's] constitutional right to keep and bear arms." *Id*.

As time passed, regulations governing the manner of carrying Arms became more common—many states prohibiting concealed Arms[15] or requiring sureties

---

[15]    *See, e.g.*, 1813 La. Acts 172 (banning concealed carry, allowing open carry); 1819 Ind. Acts 39 (banning concealed carry unless traveling); 1837-38 Tenn. Pub. Acts 200-01, Ch. 137 § 2 (banning concealed carry of Bowie knives).

when someone complained of an individual carrying Arms in a terrifying manner[16]—but there was still no regulation that completely prohibited the possession of bladed weapons that withstood judicial scrutiny. Through the passage of the Fourteenth Amendment, no state completely prohibited—or even regulated— the manufacture, sale, possession, or transfer of bladed weapons, including knives. Though this much more restrictive period is not determinative of the original public meaning of the Second Amendment, there is still no analogue to provide support for Hawaii's complete prohibition on an entire class of bladed weapons.

## CONCLUSION

Hawaii's complete prohibition on the manufacture, sale, possession, and transfer of butterfly knives violates the text, history, and tradition of the Second Amendment and is thus unconstitutional.

---

[16]    *See* 1841 Me. Laws 709, Ch. 169 § 16 (allowing carriage reasonably reported as terrifying after sureties of good behavior); *see also* 1847 Va. Laws 127, Ch. 14 § 16; 1853 Or. Laws 220, Ch. 16 §17.

DATED this the 28th day of August 2020.

Respectfully submitted,

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski
MOUNTAIN STATES
  LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, CO  80227
(303) 292-2021
cody@mslegal.org

*Attorney for Amicus Curiae*
*Mountain States Legal Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2020, I electronically filed the foregoing *Amicus Curiae Mountain States Legal Foundation' Brief in Support of Plaintiff-Appellants* with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit via the appellate CM/ECF system, which will serve all registered CM/ECF users.

/s/ Cody J. Wisniewski
Cody J. Wisniewski
MOUNTAIN STATES
  LEGAL FOUNDATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 20-15948_____.

I am the attorney or self-represented party.

**This brief contains** 6,959_____ **words,** excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
   Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** */s/ Cody J. Wisniewski*_____ **Date** August 28, 2020_____.
*(use "s/[typed name]" to sign electronically-filed documents)*

33