**CASE NO. 20-15948**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

————————

ANDREW TETER and JAMES GRELL,
*Plaintiffs and Appellants,*

v.

CLARE E. CONNERS, et al.,
*Defendants and Appellees.*

————————

## *AMICI CURIAE* BRIEF OF SAN DIEGO COUNTY GUN OWNERS POLITICAL ACTION COMMITTEE, FIREARMS POLICY COALITION, AND KNIFE RIGHTS FOUNDATION, INC. IN SUPPORT OF APPELLANTS AND REVERSAL

————————

On Appeal from the United States District Court
for the District of Hawaii
Civ. No. 19-cv-00183-ACK-WRP
United States District Court, Hon. Alan C. Kay, Judge Presiding

————————

John W. Dillon (SBN 296788)
jdillon@Dillonlawgp.com
DILLON LAW GROUP APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Telephone: (760) 642-7150
Facsimile: (760) 642-7151

*Attorney for San Diego County*
*Gun Owners Political Action Committee, Firearms Policy Coalition, and Knife*
*Rights Foundation Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

**San Diego County Gun Owners** is a political action committee and not incorporated. San Diego County Gun Owners Political Action Committee has no parent corporations. It has no stock, and hence, no publically held company owns 10% or more of its stock.

**Firearms Policy Coalition** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Knife Rights Foundation Inc.** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

August 28, 2020                                 Dillon Law Group APC
                                                Attorney for *Amicus Curiae*


                                                By: */s/ John W. Dillon*
                                                        John W. Dillon

# TOPICAL INDEX

CORPORATE DISCLOSURE STATEMENT ........................................................2

STATEMENT OF INTEREST ...........................................................................7

I.      INTRODUCTION .........................................................................10

II.     ARGUMENT...................................................................................11

        A.      History of the Butterfly Knife or "Balisong" .......................12

        B.      Butterfly Knives are Commonly Owned
                for Lawful Purposes .............................................................15

                i.      Numerical Analysis.....................................................17

                ii.     Jurisdictional Analysis ...............................................22

        C.      Butterfly Knives Are Not
                "Dangerous and Unusual" Arms ...........................................23

                i.      Butterfly Knives are Indistinguishable
                        from Unregulated Knives............................................24

        D.      The District Court Incorrectly Held
                that Intermediate Scrutiny Applied ......................................27

                i.      H.R.S. §134-53 Strikes at the Core Right
                        of Law-Abiding Citizens to Self -Defend..................27

                ii.     H.R.S. §134-53 Does Not Survive Strict
                        Scrutiny Review ..........................................................30

        E.      Even if Intermediate Scrutiny were to Apply,
                H.R.S. §134-53 Would Still Fail ...........................................31

III.    CONCLUSION...............................................................................33

CERTIFICATE OF COMPLIANCE WITH RULE 29-2(c)(2) .............................34

CERTIFICATE OF SERVICE .........................................................................35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs v. AG N.J.*
910 F.3d 106 (3d. Cir. 2018)........................................................................16

*Attorney General of New York v. Soto-Lopez*
476 U.S. 898 (1986)......................................................................................30

*Caetano v. Massachusetts*
136 S. Ct. 1027 (2016)............................................................11, 15, 16, 20, 23

*Clark v. Jeter*
486 U.S. 456 (1988).......................................................................................31

*District of Columbia v. Heller*
554 U.S. 570 (2008).............................................................. 11, 15, 16, 27, 28, 29

*Duncan v. Becerra*
No. 19-55376, 2020 U.S. App. LEXIS 25836 (9th Cir. Aug. 14, 2020).....*en passim*

*Dunn v. Blumstein*
405 U.S. 330 (1972)......................................................................................30

*Edenfield v. Fane*
507 U.S. 761 (1993)..................................................................................31, 32

*Friedman v. City of Highland Park*
784 F. 3d 406 (7th Cir. 2015) ....................................................................17, 19

*Fyock v. City of Sunnyvale*
779 F.3d 991 (9th Cir. 2015) .........................................................................27

*In re Interest of Doe*
73 Haw. 89, 91, 828 P.2d 272 (1992 Haw.) ...................................................10

*Jackson v. City & Cty. Of S.F.*
746 F.3d 953 (9th Cir. 2014) ....................................................................27, 29

*Kachalsky v. Cty. of Westchester*
701 F.3d 81 (2d Cir. 2012).............................................................................27

# TABLE OF AUTHORITIES (cont.)

**Page**

*Kolbe v. Hogan*
849 F.3d 114, 133 (4th Cir. 2017) ...........................................................30

*McCullen v. Coakley*
573 U.S. 464 (2014) ...............................................................................31

*New York State Rifle & Pistol Ass'n v. Cuomo*
804 F.3d 242 (2d Cir. 2015)................................................17, 20, 27, 28

*Packingham v. North Carolina*
137 S. Ct. 1730 (2017) ...........................................................................31

*Pena v. Lindley*
898 F.3d 969 (9th Cir. 2018) .................................................................29

*People* v. *Yanna*
297 Mich. App. 137, N. W. 2d 241 (2012)...........................................20

*Peruta v. County of San Diego*
742 F.3d 1144 (9th Cir. 2014) (*Peruta I*) ...........................................7, 8

*Peruta v. County of San Diego*
824 F.3d 919 (9th Cir. 2016) (en banc) (*Peruta II*) ...................................7

*Silvester v. Harris*
843 F.3d 816 (9th Cir. 2016) ..............................................11, 16, 27, 29

*United States v. Marzzarella*
614 F.3d 85 (3d. Cir. 2010)....................................................................16

**Hawaii Revised Statute**

Section 134-53 .............................................................*en passim*

**House Bills**

House Bill 1496 .................................................................18, 19

House Bill 1999 ........................................................................18

# TABLE OF AUTHORITIES (cont.)

**Page**

## Other Authorities

David B. Kopel, Clayton E. Cramer & Joseph E. Olson
*Knives and the Second Amendment*
47 U. Mich. J. L. REFORM 167 (2013) ....................................................................15

Weapons, and the Rights To Keep and Bear Arms and Defend Life
62 Stan. L. Rev. 199 (2009) ......................................................................................20

Wis. Stat. §941.295 (Supp. 2015) ............................................................................20

## STATEMENT OF INTEREST[1]

The **San Diego County Gun Owners Political Action Committee (SDCGO)** is a diverse and inclusive 1,300+ member political organization. SDCGO is dedicated to preserving and restoring citizens' Second Amendment rights. It has developed a strong, permanent foundation that focuses on changing the face of firearm ownership and use by working with volunteers on state and local activities and outreach. Since its beginning in 2015, SDCGO has profoundly influenced and advanced policies protecting the Second Amendment. SDCGO's primary focus is on expanding and restoring Second Amendment rights within San Diego County and in California due to an aggressive and largely successful legislative and regulatory effort to significantly limit or eliminate the firearms industry and the ownership and use of various arms at the state, county, and municipal levels.

SDCGO has advocated for Second Amendment rights in various federal cases. SDCGO advocated for the right to carry a *concealed* firearm in public in San Diego during the pendency of the *Peruta* decision (*Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc) (*Peruta II*)), which overturned a three-judge panel's decision striking down a *concealed* carry licensing statute (*Peruta v. County*

---

[1] All parties consent to the filing of this brief. No counsel for any party authored this brief in whole or in part. No person, other than *amici curiae,* contributed money intended to fund the brief's preparation and submission.

*of San Diego*, 742 F.3d 1144 (9th Cir. 2014) (*Peruta I*). SDCGO also submitted *amicus curie* briefing in *Young v. Hawaii* supporting the right of lawful individuals to openly carry firearms in public for self-defense. Most recently, SDCGO is a plaintiff in *Miller v. Becerra*, a Second Amendment challenge regarding the constitutionality of California's "assault weapon" ban. Although much of SDCGO's advocacy has centered on firearms, there is no question that knives and other bearable arms are also protected by the Second Amendment, including butterfly knives. However, in the State of Hawaii, under Hawaii Revised Statute (H.R.S.) section 134-53, butterfly knives (also known as "balisongs") are categorically banned, which means it is illegal to manufacture, sell, transfer, possess, or transport butterfly knives in the state of Hawaii. This complete prohibition prevents lawful individuals from obtaining and using commonly owned arms for self-defense and other lawful purposes.

**Firearms Policy Coalition ("FPC")** is a nonprofit organization that defends and advances freedom and individual liberties — including the fundamental right to keep and bear arms — and promotes sound, principled, and constitutionally based public policy. FPC accomplishes its mission through research, education, and legal programs, among others. Since its founding, FPC has emerged as a leading advocate for individual liberty in state and federal courts, regularly participating as a party or *amicus*. FPC is party to several cases before this Court and within its jurisdiction

and has filed *amicus* briefs in many recent Second Amendment cases, including *Rhode v. Becerra*, *Duncan v. Becerra, Rupp v. Becerra, United States v. Torres,* and *Young v. Hawaii.* FPC respectfully believe that its substantial experience and expertise in the Second Amendment field would aid this Court.

**Knife Rights Foundation Inc. (Knife Rights)** is a non-profit organization that serves its supporters and the public by protecting the rights of knife owners to keep and carry knives and edged tools. Knife Rights includes the promotion of education regarding state and federal knife laws and regulations, and the defense and protection of the civil rights of knife owners nationwide.

This case concerns *amici* because it directly impacts their members' ability to acquire butterfly knives and exercise their right to keep and bear arms in states that fall under the Ninth Circuit's jurisdiction.

## I.    INTRODUCTION

*Amici curiae* (SDCGO, FPC, and Knife Rights) submit this *amicus* brief in support of Appellants' appeal of the District Court's order granting Appellees' motion for summary judgment. On January 14, 2020, Plaintiffs filed their Motion for Summary Judgment and entering judgment in favor of Appellees. *See* ER160-ER170, ER004-ER045.

At issue is Hawaii's categorical ban on butterfly knives, or "balisongs." Specifically, H.R.S. section 134-53 provides that: "(a) [w]hoever knowingly manufactures, sells, transfers, possesses, or transports in the State any butterfly knife, being a knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both, shall be guilty of a misdemeanor." Enacted in 1999, H.R.S. section 134-53 was enacted after the Hawaii Supreme Court clarified that butterfly knives *were not switchblades*, and thus, were legal to possess. *See In re Interest of Doe*, 73 Haw. 89, 91, 828 P.2d 272, 274 (1992 Haw.). Accordingly, from 1959 (statehood) until enactment of H.R.S. section 134-53 in 1999, butterfly knives were legal to manufacture, sell, transfer, posses, and transport in Hawaii.

Nonetheless, the District Court applied intermediate scrutiny to Hawaii's butterfly knife ban, incorrectly holding that the ban "does not severely burden" the Second Amendment, and survives intermediate scrutiny because it "further[ed] the

State's important interest to promote public safety by reducing access to butterfly knives, which leads to gang related crime." See ERO42-ER045. The District Court's decision applied the wrong standard of scrutiny to the State's categorical ban. Appellees also failed to make the necessary showing that butterfly knives are *both* "dangerous and unusual," or that the State's categorical prohibition served an important governmental interest. For these reasons, the District Court decision should be reversed.

## II. ARGUMENT

This brief responds to Appellees' groundless claims that butterfly knives fall outside the Second Amendment's protections. Not so. Butterfly knives are protected by the Second Amendment precisely because the Second Amendment "guarantees the right to carry weapons 'typically possessed by law-abiding citizens for lawful purposes.'" *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1030 (2016) (Alito, J., concurring) (per curiam) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008) (*Heller*)). Further, a "weapon may not be banned unless it is *both* dangerous and unusual." *Id*. at 1031(emphasis in original). To determine whether an arm is unusual, courts look to an arm's commonality or whether it is typically possessed by law-abiding citizens for purposes of self-defense. *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). The "commonality" and "possession for lawful purposes" are both shown below. Further, this brief shows Hawaii's butterfly knife

ban burdens protected conduct and, therefore, strict scrutiny is the appropriate standard. Under that standard, the ban fails.

### A. History of the Butterfly Knife or "Balisong"

Butterfly knives, also known as "balisongs," "are one of the most popular knife styles today." *See* Declaration of John W. Dillon ("Dillon Decl.) at ¶3, **Exhibit A**, ¶4, **Exhibit B.** The origin of the butterfly knife is often attributed to the Philippines, but another theory is that the first butterfly knife came from France.

Under the first theory, the butterfly knife originated in the Philippines as early as 800 AD. In fact, the "balisong" terminology appears to originate from the Filipino language itself, consisting of two Tagalog words: "baling" and "sungay" or "broken" and "horn." *See* Dillon Decl. ¶ 5, **Ex. C.**[2] The second theory is the butterfly knife was actually invented in France sometime between 1500 and 1700 because the "Pied Du Roi" or "Foot of the King" is a French measurement tool that greatly resembles a modern butterfly knife. Proponents of the French theory believe that Spain, allied with France at the time, adopted the butterfly knife in their tasks and eventually took it to the Philippines during sailing excursions. Dillon Decl. ¶3, **Ex. A**.

---

[2] Some of the earliest butterfly knives from Batangas consisted of karabaw (water buffalo) horn inserts and brass handles, and the blades were made of recycled steel, often from vehicle leaf springs. See Dillon Decl. ¶5, **Ex. C.**

Regardless of where originated, the butterfly knife was and is used by the Filipino people, especially those in the Tagalog region, as a self-defense *and* pocket utility knife. Dillon Decl. ¶6, **Ex. D**. In fact, beyond its most traditional uses as a self-defense and general purpose knife, "hollow ground balisongs were also used as straight razors before conventional razors were available in the Philippines" and manipulations called "flipping" or "fanning" are widely performed for art or amusement. *Id*. In fact, balisongs were far more common than straight razors prior to the Second World War. Dillon Decl. ¶5, **Ex. C**.

The butterfly knife became less popular in Europe in the latter part of the 19th Century, but in the early 20th Century, the *pandays* of Batangas (metal craftsman) began producing the butterfly knife to meet local demand. Dillon Decl. ¶5, **Ex. C**. Although the Batangas' butterfly knives that were produced in the early 20th century were similar to German designs around the same time, what is certain is that the "popularity and ubiquity of the Filipino balisong surpassed that of any European butterfly knife design." *Id*. The butterfly knife design became synonymous with the Batangas in the Philippines, so much so that it was soon thought of my many as the home of the balisong. *Id*. Indeed, many towns and barrios still have families that make the distinctively "Batangueno knife" with varying degrees of quality and success. *Id*.

-13-

"Many believe the butterfly knife first came to American shores in the early part of the 20th Century with Filipino immigrants, but its popularity and infamy in the United States only really began after the U.S. Soldiers returned with balisongs from the Philippines after World War II." Dillon Decl. ¶5, **Ex. C**. These knives were so popular they were mass produced around Asia in the latter part of the 20th Century to meeting growing US demand. *Id*. In the late 1970s, U.S. knife manufactures also began to produce their own butterfly knives. Balisong USA was one of these manufacturers, which changed its name in the early 1980s to Pacific Cutlery before finally becoming Benchmade — one of the most popular and largest knife manufacturers in the U.S. today. Dillon Decl. ¶6, **Ex. D**. During this time, then Balisong USA made butterfly knives with a wide variety of custom blade designs and exotic handle inlays. These early American butterfly knives are highly sought after by collectors, who frequently purchase them as investments. *Id*. Butterfly knives are still made by Benchmade and many other U.S. knife manufacturers today.[3]

---

[3] A non-exclusive list of U.S. manufacturers of butterfly knives consist of: Bear & Son Cultery, Inc., Benchmark Knife Co., Benchmade Knife Co., Bladerunners Systems, Bradley Cutlery, Elite Outfitting Solutions, Emerson Knives, Inc., KAI USA LTD (branded as Kerchaw), Microtech Knives, Inc., Piranha Knife, Rick Hinderer Knives, Terrain 365 LLC, and approximately 25 other custom knife makers who regularly produce custom or mid-tech butterfly knives.

From 1981 to 1984, hundreds of thousands of butterfly knives were imported into the United States from a variety of countries, primarily the Philippines, Japan, China, and Korea — although some were imported from France, Germany, and Spain. Dillon Decl. ¶6, **Ex. D**.

The point of the above historical analysis is to show that butterfly knives have been readily available in Hawaii and the United States generally since the early part of the 20th Century.[4] Their prevalence underscores the use and popularity of butterfly knives in our country's history; and likewise, shows that they are not "unusual" arms, falling outside Second Amendment protections.

### B. Butterfly Knives are Commonly Owned for Lawful Purposes

The Second Amendment "guarantees the right to carry weapons 'typically possessed by law-abiding citizens for lawful purposes.'" *Caetano, 136 S. Ct. at 1030.* "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.* at 1031. When analyzing whether an arm or weapon is "unusual," the Supreme Court held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of the founding." Id.* at 1030 (quoting *Heller*, 554 U.S. at 582). Thus, even if a weapon was not in existence during the Founding era, it does not mean the weapon is "unusual."

---

[4] See David B. Kopel, Clayton E. Cramer & Joseph E. Olson, *Knives and the Second Amendment*, 47 U. Mich. J. L. REFORM 167 (2013).

Most importantly, where a "weapon belongs to a class of arms commonly used for lawful purposes," "the relative dangerousness of a weapon is *irrelevant*." *Id.* at 1031 (citing *Heller*, 554 U.S. at 627, emphasis added).

There are two ways to determine whether an arm is unusual. Courts look to an arm's numerical commonality or whether it is typically possessed by law-abiding citizens for lawful purposes.  See, *e.g., Silvester v. Harris,* 843 F.3d 816, 830 (9th Cir. 2016) (Thomas, CJ., concurring) (finding that the "right to keep and bear arms is limited to 'the sorts of weapons' that are 'in common use'" (quoting *Heller*, 554 U.S. at 627-28)); see *Ass'n of N.J. Rifle & Pistol Clubs v. AG N.J.*, 910 F.3d 106, 116 (3d. Cir. 2018) (*ANJRPC*) (holding that for the first prong inquiry, courts "consider whether the type of arm at issue is commonly owned," citing *United States v. Marzzarella,* 614 F.3d 85, 90-91) (3d. Cir. 2010). Courts can also apply a jurisdictional analysis considering the legality of the arm in question throughout the United States. *Caetano*, 136 S. Ct. at 1032 (2016) (Alito, J., concurring) (per curiam). In other words, courts ask whether the arm in question is legal to buy, sell, transfer, possess, and/or carry in a majority of the United States.

"Numerical commonality" is largely determined by statistics. However, this kind of statistical analysis is only helpful if the statistics exist. For example, firearms sales are heavily regulated across the Country; therefore, it is possible to determine approximate numbers of firearms bought and sold. However, in the case of knives,

which are not regulated items and can generally be bought and sold online or in person absent any kind of regulation or background check, statistical analyses are far less common. Thus, "a pure statistical inquiry may hide as much as it reveals. In the Second Amendment context, protected arms may not be numerically common by virtue of an unchallenged, unconstitutional regulation." *Duncan v. Becerra*, No. 19-55376, 2020 U.S. App. LEXIS 25836, at *23 (9th Cir. Aug. 14, 2020). "[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.") *Friedman v. City of Highland Park*, 784 F. 3d 406, 409 (7th Cir. 2015). Therefore, "[w]hile common use is an objective and largely statistical inquiry, typical possession requires [the court] to look into both broad patterns of use and the subjective motives of gun owners." *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015) ("*NYSRPA*") (internal alterations and quotation marked omitted). Thus, this Court should consider the broad patterns of use and the number of jurisdictions that allow for the lawful possession and carrying of such knives.

### i. Numerical Analysis

As stated above, knife sales are generally not regulated in the United States. Thus, it is difficult to quantify the actual numbers of butterfly knives (or even knives in general) that are in circulation in the United States or specifically in Hawaii.

However, prior to the State's ban on butterfly knives, the legislative history, House Bill 1496, 1999, sheds light on the popularity of butterfly knives. In fact, most of the testimony in favor of House Bill 1496 admits that butterfly knives were commonly owned, widely sold, and offered for sale at flea markets and open-air markets all over Hawaii. *See* ER083-ER087.

For example, in his testimony in support of the passage of House Bill 1496, George Mckeague, Captain of the Criminal Investigation Division of the Honolulu Police Department, City and County of Honolulu, admitted that an "increasing trend in minors and gang members armed with knives and daggers. Butterfly knives are preferred as they are easy to conceal and are more intimidating when brandished." ER085-ER086. Captain McKeague's testimony also states that "[c]urrently, these items are fairly easy for minors to obtain at swap meets and open-air markets." *Id*.

Notably, at the time of this testimony, butterfly knives were *legal to own and possess*. In other words, the testimony identifies that, at the time, minors and gang members possessed *legal knives.*[5] The testimony proves only that butterfly knives were commonly owned and easily obtained or purchased all over Hawaii. Indeed, in this case, no actual evidence of *criminal misuse of butterfly knives* was ever offered.

---

[5] The fact that certain knives are found on "gang members" *does not establish* that the knives in question were actually *being used* for *criminal purposes*. Nor does it establish that butterfly knives are associated with "gang activity."

None of the legislative history provides any such evidence, such as police reports or case studies, showing that butterfly knives were *used in the commission of crimes.* In short, Appellees failed to make any showing that butterfly knives are associated with crime or gang activity.

Additionally, the testimony of the Department of the Prosecuting Attorney, City and County of Honolulu, establishes that before House Bill 1496 was passed, "venders at local flea markets and in Waikiki have been selling butterfly knives to very young minors. Given that the knives are being *sold openly*, the sales are apparently [legal] since section 134-51 prohibits the *concealed carrying* of such knives." ER096-ER087 (emphasis added). Moreover, the testimony of the Deputy Public Defender of the State of Hawaii established that "[m]any of the enumerated prohibited items in this bill are *widely available*." ER083-ER084.

Thus, the legislative history alone establishes that butterfly knives were common arms, widely available and legally transferred, purchased, and possessed in the State of Hawaii prior to the passage of House Bill 1496. As established above, "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.") *Friedman v. City of Highland Park*, 784 F. 3d 406, 409 (7th Cir. 2015). In sum, the fact that butterfly knives are

*now illegal* to purchase, possess, or carry cannot be considered when determining if the knives in question are commonly owned for lawful purposes.

Looking beyond that Appellees' own evidence establishes that butterfly knives were commonly owned arms in Hawaii before this categorical ban went into effect, "broad patterns of use and the subjective motives" of knife owners also need to be taken into account. *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015) ("*NYSRPA*"). Analogizing to Tasers and stun guns, the Supreme Court in *Caetano,* 136 S. Ct. at 1032-1033 (2016), used data from other states to show they are widely owned, accepted, and used for lawful purposes:

> The more relevant statistic is that "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," who it appears may lawfully possess them in 45 States. *People* v. *Yanna*, 297 Mich. App. 137, 144, 824 N. W. 2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional); see Volokh, Nonlethal Self-Defense, (Almost Entirely) Nonlethal [***14] [*1033] Weapons, and the Rights To Keep and Bear Arms and Defend Life, 62 Stan. L. Rev. 199, 244 (2009) (citing stun gun bans in seven States); Wis. Stat. §941.295 (Supp. 2015) (amended Wisconsin law permitting stun gun possession); see also Brief in Opposition 11 (acknowledging that "approximately 200,000 civilians owned stun guns" as of 2009). While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment.

*Id*.

Similarly, after World War II, the butterfly knife became extremely popular in the United States. So much so, "from 1981 to 1984, hundreds of thousands of [butterfly] knives were imported into the United States from a variety of countries,

primarily: the Philippines, Japan, China, and Korea — although some were imported from France, Germany, and Spain." Dillon Decl. ¶6, **Ex. D**. This demand also caused many U.S. knife manufacturers to produce their own designs of butterfly knives.[6]

The demand for butterfly knives has grown since they first arrived in the United States and their lawful use goes beyond self-defense. For instance, although the use of butterfly knives originated primarily in the context of self-defense and general utility, their popularity in the modern era has significantly grown due to butterfly knife "flipping" or "fanning." Dillon Decl. ¶4, **Ex. B**. "Flipping" consists of the user manipulating the knife and spinning or flipping it in increasing difficult movements for display purposes. The art of "flipping" has become so popular that there are now annual competitions in which participants compete to determine who is the best at flipping. Dillon Decl. ¶7, **Ex. E**; ¶8, **Ex. F**; and ¶9, **Ex. G**.

Moreover, the popularity of butterfly knife "flipping" can easily be seen by a simple Google video search of "butterfly knife flipping" which will yield approximately 67,300 video results. Dillon Decl. ¶10, **Ex. H**. In fact, "the popularity of the butterfly knife may be on the decline in the Philippines where it originated, but it is on the rise in the U.S." Dillon Decl. ¶11, **Ex. I**. The popularity of butterfly

---

[6] Today, there are at least 23 different knife manufacturers in the U.S. that produce butterfly knives. See https://www.knifecenter.com/department/american-made/american-made-butterfly-knives.

-21-

knives can most easily be seen through various social media platforms like YouTube and Instagram. *Id*. "Kids as young as 11 years old are now majorly competitive in the sport, it's attracting Americans — and especially Filipino Americans to the sport." *Id*. While Appellees attempt to classify butterfly knives as unusually dangerous and concealable weapons, a more apt description of butterfly knives in their most common use is "a giant fidget spinner, juggling act, and dance all rolled into one — that's the vibe of these kids who call themselves balisong flippers" — or more simply "one of the most popular knife styles today." *Id*.; *see also* Dillon Decl. ¶3, **Ex. A**.

Still today, butterfly knives "are an integral part of the Filipino martial art called Escrima." ER083. "Escrima schools here in Hawaii teach Balisong as a legitimate martial art. Martial arts instructors and enthusiasts should be allowed to continue the teaching of a cultural heritage. *Id*. Moreover, considering the number of manufacturers in the U.S. that have produced butterfly knives for a significant period of time, no doubt exists that the number of butterfly knives lawfully owned and possessed in the United States is in the millions.

## ii. Jurisdictional Analysis

Surveying the law of the various states also sheds light into the commonality of butterfly knives and their use for lawful purposes. Presently, based on this jurisdictional analysis, only *three states* enforce a complete ban on the possession

and carry (both openly and concealed) of butterfly knives.[7] Twenty-Nine (29) states allow for the possession and the open carrying of butterfly knives. *See* Declaration of Doug Ritter ¶10 (Ritter Decl.) Another five (5) states allow for possession, open carry, and concealed carry of butterfly knives if the blade of the knife is under a certain length or as long as there is an "explainable lawful purpose" for carrying the knife. Ritter Decl. at ¶11. Nine (9) other states allow for the lawful possession and open carrying of butterfly knives but restrict or prohibit concealed carrying of butterfly knives. *Id.* at ¶12. Thus, in forty-three (43) states it is lawful to possess and carry butterfly knives either openly or concealed. *Id.* at ¶13; *see also Caetano*, 136 S. Ct. at 1032 ("The more relevant statistic is that '[h]undreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 States."). Therefore, Hawaii's categorical ban on butterfly knives is an extreme outlier in the United States based on a jurisdictional analysis.

### C. Butterfly Knives Are Not "Dangerous and Unusual" Arms

As established above, butterfly knives are unquestionably commonly owned for lawful purposes such as self-defense, collecting, "flipping," and utility. Thus, as commonly owned arms, their relative "dangerousness" is irrelevant. *Caetano*, 136 S. Ct. at 1031 (noting that the "relative dangerousness of a weapon is irrelevant

---

[7] These states are Hawaii, Washington, and New Mexico. Declaration of Doug Ritter, ¶9.

when the weapon belongs to a class of arms commonly used for lawful purposes."). The analysis stops here. Because butterfly knives are commonly owned for lawful purposes, they are not "dangerous and unusual" arms.

Nevertheless, the District Court "decline[d] to decide one way or another whether butterfly knives are "dangerous and unusual" weapons not within the scope of the Second Amendment." ER025. Additionally, Appellees have attempted to classify butterfly knives as "dangerous and unusual" because: (i) they are "concealable;" (ii) are "able to be hidden in clothing;" (iii) "can be deployed quickly," and "are popular with criminals and gang members because of these features." Dkt. No. 36, Defendants Motion for Summary Judgment, at p. 9. According to Appellees, because of these four factors, "butterfly knives, like switchblades, are 'unusual' in that they are not 'typically possessed by law-abiding citizens for lawful purposes.'" *Id*. The District Court and Appellees have both failed to sufficiently distinguish butterfly knives from other unrestricted knives.

### i. Butterfly Knives are Indistinguishable from Unregulated Knives

First, common sense dictates that all folding knives and most knives in general are concealable. Except for large-fixed blade knives, axes, machetes, and unusually large folding knives, any folding knife can be concealed without effort in an individual's pocket. Dkt. No. 36, Defendants Motion for Summary Judgment, at p. 9. Thus, a butterfly knife is no more concealable than any other folding knife. Second,

*like all folding knives*, the blade of a butterfly knife is stored within the handle of the knife and can be "hidden in clothing."

Third, although Appellees continue to make claims that butterfly knives "can be deployed quickly," the evidence in the record reflects the opposite. When compared to other modern knife designs, the butterfly knife is not unique or even fast in its deployment. In fact, when compared to other knife designs, which included common unregulated folding knives, the butterfly knife was the slowest in deployment by a trained expert. ER088-ER099; ER130-ER136; see also Appellants' Opening Brief (AOB) at p. 20, fn. 6. This was wholly undisputed by Appellees.

Finally, the District Court held, and Appellees improperly claim, that butterfly knives are "popular with criminals and gang members. Dkt. No. 36, Defendants Motion for Summary Judgment, at p. 9-12; see also ER039. However, as stated above, the testimony offered in the legislative history fails to show that butterfly knives are used in crimes. The testimony offered by the Honolulu Police Department *does not* provide any evidence of criminal misuse of butterfly knives. It merely states that prior to the ban on butterfly knives, these knives were commonly found on individuals. ER083-ER087. Moreover, the record is entirely devoid of any showing *that butterfly knives have ever been used in a crime*. Thus, Appellees have failed to make any showing that butterfly knives were or are associated with criminal or gang activity.

Though Appellees allege that butterfly knives are more easily concealable, able to be hidden in clothing, deployed quickly, associated with gang and criminal activity, and thus, are "dangerous and unusual," none of these claims are supported by the evidence and Appellees have failed to distinguish butterfly knives from any other unregulated knives. In fact, the butterfly knife is considered not only the strongest, but the safest *folding knife* according to most experts because the blade cannot fold closed inadvertently on the operator so long as the operator has a firm grasp on the handles. Dillon Decl. ⁋4, **Ex. B** ("The modern balisong knife has plenty of uses…. Today, it is one of the knives with massive fanbase. It has been transformed into a multipurpose knife. Because its blade can be concealed inside the two handles, it has become the easiest to carry knife. So, people prefer carrying it in the pocket as their primary self-defense weapon."); see also ER088-ER099; ER130-ER136.

The fact that a butterfly knife can be opened in a flashy manner does not make it any more dangerous than a standard folding knife. Moreover, regardless of the way in which it is opened, once the knife is opened, it is a standard blade with a single sharp edge and pointed tip. In other words, once opened, a butterfly knife is used in the *exact same manner as any other standard knife* which is not subject to any sort of prohibition.

### D. The District Court Incorrectly Held that Intermediate Scrutiny Applied

The record shows that butterfly knives are protected arms, in common use for lawful purposes, and not dangerous and unusual. Thus, H.R.S. section134-53 burdens protected conduct. Because H.R.S. section 134-53 strikes at the core right of law-abiding citizens to defend hearth and home, and the burden imposed on the core right is substantial, strict scrutiny is the appropriate standard of review. See *Silvester*, 843 F.3d at 821. The District Court's application of intermediate scrutiny was incorrect.

#### i. H.R.S. §134-53 Strikes at the Core Right of Law-Abiding Citizens to Self -Defend

*Heller* held that the "core" Second Amendment right is for law-abiding citizens to defense hearth and home. 554 U.S. at 635; see also *Kachalsky v. Cty. of Westchester,* 701 F.3d 81, 89 (2d Cir. 2012) ("Second Amendment guarantees are at their zenith within the home."). This is a simple inquiry: If a law regulating arms adversely affects a law-abiding citizen's right of defense of hearth and home, that law strikes at the core Second Amendment right.

*Duncan v. Becerra, No. 19-55376, 2020 U.S. App. LEXIS 25836, at \*34 (9th Cir. Aug. 14, 2020)* (*Duncan*) (citing *Jackson v. City & Cty. Of S.F.,* 746 F.3d 953, 963 (9th Cir. 2014).

Much like California's unconstitutional ban on "large capacity magazines," by banning butterfly knives everywhere for everyone, including within the home where protections are "at their zenith," H.R.S. section 134-53 strikes at core Second Amendment rights. *Duncan*, at 32; see also *Fyock*, 779 F.3d at 999, *NYSRPA*

804 F.3d at 258 (citing *Heller*, 554 U.S. at 628). Thus, Hawaii's categorical ban on butterfly knives burdens core Second Amendment rights in a substantial way, because "any law that comes close to categorically banning the possession of arms that are commonly used for self-defense imposes a substantial burden on the Second Amendment. *Duncan*, at *33. Moreover, not only does Hawaii's ban apply everywhere to everyone, it offers no meaningful exceptions for law abiding citizens. "These features are the hallmark of substantial burden." *Id*., at *40.

Appellees argue that the ban does not impose a substantial burden on the Second Amendment because citizens still can defend themselves with other kinds of knives. However, the Supreme Court in *Heller* rejected that type of policy argument when applied to a fundamental constitutional right; and this Court's recent decision in *Duncan* has declined to accept such a policy argument.[8] *Duncan*, at *40. Appellees conclusory claim that butterfly knives do not qualify as a separate class of arms and are just a "subset of a class of knives" is contradicted by the State's own prohibition. The State created a separate class of knife by its definition of what constitutes a butterfly knife under H.R.S. §134-53. And such an argument would never be accepted in the First Amendment context, as "no court would uphold a

---

[8] "A regulation may impose a substantial burden on the Second Amendment, even though the restriction does not foreclose the right to self-defense. *Duncan*, at *40 (citing *Heller*, 554 U.S. at 574).

-28-

state's ban on half of all parks and sidewalks for public protest because the other half remained available for use." *Id.*, at \*41. Appellees' policy arguments were flatly rejected by *Heller* – "A constitutional guarantee subject to future judges' assessment of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, at 634-35. Appellees' position that they may arbitrarily ban a class of arms based on assumptions and policy preference misses the mark "because the Second Amendment limits that state's ability to second-guess the people's choice of arms if it imposes a substantial burden on the right to self-defense…. '[S]ubstantial burden' cannot be a policy-balancing inquiry because it implicates a fundamental constitutional right." *Duncan*, at \*50.

Here, Appellees effectively intrude into the homes of law-abiding citizens to forcibly prohibit arms that are commonly used for lawful purposes, including self-defense,[9] and offers no meaningful exceptions or grandfather clause. Thus, it invites strict scrutiny. *Id.*, at \*46.

---

[9] This reasoning is consistent with other Ninth Circuit Precedent. *Jackson*, 746 F.3d at 968 (implying strict scrutiny likely apples if a law completely bans the possession of certain class of ammunition (there, hollow-point bullets)). See also *Silvester*, 843 F.3d at 827 (implying a complete ban on possession likely merits a more stringent review than intermediate scrutiny). See also, *Pena v. Lindley*, 898 F.3d 969,

### ii. H.R.S. §134-53 Does Not Survive Strict Scrutiny Review

Strict scrutiny is the "most rigorous and exacting standard of constitutional review." It requires that a law be "narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 920 (1995); see also *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017). "[I]f there are other, reasonable ways to achieve [a compelling state purpose] with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less dramatic means'" *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 909-10 (1986) (citing *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972)) (alterations original).

Further, Appellees have failed to make any showing there is a legitimate state interest in protecting the public from butterfly knife crime or preventing crimes committed with butterfly knives. "We remind future litigants that it is still necessary to show that the stated interest is compelling and may not simply be presumed." *Duncan*, at *57, fn. 27. Here, the record is entirely devoid of any showing that butterfly knives are used, or ever have been used, in any criminal activity. There cannot be a compelling governmental interest in preventing butterfly knife crime if not such crimes have ever been established. Additionally, Appellees cannot claim

---

977 (9th Cir. 2018) (Court reaffirmed that possession bans on arms are strong medicine likely requiring strict scrutiny).

that banning butterfly knives would even reduce crime involving knives in general as other knives are still freely available. Thus, the District Court incorrectly found there is a sufficient compelling governmental interest, where none exist.

Unquestionably, H.R.S. section 134-53 fails strict scrutiny analysis because Appellees' method of achieving its goals is a statewide blanket ban on possession everywhere, for everyone. Unquestionably, this is not the least restrictive means of achieving a compelling state interest. As stated above, the ban applies to possession in the home; it applies to everyone, everywhere; and it has no exceptions or grandfathering provisions. "These are not features of a statute upheld by courts under the least restrictive means standard." *Duncan*, at *58.

### E. Even if Intermediate Scrutiny were to Apply, H.R.S. §134-53 Would Still Fail

For the same reasons H.R.S. section 134-53 fails strict scrutiny, it also fails intermediate scrutiny. To survive intermediate scrutiny a statute "must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The "law must be 'narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)). Unquestionably, the intermediate scrutiny test "still requires a reviewing court to scrutinize a challenged law with a healthy dose of skepticism. Indeed, the law must address

"harms" that "are real" in a "material" way. *Edenfield v. Fane,* 507 U.S. 761, 771 (1993).

Appellees alleged "significant" government interest is to protect public safety by reducing access to such weapons by criminal gang members." Appellees simply assume a "significant" governmental interest without making the required evidentiary showing. Further, when reviewing H.R.S. §134-53's fit to Appellee's stated interest, it is excessive and sloppy. The prohibition is a blanket ban on all butterfly knives everywhere in Hawaii for everyone, without exception or grandfathering provisions. Appellees' claim that a complete ban is necessary to prevent butterfly knives from being acquired by gang members lacks any evidentiary showing. Under this reasoning, "[t]he State could ban virtually anything if the test is merely whether something causes social ills when someone other than its lawful owner misuses it." *Duncan*, at *64. Even if this Court's considers Appellees' stated interests as significant, the butterfly knife ban does not address them in a "material" way. *Edenfield*, 507 U.S. at 770-71. Appellees' data (or lack thereof) is "remarkably thin." Appellees offer no evidence that butterfly knives are used in crimes whatsoever, no any evidence that banning certain knives would have any impact on knife crime at all. Thus, if this Court were to apply intermediate scrutiny, H.R.S. §134-53 would still fail.

## III.    CONCLUSION

For the above stated reasons, the District Court wrongly held that Hawaii's

categorical ban on butterfly knives is constitutional and should be reversed.

August 28, 2020                                    Dillon Law Group APC
                                                   Attorney for *Amicus Curiae*


                                                   By: */s/ John W. Dillon*
                                                       John W. Dillon

## CERTIFICATE OF COMPLIANCE WITH RULE 29-2(c)(2)

I hereby certify this brief complies with the type-volume limitation of Ninth Circuit Rule 29-2(c)(2) because this brief contains 6,221 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

August 28, 2020

Dillon Law Group APC
Attorney for *Amicus Curiae*


By: */s/ John W. Dillon*
     John W. Dillon

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2020 I electronically filed the foregoing Amicus Curiae Brief of San Diego County Gun Owners Political Action Committee, Firearms Policy Coalition, and Knife Rights Foundation Inc., in Support of Appellants and reversal with the Clerk of the Court by using the CM/ECF system. I certify that the participants of this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

August 28, 2020

Dillon Law Group APC
Attorney for *Amicus Curiae*

By: */s/ John W. Dillon*
    John W. Dillon