

**DAVID Y. IGE**
GOVERNOR

**HOLLY T. SHIKADA**
ATTORNEY GENERAL

**VALERIE M. KATO**
FIRST DEPUTY ATTORNEY GENERAL

**STATE OF HAWAII**
**DEPARTMENT OF THE ATTORNEY GENERAL**
425 QUEEN STREET
HONOLULU, HAWAII 96813
(808) 586-1360

April 28, 2022

Via CM/ECF system

Molly C. Dwyer
Clerk of the Court
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

Re:  *Teter v. Connors,* No. 20-15948
     Fed. R. App. P. Rule 28(j) Letter

Dear Ms. Dwyer:

Defendants-Appellees CLARE E. CONNORS and AL CUMMINGS ("Defendants") submit this Federal Rules of Appellate Procedure Rule 28(j) letter for the above-entitled case, notifying this Court of the following authority that came to Defendants' attention after the Answering Brief was submitted in this case on October 20, 2020.

On February 26, 2021, Defendants filed a Rule 28(j) letter in this case notifying the Court that a petition for rehearing en banc had been granted in *Duncan v. Becerra*, No. 19-55376, 2021 WL 728825 (9th Cir. Feb. 25, 2021). The Court also vacated the panel decision published as *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020).

On November 30, 2021, the Ninth Circuit filed an en banc decision in the *Duncan* case under the name of *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc). Among other things, the en banc court applied intermediate scrutiny in upholding California's ban on large-capacity magazines. *Id.* at 1103-11. This decision supports the argument on pages 29-31 of the Answering Brief opposing Plaintiffs-Appellants' strict scrutiny argument and their reliance on the *Duncan* panel decision.

It should be noted that a petition for a writ of certiorari in this case was docketed in the Supreme Court on March 2, 2022 and remains pending.

A copy of the Duncan *en banc* decision is attached for the Court's convenience.

Molly C. Dwyer, Clerk of the Court
April 28, 2022
Page 2

Sincerely,

s/ Robert T. Nakatsuji
ROBERT T. NAKATSUJI
First Deputy Solicitor General

Attorney for Defendants-Appellees
CLARE E. CONNORS and AL CUMMINGS

Attachment
cc:   Counsel for all participants (via CM/ECF system)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

KeyCite Blue Flag – Appeal Notification
Petition for Certiorari Docketed by VIRGINIA DUNCAN, ET AL. v.
ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA, U.S.,
March 2, 2022

19 F.4th 1087
United States Court of Appeals, Ninth Circuit.

Virginia DUNCAN; Richard Lewis; Patrick
Lovette; David Marguglio; Christopher Waddell;
California Rifle & Pistol Association, Inc., a
California corporation, Plaintiffs-Appellees,
v.
Rob BONTA, in his official capacity as Attorney
General of the State of California, Defendant-
Appellant.

No. 19-55376
|
Argued and Submitted En Banc June 22, 2021
Pasadena, California
|
Filed November 30, 2021

**Synopsis**
**Background:** Gun owners brought action against state's
Attorney General, challenging state statute prohibiting
possession of large-capacity magazines that could hold
more than ten rounds of ammunition, and asserting facial
constitutional claims for violation of Second Amendment
and for taking without just compensation. The United
States District Court for the Southern District of
California, Roger T. Benitez, Senior District Judge,
366 F.Supp.3d 1131, granted summary judgment to
owners and granted permanent injunction, but stayed the
judgment in part, pending appeal, 2019 WL 1510340.
Attorney General appealed. The Court of Appeals, 970
F.3d 1133, affirmed as to Second Amendment claim.
Rehearing en banc was granted.

**Holdings:** The Court of Appeals, Graber, Circuit Judge,
held that:

[1] intermediate scrutiny for Second Amendment violation
was applicable;

[2] statute did not facially violate Second Amendment,
under intermediate scrutiny; and

[3] statute was not facially a physical taking for which just
compensation was due, nor a facial regulatory taking.

Reversed and remanded.

Graber, Circuit Judge, filed a concurring opinion.

Berzon, Circuit Judge, filed a concurring opinion, in
which Thomas, Chief Judge, and Paez, Murguia, Watford,
and Hurwitz, Circuit Judges, joined.

Hurwitz, Circuit Judge, filed a concurring opinion.

Bumatay, Circuit Judge, filed a dissenting opinion, in
which Ikuta and R. Nelson, Circuit Judges, joined.

VanDyke, Circuit Judge, filed a dissenting opinion.

**Procedural Posture(s):** On Appeal; Petition for
Rehearing En Banc; Motion for Summary Judgment.

West Headnotes (19)

**[1]** **Weapons**—Right to bear arms in general

The Second Amendment protects a personal
right to keep and bear arms for lawful purposes,
most notably for self-defense within the home.
U.S. Const. Amend. 2.

**[2]** **Weapons**—Constitutional, Statutory, and
Regulatory Provisions

The Second Amendment is fully applicable to
the States. U.S. Const. Amends. 2, 14.

**[3]** **Weapons**—Violation of right to bear arms

Under the two-step framework to review Second
Amendment challenges, the court first asks if

**ATTACHMENT**

the challenged law affects conduct that is protected by the Second Amendment, and if not, then the law is constitutional, and the analysis ends, but if, on the other hand, the law implicates the Second Amendment, the court next chooses and applies an appropriate level of scrutiny. U.S. Const. Amend. 2.

2 Cases that cite this headnote

**[4]**     **Weapons** Violation of right to bear arms

History, text, and tradition greatly inform the first step of the two-step analysis for a Second Amendment challenge, at which the court asks whether the challenged law implicates the Second Amendment, and those sources also inform the second step, at which the court chooses and applies strict scrutiny or intermediate scrutiny. U.S. Const. Amend. 2.

2 Cases that cite this headnote

**[5]**     **Constitutional Law** Facial invalidity

Plaintiffs who bring a facial constitutional challenge to a statute must show that no set of circumstances exists under which the statute would be valid.

1 Cases that cite this headnote

**[6]**     **Constitutional Law** Facial invalidity

Judicial review of a facial constitutional challenge to a statute is limited to the text of the statute itself, and individual circumstances do not factor into the court's analysis.

1 Cases that cite this headnote

**[7]**     **Weapons** Violation of right to bear arms

Laws burdening Second Amendment rights must withstand more searching scrutiny than rational basis review, and courts apply either strict scrutiny, which requires both narrow tailoring to a compelling governmental interest and the use of the least-restrictive means, or intermediate scrutiny, which requires a reasonable fit with an important governmental interest. U.S. Const. Amend. 2.

**[8]**     **Weapons** Violation of right to bear arms

The precise level of heightened scrutiny, when a law is challenged on Second Amendment grounds, depends on how close the law comes to the core of the Second Amendment right, as well as the severity of the law's burden on the right, and strict scrutiny applies only to laws that both implicate a core Second Amendment right and place a substantial burden on that right, while intermediate scrutiny applies to laws that either do not implicate a core Second Amendment right or that do not place a substantial burden on that right. U.S. Const. Amend. 2.

2 Cases that cite this headnote

**[9]**     **Weapons** Violation of right to bear arms

State statute, prohibiting possession of large-capacity magazines that could hold more than ten rounds of ammunition, placed only a minimal burden on the core Second Amendment right of self-defense in the home, and thus, intermediate scrutiny was appropriate; statute had no effect whatsoever on which firearms could be owned, owners of firearms could possess as many firearms, bullets, and magazines as they chose, they could fire as many bullets as they wanted for whatever lawful purpose they chose, and statute had sole practical effect of requiring shooters to pause for a few seconds after firing ten bullets, to reload

**ATTACHMENT**

or to replace the spent magazine. U.S. Const. Amend. 14; Cal. Penal Code §§ 16740, 🚩 32310.

**[10]** **Weapons** 🔑 Violation of right to bear arms

Assuming that state statute, prohibiting possession of large-capacity magazines that could hold more than ten rounds of ammunition, implicated the Second Amendment, the statute did not facially violate Second Amendment, under intermediate scrutiny; statute was reasonable fit for important government interest of reducing devastating damage wrought by mass shootings, because it outlawed no weapon, it interfered only minimally with core right of self-defense of home and family, and it saved lives. U.S. Const. Amend. 2; Cal. Penal Code §§ 16740, 🚩 32310.

**[11]** **Constitutional Law** 🔑 Intermediate scrutiny

To satisfy intermediate scrutiny for a constitutional violation, the government's statutory objective must be significant, substantial, or important, there must be a reasonable fit between the challenged law and that objective, the legislature must have drawn reasonable conclusions, and the evidence must fairly support the legislative judgment.

**[12]** **Constitutional Law** 🔑 Intermediate scrutiny

The intermediate-scrutiny test, when the constitutionality of a statute is challenged, is not a strict one, and the government need not use the least restrictive means.

**[13]** **Constitutional Law** 🔑 Intermediate scrutiny

In applying intermediate scrutiny when the constitutionality of a statute is challenged, courts are weighing a legislative judgment, not evidence in a criminal trial, so they do not impose an unnecessarily rigid burden of proof, and they do not require scientific precision.

**[14]** **Constitutional Law** 🔑 Intermediate scrutiny

In applying intermediate scrutiny when the constitutionality of a statute is challenged, the court may consider the legislative history of the enactment as well as studies in the record or cited in pertinent case law.

**[15]** **Constitutional Law** 🔑 Intermediate scrutiny
**Constitutional Law** 🔑 Policy

In applying intermediate scrutiny when the constitutionality of a statute is challenged, the court defers to reasonable legislative judgments, and in the face of policy disagreements, or even conflicting legislative evidence, the court must allow the government to select among reasonable alternatives in its policy decisions, because sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable.

**[16]** **Eminent Domain** 🔑 What Constitutes a Taking; Police and Other Powers Distinguished

**ATTACHMENT**

There are two types of per se takings: (1) permanent physical invasion of the property, and (2) a deprivation of all economically beneficial use of the property. U.S. Const. Amend. 5.

**[17]** **Eminent Domain**⊷What Constitutes a Taking; Police and Other Powers Distinguished

A regulatory taking may occur if the regulation goes too far. U.S. Const. Amend. 5.

**[18]** **Eminent Domain**⊷What Constitutes a Taking; Police and Other Powers Distinguished

For a facial takings claim, the plaintiff must show that the mere enactment of the challenged law constituted a taking, and must demonstrate that no set of circumstances exists under which the law would be valid. U.S. Const. Amend. 5.

1 Cases that cite this headnote

**[19]** **Eminent Domain**⊷Weapons
**Weapons**⊷Violation of other rights or provisions

State statute, prohibiting possession of large-capacity magazines that could hold more than ten rounds of ammunition, was not facially a physical taking for which just compensation was due, nor a facial regulatory taking, assuming that a facial regulatory taking claim was cognizable; government acquired nothing by virtue of limitation on capacity of magazines, and owners, who could modify or sell their nonconforming magazines, were not deprived of all economic use. U.S. Const. Amend. 5; Cal. Penal Code §§ 16740(a), 🚩 32310(d).

**West Codenotes**

**Negative Treatment Reconsidered**
🚩 Cal. Penal Code § 32310

**\*1089** Appeal from the United States District Court for the Southern District of California, D.C. No. 3:17-cv-01017-BEN-JLB, Roger T. Benitez, District Judge, Presiding

**Attorneys and Law Firms**

Samuel P. Siegel (argued) and Helen H. Hong, Deputy Solicitors General; John D. Echeverria, Deputy Attorney General; Mark R. Beckington and Heather Hoesterey, Supervising Deputy Attorneys General; Thomas S. Patterson, Senior Assistant Attorney General; Michael J. Mongan, Solicitor General; Rob Bonta, Attorney General; Office of the Attorney General, Sacramento, California; for Defendant-Appellant.

Erin E. Murphy (argued), Paul D. Clement, Kasdin M. Mitchell, and William K. Lane III, Kirkland & Ellis LLP, Washington, D.C.; C.D. Michel, Anna M. Barvir, and Sean A. Brady, Michel & Associates P.C., Long Beach, California; for Plaintiffs-Appellees.

Jonathan E. Lowy and T. Tanya Schardt, Brady, Washington, D.C.; Rafael Reyneri, Scott D. Danzis, Thomas C. Villalon, and Nora Conneely, Covington & Burling LLP, Washington, D.C.; for Amicus Curiae Brady.

Scott A. Edelman, Gibson Dunn & Crutcher LLP, Los Angeles, California; Vivek R. Gopalan, Matthew C. Reagan, and Zhen He Tan, Gibson Dunn & Crutcher LLP, San Francisco, California; Kathryn M. Cherry, Gibson Dunn & Crutcher LLP, Dallas, Texas; Hannah Shearer and Hannah Friedman, Giffords Law Center to Prevent Gun Violence, San Francisco, California; J. Adam Skaggs, Giffords Law Center to Prevent Gun Violence, New York, New York; for Amici Curiae Giffords Law Center to Prevent Gun Violence and March for Our Lives Action Fund.

Antonio J. Perez-Marques and Antonio M. Haynes, David Polk & Wardwell LLP, New York, New York; Eric Tirschwell, Mark Anthony Frassetto, and Janet Carter, William J. Taylor Jr., Everytown Law, New York, New York; for Amicus Curiae Everytown for Gun Safety.

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

Christa Y. Nicols, Brady, Washington, D.C., for Amicus Curiae Team ENOUGH.

Jonathan K. Baum, Katten Muchin Rosenman LLP, Chicago, Illinois; Mark T. Ciani, Katten Muchin Rosenman LLP, New York, New York; for Amici Curiae California Chapter of the American College of Emergency Physicians, American Academy of Pediatrics California, and California Academy of Family Physicians.

Karl A. Racine, Attorney General; Loren L. Alikhan, Solicitor General; Caroline S. Van Zile, Principal Deputy Solicitor General; Carl J. Schifferle, Deputy Solicitor General; Sonya L. Lebsack, Assistant Attorney General; Office of the Solicitor General, Washington, D.C.; William Tong, Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General, Wilmington, Delaware; Clare E. Connors, Attorney General, Honolulu, Hawaii; Kwame Raoul, Attorney General, Chicago, Illinois; Brian E. Frosh, Attorney General, Baltimore, Maryland; Maura Healey, Attorney General, Boston, Massachusetts; Dana Nessel, Attorney General, Lansing, Michigan; Keith Ellison, Attorney General, St. Paul, Minnesota; Gurbir S. Grewal, Attorney General, Trenton, New Jersey; Hector Balderas, Attorney General, Santa Fe, New Mexico; Letitia James, Attorney General, New York, New York; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Josh Shapiro, Attorney General, Harrisburg, Pennsylvania; Peter F. Neronha, Attorney General, Providence, Rhode Island; Thomas J. Donovan Jr., Attorney General, Montpelier, Vermont; Mark R. Herring, Attorney General, Richmond, Virginia; Robert W. Ferguson, Attorney General, Olympia, Washington; for Amici Curiae District of Columbia, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington.

Michael N. Feuer, City Attorney; Kathleen Kenealy, Chief Assistant City Attorney; Scott Marcus, Senior Assistant City Attorney; Danielle L. Goldstein, James P. Clark, and Blithe Smith Bock, Deputy City Attorneys; Office of the City Attorney, Los Angeles, California; Dennis J. Herrera, City Attorney; Aileen McGrath, Co-Chief of Appellate Litigation; Office of the City Attorney, San Francisco, California; Barbara J. Parker, City Attorney, Office of the City Attorney, Oakland, California; Mara W. Elliott, City Attorney; Jonathan I. Lapin, Chief Deputy City Attorney; Office of the City Attorney, San Diego, California; Yibin Shen, City Attorney; Michael Roush, Chief Assistant City Attorney; Montague Hung, Deputy City Attorney; Office of the City Attorney, Alameda, California; Scott H. Howard, City Attorney, Pasadena, California; George S. Cardona,

Interim City Attorney, Santa Monica, California; John A. Nagel, City Attorney; Rebecca L. Moon, Senior Assistant City Attorney; Office of the City Attorney, Sunnyvale, California; Michael Jenkins, City Attorney, Best Best & Krieger LLP, Manhattan Beach, California; for Amici Curiae City of Los Angeles, City and County of San Francisco, City of San Diego, City of Oakland, City of West Hollywood and Mayor Lindsey P. Horvath, City of Alameda, City of Calabasas, City of Santa Monica, and City of Sunnyvale.

James E. Hough, Jamie A. Levitt, and Cesar A. Francia, Morrison & Foerster LLP, New York, New York; Daniel A. Goldschmidt, Morrison & Foerster LLP, Chiyoda-ku, Tokyo, Japan; James R. Sigel, Morrison & Foerster LLP, San Francisco, California; Samuel B. Goldstein, Morrison & Foerster LLP, Washington, D.C.; for Amici Curiae Pride Fund to End Gun Violence, Equality California, and Gays Against Guns.

Stephen P. Halbrook, Fairfax, Virginia; Nezida S. Davis, Bakari Law LLC, Decatur, Georgia; for Amici Curiae National African American Gun Association Inc. and Pink Pistols.

Jeremiah L. Morgan, Robert J. Olson, William J. Olson, and Herbert W. Titus, William J. Olson P.C., Vienna, Virginia; Joseph W. Miller, Joseph Miller Law Offices LLC, Fairbanks, Alaska; Steven C. Bailey and Gary G. Kreep, Ramona, California; for Amici Curiae Gun Owners of America, Inc.; Gun Owners Foundation; Gun Owners of California; California Constitutional Rights Foundation; Virginia Citizens Defense League; Montana Shooting Sports Association; Oregon Firearms Federation; Tennessee Firearms Association; Conservation Legal Defense and Education Fund; Policy Analysis Center; Heller Foundation; and Restoring Liberty Action Committee.

John Parker Sweeney, James W. Porter III, Marc A. Nardone, and Candice L. Rucker, Bradley Arant Boult Cummings, Washington, D.C., for Amicus Curiae National Rifle Association of America Inc.

Dan M. Peterson, Dan M. Peterson PLLC, Fairfax, Virginia, for Amici Curiae National Association of Chiefs of Police, Western States Sheriffs' Association, California Reserve Peace Officers Association, San Francisco Veteran Police Officers Association, International Law Enforcement Educators and Trainers Association, Law Enforcement Legal Defense Fund, California State Sheriffs' Association, New Mexico Sheriffs' Association, Association of New Jersey Rifle & Pistol Clubs Inc., Bridgeville Rifle & Pistol Club, Connecticut Citizens Defense League, Delaware State Sportsmen's

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)
21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

Association, Gun Owners' Action League Massachusetts, Gun Owners of California, Maryland State Rifle & Pistol Association, New York State Rifle & Pistol Association, Vermont Federation of Sportsmen's Clubs, Vermont State Rifle & Pistol Association, and Virginia Shooting Sports Association.

Joseph G.S. Greenlee, Firearms Policy Coalition, Sacramento, California; George M. Lee, Seiler Epstein LLP, San Francisco, California; for Amici Curiae William Wiese, Jeremiah Morris, Lance Cowley, Sherman Macaston, Clifford Flores, L.Q. Dang, Frank Federau, Alan Normandy, Todd Nielsen, California Gun Rights Foundation, Firearms Policy Coalition, Firearms Policy Foundation, Armed Equality, San Diego County Gun Owners, Orange County Gun Owners, Riverside County Gun Owners, California County Gun Owners, and Second Amendment Foundation.

Donald E. J. Kilmer Jr., Law Offices of Donald Kilmer APC, San Jose, California, for Amicus Curiae Madison Society Foundation Inc.

John Cutonilli, Garrett Park, Maryland, pro se Amicus Curiae.

Patrick S. Loi and Anthony P. Schoenberg, Farella Braun & Martel LLP, San Francisco, California, for Amicus Curiae Americans Against Gun Violence.

Marek Suchenek Ph.D., Long Beach, California, pro se Amicus Curiae.

Mark Brnovich, Attorney General; Joseph A. Kanefield, Chief Deputy & Chief of Staff; Brunn W. Roysden III, Solicitor General; Michael S. Catlett, Deputy Solicitor General; Office of the Attorney General, Phoenix, Arizona; Jeff Landry, Attorney General; Elizabeth B. Murrill, Solicitor General; Josiah Kollmeyer, Assistant Solicitor General; Department of Justice, Baton Rouge, Louisiana; Steve Marshall, Attorney General, State of Alabama; Treg Taylor, Attorney General, State of Alaska; Leslie Rutledge, Attorney General, State of Arkansas; Christopher M. Carr, Attorney General, State of Georgia; Lawrence G. Wasden, Attorney General, State of Idaho; Theodore E. Rokita, Attorney General, State of Indiana; Derek Schmidt, Attorney General, State of Kansas; Daniel Cameron, Attorney General, Commonwealth of Kentucky; Lynn Fitch, Attorney General, State of Mississippi; Eric S. Schmitt, Attorney General, State of Missouri; Austin Knudsen, Attorney General, State of Montana; Douglas J. Peterson, Attorney General, State of Nebraska; Dave Yost, Attorney General, State of Ohio; Mike Hunter, Attorney General, State of Oklahoma; Alan Wilson, Attorney General, State of South Carolina; Jason R. Ravnsborg, Attorney General, State of South Dakota; Ken Paxton, Attorney General, State of Texas; Sean D. Reyes, Attorney General, State of Utah; Patrick Morrissey, Attorney General, State of West Virginia; Bridget Hill, Attorney General, State of Wyoming; for Amici Curiae States of Arizona, Louisiana, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Kansas, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, Wyoming, and Commonwealth of Kentucky. Craig A. Livingston and Crystal L. Van Der Putten, Livingston Law Firm P.C., Walnut Creek, California; Lawrence G. Keane and Benjamin F. Erwin, National Shooting Sports Foundation Inc., Newtown, Connecticut; for Amicus Curiae National Shooting Sports Foundation Inc.

Before: Sidney R. Thomas, Chief Judge, and Susan P. Graber, Richard A. Paez, Marsha S. Berzon, Sandra S. Ikuta, Mary H. Murguia, Paul J. Watford, Andrew D. Hurwitz, Ryan D. Nelson, Patrick J. Bumatay and Lawrence VanDyke, Circuit Judges.

## OPINION

GRABER, Circuit Judge:

**\*1095** In response to mass shootings throughout the nation and in California, the California legislature enacted Senate Bill 1446, and California voters adopted Proposition 63. Those laws amended California Penal Code section 32310 to prohibit possession of large-capacity magazines, defined as those that can hold more than ten rounds of ammunition. California law allows owners of large-capacity magazines to modify them to accept ten rounds or fewer. Owners also may sell their magazines to firearm dealers or remove them from the state. And the law provides several exceptions **\*1096** to the ban on large-capacity magazines, including possession by active or retired law enforcement officers, security guards for armored vehicles, and holders of special weapons permits.

Plaintiffs, who include persons who previously acquired large-capacity magazines lawfully, bring a facial challenge to California Penal Code section 32310. They argue that the statute violates the Second Amendment, the Takings Clause, and the Due Process

ATTACHMENT

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

Clause. We disagree.

Reviewing de novo the district court's grant of summary judgment to Plaintiffs, *Salisbury v. City of Santa Monica*, 998 F.3d 852, 857 (9th Cir. 2021), we hold: (1) Under the Second Amendment, intermediate scrutiny applies, and section 32310 is a reasonable fit for the important government interest of reducing gun violence. The statute outlaws no weapon, but only limits the size of the magazine that may be used with firearms, and the record demonstrates (a) that the limitation interferes only minimally with the core right of self-defense, as there is no evidence that anyone ever has been unable to defend his or her home and family due to the lack of a large-capacity magazine; and (b) that the limitation saves lives. About three-quarters of mass shooters possess their weapons and large-capacity magazines lawfully. In the past half-century, large-capacity magazines have been used in about three-quarters of gun massacres with 10 or more deaths and in 100 percent of gun massacres with 20 or more deaths, and more than twice as many people have been killed or injured in mass shootings that involved a large-capacity magazine as compared with mass shootings that involved a smaller-capacity magazine. Accordingly, the ban on legal possession of large-capacity magazines reasonably supports California's effort to reduce the devastating damage wrought by mass shootings. (2) Section 32310 does not, on its face, effect a taking. The government acquires nothing by virtue of the limitation on the capacity of magazines, and because owners may modify or sell their nonconforming magazines, the law does not deprive owners of all economic use. (3) Plaintiffs' due process claim essentially restates the takings claim, and it fails for the same reasons. Accordingly, we reverse the judgment of the district court and remand for entry of judgment in favor of Defendant Rob Bonta, Attorney General for the State of California.

FACTUAL AND PROCEDURAL HISTORY

A. *Large-Capacity Magazines*

A magazine is an "ammunition feeding device" for a firearm. Cal. Penal Code § 16890. On its own, a magazine is practically harmless and poses no threat to life or limb. But when filled with bullets and attached to a firearm, its deadliness is equally obvious. A magazine enables a shooter to fire repeatedly—a number of times up to the ammunition capacity of the magazine—without reloading.

Once a magazine is empty, the shooter may continue to fire only after pausing to change magazines or to reload the original magazine. The time it takes to change magazines ranges from about two to ten seconds, depending on the skill of the shooter and the surrounding circumstances. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J. ("ANJRPC")*, 910 F.3d 106, 113 (3d Cir. 2018).

California and many other jurisdictions define a "large-capacity magazine" as a magazine capable of holding more than ten rounds of ammunition. *E.g.*, Cal. Penal Code § 16740; 18 U.S.C. § 921(a)(31)(A) (1994); Conn. Gen. Stat. § 53-202w(a)(1); D.C. Code § 7-2506.01(b); N.J. Stat. Ann. § 2C:39-1(y). Large-capacity magazines **\*1097** thus allow a shooter to fire more than ten rounds without any pause in shooting.

Most, but not all, firearms use magazines. For those firearms that accept magazines, manufacturers often include large-capacity magazines as a standard part of a purchase of a firearm. "Most pistols are manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds." *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (en banc). Although data on magazine ownership are imprecise, some experts estimate that approximately half of all privately owned magazines in the United States have a capacity greater than ten rounds. *Id.*

As we will discuss in detail below, Defendant introduced evidence that mass shootings often involve large-capacity magazines, to devastating effect. Shooters who use large-capacity magazines cause significantly more deaths and injuries than those shooters who are equipped with magazines of smaller capacity. Intended victims and law enforcement officers use brief pauses in shooting to flee or to fight back. Because shooters who are equipped with large-capacity magazines may fire many bullets without pause, shooters are able to—and do—inflict far more damage using those magazines than they otherwise could.

B. *California's Ban*

In 1994, Congress banned the possession or transfer of large-capacity magazines. Pub. L. 103-322, § 110103, Sept. 13, 1994, 108 Stat. 1796, 1998–2000 (formerly codified at 18 U.S.C. § 922(w)). The federal ban exempted those magazines that were legally possessed

ATTACHMENT

Duncan v. Bonta, 19 F.4th 1087 (2021)
21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

before the date of enactment. *Id.* The law expired ten years later, in 2004. *Id.* § 110105(2).

California began regulating large-capacity magazines in 2000, prohibiting their manufacture, importation, or sale in the state. 🚩 Cal. Penal Code § 12020(a)(2) (2000). After the expiration of the federal ban, California strengthened its law in 2010 and again in 2013 by, among other things, prohibiting the purchase or receipt of large-capacity magazines. 🚩 Cal. Penal Code § 32310(a) (2013). But possession of large-capacity magazines remained legal, and law enforcement officers reported to the California legislature that, as a result, enforcement of the existing laws was "very difficult."

In 2016, the California legislature enacted Senate Bill 1446, which barred possession of large-capacity magazines as of July 1, 2017, and imposed a fine for failing to comply. 2016 Cal. Stat. ch. 58, § 1. Later in 2016, voters in California approved Proposition 63, also known as the Safety for All Act of 2016, which subsumed Senate Bill 1446 and added provisions that imposed a possible criminal penalty of imprisonment for up to a year for unlawful possession of large-capacity magazines after July 1, 2017. 🚩 Cal. Penal Code § 32310(c). Proposition 63 declared that large-capacity magazines "significantly increase a shooter's ability to kill a lot of people in a short amount of time." Prop. 63 § 2(11). "No one except trained law enforcement should be able to possess these dangerous ammunition magazines," and the present law's lack of a ban on possession constituted a "loophole." *Id.* § 2(12). The law's stated purpose is "[t]o make it illegal in California to possess the kinds of military-style ammunition magazines that enable mass killings like those at Sandy Hook Elementary School; a movie theater in Aurora, Colorado; Columbine High School; and an office building at 101 California Street in San Francisco, California." *Id.* § 3(8).

**\*1098** California law defines a "large-capacity magazine" as

any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include any of the following:

(a) A feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds.

(b) A .22 caliber tube ammunition feeding device.

(c) A tubular magazine that is contained in a lever-action firearm.

Cal. Penal Code § 16740. The ban on possession of large-capacity magazines exempts persons who are active or retired law enforcement officers, security guards for armored vehicles, and holders of special weapons permits for limited purposes; the law also allows the manufacture of magazines for government use and the use of magazines as props in film production. *Id.* §§ 32400–55. Finally:

Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:

(1) Remove the large-capacity magazine from the state;

(2) Sell the large-capacity magazine to a licensed firearms dealer; or

(3) Surrender the large-capacity magazine to a law enforcement agency for destruction.

*Id.* § 32310(d).

California is not alone in banning the possession of large-capacity magazines after the federal prohibition expired in 2004. The District of Columbia and eight other states have imposed significant restrictions on large-capacity magazines. Colo. Rev. Stat. §§ 18-12-301, 302; Conn. Gen. Stat. § 53-202w; D.C. Code § 7-2506.01(b); Haw. Rev. Stat. § 134-8(c); Mass. Gen. Laws Ann. ch. 140, §§ 121, 131(a), 131M; Md. Code Ann., Crim. Law § 4-305(b); N.J. Stat. Ann. §§ 2C:39-1(y), 39-3(j), 39-9(h); N.Y. Penal Law §§ 265.00, 265.36; 13 Vt. Stat. Ann. § 4021. Municipalities, too, have banned the possession of large-capacity magazines. *E.g.*, Highland Park, Ill. City Code § 136.005; Sunnyvale, Cal. Mun. Code § 9.44.050 (enacted before the statewide ban).

C. *Procedural History*

Plaintiffs brought this action in 2017, arguing that California's prohibition on the possession of large-capacity magazines violates the Second Amendment, the Fifth Amendment's Takings Clause, and the Fourteenth Amendment's Due Process Clause. Plaintiffs own, or represent those who own, large-capacity magazines, and they do not want to comply with California's requirement that they modify the magazines to accept ten or fewer rounds, remove the magazines from the state, sell them to

**ATTACHMENT**

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

a licensed firearms dealer, or allow state authorities to destroy them.

Shortly before July 1, 2017, the district court preliminarily enjoined the state from enforcing the law, holding that Plaintiffs were likely to succeed on their claims under the Second Amendment and the Takings Clause. *Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017). On appeal to this court, a two-judge majority affirmed the preliminary injunction, concluding that the district court did not abuse its discretion in holding that Plaintiffs had shown a likelihood of success on their claims. *Duncan v. Becerra*, 742 F. App'x 218, 221–22 (9th Cir. 2018) (unpublished); *see also id.* at 220 ("We do not determine the ultimate merits, but rather determine only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand." (internal quotation marks omitted)). Judge **\*1099** Wallace dissented. *Id.* at 223–26. He acknowledged the deferential standard of review on appeal from a preliminary injunction but he "d[id] not consider it a close call to conclude the district court abused its discretion in finding Plaintiffs were likely to succeed on the merits of their constitutional challenges." *Id.* at 226 (Wallace, J., dissenting). Judge Wallace reasoned that "California's evidence—which included statistical studies, expert testimony, and surveys of mass shootings showing that the use of [large-capacity magazines] increases the lethality of gun violence—was more than sufficient to satisfy intermediate scrutiny." *Id.* at 223. And he further concluded that the California law did not violate the Takings Clause, because there is no physical taking and no evidence that alteration or sale of large-capacity magazines would be economically infeasible. *Id.* at 225.

In 2019, the district court granted summary judgment to Plaintiffs on the Second Amendment and takings claims and permanently enjoined Defendant from enforcing the law. *Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019). On appeal, a divided panel affirmed the district court's grant of summary judgment as to the Second Amendment claim. *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020). Chief District Judge Lynn dissented; she would have rejected Plaintiffs' Second Amendment claim. *Id.* at 1169–76.

The panel majority's opinion conflicted with decisions by all six circuit courts to have considered—and rejected—Second Amendment challenges to similar laws.

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), *cert. denied*, —— U.S. ——, 141 S. Ct. 109, 207 L.Ed.2d 1050 (2020); *ANJRPC*, 910 F.3d 106; *Kolbe*, 849 F.3d 114; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo* ("*NYSRPA*"), 804 F.3d 242 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (" *Heller II*"). We granted rehearing en banc and, pursuant to our ordinary practice, vacated the panel's opinion. *Duncan v. Becerra*, 988 F.3d 1209 (9th Cir. 2021) (order); Ninth Cir. Rules 35-1 to 35-3, Adv. Comm. Note 3.

## DISCUSSION

We address (A) the Second Amendment claim and (B) the takings claim.[1]

[1]    In a footnote, Plaintiffs state that summary judgment was proper in their favor on the due process claim "[f]or all the same reasons" that apply to the takings claim. Because we reject the takings claim, we reject the due process claim.

### A. *Second Amendment Claim*

[1] [2] The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment "protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). The Second Amendment "is fully applicable to the States." *Id.* at 750, 130 S.Ct. 3020.

In *District of Columbia v. Heller*, 554 U.S. 570, 574, 628, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court struck down, as inconsistent with the Second Amendment right to keep and bear arms, the District of Columbia's laws that "generally prohibit[ed] the possession of handguns" and "totally ban[ned] handgun possession in the home." The Court declined to define the applicable framework for addressing Second Amendment claims, holding that the handgun ban failed

## ATTACHMENT

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

"[u]nder **\*1100** any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628, 128 S.Ct. 2783.

[3] "Following *Heller* and *McDonald*, we have created a two-step framework to review Second Amendment challenges." *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (en banc), *petition for cert. filed*, (U.S. May 11, 2021) (No. 20-1639). We first ask "if the challenged law affects conduct that is protected by the Second Amendment." *Id.* If not, then the law is constitutional, and our analysis ends. *Id.* If, on the other hand, the law implicates the Second Amendment, we next choose and apply an appropriate level of scrutiny. *Id.* at 784. Ten of our sister circuits have adopted a substantially similar two-step test. *Gould v. Morgan*, 907 F.3d 659, 668–69 (1st Cir. 2018), *cert. denied*, — U.S. ——, 141 S. Ct. 108, 207 L.Ed.2d 1050 (2020); *NYSRPA*, 804 F.3d at 254; *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015); *see Young*, 992 F.3d at 783 (listing cases from the Third, Fourth, Fifth, Sixth, Seventh, Tenth and D.C. Circuits that apply a similar two-step framework).

Judge Bumatay's dissent would jettison the two-step framework adopted by us and our sister circuits, in favor of a "text, history, and tradition" test. Dissent by J. Bumatay at 1142. Plaintiffs have not sought this test, despite having filed supplemental briefs after we granted rehearing en banc, and Defendant has not had a chance to respond. The dissent nevertheless asks us to disrupt a decade of caselaw and to create a circuit split with ten of our sister circuits, not because of any recent development in the law, but because of the dissent's preferred reading of the same Supreme Court cases that we have applied many times. We reject the dissent's invitation. Our test is fully consistent with every other circuit court's approach and, for the reasons that follow, we agree with those decisions that have thoroughly and persuasively rejected the dissent's alternative approach to Second Amendment claims. *E.g.*, *NYSRPA*, 804 F.3d at 257 n.74; *Heller II*, 670 F.3d at 1264–67.

[4] Our two-step inquiry faithfully adheres to the Supreme Court's guidance in *Heller* and *McDonald*. The Court looked extensively to history, text, and tradition in discussing the scope of the Second Amendment right. Accordingly, history, text, and tradition greatly inform step one of the analysis, where we ask whether the challenged law implicates the Second Amendment. *See, e.g.*, *Young*, 992 F.3d at 784–826 (undertaking a detailed historical review); *Teixeira v. County of Alameda*, 873 F.3d 670, 682–87 (9th Cir. 2017) (en banc) (reviewing historical materials at length). Those sources also inform step two, where we choose strict scrutiny, intermediate scrutiny, or no scrutiny at all (as in *Heller*) by examining the effect of the law on the core of the Second Amendment right as traditionally understood. *E.g.*, *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013).

But we do not read the Supreme Court's cases as foreclosing the application of heightened scrutiny as the final step of the analysis. The Court expressly held that rational basis review is never appropriate. *Heller*, 554 U.S. at 628 n.27, 128 S.Ct. 2783. Had the Court intended to foreclose the other forms of traditional review, it could have said so. Instead, and to the contrary, the Court referred specifically to "the standards of scrutiny that we have applied to enumerated constitutional rights" and held that application of heightened scrutiny is unnecessary when the law at issue "would fail constitutional muster" under any standard of scrutiny. *Id.* at 628–29, 128 S.Ct. 2783.

**\*1101** The Court clearly rejected Justice Breyer's "judge-empowering 'interest balancing inquiry' " that, rather than corresponding to any of "the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis)," asked instead " 'whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.' " *Id.* at 634, 128 S.Ct. 2783 (citing *id.* at 689–90, 128 S.Ct. 2783 (Breyer, J., dissenting)). But the standards that we apply—strict and intermediate scrutiny—plainly are the traditional tests and are not the interest-balancing test proposed by Justice Breyer. In *Heller*, the Court emphasized that the Second Amendment, "[l]ike the First, ... is the very *product* of an interest balancing by the people." *Id.* at 635, 128 S.Ct. 2783. The Court regularly assesses First Amendment challenges using intermediate and strict scrutiny, depending on the nature of the law and the context of the challenge. *E.g.*, *Packingham v. North Carolina*, —— U.S. ——, 137 S. Ct. 1730, 1736, 198 L.Ed.2d 273 (2017); *Reed v. Town of Gilbert*, 576 U.S. 155, 163–65, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). We see no reason why those same standards do not apply to Second Amendment challenges as well. Unless and until the Supreme Court tells us and the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Tenth, Eleventh, and D.C. Circuits that, for a decade or more, we all have

**ATTACHMENT**

fundamentally misunderstood the basic framework for assessing Second Amendment challenges, we reaffirm our two-step approach.

[5] [6]Here, Plaintiffs bring a facial Second Amendment challenge to California's ban on large-capacity magazines. Accordingly, Plaintiffs "must show that no set of circumstances exists under which the [statute] would be valid." *Young*, *992 F.3d at 779* (alteration in original) (internal quotation marks omitted). Our review is "limited to the text of the statute itself," and Plaintiffs' (and amici's) individual circumstances do not factor into our analysis. *Id.*

We are guided by the decisions of six of our sister circuits, all of which upheld laws banning or restricting large-capacity magazines as consistent with the Second Amendment. *Worman*, *922 F.3d 26*; *ANJRPC*, *910 F.3d 106*; *Kolbe*, *849 F.3d 114*; *NYSRPA*, *804 F.3d 242*; *Friedman*, *784 F.3d 406*; *Heller II*, *670 F.3d 1244*; *see* *Fyock v. City of Sunnyvale*, *779 F.3d 991 (9th Cir. 2015)* (affirming the denial of a preliminary injunction in a case in which the plaintiffs challenged a municipal ban on large-capacity magazines). Most of those decisions applied the same general two-step approach that guides us and reached the same conclusions that we reach. In particular, they assumed without deciding, at step one, that the law implicated the Second Amendment; and held, at step two, that intermediate scrutiny applied and that the ban or restrictions survived that form of review. *Worman*, *922 F.3d at 33–40*; *ANJRPC*, *910 F.3d at 116–24*; *NYSRPA*, *804 F.3d at 254–64*; *Heller II*, *670 F.3d at 1260–64*; *see* *Fyock*, *779 F.3d at 996–1001* (following that same general approach in the context of an appeal from a preliminary injunction).[2]

[2]    Sitting en banc, the Fourth Circuit reached two alternative holdings in upholding Maryland's ban on large-capacity magazines. It first held, at step one, that bans on large-capacity magazines do *not* implicate the Second Amendment. *Kolbe*, *849 F.3d at 135–37*. The court next held, in the alternative and in accord with the four decisions cited in the text that, assuming any scrutiny was warranted, intermediate scrutiny applied and that the ban withstood such scrutiny. *Id. at 138–41*. For its part, the Seventh Circuit declined to apply that court's ordinary two-step inquiry, holding instead that a municipal ban on large-capacity magazines was constitutional because those

magazines were not common at the time of ratification, and the ordinance leaves residents "ample means to exercise the inherent right of self-defense that the Second Amendment protects." *Friedman*, *784 F.3d at 411* (internal quotation marks omitted).

**\*1102** 1. *Step One: Whether the Challenged Law Implicates the Second Amendment*

At step one, we ask whether the challenged law affects conduct that the Second Amendment protects. *Young*, *992 F.3d at 783*. Defendant argues that California's ban withstands scrutiny at this step for two reasons. First, Defendant asks us to follow the lead of the Fourth Circuit and hold that large-capacity magazines lack Second Amendment protection because they are similar to " 'M-16 rifles and the like,' i.e., 'weapons that are most useful in military service.' " *Kolbe*, *849 F.3d at 142* (quoting *Heller*, *554 U.S. at 627, 128 S.Ct. 2783*). Second, Defendant argues that longstanding regulations have governed magazine capacity such that California's ban on large-capacity magazines survives scrutiny at this initial step of the analysis. *See* *Young*, *992 F.3d at 783* (holding that, if longstanding, accepted regulations have governed the subject of the challenged law, then the Second Amendment is not implicated).

Both arguments appear to have significant merit. As we describe below, large-capacity magazines have limited lawful, civilian benefits, whereas they provide significant benefits in a military setting. Accordingly, the magazines likely are "most useful in military service," at least in an ordinary understanding of that phrase. *Kolbe*, *849 F.3d at 135–37*.

Moreover, Congress and some states have imposed firing-capacity restrictions for nearly a century. In 1932, Congress banned, in the District of Columbia, "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading." Around the same time, several states, including California, enacted bans on firearms that could fire automatically or semi-automatically more than 10, 12, 16, or 18 bullets. 1933 Cal. Stat. 1170, § 3. The state bans were later repealed, but the District of Columbia's ban appears to have remained in place in some form continuously since 1932. We also take note of the more recent bans, first imposed

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

by Congress in 1994 and later imposed by nine states and some municipalities after the federal ban expired in 2004. *Cf.* United States v. Henry, 688 F.3d 637, 640 (9th Cir. 2012) (holding, nine years ago, that machine guns are "unusual" because they had been banned since 1986, a total of 26 years). In addition, governments long have imposed magazine capacity limits on hunters. *See, e.g.*, 50 C.F.R. § 20.21(b) (prohibiting the hunting of most migratory game birds "[w]ith a shotgun of any description capable of holding more than three shells, unless it is plugged with a one-piece filler, incapable of removal without disassembling the gun, so its total capacity does not exceed three shells"); Cal. Fish & Game Code § 2010 ("It is unlawful ... to use or possess a shotgun capable of holding more than six cartridges at one time, to take a mammal or bird.").

Ultimately, though, we decline to decide those two sub-issues definitively. Neither we nor the Supreme Court has decided whether the passage in Heller pertaining to weapons "most useful in military service" should be read as establishing a legal standard and, if so, how to interpret that phrase for purposes of step one of the constitutional analysis. *See* Heller, 554 U.S. at 627, 128 S.Ct. 2783 ("It may be objected that if weapons that are most useful in military service—M-16 rifles and **1103** the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause."). Similarly, determining whether sufficiently longstanding regulations have governed large-capacity magazines likely would require an extensive historical inquiry. *See, e.g.*, Young, 992 F.3d at 784–826 (undertaking a detailed historical review of regulations concerning the open carrying of arms); Teixeira, 873 F.3d at 682–87 (reviewing historical materials in determining whether the Second Amendment encompasses a right to sell firearms).

In many cases raising Second Amendment challenges, particularly where resolution of step one is uncertain and where the case raises "large and complicated" questions, United States v. Torres, 911 F.3d 1253, 1261 (9th Cir. 2019), we have assumed, without deciding, that the challenged law implicates the Second Amendment. *E.g.*, United States v. Singh, 979 F.3d 697, 725 (9th Cir. 2020), *cert. denied, Matsura v. United States*, ––– U.S. –––, 141 S.Ct. 2671, 210 L.Ed.2d 833 (2021); Mai v. United States, 952 F.3d 1106, 1114–15 (9th Cir. 2020), *cert. denied*, ––– U.S. –––, 141 S.Ct. 2566, ––– L.Ed.2d –– – (2021); Pena v. Lindley, 898 F.3d 969, 976 (9th Cir. 2018), *cert. denied*, ––– U.S. –––, 141 S. Ct. 108, 207 L.Ed.2d 1050 (2020). Our sister circuits have followed this approach specifically with respect to laws restricting large-capacity magazines. *See* Worman, 922 F.3d at 36 (assuming, without deciding, at step one due to "reluctan[ce] to plunge into this factbound morass"); ANJRPC, 910 F.3d at 117 (assuming, without deciding, at step one); NYSRPA, 804 F.3d at 257 (assuming, without deciding, at step one "[i]n the absence of clearer guidance from the Supreme Court or stronger evidence in the record"); Heller II, 670 F.3d at 1261 (assuming, without deciding, at step one because "we cannot be certain whether" the requirements at this step are met). Accordingly, we follow the "well-trodden and 'judicious course' " of assuming, without deciding, that California's law implicates the Second Amendment. Pena, 898 F.3d at 976 (quoting Woollard v. Gallagher, 712 F.3d 865, 876 (4th Cir. 2013)).

#### 2. *Step Two: Application of an Appropriate Level of Scrutiny*

##### a. *Determination of the Appropriate Level of Scrutiny*

[7]At step two, we first determine the appropriate level of scrutiny. Torres, 911 F.3d at 1262. "[L]aws burdening Second Amendment rights must withstand more searching scrutiny than rational basis review." Id. We apply either strict scrutiny, which requires both narrow tailoring to a compelling governmental interest and the use of the least-restrictive means, Victory Processing, LLC v. Fox, 937 F.3d 1218, 1226–28 (9th Cir. 2019), or intermediate scrutiny, which requires a reasonable fit with an important governmental interest, Torres, 911 F.3d at 1263.

[8]"'The precise level of heightened scrutiny depends 'on (1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right.' " Mai, 952 F.3d at 1115 (quoting Chovan, 735 F.3d at 1138). "Strict scrutiny applies only to laws that both implicate a core Second Amendment right and place a substantial burden on that right." Id. Intermediate scrutiny applies to laws that either do not implicate a core Second Amendment right or do not place a substantial burden on that right. Id.

[9]Defendant does not dispute that California's ban on large-capacity magazines implicates, at least in some measure, the core Second Amendment right of self-

ATTACHMENT

defense in the home. *See, e.g.,* **\*1104** *Pena*, 898 F.3d at 977 (assuming without deciding that firearm regulations implicate the core right); *see also Worman*, 922 F.3d at 30, 36 (assuming without deciding that Massachusetts' ban on large-capacity magazines implicates the core right); *Heller II*, 670 F.3d at 332 (declining to decide whether the District of Columbia's prohibition on large-capacity magazines "impinge[s] at all upon the core right protected by the Second Amendment"). Instead, Defendant argues that the ban imposes only a small burden on the Second Amendment right and that, accordingly, intermediate scrutiny is the appropriate lens through which to view California's law. We agree. Just as our sister circuits unanimously have applied intermediate scrutiny to other laws banning or restricting large-capacity magazines,[3] we hold that intermediate scrutiny applies to California's ban.

[3] *Worman*, 922 F.3d at 36–38; *ANJRPC*, 910 F.3d at 117–18; *Kolbe*, 849 F.3d at 138–39; *NYSRPA*, 804 F.3d at 257–61; *Heller II*, 670 F.3d at 1261–62; *see Fyock*, 779 F.3d at 998–999 (holding that the district court did not abuse its discretion in applying intermediate scrutiny to a municipal ban on large-capacity magazines).
As we described in note 2, the Seventh Circuit did not apply, at least by name, any of the traditional levels of scrutiny. *Friedman*, 784 F.3d at 410–12. But in upholding the municipal ban on large-capacity magazines, the court plainly applied a standard far less demanding than strict scrutiny, and its analysis is fully consistent with our selection of intermediate scrutiny. *See, e.g., id.* at 411 (holding that the ordinance leaves residents "ample means to exercise the inherent right of self-defense that the Second Amendment protects" (internal quotations omitted)).

[10]California's ban on large-capacity magazines imposes only a minimal burden on the exercise of the Second Amendment right. The law has no effect whatsoever on which firearms may be owned; as far as the challenged statute is concerned, anyone may own any firearm at all. Owners of firearms also may possess as many firearms, bullets, and magazines as they choose. *See ANJRPC*, 910 F.3d at 118 (holding that intermediate scrutiny applied, in part because the challenged law "has no impact on the many other firearm options that individuals have to defend themselves in their home"); *Kolbe*, 849

F.3d at 138 (same: "citizens [remain] free to protect themselves with a plethora of other firearms and ammunition"); *NYSRPA*, 804 F.3d at 260 (same: "while citizens may not acquire high-capacity magazines, they can purchase any number of magazines with a capacity of ten or fewer rounds").

Owners of firearms also may *use* those items at will. They may fire as many bullets as they would like for whatever lawful purpose they choose. The ban on large-capacity magazines has the sole practical effect of requiring shooters to pause for a few seconds after firing ten bullets, to reload or to replace the spent magazine.

Nothing in the record suggests that the restriction imposes any more than a minimal burden on the Second Amendment right to keep and bear arms. Plaintiffs do not point to any evidence that a short pause after firing ten bullets during target practice or while hunting imposes any practical burden on those activities, both of which fall outside the core Second Amendment right in any event.

Similarly, the record suggests at most a minimal burden, if any burden at all, on the right of self-defense in the home. Experts in this case and other cases report that "most homeowners only use two to three rounds of ammunition in self-defense." *ANJRPC*, 910 F.3d at 121 n.25. The use of more than ten bullets in defense of the home is "rare," *Kolbe*, 849 F.3d at 127, or non-existent, *see* **\*1105** *Worman*, 922 F.3d at 37 (noting that neither the plaintiffs nor their experts "could ... identify even a single example of a self-defense episode in which ten or more shots were fired"). An expert in this case found that, using varying methodologies and data sets, more than ten bullets were used in either 0% or fewer than 0.5% of reported incidents of self-defense of the home. Even in those situations, the record does not disclose whether the shooter fired all shots from the same weapon, whether the shooter fired in short succession such that reloading or replacing a spent cartridge was impractical, or whether the additional bullets had any practical effect after the first ten shots. In other words, the record here, as in other cases, does not disclose whether the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has *ever* been realized in self-defense in the home. *See ANJRPC*, 910 F.3d at 118 ("The record here demonstrates that [large-capacity magazines] are not well-suited for self-defense."); *Kolbe*, 849 F.3d at 138 (noting the "scant evidence ... [that] large-capacity magazines are possessed, or even suitable, for self-protection"); *Heller II*, 670 F.3d at 1262 (pointing to

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

the lack of evidence that "magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport"). Indeed, Plaintiffs have not pointed to a single instance in this record (or elsewhere) of a homeowner who was unable to defend himself or herself because of a lack of a large-capacity magazine.[4]

[4]   Judge VanDyke's dissent faults us for relying on the rarity of instances of self-defense that use more than ten bullets while not giving enough weight to the infrequency of mass shootings, which the dissent describes as "statistically very rare." Dissent by J. VanDyke at 1168. To the extent that the dissent concludes that reducing the harm caused by mass shootings is not an "important" governmental objective at step two of the analysis, we disagree. Focusing solely on the frequency of mass shootings omits the second, critical part of the analysis set out below at pages 42 to 46[C]: the incredible harm caused by mass shootings. We do not ignore the relative infrequency of mass shootings. We instead conclude—and Plaintiffs do not dispute—that, considering the frequency of mass shootings *in combination with* the harm that those events cause, reducing the number of deaths and injuries caused by mass shootings is an important goal. The dissent's analogy to commercial flights, [Dissent by J. VanDyke at 1168 n.11, is illustrative: Although accidents involving commercial flights are rare, legislatures recognize that the serious harm caused by even a single crash justifies extensive regulation of the industry. To the extent that the dissent asks us to balance the interests of the lawful use of large-capacity magazines against the interests of the State in reducing the deaths and injuries caused by mass shootings, we disagree for two independent reasons. First, the Supreme Court expressly rejected that type of interest balancing. *Heller*, 554 U.S. at 634, 128 S.Ct. 2783. Second, to the extent that an interest-balancing inquiry is relevant, we reiterate that Plaintiffs have not pointed to a single instance—in California or elsewhere, recently or ever—in which someone was unable to defend himself or herself due to a lack of a large-capacity magazine, whereas the record describes the many deaths and injuries caused by criminals' use of large-capacity magazines during mass shootings.

Evidence supports the common-sense conclusion that the benefits of a large-capacity magazine are most helpful to

a soldier: "the use of large-capacity magazines results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries." *Fyock*, 779 F.3d at 1000; *see Kolbe*, 849 F.3d at 137 ("Large-capacity magazines enable a shooter to hit 'multiple human targets very rapidly.' "); *NYSRPA*, 804 F.3d at 263–64 ("Like assault weapons, large-capacity magazines result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.' " (quoting *Heller II*, 670 F.3d at 1263)). A 1989 report by the Bureau of Alcohol, Tobacco, **1106 and Firearms concluded that "large capacity magazines are indicative of military firearms," in part because they "provide[ ] the soldier with a fairly large ammunition supply." A 1998 report by that agency found that "detachable large capacity magazine[s] [were] originally designed and produced for ... military assault rifles." The Fourth Circuit concluded that, "[w]hatever their other potential uses ... large-capacity magazines ... are unquestionably most useful in military service." *Kolbe*, 849 F.3d at 137.

Recent experience has shown repeatedly that the same deadly effectiveness of a soldier's use of large-capacity magazines can be exploited by criminals, to tragic result. In Thousand Oaks, California, a shooter equipped with large-capacity magazines murdered twelve people at a bar in 2018. Firearms equipped with large-capacity magazines "have been the weapons of choice in many of the deadliest mass shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)." *Worman*, 922 F.3d at 39. As the Fourth Circuit explained:

> Other massacres have been carried out with handguns equipped with magazines holding more than ten rounds, including those at Virginia Tech (thirty-two killed and at least seventeen wounded in April 2007) and Fort Hood, Texas (thirteen killed and more than thirty wounded in November 2009), as well as in Binghamton, New York (thirteen killed and four wounded in April 2009 at an immigration center), and Tucson, Arizona (six killed and thirteen wounded in January 2011 at a

**ATTACHMENT**

congresswoman's constituent meeting in a grocery store parking lot).

*Kolbe*, 849 F.3d at 120.

In sum, large-capacity magazines provide significant benefit to soldiers and criminals who wish to kill many people rapidly. But the magazines provide at most a minimal benefit for civilian, lawful purposes. Because California's ban on large-capacity magazines imposes only a minimal burden on the Second Amendment right to keep and bear arms, we apply intermediate scrutiny.

Before applying intermediate scrutiny, we address Plaintiffs' argument that we need not apply any scrutiny at all. Plaintiffs assert that California's law falls within the category of regulations, like the handgun ban at issue in *Heller*, 554 U.S. at 628, 128 S.Ct. 2783, that fail "[u]nder any of the standards of scrutiny." We have held that the only laws that are necessarily unconstitutional in this way are those laws that "amount[ ] to a destruction of the Second Amendment right." *Young*, 992 F.3d at 784 (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). Because California's law imposes, as explained above, only a slight burden on the Second Amendment right, the law plainly does not destroy the right.

The handgun ban at issue in *Heller* failed under any level of scrutiny because it "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for the lawful purpose of self-defense, including in the home. 554 U.S. at 628, 128 S.Ct. 2783. The Supreme Court explained:

> There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. **\*1107** Whatever the reason, handguns are

the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Id.* at 629, 128 S.Ct. 2783.

California's prohibition on large-capacity magazines is entirely different from the handgun ban at issue in *Heller.* The law at issue here does not ban any firearm at all. It bans merely a subset (large-capacity) of a part (a magazine) that some (but not all) firearms use.[5] *Heller* clearly did not prohibit governments from banning some subset of weapons. *See, e.g.,* *Pena*, 898 F.3d at 978 (applying intermediate scrutiny to a ban on the commercial sale of handguns lacking certain safety features and upholding the ban); *Kolbe*, 849 F.3d at 138–39 (holding that *Heller*'s "special consideration" for handguns "does not mean that a categorical ban on any particular type of bearable arm is unconstitutional"); *Friedman*, 784 F.3d at 410 ("[A]t least some categorical limits on the kinds of weapons that can be possessed are proper.").

[5]  Judge VanDyke's dissent suggests that California's ban on large-capacity magazines is akin to a ban on all cars or on large vehicles. Dissent by J. VanDyke at 1163–64. But those analogies are inapt. A ban on large-capacity magazines cannot reasonably be considered a ban on firearms any more than a ban on leaded gasoline, or on dangerously designed gas tanks, or speed limits could be considered a ban on cars. *E.g.,* 42 U.S.C. § 7545(n); 49 C.F.R. § 393.67; Cal. Veh. Code § 22348. Like a ban on large-capacity magazines with respect to firearms, those laws retain the basic functionality of cars—driving within reasonable limits—while preventing specific societal harms from known dangers.
The same reasoning applies to the dissent's analogy to a ban on all commercial flights. Dissent by J. VanDyke at 1168 n.11. A ban on large-capacity magazines cannot reasonably be considered a ban on firearms any more than the existing, extensive regulations of commercial airlines, aircraft, pilots, and so on could be considered a ban on commercial flights. All of the dissent's analogies start from the false premise that a ban on large-capacity magazines somehow

ATTACHMENT

amounts to a ban on the basic functionality of all firearms, despite the fact that, as we have explained, many firearms do not use magazines; all firearms may be used with magazines of ten or fewer rounds; and no limit applies to the number of firearms or magazines that a person may possess and use.

Nor does the fact that, among the magazines in circulation, approximately half are of large capacity alter our conclusion. As an initial matter, we question whether circulation percentages of a part that comes standard with many firearm purchases meaningfully reflect an affirmative choice by consumers. More to the point, *Heller*'s ruling that handguns, "the quintessential self-defense weapon," cannot be prohibited rested on the premise that consumers overwhelmingly chose to purchase handguns *for the purpose of self-defense in the home*. *Heller, 554 U.S. at 628–29, 128 S.Ct. 2783*; *see Kolbe, 849 F.3d at 138* (emphasizing this point). By contrast, and as described in detail above, Plaintiffs have offered little evidence that large-capacity magazines are commonly used, or even suitable, for that purpose. *See Worman, 922 F.3d at 36–37* (holding that, unlike "the unique popularity of the handgun as a means of self-defense," "the record ... offers no indication that [large-capacity magazines] have commonly been used for home self-defensive purposes"); *Kolbe, 849 F.3d at 138–39* ("The handgun, of course, is 'the quintessential self-defense weapon.' In contrast, there is scant evidence ... that ... large-capacity magazines are possessed, or even suitable, for self-protection." (citation omitted)); *NYSRPA, 804 F.3d at 260 n.98* (" '*Heller* ... explain[ed] that handguns are protected as 'the most popular weapon chosen by Americans for self-defense in the home.' Of course, the **\*1108** same cannot be said of [large-capacity magazines].' (citation omitted)).

In sum, we decline to read *Heller*'s rejection of an outright ban on the most popular self-defense weapon as meaning that governments may not impose a much narrower ban on an accessory that is a feature of some weapons and that has little to no usefulness in self-defense. We therefore reject Plaintiffs' entreaty that we strike down California's law without applying any scrutiny at all. Because California's law imposes only a minimal burden on the Second Amendment right, we apply intermediate scrutiny.

### b. *Application of Intermediate Scrutiny*

[11]"To satisfy intermediate scrutiny, the government's statutory objective must be 'significant, substantial, or important,' and there must be a 'reasonable fit' between the challenged law and that objective." *Mai, 952 F.3d at 1115* (quoting *Silvester, 843 F.3d at 821–22*). The legislature must have drawn "reasonable" conclusions, and the evidence must "fairly support" the legislative judgment. *Pena, 898 F.3d at 979–80*.

[12] [13] [14]"The test is not a strict one," and the government need not use the "least restrictive means." *Silvester, 843 F.3d at 827* (internal quotation marks omitted). "[W]e are weighing a legislative judgment, not evidence in a criminal trial," *Pena, 898 F.3d at 979*, so "we do not impose an 'unnecessarily rigid burden of proof,' " *id.* (quoting *Mahoney v. Sessions, 871 F.3d 873, 881 (9th Cir. 2017)*), and "we do not require scientific precision," *Mai, 952 F.3d at 1118* (internal quotation marks omitted). We may consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." *Fyock, 779 F.3d at 1000* (quoting *Jackson, 746 F.3d at 966*).

[15]We defer to reasonable legislative judgments. *Pena, 898 F.3d at 979*. "[I]n the face of policy disagreements, or even conflicting legislative evidence, 'we must allow the government to select among reasonable alternatives in their policy decisions.' " *Id.* at *980* (quoting *Peruta v. County of San Diego, 824 F.3d 919, 944 (9th Cir. 2016)* (en banc) (Graber, J., concurring)). "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Mai, 952 F.3d at 1118* (quoting *Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)*); *see also Jackson, 746 F.3d at 969* (holding that, even if the relevant science were "an open question," that conclusion "is insufficient to discredit [a legislative body's] reasonable conclusions").

Both dissents suggest that, because we have not struck down any state or federal law under the Second Amendment, we have "give[n] a blank check to lawmakers to infringe on the Second Amendment right." Dissent by J. Bumatay at 1144; *accord* Dissent by J. VanDyke at 1172. To the contrary, we have carefully examined each challenge on its own merit. The

### ATTACHMENT

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

Constitution binds legislators just as it binds us. That Congress and state legislatures located in our circuit have legislated within constitutional bounds is, properly viewed, a credit to those legislatures, not evidence of an abdication of our duty. Notably, California's law is more restrained than similar laws considered by our sister circuits. *See, e.g.,* Worman, 922 F.3d 26 (considering a Massachusetts law that bans large-capacity magazines *and assault weapons*); Kolbe, 849 F.3d 114 (same: Maryland law); NYSRPA, 804 F.3d 242 (same: New York law & Connecticut law); Friedman, 784 F.3d 406 (same: City of Highland Park, **\*1109** Illinois law); Heller II, 670 F.3d 1244 (same: District of Columbia law). And our sister circuits, applying the same two-step inquiry that we apply today, have not hesitated to strike down provisions that go too far. *See, e.g.,* NYSRPA, 804 F.3d at 264 (striking down, under intermediate scrutiny, a provision of New York law that prohibited the loading of a magazine with more than seven rounds of ammunition).

The California legislature, and the people of California, enacted the ban on large-capacity magazines to prevent and mitigate gun violence. As Plaintiffs properly concede and, as we have recognized before, that interest is undoubtedly important. *E.g.,* Wilson v. Lynch, 835 F.3d 1083, 1093 (9th Cir. 2016). California's law aims to reduce gun violence primarily by reducing the harm caused by mass shootings. Although mass shootings may be an irregular occurrence, the harm that flows from them is extensive. We readily conclude that reducing the harm caused by mass shootings is an important governmental objective. The only question, then, is whether California's ban is a "reasonable fit" for reducing the harm caused by mass shootings. Silvester, 843 F.3d at 821.

Many mass shootings involve large-capacity magazines, and large-capacity magazines tragically exacerbate the harm caused by mass shootings.[6] One expert reported that "it is common for offenders to fire more than ten rounds when using a gun with a large-capacity magazine in mass shootings. In particular, in mass shootings that involved use of large-capacity magazine guns, the average number of shots fired was 99." More than twice as many people were killed or injured in mass shootings that involved a large-capacity magazine compared to mass shootings where the shooter had magazines with a smaller capacity. One expert looked solely at fatalities and the deadliest mass shootings (those with at least six deaths), and he discovered that the number of fatalities from mass shootings that involved a large-capacity magazine was at least 50% greater than the number of fatalities from those

shootings that involved smaller magazines. "Moreover, since 1968, [large-capacity magazines] have been used in 74 percent of all gun massacres with 10 or more deaths, as well as in 100 percent of all gun massacres with 20 or more deaths."

[6] Plaintiffs dispute the reliability of Defendant's experts and the underlying data, all of which are identical or similar to the reports and data that our sister circuits have cited. *E.g., ANJRPC,* 910 F.3d at 121; Kolbe, 849 F.3d at 124 n.3. We conclude that the evidence is sufficiently reliable for purposes of weighing California's legislative judgment. Pena, 898 F.3d at 979–80.

The reasons are simple and verified by events: large-capacity magazines allow a shooter to fire more bullets from a single firearm uninterrupted, and a murderer's pause to reload or switch weapons allows potential victims and law enforcement officers to flee or to confront the attacker. One expert described the period after a shooter has exhausted the current magazine as "precious down-time" that "affords those in the line of fire with a chance to flee, hide, or fight back." *Accord* ANJRPC, 910 F.3d at 119 ("Weapon changes and reloading result in a pause in shooting and provide an opportunity for bystanders or police to intervene and victims to flee."); Kolbe, 849 F.3d at 128 ("[R]educing the number of rounds that can be fired without reloading increases the odds that lives will be spared in a mass shooting ... [because there are] more chances for bystanders or law enforcement to intervene during a pause in firing, ... more chances for the shooter to have problems quickly changing a magazine under intense pressure, and **\*1110** ... more chances for potential victims to find safety." (internal quotation marks omitted)).

As other courts have pointed out, and as the record here establishes, examples abound of the harm caused by shooters using large-capacity magazines and of people fleeing, hiding, or fighting back during a shooter's pause. The Fourth Circuit noted high-profile examples in "Newtown (where nine children were able to run from a targeted classroom while the gunman paused to change out a large-capacity thirty-round magazine), Tucson (where the shooter was finally tackled and restrained by bystanders while reloading his firearm), and Aurora (where a 100-round drum magazine was emptied without any significant break in firing)." Kolbe, 849 F.3d at 128. The Third Circuit updated that list a year later by noting that "[v]ideos from the Las Vegas shooting in 2017 show that concert attendees would use the pauses in firing

ATTACHMENT

when the shooter's high capacity magazines were spent to flee." *ANJRPC*, 910 F.3d at 120 (internal quotation marks omitted). We provide yet another intervening example: after the 2018 shooting in Thousand Oaks, California, news outlets reported survivors' accounts of escaping when the shooter paused firing. *See Thousand Oaks Mass Shooting Survivor: "I Heard Somebody Yell, 'He's Reloading,' "* (ABC News, Nov. 8, 2018), https://abc7.com/thousand-oaks-ca-shooting-california/464 9166/ ("I heard somebody yell, 'He's reloading!' and that was when a good chunk of us had jumped up and went and followed the rest of the people out the window."); *People Threw Barstools Through Window to Escape Thousand Oaks, California, Bar During Shooting*, (USA Today, Nov. 8, 2018), https://www.usatoday.com/story/news/natio n-now/2018/11/08/thousand-oaks-bar-shooting-people-brok e-windows-stools-escape/1928031002/ ("At that point I grabbed as many people around me as I could and grabbed them down under the pool table we were closest to until he ran out of bullets for that magazine and had to reload."). The record contains additional examples of persons confronting a shooter or escaping during a pause in firing. *See also* ANJRPC, 910 F.3d at 120 & n.24 (listing other examples).

Approximately three-quarters of mass shooters possessed their weapons, as well as their large-capacity magazines, *lawfully*. Removing the ability of potential mass shooters to possess those magazines legally thus reasonably supports California's effort to reduce the devastating harm caused by mass shootings. "[L]imiting a shooter to a ten-round magazine could mean the difference between life and death for many people." *Kolbe*, 849 F.3d at 128 (internal quotation marks omitted). Moreover, removing all large-capacity magazines from circulation reduces the opportunities for criminals to steal them. *See, e.g.,* id. at 140 (noting the "evidence that, by reducing the availability of ... [large-capacity] magazines overall, the [challenged law] will curtail their availability to criminals and lessen their use in mass shootings, other crimes, and firearms accidents"). For example, the shooter who targeted Sandy Hook's elementary school stole his mother's lawfully-possessed weapons and large-capacity magazines, which he then used to kill more than two dozen people, including twenty children.

Just as our sister circuits have concluded in assessing the fit between restrictions on large-capacity magazines and the goal of reducing gun violence, we conclude that California's ban is a reasonable fit, even if an imperfect one, for its compelling goal of reducing the number of deaths and injuries caused by mass shootings.

*Worman*, 922 F.3d at 39– 40; *ANJRPC*, 910 F.3d at 119–22; *Kolbe*, 849 F.3d at 139–41; **\*1111** *NYSRPA*, 804 F.3d at 263–64; *Heller II*, 670 F.3d at 1263–64. Because we apply intermediate scrutiny, the law need not be the least restrictive means, and some measure of over-inclusiveness is permissible. *E.g.,* Torres, 911 F.3d at 1264 n.6. Plaintiffs and their experts speculate about hypothetical situations in which a person might want to use a large-capacity magazine for self-defense. But Plaintiffs' speculation, not backed by any real-world examples, comes nowhere near overcoming the deference that we must give to the reasonable legislative judgment, supported by both data and common sense, that large-capacity magazines significantly increase the devastating harm caused by mass shootings and that removing those magazines from circulation will likely reduce deaths and serious injuries. *See, e.g.,* Worman, 922 F.3d at 40 (rejecting, as "too facile by half," the argument that a ban on large-capacity magazines sweeps too broadly because it bars law-abiding citizens from possessing them); *Pena*, 898 F.3d at 980 (upholding a firearm-safety restriction because of the deference we owe to "[t]he legislative judgment that preventing cases of accidental discharge outweighs the need for discharging a gun" in the "rare instance" where the safety restriction "disables a gun capable of providing self-defense").

Because California's ban on large-capacity magazines is a reasonable fit for the compelling goal of reducing gun violence, we reverse the district court's grant of summary judgment to Plaintiffs on their Second Amendment claim.

B. *Takings Claim*

[16] [17]The Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. "There are two types of 'per se' takings: (1) permanent physical invasion of the property, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); and (2) a deprivation of all economically beneficial use of the property, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015–16, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)." *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012). Alternatively, a regulatory taking may occur if the regulation goes "too far." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). "[R]egulatory takings challenges are governed by the

**ATTACHMENT**

standards set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *see generally* *Cedar Point Nursery v. Hassid*, —— U.S. ——, 141 S. Ct. 2063, 2071–72, 210 L.Ed.2d 369 (2021) (describing these concepts).

[18]Because Plaintiffs bring a facial takings claim, they must show that "the mere enactment of [California's law] constituted a taking." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 318, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). Plaintiffs must demonstrate that "no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

[19]California's law requires an owner of a large-capacity magazine to choose one of four options: (1) modify the magazine so that it accommodates ten rounds or fewer; (2) sell the magazine to a firearms dealer; (3) remove the magazine to another state (where, depending on that state's laws, the owner may lawfully possess it or sell it to any third party); or (4) turn it over to a **\*1112** law enforcement agency for destruction.[7] Cal. Penal Code §§ 16740(a), 32310(d)(1)–(3). California's law plainly does not deprive an owner of "all economically beneficial use of the property." *Laurel Park*, 698 F.3d at 1188. For example, Plaintiffs have neither asserted nor introduced evidence that no firearms dealer will pay for a magazine or that modification of a magazine is economically impractical.

[7]    Judge Bumatay's dissent begins by asserting that, "[i]f California's law applied nationwide, it would require confiscating half of all existing firearms magazines in this country." Dissent by J. Bumatay at 1140. That dramatic assertion is inaccurate. The government seizes nothing; many owners are unaffected entirely; and all owners have several choices other than voluntary relinquishment of large-capacity magazines for destruction. More specifically, if every state adopted California's law, many owners of large-capacity magazines, such as current and retired law enforcement officers, would be able to keep them. Other owners would retain many options. For instance, they could modify the magazines to accommodate ten or fewer rounds; or they could sell the magazines to a firearms dealer (who could sell the magazines to buyers abroad or to those who remain authorized to possess them, such as the

thousands of current and retired law enforcement officers in this country).

Plaintiffs' facial regulatory takings claim fails for similar reasons. Assuming, without deciding, that a facial regulatory takings claim is ever cognizable, *id.* at 1189, Plaintiffs' claim fails because they have not introduced evidence of the "economic impact of the regulation on," or the "investment-backed expectations" of, any owner of a large-capacity magazine. *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646. Whatever merit there may be to an individual's *as-applied* regulatory takings claim, an issue that we do not reach in connection with this facial challenge, we cannot say on this record that a regulatory taking has necessarily occurred with respect to every owner of a large-capacity magazine.

Nor does the law on its face effect a physical taking. California reasonably chose to prohibit the possession of large-capacity magazines due to the danger that they pose to society. Nothing in the case law suggests that any time a state adds to its list of contraband—for example, by adding a drug to its schedule of controlled substances—it must pay all owners for the newly proscribed item. To the contrary, the Supreme Court has made clear that "the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers." *Lucas*, 505 U.S. at 1027, 112 S.Ct. 2886. Here, an owner of a large-capacity magazine may continue to use the magazine, either by modifying it to accept a smaller number of bullets or by moving it out of state, or the owner may sell it. On review of a facial challenge, we fail to see how those options are necessarily inadequate in all circumstances.

We do not read the Supreme Court's decisions in *Loretto*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868, and *Horne v. Department of Agriculture*, 576 U.S. 350, 135 S.Ct. 2419, 192 L.Ed.2d 388 (2015), as expansively as Plaintiffs do. In *Loretto*, 458 U.S. at 426, 102 S.Ct. 3164, the Court held that a mandated physical invasion of a landlord's real property for the installation of cable-television devices constituted a taking. The Court rejected, as "prov[ing] too much," the argument that a landlord could avoid the regulation by ceasing to rent the property. *Id.* at 439 n.17, 102 S.Ct. 3164. Similarly, in *Horne*, 576 U.S. at 361, 135 S.Ct. 2419, the Court held that a requirement that raisin growers and handlers grant the government possession and title to a certain percentage of raisins constituted

**ATTACHMENT**

**\*1113** a physical taking. The Court rejected the argument, "at least in this case," that no taking had occurred because grape farmers could avoid the raisin market altogether by, for example, making wine instead of raisins. *Id.* at 365, 135 S.Ct. 2419.

Those cases differ from this one in at least two material ways. First, unlike in *Loretto* and *Horne*, the government here in no meaningful sense takes title to, or possession of, the item, even if the owner of a magazine chooses not to modify the magazine, remove it from the state, or sell it. That California opted to assist owners in the safe disposal of large-capacity magazines by empowering law enforcement agencies to accept magazines voluntarily tendered "for destruction," Cal. Penal Code § 32310(d)(3), does not convert the law into a categorical physical taking.

Second, *Loretto* and *Horne* concerned regulations of non-dangerous, ordinary items—rental buildings and raisins, "a healthy snack." *Id.* at 366, 135 S.Ct. 2419. Like the Third Circuit, *ANJRPC*, 910 F.3d at 124 & n.32, we do not read *Loretto* and *Horne* as requiring a government to pay whenever it concludes that certain items are too dangerous to society for persons to possess without a modest modification that leaves intact the basic functionality of the item. *See Loretto*, 458 U.S. at 436, 102 S.Ct. 3164 (holding that a taking had occurred because the owner "can make no nonpossessory use of the property"). Mandating the sale, transfer, modification, or destruction of a dangerous item cannot reasonably be considered a taking akin to a physical invasion of a rental building or the physical confiscation of raisins. *See ANJRPC*, 910 F.3d at 124 (rejecting a similar takings challenge to a ban on large-capacity magazines because the owners can, among other things, sell or transfer the magazines or modify them to accept fewer rounds).

Because Plaintiffs' facial takings claim fails, we reverse the district court's grant of summary judgment to Plaintiffs on their takings claim.

**REVERSED and REMANDED for entry of judgment in favor of Defendant.**

GRABER, Circuit Judge, concurring

As the majority opinion explains, *District of Columbia*

*v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), does not provide a clear framework for deciding whether a statute does or does not violate the Second Amendment. Indeed, the Court recognized as much when it wrote:

> Justice BREYER chides us for leaving so many applications of the right to keep and bear arms in doubt .... But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field, any more than *Reynolds v. United States*, 98 U.S. 145 [, 25 L.Ed. 244] (1879), our first in-depth Free Exercise Clause case, left that area in a state of utter certainty.

*Id.* at 635, 128 S.Ct. 2783. But *Heller* does strongly suggest an analogy to the free speech guarantee of the First Amendment. For example:

–"Just as the First Amendment protects modern forms of communications, *e.g.*, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), ... the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582, 128 S.Ct. 2783.

–In regard to the extent of the Second Amendment right, the Court observed: "Of course the right [to keep and bear arms] was *not unlimited, just as the First* **\*1114** *Amendment's right of free speech was not, see, e.g.,* *United States v. Williams*, 553 U.S. 285, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008)." *Id.* at 595, 128 S.Ct. 2783 (emphasis added).

–"Other provisions of the Bill of Rights have similarly remained unilluminated for lengthy periods. This Court first held a law to violate the First Amendment's guarantee of freedom of speech in 1931, almost 150 years after the Amendment was ratified .... Even a question as basic as the scope of proscribable libel was not addressed by this Court until 1964, nearly two centuries after the founding." *Id.* at 625–26, 128 S.Ct. 2783 (citations omitted).

**ATTACHMENT**

–Rational-basis scrutiny cannot "be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech ... or the right to keep and bear arms." *Id.* at 628 n. 27, 128 S.Ct. 2783.

–And, finally:

> The First Amendment contains the *freedom-of-speech guarantee* that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong[-]headed views. *The Second Amendment is no different.* Like the First, it is the very *product* of an interest balancing by the people.

*Id.* at 635, 128 S.Ct. 2783 (first and second emphases added).

Under the First Amendment, we review laws that regulate speech under the standard of intermediate scrutiny; laws that "leave open ample alternative channels for communication of the information" and that place "reasonable restrictions on the time, place, or manner of protected speech" are permissible. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). By repeatedly drawing an analogy to the First Amendment's Free Speech Clause, *Heller* strongly suggests that intermediate scrutiny can apply to the Second Amendment, too. Accordingly, reasonable restrictions on the time, place, or manner of exercising the Second Amendment right to keep and bear arms are permissible if they leave open ample alternative means of exercising that right, the central component of which is individual self-defense. *Heller*, 554 U.S. at 599, 128 S.Ct. 2783.

Other courts, including ours, have applied the First Amendment analogy to analyze a Second Amendment challenge. We held in *Jackson v. City & County of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014), that "First Amendment principles" inform our analysis. In particular, "firearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not," and "laws which regulate only the '*manner* in which persons may exercise their Second Amendment rights' are less burdensome than those which bar firearm possession completely." *Id.* (quoting *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013)); *accord* *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 415 (4th Cir. 2021) ("Just as the First Amendment employs strict scrutiny for content-based restrictions but intermediate scrutiny for time, place, and manner regulations, the scrutiny in [the Second Amendment] context depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." (internal quotation marks omitted)); *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 198 (5th Cir. 2012) ("In harmony with well-developed principles that have guided our interpretation of the First Amendment, we believe that a law impinging upon the Second **\*1115** Amendment right must be reviewed under a properly tuned level of scrutiny—i.e., a level that is proportionate to the severity of the burden that the law imposes on the right."); *United States v. Decastro*, 682 F.3d 160, 167 (2d Cir. 2012) ("In deciding whether a law substantially burdens Second Amendment rights, it is therefore appropriate to consult principles from other areas of constitutional law, including the First Amendment (to which *Heller* adverted repeatedly)."); *Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("*Heller II*") ("As with the First Amendment, the level of scrutiny applicable under the Second Amendment surely depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." (internal quotation marks omitted)); *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) ("Borrowing from the Court's First Amendment doctrine" in formulating an appropriate test for Second Amendment challenges); *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (looking to "the First Amendment speech context" in applying intermediate scrutiny to a law that "is more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights").

Applying those principles here, intermediate scrutiny is the appropriate standard for assessing California's ban on large-capacity magazines. Other circuits have recognized, and I agree, that a ban on large-capacity magazines leaves open ample alternative means of self-defense. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

106, 118 (3d Cir. 2018) *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015). As the majority opinion describes more fully, citizens have a nearly unlimited array of weapons that they may use, and very close to 100% of instances of self-defense use fewer—typically far fewer—bullets than ten. But even considering a rare situation in which someone defending a home wishes to fire more than ten bullets in a short period of time, alternatives nevertheless remain: the shooter may carry more than one firearm, more than one magazine, or extra bullets for reloading the magazine. Because of the inconvenience of carrying more than one firearm or the delay of a few seconds while a magazine is changed, those options are not a perfect substitute for a single magazine loaded with scores of bullets. But alternative-means analysis does not require an exact match. *See, e.g.,* *Jackson*, 746 F.3d at 964 (applying intermediate scrutiny to San Francisco's requirement that a gun be kept in a safe at home when not carried on the person because "a modern gun safe may be opened quickly" and because "San Franciscans are not required to secure their handguns while carrying them on their person"); *Mastrovincenzo v. City of New York*, 435 F.3d 78, 101 (2d Cir. 2006) ("The requirement that ample alternative channels exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand." (internal quotation marks omitted)). Individuals plainly have ample alternative means for self-defense.

And, because the only practical effect of California's law is the inability of a shooter to fire more than ten bullets without pause, the regulation is akin to a reasonable manner restriction. As far as the challenged statute is concerned, a shooter may fire any firearm at all and as many times as the shooter chooses, but only in a manner that requires briefly pausing after ten shots. *See* *Heller II*, 670 F.3d at 1262 (holding that D.C.'s ban on large-capacity magazines was akin to a regulation of the **\*1116** manner in which speech takes place). In conclusion, because California's ban on large-capacity magazines imposes only a minimal burden on the Second Amendment right to keep and bear arms, intermediate scrutiny applies. The majority opinion explains why California's law meets that constitutional standard.

To be sure, the First Amendment and the Second Amendment differ in many important respects (including text and purpose), and the analogy is imperfect at best. *See* *Young v. Hawaii*, 992 F.3d 765, 827–28 (9th Cir. 2021) (en banc), *petition for cert filed*, (U.S. May 11, 2021) (No. 20-1639) (rejecting analogy to the First

Amendment's "prior restraint" doctrine when analyzing firearms-licensing laws). Among other things, firearms present an inherent risk of violence toward others that is absent in most First Amendment cases. *See* *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) (distinguishing the Second Amendment right from other fundamental rights on this ground, as one justification for refusing to apply strict scrutiny). Nonetheless, in my view *Heller* suggests that we should apply that analogy when appropriate. And I think that it is appropriate here to conclude that the challenged law is similar to a permissible "manner" restriction on protected speech.

BERZON, Circuit Judge, with whom THOMAS, Chief Judge, and PAEZ, MURGUIA, WATFORD, and HURWITZ, Circuit Judges, join, concurring

I concur in Judge Graber's principal opinion for the Court. I write separately to respond to the substance of the "text, history, and tradition" approach to Second Amendment legal claims, laid out in detail and advocated by Judge Bumatay's Dissent. Bumatay Dissent at 1140–59. In connection with that response, I shall offer a brief theoretical and historical defense of the two-step, tiered scrutiny approach used by eleven of the federal courts of appeal in Second Amendment cases. *See* Principal Opinion at 1099–1100 (referencing cases from the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and D.C. Circuits).

As I hope to demonstrate, the notion that judges can avoid so-called subjectivity—meaning, I gather, adjudging the validity of an arms-control regulation on the basis of their own biases rather than on the basis of ascertainable, self-limiting standards and procedures—more successfully under the "text, history, and tradition" approach than under the two-step, tiered scrutiny analysis is a simplistic illusion. Unlike the "text, history, and tradition" approach, the two-step, tiered scrutiny approach requires courts to show their work, so to speak, both to themselves and to readers and other courts. It incorporates historical analysis at the initial stage—that is, in considering whether a given kind of arms-related behavior falls within the scope of Second Amendment's protection at all. *See, e.g.,* *Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021) (en banc), *petition for cert. filed* (U.S. May 11, 2021) (No. 20-1639); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014). But where the available historical materials are either indeterminate, as here, Principal Opinion at

**ATTACHMENT**

1103, or indicate that the particular behavior *does* fall within the scope of the "right of law-abiding, responsible citizens to use arms in defense of hearth and home" that the Second Amendment was intended to protect, *District of Columbia v. Heller*, 554 U.S. 570, 616, 628, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), a court applying the two-step approach moves on to the second stage of the inquiry. That stage requires the court expressly to consider and carefully to calibrate **\*1117** the nature of the challenged regulation and the government interests at hand, exposing the court's analysis and interpretive choices to plain view.

In contrast, resort to text, history, and tradition alone when assessing the constitutionality of particular, discrete arms regulations (as opposed to when assessing broader questions regarding the general reach of the Second Amendment, as was undertaken in *Heller*, 554 U.S. at 576–628, 128 S.Ct. 2783) obscures the myriad decisions that underlie coming to a resolution regarding the validity of a specific arms regulation using such an analysis. And so, far from limiting judicial discretion, the "text, history, and tradition" approach draws a veil over a series of decisions that are not preordained and that materially impact the outcome in any given case.

Additionally, the notion that text, history, and, especially, "tradition" are objectively ascertainable disregards what linguists, historians, and anthropologists have long recognized: language can be indeterminate, especially as time passes; ascertaining what happened in the past is contingent and variable, because both the data available and the means of structuring and analyzing that data vary over time; and "tradition" is a term with little stable meaning, both as to the time period it takes for a "tradition" to become established and as to the individuals or communities whose habits and behaviors are said to establish a "tradition."

In short, the appeal to objectivity in the Bumatay Dissent, while alluring, is spurious, as the "text, history, and tradition" approach is ultimately an exercise in wishful thinking. There is good reason that jurists have come to favor application of the tiered scrutiny approach to many forms of constitutional adjudication, including in Second Amendment cases. The tiered scrutiny approach requires judges carefully to attend to their own thought processes, keeping their eyes open, rather than closed, to the aspiration of bias-free and objective decisionmaking.

## I.

An evaluation of the text of the Second Amendment and the history and traditions of our nation are assuredly important considerations in any case involving the Second Amendment. "[T]he Supreme Court's guidance in *Heller* and *McDonald* ... looked extensively to history, text, and tradition in discussing the scope of the Second Amendment right." Principal Opinion at 1100; *see also Young*, 992 F.3d at 783–84; *Teixeira*, 873 F.3d at 682; *Jackson*, 746 F.3d at 960. The principal opinion recognizes the important role that text, history, and tradition play in a Second Amendment case, noting that those considerations factor into both parts of the Court's two-step analysis. Principal Opinion at 1100–01. Specifically, text, history, and tradition "greatly inform step one of the analysis, where we ask whether the challenged law implicates the Second Amendment," and they "also inform step two, where we choose strict scrutiny, intermediate scrutiny, or no scrutiny at all (as in *Heller*) by examining the effect of" a disputed law "on the core of the Second Amendment right as traditionally understood." *Id.*

Judge Bumatay agrees that the text, history, and tradition of the Second Amendment should guide our inquiry with respect to the overall scope of the Second Amendment. Bumatay Dissent at 1140, 1142–43. But his proposition is that those three factors must also be *dispositive* with respect to the question whether any given gun regulation, no matter how discrete, is constitutional. *Id.* In other words, under his view, *every* Second Amendment case **\*1118** should begin *and end* with an examination of text, history, and tradition. *Id.*

According to the Bumatay Dissent, precedent directs us to "dispense[ ]" with the principal opinion's two-step, tiered scrutiny approach and replace it with the "text, history, and tradition" test. *See, e.g.*, Bumatay Dissent at 1140–41, 1142, 1143–44. Judge Graber's opinion for the Court explains why that precedent-based argument is mistaken, Principal Opinion at 1100–01, as does Judge Ginsburg's majority opinion for the D.C. Circuit in *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1264–67 (D.C. Cir. 2011). I do not repeat that discussion.

Aside from the incorrect precedent argument, the Bumatay Dissent maintains, principally, that the "text, history, and tradition" test should govern Second Amendment legal disputes because it is inherently more objective and less subject to manipulation than the two-step approach. *See, e.g.*, Bumatay Dissent at 1142–44,

ATTACHMENT

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

1148–51. Contrary to that assertion, there are several reasons why text and history and, especially, tradition fall short of the judge-constraining attributes with which they are endowed by Judge Bumatay and the (uniformly non-controlling) appellate opinions on which he relies. *See* Bumatay Dissent at 1145–47. This concurrence will explain why a framework that relies exclusively on text, history, and tradition to adjudicate Second Amendment claims provides only the aura, but not the reality, of objectivity and resistance to manipulation based on a judge's supposed biases when applied to discrete regulations governing activity that falls within the scope of the Second Amendment, as that scope was determined by 📙 *Heller.*[1]

[1] There is no reason to think that "personal motives" such as a distaste for firearms or a lack of familiarity with firearms influenced the outcome of this case. Hurwitz Concurrence at 1138–40. A judge's obligation is to be aware of their biases and vigorously avoid using them to decide cases, not to bleach their minds, an impossibility. *See, e.g., Miles v. Ryan,* 697 F.3d 1090, 1090–91 (9th Cir. 2012).

**A.**

Beginning with the "text" prong of the "text, history, and tradition" framework, the evolution of language over time poses a significant problem. Words do not have inherent meaning. To the contrary, the meaning of a text depends in large part on "how the interpretive community alive at the time of the text's adoption understood" the words as they were used in the text, and that understanding is unlikely to match the understanding of a future interpretive community. Frank H. Easterbrook, *Foreword* to Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts xxv (2012).

This problem arises frequently in textual interpretation cases involving "statutes of long-standing vintage." 📙 *United States v. Kimsey,* 668 F.3d 691, 699–701 (9th Cir. 2012). To be sure, it is not impossible to navigate this difficulty and avoid erring in some such cases, *see, e.g., id.* 📙 But the older a text is, the more distant we become from the interpretive community alive at the time of the text's adoption, and the less able we are to approach a text

through the perspective of such people. Easterbrook, *supra,* at xxv. There comes a point where the original meaning of the text "is no longer recoverable reliably," as it has simply been lost to the passage of time. *Id.* When problems of this kind surface in Second Amendment cases involving the constitutionality of discrete firearm regulations, the text of the Second Amendment is unlikely to offer a dependable solution.

**\*1119** More importantly for present purposes, although the word "text" appears in the title of the Bumatay Dissent's "text, history, and tradition" test, the language of the Second Amendment does not play much of an operative role in the Dissent's application of that test to the large-capacity magazine regulation here challenged, and for good reason. As the reasoning of the Dissent illustrates, the primary focus of the "text, history, and tradition" framework, as applied to specific regulations, is, unsurprisingly, on evidence of our nation's history and traditions. Bumatay Dissent at 1150–59. The language of the Constitution was necessarily drafted at a high level of abstraction. Its broad language becomes less informative the more specific the inquiry at issue, and textual analysis therefore often plays only a minimal role in analyzing how a constitutional provision applies to a specific regulation. Put differently, although the language of the Second Amendment played a vital role in determining the overall scope of the Amendment in 📙 *Heller,* 554 U.S. at 576–603, 128 S.Ct. 2783, the Amendment's text is unlikely to provide much guidance in cases involving the validity of discrete regulations. The "text" prong of the "text, history, and tradition" approach is therefore unlikely to yield ascertainable answers in cases where the Second Amendment's general language is applied to narrow, particular regulations targeting modern arms devices. I therefore concentrate my critique on the "history" and "tradition" prongs of the Bumatay Dissent's "text, history, and tradition" approach.

**B.**

The "history" prong, when relied upon as a mandatory, independently dispositive element of the "text, history, and tradition" approach, as applied to discrete regulations, has considerable shortcomings. To begin, without expressing any opinion regarding the actual accuracy of the historical analysis embedded in the 📙 *Heller* decision—which would be inappropriate, given that

**ATTACHMENT**

*Heller* is controlling precedent—I note that many "historians, scholars, and judges have ... express[ed] the view that the [Supreme Court's] historical account was flawed." *McDonald v. City of Chicago*, 561 U.S. 742, 914, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (Breyer, J., dissenting) (citing David Thomas Konig, *Why the Second Amendment Has a Preamble: Original Public Meaning and the Political Culture of Written Constitutions in Revolutionary America*, 56 UCLA L. Rev. 1295 (2009); Paul Finkelman, *It Really Was About a Well Regulated Militia*, 59 Syracuse L. Rev. 267 (2008); Patrick J. Charles, *The Second Amendment: The Intent and Its Interpretation by the States and the Supreme Court* (2009); William G. Merkel, The District of Columbia v. Heller *and Antonin Scalia's Perverse Sense of Originalism*, 13 Lewis & Clark L. Rev. 349 (2009); Nathan Kozuskanich, *Originalism in a Digital Age: An Inquiry Into the Right to Bear Arms*, 29 J. Early Republic 585 (2009); Saul Cornell, *St. George Tucker's Lecture Notes, the Second Amendment, and Originalist Methodology: A Critical Comment*, 103 Nw. U. L. Rev. 1541 (2009); Richard A. Posner, *In Defense of Looseness: The Supreme Court and Gun Control*, New Republic, Aug. 26, 2008 ("*In Defense of Looseness*"); Richard A. Epstein, *A Structural Interpretation of the Second Amendment: Why* Heller *Is* (*Probably*) *Wrong on Originalist Grounds*, 59 Syracuse L. Rev. 171 (2008)); *see also* Robert J. Spitzer, *Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning* 146–48 (2008); Dennis Baron, **\*1120** *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 Hastings Const. L.Q. 509, 510–11, 513 (2009); Noah Shusterman, *Armed Citizens* 223–24 (2020).

We are, of course, bound by the conclusion *Heller* drew from historical materials regarding the protection accorded by the Second Amendment to the individual right to keep and bear arms for self-defense, and I do not mean to suggest that that conclusion should be revisited. Rather, the salient fact for present purposes is that many jurists and scholars well-educated on the subject fundamentally disagree with the Supreme Court's historical analysis in *Heller*, demonstrating that Second Amendment history is very much open to dispute.

The Bumatay Dissent nonetheless characterizes history as both certain and static, as if we can obtain an enduring understanding of what happened in the past after engaging in a single, meticulous review of cut-and-dried evidence. *See, e.g.*, Bumatay Dissent at 1148–49. But our understanding of history is, in fact, ever-changing. For one thing, we unearth new historical documents over time, and those documents sometimes lead us to revise

our earlier understandings of history. *Cf.* Josh Blackman & James C. Phillips, *Corpus Linguistics and the Second Amendment*, Harv. L. Rev. Blog, Aug. 7, 2018. The advent of the internet and other tools has also dramatically changed our ability to access and systematically review historical documents. When *Heller* was decided, for example, the Supreme Court had access to "only a fairly narrow range of sources" regarding the common usage of the Second Amendment's terms at the time the Second Amendment was drafted. *Id.* Now, there are enormous databases of historical documents, including one overseen by Brigham Young University that comprises about one hundred thousand works produced between 1760 and 1799, such as letters, newspapers, sermons, books, and journals. *Id.* The ability to perform electronic searches using such databases has led to substantial new discoveries regarding our nation's history, including hypotheses related to the meaning of the term "keep and bear arms" in the Second Amendment. *Id.*

Society also progresses over time, resulting in changed attitudes that may in turn affect our view of history. Take the Reconstruction Era as an example. A "traditional portrait" of the era, showcased in films like *Birth of a Nation* and embraced for much of the twentieth century, framed President Andrew Johnson as a hero who restored home rule and honest government to the South in a triumph over radical Northerners, who sought to plunder the spoils of the region, and childlike freedmen, who were not prepared to exercise the political power that had been foisted upon them. Eric Foner, *Reconstruction Revisited*, 10 Revs. Am. Hist. 82, 82–83 (1982). But in the 1960s, following the Second Reconstruction and a change in attitude toward people of color, the narrative flipped. Freedmen were recast as heroes, white Southerners as villains, and the Reconstruction governments as far more competent than had previously been let on. *Id.* at 83–84. A decade later, wary of exaggerating the faults and virtues of the people of the time, historians rejected both accounts and began questioning whether "much of importance happened at all" during the Reconstruction Era. *Id.* at 84–85. The dominant account of the Reconstruction Era has continued to evolve over time, both because new scholars, many of them scholars of color, have contributed to the conversation, and because the events of the period appear quite different from the vantage point of passing time. *Id.* at 86–95. In other words, interpreting history is not as simple as compiling and processing stacks of paper. *See also, e.g.*, David W. Blight, *Historians and "Memory,"* Common Place, Apr. 2002; Jonathan Gienapp, **\*1121** *Constitutional Originalism and History*, Process: A Blog for American History (Mar. 20, 2017), http://www.processhist ory.org/originalism-history/.

**ATTACHMENT**

Additionally, judges are not trained historians, and the study of history is rife with potential methodological stumbling blocks. The volume of available historical evidence related to the legal question in any discrete Second Amendment controversy, for example, will vary enormously and may often be either vast or quite sparse.

On the one hand, for legal questions as to which there is a wealth of historical evidence, an imprecise research methodology can lead to what has been "derisively referred to ... as 'law office history.'" *In Defense of Looseness, supra.* As then-Judge Posner explained it, "law office history" refers to a process by which a judge or advocate "sends his law clerks" or associates "scurrying to the library and to the Web for bits and pieces of historical documentation" that will support a given position on a legal issue. *Id.* When the clerks or associates are "numerous and able," when they "enjoy[ ] the assistance of ... capable staffs" such as the staff at the Supreme Court library, or when they can rely on similar labor distilled into "dozens and sometimes hundreds of amicus curiae briefs," it becomes "a simple matter ... to write a plausible historical defense" of the desired position. *Id.* Accordingly, even if an opinion appears to rely on a "breathtaking" number of historical references, the underlying analysis may not constitute "disinterested historical inquiry," but may instead represent "the ability of well-staffed courts" or firms to pick from among the available historical sources those most conducive to a given proposition. *Id.*

To so recognize is not to suggest that judicial inquiries under the "text, history, and tradition" test—as opposed to the inquiries of advocates, which are necessarily result-driven—would be directed in advance at reaching a foreordained result. Rather, the inquiries would be directed at reaching *a* result, which necessitates marshaling the available historical materials such that they support a single legal conclusion. *See, e.g.*, Avani Mehta Sood, *Motivated Cognition in Legal Judgments—An Analytic Review*, 9 Ann. Rev. L. & Soc. Scis. 307, 308–10 (2013). But history, assessed in a genuinely neutral fashion, may not support one conclusion. Instead, it may support conflicting conclusions or no conclusion at all.

Although a historical account with a thesis or viewpoint may read better than one that acknowledges ambiguity or irresolution, historians are trained to sift through materials with an underlying acceptance that the materials may or may not support one conclusion or another, or that the conclusions that can be drawn from the evidence may evolve over time. Put differently, historians need not

resolve apparent contradictions and may follow the evidence where it leads. *See* Gienapp, *supra.* Courts do not have that luxury. Judges must definitively answer specific, detailed legal questions—here, whether the Second Amendment permits states to ban high-capacity magazines that allow a weapon to fire more than ten rounds without reloading. That need to provide an answer—referred to in the literature as "motivated thinking" or "motivated reasoning," *see, e.g.*, Sood, *supra*—can skew a court's historical analysis, much as scientific research can be undermined by the desire to make some discovery rather than none, *see, e.g.*, Danielle Fanelli & John P. A. Ioannidis, *U.S. Studies May Overestimate Effect Sizes in Softer Research*, Proc. Nat'l Acad. Scis. U.S., Sept. 10, 2013, at 1–6.

**\*1122** On the other hand, an inquiry into some legal questions—such as the question whether a specific contemporary arms regulation is lawful under the "text, history, and tradition" test—may turn on a very narrow array of available historical resources. As the Supreme Court recognized in the context of a Title VII dispute, "small sample size may, of course, detract from the value" of evidence. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). This Court has so recognized as well, noting that if an inquiry relies on an unduly small number of data points, it will have "little predictive value and must be disregarded." *Morita v. S. Cal. Permanente Med. Grp.*, 541 F.2d 217, 220 (9th Cir. 1976). This "small sample size" problem has been discussed in numerous scholarly contexts, including with respect to historical analyses involving firearms. *See, e.g.*, James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 Wm. & Mary L. Rev. 1777, 1826 (2002) (maintaining that a scholar published a book that made unsubstantiated claims about gun ownership in America based on faulty science, including a failure to account for and report sample sizes). So there may be occasions in which the universe of available historical evidence is too small for courts to draw reliable conclusions, rendering the "history" prong of the "text, history, and tradition" framework inoperable.

Sample size issues and the drive to draw a single legal conclusion are not the only potential methodological pitfalls for the "text, history, and tradition" test. Cognitive biases ranging from confirmation bias to anchoring bias, *see, e.g.*, Daniel Kahneman, *Thinking Fast and Slow* 80–81, 119–28, 324, 333 (2011), can cloud a judge's analysis.[2] And very few judges have received formal training on technical elements of historiographical research design, such as the importance of drawing from varied sources and assessing sources to ferret out potential

**ATTACHMENT**

bias imparted by the author. The risk that error will result from these imperfections in the "history" prong of the "text, history, and tradition" framework counsels against adopting the framework as the *controlling* test for *all* Second Amendment disputes, as opposed to relying on history as a useful tool embedded in a structured, sequential inquiry such as the two-step, tiered scrutiny approach.

> [2]      Confirmation bias refers to the tendency to interpret new information as confirmation of one's pre-existing assumptions or theories. Anchoring bias refers to the tendency to over-rely on the initial evidence we discover as we learn about a given topic. *See id.*

### C.

As flawed as the suppositions of objectivity and certainty are for the "text" and "history" prongs of the Bumatay Dissent's proposed framework, as applied to discrete regulations, the focus on "tradition" is even more problematic with regard to those supposed virtues. Courts have "vast discretion in deciding which traditions to take into account" and "substantial discretion in determining how to define the tradition at issue." John C. Toro, *The Charade of Tradition-Based Substantive Due Process*, 4 N.Y.U. J. L. & Liberty 172, 181 (2009). Additionally, even if a court finds that tradition does support a given legal outcome, the court "must take the further step of determining whether" that tradition "*should* receive modern-day protection—an inquiry which depends heavily" on the court making a contextual judgment that accounts for the contemporary legal milieu. *Id.*

In particular, a foundational question plaguing any tradition-based framework is "[w]hose traditions count." *Id.* at 181. For example, in several substantive due process **\*1123** cases such as *Lawrence v. Texas*, 539 U.S. 558, 567–68, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), the Supreme Court appealed to historical attitudes going back to ancient times to support its interpretation. Toro, *supra*, at 181–83. But when determining in *Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), whether individuals have a right to physician-assisted suicide, the Supreme Court disregarded a trove of ancient history supporting the practice even though that history had been extensively referenced in the opinion on

review, and instead began its analysis by citing commentators from the thirteenth century. *Id.* at 710, 117 S.Ct. 2258; *see also* Toro, *supra*, at 183–85. Whereas ancient authorities were, by and large, tolerant of suicide, St. Augustine's interpretation of the demands of the Fifth Commandment drastically reshaped the way Western societies viewed the subject by the time of the thirteenth century. Toro, *supra*, at 184–85. The Supreme Court chose to begin its analysis at that point and, accordingly, held that the right to physician-assisted suicide is not deeply rooted in tradition. *Glucksberg*, 521 U.S. at 735, 117 S.Ct. 2258.

As this example illuminates, a framework that relies heavily on tradition is inherently indeterminate, because it often depends upon the choice of traditions on which to rely. My point is not that such choices are illegitimate—courts have to make decisions between competing legal positions, and such decisions necessarily require choices—but instead that there *are* choices that must be made in appealing to tradition. Without transparency as to those choices and a structured procedure for making those choices, the pretense of objectivity collapses.

Moreover, there are frequently traditions that support each side of a constitutional controversy. *Id.* at 186. A framework focused predominantly on tradition leaves litigants free to cherry-pick from those traditions to justify their preferred results. *Id.*

In *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), for example, the Supreme Court addressed the constitutionality under the Fourteenth Amendment's Due Process Clause of a California statute providing that "a child born to a married woman living with her husband is presumed to be a child of the marriage." *Id.* at 113, 109 S.Ct. 2333 (plurality opinion). The natural father of an adulterously conceived child brought suit, arguing that the law infringed upon his and the child's due process right to maintain a relationship with one another. *Id.* Justice Scalia, writing for the plurality, disagreed, concluding that "our traditions have protected the marital family" and have generally declined to afford rights to the natural father of an adulterously conceived child. *Id.* at 124–27 & n.6, 109 S.Ct. 2333.

Justice Brennan, in dissent, maintained that rather than focusing on historical traditions related to the rights of an adulterous natural father, the Court should instead focus on the historical tradition of affording great respect to the parent-child relationship. *Id.* at 139, 109 S.Ct. 2333. In

**ATTACHMENT**

defending that position, Justice Brennan noted that the concept of tradition "can be as malleable and as elusive as 'liberty' itself," and admonished the plurality for "pretend[ing] that tradition places a discernible border around the Constitution." *Id.* at 137, 109 S.Ct. 2333. Although that "pretense is seductive" because "it would be comforting to believe that a search for 'tradition' involves nothing more idiosyncratic or complicated than poring through dusty volumes on American history," "reasonable people can disagree about the content **\*1124** of particular traditions" and about "which traditions are relevant." *Id.*

With respect to the Second Amendment, historical sources from the Founding Era through the late nineteenth century indicate that members of the public held vastly different views on gun ownership and gun regulation depending on where they lived, both in terms of geographical region and in terms of whether the individual lived in an urban or rural environment. *See, e.g.*, Joseph Blocher & Darrell A. H. Miller, *The Positive Second Amendment: Rights, Regulation, and the Future of* Heller 20, 29–35 (2018); Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82, 112–21 (2013). Because a litigant who advocates a certain outcome may cite predominantly to authorities from a region or locality that tends to support the litigant's view, the "tradition" prong of the "text, history, and tradition" test is highly manipulable. Indeed, this aspect of the approach renders it akin, in many ways, to an analysis of legislative intent—a practice rejected by textualists because the "legislature is a hydra-headed body whose members may not" share a common view. Richard A. Posner, *Reflections on Judging* 189 (2013); *see also* Gienapp, *supra*. Similarly, the annals of history and lore rarely divulge a common view on what practices qualify as traditional.

Relatedly, there are often permissive and restrictive traditions that "cut in opposite directions." Toro, *supra*, 189. In the context of a case involving a patient's right to refuse life-prolonging medical treatment, for example, the Supreme Court had to choose between two traditions—one permissive tradition of allowing the state to regulate suicide, and one restrictive tradition of forbidding states from interfering in private medical decisions involving refusal of treatment. *Cruzan ex rel. Cruzan v. Dir., Mo. Dept. Health*, 497 U.S. 261, 269–82, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). The Supreme Court ultimately ruled in favor of the restrictive tradition, but, from the perspective of adhering to our nation's traditions, the opposite conclusion would have also been justified.

So far, no jurist or academic has come forward with a workable method of choosing between conflicting restrictive and permissive traditions. *See* Toro, *supra*, at 190–91. Crucially, for our purposes, the "text, history, and tradition" test provides no guideposts on how a court should navigate indistinct traditions or weigh between conflicting traditions, and it therefore cannot provide a workably objective or bias-filtering framework for adjudicating Second Amendment controversies regarding discrete, specific regulations.

Even if there is only one relevant tradition at issue within a given case, there is still the problem of deciding how narrowly or broadly to define the tradition. That choice can be outcome determinative regarding the court's assessment of the impact of the given tradition on, for example, the validity of a specific arms regulation. *Id.* at 186. A historical prohibition on carrying firearms in "fairs, markets, and in the presence of the King's ministers," for example, "could support regulations of wildly different scope: wherever people congregate, wherever the state is in control, wherever people buy things, or wherever government agents are stationed." Blocher & Miller, *supra*, at 130; *see also* Peter J. Smith, *Originalism and Level of Generality*, 51 Ga. L. Rev. 485, 487 (2017); Frank H. Easterbrook, *Abstraction and Authority*, 59 U. Chi. L. Rev. 349, 358 (1992).

According to an analysis of fifty recent Second Amendment opinions, a court's decision to use a higher level of generality when describing the core legal question in a given dispute usually supported striking down a challenged arms regulation, whereas **\*1125** a court's decision to use a lower degree of generality typically led to the law being upheld. Mark Anthony Frassetto, *Judging History: How Judicial Discretion in Applying Originalist Methodology Affects the Outcome of Post-Heller Second Amendment Cases*, 29 Wm. & Mary Bill Rights J. 413, 415, 438–39 (2020). In the context of public carry disputes, for example, the study found that "[j]udges favoring a broad right to carry in public have generally framed the question as whether the Second Amendment protects a right to carry arms in public at all," whereas "judges who have favored upholding public carry restrictions have" phrased the question more narrowly, characterizing the question as "whether carrying a concealed weapon in public was understood to be within the scope of the right protected by the Second Amendment at the time of ratification." *Id.* at 439–41 (citation omitted). As this discussion highlights, several factors inherent in the "tradition" inquiry can have a dispositive impact on the outcome of a legal dispute. A mandatory, rigid "text, history, and tradition" framework, contrary to the assertions of its proponents, provides no objective method for navigating such factors that would ensure objectivity and consistency in the law.

ATTACHMENT

Next, even if an asserted right does find support in a relevant tradition and even if courts can agree on the proper way to characterize that tradition, courts would still be left with the problem of determining whether a particular tradition should be carried forward as constitutionally sanctioned. That determination necessarily involves, albeit behind a veil, policy and value-balancing judgments of the kind that the Bumatay Dissent claims the "text, history, and tradition" test would avoid.

Our nation's history includes many traditions that would not now be accorded constitutional protection. *See* Toro, *supra*, at 193. One example that has been given is the now-rejected assumption that a woman is subject to her husband's control and governance, a concept that gave rise to the widespread doctrinal rule at common law that a husband could not be convicted of sexually assaulting his wife. *Id.* If a man sought constitutional protection for "the right to have forcible intercourse" with his wife, his claim would, unfortunately, find ample support in our nation's history and traditions. *Id.*; *see also, e.g.,* Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 257–62, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (holding that private race discrimination in places of public accommodation, although traditional at the time, could be constitutionally forbidden). A test that places great weight on historical traditions can undermine the very bedrock of constitutional governance, by overriding later, well-accepted legislative policies and by precluding the judiciary from deriving and applying principles of constitutional interpretation capable of adjudging when our practices, however traditional, have deviated from our nation's precepts.

Considering in this regard the Second Amendment in particular, racially discriminatory gun regulations have been commonplace throughout our nation's history, ranging from statutes that expressly singled out people of color in their text, to statutes that disproportionately impacted people of color, such as prohibitions on the sale of certain less costly guns. Br. of Amicus Curiae Rutherford Institute in Supp. Of Pet'rs at 13–18, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (July 20, 2021). Although a court would invalidate such a law in the modern day under the Equal Protection Clause, it is notable that the "text, history, and tradition" test itself provides no mechanism to distinguish unjust or unconstitutional traditions, such as the tradition of having race-based arms restrictions, from other traditions.

**\*1126** In short, the tradition prong of the "text, history, and tradition" test offers even less guidance on the

validity of discrete arms regulations under the Second Amendment than the already inadequate "text" and "history" prongs. It thereby invites inconsistency in the law and reliance of judges on their own personal policy preferences, contrary to the purported attributes of the approach touted by Judge Bumatay and by others who have supported the adoption of the "text, history, and tradition" test.

### D.

The "text, history, and tradition" approach, as laid out in the Bumatay Dissent, suffers from two major additional defects. First, a key aspect of the rubric—the one most emphasized by the Dissent, *see* Bumatay Dissent at 1151–57—is whether a particular weapon, ammunition, or other arms-related hardware is "in common use at the time." Heller, 554 U.S. at 627, 128 S.Ct. 2783 (quoting United States v. Miller, 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)). If so, the Bumatay Dissent posits, the device should receive Second Amendment protection.

But *when* must a device be in "common use" to receive protection? Apparently, at the time of a court's decision. Bumatay Dissent at 1139–40, 1140–41, 1155–57 (reasoning that large-capacity magazines "are owned by millions of people nationwide" and "enjoy widespread popularity today"); *see also* VanDyke Dissent at 1170–71 (discussing the present-day popularity of high-capacity weapons and relying on that evidence when assessing which weapons are "in common use"). Federal courts of appeal have indeed largely relied upon present-day statistical data when discussing whether a weapon qualifies as "in common use at the time." Blocher & Miller, *supra*, at 89 & n.126.[3] But, as our colleagues on the Seventh Circuit explained, "relying on how common a weapon is at the time of litigation would be circular." Friedman v. City of Highland Park, 784 F.3d 406, 409 (7th Cir. 2015). "[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it" which, in turn, prevented the weapon from becoming commonly owned. Id. In other words, "[a] law's existence can't be the source of its own constitutional validity." Id.; *see also* Blocher & Miller, *supra*, at 89 ("law-abiding people [must] choose weapons from among the weapons that are lawful to possess, leading to the seemingly circular result that what is

ATTACHMENT

[3]  An unanswered question regarding this interpretation of the "common use" inquiry is what metric a court should apply when determining whether a weapon qualifies as in common use. "One can come to quite a range of conclusions" regarding the prevalence of the same weapon "depending on whether one calculates common use by absolute numbers, by absolute dollars, or by the percentage of the market," whether that be the market for firearms in general, for the specific type of firearm at issue, "or for all self-defense technology." Blocher & Miller, *supra*, at 89 (citing Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1480 (2009)).

To regard an arms-related device's popularity as "the source of its own constitutional[ity]" is no less circular. Devices may become popular before their danger is recognized and regulated, or the danger of a particular device may be exacerbated by external conditions that change over time. And a device may become popular because of marketing decisions made by manufacturers that limit the available choices. Here, for example, large-capacity magazines **\*1127** come as a standard part on many models of firearms, so a consumer who wants to buy those models has no choice regarding whether the weapon will include a magazine that can fire more than ten rounds without reloading. Principal Opinion at 1096–97, 1107–08. In any event, the prevalence of a particular device *now* is not informative of what the Second Amendment encompassed when adopted, or when the Fourteenth Amendment was added to the Constitution, or when the Second Amendment was declared incorporated into the Fourteenth Amendment and so applicable to state and local governments in McDonald, 561 U.S. at 791, 130 S.Ct. 3020 (plurality opinion).

This is not to say that new weapons do not receive Second Amendment protection. To the contrary, Heller makes clear that the Second Amendment protects "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Heller, 554 U.S. at 582, 128 S.Ct. 2783; see also Caetano v. Massachusetts, 577 U.S. 411, 411–12, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016). And an assessment of prevalence must play *some* role in a court's analysis;

Heller explained that the Second Amendment's protection extends only to those weapons commonly used "by law-abiding citizens for lawful purposes." Heller, 554 U.S. at 624–25, 627, 128 S.Ct. 2783; see also Fyock v. Sunnyvale, 779 F.3d 991, 997–98 (9th Cir. 2015).

Notably, however, Heller focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon. The Supreme Court explained that, at the time of the Second Amendment's adoption, "all citizens capable of military service ... would bring the sorts of lawful weapons that they possessed at home to militia duty" and although "[i]t may well be true today that a militia, to be as effective as militias in the [eighteenth] century, would require [more] sophisticated arms," such "modern developments" cannot change the scope of the Second Amendment right, which remains rooted in that original rationale. Id. at 627–28, 128 S.Ct. 2783. The Bumatay Dissent's excessive focus on the current prevalence of high-capacity magazines is therefore misplaced, as a proper analysis must account for the purpose and use of a weapon in addition to its current popularity.

This discussion also surfaces another defect in the "text, history, and tradition" test—namely, the framework provides courts with little to no guidance in cases involving the regulation of new and emerging weapons technologies. Presumably, history and tradition will either be silent on or offer very little insight into the constitutionality of measures aimed at such weapons, since, by definition, the weapons lack a historical pedigree.

Heller approves of the practice of adopting new regulations in the face of new technologies, as it expressly indicates that bans on the private possession of machine guns are valid. 554 U.S. at 624, 128 S.Ct. 2783. Such bans arose gradually in the 1920s and 1930s after machine guns became widespread, more than 130 years after the states ratified the Second Amendment. Friedman, 784 F.3d at 408. And "[n]othing in Heller suggests that a constitutional challenge to bans on private possession of machine guns brought during the 1930s, soon after their enactment, should have succeeded." Id.

It appears likely that in many Second Amendment cases, courts will be called upon to assess whether a regulation targeting new and emerging weapons technologies adheres to the commands of the Second Amendment.

ATTACHMENT

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

Now-Justice Kavanaugh, in *Heller II*, responded to this concern by stating that courts must "reason by analogy from history and tradition." **\*1128** *Heller II*, 670 F.3d at 1275. But resort to analogy can go only so far, as it does not provide room to account for contemporary circumstances not foreseeable at the time of the Second Amendment's adoption or incorporation. Additionally, reasoning by analogy in these circumstances would have no guiderails and would be subject to the "level of generality" concerns discussed above. *See supra* pp. 1124–25.

In sum, because the "text, history, and tradition" test does not adequately account for the primary purpose of currently popular weapons technologies and does not speak to how courts should analyze regulations targeting new and emerging technologies, the framework is, for those reasons as well, inadequate for addressing the constitutionality of specific gun regulations.

\* \* \*

We are, of course, bound by *Heller*, which directs us to consider the text of the Second Amendment and our country's history and traditions when determining the general scope of the Second Amendment right. But a framework that relies exclusively on those considerations simply does not provide an administrable framework for adjudicating Second Amendment controversies once a court's analysis moves beyond the overall scope of the Second Amendment and into the constitutionality of specific gun measures. As the Supreme Court of Ohio helpfully summarized, the "text, history, and tradition" test is not workable because it leaves the following critical questions unanswered:

> What should a court do when [text, history, and tradition] do not provide a clear answer? If the [district court] reviewed this case again and found the historical record unclear, would we not be right back where we started? More generally, how would the dissenting opinion address the concern that historical evidence can be viewed in different ways by different people? How would it deal with an argument that changed circumstances make reliance on certain Framing Era practices unjustified? Would it reject that

> notion reflexively on the ground that modern concerns are wholly irrelevant under the text-history-and-tradition-based approach? Or does it acknowledge that present-day judgments have a role to play? ... Does one simply look for an historical analogue to the law at issue? And if analogues exist, how widespread must they be? How does one deal with modern technologies and circumstances that did not exist at the time of the Founding?

*State v. Weber*, 163 Ohio St. 3d 125, 139–40, 168 N.E.3d 468 (2020), *cert. denied*, —— U.S ——, 142 S.Ct. 91, 211 L.Ed.2d 22(2021). Because the "text, history, and tradition" approach does not fill these gaps, it cannot supply both a necessary *and sufficient* condition for striking down a law which seeks to regulate the Second Amendment right. Nor, for the reasons I have surveyed, is the "text, history, and tradition" test the objective, principled method for adjudicating Second Amendment legal controversies that the Bumatay Dissent repeatedly insists that it is.

In contrast, the two-step, tiered scrutiny framework—which I discuss more fully in Part III—consistently applied in Second Amendment cases in this Court and in ten other Circuits, *see* Principal Opinion at 1099–1100, offers two cures for the key defects in the propounded "test, history, and tradition" approach. Specifically, under the two-step approach, a court may forthrightly recognize that, as to a specific form of contemporary regulation, the historical record is thin or inconclusive. The court may then move forward with its analysis by assuming without deciding that the Second Amendment is nevertheless implicated by the policy or regulation at issue, **\*1129** as the principal opinion does here. Principal Opinion at 1103 (citing several additional examples). Moreover, the two-step approach provides guidance regarding a court's proper steps once ambiguity in the available materials is acknowledged, thereby *constraining* judicial discretion at that juncture. Once a court moves on to step two, it must decide what level of heightened scrutiny applies, and then engage in a relevant, above-board, tiered analysis. *Id.* at 1099–1100, 1103–1111. Under the "text, history, and tradition" approach, by contrast, the well runs dry as soon as the court has exhausted the text of the Second Amendment and evidence of our nation's history and traditions, even when those factors are, by any fair evaluation, indeterminate. The "text, history, and

**ATTACHMENT**

tradition" approach therefore obscures, rather than reveals and channels, the pivotal decisionmaking process, leaving judges with unfettered and unexamined discretion once a court's regulation-specific Second Amendment analysis moves beyond incontestable history and tradition, as it is often bound to do.

## II.

The Bumatay Dissent provides a powerful illustration of the shortcomings of the "text, history, and tradition" approach. Beginning with the "common use" inquiry, the Dissent repeatedly emphasizes that large-capacity magazines are currently prevalent, but it spends close to no time discussing the primary purpose or use of such weapons, instead simply asserting that the weapons are "commonly used by Americans for lawful purposes." *See, e.g.*, Bumatay Dissent at 1140, 1142, 1151–54, 1155–57. Relatedly, in response to the principal opinion's observation that high-capacity magazines are specifically suited for large-scale military use rather than for self-defense, Principal Opinion at 1102, 1105–07, Judge VanDyke avers that, "almost every attribute of a weapon that makes it more effective for military purposes also makes it more effective for self-defense: more accurate, faster firing, the ability to engage multiple targets quickly—these are all characteristics of a weapon that make it better for *both* military and self-defense purposes." VanDyke Dissent at 1168–69.

But, as Judge Gould explained in his concurrence in *Nordyke v. King*, 644 F.3d 776 (9th Cir. 2011) (Gould, J., concurring), *on reh'g en banc*, 681 F.3d 1041 (9th Cir. 2012), although "laws barring possession of military-grade weapons might be argued to substantially burden the right to have weapons," such laws "are indisputably permissible because they do not tread on the Second Amendment's core purposes." *Id.* at 797 n.6. "I do not mean to be facetious," Judge Gould wrote, "but to me it is obvious that the Second Amendment does not protect the right to keep a nuclear weapon in one's basement, or a chemical or biological weapon in one's attic." *Id.* Although nuclear bombs and chemical and biological weapons are, of course, in a completely different class of weapon than large-capacity magazines in terms of the level of danger they pose, and they are thankfully nowhere near as widespread as large-capacity magazines, neither of those observations gets to the heart of what the

primary purpose or use of a large-capacity magazine *is*. Arguably, the primary use of a large-capacity magazine, by design, is for effective combat engagement in a theater of war. Principal Opinion at 1102, 1105–07. If true, then regardless of their prevalence in society, large-capacity magazines would not fall within the shelter of the Second Amendment.

Turning to the subject of assessing the constitutionality of regulations addressing new or emerging technologies, Judge Bumatay's *1130 analysis again misses the mark. As California and amici supporting the government explain, restrictions on semi-automatic weapons capable of firing a large number of rounds without reloading were enacted nationally and in several states shortly after such weapons became widely commercially available. Opening Br. at 27– 31; Reply Br. at 10–12; Br. of Amicus Curiae Everytown for Gun Safety in Supp. Of Def.-Appellant at 4–9; *see also* Blocher & Miller, *supra*, at 42–45; Robert J. Spitzer, *America Used to Be Good at Gun Control*, N.Y. Times (Oct. 3, 2017). Historically, gun regulation has followed that pattern, with regulations arising not when a new technology is *invented*, but instead when the technology begins "to circulate widely in society." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 67–71 (2017). The ban on high-capacity magazines at issue in this case therefore represents a "continuation of nearly a century" of arms regulations targeting weapons that can fire a large number of rounds without reloading, Br. of Amicus Curiae Everytown for Gun Safety in Supp. Of Def.-Appellant at 9. The statute thereby arguably constitutes a longstanding prohibition that should not be disturbed by application of the Second Amendment, at least as long as the "longstanding prohibition" inquiry accounts for the date when the target of a restriction became commonplace. And based on *Heller*'s commentary regarding machine guns, 554 U.S. at 624, 128 S.Ct. 2783; *see also supra* pp. 1127–28, the inquiry should account for that factor.

The Bumatay Dissent ignores this context. It asserts that large-capacity magazines have not been "subject to longstanding regulatory measures," and that it is "not a close question" whether the statute at issue must accordingly be struck down. Bumatay Dissent at 1142. In support, the Dissent provides scattered examples of weapons with similar firing capacities that date back as far as 1580, but it does not contend that such weapons were widely commercially available at the time, arguing only that such weapons had become common "by the time of the Second Amendment's incorporation," apparently referring to 1868. Bumatay Dissent at 1154–55 (citing David B. Kopel, *The History of Firearm Magazines and*

**ATTACHMENT**

*Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015)). Judge Bumatay nevertheless declares that, because regulations targeting high-capacity magazines did not exist during the Founding Era, they cannot be considered longstanding regulations under the "text, history, and tradition" test. *Id.* at 140–141; *see also id.* at 137–142.

But, as explained, even taking a generous (to the Bumatay Dissent) view on what qualifies as "common," and even relying on the same source cited by the Dissent, high-capacity magazines did not become common until the late nineteenth century or early twentieth century. *See* Br. of Amicus Curiae Everytown for Gun Safety in Supp. Of Def.-Appellant at 4–9; Kopel, *supra*, at 851. The Bumatay Dissent's "text, history, and tradition" framework would thereby require states to adopt regulations before circumstances warrant, sometimes before a problem even exists. Such a requirement would hamstring the ability of states to regulate nearly any new or emerging weapons technologies. The "text, history, and tradition" test, as a result, would fail to comply with ⚑ *McDonald*'s instruction that the Second Amendment must be construed such that states retain the ability to "devise solutions to social problems that suit local needs and values" and to "experiment[ ] with reasonable firearms regulations." ⚑ 561 U.S. at 785, 130 S.Ct. 3020 **\*1131** (plurality opinion).[4]

[4] The dissents assert that the Second Amendment right has been treated as if it were "disfavored." *See, e.g.*, Bumatay Dissent at 1143–44; VanDyke Dissent at 1160–61. But in terms of what the Second Amendment protects, the Supreme Court explained in ⚑ *Heller* that the Second Amendment right has long existed in harmony with reasonable regulation, and the Court approved a non-exhaustive range of presumptively lawful regulations, without announcing any criteria for determining whether non-listed kinds of arms regulations are or are not lawful. ⚑ 554 U.S. at 626–27, 128 S.Ct. 2783; *see also, e.g.*, Blocher & Miller, *supra*, at 185. And there are several prominent examples of state and federal courts striking down gun regulations that press those indistinct boundaries. *Id.* at 185–86; *see also* Principal Opinion at 1108–09.

In terms of methodology, Judge Bumatay does not explain how he approached the historical research underlying the observations made in his opinion. Although such methodological disclosures are not common in judicial opinions, they are standard in

academic articles, and for good reason. As explained above, *see supra* pp. 1120–22, even slightly defective methodology can undermine the persuasive force of research, and historiographical research is full of potential methodological pitfalls. How large is the pool of available evidence that the Bumatay Dissent drew upon? Is it large enough that we may glean reliable conclusions from it? Did the Dissent draw from that pool in a fashion that would reflect the range of differing opinions throughout history on gun ownership and gun regulation, such as by ensuring that its sources came from differing geographical regions and from both urban and rural areas? Is it possible the Bumatay Dissent relies upon inaccurate sources, or sources that include bias imparted by the author? Is it possible that Judge Bumatay approached the research with a desire to find *a* clear answer—not any particular clear answer—to the legal question in this case, such that the research process itself became skewed? Were the individuals who performed the key research tasks for the Bumatay Dissent aware of cognitive biases like confirmation bias and anchoring bias, and did those individuals actively seek to counteract the impact of such biases on their research?

The truth is, we simply do not know the answer to those questions, and the "text, history, and tradition" test is not designed to supply readers with those answers. As a result, we cannot be confident in the validity of the observations made in the Bumatay Dissent. In contrast, the two-step, tiered scrutiny approach embraced by the principal opinion, as I will explain in more detail in Part III, relies on a familiar, well-established methodology that requires judges to expressly disclose, on the public record, the reasoning that guides their decision in any given case. And it is designed to accommodate situations where evidence of history and tradition is conflicting or inconclusive. In this respect, the two-step, tiered scrutiny approach represents a superior framework for adjudicating Second Amendment controversies involving the constitutionality of discrete regulations.

## III.

Looking in detail at the attributes of the two-step, tiered scrutiny approach more broadly, I begin from the established proposition that the Second Amendment is "not unlimited." ⚑ *Heller*, 554 U.S. at 595, 128 S.Ct. 2783. Although its reach extends to modern weapons just as the First Amendment protects modern forms of speech

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

and the Fourth Amendment applies to searches of modern forms of technology, *id.* at 582, 128 S.Ct. 2783, the Second Amendment has multiple limitations. It does not prevent regulation aimed at "dangerous **\*1132** or unusual" weapons, including complete bans on such weapons. *Id.* at 623, 627, 128 S.Ct. 2783. It does not undermine the validity of "longstanding prohibitions" such as laws that prevent firearms from being carried into schools. *Id.* at 626–27, 128 S.Ct. 2783. And it "by no means eliminates" a state's ability "to devise solutions to social problems that suit local needs and values," and to "experiment[ ] with reasonable firearms regulations." *McDonald*, 561 U.S. at 785, 130 S.Ct. 3020 (plurality opinion). Because the Second Amendment provides nuanced, not absolute, protection to individuals' right to keep and bear arms for self-defense, and because, for the reasons I surveyed, the "text, history, and tradition" test cannot meaningfully and predictably resolve which discrete regulations accord with the Amendment's protections, *see supra* Parts I, II, some other method of structuring judicial inquiry into that question is needed.

As the principal opinion explains, the two-step approach—which provides for *both* a historical inquiry and a tiered scrutiny inquiry similar to that used to apply other constitutional protections to discrete and variable regulations—has been embraced by the federal courts of appeal. Principal Opinion at 1099–1100. A consideration of the theoretical and historical underpinnings of the tiers of scrutiny indicates that the two-step approach represents a well-established framework for guiding and openly communicating, as opposed to hiding, a court's dual attention to historical background as well as to the real-world burdens and the governmental concerns at stake. The principal opinion's two-step, tiered scrutiny approach, in particular, is in no way the free-for-all vehicle for sanitizing judges' policy preferences that Judge Bumatay makes it out to be. To the contrary, the set of prescribed steps embedded in the tiers of scrutiny demand self-awareness on the part of judges and lead to a public-facing decisionmaking process grounded in an evidentiary record.

## A.

*Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), can be viewed as the "starting point" for the development of each of the three tiers of scrutiny.

*See* Donald L. Beschle, *No More Tiers?: Proportionality as an Alternative to Multiple Levels of Scrutiny in Individual Rights Cases*, 38 Pace L. Rev. 384, 387–88 (2018); *see also* Moshe Cohen-Eliya & Iddo Porat, *American Balancing and German Proportionality: The Historical Origins*, 8 Int'l J. Const. L. 263, 280 (2010). There were three opinions in *Lochner*. Justice Peckham's opinion for the majority held that the "right" of employers and employees to contract with one another regarding working conditions was subsumed within the Fourteenth Amendment's Due Process Clause. *Lochner*, 198 U.S. at 53–54, 25 S.Ct. 539. For New York's statute limiting the working hours of bakers to survive review, Justice Peckham wrote, the government would need to satisfy an exacting test: demonstrating that the statute had a "direct relation" and was "necessary" to serve an "appropriate and legitimate" state interest, such as the state's interest in health and safety. *Id.* at 56–58, 25 S.Ct. 539. The opinion went on to invalidate the statute, concluding that the government failed to carry its burden under that test. *Id.* at 64–65, 25 S.Ct. 539. Over time, Justice Peckham's somewhat familiar test "evolve[d] into the modern strict scrutiny test." Beschle, *supra*, at 388.

Justice Holmes, in dissent, advocated on behalf of a substantially more deferential approach, whereby the statute would be invalidated only if it was clear that any "rational and fair man necessarily would **\*1133** admit that the statute proposed would infringe fundamental principles." *Lochner*, 198 U.S. at 76, 25 S.Ct. 539 (Holmes, J., dissenting). The Holmes dissent may therefore be viewed as an early predecessor of the rational basis test. Justice Harlan, also in dissent, struck a middle ground. He agreed with Justice Holmes that any "liberty of contract" implicit in the Constitution may be constitutionally subject to regulation that "the state may reasonably prescribe for the common good and the well-being of society." *Id.* at 68, 25 S.Ct. 539 (Harlan, J., dissenting). But his proposed approach was not nearly as deferential as Justice Holmes's. Instead, he would have required the state to produce a reasonable amount of evidence in support of the regulation before it could be found valid. *Id.* at 69–74, 25 S.Ct. 539. This middle-of-the-road alternative can be characterized as a forebear to intermediate scrutiny.

Although *Lochner* did not survive the test of time, "a significant question remained" regarding whether the analytical frameworks employed by Justices Peckham, Holmes, and Harlan were themselves inappropriate, as opposed to being inappropriately applied in that case. *Id.*

ATTACHMENT

at 389. The Supreme Court began addressing this question in the late 1930s, ultimately embracing the use of heightened scrutiny in a variety of cases. *Id.*; Cohen-Eliya & Porat, *supra*, at 282–83. In *United States v. Carolene Products Co.*, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), for instance, the Supreme Court clarified that heightened scrutiny is appropriate when a court evaluates any one of three types of legislation: a statute in conflict with a fundamental right such as those enumerated in the Bill of Rights, a statute that undermines the healthy functioning of our democracy, or a statute that harms "discrete and insular minorities." *Id.* at 152 n.4, 58 S.Ct. 778.

From the 1960s through the 1980s, the strict scrutiny test became entrenched in constitutional decisionmaking and was gradually shaped into the familiar two-part standard that requires government actors to demonstrate that a statute has a compelling underlying purpose, and that the statute is necessary—meaning there are not any less restrictive alternatives—to achieve the relevant purpose. *See, e.g.*, *Palmore v. Sidoti*, 466 U.S. 429, 432–33, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 290–91, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *McLaughlin v. Florida*, 379 U.S. 184, 191–92, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 307–08, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964); *see also* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1273–85 (2007). The earliest applications of the strict scrutiny test included, among other subjects, racial discrimination cases involving the Equal Protection Clause, *e.g.*, *Palmore*, 466 U.S. at 432– 33, 104 S.Ct. 1879, free speech cases, *e.g.*, *Flowers*, 377 U.S. at 307–08, 84 S.Ct. 1302, and voting rights cases, *e.g.*, *Harper*, 383 U.S. at 670, 86 S.Ct. 1079. Each application fell within at least one of the three buckets outlined in the *Carolene Products* footnote four. Rational basis review also became widespread during the same period, applying in essentially all other cases. *See, e.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 469, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *N.D. State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 164–67, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973); *Ferguson v. Skrupa*, 372 U.S. 726, 728–29, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

**\*1134** Around this time, constitutional scholars such as Professor Gerald Gunther voiced a concern that strict scrutiny was overly harsh, as it was "strict in theory, [but] fatal in fact." Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 Vand. L. Rev. 793, 794 (2006). Others lamented that rational basis scrutiny veered too far in the opposite direction, leading to essentially per se findings of validity in every case where it applied. Beschle, *supra*, at 392. There was a sense that the two-tiered system of judicial scrutiny was lacking, and that some middle ground was needed. *Id.* at 393. After a series of cases in which the Supreme Court nominally applied rational basis review to gender discrimination claims but engaged in an analysis that appeared much more like strict scrutiny review, *see* *Weinberger v. Wiesenfeld*, 420 U.S. 636, 642–45, 648–53, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639–48, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Reed v. Reed*, 404 U.S. 71, 74–77, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), the Supreme Court eventually expressly adopted a new tier of scrutiny, one that was less exacting than strict scrutiny but more rigorous than rational basis review, *see* *Craig v. Boren*, 429 U.S. 190, 197–98, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *see also* *Plyler v. Doe*, 457 U.S. 202, 215–21, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). The middle-ground approach that had its roots in Justice Harlan's *Lochner* dissent developed into what is now referred to as intermediate scrutiny. Beschle, *supra*, at 393–94.

Although the development of intermediate scrutiny created a more nuanced version of the tiered system of judicial scrutiny in constitutional cases, a perception persisted that it may be useful for the tiers of scrutiny both to become less rigid and to include more context-specific guidance. *Id.* at 394–97. Over time, these critiques were met with changes to the tiered scrutiny method of analysis. For example, differing tests that embed a tiered scrutiny method of review have arisen in free speech cases, such that a slightly different structure of analysis applies depending on whether the speech is commercial in nature or occurs in a public forum, as well as whether a disputed regulation targets specific speech-related content, including by targeting a specific viewpoint. *See, e.g.*, *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (commercial speech regulation); *Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (public forum speech regulation); *Turner Broad. Sys., Inc. v.*

**ATTACHMENT**

*FCC*, 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (content-neutral speech regulation); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 48–49, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (content-based speech regulation); *see also* R. Randall Kelso, *The Structure of Modern Free Speech Doctrine: Strict Scrutiny, Intermediate Review, and "Reasonableness" Balancing*, 8 Elon L. Rev. 291, 292–95 (2016). Numerous cases have also applied strict scrutiny and rational basis review more flexibly, such that per se findings of validity and invalidity have become less common. *See, e.g.,* *Romer v. Evans*, 517 U.S. 620, 631–36, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439–42, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Grutter v. Bollinger*, 539 U.S. 306, 326–44, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003); *see also* Marcy Strauss, Reevaluating Suspect Classification, 35 Seattle U. L. Rev. 135, 135–36 n.5 (2011). Thus, more than one hundred years after *Lochner* first aired the predecessors of the various available approaches, the **\*1135** tiered scrutiny method of analysis has developed into a framework that serves to guide and constrain judicial decisionmaking across a variety of scenarios. Although imperfect, the tiered scrutiny method of analysis has risen to the challenge of providing a structured framework for adjudicating cases involving individual rights.

### B.

Today, a heightened tier of scrutiny applies when courts evaluate a wide range of legal claims, including equal protection claims involving suspect and quasi-suspect classifications; claims involving fundamental rights such as the right to vote, the right to free speech, and the right to freely exercise one's religion; and claims involving the inverse commerce clause. *See, e.g.,* *Loving*, 388 U.S. at 11, 87 S.Ct. 1817 (race discrimination); *Craig*, 429 U.S. at 197–98, 97 S.Ct. 451 (gender discrimination); *Clark v. Jeter*, 486 U.S. 456, 465, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (legitimate parenthood discrimination); *Burdick v. Takushi*, 504 U.S. 428, 432–34, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (right to vote); *Central Hudson Gas & Elec. Corp.*, 447 U.S. at 566, 100 S.Ct. 2343 (commercial speech regulation); *Turner Broad. Sys., Inc.*, 520 U.S. at 189, 117 S.Ct.

1174 (content-neutral speech regulation); *Fulton v. City of Philadelphia*, ––– U.S. ––––, 141 S. Ct. 1868, 1876–77, 210 L.Ed.2d 137 (2021) (free exercise of religion); *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, ––– U.S. ––––, 139 S. Ct. 2449, 2467–68 & n.11, 2473–74, 204 L.Ed.2d 801 (2019) (inverse commerce clause); *see also* Aharon Barak, *Proportionality: Constitutional Rights and Their Limitations* 510–11 (2012).

The second stage of the principal opinion's two-step approach, as mentioned, analyzes the degree to which an arms-related regulation burdens the Second Amendment right when determining whether to apply strict scrutiny, intermediate scrutiny, or "no scrutiny at all (as in *Heller*)." Principal Opinion at 1100. Of the established, non-Second Amendment tiered scrutiny frameworks, this aspect of the two-step, tiered scrutiny approach is perhaps most analogous to the *Anderson-Burdick* doctrine used for election and voting rights cases. Under that doctrine, the rigor of a court's inquiry into the validity of an election-related regulation depends upon the extent to which the challenged regulation burdens constitutional rights, such as the right to vote. *Burdick*, 504 U.S. at 432–34, 112 S.Ct. 2059. If the right to vote is severely burdened, strict scrutiny applies. *Id.* If the right to vote is burdened in a "reasonable" manner, then less rigorous scrutiny applies instead. *Id.*; *see also* *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 353–54, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (applying a similar framework to disputes involving the inverse commerce clause).

Use of the two-step, tiered scrutiny approach for Second Amendment cases, then, represents yet another instantiation of the tiered method of analysis evolving to meet the filtering needs of various contextual scenarios involving constitutional rights. No reason has been suggested, in the dissents in this case or elsewhere, as to why a well-established structure for constitutional adjudication should apply to a wide range of constitutional protections but not to the Second Amendment.

We adopted the two-step approach for Second Amendment claims in *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). There, we reviewed and analyzed other Circuits' application of the two-step inquiry and explained that the two-step approach "reflects the Supreme Court's holding in *Heller* that, while the Second Amendment protects an individual right to keep

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

and bear arms, the scope of that right is not unlimited." *Id.* at 1136. As **\*1136** *Chovan* suggests, we adopted the two-step approach because it provides crucial guideposts that assist and constrain our inquiry once we move beyond assessing the overall scope of the Second Amendment and into applying the Amendment to a specific measure or regulation. This aspect of the two-step approach is, indeed, its greatest asset. The elements of a heightened scrutiny analysis are fixed and widely known, lending themselves to a mode of reasoning and explication on the part of judges that disciplines the judicial inquiry and is accessible to the litigants and the public. Application of the two-step approach to the Second Amendment is therefore likely to promote both judicial introspection and public insight into the judicial decisionmaking process.

Use of the two-step approach may also encourage participation in the development of an understanding about the constitutional reach of the Second Amendment by the other branches of government, nationally and locally. Because the tiers of scrutiny offer a clear structure that communicates to the audiences of judicial opinions the type and sequence of arguments that must be made to ensure that a piece of legislation or other governmental enactment survives constitutional review, application of the tiered scrutiny approach may encourage legislators and other government actors carefully to assess whether their actions have a proper purpose and are appropriately tailored to serving that purpose. In other words, judicial review under the two-step, tiered scrutiny approach would have a disciplining effect not only on the judiciary, but on lawmakers as well.

The tiered method of scrutiny may also assist courts in isolating "process failures" in the legislative process. Vicki C. Jackson, *Constitutional Law in an Age of Proportionality*, 124 Yale L.J. 3094, 3151 (2015). As the Bumatay Dissent acknowledges, *see* Bumatay Dissent at 1140, 1143, one of the primary functions of the judiciary is to ensure that the legislative process is not systemically infected by "process failures," which arise when lawmakers, either consciously or subconsciously, allow prejudice or discrimination to shape the law. John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 102–04 (1980). But as I have explained, the "text, history, and tradition" approach is ill-suited to that end. *See supra* Parts I, II.

In contrast, at the second stage of the two-step, tiered scrutiny approach, a court must carefully consider—as the principal opinion does here, *see* Principal Opinion at 1103–08—the parties' submissions and the evidentiary and legislative record to assess the degree of impact a particular regulation has on the Second Amendment right. Having done so, the court then chooses which level of scrutiny is appropriate and applies the prescribed level of rigor to its assessment of both the interests that gave rise to the regulation and—again, after detailed attention to the parties' submissions and the evidentiary and legislative records—the degree to which the regulation advances that asserted interest. Because heightened scrutiny requires the government to both articulate a justification for its disputed action and provide an evidentiary record supporting that justification, it is likely to smoke out process failures. At the same time, because legislators are aware of this fact, application of the two-step approach may also produce front-end incentives that prevent many process failures from occurring in the first place. Application of the tiered scrutiny approach may thereby facilitate judicial oversight into whether the legislative branch is acting impartially and responsibly, with due regard to the underlying constitutional protection.

**\*1137** Rejecting this process-oriented mode of protecting constitutional rights as unreliable, Judge Bumatay characterizes the two-step, tiered scrutiny approach as "nothing more than a black box used by judges to uphold favored laws and strike down disfavored ones." Bumatay Dissent at 1140. He is mistaken. For the reasons explained, the two-step approach is not an invitation to engage in freewheeling judicial decisionmaking or generalized interest-balancing. Instead, it prescribes a careful, structured evaluation that is preserved for posterity and based on an evidentiary record. The two-step, tiered scrutiny approach thus places a heavy burden on the state to justify any intrusions into individual rights and, again, requires judges to explain their decisions in an accessible, transparent fashion that encourages public oversight.

To be sure, analyses of this kind can be poorly done, and in any specific instance may or may not succeed in uncovering and minimizing the impact of judges' policy preferences on the outcome of the case. But where there is such failure, the failure will be exposed via ascertainable lapses in the court's logical or factual analysis, giving rise to either critiques by other courts or reversal on appeal. So the process-structuring aspects of the tiered scrutiny approach constrain the ability of the judicial system *as a whole* to allow personal policy preferences to determine outcomes, whether or not the process has the same success in each opinion written. The "text, history, and tradition" framework offers none of these benefits. It provides no guidelines for the many cases in which the historical record is inconclusive, and thereby both invites biased decisionmaking and shrouds that decisionmaking

**ATTACHMENT**

in secrecy.

The Bumatay Dissent further asserts that the Supreme Court already rejected the two-step, tiered scrutiny approach when it "bristled" at the suggestion in Justice Breyer's dissent that courts should engage in a "freestanding 'interest balancing' approach" when adjudicating Second Amendment cases. *Id.* at 1144–46 & 1145 n.10*Id. at 1144–46 & 1145 n.10* (quoting *Heller*, 554 U.S. at 634, 128 S.Ct. 2783). But, in fact, Justice Breyer's proposal was a thinly veiled reference to the proportionality test, the dominant international framework for adjudicating gun rights cases. *See, e.g.*, Moshe Cohen-Eliya & Iddo Porat, *The Hidden Foreign Law Debate in* Heller: *The Proportionality Approach in American Constitutional Law*, 46 San Diego L. Rev. 368, 369–70 (2009). Although the proportionality test has some broad similarities to the tiers of scrutiny, comparative law theorists note that the tiered scrutiny approach offers substantial benefits that the proportionality approach lacks. Namely, the proportionality approach directs judges to engage in a case-by-case weighing analysis that assesses whether the benefits of a disputed policy outweigh or are sufficient to justify the degree of intrusion into the right at issue in the case. *Id.* at 380–81. The tiers of scrutiny, in contrast, supply a pre-determined weighing calculus triggered by the details of each case. Barak, *supra*, at 512, 521–22. In other words, the tiered scrutiny approach provides a real check on judicial power, because much of the central weighing analysis in each case is not within the control of individual judges and is instead "bounded" by a pre-existing categorical framework. *Id.* Once again, this aspect of the tiered scrutiny approach cabins judicial discretion and promotes long-run objective decisionmaking, to the degree such decisionmaking is possible.

Finally, the Bumatay Dissent states that this Circuit's precedent regarding intermediate scrutiny in Second Amendment cases has "dispense[d] with the requirement of narrow tailoring" by adopting a "reasonable fit" tailoring requirement. Bumatay Dissent at 1144 n.8. But **\*1138** *Vivid Entertainment, LLC v. Fielding*, 774 F.3d 566 (9th Cir. 2014), the case cited by the Dissent for the proposition that intermediate scrutiny ordinarily requires "narrow tailoring," clarified that "[i]n order to be narrowly tailored for purposes of intermediate scrutiny," the regulation need not be the least restrictive means of achieving the government interest, as the requirement is "satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id. at 580*. Our Second Amendment case law defines the "reasonable fit" requirement in exactly the same way, noting that although

a firearm regulation need not utilize the least restrictive means of achieving its underlying objective, it must "promote a substantial government interest that would be achieved less effectively absent the regulation." *See, e.g.*, *Mai v. United States*, 952 F.3d 1106, 1116 (9th Cir. 2020), *reh'g denied*, 974 F.3d 1082 (9th Cir. 2020), *cert. denied*, –––– U.S. ––––, 141 S. Ct. 2566, ––– L.Ed.2d –– – (2021); *United States v. Torres*, 911 F.3d 1253, 1263 (9th Cir. 2019); *Fyock*, 779 F.3d at 1000. There is therefore no merit to the suggestion that the Ninth Circuit's application of intermediate scrutiny in Second Amendment cases is somehow less exacting than its application of the standard in other kinds of cases.

Further, Judge Bumatay cites no precedent in support of his assertion that intermediate scrutiny review would allow the government to justify a policy on grounds that are not "genuine." Bumatay Dissent at 1144 n.8. To the contrary, in cases where intermediate scrutiny applies, the burden falls on the government to demonstrate that an important interest underlies the policy, and that interest "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996); *see also, e.g.*, *Karnoski v. Trump*, 926 F.3d 1180, 1199–1202 (9th Cir. 2019).

## CONCLUSION

Rather than representing a "much less subjective" framework for decisionmaking in Second Amendment cases involving discrete arms regulations, Bumatay Dissent at 1148–49, the "text, history, and tradition" test obscures the myriad indeterminate choices that will arise in most such cases. The tiered scrutiny approach, in contrast, serves to guide and constrain a court's analysis in Second Amendment disputes regarding discrete arms regulations, as it has done for numerous other constitutional provisions. I therefore have no doubt that the principal opinion in this case properly rejects the Bumatay Dissent's invitation to abandon the tiered scrutiny approach for adjudicating Second Amendment controversies involving discrete regulations in favor of the "text, history, and tradition" approach. We are very wise not to do so, for all of the reasons I have explained.

## ATTACHMENT

HURWITZ, Circuit Judge, concurring

I join Judge Graber's opinion for the Court unreservedly. I ordinarily would not say more, but I am reluctantly compelled to respond to the dissent of my brother Judge VanDyke, who contends that the "majority of our court distrusts gun owners and thinks the Second Amendment is a vestigial organ of their living constitution." That language is no more appropriate (and no more founded in fact) than would be a statement by the majority that today's dissenters are willing to rewrite the Constitution because of their personal infatuation with firearms. Our colleagues on both sides of the issue deserve better.

I recognize that colorful language captures the attention of pundits and partisans, and there is nothing wrong with using **\*1139** hyperbole to make a point. But my colleague has no basis for attacking the personal motives of his sisters and brothers on this Court. His contention that prior decisions of this Circuit—involving different laws and decided by different panels—somehow demonstrate the personal motives of today's majority fails to withstand even cursory analysis. By such reasoning, one also would have to conclude that my friends in today's minority who, like me, are deciding a Second Amendment case for the first time, are also driven by personal motives.

Judge VanDyke has no way of knowing the personal views of other members of the Court about firearms. Indeed, members of the Court not among today's dissenters have firearms in their homes. Members of this Court not among today's dissenters have volunteered for service in the active military or the National Guard (the modern "well regulated Militia") and bore arms during that service. But those personal experiences—or the lack of them—do not drive the decision on the important issue at hand. That issue is whether the people of the State of California are forbidden by the United States Constitution to enact measures like the contested statute to protect themselves from gun violence.

Reasonable judges can disagree as to whether the California statute crosses a constitutional line. I believe that Judge Graber has persuasively explained why it does not. But I do not question the personal motives of those on the other side of that issue. On the seriousness of the problem that California seeks to address, however, there should be no dispute. However infrequent mass shootings may be, hardly anyone is untouched by their devastation. The Ninth Circuit lost one of its own, Chief Judge Roll of the District of Arizona, to precisely such a shooting, notwithstanding Judge VanDyke's assumption that federal judges are somehow immune from such dangers. Other members of the Court have lost family and friends to gun violence. I recount these matters of common knowledge not, as Judge VanDyke suggests, to import my personal experiences into the decision-making process in this case, but instead to emphasize that despite the alleged "infrequency" of mass shootings, they have effects far beyond the moment that are the proper subject of legislative consideration. And, to the extent that the frequency of such carnage is relevant, surely the people and their elected representatives are far better situated in the first instance than we to make that determination. The people of California should not be precluded from attempting to prevent mass murders simply because they don't occur regularly enough in the eyes of an unelected Article III judge.

The crucial issue here is what level of scrutiny to apply to the California law. We can respectfully disagree whether the measures California has adopted violate the Second Amendment. But an attack on the personal motives of the members of this Court who reach the same result in this case as every other Circuit to address this issue neither advances our discourse nor gives intellectual support to the legal positions argued by my respected dissenting colleagues. I start from the assumption that Judge VanDyke, whose dissent displays an admirable knowledge of firearms and ammunition, dissents today not because of his personal experiences or policy preferences but instead because he sincerely believes that his oath of fidelity to the Constitution requires that we invalidate what our colleague Judge Lee described in the now-vacated majority opinion for the three-judge panel as a "well-intentioned" law designed by the sovereign state of California to "curb the scourge of gun violence." 🚩 **\*F.3d 1133, 1140** *Duncan v. Becerra*, 970 –41 (9th Cir. 2020). I simply ask that today's majority, each of whom took the very same oath, be treated with the same level of respect.

BUMATAY, Circuit Judge, with whom IKUTA, and R. NELSON, Circuit Judges, join, dissenting

When Justice Brandeis observed that states are the laboratories of democracy, he didn't mean that states can experiment with the People's rights. *See* 🔖 *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting). But that's what California does here. The state bans magazines that can carry over ten rounds—a firearm component with a long historical lineage commonly used by Americans for lawful purposes, like self-defense. Indeed, these magazines are lawfully owned by millions of people nationwide and come standard on the most popular

ATTACHMENT

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

firearms sold today. If California's law applied nationwide, it would require confiscating half of all existing firearms magazines in this country. California nevertheless prevents its citizens from owning these magazines. But the Constitution protects the right of law-abiding citizens to keep and bear arms typically possessed for lawful purposes. On en banc review, we should have struck down the law.

Contrary to the Second Amendment, however, our court upholds California's sweeping ban on so-called large-capacity magazines.[1] It can't be because these magazines lack constitutional protection. The majority assumes they are. And it can't be because the ban is longstanding. California's law is of recent vintage. Rather, the law survives because the majority has decided that the costs of enforcing the Second Amendment's promise are too high. The majority achieves this result by resorting to the tiers-of-scrutiny approach adopted by this court years ago. Under that balancing test, the government can infringe on a fundamental right so long as the regulation is a "reasonable fit" with the government's objective.

[1]  We use the term "large-capacity magazine" for consistency with the majority but note that magazines with the capacity to accept more than ten rounds of ammunition are standard issue for many firearms. Thus, we would be more correct to refer to California's ban on "standard-capacity magazines."

In reality, this tiers-of-scrutiny approach functions as nothing more than a black box used by judges to uphold favored laws and strike down disfavored ones. But that is not our role. While we acknowledge that California asserts a public safety interest, we cannot bend the law to acquiesce to a policy that contravenes the clear decision made by the American people when they ratified the Second Amendment.

In *District of Columbia v. Heller*, 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court held that the Second Amendment confers "an individual right to keep and bear arms." This watershed case provided clear guidance to lower courts on the proper analytical framework for adjudicating the scope of the Second Amendment right. That approach requires an extensive analysis of the text, tradition, and history of the Second Amendment. Our court should have dispensed with our interest-balancing approach and hewed to what the Supreme Court told us to do. Under that approach, the outcome is clear. Firearms and magazines capable of firing more than ten rounds have existed since before the

Founding of the nation. They enjoyed widespread use throughout the nineteenth and twentieth centuries. They number in the millions in the country today. With no longstanding prohibitions against them, **\*1141** large-capacity magazines are thus entitled to the Second Amendment's protection. It's the People's decision in ratifying the Constitution, not California's, that dictates the result here.

For these reasons, we respectfully dissent.

## I. Factual Background

In California, a "large-capacity magazine" is "any ammunition feeding device with the capacity to accept more than 10 rounds." Cal. Penal Code § 16740. Since 2000, California has prohibited the manufacture, importation, and sale of large-capacity magazines. *See* Act of July 19, 1999, ch. 129, 1999 Cal. Stat. §§ 3, 3.5. Thirteen years later, the California legislature prohibited the receipt and purchase of large-capacity magazines. *See* 2013 Cal. Stat. 5299, § 1. And three years after that, the California legislature made it unlawful to possess large-capacity magazines. *See* 2016 Cal. Stat. 1549, § 1; Cal. Penal Code § 32310(a), (c). Shortly after, California voters adopted Proposition 63, which strengthened California's magazine ban by making possession punishable by up to one year in prison. *See* Cal. Penal Code § 32310(c). There's no grandfather clause—the law applies no matter when or how the magazine was acquired. *See id.*

Today, California citizens who possess large-capacity magazines have four options: remove the magazine from the state; sell the magazine to a licensed firearms dealer; surrender the magazine to a law enforcement agency for destruction; or permanently alter the magazine so that it cannot accept more than ten rounds. *Id.* §§ 16740(a), 32310(d).

The question before us is whether California's magazine ban violates the Second Amendment. It does.

## II. Legal Background

ATTACHMENT

The Second Amendment commands that the "right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. At the outset, it's worth emphasis that the Second Amendment guarantees a pre-existing, fundamental, natural right. That's because it is necessary to "protect and maintain inviolate the three great and primary rights of personal security, personal liberty, and private property." 1 William Blackstone, Commentaries on the Laws of England, *136, *139. In other words, the right is among "that residuum of human rights, which is not intended to be given up to society, and which indeed is not necessary to be given for any good social purpose."[2]

2    Letter from Richard Henry Lee to Governor Edmund Randolph (Oct. 16, 1787), https://archive.csac.history.wisc.edu/Richard_Henry_Lee_to_Edmund_Randolph.pdf.

The Second Amendment's fundamental nature follows from its close connection to the right of self-defense. As John Adams explained:

> Resistance to sudden violence, for the preservation not only of my person, my limbs and life, but of my property, is an indisputable right of nature which I have never surrendered to the public by the compact of society, and which perhaps, I could not surrender if I would.[3]

Judge George Thatcher, a member of the First United States Congress, contrasted rights conferred by law with those that are natural; the right of "keeping and bearing *1142 arms" belonged in the latter category as it is "coeval with man."[4]

3    Boston Gazette, Sept. 5, 1763, *reprinted in* 3 The Works of John Adams 438 (Charles F. Adams ed., 1851), in Anthony J. Dennis, *Clearing the Smoke from the Right to Bear Arms and the Second Amendment*, 29 Akron L. Rev. 57, 73 (1995).

4    Scribble-Scrabble, Cumberland Gazette, Jan. 26, 1787, *reprinted in* Firearms Law and the Second Amendment: Regulation, Rights, and Policy, Johnson et al. 300 (2d ed. 2017). Scribble-Scrabble was the pen name of George Thatcher. *See* Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee*

*Malcolm*, 105 Nw. U. L. Rev. 1821, 1825 (2011).

The fundamental nature of the Second Amendment has been well recognized by the Supreme Court. At its core, the Court held, the Second Amendment protects the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635, 128 S.Ct. 2783. The protection is an individual one and extends to all bearable arms that are typically possessed by law-abiding citizens for lawful purposes, like self-defense. *Id.* at 582, 595, 625, 128 S.Ct. 2783. Moreover, the right is so "fundamental" and "deeply rooted in this Nation's history and tradition," that it is "fully applicable to the States." *McDonald v. City of Chicago*, 561 U.S. 742, 750, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (simplified).

## III. California's Large-Capacity Magazine Ban Is Unconstitutional

From this background, we turn to the Second Amendment's application to this case. From the start, the majority misses the mark, the most fundamental error being the use of an improper framework to analyze Second Amendment challenges. Once again, our court applies a two-step, tiers-of-scrutiny approach. But that approach is inconsistent with what the Second Amendment commands and what the Supreme Court requires. On en banc review, we should have scrapped this regime and adopted what the Supreme Court tells us is the proper analytical framework—one that looks to the text, history, and tradition of the Second Amendment.

Under that analytical framework, California's ban on large-capacity magazines cannot withstand a Second Amendment challenge. Large-capacity magazines are bearable arms that are commonly owned for lawful purposes, and not subject to longstanding regulatory measures. This is not a close question. It flows directly from *Heller*.

## A. *Heller*'s Analytical Framework

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

### 1. The Supreme Court Rejected an Interest-Balancing Test

Before turning to what *Heller* did, it's important to understand what it did not do. *Heller* did not give lower courts license to pursue their own conception of the Second Amendment guarantee. While *Heller* did not answer all questions for all times, as discussed below, it provided a framework for analyzing Second Amendment issues without resorting to the familiar tiers-of-scrutiny approach. Instead of recognizing this, lower courts, including our own, routinely narrow *Heller* and fill the supposed vacuum with their own ahistorical and atextual balancing regime. This contradicts *Heller*'s express instructions.

The majority continues this error by reaffirming our court's two-step Second Amendment inquiry. Maj. Op. 1099–1100. Under that test, we ask two questions: (1) "if the challenged law affects conduct that is protected by the Second Amendment"; and if so, (2) we "choose and apply an appropriate level of scrutiny." *Id.* (simplified).

The step one inquiry often pays lip service to *Heller*: it asks whether the law "burdens conduct protected by the Second Amendment," *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013), "based on a historical understanding of the scope **\*1143** of the [Second Amendment] right," *Jackson v. City & Cnty. Of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (simplified). To determine whether the challenged law falls outside the scope of the Amendment, we look to whether "persuasive historical evidence show[s] that the regulation [at issue] does not impinge on the Second Amendment right as it was historically understood." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). Thus, the first step asks if the conduct is protected by the Second Amendment as a historical matter.[5]

[5] The majority does not bother to do the hard work of examining the historical record and merely assumes that the magazine ban infringes on the Second Amendment. Such an analytical step blinds the majority to the long historical tradition of weapons capable of firing more than ten rounds in this country and the exceptional nature of California's ban here. *Cf. Mai v. United States*, 974 F.3d 1082, 1091 (Bumatay, J., dissenting

from the denial of reh'g en banc) ("By punting the analysis of the historical scope of the Second Amendment ..., we let false assumptions cloud our judgment and distort our precedent even further from the original understanding of the Constitution.").

It is at step two where our court goes astray. Instead of ending the inquiry based on history and tradition, our court layers on a tier of scrutiny—an exercise fraught with subjective decision-making. In picking the appropriate tier, we operate a "sliding scale" depending on the severity of the infringement. *Id.* Practically speaking, that means putting a thumb on that scale for "intermediate scrutiny." In over a dozen post-*Heller* Second Amendment cases, we have never adopted strict scrutiny for any regulation.[6] That's because our court interprets the sliding scale to require intermediate scrutiny so long as there are "alternative channels for self-defense." *Jackson*, 746 F.3d at 961.[7]

[6] *See Young v. Hawaii*, 992 F.3d 765, 773 (9th Cir. 2021) (en banc); *United States v. Singh*, 979 F.3d 697, 725 (9th Cir. 2020); *Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020); *United States v. Torres*, 911 F.3d 1253, 1263 (9th Cir. 2019); *Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018); *Teixeira v. County of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (en banc); *Mahoney v. Sessions*, 871 F.3d 873, 881 (9th Cir. 2017); *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017); *Fisher v. Kealoha*, 855 F.3d 1067, 1070–71 (9th Cir. 2017); *Fortson v. L.A. City Attorney's Office*, 852 F.3d 1190, 1194 (9th Cir. 2017); *Silvester*, 843 F.3d at 827; *Wilson v. Lynch*, 835 F.3d 1083, 1093 (9th Cir. 2016); *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016) (en banc); *Fyock v. City of Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015); *Jackson*, 746 F.3d at 965; *Chovan*, 735 F.3d at 1138.

[7] Once again, our court fails to pay attention to *Heller* with this type of analysis. *Heller* expressly says, "[i]t is no answer to say ... that it is permissible to ban the possession of handguns

ATTACHMENT

so long as the possession of other firearms (i.e., long guns) is allowed." 554 U.S. at 629, 128 S.Ct. 2783; *see also Caetano v. Massachusetts*, 577 U.S. 411, 421, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) (Alito, J., concurring) ("But the right to bear other weapons is 'no answer' to a ban on the possession of protected arms."). Likewise, it is no answer to say—as Judge Graber's concurrence explicitly does—that citizens may defend their homes during an attack with multiple firearms or magazines or by reloading their firearms instead of using a large-capacity magazine. Graber Concurrence 1115–16. While the concurrence calls the burden of carrying multiple firearms or magazines and the delay of reloading magazines mere "inconvenience[s]," *id.*, the record shows that such alternatives impair the ability of citizens to defend themselves. Stated simply, the unpredictable and sudden nature of violent attacks may preclude the effective use of multiple firearms and magazines and the ability to reload weapons. Limiting self-defense to these alternate means would disadvantage law-abiding citizens, who may not have proper training to reload firearms or gather multiple armaments under the trauma and stress of a violent attack.

What's more, we often employ a toothless "intermediate scrutiny," upholding the **\*1144** regulation if it "reasonabl[y] fit[s]" the state's asserted public-safety objective.[8] Maj. Op. 1095–96. In other words, so long as a firearms regulation aims to achieve a conceivably wise policy measure, the Second Amendment won't stand in its way. In effect, this means we simply give a blank check to lawmakers to infringe on the Second Amendment right. Indeed, post-*Heller*, we have never struck down a single firearms regulation.[9]

[8] The "reasonable fit" modification to intermediate scrutiny dispenses with the requirement of narrow tailoring. *See, e.g., Vivid Entertainment, LLC v. Fielding*, 774 F.3d 566, 580 (9th Cir. 2014) (holding that a statute must be "narrowly tailored" to survive intermediate scrutiny). We appropriated the "reasonable fit" standard from "a specific, and very different context" under the First Amendment: "*facially neutral* regulations that *incidentally* burden freedom of speech in a way that is *no greater than is essential.*" *Mai*, 974 F.3d at 1101 (VanDyke, J., dissenting from the denial of reh'g en banc). But tailoring ensures that the government's asserted interest is its "genuine

motivation"—that "[t]here is only one goal the classification is likely to fit ... and that is the goal the legislators actually had in mind." Brief for J. Joel Alicea as Amicus Curiae Supporting Petitioners at 20, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, (July 20, 2021) (No. 20-843) (quoting John Hart Ely, Democracy and Distrust 146 (1980)). Dispensing with narrow tailoring thus abdicates our responsibility to test the government's true interest in a regulation.

[9] *See* footnote 6.

All this interest balancing is in blatant disregard of the Court's instructions. Nowhere in *Heller* or *McDonald* did the Supreme Court pick a tier of scrutiny for Second Amendment challenges. Nor did the Court compare the relative costs of firearms regulations to their potential public-safety benefits, adopt a sliding scale, look at alternative channels of self-defense, or see if there was a reasonable fit between the regulation and the state's objective. The absence of these balancing tools was not accidental. The Court made clear that such judicial balancing is simply incompatible with the guarantees of a fundamental right. Time and time again, the Supreme Court expressly rejected the means-end balancing approach inherent in the two-step test applied by our court. We should have followed their directions.

First was *Heller.* In that case, the Court soundly rejected any sort of interest-balancing in assessing a handgun ban. In dissent, Justice Breyer criticized the majority for declining to establish a level of scrutiny to evaluate Second Amendment restrictions. He then proposed adopting an "interest-balancing inquiry" for Second Amendment questions, weighing the "salutary effects" of a regulation against its "burdens." *Heller*, 554 U.S. at 689–90, 128 S.Ct. 2783 (Breyer, J., dissenting). In response, the Court bristled at the suggestion that a constitutional right could hinge on the cost-benefit analysis of unelected judges:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of

**ATTACHMENT**

government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.

*Heller*, 554 U.S. at 634, 128 S.Ct. 2783 (majority opinion). Rather than entertaining what tier of scrutiny should apply to the Second Amendment, the Court noted that the Amendment itself was "the very *product* of an interest balancing by the people," and that courts are simply not permitted to "conduct [that balancing] **\*1145** anew." *Id.* at 635, 128 S.Ct. 2783 (emphasis in original). In sum, *Heller* struck down the handgun ban at issue because those firearms are commonly used by law-abiding citizens for lawful purposes, not because the ban failed intermediate scrutiny.[10]

[10] The majority asserts that *Heller* rejected Justice Breyer's "interest balancing inquiry"—not because of the Court's disapproval of tiers of scrutiny—but because Justice Breyer did not use the precise words "intermediate scrutiny." Maj. Op. 1100–01. We do not think the Court would be so focused on form over substance to reject Justice Breyer's argument because of nomenclature. Indeed, the type of inquiry the majority engages in—such as weighing the ban's effect on mass shooters, *id.* at 1111—is exactly the kind of balancing between "government public-safety concerns" and Second Amendment interests that Justice Breyer called for, *see Heller*, 554 U.S. at 689, 128 S.Ct. 2783 (Breyer, J., dissenting).

The majority also relies on *Heller*'s passing reference to D.C.'s handgun ban failing "under any standard of scrutiny" as license to engage in the judicial-interest balancing adopted by this court. Maj. Op. 1100–01. But that misreads the statement. As then-Judge Kavanaugh noted, "that [reference] was more of a gilding-the-lily observation about the extreme nature of D.C.'s law—and appears to have been a pointed comment that the dissenters should have found D.C.'s law unconstitutional even under their own suggested balancing approach—than a statement that courts may or should apply strict or intermediate scrutiny in Second Amendment

cases." *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1277–78 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

Two years later came *McDonald*. There, the Court was again emphatic that the Second Amendment right was not subject to "interest balancing." 561 U.S. at 785, 130 S.Ct. 3020. *McDonald* reiterated the Court's "express[ ] reject[ion]" of "the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." *Id.* (citing *Heller*, 554 U.S. at 633–35, 128 S.Ct. 2783). The Court explicitly rejected some state courts' approach to permit balancing tests for firearm rights. *Id.* The Court reasoned that the Fourteenth Amendment did not apply "only a watered-down, subjective version of the individual guarantees of the Bill of Rights" against the States. *Id.* (simplified).

Once again responding to Justice Breyer, *McDonald* disclaimed the notion that the Amendment is to be assessed by calculating its benefits and costs. Justice Breyer, in dissent, noted that incorporating the Second Amendment against the States would require judges to face "complex empirically based questions," such as a gun regulation's impact on murder rates, which are better left to legislatures. *Id.* at 922–26, 130 S.Ct. 3020 (Breyer, J., dissenting). The Court answered that Justice Breyer was "incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *Id.* at 790–91, 130 S.Ct. 3020. On the contrary, rejecting any "interest-balancing test" for the Second Amendment right obviates the courts from making those "difficult empirical judgments." *Id.* (citing *Heller*, 554 U.S. at 634, 128 S.Ct. 2783).

Most recently, *Caetano* demonstrated the Court's application of *Heller* and, unsurprisingly, that case did not involve interest balancing. *See* 577 U.S. 411, 136 S.Ct. 1027, 194 L.Ed.2d 99. *Caetano* viewed *Heller* as announcing rules for determining the constitutionality of firearms regulations and applied these rules to a state ban on stun guns. *See* 577 U.S. at 411, 136 S.Ct. 1027. There, the Court drew three takeaways from *Heller*: (1) the Second Amendment protects arms "not in existence at the time of the founding"; (2) a weapon not "in common use at the time of the Second **\*1146**

ATTACHMENT

Amendment's enactment" does not render it "unusual"; and (3) the Second Amendment protects more than "only those weapons useful in warfare." *Id.* at 411–12, 136 S.Ct. 1027 (simplified). The Court held the state court's reasoning contradicted *Heller*'s "clear statement[s]" and vacated its decision. *Id.* at 412, 136 S.Ct. 1027. Notably, *Caetano* did not adopt a tier of scrutiny or otherwise engage in interest balancing. It certainly did not ask whether the stun gun ban was a "reasonable fit" with the state's public safety objective.

That the Court has uniformly rejected "interest balancing" when it comes to the Second Amendment is nothing new. Then-Judge Kavanaugh understood as much shortly after *Heller* and *McDonald* were decided. As he explained, the Supreme Court "set forth fairly precise guidance to govern" Second Amendment challenges. *Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting). "*Heller* and *McDonald*," he said, "leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." *Id.* More recently, Justice Kavanaugh has articulated his "concern that some federal and state courts may not be properly applying *Heller* and *McDonald*." *N.Y. State Rifle & Pistol Ass'n v. City of New York*, –– U.S. – ––, 140 S. Ct. 1525, 1527, 206 L.Ed.2d 798 (2020) (Kavanaugh, J., concurring).

Other justices have similarly questioned the continued use of tiers of scrutiny by lower courts. Justice Thomas, for instance, observed that many courts of appeals "have resisted [the Court's] decisions in *Heller* and *McDonald*" and sought to "minimize [*Heller*'s] framework." *Rogers v. Grewal*, –– U.S. ––––, 140 S. Ct. 1865, 1866, 207 L.Ed.2d 1059 (2020) (Thomas, J., dissenting from the denial of certiorari) (simplified). He emphasized that *Heller* "explicitly rejected the invitation to evaluate Second Amendment challenges under an 'interest-balancing inquiry, with the interests protected by the Second Amendment on one side and the governmental public-safety concerns on the other.' " *Id.* at 1867 (simplified).

*Rogers* wasn't the first time that Justice Thomas sounded the alarm on this issue. In *Friedman v. City of Highland Park*, Justice Thomas reiterated that the Court "stressed that the very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon."

577 U.S. 1039, 136 S. Ct. 447, 448, 193 L.Ed.2d 483 (2015) (Thomas, J., dissenting from denial of certiorari) (simplified); *see also Silvester v. Becerra*, –– U.S. ––––, 138 S. Ct. 945, 948, 200 L.Ed.2d 293 (2018) (Thomas, J., dissenting from the denial of certiorari) (explaining that *Heller* rejected "weigh[ing] a law's burdens on Second Amendment rights against the governmental interests it promotes"); *Jackson v. City & Cnty. of San Francisco*, 576 U.S. 1013, 135 S. Ct. 2799, 2802, 192 L.Ed.2d 865 (2015) (Thomas, J., dissenting from the denial of certiorari). Moreover, Justice Thomas has criticized tiers-of-scrutiny jurisprudence in general as an atextual and ahistorical reading of the Constitution. *See Whole Woman's Health v. Hellerstedt*, –– U.S. ––––, 136 S. Ct. 2292, 2327–28, 195 L.Ed.2d 665 (2016) (Thomas, J., dissenting) (characterizing the use of "made-up tests" to "displace longstanding national traditions as the primary determinant of what the Constitution means" as illegitimate (simplified).)[11]

[11]  For most of this country's history, judges viewed their role not as "weighing or accommodating competing public and private interests," but instead employing "boundary-defining techniques" which made their job a more "objective, quasi-scientific one." Richard Fallon, Strict Judicial Scrutiny, 54 UCLA L. Rev. 1267, 1274, 1285–86 (2007) (simplified). As Judge Berzon's concurrence demonstrates, the tiers-of-scrutiny approach is of recent vintage. Berzon Concurrence 1133–34. Judge Berzon, thus, confirms Professor Fallon's view that strict scrutiny (and its rational-basis and intermediate-scrutiny cousins) have no "foundation in the Constitution's original understanding." Fallon, *supra*, at 1268.

**\*1147** Justices Alito and Gorsuch have also taken issue with how lower courts are applying *Heller.* After determining that the lower court improperly upheld a New York City handgun ordinance under "heightened scrutiny," Justice Alito, joined by Justice Gorsuch, commented, "[w]e are told that the mode of review in this case is representative of the way *Heller* has been treated in the lower courts. If that is true, there is cause for concern." *N.Y. State Rifle & Pistol Ass'n*, 140 S. Ct. at 1544 (Alito, J., dissenting).

A chorus of circuit judges from across the country has also rejected the tiers-of-scrutiny approach adopted by this and other courts. *See, e.g., Mai*, 974 F.3d at 1083 (Collins, J., dissenting from the denial of reh'g en banc);

**ATTACHMENT**

*id.* at 1097 (VanDyke, J., dissenting from the denial of reh'g en banc); *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 127 (3d Cir. 2018) (Bibas, J. dissenting); *Mance v. Sessions*, 896 F.3d 390, 394 (5th Cir. 2018) (Elrod, J., joined by Jones, Smith, Willett, Ho, Duncan, and Engelhardt, JJ., dissenting from the denial of reh'g en banc); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 702 (6th Cir. 2016) (Batchelder, J., concurring); *id.* at 710 (Sutton, J., concurring).

We join this chorus. We cannot "square the type of means-ends weighing of a government regulation inherent in the tiers-of-scrutiny analysis with *Heller*'s directive that a core constitutional protection should not be subjected to a freestanding interest-balancing approach." *Mai*, 974 F.3d at 1086–87 (Bumatay, J., dissenting from the denial of reh'g en banc) (simplified)). That judges are not empowered to recalibrate the rights owed to the people has been stated again and again:

> Our duty as unelected and unaccountable judges is to defer to the view of the people who ratified the Second Amendment, which is itself the "very *product* of an interest balancing by the people." *Heller*, 554 U.S. at 635, 128 S.Ct. 2783. By ignoring the balance already struck by the people, and instead subjecting enumerated rights, like the Second Amendment, to our own judicial balancing, "we do violence to the [constitutional] design." *Crawford v. Washington*, 541 U.S. 36, 67–68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

*Id.* at 1087. After all, "[t]he People, through ratification, have already weighed the policy tradeoffs that constitutional rights entail." *Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1101, 194 L.Ed.2d 256 (2016) (Thomas, J., concurring).

Despite these warnings, our court charges ahead in applying the two-step-to-intermediate-scrutiny approach. Application of "intermediate scrutiny" to the large-capacity magazine ban, however, engages in exactly the sort of "costs and benefits" analysis the Court said we should not be doing. *McDonald*, 561 U.S. at 790–91, 130 S.Ct. 3020. This approach, moreover, is nothing more than a judicial sleight-of-hand, allowing courts to feign respect to the right to keep and bear arms while "rarely ever actually using it to strike down a law."[12] Intermediate scrutiny, **\*1148** we fear, is just window dressing for judicial policymaking. Favored policies may be easily supported by cherry-picked data under the tier's black box regime. But whether we personally agree with California's firearms regulations, that is no excuse to

disregard the Court's instructions and develop a balancing test for a fundamental right. Our job is not to give effect to our own will, but instead to "the will of the law"—in this case, the Constitution. *Osborn v. Bank of U.S.*, 22 U.S. 9 Wheat. 738, 866, 6 L.Ed. 204 (1824) (Marshall, C.J.).

[12] Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 Geo. Wash. L. Rev. 703, 757 (2012) (explaining that lower courts consistently apply intermediate scrutiny in line with Justice Breyer's dissent despite *Heller*'s rejection of that approach). Even if we were to ignore *Heller* and continue to follow our own misguided precedent, the majority still gets it wrong. As Judge Lee ably pointed out, strict scrutiny should apply because § 32310's categorical ban substantially burdens "the core right of law-abiding citizens to defend hearth and home." *Duncan v. Becerra*, 970 F.3d 1133, 1152 (9th Cir. 2020), reh'g en banc granted, opinion vacated, 988 F.3d 1209 (9th Cir. 2021). As the Supreme Court noted, laws that impinge on a "fundamental right explicitly ... protected by the constitution" require "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) ("[C]lassifications affecting fundamental rights are given the most exacting scrutiny." (simplified)).

Of course, this would not be the first time that our court struggled mightily to understand the Supreme Court's directions. *See, e.g.*, *Tandon v. Newsom*, ––– U.S. –––– –, 141 S. Ct. 1294, 1297, 209 L.Ed.2d 355 (2021) (per curiam) ("This is the fifth time the Court has summarily rejected the Ninth Circuit's analysis of California's COVID restrictions on religious exercise."). We have done so again here, and it is a shame.

## 2. The Supreme Court Looks to Text, History, and Tradition

Contrary to the majority's reiteration of a tiers-of-

ATTACHMENT

scrutiny, sliding scale approach, *Heller* commands that we interpret the scope of the Second Amendment right in light of its text, history, and tradition. That's because constitutional rights "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35, 128 S.Ct. 2783.

*Heller* announced a straightforward analytical framework that we are not free to ignore: the Second Amendment encompasses the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id. at 635, 128 S.Ct. 2783.* As a "prima facie" matter, that right extends to "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id. at 582, 128 S.Ct. 2783.* Any regulation that infringes on the exercise of this right implicates conduct protected by the Second Amendment.

But because the Second Amendment right is "not unlimited," *id. at 595, 128 S.Ct. 2783*, regulations that are "historical[ly] justifi[ed]" do not violate the right, *id. at 635, 128 S.Ct. 2783*. Primarily, the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," such as M-16s and short-barreled shotguns. *Id. at 625, 128 S.Ct. 2783.* In making this inquiry, we look to the "historical tradition," which has excluded "dangerous and unusual" weapons from the Amendment's protection. *Id. at 627, 128 S.Ct. 2783.* In the same way, the Amendment *does* protect weapons in "common us[age]." *Id.* Finally, the Second Amendment **\*1149** does not disturb "longstanding prohibitions" on the sale, possession, or use of guns with sufficient historical antecedents. *Id. at 626–27, 128 S.Ct. 2783.*

Rather than rely on our own sense of what is the right balance of freedom and government restraint, then, the Court instructs lower courts to follow the meaning of the People's law as understood at the time it was enacted. Such an approach is more determinate and "much less subjective" because "it depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor." *McDonald*, 561 U.S. at 804, 130 S.Ct. 3020 (Scalia, J., concurring).

Far from obscuring the decision-making process, as Judge

Berzon's concurrence contends, applying the text, history, and tradition approach forces judges to put their cards on the table. It sets out the ground rules under which constitutional decision-making is made. It ensures that only proper sources, datapoints, and considerations are used to determine the scope of the Second Amendment right. Adopting this approach necessarily constrains judges to the text and the historical record rather than to their own policy preferences. To be sure, no mode of judicial decision-making is perfect or can eliminate discretionary calls, but relying on a historical methodology provides discernible rules that "hedge[ ]" discretion and expose the "misuse of these rules by a crafty or willful judge" as "an abuse of power."[13] Even if the method requires complicated historical research or interpretative choices, the text, history, and tradition approach offers a common ground to criticize a judge who glosses over the text or misreads history or tradition.[14] Otherwise, we are left with the majority's approach which all too often allows judges to simply pick the policies they like with no clear guardrails.

[13]   Frank H. Easterbrook, Foreword to Antonin Scalia and Bryan A. Garner, Reading Law at xxiii (2012).

[14]   *See generally* William Baude, *Originalism as a Constraint on Judges*, 84 U. Chi. L. Rev. 2213 (2018).

Moreover, contrary to Judge Berzon's portrayal, the fact that "[w]ords do not have inherent meaning" is a feature—not a bug—of *Heller*'s text-based approach. *See* Berzon Concurrence 1118–19. We agree that the meaning of words may evolve over time. But enumerated rights do not. The People ratified the Second Amendment in 1791 to protect an enduring right—not one subject to the whims of future judges or the evolution of the words used to articulate the right.[15] This view is not radical. Chief Justice Marshall expressed a similar sentiment in 1827: The Constitution's words, he said, "are to be understood in that sense in which they are generally used by those for whom the instrument was intended; that its provisions are neither to be restricted into insignificance, **\*1150** nor extended to objects not comprehended in them." *Ogden v. Saunders*, 25 U.S. 12 Wheat. 213, 332, 6 L.Ed. 606 (1827) (Marshall, C.J., dissenting).

[15]   *See* Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cin. L. Rev. 849, 862 (1989) ("The purpose of constitutional guarantees ... is precisely to

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

prevent the law from reflecting certain changes in original values that the society adopting the Constitution thinks fundamentally undesirable."); *see also* William H. Rehnquist, *The Notion of a Living Constitution*, 54 Tex. L. Rev 693, 697 (1976) ("Once we have abandoned the idea that the authority of the courts to declare laws unconstitutional is somehow tied to the language of the Constitution that the people adopted, a judiciary exercising the power of judicial review appears in a quite different light. Judges then are no longer the keepers of the covenant; instead they are a small group of fortunately situated people with a roving commission to second-guess Congress [and] state legislatures ... concerning what is best for the country.").

Without hewing to the meaning of the right as understood at the time of enactment, we alter the rights chosen by the People and risk injecting our own policy judgments into the right's meaning. As for Judge Berzon's concern that the meaning of constitutional text may be "lost to the passage of time," Berzon Concurrence 1118, we have been interpreting language going back millennia. As Justice Gorsuch observed, "[j]ust ask any English professor who teaches Shakespeare or Beowulf." Neil M. Gorsuch, A Republic, If You Can Keep It 112 (2020). Simply put, original meaning gives enduring meaning to the Constitution and preserves our rights as they were enshrined at the time of adoption.

The criticisms of history and tradition playing a role in constitutional interpretation fall equally flat. *See* Berzon Concurrence 1119–26. As *Heller* shows, by looking to tradition and history, we see how constitutional text came to be and how the People closest to its ratification understood and practiced the right.[16] And by examining a firearm's history of common usage, we come to see the fundamental nature of the right and illuminate how a modern governmental regulation may infringe on a longstanding protection. Tradition and history may also allow us to take interpretive options off the table: they might say that two possible "answers" to a legal question are permissible, which "is worth something" because courts should not "impose a third possibility."[17] So, tradition and history inform the meaning of constitutional rights in ways that no tier-of-scrutiny can.

[16] *See* Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 Notre Dame L. Rev. 1, 28 (2015) ("[T]he original public meaning was, in part, determined by the

public context of constitutional communication. Thus, the public at large would have been aware of (or had access to) the basic history of the Constitution.).

[17] Ilan Wurman, *Law Historians' Fallacies*, 91 N.D. L. Rev. 161, 171 (2015).

For sure, this approach can be difficult. Some of Judge Berzon's process critiques are not all wrong. *See* Berzon Concurrence 1116–17 (noting that the "volume of available historical evidence ... will vary enormously and may often be either vast or quite sparse"). Looking to text, history, and tradition to uncover meaning takes time and careful analysis.[18] And interpreting the meaning of documents and events from long-ago is much harder than simply consulting our own policy views. But it is the high price our Constitution demands from judges who swear an oath to apply it faithfully. Indeed, the same criticisms leveled by Judge Berzon apply with greater force to the tiers-of-scrutiny approach because there is no historical backdrop to cabin a judge's discretion. While judges may not be historians, neither are we economists, statisticians, criminologists, psychologists, doctors, or actuarialists.[19] But that is exactly the type of expertise **\*1151** judges use to render judgment under the majority's approach. *See, e.g., Mai, 952 F.3d at 1118–20* (using Swedish statistical studies to justify the deprivation of the Second Amendment right of a formerly mentally ill citizen). While the text, history and tradition methodology may have shortcomings, it is better than the majority's approach.[20] Their judicial black box leaves critics grasping to understand the court's method for balancing policy interests. At the very least, text, history, and tradition has nothing to hide.

[18] *See, e.g.*, Gary Lawson & Guy Seidman, *Originalism as a Legal Enterprise*, 23 Const. Comment. 47, 74–75 (2006); William Baude & Jud Campbell, *Early American Constitutional History: A Source Guide* (2021), https://ssrn.com/abstract=2718777 (describing the wide variety of available originalist sources such as ratification debates, dictionaries, treatises, and linguistic corpora).

[19] *See* William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 Law and Hist. Rev. 809, 816 (2019) ("[L]egal uncertainty

**ATTACHMENT**

is hardly restricted to matters of history. Judges and juries frequently face questions that might stump expert economists or toxicologists.").

[20] *See* Scalia, *supra*, at 862–63.

### B. Under *Heller*, Large-Capacity Magazine Bans Are Unconstitutional

With a firm understanding of the approach directed by *Heller*, we turn to California's large-capacity ban.

### 1. Large-capacity magazines are "arms" under the Second Amendment.

To begin, when assessing a ban on a category of weapons, we look to whether the regulation infringes on the use of instruments that constitute "bearable arms" under the Second Amendment. *Heller*, 554 U.S. at 582, 128 S.Ct. 2783. The Court tells us that the term "bearable arms" includes any "[w]eapons of offence" or "thing that a man wears for his defence, or takes into his hands," that is "carr[ied] ... for the purpose of offensive or defensive action." *Id.* at 581, 584, 128 S.Ct. 2783 (simplified). It doesn't matter if the "arm" was "not in existence at the time of the founding." *See id.* at 582, 128 S.Ct. 2783.

At issue here are magazines capable of carrying more than ten rounds. A "magazine" is a firearm compartment that stores ammunition and feeds it into the firearm's chamber.[21] The magazines are integral to the operation of firearms. As a result, many popular firearms would be practically inoperable without magazines.

[21] *See Magazine*, Oxford English Dictionary Online, https://www.oed.com/view/Entry/112144; *Magazine*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/magazine.

That the law bans magazines rather than the guns themselves does not alter the Second Amendment inquiry. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis*, 136 S. Ct. at 1097 (Thomas, J., concurring). "No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized[.]" The Federalist No. 44, at 282 (James Madison) (Charles R. Kesler ed., 2003). Without protection of the components that render a firearm operable, the Second Amendment would be meaningless. *See Luis*, 136 S. Ct. at 1098 (Thomas, J., concurring); *see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing the "right to possess the magazines necessary to render ... firearms operable").

Because California's law prohibits the possession of large-capacity magazines, it is within the scope of the Second Amendment's protection.[22]

[22] California asserts that the Second Amendment doesn't extend to weapons "most useful in military service." *Heller* did not establish such an exception. In fact, *Heller* said the opposite: the Amendment's prefatory clause reference to the "conception of the militia" means that the right protects "the sorts of lawful weapons that [citizens] possessed at home [to bring] to militia duty." 554 U.S. at 627, 128 S.Ct. 2783. Justice Alito squarely dispensed with California's argument in *Caetano*, stating that the Court has "recognized that militia members traditionally reported for duty carrying the sorts of lawful weapons that they possessed at home, and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." 577 U.S. at 419, 136 S.Ct. 1027 (Alito, J., concurring) (simplified).

**\*1152 2. Large-capacity magazines are typically possessed by law-abiding citizens for lawful purposes.**

The next step in the Court's analysis requires that we determine whether large-capacity magazines are

**ATTACHMENT**

"typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625, 128 S.Ct. 2783. As we stated, this inquiry examines the historical record to determine whether the weapons are "dangerous and unusual," on the one hand, or whether they are in "common use," on the other. *Id.* at 627, 128 S.Ct. 2783 (simplified).[23]

[23] We believe this inquiry is one and the same. *Heller* mentions both in the same breath. Referring to the Court's prior precedent that "the sorts of weapons protected were those 'in common use at the time,' " the Court noted that "that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " 554 U.S. at 627, 128 S.Ct. 2783 (citing *United States v. Miller*, 307 U.S. 174, 179–80, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)). As then-Judge Kavanaugh recognized, *Heller* "said that 'dangerous and unusual weapons' are equivalent to those weapons not 'in common use.' " *Heller II*, 670 F.3d at 1272 (Kavanaugh, J., dissenting) (simplified); *see also United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."); *Wilson v. Cnty. of Cook*, 360 Ill.Dec. 148, 968 N.E.2d 641, 655 (Ill. 2012) (" *Heller* explicitly recognized a historical and long-standing tradition of firearms regulations prohibiting a category of 'dangerous and unusual weapons' that are 'not typically possessed by law-abiding citizens for lawful purposes.' ").

First, a word about "common usage." We start with the well-established premise that the Constitution protects enduring principles: "The meaning of the Constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it." *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 404, 57 S.Ct. 578, 81 L.Ed. 703 (1937). Thus, absent amendment, "the relevant [constitutional] principles must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers." *Heller II*, 670 F.3d at 1275 (Kavanaugh, J., dissenting).

Here, we look to the Second Amendment's text for its enduring meaning. Its prefatory clause reads: "A well regulated Militia, being necessary to the security of a free State[.]" U.S. Const. amend. II. The Court has told us that this prefatory clause "fits perfectly" with the Amendment's operative clause's individual right to keep and bear arms: "the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents." *Heller*, 554 U.S. at 598, 128 S.Ct. 2783. Thus, the prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia." *Id.* at 599, 128 S.Ct. 2783.

Understanding this background informs the type of weapons protected by the Second Amendment. As the Court wrote:

> In all the colonies, as in England, the militia system was based on the principle of the assize of arms. This implied the general obligation of all adult male inhabitants to possess arms, and, with certain exceptions, to cooperate in the work of defence. The possession of arms also implied the possession of ammunition, and the authorities paid quite as **\*1153** much attention to the latter as to the former.

*Miller*, 307 U.S. at 179–80, 59 S.Ct. 816 (simplified). The militia system then created a central duty: "ordinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 179, 59 S.Ct. 816. Thus, the lifeblood of militia service was citizens armed with weapons typically possessed at home for lawful purposes. As a result, the Second Amendment protects such weapons *as a class. See Heller*, 554 U.S. at 627, 128 S.Ct. 2783.

So, the Second Amendment protects the type of bearable weapons commonly used by citizens and at the ready for militia service—whether it be in 1791 or today.[24] What remains is an inquiry that is simultaneously historical and contemporary. The historical inquiry is relevant because we "reason by analogy from history and tradition" when

**ATTACHMENT**

interpreting the Constitution. *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 974 F.3d 237, 257 (3d Cir. 2020) (Matey, J., dissenting) (simplified). The Second Amendment right thus extends to "modern-day equivalents" of arms protected at the Founding. *See Parker v. District of Columbia*, 478 F.3d 370, 398 (D.C. Cir. 2007) ("[J]ust as the First Amendment free speech clause covers modern communication devices unknown to the founding generation, e.g., radio and television, and the Fourth Amendment protects telephonic conversation from a 'search,' the Second Amendment protects the possession of the modern-day equivalents of the colonial pistol."), *aff'd sub nom., Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637. For this reason, even new or relatively unpopular firearms today might enjoy the Second Amendment's protection if they are "modern-day equivalents" of firearms that have been commonly owned for lawful purposes. Of course, the protection extends equally to weapons not in common use as a historical matter, so long as they are "commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano*, 577 U.S. at 420, 136 S.Ct. 1027 (Alito, J., concurring).

[24]     It is no matter that citizens don't typically serve in militias today, or that the weapons protected by the Second Amendment would be comparatively ineffective in modern warfare. As *Heller* explained, "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Heller*, 554 U.S. at 627–28, 128 S.Ct. 2783.

Some courts have reviewed that common usage requirement as being "an objective and largely statistical inquiry." *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015). For example, Justice Alito noted the quantity of stun guns (200,000) in circulation as proof that they're commonly owned for lawful purposes. *Caetano*, 577 U.S. at 420, 136 S.Ct. 1027 (Alito, J., concurring). But a narrow focus on numbers may not capture all of what it means to be a weapon "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625, 128 S.Ct. 2783. As Judge Lee noted, "pure statistical inquiry may hide as much as it reveals." *Duncan*, 970 F.3d at 1147. A straight quantitative inquiry could create line-drawing problems and lead to bizarre results—such as the exclusion of a protectable arm because it is not widely possessed "by virtue of an unchallenged, unconstitutional regulation."

*Id.*; *see also Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly used. A law's existence can't be the source of its own constitutional validity."). Indeed, notably absent from *Heller* is any **\*1154** analysis of the number of handguns in circulation or the proportion of owned firearms that were handguns. *Heller* instead focused on the purpose for which the firearms are owned and used. *See* 554 U.S. at 629, 128 S.Ct. 2783 ("It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon."). Thus, in addition to statistical analysis, some courts also look to "broad patterns of use and the subjective motives of gun owners." *N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 256. We need not resolve all these questions today, since large-capacity magazines, as we show below, are "in common use" today under either rubric.

### a. Large-capacity magazines enjoy a long historical pedigree.

Looking at the historical record, large-capacity magazines are clear modern-day equivalents of arms in common use by the incorporation of the Second Amendment and are, thus, entitled to constitutional protection. As Judge Lee concluded: "Firearms or magazines holding more than ten rounds have been in existence—and owned by American citizens—for centuries. Firearms with greater than ten round capacities existed even before our nation's founding, and the common use of [large-capacity magazines] for self-defense is apparent in our shared national history." *Duncan*, 970 F.3d at 1147; *see also* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015) ("[I]n terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified.").

Rather than re-tell the long history of large-capacity magazines in this country, we offer some highlights:

• The first known firearm capable of firing more than ten rounds without reloading was a 16-shooter

ATTACHMENT

invented in 1580.

• The earliest record of a repeating firearm in America noted that it fired more than ten rounds: In 1722, Samuel Niles wrote of Indians being entertained by a firearm that "though loaded but once, ... was discharged eleven times following, with bullets, in the space of two minutes." Harold L. Peterson, Arms and Armor in Colonial America 1526–1783, 215 (2000).

• At the Founding, the state-of the-art firearm was the Girandoni air rifle with a 22-shot magazine capacity.

• In 1777, Joseph Belton demonstrated a 16-shot repeating rifle before the Continental Congress, seeking approval for its manufacture. Robert Held, The Belton Systems, 1758 & 1784–86: America's First Repeating Firearms 37 (1986).

• By the 1830s, "Pepperbox" pistols had been introduced to the American public and became commercially successful. Depending on the model, the Pepperbox could fire 5, 6, 12, 18, or 24 rounds without reloading.

• It took several years for Samuel Colt's revolvers (also invented in the 1830s) to surpass the Pepperbox pistol in the marketplace.

• From the 1830s to the 1850s, several more rifles were invented with large ammunition capacities, ranging from 12- to 38-shot magazines.

• By 1855, Daniel Wesson (of Smith and Wesson fame) and Oliver Winchester collaborated to introduce the lever action rifle, which contained a 30-round magazine that could be emptied in less than one minute. A later iteration of this rifle, the 16-round **1155** Henry lever action rifle, became commercially successful, selling about 14,000 from 1860 to 1866.

• By 1866, the first Winchester rifle, the Model 1866, could hold 17 rounds in the magazine and one in the chamber, all of which could be fired in nine seconds. All told, Winchester made over 170,000 copies of the from 1866 to 1898. See Norm Flayderman, Flayderman's Guide to Antique Firearms and Their Values 268 (6th ed. 1994).

• A few years later, Winchester produced the M1873, capable of holding 10 to 11 rounds, of which over 720,000 copies were made from 1873 to 1919.

From this history, the clear picture emerges that firearms with large-capacity capabilities were widely possessed by law-abiding citizens by the time of the Second Amendment's incorporation. In that way, today's large-capacity magazines are "modern-day equivalents" of these historical arms, and are entitled to the Second Amendment's protection.

**b. Magazines with over ten rounds are widely used for lawful purposes today.**

It is also uncontested that ammunition magazines that hold more than ten rounds enjoy widespread popularity today. This is evident from the fact that as many as 100,000,000 such magazines are currently lawfully owned by citizens of this country. It's also apparent from the fact that those magazines are a standard component on many of the nation's most popular firearms, such as the Glock pistol, which comes with a magazine that holds 15 to 17 rounds.[25] They are lawful in at least 41 states and under Federal law. Indeed, large-capacity magazines account for *half* of all magazines owned in the United States today. Thus, the record in this case shows that large-capacity magazines are in common use for lawful purposes today, entitling them to Second Amendment protection.

[25] We can go on and on with examples. Since 1964, Ruger has sold six million copies of its 10/22 rifles, which is manufactured with 10-round, 15-round, and 25-round magazines. More than five million AR-15 rifles have been sold, typically with 30-round magazines. The commonality of large-capacity magazines is well accepted by other courts. *See, e.g.,* 🔖 *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend" because "fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000.").

Not only are they ubiquitous, the large-capacity magazines are used for lawful purposes, like home defense. Millions of semiautomatic pistols, the "quintessential self-defense weapon" for the American

ATTACHMENT

people, *Heller*, 554 U.S. at 629, 128 S.Ct. 2783, come standard with magazines carrying over ten rounds. Many citizens rely on a single, large-capacity magazine to respond to an unexpected attack. As one firearms expert put it: firearms equipped with a magazine capable of holding more than ten rounds are "more effective at incapacitating a deadly threat and, under some circumstances, may be necessary to do so." This is why many Americans choose to advantage themselves by possessing a firearm equipped with a large-capacity magazine and why the ownership of those magazines is protected by the Second Amendment.

California does not refute any of this.[26] Indeed, courts throughout the country **\*1156** agree that large-capacity magazines are commonly used for lawful purposes. *See Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116–17 ("The record shows that millions of magazines are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense[.]" (simplified)); *N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 255 ("[S]tatistics suggest that about 25 million large-capacity magazines were available in 1995, ... and nearly 50 million such magazines—or nearly two large-capacity magazines for each gun capable of accepting one—were approved for import by 2000.). Even our court has begrudgingly admitted as much. *See Fyock*, 779 F.3d at 998 ("[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, [large-capacity] magazines are in common use. And, to the extent that certain firearms capable of use with a magazine—e.g., certain semiautomatic handguns—are commonly possessed by law-abiding citizens for lawful purposes, our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable.").

[26]    Instead, California points to data suggesting that people using firearms in self-defense fire only "2.2 shots on average." On this basis, California argues that the banned magazines are not useful for self-defense. This is a non-sequitur. That a citizen did not expend the full magazine does not mean that the magazine was not useful for self-defense purposes. It is also immaterial that plaintiffs have not shown when a large-capacity magazine was *necessary* to fend off attackers. That is not the test. *Heller* only looks to the *purpose* of the firearm's ownership—not that it is *effectively used* or *absolutely necessary* for that purpose. In fact, we are hopeful that most law-abiding citizens never have to use their firearms in self-defense.

In sum, firearms with magazines capable of firing more than ten rounds are commonplace in America today. And they are widely possessed for the purpose of self-defense, the very core of the Second Amendment. Accordingly, an overwhelming majority of citizens who own and use large-capacity magazines do so for lawful purposes. "Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons." *Friedman*, 136 S. Ct. at 449 (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) (emphasis added). So, unless subject to "longstanding prohibition," they are protected by the Second Amendment.

### 3. Bans on large-capacity magazines are not a presumptively lawful regulatory measure.

After completing its analysis, *Heller* cautioned: "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27, 128 S.Ct. 2783. The Court also noted that its list of "presumptively lawful regulatory measures" was not "exhaustive." *See id.* at 627 n.26 128 S.Ct. 2783. Thus, it would be wise to ask whether California's law enjoys the endorsement of history. Our task, therefore, is to determine "whether the challenged law traces its lineage to founding-era or Reconstruction-era regulations," *Duncan*, 970 F.3d at 1150, because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634–35, 128 S.Ct. 2783. As a preview, California cannot meet this showing: the **\*1157** magazine ban's earliest analogues only show up in the early twentieth century, which doesn't meet the definition of "longstanding" under *Heller.*

The Court's first example of a longstanding and presumptively lawful regulatory measure is the "prohibition[ ] o[f] the possession of firearms by felons

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

and the mentally ill." 🏳 *Heller*, 554 U.S. at 626, 128 S.Ct. 2783. Prohibiting the possession of arms by those found by the state to be dangerous, like violent criminals, dates to the Founding.[27] And prohibiting the mentally ill from exercising firearms rights also has roots dating to the Founding. *See Mai*, 974 F.3d at 1090 (Bumatay, J., dissenting from the denial of reh'g en banc).

[27]     *See* 🏳 *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) ("History ... support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous.") (Barrett, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009) (" '[L]ongstanding' precedent in 🏳 America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that ... its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger."); Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to 'Bear Arms'*, 49 Law & Contemp. Probs. 151, 161 (1986) ("[V]iolent criminals, children, and those of unsound mind may be deprived of firearms[.]"); 🏳 *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 369 (3d Cir. 2016) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he historical record leads us to conclude that the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed."). Because such prohibitions—in their contemporary form—date only to the early twentieth century, *Marshall, supra* at 695, some (including the majority) have mistakenly concluded that *any* firearm regulation dating to that period must be presumptively lawful. *See, e.g.*, Maj. Op. 1102–03.

🏳 *Heller* next points to laws that forbid "the carrying of firearms in sensitive places," as an example of longstanding regulatory measures." 554 U.S. at 626, 128 S.Ct. 2783. Again, this practice dates to the Founding: "colonial and early state governments routinely exercised their police powers to restrict the time, place, and manner in which Americans used their guns." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context*

*of the Second Amendment*, 25 Law & Hist. Rev. 139, 162 (2007). For example, the Delaware Constitution of 1776 stated that "no person shall come armed to any" of the state elections, so as to "prevent any violence or force being used at the said elections." Del. Const., art. 28 (1776). And the multitude of Founding-era laws regulating the times and places in which firearms could be used are well documented. *See* Churchill, *supra* at 161–66.

The final demonstrative category in 🏳 *Heller* is the imposition of "conditions and qualifications on the commercial sale of arms." 🏳 554 U.S. at 627, 128 S.Ct. 2783. The historical lineage of such a broad set is necessarily difficult to trace; the more specific the "condition" or "qualification," the more varied the history will be. *Cf.* 🏳 *Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018) ("Our circuit similarly has strained to interpret the phrase 'conditions and qualifications on the commercial sale of arms.' "). Still, in analyzing this category, our circuit has traced its antecedents to the Founding. We've noted that "colonial government regulation included some restrictions on the commercial sale of firearms." 🏳 *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc).[28]

[28]     For example, several colonies "passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians." 🏳 *Teixeira*, 873 F.3d at 685. And, for instance, "Connecticut banned the sale of firearms by its residents outside the colony." 🏳 *Id.* Connecticut law also required a license to sell gunpowder that had been manufactured in the colony outside the colony. *See* An Act for encouraging the Manufactures of Salt Petre and Gun Powder, December 1775, *reprinted in* The Public Records of the Colony of Connecticut From May, 1775, to June, 1776 191 (Charles J. Hoadly ed., 1890); ("Be it ... enacted, That no salt petre, nitre or gun-powder made and manufactured, or that shall be made and manufactured in this Colony, shall be exported out of the same by land or water without the licence of the General Assembly or his Honor the Governor and Committee of Safety[.]"). Similarly, New Jersey law required that any gunpowder be inspected and marked before its sale. An Act for the Inspection of Gun-Powder, ch. 6, § 1. 1776 N. J. Laws 6. (making it an "Offence" for "any Person" to "offer any Gun-Powder for Sale, without being previously inspected and marked as in herein after directed").

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

**\*1158** As mentioned above, a pattern emerges. *Heller*'s examples of longstanding, presumptively lawful regulations have historical analogues at least dating to the Founding. This makes sense: determining the core of the Second Amendment's protection is, after all, a "historical inquiry [that] seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).

That pattern is problematic for California. The first law limiting magazine capacity was enacted by Michigan in 1927, setting an upper limit of 16 rounds. *See* Act of June 2, 1927, No. 373, § 3, 1927 Mich. Public Acts 887, 888 (repealed 1959). Rhode Island passed a similar ban that year, prohibiting any firearm that could shoot more than 12 times without reloading. *See* Act of Apr. 22, 1927, ch. 1052, §§ 1, 4, 1927 R.I. Acts & Resolves 256, 256–57 (amended 1959). In 1932, the District of Columbia prohibited the possession of a firearm that could shoot more than 12 rounds without reloading. *See* Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652. The next year, Ohio passed a law requiring a permit to possess any firearm with an ammunition capacity over 18 rounds. *See* Act of Apr. 8, 1933, No. 166, sec. 1, §§ 12819-3, -4, 1933 Ohio Laws 189, 189 (amended 1972). California's law, meanwhile, dates only to 1999.

California does not dispute the historical record—it points to the above Prohibition-era laws of Michigan, Rhode Island, and Ohio to defend its own ban's historical pedigree. But such laws aren't nearly old enough to be longstanding. Even if, for the sake of argument, we granted that a regulation need only date to the Reconstruction era to be sufficiently longstanding, California's large-capacity magazine ban still fails. Thus, California's magazine ban is not longstanding or presumptively lawful.[29] *See Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116–17 ("[T]here is no longstanding history of LCM regulation."); *id. at 117 n.18* ("LCMs were not regulated until the 1920s, but most of those laws were invalidated by the 1970s. The federal LCM ban was enacted in 1994, but it expired in 2004.") (simplified).

[29]  Sufficient historical pedigree is only capable of establishing a presumption in favor of constitutionality. But that presumption is not dispositive. Thus, even if California's magazine ban dated to a period that would plausibly render it longstanding (*i.e.*, the Founding or Reconstruction), we would still need to answer

whether that presumption could be overcome. California's law effectively outlaws massive swaths of firearms chosen by law-abiding citizens for lawful purposes like self-defense. If a court were forced to answer the question, it's possible that the ban's history couldn't save it.

Not only is California's ban not historically longstanding, but it also differs in **\*1159** kind from the regulatory measures mentioned in *Heller*. Regulations on possession by people dangerous to society, where a firearm may be carried, and how firearms may be exchanged, *see Heller*, 554 U.S. at 626–27, 128 S.Ct. 2783, are about the manner or place of use and sale or the condition of the user. California's ban, on the other hand, is much more like a "prohibition on an entire class of 'arms' that is overwhelmingly chosen by American society" for home defense. *Id. at 628, 128 S.Ct. 2783*. Also, like the ban in *Heller*, California's ban extends "to the home, where the need for defense of self, family, and property is most acute." *Id.*

In the end, California fails to point to a single Founding-era statute that is even remotely analogous to its magazine ban. Ironically, the closest Founding-era analogues to ammunition regulations appear to be laws *requiring* that citizens arm themselves with particular arms and a specific minimum amount of ammunition. *See* 1784 Mass. Acts 142; 1786 N. Y. Laws 228; 1785 Va. Statutes at Large 12 (12 Hening c. 1); 1 Stat. 271 (1792) (Militia Act); Herbert L. Osgood, *The American Colonies in the Seventeenth Century* 499–500 (1904) (showing that states required citizens to equip themselves with adequate firearms and sufficient ammunition—varying between twenty and twenty-four cartridges *at minimum*). That does not offer historical support for California's ban; in fact, it runs directly counter to California's position.

## IV.

California's experiment bans magazines that are commonly owned by millions of law-abiding citizens for lawful purposes. These magazines are neither dangerous and unusual, nor are they subject to longstanding regulatory measures. In ratifying the Second Amendment, the People determined that such restrictions are beyond

**ATTACHMENT**

the purview of government. Our court reaches the opposite conclusion in contravention of the Constitution and Supreme Court precedent. In so doing, it once again employs analytical tools foreign to the Constitution—grafting terms like "intermediate scrutiny," "alternative channels," and "reasonable fit" that appear nowhere in its text. So yet again, we undermine the judicial role and promote ourselves to the position of a super-legislature—voting on which fundamental rights protected by the Constitution will be honored and which will be dispensed with.

We respectfully dissent.

VANDYKE, Circuit Judge, dissenting

I largely agree with Judge Bumatay's excellent dissent. And to paraphrase James Madison, if judges were angels, nothing further need be said. But unfortunately, however else it might be described, our court's Second Amendment jurisprudence can hardly be labeled angelic. Possessed maybe—by a single-minded focus on ensuring that any panel opinions actually enforcing the Second Amendment are quickly reversed. The majority of our court distrusts gun owners and thinks the Second Amendment is a vestigial organ of their living constitution. Those views drive this circuit's caselaw ignoring the original meaning of the Second Amendment and fully exploiting the discretion inherent in the Supreme Court's cases to make certain that *no* government regulation ever fails our laughably "heightened" Second Amendment scrutiny.

This case is par for the course. The majority emphasizes the statistical rarity of law-abiding citizens' need to fire more than an average of 2.2 shots in self-defense, but glosses over the statistical rarity of the harm that California points to as supporting its magazine ban. Instead of **\*1160** requiring the government to make an actual heightened showing, it heavily weighs the government's claim that guns holding more than 10 rounds are "dangerous" (of course they are—all guns are) against a self-defense interest that the majority discounts to effectively nothing. Once again, our court flouts the Supreme Court's exhortation against such "a freestanding 'interest-balancing' approach" to the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 634, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

If the Second Amendment is ever going to provide any real protection, something needs to change. I have some suggestions, which I offer below after first discussing

some of the flaws in the majority's analysis of this case.[1] Until the Supreme Court requires us to implement a paradigm shift, the Second Amendment will remain a second-class right—especially here in the Ninth Circuit.

[1]    Because Judge Bumatay's dissent explains at length the shortcomings of the majority's analysis, I provide only some supplemental observations.

* * *

It should be presumptively unconstitutional to burden constitutional rights. But looking at our court's cases, you would assume that any burden on the right to bear arms is presumptively permitted. I've described before how our circuit's version of Second Amendment "heightened" scrutiny has no height. It is practically indistinguishable from rational basis review. *See Mai v. United States*, 974 F.3d 1082, 1097–106 (9th Cir. 2020) (VanDyke, J., dissenting from denial of rehearing en banc). While our court gives lip service to *Heller*, its practice of effectively applying rational basis review ignores *Heller*'s admonition that if passing rational basis review was "all that was required to overcome the right to keep and bear arms ... the Second Amendment would be redundant ...." *Heller*, 554 U.S. at 628 n.27, 128 S.Ct. 2783.

The brokenness of our court's balancing approach is particularly evident in this case, where the majority weighs rarity like lead when it favors the ban, but then weighs rarity like helium when it undermines California's asserted interest. On one hand, the majority ignores the fact that California's claimed reason for its ban—mass shootings—involves a harm that, while tragic and attention-grabbing, is thankfully extremely rare by any statistical metric. You are much more likely to be randomly injured or killed by a drunk driver than a mass shooter. But on the other hand, the majority emphasizes the rarity of any individual American's use of ammunition in self-defense, latching onto California's argument that only 2.2 rounds are used on average in a self-defense shooting, and concludes that any more rounds than that are thus outside the "core" of the Second Amendment.

We might call this Version 2.2 of the Second Amendment. It cannot be the right way to analyze an alleged violation of the right to bear arms. The average number of times that any law-abiding citizen *ever* needs to "bear arms" at all in a self-defense situation is far below one—most people will (thankfully) *never* need to use a gun to defend themselves. Thus, applying the

ATTACHMENT

majority's rarity analysis, possession of a gun itself falls outside the "core" of the Second Amendment. But we know that cannot be true from *Heller*, where the Supreme Court determined "self-defense ... was the *central component*" of the Second Amendment, notwithstanding the practical infrequency of any particular person's need to actually defend herself with a gun. 554 U.S. at 599, 128 S.Ct. 2783.

**\*1161** So the majority's rarity balancing isn't just lopsided—it starts from the wrong premise. We would never treat fundamental rights we care about this way, particularly those expressly enumerated in the Constitution. We don't protect the free speech of the taciturn less than the loquacious. We don't protect the free exercise of religion in proportion to how often people go to church. We wouldn't even allow soldiers to be quartered only in those parts of your house you don't use much. Express constitutional rights by their nature draw brighter and more prophylactic lines—precisely because those who recognized them were concerned that people like California's government and the judges on our court will attempt to pare back a right they no longer find useful. This is the sentiment James Madison expressed in extolling "the wisdom of descrying ... the minute tax of 3 pence on tea, the magnitude of the evil comprized in the precedent. Let [us] exert the same wisdom, in watching agst every evil lurking under plausible disguises, and growing up from small beginnings." *Madison's "Detached Memoranda,"* 3 Wm. & Mary Q. (3d ser.) 534, 557–58 (E. Fleet ed., 1946). The majority here extends our circuit's practice of chipping away at a disfavored constitutional right, replacing the Second Amendment with their 2.2nd Amendment.

This case is the latest demonstration that our circuit's current test is too elastic to impose any discipline on judges who fundamentally disagree with the need to keep and bear arms. I consequently suggest two less manipulable tests the Supreme Court should impose on lower courts for analyzing government regulations burdening Second Amendment rights, replacing the current malleable two-step, two-pronged inquiry with something that would require courts to actually enforce the second provision of the Bill of Rights.

First, the Supreme Court should elevate and clarify *Heller*'s "common use" language and explain that when a firearm product or usage that a state seeks to ban is currently prevalent throughout our nation (like the magazines California has banned here), then strict scrutiny applies. Second, the Court should direct lower courts like ours to compare one state's firearm regulation to what other states do (here a majority of states allow

what California bans), and when most other states don't similarly regulate, again, apply strict scrutiny. Where many law-abiding citizens seeking to prepare to defend themselves have embraced a particular product or usage, or the majority of states have not seen a necessity to restrict it, real heightened scrutiny should be required instead of allowing our court to sloppily balance the citizen's "need" against the government's claimed "harm."

No doubt these proposed tests are not perfectly satisfying—doctrinally or academically. Few actual legal tests are, since the application of legal rules happens in the messiness of the real world. Nor would these suggested tests address every situation. Judge Berzon observes, for example, that under the "common use" test I seek to invigorate, gun-adverse states like California will predictably react to new technologies by trying to kill the baby in the cradle—immediately banning any new technology before it can become "commonly used." Perhaps so, but those are difficulties at the margin. Right now, as I discuss further below, we have a Second Amendment test that enables *zero* enforcement in this circuit. Ultimately, Judge Bumatay's and Judge Berzon's opinions converge at one very important point: *neither* our current two-step test *nor* any proposed alternative that allows much interpretative or balancing discretion will ultimately lead to consistent and rigorous enforcement of the **\*1162** Second Amendment—particularly with the many judges who disagree with its very purpose.[2] It's now beyond obvious that you can't expect our court to faithfully apply any Second Amendment test that allows us to exercise much discretion. Many fundamental rights are protected by more bright-line tests.[3] It's past time we bring that to the Second Amendment.

---

[2]  To be clear, I think Judge Bumatay has penned an exemplary dissent addressing "text, tradition, and history." My objection is not that judges *cannot* do good analysis under this framework, but rather that without a more bright-line test there is far too much opportunity for manipulation, especially with a right as unpopular with some judges as the Second Amendment.

[3]  *See* David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 ST. LOUIS U.L.J. 193, 303 (2017) ("Bright-line rules declaring certain government actions categorically unconstitutional, without the need for a means/ends test, are common in constitutional law. They are found in the First Amendment, Fifth Amendment, Sixth

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

Amendment, Eighth Amendment, Tenth Amendment, and Fourteenth Amendment.") (footnotes omitted).

## I. The Majority Takes Our Circuit's "Heightened" Scrutiny to a New Low.

I've observed before how, for Second Amendment cases, our circuit has "watered down the 'reasonable fit' prong of intermediate scrutiny to little more than rational basis review," starting by borrowing an inapt test from the First Amendment context and then weakening it with each passing case upholding government restrictions. *Mai*, 974 F.3d at 1101–04 (VanDyke, J., dissenting from denial of rehearing en banc). This case furthers that trend. Instead of "demand[ing] a closer regulatory fit for a law that *directly* burdens a fundamental right," our en banc court fails to apply any "real heightened scrutiny, or even just faithfully appl[y] the [heightened scrutiny] test as articulated in" comparable First Amendment jurisprudence. *Id.* at 1104. Indeed, notwithstanding our court's early commitment that "we are ... guided by First Amendment principles" in applying the Second Amendment, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014), it is telling that comparisons between the First and Second Amendment in this latest case have largely been dropped by the majority and relegated to concurring opinions— likely because it gets embarrassing and wearisome to constantly rationalize why we treat the Second Amendment so differently than its close constitutional neighbor.

In analyzing whether California's magazine ban violates the Second Amendment, the majority here follows a now well-traveled path. It starts like many of our Second Amendment cases: by assuming, instead of deciding, that the Second Amendment even applies to California's ban. *See, e.g.*, *Mai v. United States*, 952 F.3d 1106, 1114–15 (9th Cir. 2020); *Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018); *Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015).[4] This itself **\*1163** is very telling. It emphasizes the practical vacuity of the second step in our court's two-step test. The reason it is so effortless for our court to "assume" that the Second Amendment applies is because the plaintiff will always lose at our court's step-two intermediate scrutiny. If we genuinely applied any form of heightened scrutiny, we would have to be more careful and concise about what activity or item warrants protection under the Second Amendment. And something is wrong when most of our court's judges can't bring themselves to say the Second Amendment actually covers anything beyond a *Heller*-style total handgun ban. It's the judicial equivalent of holding your nose.

[4]      The majority claims that the current two-step inquiry "faithfully adheres" to *Heller*, since "history, text, and tradition greatly inform step one of the analysis ...." But this only illustrates my point about the malleability of our current framework. Our court consistently uses step one of our test to either: (1) wade through the complicated history to conclude the regulation does *not* burden conduct protected by the Second Amendment at all, *see, e.g.*, *Young v. Hawaii*, 992 F.3d 765, 785 (9th Cir. 2021) (en banc) ("As we might expect in this area, fraught with strong opinions and emotions, history is complicated, and the record is far from uniform."); or (2) as here, side-step this inquiry altogether by *assuming* the conduct implicates the Second Amendment, only to uphold the regulation at step two by applying an extremely loose balancing test (more on that below). It's clear that history, text, and tradition is currently comatose in our circuit's jurisprudence *enforcing* the Second Amendment—we only rely on it when deemed useful to support the conclusion that something falls outside our court's illusory Second Amendment protection.

After the majority here assumes that California's magazine ban "implicates" the Second Amendment at step one of our test, at step two it concludes that banning the most commonly purchased magazine used in handguns for self-defense only places a "small burden" on the exercise of the right to bear arms and thus only intermediate scrutiny applies. And by this point we all know what that means: the regulation burdening the citizens' Second Amendment rights *always* wins under our version of Second Amendment "intermediate scrutiny." Repeatedly characterizing the legislation as a "minimal burden," the majority decries any possible need for the banned magazines and relies heavily on the rarity of their full use in self-defense, while giving no weight to the *effectiveness* of such magazines in self-defense.

Building on this rationale, Judge Graber's concurrence provides a list of unrealistic alternatives one could use in lieu of a higher-capacity magazine: carry multiple guns;

**ATTACHMENT**

carry extra magazines; carry some loose rounds in your pocket; carry a cop (okay, I made that last one up). I doubt many who actually carry a gun for self-defense would find these alternatives realistic. And the majority references no "heightened" showing made by the government, other than listing past tragic events across the nation in which criminals misused guns. Those events were, of course, horrific. But citing select (and in this case, statistically very rare) examples of misuse cannot be a basis to overcome the Second Amendment. If it was, then the much more prevalent misuse of guns in criminal activity generally would suffice to ban all guns. That is why, when applying real heightened scrutiny, a "substantial relation is necessary but not sufficient."

*Ams. for Prosperity Found. v. Bonta*, —— U.S. ——, 141 S. Ct. 2373, 2384, 210 L.Ed.2d 716 (2021) (applying exacting scrutiny in a First Amendment case).

The truth is that what our court calls "intermediate scrutiny" when reviewing Second Amendment cases doesn't even rise to the level of real rational basis review. That's a bold claim, I know. But think about it: if your state banned all cars, forcing all its citizens to use bicycles because many people are killed by drunk drivers (not to mention automobile accidents generally), would you think that was rational? No. What if California just banned all *large* vehicles (trucks, vans, etc.) because on rare occasions some crazed individual intentionally drives his car into a group of people, and large cars presumably do more damage? I doubt it. But that is what California has done here—banned a type of firearm magazine that has obvious self-defense benefits when used against a *group* of assailants, based on a purported harm that, while high-profile, **\*1164** is statistically extraordinarily improbable.[5] Much more improbable than harm from misuse of a car. And while cars are not expressly protected by the Constitution, "arms" are.[6]

[5]    By emphasizing their statistical rarity, I do not belittle the tragedy experienced by those affected by a mass shooting (any more than observing that airline crashes are thankfully rare detracts from the heartbreak of those involved when they happen).

[6]    Characterizing my car ban analogies as "inapt," the majority says that California's magazine ban is more akin to "speed limits." But in attempting to trade my analogies for a more favorable one, the majority misses the obvious point: that in every context except our distorted Second Amendment jurisprudence, everyone agrees that

when you evaluate whether a response to avoid some harm is "rational"—much less a "reasonable fit"—you take into account *both* the gravity of the possible harm *and* the risk of it occurring. The majority here completely ignores the latter. Perhaps if I use the majority's own analogy it might click: If California chose to impose a state-wide 10 mph speed limit to prevent the very real harm of over 3,700 motor-vehicle deaths each year experienced from driving over 10 mph, *no one* would think such a response is rational—precisely because, even though the many deaths from such crashes are terrible, they are a comparatively rare occurrence (although much *more* common than deaths caused by mass shootings).

The reason I think most of my colleagues on this court would genuinely struggle more with a car ban than they do with a gun ban is that they naturally see the value in cars. They drive cars. So they are willing to accept some inevitable amount of misuse of cars by others. And my colleagues similarly have no problem protecting speech—even worthless, obnoxious, and hateful speech[7]—because they like and value speech generally. After all, they made their careers from exercising their own speech rights. On the other hand, as clearly demonstrated by this case, most of my colleagues see "limited lawful" value in most things firearm-related.

[7]    *See, e.g.,* *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) ("indecent ... [expression] is protected by the First Amendment"); *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 44, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977) (per curiam) (protecting the First Amendment rights of Nazis to protest).

But the protections our founders enshrined in the Bill of Rights were put there precisely because they worried our future leaders might not sufficiently value them. That is why our court's "intermediate scrutiny" balancing approach to the Second Amendment is no more appropriate here than it would be for any other fundamental right. As the Supreme Court explained in rejecting Justice Breyer's " 'interest-balancing' approach," noting that "no other enumerated constitutional right['s] ... core protection" was subject to such a test,

ATTACHMENT

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.

*Heller*, 554 U.S. at 634–35, 128 S.Ct. 2783.

The majority repeatedly denies that it is engaging in the type of "judge-empowering interest-balancing inquiry" rejected in *Heller*, insisting instead that it is merely applying our "traditional test" in this case. It's doing both. Our traditional two-part test *is* a "judge-empowering interest-balancing inquiry." It's a convoluted, multi-step balancing test that weighs different considerations at different times so as to give judges maximum discretion and mask when they treat the same considerations differently at the various stages of the balancing (like here). When one steps back **\*1165** and evaluates our current Second Amendment test, it is clear the court is engaging in an interest-balancing test—it's just that the balancing is done in two or more steps instead of all together.

What we call our two-step test really has three parts, since the second "step" is divided into two parts. A play in two acts, so to speak. Step II, Part I: the court determines the proper level of scrutiny, which includes *weighing* "the severity of the law's burden on the right." Step II, Part II: the court then applies the "appropriate" level of scrutiny (which, in our court's case, is always intermediate), where the court *weighs* the government's interest in the regulation (including "reasonable fit"). An ever-adapting script, it is always these two *competing interests* that drive the court's analysis. Ultimately, the court is *comparing* the plaintiff's burden against the state's interest. If the burden on the plaintiff's Second Amendment rights is great (i.e., near the mythical "core" of the Second Amendment), then the government is (theoretically) required to make a stronger showing of its interest and fit. And vice-versa. Like a good Marvel movie, there's always lots of drama, but the result is fore-ordained.

This particularly pernicious balancing test is a shell game. The balancing is done piecemeal so that the court can use differently weighted scales at each step and obfuscate the stark disparity between how it weighs the impact from the claimed violation of an express constitutional right, versus how it weighs the government's justification and the regulation's fit. When weighing the impact on the elusive "core" of the Second Amendment, the court whips out a scale specially calibrated to always read "minimal burden" (unless the government officials were dumb enough to do exactly the same thing Washington, D.C. and Chicago did in *Heller* and *McDonald*: entirely ban all handguns). But when it comes time to weigh the government's interest and the reasonableness of the regulation's fit under "intermediate scrutiny," the court puts away the first scale and pulls out a different scale calibrated to always read "close enough," even where, as here, the fit between the ban and the ultrarare harm asserted is not even rational.

The majority acknowledges that, applying our super-pliable test, "we have not struck down any state or federal law under the Second Amendment." But it insists "we have carefully examined each challenge on its own merit." If every case without fail leads to the same anti-firearms conclusion, however, then at some point it begs credulity to deny that something else is driving the outcomes.

Judge Hurwitz has penned a short concurrence respectfully characterizing as inappropriate and hyperbolic my observations regarding how my colleague's personal views influence our court's Second Amendment cases. I agree that it is a troubling charge to posit personal views as a driving force behind judicial decision-making, and not one I make lightly. But whatever else it may be, my claim is hardly hyperbolic. Here are the facts: We are a monstrosity of a court exercising jurisdiction over 20% of the U.S. population and almost one-fifth of the states—including states pushing the most aggressive gun-control restrictions in the nation. By my count, we have had at least 50 Second Amendment challenges since *Heller*—significantly more than any other circuit—*all* of which we have ultimately denied. In those few instances where a panel of our court has *granted* Second Amendment relief, we have *without fail* taken the case en banc to reverse that ruling. This is true regardless of the diverse regulations that have come **\*1166** before us—from storage restrictions to waiting periods to ammunition restrictions to conceal carry bans to open carry bans to magazine capacity prohibitions—the common thread is our court's ready willingness to bless any restriction related to guns. Respectfully, Judge Hurwitz's claim that our judges' personal views about the Second Amendment and guns have not affected our jurisprudence is simply not plausible. Res ipsa loquitur.

**ATTACHMENT**

Judge Hurwitz's own concurrence demonstrates this reality. In defending the validity of California's interest, he doesn't dispute that mass shootings are "infrequent," but expressly dismisses that reality as irrelevant. Why? Because, in his view, "hardly anyone is untouched by the[ ] devastation." His proof? A *very personal* anecdote about losing our beloved colleague to a mass shooting. No one disputes the depth of that tragedy, which is exactly why such uncommon occurrences nonetheless deeply influence my colleagues' views about gun control and the Second Amendment. But the fact that members of our court have been *personally* affected by a mass shooting is not a legitimate reason to ignore the undisputed statistical rarity when weighing the government's interest in its ban—it falls in the same category as choosing to drive instead of flying because you know someone who was tragically killed in a rare commercial airline accident. As a personal psychological phenomenon, such exaggeration of risks is completely understandable. As a legal matter, it should have no place in applying fundamental constitutional rights, including the Second Amendment. And just as irrelevant is Judge Hurwitz's reliance on yet more *personal* anecdotes—that "[o]ther members of the Court have lost family and friends to gun violence"—that are entirely unrelated to mass shootings. Defending California's regulation by sharing such deeply personal examples only demonstrates just how hard it is for any judge, including my esteemed and talented colleagues, to evaluate these cases in the objective and detached manner required when the legal test itself offers no meaningful guiderails.

It is important to emphasize that I point to my valued colleagues' personal views not to engage in some unrelated ad hominem attack, but rather because the impact of those views is directly relevant to the purpose of this dissent. When judges are effectively told to balance the necessity for some particular gun-control regulation against that regulation's effect on the "core" of the Second Amendment, there isn't much for the judges to work with other than their own personal views about guns and the Second Amendment. Whether judges intend to bring in their personal views or not, those views inescapably control our holdings when applying a test as malleable as our Second Amendment intermediate scrutiny standard. Without rules that actually bind judges, personal intuition inescapably fills the void. The result of individual judges applying a formless test is a world where "equality of treatment is difficult to demonstrate and, in a multi-tiered judicial system, impossible to achieve ...." Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175, 1182 (1989).

Instead of striving to *avoid* this inequality of treatment,

the majority *highlights* the inequality among the circuits as a defense of *our* current two-step approach. They do this by citing *one* case to show "our sister circuits, applying the same two-step inquiry that we apply today, have not hesitated to strike down provisions that go too far." This again bolsters my point. Because the prevailing two-step balancing test is so malleable and discretionary, one would expect that different judges with different conceptions of guns and gun **\*1167** rights would weigh the different considerations differently and come to different conclusions.[8]

[8]  The majority defends our undefeated, 50–0 record against the Second Amendment by pointing out that the states in our circuit simply have "more restrained" gun-control laws than the states in other circuits. While the majority is apparently serious, this claim can't be taken seriously given that our circuit's jurisdiction includes states like California and Hawaii—which have enacted many of the most aggressive gun-control laws in the nation. The majority's failure to comprehend that reality underscores my point that something other than objective and impartial application of the two-part test is driving the outcomes in our Second Amendment cases.

Until the Supreme Court forces our court to do something different than balance *our view* of the utility of some firearm product or usage against the government's claimed harm from its misuse, the Second Amendment will remain essentially an ink blot in this circuit.

**II. The Majority's Second Amendment Scales Are Rigged.**

Not content to just tilt the rules of the game heavily in the government's favor via our pathetically anemic "intermediate scrutiny," the majority here also stacks the evidentiary deck. The majority balances the average rarity of the use of ammunition in lawful self-defense situations as weighing heavily against its protection under the Second Amendment. Meanwhile, it studiously ignores the rarity of the harm (mass shootings) that California puts forward to support its ban. As explained, such balancing should have no place in a case like this—the founders already settled the weighty interest citizens have in lawfully bearing commonplace self-defense arms like those California has banned here. But the stark disparity

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

between how the majority treats the very same attribute depending on whether it supports or undercuts the majority's desired outcome illustrates well that, even if we thought balancing might have a proper role in evaluating our Second Amendment rights, we can't expect judges who fundamentally disagree with the Second Amendment to fairly read the scales.

The reality is that essentially everything the Second Amendment is about is rare, for which we all should be very grateful. Government tyranny of the sort to be met by force of arms has been, in the short history of our country, fortunately rare. The actual need for any particular person to use her firearm to defend herself is, again, extremely rare—most of us will thankfully never need to use a gun to defend ourselves during our entire life.[9] And in those rare instances where a firearm is used in self-defense, the amount of ammunition needed is generally very little—oftentimes none at all. It is certainly true that most of us will use exactly zero rounds of ammunition to defend ourselves—ever. So if the Second Amendment protects anything, it is our right to be prepared for dangers that, thankfully, very rarely materialize.

[9]      Observing the rarity does not diminish the fact that thousands of citizens use their firearms for lawful self-defense each year. It simply means that as a percentage of the population generally, or even lawful gun owners, that percentage is tiny.

Given that, the majority's focus on the fact that only 2.2 bullets are used *on average* in a self-defense shooting, and concluding that a law banning more than that "interferes only minimally with the core right of self-defense," is grossly misplaced.[10] An average of 0.0 rounds are **\*1168** fired on average in preventing government tyranny. And the average person will fire an average of 0.0 rounds in self-defense in their entire lifetime. If the rarity alone of *exercising* one's Second Amendment rights cuts so dispositively against their protection, then the Second Amendment protects nothing.

[10]      California currently allows more than 2.2 rounds in a magazine, and does not prohibit carrying multiple magazines. But don't be fooled. Under the majority's Version 2.2 of the Second Amendment, there is no reason a state couldn't limit its citizens to carrying a (generous) 3 rounds total for self-defense.

Yet when it comes to the uncommonness of mass shootings—the reason California says it needs its magazine ban—the majority counts *that* as nothing. You would think that if the government seeks to interfere with a fundamental right, the infrequency of the claimed harm would be a very important consideration. For example, if the government sought to ban some type of communication because it very infrequently resulted in harm, we would never countenance that. On the other hand, where some type of communication *frequently* results in harm, it might survive heightened scrutiny (e.g., fighting words).

Here, California relies on a statistically very rare harm as justifying its ban, but a harm that, while infrequent, grabs headlines and is emotionally compelling. The emotional impact of these tragedies does all the work for the government and our court. But if a court was going to balance a fundamental right against a claimed harm, that is precisely where judges must cut through the emotion and do their job of holding the government to its (supposedly heightened) burden. The majority here doesn't even try.[11]

[11]      The majority implies that by emphasizing the rarity of mass shootings, I omit the other relevant part of the analysis: "the incredible harm caused by mass shootings." I'm not ignoring the "incredible harm"; I'm simply saying that, just as we do with all serious harms, we must evaluate the seriousness of that harm *along with* the probability of it occurring. For example, no one doubts that commercial airline crashes, when they occur, result in "incredible harm." And yet no government has seriously considered banning commercial flights. Why? Because airplane crashes are extremely rare—just like mass shootings. The majority's response—doubling down on its emphasis of the harm while continuing to intentionally avoid its rarity—demonstrates that it is the majority, not me, that "omits ... [a] critical part of the analysis."

The majority's uneven treatment of rarity is not the only example where its anti-Second Amendment bias shows through in how it reads the record. The majority questions whether law-abiding citizens even *want* higher capacity magazines for self-defense, speculating "whether circulation percentages of a part that comes standard with many firearm purchases meaningfully reflect an affirmative choice by consumers." But such musings only reveal a clear lack of knowledge about guns—or even basic economics, apparently. In free countries like this one, unless a market is interfered with by regulations like the one at issue in this case, it generally provides what

**ATTACHMENT**

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

consumers want. The market for self-defense firearms is no exception. Until only a few years ago, if you wanted a "micro-compact" firearm for self-defense (of the type that serves little or no military usage), you were generally limited to a six to eight-round magazine capacity. For example, the KelTec P3AT came with a six-round magazine, as did the Ruger LCP, Glock 43, Kimber Solo, and Walther PPK (of James Bond fame). The Kahr PM9 and Sig Sauer P238 offered six or seven-round magazines, while the Smith & Wesson M&P Shield came with seven or eight rounds. Not too long ago, it was basically impossible to find a lightweight, micro-compact firearm even capable of holding 10 rounds in its magazine.

Then, in 2019, Sig Sauer released the P365, which took the self-defense market **1169** by storm because suddenly law-abiding citizens could now have the same size micro-compact firearm, but now carrying 12 or 15 rounds in its magazine. Other companies quickly followed suit, with Springfield Armory releasing the Hellcat (11 to 13-round magazines), Ruger releasing the Max-9 (12+1), Smith & Wesson releasing the M&P Shield Plus (13+1), and Kimber releasing the R7 Mako (13+1). Aftermarket magazine manufacturers like Shield Arms released flush-fitting magazines holding 15 rounds for diminutive guns like the Glock 43x and 48.

All this has happened in just the past few years, in segment of the firearms market that has essentially no "military" application. It has happened because many law-abiding citizens want higher capacity magazines for one purpose: self-defense. The majority's odd speculation that maybe the self-defense market doesn't want higher capacity magazines is as uninformed as wondering why cruise-control comes standard on their cars since nobody in their urban neighborhood wants it.

While the majority is happy to engage in ill-informed speculation when it comes to limiting gun rights, it demonstrates a distinct lack of imagination and basic logic when it comes to understanding why so many citizens desire a magazine holding over 10 rounds. First, the majority posits a classic false dilemma (a.k.a. an either-or fallacy) by waxing on at length about how larger magazines "provide significant benefits in a military setting," not self-defense. Of course, almost every attribute of a weapon that makes it more effective for military purposes also makes it more effective for self-defense: more accurate, faster firing, the ability to engage multiple targets quickly—these are all characteristics of a weapon that make it better for *both* military and self-defense purposes. The majority's fixation on the effectiveness of higher-capacity magazines in the military

context does not somehow demonstrate that the magazines are not also useful for self-defense.

The majority relatedly adopts California's argument that magazines over 10 rounds are "dangerous" when misused. Again, essentially every attribute of a weapon that makes it more effective for self-defense makes it more dangerous when misused. Good sights on a handgun make it more effective for lawful self-defense—but also make it more dangerous when misused. A pistol that doesn't malfunction is really nice to have in a self-defense situation—but is also more dangerous when misused. Modern hollow-point ammunition, with its dramatically increased stopping potential, has seriously improved the performance of handguns in a self-defense situation—but of course also make the handgun more dangerous when misused. This type of logic, applied the way the majority does, would justify banning all semi-automatics since they are more dangerous than revolvers, all revolvers since they are more dangerous than derringers, all derringers since they are more dangerous than knives ... until we are left with toothpicks. That is why the Supreme Court in *Heller* only talked about weapons that are *both* "dangerous *and* unusual" being outside the purview of the Second Amendment. 554 U.S. at 627, 128 S.Ct. 2783 (emphasis added) (citation omitted). The mere fact that some attribute (like a larger capacity magazine) might make a weapon more "dangerous" when misused cannot be a basis to avoid the Second Amendment—if so, the Second Amendment protects only nerf guns.

The majority also latches onto California's argument that "mass shootings often involve large-capacity magazines." That is hardly surprising, given that, as the majority itself acknowledges, "[m]ost pistols are **1170** manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds" (citation and internal quotation marks omitted). So, in other words, mass shootings involve the most common types of firearms. This is the sort of evidence that suffices to meet our circuit's "heightened" review under the Second Amendment?

The majority also relies on the argument that limiting magazine capacity provides "precious down-time" during reloading, giving "victims and law enforcement officers" time to "fight back." But here again, that same "down-time" applies equally to a mother seeking to protect herself and her children from a gang of criminals breaking into her home, or a law-abiding citizen caught alone by one of the lawless criminal mobs that recently have been terrorizing cities in our circuit. The majority focuses only on ways higher capacity magazines might cause more

ATTACHMENT

Duncan v. Bonta, 19 F.4th 1087 (2021)

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

harm in the very rare mass shooting, while dismissing the life-threatening impact of being forced to reload in a self-defense situation as a mere "inconvenience," and characterizing as mere "speculat[ion] ... situations in which a person might want to use a large-capacity magazine for self-defense."

Ultimately, it is not altogether surprising that federal judges, who have armed security protecting their workplace, home security systems supplied at taxpayer expense, and the ability to call an armed marshal to their upper-middleclass home whenever they feel the whiff of a threat, would have trouble relating to why the average person might want a magazine with over ten rounds to defend herself. But this simply reinforces why those same judges shouldn't be expected to fairly balance any Second Amendment test asking whether ordinary law-abiding citizens *really need* some firearm product or usage.

### III. The Supreme Court Needs to Constrain Lower Courts' Discretion.

We need tests that require real heightened scrutiny and will pull our courts out of the habit of inverted deference to burdens on Second Amendment rights. In that vein, I propose several less-discretionary tests the Supreme Court should impose to cabin my errant brethren.

### A. Common Use

My first proposal is for the Supreme Court to put real teeth into a consideration that has been around since at least as far back as 1939, when the Supreme Court noted that the Second Amendment's reference to the Militia signified that the "arms" referenced by that provision are those "of the kind in common use at the time." *United States v. Miller*, 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). Again in *Heller*, the Court reiterated that "the sorts of weapons protected" by the Second Amendment are those 'in common use at the time.' " 554 U.S. at 627, 128 S.Ct. 2783 (quoting *Miller*, 307 U.S. at 179, 59 S.Ct. 816). Reinforcing this precedent, the Supreme Court should make clear that any regulation that prohibits a firearm product or usage that is "in common use" nationally must pass strict scrutiny. Not

only would that curtail lower courts' abuse of their discretion in applying the Second Amendment, but it would also help address a perennial line-drawing difficulty inherent in the right to keep and bear arms.

One of the ongoing problems with defining the contours of any constitutional right is determining how it applies to technologies that did not exist when the constitutional provision was enacted. For example, how does the First Amendment apply to **1171** social media or blog posts? But that problem is particularly vexing in applying the Second Amendment because "arms" by their very nature change over time as technology advances. As the Court in *Heller* correctly observed, the Second Amendment does not protect "only those arms in existence in the 18th century .... We do not interpret constitutional rights that way." *Id.* at 582, 128 S.Ct. 2783. But while we know that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of the founding*," *id.* (emphasis added), in an age where weapons run the gamut from fighter jets to tanks to fully-automatic machine guns to AR-15s to handguns to pocketknives, which weapons are protected by the Second Amendment and which are not? As this case and others like it demonstrate, we cannot rely on insular federal judges to weigh which weapons are appropriate for self-defense—they honestly don't have a clue, and their intuitions about firearms are not good. And we can't rely on governments to decide—that's who the Second Amendment was intended to protect against. But as *Heller* discusses, we can look to what weapons law-abiding citizens have chosen to defend themselves—that is, what weapons are currently "in common use ... for lawful purposes." *Id.* at 624, 128 S.Ct. 2783 (internal quotation marks omitted).

Here, law-abiding citizens across the nation have purchased literally millions upon millions of the type of magazines that California has banned. Americans currently possess between seventy to one hundred *million* of those magazines for self-defense.[12] The majority here concludes that banning them is a "small burden" on the Second Amendment because they "provide at most a minimal benefit for civilian, lawful purposes." *Millions* of our fellow Americans disagree with my seven colleagues in the majority, evincing by their purchase and "keep[ing]" of those magazines that they consider them necessary for self-defense. That should count for something—actually, it should count for a lot, especially for a constitutional guarantee that ostensibly protects "the right of *the people* to keep and bear arms." As the *Heller* Court explained in rejecting the argument that handguns could be banned because rifles weren't, it was

**ATTACHMENT**

"enough to note ... that the American people have considered the handgun to be the quintessential self-defense weapon." *Id.* at 629, 128 S.Ct. 2783. That same rationale should apply for any firearm product or usage that law-abiding citizens across the nation have chosen for self-defense.

[12]    67% of gun owners say self-defense is a major reason why they own their firearm. *See* Kim Parker, et al., *The demographics of gun ownership in the U.S.*, PEW RESEARCH CENTER (June 22, 2017), https://www.pewresearch.org/social-trends/2017/06/22/the-demographics-of-gun-ownership/; *see also* Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2002,* (June 2004), https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf.

### B. State Law Survey

A government should also have to meet strict scrutiny if it bans a firearm product or usage that is allowed throughout most of our nation. If most of the states in the Union allow a particular item to be used in the course of exercising a Second Amendment right, then the government's justification for forbidding or restricting that item or usage should be subjected to strict scrutiny.

Our court has often cited the practice of other states when it suits its purpose in analyzing constitutional rights. *See, e.g.,* *Young*, 992 F.3d at 805 (analyzing the **\*1172** Second Amendment, the court observed "[i]n contrast to these states, other states—also from the South—upheld good-cause restrictions on the open carry of certain dangerous firearms"); *Family PAC v. McKenna*, 685 F.3d 800, 811 n.12 (9th Cir. 2012) (First Amendment); *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1131 (9th Cir. 2004) (First Amendment); *Cammack v. Waihee*, 932 F.2d 765, 766–67 (9th Cir. 1991) (Establishment Clause). Indeed, the majority does so here, strangely observing that "California is not alone" because a few other states and local governments also ban some magazines (even though a super-majority of states don't).

The majority's instinct that it makes sense to look at other states is right; its execution is just wrong. The fact that a handful of states similarly regulate should not help justify infringement of a fundamental right. But the fact that *most* other states—here, 41 states and the federal government—*don't* similarly regulate should cause a court to suspect that maybe the government's supposed justification for its ban is lacking.

Like looking at "common use," considering other states' regulation would have at least one serious incidental side-benefit: it would reduce the troubling balkanization that currently afflicts a fundamental right supposedly protected by the Constitution. Right now, a lawful gun-owner's ability to lawfully "keep and bear arms" is subject to a widely varying patchwork quilt of state and local restrictions and bans that would be an embarrassment for any other constitutional right. Requiring governments to satisfy real heightened scrutiny before they step too far out of line with what is working in most other jurisdictions would help deter states like California from using their "laboratory of democracy" to conduct ongoing experiments on how to subject a fundamental right to death by a thousand cuts. *See* *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 694 (9th Cir. 2017) (en banc) (Tallman, J., concurring).

\* \* \*

Our court is fond of saying that Second Amendment rights are not absolute. *See, e.g.,* *Young*, 992 F.3d at 793; *Silveira v. Lockyer*, 312 F.3d 1052, 1063 (9th Cir. 2002) *abrogated on other grounds by* *Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637; *United States v. Vongxay*, 594 F.3d 1111, 1117 (9th Cir. 2010). I don't disagree with that truism—I just disagree with our court's reliance on it to uphold every single firearm regulation, ever. Requiring that any regulation that prohibits a firearm product or usage "in common use" must pass strict scrutiny would not mean that a government would be helpless to address substantial genuine threats from weapons or uses protected by the Second Amendment. It would just mean that those governments would actually need to make a real "heightened" showing of harm, and a response that is narrowly tailored to that harm. That shouldn't be asking too much for a constitutionally protected right.

If ever there was a case study illustrating Madison's concern about "evil lurking under plausible disguises, and growing up from small beginnings," it is our circuit's Second Amendment jurisprudence. In the thirteen years since the Supreme Court ruled in *Heller* that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation,"

### ATTACHMENT

**Duncan v. Bonta, 19 F.4th 1087 (2021)**

21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

🚩 554 U.S. at 592, 128 S.Ct. 2783, our court has trimmed back that right at every opportunity—to the point that now, in the nine Western states covered by our court, the right to "keep and bear arms" means, *at most*, you might get to possess one janky handgun and 2.2 rounds of ammunition, and only in your home under lock and key. That's it.

**\*1173** That's ridiculous, and so I must respectfully

dissent.

**All Citations**

19 F.4th 1087, 21 Cal. Daily Op. Serv. 12,008, 2021 Daily Journal D.A.R. 12,228

**Footnotes**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 66

**ATTACHMENT**