**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-1722

_____

WILLIAM DRUMMOND; GPCC, LLC; SECOND
AMENDMENT FOUNDATION, INC.,
Appellants

v.

ROBINSON TOWNSHIP; MARK DORSEY, Robinson
Township Zoning Officer, in his official and individual
capacity

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-18-cv-01127)
Honorable Marilyn J. Horan, United States District Judge

_____

Argued November 17, 2020

Before: JORDAN, KRAUSE, RESTREPO, *Circuit Judges*

(Opinion Filed: August 17, 2021)

Alan Gura, Esq. **[Argued]**
916 Prince Street
Suite 107
Alexandria, VA 22314

  *Counsel for Appellants*

Michael P. Gaetani, Esq.
Creenan & Baczkowski
3907 Old William Penn Highway
Suite 304
Murrysville, PA 15668

Trisha A. Gill, Esq. **[Argued]**
Sean R. Ridley, Esq.
Litchfield Cavo
603 Stanwix Street
10th Floor
Pittsburgh, PA 15222

  *Counsel for Appellees*

Joseph G. S. Greenlee, Esq.
Firearms Policy Coalition
1215 K Street
17th Floor
Sacramento, CA 95814

  *Counsel for Amici Firearms Policy Coalition Inc.,*
  *Firearms Policy Foundation, and Madison Society*
  *Foundation Inc.*

Neal Goldfarb
1301 Fairmont Street, N.W.
Washington, D.C. 20009

    *Counsel for Amicus Neal Goldfarb*

James P. Davy, Esq. **[Argued]**
P.O. Box 15216
Philadelphia, PA 19125

    *Counsel for Amici Giffords Law Center to Prevent*
    *Gun Violence and Ceasefire Pennsylvania Education*
    *Fund*

—————

OPINION OF THE COURT

—————

KRAUSE, *Circuit Judge.*

    In the wake of the Supreme Court's landmark decision in *District of Columbia v. Heller*, courts across the country, including ours, have often been called upon to define the Second Amendment's boundaries. 554 U.S. 570 (2008). But while the right to bear arms may no longer present a "vast *terra incognita*," uncharted frontiers remain. *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011). This case takes us to one such frontier: Whether restrictions on where citizens can purchase or practice with firearms implicate the right to bear arms, and, more specifically, whether the two

challenged zoning rules interfere with that right.  As neither rule finds deep roots in history or tradition, we conclude that both carry constitutional consequences.

But even as we recognize that the challenged rules must pass constitutional muster, we reiterate that Second Amendment review is not a monolith.  As the two-step framework we outlined in *United States v. Marzzarella* makes clear, different laws trigger different tests.  614 F.3d 85, 89 (3d Cir. 2010).  In identifying which rules invade the Second Amendment, we hunt for historical outliers—laws that lack traditional counterparts.  In subjecting those rules to heightened scrutiny, likewise, we look for modern outliers—laws with few parallels in contemporary practice.  The more "exceptional" a rule, the more likely the government has overlooked less burdensome "options that could serve its interests just as well." *McCullen v. Coakley*, 573 U.S. 464, 490 (2014).  Because the challenged zoning rules constitute outliers, and because the pleading-stage materials fail to justify their anomalous features, we will vacate the District Court's dismissal order and remand for discovery, and for a prompt ruling on the pending motion for a preliminary injunction.

## I.    Background

### A.    The Greater Pittsburgh Gun Club

For the better part of a century, a 265-acre tract in Robinson Township, Pennsylvania has hosted a gun range. J.A. at 60.  In its heyday, the range—now called the Greater Pittsburgh Gun Club—boasted over 800 dues-paying members

and also served as a practice location for nearby National Guard units. *Id*. at 60–61. As time passed, and as owners came and went, the Club continued to provide Robinson Township residents with guns and a place to practice with them. *Id*.

Over the years, however, the Club also faced its share of challenges. In 1993, for example, the Township initiated a nuisance action against the Club. *Id*. at 16. The litigation dragged on for years before a state court finally dismissed the suit. *Id*. And, in 2008, the range's then-owner pleaded guilty to possessing weapons as a convicted felon and received a three-year prison term as a result. With its owner behind bars, the Club closed its doors, not to reopen for about a decade. J.A. at 15.

The Club's fortunes seemed poised to improve in 2017. *Id*. at 61–64. The preceding winter, Appellant William Drummond leased the property. *Id*. at 64. Consistent with the Club's prior use, Drummond intended to engage in "the retail sale of firearms" and to "operat[e] a shooting range." *Id*. In particular, he planned to allow customers to shoot "ordinary firearms of the kind in common use for traditional lawful purposes, including pistols, shotguns, and center-fire rifles up to .50 caliber." *Id*. at 65.

For Drummond's business to succeed, it needed to abide by the Township's zoning rules. Like many jurisdictions following traditional practices, the Township divides its land into districts "in which only compatible uses are allowed and incompatible uses are excluded." *City of Edmonds v. Oxford*

5

*House, Inc.*, 514 U.S. 725, 732 (1995) (citation omitted). At the time Drummond finalized the lease, the Township permitted gun ranges in three types of districts: Both Industrial and Special Conservation districts could host "Shooting Ranges," J.A. at 150–51, and Interchange Business Districts (IBD) could host "Sportsman's Clubs." *See* Zoning Ordinance at Art. II, §§ 311, 601–02 (2017). Although Shooting Ranges and Sportsman's Clubs had different names, the Township held them to the same standards: enforcing safety best practices, minimizing noise, and refraining from serving alcohol during shooting events. *Id*. That, however, was about to change.

## B.    The Revised Zoning Rules

When the Township's residents learned that Drummond had leased the Club, they "ask[ed] for re-zoning to limit activities at the property." J.A. at 118. More specifically, they complained that renewed "use of high power rifles" at the Club would pose a "nuisance" and a "danger." *Id*. at 118, 121. They therefore pressed the Township's Board of Supervisors to "control[ ]" the Club "through stricter zoning."[1] *Id*. at 118. For his part, Drummond opposed any re-zoning. *Id*. at 67.

---

[1] Drummond asserts that a "vendetta" motivated the Township to implement stricter zoning rules. Opening Br. at 2. But as Drummond's counsel acknowledged at oral argument, the Township's intent plays no part in our analysis of his facial Second Amendment claims.

The Board nonetheless voted to amend the rules governing Sportsman's Clubs in IBD districts, a category that covers the land Drummond leased. *Id*. at 124. According to a preamble prepared by the Board, the amendment's purpose was "to avoid nuisances and to provide for and protect the public health, safety and welfare." *Id*. To that end, the Board instituted two changes that form the subject of this appeal:[2]

- **The Rim-Fire Rifle Rule:** Whereas the old version of the ordinance allowed Sportsman's Clubs to organize center-fire rifle practice (as did Drummond's lease), the new version limits Clubs to "pistol range, skeet shoot, trap and skeet, and rim-fire rifle[]" practice. *Id*. at 125.

- **The Non-Profit Ownership Rule:** In contrast to prior rules, which did not distinguish between for-profit and non-profit entities, the ordinance now defines a "Sportsman's Club" as a "nonprofit entity formed for conservation of wildlife or game, and to provide members with opportunities for hunting, fishing or shooting." J.A. at 124.

---

[2] The Board also switched Sportsman's Clubs from a "permitted use" to a "conditional use." *Id*. at 127–28. Drummond challenges this change in his complaint, but his appeal focuses on the non-profit and rim-fire rifle rules, so we do the same.

7

When the Board imposed these limits on gun ranges in IBD districts, it left intact the permissive rules governing gun ranges in Industrial and Special Conservation districts. *Id.*

### C.  Resort to the Courts

This case began in 2018 and remains at the pleading stage, yet has come before us once already.  Soon after the Township amended the ordinance, Drummond filed suit.[3]  He did not assert that the rim-fire and non-profit rules injure him in his capacity as the operator of a gun range.  Instead, he claimed that the rules restrict his customers' efforts to acquire firearms and maintain proficiency in their use.  *See Drummond v. Twp. of Robinson*, 784 F. App'x 82, 84 (3d Cir. 2019) [hereinafter *Drummond I*].  So he challenged the ordinance as facially unconstitutional and requested a preliminary injunction barring the Township from enforcing it.

Once Drummond submitted his complaint, the Township moved to dismiss.  In probing the plausibility of Drummond's Second Amendment claims, the District Court invoked the two-step framework articulated in *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).  Step One asks if a law implicates the right to bear arms; if the answer is yes, Step Two subjects the law to heightened scrutiny.  *Id.*  Because

---

[3] The complaint also raised a Due Process claim, an Equal Protection claim, and several as-applied Second Amendment claims, but the District Court dismissed all of those claims, and we previously affirmed those aspects of its order.  *See Drummond v. Twp. of Robinson*, 784 F. App'x 82, 83–84 (3d Cir. 2019) [hereinafter *Drummond I*].

8

the Court determined that the challenged rules fall outside the right's scope, it dismissed the complaint and denied the preliminary injunction motion as moot.

But when Drummond appealed to us, we reversed. We explained that *Marzzarella* Step One demands a "textual and historical" inquiry, and that the District Court had inadvertently "skipped" that step. *Drummond I*, 784 F. App'x at 84. Without taking a position as to the proper resolution of Steps One or Two, we remanded for the District Court to revisit its Second Amendment analysis.

After our mandate issued, three months passed. In the interim, neither Drummond nor the Township requested a status hearing, filed any motions, or otherwise acknowledged our order. Nor did the District Court avail itself of supplemental briefing or argument. Instead, it *sua sponte* reconsidered and granted the Township's motion to dismiss.

This time, the Court found that the Township's ordinance burdens conduct within the Second Amendment's scope, satisfying *Marzzarella* Step One. The Court went on to hold, however, that Drummond's Second Amendment claims fail at Step Two. Even though no discovery had taken place, the Court concluded that "the fit between the [challenged] regulations and the Township's objective is reasonable." *Id*. at 663. So the District Court again dismissed the complaint.

Now before our Court for a second time, Drummond urges us to vacate the dismissal order, to enter a preliminary

injunction preventing the Township from enforcing the ordinance, and to reassign this case to another district judge.

## II.     __Motion to Dismiss__[4]

The central question presented is whether Drummond plausibly alleges that the Township's rules contradict the Second Amendment.  To answer that question, we proceed in three steps.  First, we distill constitutional commands from *District of Columbia v. Heller*, the North Star guiding our Second Amendment jurisprudence.  Second, applying those commands, we hold that the Township's ordinance implicates the right to bear arms and must therefore face heightened scrutiny.  Finally, we explain why the Township cannot overcome that scrutiny at the pleading stage.[5]

---

[4] The District Court retained jurisdiction under 28 U.S.C. § 1331, and we wield jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's dismissal of claims under Rule 12(b)(6), *Geness v. Cox*, 902 F.3d 344, 353–54 (3d Cir. 2018), accepting the complaint's factual allegations as true and construing them in the light most favorable to the nonmoving party, *Weimer v. Cty. of Fayette*, 972 F.3d 177, 180 (3d Cir. 2020).

[5] Drummond challenges the Township's ordinance as applied to him, but we affirmed the District Court's ruling that the as-applied challenge was unripe because Drummond never gave "the local zoning hearing board the opportunity to review the zoning officer's decision." *Drummond I*, 784 F. App'x at 83 n.1 (citation omitted).  We are now dealing with a facial challenge to the ordinance.  But the distinction between facial and as-applied claims "goes to the breadth of the remedy

## A. *Heller*'s Teachings

Before addressing Drummond's claim, we review the lessons laid down by *Heller*. Its core insight is by now familiar: The Second Amendment enshrines an "individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. That right, like most rights, "is not unlimited." *Id*. at 626. Indeed, *Heller* approved several categories of gun regulations as consistent with the right to bear arms. *See id*. at 626–27. Rather than elaborate the Second Amendment's "full scope," *id*., however, the Court left it to future cases to discern "additional classes of [lawful] restrictions," *Marzzarella*, 614 F.3d at 93.

But while *Heller* does not reveal all of the right's limits, it shows us how to find them. Here, as in other aspects of its analysis, it draws on free speech doctrine. In First Amendment cases, the Supreme Court defines categorical exceptions—for "obscenity," "defamation," and "fraud," for example—by looking to "historical evidence" and "long-settled tradition[s]." *United States v. Stevens*, 559 U.S. 460, 468–69 (2010). In

---

employed by the Court, not what must be pleaded in a complaint." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). For this reason, the Supreme Court typically "consider[s] facial challenges simply by applying the relevant constitutional test to the challenged statute, without trying to dream up whether or not there exists some hypothetical situation in which application of the statute might be valid." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016) (collecting cases). We follow the same approach here.

Second Amendment cases, likewise, we trace the right's reach by studying the historical record. *Heller*, 554 U.S. at 603.

If this historical inquiry reveals that a law interferes with the Second Amendment, it must satisfy the same type of searching tests we use to safeguard First Amendment freedoms. *Heller* rules out rational-basis review as too feeble to preserve "specific, enumerated right[s,]" like the right to bear arms. *See id.* at 628 n.27. Instead, it requires that challenged laws survive "some form of heightened scrutiny," whether strict or intermediate. *Marzzarella*, 614 F.3d at 96. By subjecting gun regulations to these robust tests, we respect the Court's mandate to "elevate[ ] above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635.

The two-step *Marzzarella* framework incorporates these insights. Consistent with *Heller*, Step One ensures that when we sketch the right's scope, our inquiry remains rooted in historical practices. *See Marzzarella*, 614 F.3d at 91. And, also consistent with *Heller*, Step Two establishes that when a rule restricts the right, it must endure either strict or intermediate scrutiny as we articulated those tests in *Marzzarella*. *See id.* at 97. In adapting those tests for new Second Amendment domains, we may look to free speech cases for guidance. *See Marzzarella*, 614 F.3d at 96–97; 99; *Ass'n of N.J. Rifle & Pistol Club, Inc. v. Att'y Gen.*, 910 F.3d 106, 123–24 n.28 (3d Cir. 2018). With these lessons in mind, we turn to Drummond's claim.

**B.** *Marzzarella* **Step One**

Our task today is to apply *Heller*'s familiar approach in an unfamiliar setting. Until now, neither the Supreme Court nor our Court has confronted a Second Amendment claim challenging a restriction on firearms purchase or practice. Following *Heller*'s lead, we do not explore this "entire field" today. 554 U.S. at 635. Rather, we survey only the historical terrain necessary to settle whether the specific rules Drummond challenges fall within "exceptions to the Second Amendment guarantee." *Marzzarella*, 614 F.3d at 91. In the discussion below, we clarify the historical question before us and then show why the challenged rules trigger heightened scrutiny.[6]

The key to implementing *Heller* is deciding how closely a contemporary rule must resemble its traditional counterparts. If we approve only those rules that mirror "precise founding-era analogue[s]," *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), we risk compelling governments to confront "new weapons or modern circumstances" with old playbooks,

---

[6] The Township declined to take a position as to *Marzzarella* Step One, but we address it here because it represents "a threshold question [of law] necessary to a proper analysis." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 158 n.15 (3d Cir. 2002); *cf. McCullen v. Coakley*, 573 U.S. 464, 478 (2014) ("[W]e think it unexceptional to perform the first part of a multipart constitutional analysis first.").

13

*Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) [hereinafter *Heller II*] (Kavanaugh, J., dissenting). At the same time, if we upheld every modern law that remotely resembles a historical analogue, we risk endorsing outliers that our ancestors would never have accepted. To steer safely between these twin dangers, courts focus on "whether a particular *type* of regulation has been a 'longstanding' exception to the right." *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (citation omitted).

These principles refine our analytical approach. The question before us is not whether the challenged rules replicate precise historical models. That rigid approach would leave municipal authorities with no room to respond to unique local needs and priorities. *See Nextel W. Corp. v. Unity Twp.*, 282 F.3d 257, 267 (3d Cir. 2002).

Instead, each challenged rule triggers an inquiry into a distinct "*type* of regulation." *Class*, 930 F.3d at 465. For the rim-fire rifle rule, the question is if the Second and Fourteenth Amendments' ratifiers approved regulations barring training with common weapons in areas where firearms practice was otherwise permitted. For the non-profit ownership rule, similarly, the question is if our ancestors accepted prohibitions on the commercial operation of gun ranges in areas where they were otherwise allowed. As it turns out, neither type of regulation rests on deep historical foundations, so both challenged rules attract heightened scrutiny.

Start with the rim-fire rifle rule. In exploring the history of what weapons citizens may carry for self-defense, *Heller* excluded "dangerous and unusual weapons" from the Second Amendment's scope but included "arms in common use" within its protection. 554 U.S. at 627, 624 (internal quotation marks and citation omitted). This "implies a corresponding right to acquire and maintain proficiency" with common weapons. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) [hereinafter *Ezell I*]. A right to bear those weapons, after all, "wouldn't mean much without the training and practice that make [them] effective." *Id.*

A similar distinction arises from a review of historical practices. The only remotely analogous traditional rules that we have found regulated gunpowder sales. For instance, antebellum New Hampshire barred the sale of gunpowder "in any highway . . . or on any wharf, or on parade or common," while postbellum Nebraska limited the sale of more than a pound of "gunpowder or guncotton." *Compare* 1825 N.H. Laws 74, An Act to Regulate the Keeping and Selling, and the Transporting of Gunpowder, ch. 61, § 5, *with* 1895 Neb. Laws 233, Revised Ordinances of Lincoln, Neb., ch. 14, art. XXV, § 17.[7] These examples confirm that restrictions on "dangerous and unusual weapons"—in this case, large amounts of gunpowder—pose no Second Amendment problem. *Caetano*

---

[7] As *Heller* observed, sources from "the period *after* [an amendment's] enactment" often provide a "critical tool of constitutional interpretation." 554 U.S. at 605 (emphasis added).

*v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (citation omitted). That principle provides no support to the Township here, however, because center-fire weapons have remained in common use since shortly after the Civil War. *See Hubbell v. United States*, 20 Ct. Cl. 354, 369 (1885).

The non-profit ownership rule suffers from a similar lack of historical foundations. In essence, this rule prevents businesses in certain areas from selling guns or range time at a profit. But we have previously concluded that a categorical exception for rules "prohibiting the commercial sale of firearms" would be "untenable" in light of *Heller*. *Marzzarella*, 614 F.3d at 92 n.8. It is no surprise, then, that a search for historical parallels comes up short. Neither the Township nor its Amici have identified any persuasive analogies. Nor have we.

Perhaps the closest comparison—and it is not especially close—is to rules restricting who could purchase weapons. Some Colonial and Reconstruction Era governments made it illegal to sell guns to enslaved or formerly enslaved people and members of Native American tribes.[8] *See Nat'l Rifle Ass'n*, 700 F.3d at 200 (collecting examples); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (same). What defeats this analogy, however, is that historical rules kept

---

[8] As then-Judge Barrett once observed, "[i]t should go without saying that such race-based exclusions would be unconstitutional today." *Kanter v. Barr*, 919 F.3d 437, 458 n.7 (7th Cir. 2019) (Barrett, J., dissenting).

weapons out of the hands of certain *buyers*, while the non-profit ownership rule aims to reduce *sellers*' commercial gain. Were we to conflate these distinct types of regulations, we would read the historical record more loosely than *Heller* allows.

This is not to say that rules restricting firearms purchase and practice to zoning districts compatible with those uses trigger heightened scrutiny. That aspect of the Township's ordinance, like the "longstanding prohibitions" *Heller* approved, rests on deep historical roots. 554 U.S. at 626. To borrow an example cited by the Seventh Circuit, Colonial Boston made it illegal to practice anywhere other than "at the lower End of [Boston] Common" or "from the Several Batteries." Act of May 28, 1746, ch. X, *in* Acts and Laws of the Massachusetts Bay 208 (Kneeland ed. 1746) (cited in *Ezell I*, 651 F.3d at 705). Other Founding Era cities likewise forbade firearms purchase and practice in populated places.[9] Similar rules—in the form of Euclidean zoning ordinances—have been widespread for at least a century. *See Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386–87 (1926).

---

[9] *See, e.g.*, 1788-1801 Ohio Laws 42, An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4 (prohibiting firearms practice within "one quarter mile" of "the nearest building"); Samuel Ames, The Revised Statutes of the State of Rhode Island, at 204–05 (1857) (excluding "rifle galler[ies]" from "the compact part of the city").

The Township's ordinance deviates from this historical paradigm. True, the ordinance shares some features with traditional antecedents: It divides the Township into districts, excludes firearms purchase and practice from residential areas, and designates certain areas for center-fire practice and commercial ranges.[10] But the principle that emerges from First Amendment cases—*Heller*'s favored constitutional analogy— is that the presence of ordinary restrictions in some places cannot excuse extraordinary restrictions in others.[11] Thus, if

---

[10] In defending its ordinance, the Township invites us to take judicial notice of search results showing that about a dozen gun stores operate in or near the Township. But at the pleading stage, we consider "only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citations omitted). None of those categories cover the search results.

[11] On a related front, Amicus Giffords Law Center urges us to exempt minimally-burdensome zoning restrictions from Second Amendment scrutiny at Step One regardless of whether they take an unprecedented form. *See* Amicus Giffords Br. at 25–27 (citing *Teixeira*, 873 F.3d at 680). But this proposal ignores the Supreme Court's emphasis on history and tradition and strong preference for "well-defined and narrowly limited" exceptions. *Stevens*, 559 U.S. at 468–69. Amicus's broad, burden-centered standard gives citizens little guidance about what activities merit constitutional protection; deprives governments of notice about which enactments face heightened scrutiny; and threatens the coherence of

we follow the Establishment Clause model by looking to "longstanding history" and "tradition," *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2089 (2019), a zoning scheme that combines conventional districting with unconventional rules will, by definition, lack traditional counterparts. And if we borrow instead from free speech doctrine, the availability of alternative districts for firearms purchase and practice will inform our application of heightened scrutiny, but will not justify a categorical exception. *See, e.g.*, *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986). So no matter which First Amendment analogue we choose, immunizing the Township's atypical rules would relegate the Second Amendment to a "second-class right"—the precise outcome the Supreme Court has instructed us to avoid. *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

## C.     *Marzzarella* Step Two

That brings us to the second and final step in the *Marzzarella* framework. It boils down to two sub-parts. First we decide whether to apply strict or intermediate scrutiny. Then we test if the Township's ordinance passes constitutional muster.[12]  *Marzzarella*, 614 F.3d at 96.

---

our *Marzzarella* framework, which already accounts for burden at Step Two. We have never endorsed an exception that introduces so much uncertainty about the Second Amendment's scope, and we decline to do so today.

[12] Drummond insists that our prior order resolved Step Two in his favor, and that, in reaching a different result, the

### 1.      Intermediate Scrutiny Governs

The District Court subjected the challenged rules to intermediate scrutiny, the Township urges that we do the same, and Drummond takes no position on the issue.  For the reasons below, we agree that intermediate scrutiny represents the right benchmark against which to measure Drummond's claims.

Which type of scrutiny a law attracts depends on whether it invades the Second Amendment's "core." *Marzzarella*, 614 F.3d at 92.  At its heart, the Amendment "protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home." *Marzzarella*, 614 F.3d at 92 (footnote omitted) (citing *Heller*, 554 U.S. at 635).  When a law disables defense at home by banning "arms in common use . . . for lawful purposes," it triggers strict scrutiny.  *See Heller*, 554 U.S. at 625, 628 (invalidating a categorical ban on "handgun possession in the home").  But when a law limits other uses of firearms, or defense that takes place in public, intermediate scrutiny prevails.  *See, e.g.*, *Drake*, 724 F.3d at 436 (applying intermediate scrutiny to public-carry restrictions).

Most purchase and practice restrictions merit intermediate rather than strict scrutiny.  In exceptional cases, though, limits on buying and training with weapons in public

---

District Court defied our mandate.  We cannot agree.  While we directed the Court to follow *Marzzarella*'s two-step framework, we declined to dictate the outcome of either step. *See Drummond I*, 784 F. App'x at 84.

pose a "functional[ ] bar" to defense in private. *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 883 F.3d 45, 56–57, 59 (2d Cir. 2018), *vacated on other grounds*, 140 S. Ct. 1525 (2020). If a zoning ordinance has the effect of depriving would-be gun owners of the guns and skills commonly used for lawful purposes like self-defense in their homes, strict scrutiny may be warranted.[13] *See Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 117. When Chicago enacted a rule "prohibit[ing] all firing ranges in the city," for example, the Seventh Circuit enforced an especially "rigorous" form of intermediate scrutiny, "if not quite 'strict scrutiny.'" *Ezell I*, 651 F.3d at 690, 708.

In contrast to Chicago's "total ban," the Township's ordinance preserves avenues for citizens to acquire weapons and maintain proficiency in their use. *Id*. at 690. It prohibits commercially-operated Sportsman's Clubs, but permits their non-profit counterparts. It forbids center-fire cartridges, but frees citizens to train with other forms of ammunition. And it regulates IBD districts, but opens two other districts to commercial ranges and center-fire rifle training. Because the ordinance stops short of a ban on firearms purchase and

---

[13] This functional approach has been applied both to practice restrictions, *see Ezell v. City of Chicago*, 846 F.3d 888, 894 (7th Cir. 2017) [hereinafter *Ezell II*]; (requiring the government to make target shooting "practicable" for gun owners), and purchase restrictions, *see United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017) (upholding a prohibition on certain interstate firearm transfers partly because it "only minimally affects the ability to acquire a firearm").

practice in the Township, the core right to self-defense emerges intact.

Perhaps reluctant to endorse this approach, Drummond encourages us to equate gun stores with bookstores.  When the government restricts what bookstores may sell or display, courts usually apply strict scrutiny, *see Ben Rich Trading, Inc. v. City of Vineland*, 126 F.3d 155, 160 (3d Cir. 1997), and Drummond suggests that we should treat gun stores the same way.  But this analogy falls flat:  The First Amendment shields bookstores not because they inform readers' speech, but "because [the bookstores] themselves . . . are seen as speaking by distributing material that they want to distribute."  Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1545 n.437 (2009).  The same cannot be said of gun stores.  We know of no court, modern or otherwise, to hold that the Second Amendment secures a standalone right to *sell* guns or range time.  *See generally id*. at 1545.  And even Drummond does not ask us to go so far.

To sum up:  The challenged ordinance steers clear of the Second Amendment's core and thus implicates intermediate scrutiny.

## 2.     The Ordinance Plausibly Fails Intermediate Scrutiny

With the level of scrutiny settled, all that remains is to apply it.  We first outline what intermediate scrutiny requires, then show why the challenged rules cannot overcome

intermediate scrutiny at the pleading stage, and finally explain where the Township's counterarguments go awry.[14]

### a) What Intermediate Scrutiny Requires

To survive intermediate scrutiny, a law must clear two hurdles. First, it must serve a "significant, substantial, or important" government interest. *Marzzarella*, 614 F.3d at 98 (internal quotation marks and citations omitted). Second, "the fit between the asserted interest and the challenged law" must be "reasonable" and "may not burden more conduct than is reasonably necessary."[15] *Drake*, 724 F.3d at 436 (internal quotation marks, citation, and brackets omitted). Though we owe "substantial deference" to local zoning decisions, *id.*; *see Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 n.18 (3d Cir. 2016), restrictions on conduct within the scope of the Second Amendment must still satisfy these requirements, *see Ezell v. City of Chicago*, 846 F.3d 888, 896 (7th Cir. 2017) [hereinafter *Ezell II*]; *Turner Broad. Sys. Inc. v. FCC*, 520 U.S. 180, 195

---

[14] Drummond also argues that a prior state court judgment carries a preclusive effect that prevents us from finding in the Township's favor as to Step Two. Because a straightforward application of intermediate scrutiny dictates that we vacate and remand, we see no need to reach this issue.

[15] As we recently noted, we have occasionally used the term "substantial fit" rather than "reasonable fit." *See United States v. Boyd*, 999 F.3d 171, 188 n.14 (3d Cir. 2021). To be clear, those terms describe a single standard, which we will reference as the parties do, as the reasonable-fit test.

(1997) (explaining that courts have an obligation "to assure that, in formulating [their] judgments, [the governing body] has drawn reasonable inferences based on substantial evidence" (citation omitted)).

In applying intermediate scrutiny, the District Court borrowed from First Amendment doctrine. When a free speech plaintiff challenges a time, place, or manner restriction, the government must demonstrate interest, fit, and a third element—that the restriction "leave[s] open ample alternative channels" for speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citations omitted). Importing this test and focusing on the alternative-channels element, the District Court found that Drummond failed to "plead any facts regarding the availability or absence of other commercial gun ranges or gun ranges where center-fire rifles may be fired." J.A. at 35. Because of that failure, the Court dismissed Drummond's claims without analyzing fit.

But while the District Court was right to look to free speech cases for guidance, it drew the wrong lessons—or at least incomplete ones. Critically here, our First Amendment jurisprudence makes clear that the government, not the plaintiff, must prove that a challenged law satisfies intermediate scrutiny. *See Bruni*, 824 F.3d at 369. So at *Marzzarella* Step Two, the Township needs to establish fit. When a rule places only a *de minimis* burden on the right to bear arms, it may be clear—even "before any evidence is produced"—that the rule "is reasonably narrowly tailored." *Bruni*, 824 F.3d at 372 n.20; *id*. at 377 n.18 (Fuentes, J.,

24

concurring).  But when a rule imposes a "significant" burden and takes an "exceptional" form, as is true of the challenged rules here, "the government must demonstrate that alternative measures that burden substantially less [protected activity] would fail to achieve [its] interests."  *McCullen*, 573 U.S. at 489, 490, 495.  By shifting the evidentiary burden from the Township to Drummond, and by performing no analysis of alternatives, the District Court subjected the challenged rules to far less searching scrutiny than our cases command.

### b) Why the Township Fails to Establish Fit

For efficiency's sake and for illustrative purposes, we examine the interest and fit elements ourselves, rather than remanding for the District Court to do so.  At the outset, there is no doubt that the ordinance promotes a substantial government interest.  It aims to advance "public health, safety and welfare," J.A. at 124, controlling cases treat those interests as important, *see Drake*, 724 F.3d at 437; *United States v. Salerno*, 481 U.S. 739, 748–49 (1987), and Drummond does not dispute this point.[16]   That the Township's "asserted interests are important in the abstract does not mean, however, that the [challenged zoning] rules will in fact advance those

---

[16]  The District Court also decided that "nuisance prevention" was an important government objective.  J.A. at 10.  Without any analysis or at least additional factual details identifying the nature of the alleged nuisance, a generic "nuisance prevention" label does not, in and of itself, establish a threat to public safety or any other important government objective.

interests." *Phillips v. Borough of Keyport*, 107 F.3d 164, 174–75 (3d Cir. 1997) (citation omitted). The Township "must do more than simply 'posit the existence of the disease sought to be cured.'" *Id*. Instead, it must persuade us that "the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id*. That leaves us to focus on the fit between the Township's ends and the means it uses to achieve them.

And therein lies the problem. The first and most important sign that something is amiss comes from the ordinance's outlier status. When a challenged law has few analogues, it raises concern "that the [government] has too readily forgone options that could serve its interests just as well, without substantially burdening" protected conduct. *McCullen*, 573 U.S. at 490. This is such a case. Neither the Township nor its Amici put forward any parallels for the challenged rules, whether in history or in contemporary practice. *See* Section II.B, *supra*. The ordinance's outlier status cannot be decisive, of course, but it does trigger an especially exacting means-ends analysis.

A closer look at the challenged rules reveals serious questions about fit. First consider the rim-fire rifle rule. On the Township's account, this rule prevents the use of powerful ammunition, reducing noise and increasing safety. But as the Township admitted at oral argument, this theory is just that: A theory, unsupported by evidence. *See Ezell II*, 846 F.3d at 896. And even if it were otherwise, the Township would still need to show it "seriously considered" more targeted tools for

achieving its ends. *Bruni*, 824 F.3d at 371. To take two obvious examples, the Township already instructs Sportsman's Clubs to implement noise-reduction techniques and range-safety best practices. Zoning Ordinance at Art. III, § 311. It is true that the Township need not "demonstrate it has tried or considered *every* less burdensome alternative," but it cannot forego an entire "range of alternatives" without developing "a meaningful record . . . that those options would fail to alleviate the problems meant to be addressed." *Bruni*, 824 F.3d at 370–71. If considered judgment or experience has exposed less-burdensome alternatives as unreasonable, that is for the Township to show after discovery.

Now turn to the non-profit ownership rule. On appeal, the Township justifies this rule on the ground that it moderates the intensity of use at Sportsman's Clubs.[17] But even if evidence corroborated this point—and at this early stage, none does—it would hardly establish sufficient tailoring. *See Ezell II*, 846 F.3d at 896. Here again, "less intrusive tools" for relieving commercial intensity would appear to be "readily available." *McCullen*, 573 U.S. at 494. It is not apparent, for instance, why the Township could not achieve its goals by implementing occupancy limits or hours-of-operation restrictions, for nowhere has it demonstrated—at least not yet—that it "reasonably rejected" common regulatory tools in

---

[17] Prior to this appeal, the Township did not identify "intensity of land use" as a justification in its pleadings, exhibits, or arguments; rather, that possible justification was independently raised by the District Court and is only now raised by the Township.

favor of the unusual prohibition on for-profit firing ranges. *Bruni*, 824 F.3d at 371.

So far, we have identified two reasons why the ordinance plausibly fails intermediate scrutiny:  No evidence ties the challenged rules to the asserted interest, and the Township neglects to explain why it eschewed more targeted alternatives.  But the Township also encounters a third problem.  When it implemented the non-profit ownership and rim-fire rifle rules for Sportsman's Clubs, the Township left the permissive rules regulating Shooting Ranges intact.  It also continued to allow individuals to practice with center-fire rifles everywhere in IBD districts aside from Sportsman's Clubs.  These glaring instances of under-inclusion exacerbate our already significant concerns about fit.

If non-profit status moderates commercial intensity, as the Township insists, why permit for-profit Shooting Ranges?  And if center-fire rifles amplify noise and safety concerns, why allow them at Shooting Ranges—indeed, everywhere other than Sportsman's Clubs?  To the extent the Township posits that adjacent uses or other circumstances explain its "truly exceptional" decision to single out Sportsman's Clubs, *McCullen*, 373 U.S. at 490, it must support that position not with "lawyers' talk," but with actual "evidence."  *Ezell II*, 846 F.3d at 896 (citation and quotation marks omitted).  And at the pleading stage, of course, the Township has none.

### c) Where the Township's Counterarguments Founder

In resisting Drummond's request for remand, the Township advances two arguments. It first urges us to defer to the Board's findings. The ordinance's preamble states that the challenged rules promote the "health, safety and welfare" of the Township's residents. J.A. at 124. Relying on our longstanding reluctance to "sit as a zoning board of appeals," *Chez Sez III Corp. v. Twp. of Union*, 945 F.2d 628, 633 (3d Cir. 1991) (citation omitted), and emphasizing that we afford "some deference" to zoning rules that restrict speech, *Bruni*, 824 F.3d at 370, the Township depicts the preamble as definitively resolving the ordinance's fit.

The problem with this proposal is that it amounts not to "some deference," but total abdication. *Bruni*, 824 F.3d at 370. If a zoning board could immunize its own rules from review merely by mentioning public safety, heightened scrutiny would be heightened in name only. Indeed, the Township's proposal would authorize even absolute bans on gun ranges and stores whenever a local zoning board believes a ban would promote public safety. *Heller* demands far more. *See* 554 U.S. at 576, 632.

Taking another tack, the Township assigns the ordinance to a category of low-burden laws that overcome intermediate scrutiny without discovery. When a rule places only a "slight burden" on protected conduct, it may be impossible to identify "alternative measures" that would "burden *substantially* less [conduct]." *Bruni*, 824 F.3d at 372

n.20 (citation omitted).  Under those circumstances, it may be obvious—"even at the pleading stage"—that the rule overcomes intermediate scrutiny.  *Id*.  Our First Amendment precedents leave open this possibility, *see id*., and we see nothing in *Heller* to foreclose it in the Second Amendment context.

In this case, however, we cannot be confident that the ordinance inflicts only a *de minimis* burden on the right to bear arms.  As the Township argues and as we accept above, the challenged rules stop short of an absolute ban on firearms purchase and practice.  It does not follow, though, that the burden they produce is not significant.  The non-profit ownership rule, in particular, has already forced the Greater Pittsburgh Gun Club out of business, and may have the same effect on other Sportsman's Clubs.  It is plausible that those closures impair residents' access to the weapons and skills commonly used to lawfully defend their homes.  Thus, whether the challenged rules impose a slight burden or a substantial one is not a question we can decide at the pleading stage.[18]

---

[18] As previously noted, *see supra* note 10, the Township's motion to dismiss included search results showing that some gun stores operate in or near the Township.  But even if we were to take judicial notice of those results, itself problematic, they tell us nothing about whether nearby stores provide adequate substitutes for the Greater Pittsburgh Gun Club and any other Sportsman's Clubs that may have closed as a result of the challenged ordinance, nor does access to alternatives for *purchasing* firearms resolve our concerns associated with restrictions on firearms *practice*.

Our Second Amendment inquiry ends where it began. *Heller* rejects rational-basis review and instead requires a rigorous analysis of rules that interfere with the right to bear arms.  Here, for example, the Township must marshal evidence to explain why, for Sportsman's Clubs in IBD districts, it embraced the unusual rim-fire rifle and non-profit ownership rules over more common, less burdensome alternatives.  The question is not whether the Township used "the least restrictive or least intrusive means of serving its interests," *Ward*, 491 U.S. at 798, but whether it "seriously considered[] substantially less restrictive alternatives," *Bruni*, 824 F.3d at 357.  As is unsurprising at the pleading stage, the Township has failed to "establish a close fit between the challenged zoning regulations and the actual public benefits they serve—and to do so with actual evidence, not just assertions." *Ezell II*, 846 F.3d at 894; *Binderup v. Att'y Gen.*, 836 F.3d 336, 354 (3d Cir. 2016) (requiring the government to "present some meaningful evidence, not mere assertions, to justify its predictive judgments" (alteration in original) (citation omitted)).  We leave it to the District Court to analyze whatever evidence the Township presents in light of these governing principles.

## III.　Remaining Motions

In addition to seeking reinstatement of his Second Amendment claims, Drummond asks us to enter a preliminary injunction and to reassign this case to another district judge.  We reject both requests.

First, rather than address Drummond's request for a preliminary injunction, we will remand for the District Court

to consider that relief.  Drummond's preliminary injunction motion did not receive a substantive ruling before the District Court dismissed this action.  Assuming the motion is renewed on remand, we trust the District Court will address it promptly.

Second, we decline to reassign this case to another district judge.  It is well-established that "adverse rulings—even if they are erroneous—are not in themselves proof of prejudice or bias." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 330 (3d Cir. 2015) (citations omitted).  This principle assumes particular importance in cases, like this one, where a district court must apply complex constitutional principles in an unfamiliar factual context.  And, contrary to Drummond's suggestion, the District Court did not disregard our prior order.  That order directed the Court to follow *Marzzarella*'s two-step framework, not to reach a particular result at either step.  We remain confident in the District Judge's ability to thoughtfully and impartially oversee this case.

## IV.   <u>Conclusion</u>

For the foregoing reasons, we vacate the order dismissing Drummond's Second Amendment claims, deny his request for reassignment, and remand for further proceedings consistent with this opinion.