No. 20-15948

# In the United States Court of Appeals
## for the Ninth Circuit

ANDREW TETER AND JAMES GRELL

*Plaintiffs-Appellants*,

v.

CLARE CONNORS, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII AND AL CUMMINGS, IN HIS OFFICIAL CAPACITY AS THE STATE SHERIFF DIVISION ADMINISTRATOR

*Defendants-Appellees.*

**Appeal from a Judgment of United States District Court
For the District of Hawaii
Civ. No. 19-cv-00183-ACK-WRP
United States District Court Judge Alan C. Kay**

## APPELLANTS' SUPPLEMENTAL BRIEF

ALAN ALEXANDER BECK
Attorney at Law
2692 Harcourt Drive
San Diego, California 92123
Telephone: (619) 905-9105
alan.alexander.beck@gmail.com

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

*Attorneys for Appellants, Andrew Teter and James Grell*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.     *Bruen* Rejected Means-End, Intermediate Scrutiny ................................. 2

II.    H.R.S. §134-53 Is Unconstitutional Because It Bans Arms That Are Protected by The "Plain Text" of the Second Amendment................................. 4

III.   There is No Historical Analogue to Hawaii's Ban................................ 13

       A.     Controlling Principles .................................................................. 13

       B.    No "Well-Established and Representative" Historical Analogue Exists.......................................................................................... 15

CONCLUSION ................................................................................................. 23

CERTIFICATE OF COMPLIANCE .................................................................. 24

CERTIFICATE OF SERVICE .......................................................................... 25

i

# TABLE OF AUTHORITIES

## CASES

*Aymette v. State,*
    21 Tenn. 154 (1840) ........................................................................................... 19

*Bacon v. State,*
    322 Md. 140, 586 A.2d 18 (1991) ...................................................................... 16

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ............................................................................................. 4

*City of Akron v. Rasdan,*
    105 Ohio App.3d 164, 663 N.E.2d 947(Ohio Ct. App., 1995) ................................ 11

*City of Seattle v. Evans,*
    184 Wash.2d 856, 366 P.3d 906 (2015) .......................................................... 10

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..................................................................................... *passim*

*Drummond v. Robinson,*
    9 F.4th 217 (3d Cir. 2021) ......................................................................... 14, 18

*Duncan v. Bonta,*
    19 F.4th 1087 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated and case*
    *remanded,* 142 S.Ct. 2895 (2022) .................................................................... 3

*English v. State,*
    35 Tex. 473 (1871) .......................................................................................... 20

*Fyock v. City of Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) ............................................................................ 5

*Griffin v. State,*
    47 A.3d 487 (Del. 2012) ................................................................................. 11

*In re Daryl L.,*
    68 Md.App. 375, 511 A.2d 1108 (Ct.Spec.App.1986) ...................................... 16

*Jackson v. City & Cty. of San Francisco,*
   746 F.3d 953 (9th Cir. 2014), *cert. denied*, 576 U.S. 1013 (2015) .................................... 3

*Kanter v. Barr,*
   919 F.3d 437 (7th Cir. 2019) ................................................................ 18

*Kennedy v. Louisiana,*
   554 U.S. 407 (2008) ............................................................................ 15

*Mackall v. State,*
   283 Md. 100, 387 A.2d 762 (1978) .................................................... 5

*Moore v. Madigan,*
   702 F.3d 933 (7th Cir. 2012) ............................................................ 18

*New York State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ............................................................... *passim*

*Nunn v. State,*
   1 Ga. 243 (1846) ............................................................................... 19

*People v. Mitchell,*
   209 Cal. App. 4th 1364 (2012) ........................................................ 13

*People v. Quattrone,*
   211 Cal.App.3d 1389, 260 Cal.Rptr. 44 (1989) ............................... 16

*People v. Zuniga,*
   303 A.D.2d 773, 759 N.Y.S.2d 86 (2d Dept. 2003) ........................ 16

*Silvester v. Harris,*
   843 F.3d 816 (9th Cir. 2016), *cert. denied*, 138 S.Ct. 945 (2018) .................................. 18

*State v. Deciccio,*
   315 Conn. 79 (2014) ........................................................................... 9

*State v. Delgado,*
   298 Or. 395, 692 P.2d 610 (1984) ............................................... 6, 10

*State v. Duke,*
   42 Tex. 455 (1875) ........................................................................... 20

*State v Griffin,*
   2011 Del Super LEXIS 193, 2011 WL 2083893 (Del Super Ct, May 16, 2011) ...... 11

*State v. Herrmann,*
   2015 WI App 97, 366 Wis. 2d 312, 873 N.W.2d 257 (2015) ............................... 11, 12

*State v. Montalvo,*
   229 N.J. 300 (2017) ................................................................................................ 11

*State v. Murillo,*
   347 P.3d 284, 2015 -NMCA-046 (N.M. 2015) ....................................................... 13

*State v. Reid,*
   1 Ala. 612 (1840) .................................................................................................... 19

*State v. Riddall,*
   112 N.M. 78, 811 P.2d 576, *cert. denied*, 112 N.M. 21, 810 P.2d 1241 (1991) ........... 15

*State v. Strange,*
   785 P.2d 563 (Alaska 1990) .................................................................................... 16

*State v. Warren,*
   No. 47168-6-I, 2001 Wash. App. LEXIS 1495 (Ct. App. July 9, 2001) ................... 15

*State v. Wheeler,*
   1999 WL 148235 (Ohio Ct. of App. 1999) .............................................................. 16

*Teixeira v. County of Alameda,*
   873 F.3d 670 (9th Cir. 2017), *cert. denied*, 138 S.Ct. 1988 (2018) ............................... 18

*Wrenn v. District of Columbia,*
   864 F.3d 650 (D.C. Cir. 2017) ................................................................................ 18

*Young v. Hawaii,*
   992 F.3d 765 (9th Cir. 2021) (*en banc*), *cert. granted, judgment vacated and case
   remanded,* 142 S.Ct. 2895 (2022) ........................................................................... 18

*Young v. Hawaii,*
   --- F.4th ----2022 WL 3570610 (9th Cir. Aug. 19, 2022) ............................................ 4

iv

*Zaitzeff v. City of Seattle*,
 17 Wash.App.2d 1, 484 P.3d 470 (2021) ..................................................... 12

**STATUTES**

Militia Act, 1 Stat. 271-04 (1792) ..................................................................... 6

1782 Del. Sess. Laws, at 3 § 6 ......................................................................... 9

H.R.S. §134-53 ............................................................................................. 1, 4

1786 N.C. Sess. Laws, at § VI, at 409 ............................................................. 9

1860 Terr. of N. M. Laws §§1-2 ..................................................................... 20

1791 S.C. Sess. Laws, at 17 ............................................................................. 9

1871 Tex. Gen. Laws ch. 34, §1 ..................................................................... 20

Wash. Rev. Code Ann. § 9.41.250 ................................................................ 15

**OTHER AUTHORITIES**

1 *Documents Relating To The Colonial History Of The State Of New York* (Berthold
 Fernow ed., Albany, N.Y.: Weed, Parsons & Co., 1887) ............................... 7

43 Southern Illinois Law Journal 495 (2019), U Denver Legal Studies Research
 Paper No. 18-28, Available at SSRN: https://ssrn.com/abstract=3205664 or
 http://dx.doi.org/10.2139/ssrn.3205664 ................................................ 8, 9

*Acts And Laws, Of His Majesties Colony Of Rhode-Island, And Providence Plantations In
 America* (Boston: John Allen, 1179 [1719]), reprinted in Cushing, *The Earliest
 Acts And Laws Of The Colony Of Rhode Island And Providence Plantations, 1647-1719*
 (Wilmington, Del.: M. Glazier, 1977) ............................................................. 7

*Acts And Laws, Passed By The General Court Or Assembly Of The Province Of New-
 Hampshire In New-England* (Boston: B. Green, 1716) ................................. 6, 7

*Acts Passed at the Annual Session of the General Assembly of the State of Alabama*
 (Tuscaloosa: Hale & Eaton, 1838 [1839]) ..................................................... 20

Paul A. Clark, *Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to Bloodshed?*, 13 Conn. Pub. Int. L.J. 219 (2014) .................................................. 12

William Waller Hening, *3 The Statutes At Large; Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature, In The Year 1619* (Philadelphia: Thomas DeSilver, 1823) .......................................................... 7

https://legionary.com/butterfly-knives-are-they-good-for-self-defense/ .................... 11

https://www.bladehq.com/blog/a-brief-history-of-the-butterfly-knife/ .......... 5, 10, 11

https://blademag.com/knife-history/history-the-disputed-origins-of-the-butterfly-knife ................................................................................................. 5

https://www.thefreedictionary.com/jackknife ................................................. 5

Kopel, Clayton E. Cramer & Joseph Edward Olsen, *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167 (Fall 2013) .................................... 5

Kopel, David B. and Greenlee, Joseph, *The Second Amendment Rights of Young People* (January 16, 2019) ............................................................................... 8

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) .............................................................................................. 17

*Laws Of North Carolina –1715* ................................................................... 7

*Laws and Acts of Rhode Island, and Providence Plantations Made from the First Settlement in 1636 to 1705*, reprinted in *The Earliest Acts And Laws Of The Colony Of Rhode Island And Providence Plantations, 1647-1719* (John D. Cushing ed., Wilmington, Del.: M. Glazier, 1977) ............................................................................... 7

Aaron Learning & Jacob Spicer, *The Grants, Concessions, And Original Constitutions Of The Province Of New-Jersey* (Philadelphia: W. Bradford, 1752) .................. 7

H. Peterson, *Daggers and Fighting Knives of the Western World* (2001) ................. 6

*Records Of The Colony And Plantation Of New Haven, From 1638 To 1649* (Charles J. Hoadly ed.) (Hartford, Conn.: Case, Tiffany, 1857) ...................... 7

C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741 (1993).................. 22

The Compact With The Charter And Laws Of The Colony Of New Plymouth
(William Brigham ed., Boston: Dutton and Wentworth, 1836) ................................... 7

# INTRODUCTION

Plaintiffs-Appellants Andrew Teter and James Grell ("Plaintiffs") challenge, on Second Amendment grounds, the total ban on possession of butterfly knives found in H.R.S. §134-53.[1]  This supplemental brief is filed pursuant to this Court's August 18, 2022 Order requesting supplemental briefing on *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*"). *Bruen* has made it clear that the challenged law is unconstitutional. In *Bruen*, the Supreme Court streamlined the existing process for evaluating Second Amendment claims. It removed the means-end, intermediate scrutiny second step of the two-step analysis that this court had used to evaluate Second Amendment claims and provided guidance on how to evaluate Second Amendment claims going forward. *Bruen*, at 2127. However, *Bruen* did not change the methodology employed to determine whether an arm is *protected* by the Second Amendment, the text, history and tradition approach first adopted in *Heller*. Thus, Plaintiffs' original briefing on this point to this Court remains valid.  *Bruen* made clear that a law must have an historical analog in order to be valid.  Hawaii's butterfly knife ban fails that test. Hawaii's ban on butterfly knives is unconstitutional.

---

[1]  Section 134-53(a) provides: "Whoever knowingly manufactures, sells, transfers, possesses, or transports in the State any butterfly knife, being a knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both, shall be guilty of a misdemeanor."

## ARGUMENT

### I. *Bruen* Rejected Means-End, Intermediate Scrutiny

The Supreme Court expressly rejected applying means-end scrutiny generally, and intermediate scrutiny specifically: "Today, we decline to adopt that two-part approach. . . . Despite the popularity of this two-step approach, it is one step too many." *Bruen*, at 2127. Means-end scrutiny is inappropriate because it allows courts to "defer to the determinations of legislatures." *Id.* at 2131. "[W]hile that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here." *Id. Bruen* reiterated *Heller*'s refusal "to engage in means-end scrutiny generally" and expressly rejected "the intermediate-scrutiny test that respondents and the United States now urge us to adopt." *Id.* at 2129.

Instead, the *Bruen* Court endorsed a test centered **solely** on text, history, and tradition. "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. In such cases, "the government may not simply posit that the regulation promotes an important

interest," but rather "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id. at* 2126. *See also Id.* at 2150 ("we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden.").

*Bruen* thus abrogated the two-step, intermediate scrutiny test this Court had previously adopted in assessing Second Amendment claims. *See Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014), *cert. denied*, 576 U.S. 1013 (2015) (describing two step test). In *Duncan v. Bonta,* 19 F.4th 1087 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated and case remanded*, 142 S.Ct. 2895 (2022), this Court stated "[u]nless and until the Supreme Court tells us and the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Tenth, Eleventh, and D.C. Circuits that, for a decade or more, we all have fundamentally misunderstood the basic framework for assessing Second Amendment challenges, we reaffirm our two-step approach." *Bruen* has now told this Court and the rest of these courts of appeals the two-step test is "one step too many." Rather, this Court must now stop at the first step of that "two step" analysis. "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S.Ct. at 2126.

3

## II. H.R.S. §134-53 Is Unconstitutional Because It Bans Arms That Are Protected by The "Plain Text" of the Second Amendment

As noted above, the first step is to examine whether the regulation at issue regulates a matter that falls within the "plain text" of the Second Amendment. *Bruen*, at 2129-30. See also *Young v. Hawaii*, --- F.4th ----2022 WL 3570610 (9th Cir. Aug. 19, 2022) (O'Scannlain, J., dissenting from remand) ("As the Supreme Court just instructed us, the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."). H.R.S. §134-53 fails that basic test.

First, here as in *Bruen* and *Young*, both Plaintiffs are "ordinary, law-abiding, adult citizen[][s], and are therefore unequivocally part of the people whom the Second Amendment protects." *Id.* at *10 (punctuation omitted). Second, the knives regulated by the Hawaii statute indisputably are a type of "arm" covered by the plain text of the Second Amendment. *Bruen* reiterates the holding in *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Bruen*, 142 S.Ct. at 2132, quoting *Heller*, 554 U.S. at 582. *See also Caetano v. Massachusetts*, 577 U.S. 411 (2016) (stun guns). "[B]earable arms" includes all arms

4

"commonly possessed by law-abiding citizens for lawful purposes." *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). That test obviously includes knives.

A butterfly knife (sometimes known as a "balisong knife") is basically a jackknife[2] with a second handle: A butterfly knife consists of two handle sections that, when the knife is closed, completely cover the blade. "Many experts believe that a butterfly knife is the strongest and safest folding knife because the blade cannot fold closed inadvertently on the operator so long as the operator has a firm grasp on the handles." D. Kopel, Clayton E. Cramer & Joseph Edward Olsen, *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 179 (Fall 2013). Butterfly knives have been around for centuries and undoubtedly existed at the time of the Founding. "Legend has it that the balisong knife has roots that go back to around 800 AD." https://blademag.com/knife-history/history-the-disputed-origins-of-the-butterfly-knife (last viewed Sept. 2, 2022). Other history indicates that "the butterfly knife was invented in France between 1500 and 1700." (Id.). "The French book "Le Perret" shows a sketch of a butterfly knife, and was published in 1710 A.D. The book itself suggests the butterfly knife was developed in the late 1600's or early 1700's A.D in France." https://www.bladehq.com/blog/a-brief-history-of-the-butterfly-knife/.

---

[2] A "jackknife" is "a knife with the blade pivoted to fold into a recess in the handle." https://www.thefreedictionary.com/jackknife. Such a knife is also sometimes called a "penknife," which is simply "any knife with the blade folding into the handle, some very large." *Mackall v. State*, 283 Md. 100, 387 A.2d 762, 769 n.13 (1978).

There also can be no reasonable dispute that knives are "bearable arms" commonly possessed for "lawful purposes." Indeed, *Bruen* lists knives as a type of protected arm, noting that "[i]n the medieval period, '[a]lmost everyone carried a knife or a dagger in his belt.'" *Bruen*, 142 S.Ct. at 2140, quoting H. Peterson, *Daggers and Fighting Knives of the Western World* 12 (2001). "While these knives were used by knights in warfare, '[c]ivilians wore them for self-protection,' among other things." *Bruen*, at 2140. *See also Heller*, 554 U.S. at 590 ("In such circumstances the temptation [facing Quaker frontiersmen] to seize a hunting rifle or knife in self-defense... must sometimes have been almost overwhelming."). "In early colonial America the sword and dagger were the most commonly used edged weapons.

During the American colonial era, every colonist had a knife." *State v. Delgado*, 298 Or. 395, 692 P.2d 610, 613-614 (1984). The federal Militia Act of 1792 required all able-bodied free white men between 18 and 45 to possess, among other items, "a sufficient bayonet…." *See* Militia Act, 1 Stat. 271-04 (1792). Knives were common *and* were arms for militia purposes. Colonial militia laws required that men (and, sometimes, all householders, regardless of sex) own not only firearms, but also bayonets or swords; the laws sometimes required the carrying of swords in non-militia situations, such as when going to church.[3]

---

[3] For laws of the colonies of New Hampshire, New Haven, New Jersey, New Plymouth, New York, North Carolina, Rhode Island, and Virginia, see: *Acts And Laws, Passed By The General Court Or Assembly Of The Province Of New-Hampshire In New-England* 91-92

There can be no dispute that butterfly knives are bearable arms because they can be held by a person to attack another person in confrontations.[4, 5] *See* ER103. *See Heller*, 554 U.S. at 592 (the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."). Knives have always had that self-defense purpose. Since the Colonial Era, knives have been considered arms protected by the

---

(Boston: B. Green, 1716) ("a good Sword or Cutlash"); *Records Of The Colony And Plantation Of New Haven, From 1638 To 1649* at 25-26 (Charles J. Hoadly ed.) (Hartford, Conn.: Case, Tiffany, 1857) ("a sworde"); *id.* at 131-132 (all males aged 16 to 60 must have "a sword"); *id.* at 201-02 (same); Aaron Learning & Jacob Spicer, *The Grants, Concessions, And Original Constitutions Of The Province Of New-Jersey* 78 (Philadelphia: W. Bradford, 1752) (every male aged 16 to 60 must have "a Sword and Belt..."); The Compact With The Charter And Laws Of The Colony Of New Plymouth 115 (William Brigham ed., Boston: Dutton and Wentworth, 1836) (every Sunday, 1/4 of the men, on a rotating basis, must carry arms to church; along with a gun and ammunition, carrying "sword" was required); 1 *Documents Relating To The Colonial History Of The State Of New York* 49-50 (Berthold Fernow ed., Albany, N.Y.: Weed, Parsons & Co., 1887); *Laws Of North Carolina* –1715, at 29 ("well-fixed sword"); *Laws and Acts of Rhode Island, and Providence Plantations Made from the First Settlement in 1636 to 1705*, reprinted in *The Earliest Acts And Laws Of The Colony Of Rhode Island And Providence Plantations*, 1647-1719 at 57, 106-07. (John D. Cushing ed., Wilmington, Del.: M. Glazier, 1977) ("a Sword or Bayenet"); *Acts And Laws, Of His Majesties Colony Of Rhode-Island, And Providence Plantations In America* 85-94 (Boston: John Allen, 1179 [1719]), reprinted in Cushing, *The Earliest Acts And Laws Of The Colony Of Rhode Island And Providence Plantations*, 1647-1719 at 135, 221-228 (Wilmington, Del.: M. Glazier, 1977) ("one good Sword, or Baionet"); *William Waller Hening, 3 The Statutes At Large; Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature, In The Year* 1619, at 13 (Philadelphia: Thomas DeSilver, 1823) ("a sword, musquet and other furniture fitt for a soldier"); *id.* vol. 5, at 16-17 (militiamen who are "horse-men" have a sword or cutlass).

[4] *District of Columbia v Heller*, 554 US 570, 647 (2008) ("arms" refer to "weapons of offence, or armour of defence," or "anything that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another[.]").

[5] The State's witness, Lt. Nagamine, agreed that a butterfly knife could be used both to defend yourself and attack someone.

Second Amendment. *See* Kopel, David B. and Greenlee, Joseph, *The Second Amendment Rights of Young People* (January 16, 2019). 43 Southern Illinois Law Journal 495, 518-519 (2019), U Denver Legal Studies Research Paper No. 18-28, Available at SSRN: https://ssrn.com/abstract=3205664 or http://dx.doi.org/10.2139/ssrn.3205664 (In New Hampshire, "[t]wo types of edged weapons were needed. First, "a Bayonet fitted to his Gun." In close quarters fighting, an infantryman would attach the bayonet to the front of his gun. Then the gun would be used as a spear." Besides the bayonet, one additional edged weapon was mandatory: "a Cutting Sword, or a Tomahawk or Hatchet.") In South Carolina, the required "Edged arms were "a good and sufficient small sword, broad sword, cutlass or hatchet." *Id.* at 550. In Vermont, the mandatory "edged arm was to be "a good sword, cutlass, tomahawk or bayonet."" *Id.* at 572.[6] There were a great variety in the knives available.

"The variety of American firearms and edged weapons was further increased by the fact that America at all times, including after the Revolution, was a major export market for older, surplus European arms—not only from the United Kingdom, but also from Germany, France, Spain, and the low countries; to these would be added firearms scavenged from the various European armies that fought in colonial wars or

---

[6] At the time of the Second Amendment's ratification, every state required ordinary citizens to own some type of edged weapons as part of the militia laws. *Id.* at 537–38 (New Jersey), 542–43 (Maryland), 547–48 (North Carolina), 550 (South Carolina), 554–55 (New Hampshire), 557–58 (Delaware), 562–63 (Pennsylvania), 567 (New York), 569 (Rhode Island), 573 (Vermont), 583 (Virginia), 585 (Massachusetts), 587 (Georgia), 589 (Connecticut).

the American Revolution." *Id.* at 517. During the Colonial Era "[m]ost firearms could fire only one shot, after which the user might have to take several seconds to reload. So, at close quarters, a firearm would be good for only one shot. If a person carried a pair of pistols (a *brace*), then he or she could fire two shots. But there would be no time to reload anything more against an adversary who was within arm's reach. So edged weapons were essential to self-defense." *Id.* at 518. They were commonly part of the arms required to be brought to militia duty. *See e.g.* 1782 Del. Sess. Laws, at 3 § 6; (which required militia member "at his own expense, provide himself . . . with a Musket or Firelock with a bayonet" before showing up for militia training). *see also* 1786 N.C. Sess. Laws, at § VI, at 409 (same); 1791 S.C. Sess. Laws, at 17 (same).

There is also a consensus among modern courts that knives are protected by the Second Amendment. *See* Opening Brief at 7-23. The Connecticut Supreme Court found dirk knives to be "'[a]rms' within the meaning of the second amendment." *State v. Deciccio*, 315 Conn. 79, 128, 105 A.3d 165 (2014). As the court explained, "their more limited lethality relative to other weapons that, under *Heller*, fall squarely within the protection of the second amendment—e.g., handguns—provides strong support for the conclusion that dirk knives also are entitled to protected status." *Id.* at 122. The court further reasoned that "dirk knives bear a close relation to the bayonet and the sword, and have long been used for military purposes, removes them from the category of weapons that may be deemed dangerous and unusual, thereby rendering them subject to protection under the second amendment." *Id.* at 122-23.

9

Similarly, in *State v. Delgado*, 298 Or. 395, 692 P.2d 610(1984), the Oregon Supreme Court found that Oregon's ban on the possession of switchblades violated the Oregon Constitution's right to arms:

> In early colonial America the sword and dagger were the most commonly used edged weapons. During the American colonial era every colonist had a knife. As long as a man was required to defend his life, to obtain or produce his own food or to fashion articles from raw materials, a knife was a constant necessity.

*Delgado*, at 613-614. It then found that a switchblade is constitutionally protected based on these historical antecedents:

> We are unconvinced by the state's argument that the switch-blade is so "substantially different from its historical antecedent" (the jackknife) that it could not have been within the contemplation of the constitutional drafters. They must have been aware that technological changes were occurring in weaponry as in tools generally. The format and efficiency of weaponry was proceeding apace. This was the period of development of the Gatling gun, breach loading rifles, metallic cartridges and repeating rifles. The addition of a spring to open the blade of a jackknife is hardly a more astonishing innovation than those just mentioned.

*Delgado*, at 614.

In *City of Seattle v. Evans*, 184 Wash.2d 856, 366 P.3d 906 (2015), the Washington Supreme Court found that paring knives are not protected by the Second Amendment because paring knives are not designed to be used for self-defense. *Evans,* 366 P.3d at 913. The court then strongly suggested that knives designed for self-defense such as "bowie knives and swords," having been commonly used for self-defense, may be considered protected arms. *Id.* Butterfly knives have likewise long been used for self-defense. *See,* e.g., https://www.bladehq.com/blog/a-brief-history-of-the-butterfly-

knife/ ("This much is certain: there is a long history of the butterfly knife being used in martial arts from the Philippines specifically in the kali, escrima, and arnis disciplines."); https://legionary.com/butterfly-knives-are-they-good-for-self-defense/ ("The butterfly knife falls right in between empty hand self-defense techniques and a full weapon combat style.").

In *State v. Montalvo*, 229 N.J. 300, 162 A.3d 270 (2017), the New Jersey Supreme Court overturned a conviction for possession of a machete. In doing so, the court found that machete-type knives are protected by the Second Amendment and that a conviction for their possession in the home was unconstitutional. The Delaware Supreme Court has also found knives are protected by the Second Amendment. *See State v Griffin*, 2011 Del Super LEXIS 193, *26 n.62, 2011 WL 2083893 (Del Super Ct, May 16, 2011) ("A knife, even if a 'steak' knife, appears to be a 'bearable arm' that could be utilized for offensive or defensive purposes."), *reversed and remanded on other grounds*, *Griffin v. State*, 47 A.3d 487 (Del. 2012). The Ohio courts have likewise found that knives are protected under their State Constitution. *See City of Akron v. Rasdan*, 105 Ohio App.3d 164, 663 N.E.2d 947(Ohio Ct. App., 1995) (concluding that the "right to keep and bear arms" under the Ohio Constitution extends to knives).

In *State v. Herrmann*, 366 Wis. 2d 312, 325, 873 N.W.2d 257, 263 (2015), the Wisconsin Court of Appeals overturned appellant's conviction for possession of a switchblade as unconstitutional. The Court found "[i]n this case, it is undisputed that

Herrmann possessed his switchblade inside his home for his protection. The Second Amendment, as interpreted in *Heller*, protects Herrmann's right to do so."[7]

Cases that have sustained knife bans have done so under intermediate scrutiny; an approach now abrogated by *Bruen*. For example, *Zaitzeff v. City of Seattle*, 17 Wash.App.2d 1, 484 P.3d 470, 475 (2021), held that swords are protected by the Second Amendment and the Washington Constitution. The court stated that "*Heller*'s definitions of arms suggest that the Second Amendment protects swords as arms. Historically, swords have been weapons of offense used to strike at others. And while law-abiding citizens do not typically carry swords for lawful purposes today . . . swords were common at the time of founding." *Id.*, 484 P.3d at 475. "As law-abiding citizens traditionally used swords for self-defense, we conclude that both constitutions protect Zaitzeff's sword as an arm." *Id* at *9. The court nonetheless sustained the City's ordinance under intermediate scrutiny. *Id.*, 484 P.3d at 479. As noted, *Bruen* has since abrogated intermediate scrutiny in Second Amendment cases.

---

[7] The court also stated that: "we do not think *Heller* can be read to create different levels of protection for different types of arms that fall under the Second Amendment, based on their popularity. In addition, it is not particularly surprising that handguns are more prevalent than switchblades, given that switchblades were banned or severely restricted in many states, including Wisconsin, beginning in the late 1950s and early 1960s." Citing Paul A. Clark, *Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to Bloodshed?*, 13 Conn. Pub. Int. L.J. 219, 219 (2014). *See also State v. Herrmann*, 2015 WI App 97, ¶18 n.9, 366 Wis. 2d 312, 325, 873 N.W.2d 257, 263 (2015).

The trial court relied on *State v. Murillo*, 347 P.3d 284, 289, 2015 -NMCA- 046 (N.M. 2015), in upholding Hawaii's law. ER040. While the *Murillo* Court assumed, but did not decide, that switchblades were "arms," it also noted that "knives … are themselves a peripheral subset of arms typically used for self-defense or security." *Murillo*, 347 P.3d at 288. The court only sustained the law by applying intermediate scrutiny (*Id.*). Again, *Bruen* abrogated that approach. *Id.* In expressly noting that knives are "typically used for self-defense," the court necessarily found that these knives are protected arms. *See also People v. Mitchell*, 209 Cal. App. 4th 1364, 1374 (2012) (applying intermediate scrutiny to uphold a conviction for carrying a dirk knife concealed).

## III.    There is No Historical Analogue to Hawaii's Ban

## A.    Controlling Principles

*Bruen* instructs that where the plain text the Second Amendment covers the individual's conduct, then "the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2130. At that point "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

"'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–635). The State must thus look to 1791 (when the Bill of Rights were adopted), or at the latest, 1868 (when the Fourteenth Amendment was adopted). *See*

*Bruen*, 142 S.Ct. at 2135 ("The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years."). Thus, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154. Likewise, *Bruen* refused even to address "any of the 20th-century historical evidence brought to bear by respondents or their amici," ruling that such evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

The government must "identify a well-established and representative historical analogue to its regulation" dating back to *circa* 1791. *Id.* at 2133. In undertaking this analysis, *Bruen* holds that "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* at 2133, quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021). Rather, "the government [must] identify a well-established and representative historical *analogue. (Id.).* Outlier regulations are not to be accepted. *Bruen*, at 2133, 2153, 2156, 2147 n.22. Thus, *Bruen* rejected New York's reliance on three colonial statutes (1686 East New Jersey, 1692 Massachusetts, 1699 New Hampshire), *id.* at 2142–44, three late-18th-century and early-19th-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee), *id.* at 2144–45, three additional 19th-century state laws (1821 Tennessee, 1871 Texas, 1887 West

Virginia), *id.* at 2147, 2153, five late-19th-century regulations from the Western Territories (1869 New Mexico, 1875 Wyoming, 1889 Idaho, 1889 Arizona, 1890 Oklahoma), *id.* at 2154–55, and one late-19th-century Western State law (1881 Kansas), *id.* at 2155–56.[8]

## B. No "Well-Established and Representative" Historical Analogue Exists

Here, the butterfly knife does not represent an unprecedented societal concern or dramatic technological change. *See Heller*, 554 U.S. at 633. Knives have been used for self-defense since they were invented millennia ago. Butterfly knives are likewise nothing new. And even if modern laws alone could demonstrate a broad tradition of a regulation, there must at least be a strong showing that such laws are common in the states, *i.e.*, many more than six states. *See Kennedy v. Louisiana*, 554 U.S. 407, 423–26 (2008) (only six states permitting death penalty for child rapists shows national consensus against it). Here, **only** Hawaii bans all possession of butterfly knives by name.[9] By any measure, Hawaii is an extreme, modern-day outlier.

---

[8] The Court did not necessarily agree with the government's reading of the colonial laws or the early state laws, but the Court stated that "even if" the government's reading were correct, the record would not justify the challenged regulation. *Bruen*, 142 S.Ct. at 2144.

[9] A butterfly knife is treated as a "switchblade" knife in New Mexico, *State v. Riddall*, 112 N.M. 78, 811 P.2d 576, *cert. denied*, 112 N.M. 21, 810 P.2d 1241 (1991). Due to the ambiguous nature of Washington's "dangerous weapons" statute (Wash. Rev. Code Ann. § 9.41.250), Plaintiffs previously believed that butterfly knives were prohibited in Washington State, however, its appeals court has found otherwise. *See State v. Warren*, No. 47168-6-I, 2001 Wash. App. LEXIS 1495 (Ct. App. July 9, 2001) (evidence

Thus, here, as in *Bruen*, the historical analysis is "fairly straightforward" and "simple." *Bruen*, at 2131–32. The historical analysis is straightforward when, for instance, "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. The historical analysis is also straightforward when "the Founders themselves could have adopted [a 'distinctly similar' historical regulation to the challenged law] to confront that problem" but did not. *Id.* "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

*Heller* and *Bruen* "exemplifie[d] this kind of straightforward historical inquiry." *Bruen*, at 2131. Both examined laws enacted to remedy centuries-old problems. Both found that those laws lacked a historical analogue. Both, accordingly, struck those laws

---

insufficient to establish that a butterfly knife was a "dangerous weapon" under state law). New Mexico is an outlier. California, which only bans the **carry** of switchblades over two inches, is the only other state Plaintiffs could find which treat butterfly knives as switchblades. *See People v. Quattrone*, 211 Cal.App.3d 1389, 260 Cal.Rptr. 44 (1989). These holdings are simply wrong; a butterfly knife (unlike a switchblade) is not spring-assisted into a locked position. *See In re Daryl L.*, 68 Md.App. 375, 511 A.2d 1108 (Ct.Spec.App.1986) (holding that a locking device did not convert a penknife into an illegal switchblade); *Bacon v. State*, 322 Md. 140, 586 A.2d 18, 23 (1991) (holding that a penknife with a 5" blade opened into a locked position was not a switchblade and not illegal). As explained, butterfly knives are simply two-handle knives in which the blade folds into the handles and open manually without any spring assistance. *See State v. Strange*, 785 P.2d 563 (Alaska 1990) (collecting authorities*); People v. Zuniga*, 303 A.D.2d 773, 759 N.Y.S.2d 86 (2d Dept. 2003); *State v. Wheeler,* 1999 WL 148235 (Ohio Ct. of App. 1999).

16

as unconstitutional. In *Heller,* the District of Columbia law at issue "addressed a perceived societal problem—firearm violence in densely populated communities" by banning handgun possession in the home. *Bruen*, at 2131. Although "the Founders themselves could have adopted [a similar law] to confront that problem," they did not. *Id.* In striking down the District of Columbia's ban on handguns in *Heller*, the Supreme Court found it dispositive that no "Founding-era historical precedent" banned handgun possession in the home. *Id. Bruen* examined New York's proper cause requirement for obtaining a carry permit, which "concern[ed] the same alleged societal problem addressed in *Heller*: handgun violence, primarily in urban area[s]." *(Id)* (quotation marks omitted). In striking down New York's proper cause requirement, the Supreme Court deemed it controlling that the law lacked an analogue from "before, during, and even after the Founding." *Bruen*, at 2131–32. These same points apply equally to knives.

At the time of the Founding, the preferred means of addressing the threat of violence was to require law-abiding individuals to be armed. States "typically required that arms be brought to churches or to all public meetings," and "statutes required arms carrying when traveling or away from home." *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 232 (2018) (cited with approval in *Bruen*, at 2133). There is no tradition of banning the possession of a knife of any type.

Indeed, during the colonial era, there were no bans on knives of any kind.[10]

While the Supreme Court did not need to resolve the question in *Bruen* (2162-63

(Barrett, J., concurring)), this Court has repeatedly held that the courts must look to the

Colonial Era in order to find historical traditions under step one of the Court's two-

step jurisprudence. *See*, e.g., *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (*en banc*),

*cert. granted, judgment vacated and case remanded*, 142 S.Ct. 2895 (2022); *Silvester v. Harris*, 843

F.3d 816, 821 (9th Cir. 2016), *cert. denied,* 138 S.Ct. 945 (2018). *Accord Teixeira v. County

of Alameda,* 873 F.3d 670, 682 (9th Cir. 2017) (*en banc*), *cert. denied,* 138 S.Ct. 1988 (2018).

That is a faithful reading of *Heller*. And it is in line with the Seventh Circuit's decision

in *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) ("…1791, the year the Second

Amendment was ratified—the critical year for determining the amendment's

historical meaning…"), and with the D.C. Circuit in *Wrenn v. District of Columbia,* 864

F.3d 650, 668 (D.C. Cir. 2017) ("our opinion does little more than trace the boundaries

laid in 1791 and flagged in *Heller I*"). Both *Moore* and *Wrenn* were cited with approval in

---

[10] The only potential exception were restrictions imposed on minority groups. "Some Colonial and Reconstruction Era governments made it illegal to sell guns to enslaved or formerly enslaved people and members of Native American tribes." *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 (3d Cir. 2021) (footnote omitted). Some of the statutes reference restriction on arms rather than firearms, so it is unclear whether these laws restricted knives. Either way "[i]t should go without saying that such race-based exclusions would be unconstitutional today." *Kanter v. Barr*, 919 F.3d 437, 458 n.7 (7th Cir. 2019) (Barrett, J., dissenting). *See also Drummond*, 9 F.4th at 228 n.8 (same). Therefore, even if these Colonial laws applied to edged weapons, they cannot be used to demonstrate a historical tradition, much less justify a general, State-wide ban for the entire population, such as imposed by the Hawaii law.

*Bruen. Bruen*, at 2127, 2135. The Colonial Era is the relevant time period and there were no bans on knives during the Colonial Era. That alone should resolve this matter.

However, even if this Court looked to the Reconstruction Era for an historical analog, the result would be the same. Some Nineteenth Century laws placed restrictions on bowie knives and certain other knives. *Bruen*, at 2186 (Breyer, J., dissenting). However, those laws dealt with the concealed carry of bowie knives and other weapons, not bans on possession. The general rule from the line of 19th Century cases *Heller* discusses is that the carry of arms such as bowie knives could be regulated, but not banned outright. For example, *Heller* points out that *Aymette v. State*, 21 Tenn. 154 (1840), "held that the state constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." *Heller*, 554 U.S. at 613. Similarly, *Nunn v. State*, 1 Ga. 243, 246 (1846), also cited in *Heller*, 554 U.S. at 612, recognized an exemption for the open carry of bowie knives, holding that "*no person or persons shall be found guilty of violating the before-recited act, who shall openly wear, externally, bowie-knives, dirks, tooth-picks, spears, and which shall be exposed plainly to view.*" *Nunn,* 1 Ga. at 246. *Heller* also relied on *State v. Reid*, 1 Ala. 612, 616-617 (1840), which held that "[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or which

requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."[11] *Heller*, 554 U.S. at 629.

These cases stand for the proposition that concealed carry can be banned when the government allows for the open carry of arms. There are only two jurisdictions, New Mexico and Texas, mentioned by the dissent in *Bruen*, which did not turn on this distinction between open carry and concealed carry. "[T]he Territory of New Mexico appears to have banned all carriage whatsoever of "any class of pistols whatever," as well as "bowie kni[ves,] . . . Arkansas toothpick[s], Spanish dagger[s], slung-shot[s], or any other deadly weapon." 1860 Terr. of N. M. Laws §§1-2, p. 94. *Bruen*, at 2186 (Breyer, J., dissenting). "And Texas made it a misdemeanor to carry in public any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense absent reasonable grounds for fearing an [immediate and pressing] unlawful attack." 1871 Tex. Gen. Laws ch. 34, §1." *Bruen*, at 2188. (Breyer, J., dissenting) (punctuation omitted).

However, the dissent's reliance on these two instances was rejected by the majority in the *Bruen*. *Bruen*, at 2153. Specifically, the Court found that the two Texas cases -- *English* v. *State*, 35 Tex. 473 (1871), and *State* v. *Duke*, 42 Tex. 455 (1875) – were outliers and therefore "provide little insight into how postbellum courts viewed the

---

[11] Similarly, Alabama had a ban on the concealed carry of bowie knives but allowed for their open carry. See *Acts Passed at the Annual Session of the General Assembly of the State of Alabama* (Tuscaloosa: Hale & Eaton, 1838 [1839]), chap. 77, 67-68.

right to carry protected arms in public." *Id.* The New Mexico statute was both an outlier, *Bruen*, 2147 at n.22, and distinguishable, *id.* at 2154 n.29, as it expressly allowed an exception for self-defense. Clearly, if these restrictions on pistol carry were irrelevant, then they are likewise irrelevant with respect to knives in general.

*Heller* holds that matters that took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources." *Heller*, at 614. *Bruen* notes that is a "scholarly debate" about "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). *Bruen*, at 2138. The Court found no "need" to address this debate because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* So too here with respect to the possession of knives. Thus, even if this Court relies upon 19th Century laws, there is no appropriate historical analogue to Hawaii's total ban on mere possession. Under either period, the State must "identify a well-established and representative historical analogue to its regulation." *Id.* at 2133. This analog must be "distinctly similar" to the law at issue in its impact on the right of self-defense. *Id.* at 2131. A ban on possession is nothing like a restriction on concealed carry. Knife violence has existed throughout the history of this country. Yet knife bans did not exist during either historical period. There is no historical justification for Hawaii's butterfly knife ban.

Finally, *Bruen* noted that when a challenged law addresses an "unprecedented societal concern[]" or involves "dramatic technological changes," the historical analysis may be less straightforward. *Id.* at 2132. In these instances, "th[e] historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* at 2132. "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). The controlling "metric" in that analysis is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and second, whether that regulatory burden is comparably justified." *Id.* at 2133. This inquiry "does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 2133 n.7.

Here, there is no "unprecedented social concern" or "dramatic technological changes" with respect to knives. The basic technological characteristics of knives are utterly unchanged. Knives have been around for millennia. In the West, the design of a butterfly knife dates back to when they were first developed in France sometime between 1500 and 1700 and perhaps earlier. These knives thus were known at the time of the Founding. The social concern with the misuse of knives is no different now than it was then. Knives now and then could be used for self-defense or misused offensively in violent crime. Hawaii's complete ban is flatly unconstitutional.

22

## CONCLUSION

This Court should reverse the judgment below and find that Hawaii's ban on the possession of butterfly knives is unconstitutional.

Respectfully submitted,

_s/ Alan Alexander Beck_
ALAN ALEXANDER BECK (HI Bar No. 9145)
Attorney at Law
2692 Harcourt Drive
San Diego, California 92123
Telephone: (619) 905-9105
Email: alan.alexander.beck@gmail.com

_s/ Stephen D. Stamboulieh_
STEPHEN D. STAMBOULIEH
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
Email: stephen@sdslaw.us

## **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(f) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,192 words and complies with the word limit of Cir. R. 32-1.

2.      This brief complies with the typeface and type size requirements of Fed. R. App. P.32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Garamond.

Dated: September 16, 2022.

*/s/ Alan Alexander Beck*
Alan Alexander Beck

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 16, 2022, I filed the foregoing Appellants' Supplemental Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>*/s/ Alan Alexander Beck*</u>
Alan Alexander Beck