No. 20-15948

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

ANDREW TETER and JAMES GRELL,

*Plaintiffs-Appellants,*

v.

HOLLY T. SHIKADA, in her Official Capacity as the Attorney General of the State of Hawaiʻi and WILLIAM OKU, JR., in his Official Capacity as the State Sheriff Division Administrator,[1]

*Defendants-Appellees.*

---

On Appeal from the United States District Court for the District of Hawaiʻi
Honorable Alan C. Kay, Senior United States District Judge
(Civil No. 19-cv-00183-ACK-WRP)

---

## SUPPLEMENTAL BRIEF OF DEFENDANTS-APPELLEES

## CERTIFICATE OF COMPLIANCE

## CERTIFICATE OF SERVICE

---

[1] HOLLY T. SHIKADA succeeded CLARE E. CONNORS on December 10, 2021 and WILLIAM OKU, JR., succeeded AL CUMMINGS on December 1, 2020. They are automatically substituted as parties pursuant to Fed. R. App. P. 43(c)(2).

HOLLY T. SHIKADA
Attorney General of Hawaiʻi
KIMBERLY T. GUIDRY
 Solicitor General

ROBERT T. NAKATSUJI
First Deputy Solicitor General
Department of the Attorney General
State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi  96813
Telephone:  (808) 586-1360
Fax:  (808) 586-8116
E-mail:
Robert.T.Nakatsuji@hawaii.gov

Attorneys for Defendants-Appellees
HOLLY T. SHIKADA and WILLIAM OKU, JR.

## TABLE OF CONTENTS

I.    BACKGROUND ..................................................................................1

II.   STATEMENT OF AUTHORITIES ...............................................1

III.  SUMMARY OF THE ARGUMENT .............................................2

IV.   ARGUMENT ....................................................................................5

      A.   The Second Amendment Analysis Following *Bruen* ...........................5

      B.   Hawaii's Ban on Butterfly Knives is Supported by
           Historical Analogues. ...............................................................8

           1.   Hawaii's Bans on Butterfly Knives, Switchblades,
                and Deadly Weapons ...............................................8

           2.   Founding Era Statutes ............................................14

      C.   Section 134-53 Is Valid Because It Was Designed to
           Ensure that Law-Abiding, Responsible Citizens Rather
           than Criminals Can Possess Weapons...................................34

      D.   Standing and Ripeness Issues Also Support Dismissing
           this Case. ...............................................................................36

      E.   Other Possible Arguments by Plaintiffs.............................37

V.    CONCLUSION.............................................................................39

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Bruen*,
   1:22-cv-0734 (GTS/CFH), 2022 WL 3999791 (N.D.N.Y. Aug. 31,
   2022) ........................................................................................................... 37

*Aymette v. State*,
   21 Tenn. 154 (1840) .................................................................................... 16

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ("*Heller I*") .......................................... 7, 30, 35, 36

*Drummond* v. *Robinson*,
   9 F.4th 217 (CA3 2021) ................................................................................ 7

*Haynes v. State*,
   24 Tenn. 120 (1844) .................................................................................... 16

*In re John Doe, born August 3, 1977*,
   73 Haw. 89, 828 P.2d 272 (1992) ............................................................... 9

*Lacy v. State*,
   903 N.E.2d 486 (Ind. Ct. App. 2009) ....................................................... 10

*New York State Rifle and Pistol Association, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ....................................................................... *passim*

*Pena v. Lindley*,
   898 F.3d 969 (9th Cir. 2018) ..................................................................... 38

*People ex rel. Mautner v. Quattrone*,
   260 Cal. Rptr. 44 (Cal. Ct. App. 1989) ...................................................... 9

*People v. Canales*,
   55 P.2d 289 (Cal. Ct. App. 1936) .............................................................. 31

*People v. Ferguson*,
   18 P.2d 741, 742 (Cal. Ct. App. 1933) ...................................................... 30

*People v. Flood*,
   957 P.2d 869 (Cal. 1998) ............................................................................ 30

*People v. Grubb*,
   408 P.2d 100 (Cal. 1965) ...................................................................31

*People v. Mulherin*,
   35 P.2d 174 (Cal. Ct. App. 1934) .....................................................30

*People v. Persce*,
   97 N.E. 877 (N.Y. 1912) ...................................................................31

*People v. Satchell*,
   489 P.2d 1361 (Cal. 1971), ...............................................................30

*State v. Giltner*,
   56 Haw. 374, 537 P.2d 14 (1975) ................................................12, 13

*State v. Muliufi*,
   64 Haw. 485, 643 P.2d 546 (1982) ..............................................12, 13

*State v. Murillo*,
   347 P.3d 284 (N.M. Ct. App. 2015) .............................................11, 35

*State v. Ogata*,
   58 Haw. 514, 572 P.2d 1222 (1977) ..................................................11

*State v. Rackle*,
   55 Haw. 531, 523 P.2d 299 (1974) ..............................................12, 13

*State v. Riddall*,
   811 P.2d 576 (N.M. Ct. App. 1991) .....................................................9

*State v. Workman*,
   14 S.E. 9 (W. Va. 1891) .....................................................................16

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ...........................................................36

*Taylor v. United States*,
   848 F.2d 715 (6th Cir. 1988) ...............................................................9

*Thomas v. Anchorage Equal Rts. Comm'n*,
   220 F.3d 1134 (9th Cir. 2000) (en banc). ..........................................37

*Wang v. Chinese Daily News, Inc.*,
  737 F.3d 538 (2013) ...................................................................37

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019) ......................................................38

## Federal Constitutitonal Provisions and Statutes

U.S. Const. amend. II...............................................................1, 6

15 U.S.C. §§ 1241-1245............................................................10

S. Rep. 85-1980, 85th Cong. 2d. Sess. (1958),
  1958 U.S.C.C.A.N. 3435..........................................................11

## Hawaiʻi Statutes, Legislation, and Legislative History

Haw. Rev. Stat. § 134-51 .................................................... *passim*

Haw. Rev. Stat. § 134-51(a)........................................................33

Haw. Rev. Stat. § 134-52 (2011) .............................................2, 9

Haw. Rev. Stat. § 134-53 ....................................................*passim*

Revised Laws of Hawaiʻi § 3089 (1905) ...................................33

1852 Haw. Sess. Laws Act of May 25, 1852............................33

1937 Haw. Sess. Laws Act 123, §§ 1-2 at 165 .......................33

1993 Haw. Sess. Laws Act 226, §§ 1-4 at 404-05.....................9

1999 Haw. Sess. Laws Act 285, § 1 ......................................9, 10

S. Stand. Comm. Rep. No. 1389, in 1999 Senate Journal .......13

*Translation of the Constitution and Laws of the Hawaiian Islands,
  Established in the Reign of Kamehameha III*, at 162-63 (1842)
  (reprinting Act of Nov. 12, 1833)...........................................32

**Other State Statutes**

Section 12020 of the California Penal Code (Later Re-Enacted and
Currently Located in Section 22210) ....................................................29

1837 Ala. Sess. Laws Act 11, at 7 ...........................................................14

1837 Ga. Sess. Laws Act of Dec. 25, 1837, at 90-91 .........................14, 22

1837 Miss. Sess. Laws Act of May 13, 1837, at 290-92 ...................15, 22

1838 Fla. Sess. Laws. Act 24, at 36 ...................................................15, 22

1838 Tenn. Sess. Laws Act CXXXVII, at 200-01...................................15

1838 Va. Sess. Laws Act 101, at 76 .........................................................15

1839 Ala. Sess. Laws Act 77, at 67 .........................................................15

1849 N.Y. Sess. Laws Act 278, at 403 .....................................................22

1849 Vt. Sess. Laws Act 36, at 26 ...........................................................22

1850 Mass. Sess. Laws Act 194, at 401....................................................22

1851 Pa. Sess. Laws Act 239, at 382 .......................................................23

1855 Cal. Sess. Laws Act CXXVII, at 152-53 ........................................17

1855 La. Sess. Laws Act 120, at 148 ........................................................17

1859 Ind. Sess. Laws Act LXXVIII, at 129........................................17, 23

1859 Mass. Sess. Laws Act 199, at 357....................................................23

1859 Ohio Sess. Laws Act of Mar. 18, 1859, at 56-57...........................17

1861 Nev. Sess. Laws Act XXVIII, at 61, 62....................................17, 23

1864 Cal. Sess. Laws Act CXXVIII, at 115 ............................................23

1866 N.Y. Sess. Laws Act 716, at 810-11 ...............................................23

1868 Fla. Sess. Laws Act 1,637, at 95 .....................................................24

1868 Kan. Sess. Laws Act 31, at 378 .......................................................17

1870 La. Sess. Laws Act 100, at 159 .......................................................17

1870 Tex. Sess. Laws Act LXXVIII, at 139 ...............................................17

1871 Tex. Sess. Laws Act XXXIV, at 25 ...........................................18, 24

1872 Wis. Sess. Laws Act 7, at 17 ..........................................................24

1872-1873 Ala. Sess. Laws Act 86, at 130 ..............................................24

1873 Neb. Sess. Laws Act 58, at 724 .......................................................18

1873 W.V. Sess. Laws Act CCXXVI, at 709 .............................................18

1874 Mo. Sess. Laws Act of Mar. 26, 1874, at 43 ..............................18, 24

1875 Ark. Sess. Laws Act of Feb. 16, 1875, at 156 ............................18, 25

1875 Ind. Sess. Laws Act XVII, at 62 .......................................................25

1875 Pa. Sess. Laws Act 38, at 33 ...........................................................25

1875 Va. Sess. Laws Act 124, at 102 ........................................................18

1877 Mo. Sess. Laws Act of April 28, 1877, at 240.............................18, 25

1877 N.H. Sess. Laws Act LII, at 38 .........................................................25

1878 Miss. Sess. Laws Act XLVI, at 175....................................................19, 25

1879 Ill. Sess. Laws Act of May 24, 1879, at 114-15 ...............................26

1879 N.C. Sess. Laws Act 127, at 231.................................................19, 26

1879 Tenn. Sess. Laws Act CLXXXVI, at 231 ..........................................26

1880 S.C. Sess. Laws Act 362, at 448 ......................................................26

1881 Ill. Sess. Laws Act of April 16, 1881, at 73........................................26

1882 W.V. Sess. Laws Act CXXXV, at 421 .........................................19, 27

1884 Va. Sess. Laws Act 143, at 180 ..................................................19, 27

1885 Or. Sess. Laws Act of Feb. 18, 1885, at 33 ...................................................27

1886 Md. Sess. Laws Act 375, at 602...........................................................19, 27

1887 Mich. Sess. Laws Act 129, at 144..............................................................27

1890 Okla. Sess. Laws Act 25, Art. 47, § 2, at 495 .........................................19, 28

1892 Vt. Sess. Laws Act 85, at 95 .........................................................................19

1837 Ala. Sess. Laws Act 11, at 7 .........................................................................14

1893 R.I. Sess. Laws Act 1180, at 231-32.......................................................20, 28

1909 N.J. Sess. Laws Act 17, at 34......................................................................29

1915 N.D. Sess. Laws Act 83, at 96......................................................................29

1917 Cal. Sess. Laws Act 145, at 221...................................................................29

1917 Minn. Sess. Laws Act 243, at 354 ...............................................................29

## Rules

Circuit Rule 28-2.7...................................................................................................2

Fed. R. App. P. 43(c)(2)..........................................................................................1

## Other Authorities

*Baton (law enforcement)*, Wikipedia, https://en.wikipedia.org/wiki
/Baton_(law_enforcement) (last visited July 28, 2022) ......................................21

*Brass knuckles*, Wikipedia,
https://en.wikipedia.org/wiki/Brass_knuckles (last visited July 28,
2022).....................................................................................................................20

Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic*, at
87 (1999)..............................................................................................................15

David B. Kopel, Clayton E. Cramer, and Joseph Edward Olson,
*Knives and the Second Amendment*,
47 U. Mich. J. L. Reform 167, 179 (Fall 2013) ..................................................15

*Slungshot*, Wikipedia, https://en.wikipedia.org/wiki/Slungshot (last visited July 28, 2022)..............................................................................20

*Swordstick*, Wikipedia, https://en.wikipedia.org/wiki/Swordstick (last visited July 28, 2022)..............................................................................20

Section 134-53 of the Hawaiʻi Revised Statutes does not violate the Second Amendment to the U.S. Constitution, even after the U.S. Supreme Court's decision in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

## I.     BACKGROUND

Appellate briefing was completed in this case; however, the Ninth Circuit then held the case in abeyance pending the U.S. Supreme Court's decision in *Bruen*.  DktEntry 50.  *Bruen* was finally decided on June 23, 2022.  On July 1, 2022, Defendants-Appellees HOLLY T. SHIKADA, in her Official Capacity as the Attorney General of the State of Hawaiʻi, and WILLIAM OKU, JR., in his Official Capacity as the State Sheriff Division Administrator ("Defendants"), filed their Motion for Remand or, in the Alternative, for Supplemental Briefing.  DktEntry 60.  Plaintiffs-Appellants ANDREW TETER and JAMES GRELL ("Plaintiffs") filed an Opposition and Defendants filed a Reply.  DktEntry 62, 63.  On August 18, 2022, the Ninth Circuit issued its Order denying remand and ordering the parties to submit supplemental briefs addressing *Bruen*, not to exceed 10,000 words and within 30 days.  DktEntry 66.

## II.     STATEMENT OF AUTHORITIES

Except for provisions previously included in the Addendum filed with Defendants' Answering Brief, Defendants set forth the pertinent constitutional

1

provisions, statutes, and rules in a separately filed Addendum, pursuant to Circuit Rule 28-2.7.

## III.    SUMMARY OF THE ARGUMENT

Although *Bruen* has effected a fundamental change in Second Amendment law, Section 134-53 is constitutional even under the *Bruen* standard.  Initially, one could argue that, as a purely textual matter, "the people" protected by the Second Amendment simply does not include criminals, and since butterfly knives are associated with criminals and criminal activity, Section 134-53 is valid.  But if the Court does not want to end the analysis here, Section 134-53 is also well-supported by historical analogues.  Hawaii's ban on butterfly knives is closely related to its ban on switchblades (Section 134-52) and its general Deadly Weapons statute (Section 134-51).  Switchblades have been banned largely because they are associated with criminals.  Hawaii's general Deadly Weapons statute also bans weapons that are closely associated with criminal activity.  The legislative history of Section 134-53 confirms that butterfly knives were banned because of their association with gangs and criminal activity.  Therefore, Hawaii's ban on butterfly knives is part of a tradition of banning weapons that are closely associated with criminals and criminal activity.  That tradition has historical roots that stretch back to the Founding Era.

Numerous statutes banning weapons associated with criminals and criminal activity were enacted by other states from the 1830s and thereafter. In the 1830s, several states banned or restricted Bowie knives as part of a "panic over the Bowie knife." Bowie knives were considered to be particularly dangerous weapons, but more importantly, they were also considered to be one of the favored weapons of criminals. They were the weapon of "the robber and the assassin," and "desperadoes" and "ruffians." Even after the 1830s, states continued to enact bans or restrictions on Bowie knives. Many states made it illegal to carry Bowie knives, open or concealed, imposed taxes on them, deemed a death occurring while dueling with a Bowie knife to be murder, or prohibited Bowie knives in churches or election polling places.

During the same time period, states also started banning other weapons beyond Bowie knives that were associated with criminals. States banned weapons such as "slungshots," "sword-canes," "metal or brass knuckles," "billy clubs," and "blackjacks." What all these diverse weapons had in common was that they were popular among criminals and often used in criminal activity. These weapons constituted "the criminal's arsenal." Hawai'i enacted its own deadly weapons statutes at around the same time period. Hawaii first banned sailors, in 1833, from carrying knives and sword-canes when they came ashore. Eventually, Hawaii's Deadly Weapons statute banned "any dirk, dagger, blackjack, slu[n]g shot, billy,

3

metal knuckles, pistol, or other deadly or dangerous weapon." Hawaii's ban on butterfly knives is part of a historical tradition of banning weapons associated with criminals and criminal activity that has abundant historical analogues both in the continental United States and in Hawaiʻi.

Under *Bruen*, the central considerations are "how and why" the regulations burden the Second Amendment. The "how" part of the analysis is satisfied because the historical laws banned, taxed, or otherwise restricted weapons associated with criminals and criminal activity. These laws served to deprive criminals of the weapons in their "arsenals." This is clearly analogous to what Section 134-53 accomplishes as well. The "why" part of the analysis is satisfied because by banning, taxing, or otherwise restricting these weapons, the historical laws prevented criminals from using these weapons and protected law-abiding, responsible citizens from having these weapons used against them. These weapons were associated with "ruffians" and "desperadoes" and not with law-abiding, responsible citizens. Therefore, the ultimate purpose of these laws was to protect public safety. Section 134-53 was intended to do the same thing.

Section 134-53 is also valid under the approach taken in footnote 9 of *Bruen*. In footnote 9, the Court noted that regulations that are "designed to ensure" that "law-abiding, responsible citizens" can exercise their Second Amendment rights are valid, as long as they "contain only 'narrow, objective, and definite standards'"

4

and are not "put toward abusive ends[.]" By definition, criminals are not "law-abiding, responsible citizens." Section 134-53 is "designed to ensure" that criminals cannot obtain butterfly knives, not to impair the self-defense needs of "law-abiding, responsible citizens." "Law-abiding, responsible citizens" have ample access to other forms of self-defense, including firearms, other knives, other folding knives, and any other instruments not otherwise illegal. The only weapon banned by Section 134-53 is the butterfly knife as specifically defined in that statute. Section 134-53 contains "narrow, objective, and definite standards." Butterfly knives are specifically defined in Section 134-53 as "a knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both[.]" There is no room for discretion in this standard. This standard also cannot be "put toward abusive ends," since there is no discretion to impose "lengthy wait times" or "exorbitant fees[.]" Plaintiffs also failed to sufficiently allege facts necessary to support standing and ripeness, both of which are jurisdictional issues that can be raised at any time.

## IV.   ARGUMENT

### A.   The Second Amendment Analysis Following *Bruen*.

*Bruen* has effected a fundamental change in Second Amendment law. *Bruen* rejected the two-part analysis that virtually all the U.S. Courts of Appeals had adopted. *Id.* at 2127. The decision eliminated means-ends scrutiny and replaced it

with what *Bruen* calls a "methodology centered on constitutional text and history." *Id.* at 2128-29. Under that approach, courts must initially assess whether the "Second Amendment's plain text covers" the regulated conduct, *id.* at 2126—*i.e.*, whether the regulation at issue prevents "the people" from "keep[ing]" or "bear[ing]" "Arms," U.S. Const. amend. II. If the answer to that question is yes, then the government can justify its regulation by showing that the challenged law is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30. "[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 2132. The Court pointed to two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense. . . . whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original).

The Court further explained:

> On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so

"risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond* v. *Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Bruen*, 142 S. Ct. at 2133. The Court also focused on both 1791 and 1868 as the relevant timeframe and declined to select between them. *Id.* at 2136-38.

The Court also noted that regulations can be upheld if "they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* at 2138 n.9. Such regulations are permissible if they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* They must "contain only 'narrow, objective, and definite standards'" and they cannot be "abusive[.]" *Id.*

The categorial exceptions originally recognized in *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008) ("*Heller I*"), for "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms[,]" as well as "the historical tradition of prohibiting the carrying of dangerous and unusual weapons[,]" also appear to remain valid. *See Bruen*, 142 S. Ct. at 2161-62 (Kavanaugh, J., concurring).

**B.      Hawaii's Ban on Butterfly Knives is Supported by Historical Analogues.**

Pursuant to *Bruen*, one could argue that as a purely textual matter, "the people" protected by the Second Amendment simply does not include criminals, and since butterfly knives are associated with criminals and criminal activity, Section 134-53 is valid.  As part of its textual analysis in *Bruen*, the Court concluded that the plaintiffs were part of "the people" protected by the Second Amendment because they were "ordinary, law-abiding, adult citizens[.]"  *Bruen*, 142 S. Ct. at 2134.  This must mean, conversely, that persons who are not "ordinary, law-abiding, adult citizens" are not included in "the people[.]"  Therefore, banning weapons associated with criminals, who by definition are not "ordinary, law-abiding, adult citizens," should not violate the Second Amendment.

The *Bruen* analysis could end at this point.  However, assuming that this Court does not want to end the analysis here, the next step would be to consider Founding Era analogues.  Section 134-53 is well-supported by historical analogues.

**1.      Hawaii's Bans on Butterfly Knives, Switchblades, and Deadly Weapons**

Hawaii's ban on butterfly knives is currently located in Section 134-53 and provides in relevant part:

> (a) Whoever knowingly manufactures, sells, transfers, possesses, or transports in the State any butterfly knife, being a knife having a blade encased in a split handle that manually unfolds with hand or wrist

action with the assistance of inertia, gravity or both, shall be guilty of
a misdemeanor.

Haw. Rev. Stat. § 134-53 (2011). Section 134-53 was enacted in 1999. *See* 1999
Haw. Sess. Laws Act 285, §§ 1-5 at 905. However, it is part of a historical
tradition that stretches back much further. Prosecutors in Hawaiʻi first tried to
charge defendants with possession of butterfly knives based on Hawaii's law
banning switchblades, Section 134-52, which provides in relevant part:

> (a) Whoever knowingly manufactures, sells, transfers, possesses, or
> transports in the State any switchblade knife, being any knife having a
> blade which opens automatically (1) by hand pressure applied to a
> button or other device in the handle of the knife, or (2) by operation of
> inertia, gravity, or both, shall be guilty of a misdemeanor.

Haw. Rev. Stat. § 134-52 (2011). Other jurisdictions, including the federal
government, had treated butterfly knives as included within the definition of
switchblades. *See Taylor v. United States*, 848 F.2d 715, 720, (6th Cir. 1988);
*People ex rel. Mautner v. Quattrone*, 260 Cal. Rptr. 44, 45-48 (Cal. Ct. App.
1989); *State v. Riddall*, 811 P.2d 576, 577-80 (N.M. Ct. App. 1991). However, in
1992, the Hawaiʻi Supreme Court held, in *In re John Doe, born August 3, 1977*, 73
Haw. 89, 828 P.2d 272 (1992), that Section 134-52 did not extend to butterfly
knives as a matter of statutory construction. As a result, the Legislature amended
Hawaii's general Deadly Weapons statute, Section 134-51, to include butterfly
knives. *See* 1993 Haw. Sess. Laws Act 226, §§ 1-4 at 404-05. Section 134-51 was
amended to read in relevant part:

9

> (a) Any person, not authorized by law, who carries concealed upon [one's person] the person's self or within any vehicle used or occupied by the person[,] or who is found armed with any dirk, dagger, **butterfly knife**, blackjack, slug shot, billy, metal knuckles, pistol, or other deadly or dangerous weapon[,] shall be guilty of a misdemeanor[. Any such person] and may be immediately arrested without warrant by any sheriff, police officer, or other officer or person.

*Id.* § 1 at 404 (repealed statutory material bracketed, new statutory material underscored) (emphasis added). In 1999, however, the Legislature removed the prohibition on butterfly knives from Section 134-51 and placed it in its own statute, Section 134-53, so as to give it "particular attention" and treat it similarly to switchblades. *See* Act 285, §§ 1-5 at 905; Conf. Comm. Rep. No. 88, SER 47; S. Stand. Comm. Rep. No. 1389, in 1999 Senate Journal, at 1559, SER 40, 60. Since then, the ban on butterfly knives has remained in its own statute, Section 134-53.

What is clear from this history is that Hawaii's ban on butterfly knives is closely related to its ban on switchblades and its general Deadly Weapons statute. Switchblades have been banned largely because they are associated with criminals. In *Lacy v. State*, 903 N.E.2d 486, 490 (Ind. Ct. App. 2009), the Indiana Court of Appeals upheld the constitutionality of Indiana's ban on switchblades. The *Lacy* court cited the "Federal Anti-Switchblade Act" (aka the Federal Switchblade Act), which has long made importation of switchblades illegal under federal law. *Id.* (citing 15 U.S.C. §§ 1241-1245). The *Lacy* court also cited the legislative history

of the federal act, which provided that the "problem of the use of switchblades and other quick opening knives for criminal purposes has become acute during recent years – particularly by juvenile delinquents in large urban areas," and that "police chiefs, almost without exception, indicate that these vicious weapons are on many occasions the instruments used by juveniles in the commission of robberies and assaults." *Id.* (quoting S. Rep. 85-1980, 85th Cong. 2d. Sess. (1958), 1958 U.S.C.C.A.N. 3435, 3436-3437). The *Lacy* court held: "[W]e conclude that switchblades are primarily used by criminals[.]" *Id.* at 492. Switchblades are banned because they are "by design and use, almost exclusively the weapon of the thug and the delinquent." *See State v. Murillo*, 347 P.3d 284, 289 (N.M. Ct. App. 2015).

Hawaii's general Deadly Weapons statute also bans weapons that are associated with criminal activity. Section 134-51 currently provides in relevant part:

> (a) Any person, not authorized by law, who carries concealed upon the person's self or within any vehicle used or occupied by the person or who is found armed[2] with any dirk, dagger, blackjack, slu[n]g shot, billy, metal knuckles, pistol, or other deadly or dangerous

---

[2] "[A] person who carries a prohibited weapon upon his person, whether concealed or unconcealed, is a person 'armed' within the meaning of the statute." *State v. Ogata*, 58 Haw. 514, 519-20, 572 P.2d 1222, 1226 (1977). "HRS § 134-51 may be violated by the carrying of deadly or dangerous weapons, whether concealed or unconcealed." *Id.* at 520, 572 P.2d at 1227.

> weapon shall be guilty of a misdemeanor and may be immediately arrested without warrant by any sheriff, police officer, or other officer or person.

Haw. Rev. Stat. § 134-51 (2011). Whether a particular instrument is a "deadly or dangerous weapon" under Section 134-51 has been addressed in a well-developed line of Hawai'i cases. In *State v. Rackle*, 55 Haw. 531, 523 P.2d 299 (1974), the Hawai'i Supreme Court held that a flare gun was not a "deadly or dangerous weapon" because the statute applies to "instruments closely associated with criminal activity whose sole design and purpose is to inflict bodily injury or death upon another human being." *Id.* at 537, 523 P.2d at 303. In *State v. Giltner*, 56 Haw. 374, 537 P.2d 14 (1975), the Hawai'i Supreme Court held that a diver's knife was not a "deadly or dangerous weapon":

> [W]hat the statute proscribe[s] [is] the act of carrying any of the weapons enumerated, and those closely akin to those named, as well as **instruments associated with criminal activity whose sole design is to inflict death or bodily injury**. The fact that an object originally designed for **normal or lawful use** can be perverted to a use dangerous to one attacked does not convert it into a "deadly or dangerous weapon" within the meaning of the statute. The instrument proscribed is one which was designed primarily as a weapon, or one which has been modified for combat purposes.

*Id.* at 376, 537 P.2d at 16 (emphases added). In *State v. Muliufi*, 64 Haw. 485, 643 P.2d 546 (1982), the Hawai'i Supreme Court summarized the prior cases and further noted that:

> (I)t is useful to distinguish between those **weapons which are offensive in themselves, meaning that the universal experience**

12

> **within our society has been that these weapons are used only in furtherance of crime**, and those that can be used offensively, in the hands of one inclined to do so, but also **have recognized uses of a socially acceptable nature**.

*Id.* at 488, 643 P.2d at 548 (emphases added).

Consequently, Section 134-51 is directed against weapons that are "closely associated with criminal activity" and are "used only in furtherance of crime[.]" *See Rackle*, 55 Haw. at 537, 523 P.2d at 303; *Giltner*, 56 Haw. at 376, 537 P.2d at 16; *Muliufi*, 64 Haw. at 488, 643 P.2d at 548. It is specifically **not** directed against instruments that have "normal or lawful use[s]" and "have recognized uses of a socially acceptable nature." *See Giltner*, 56 Haw. at 376, 537 P.2d at 16; *Muliufi*, 64 Haw. at 488, 643 P.2d at 548.

The legislative history of Section 134-53 confirms that butterfly knives were banned because of their association with gangs and criminal activity. The Legislature received abundant testimony that butterfly knives were "associated with gang activity." S. Stand. Comm. Rep. No. 1389, in 1999 Senate Journal, at 1558, SER 39, 59. Butterfly knives were being sold to very young minors at local flea markets and in Waikiki and there was "sufficient justification to prohibit the manufacture, sale or transfer of such weapons to <u>anyone</u>, not just minors." Testimony of Honolulu Prosecuting Attorney, SER 24, 35. "[The HPD] Gang Detail ha[d] noticed an increasing trend in minors and gang members armed with knives and daggers" and "[b]utterfly knives [we]re preferred as they are easy to

13

conceal and are more intimidating when brandished." Testimony of Captain George McKeague, Honolulu Police Department, SER 37. "Currently, these items are fairly easy for minors to obtain at swap meets and open-air markets." *Id.*

Hawaii's ban on butterfly knives is part of a tradition of banning weapons that are closely associated with criminals and criminal activity. That tradition has historical roots that stretch back to the Founding Era.

### 2. Founding Era Statutes

Numerous statutes banning weapons associated with criminals and criminal activity were enacted by other states from the 1830s and thereafter. In the 1830s, several states banned or restricted Bowie knives.[3] Alabama passed a law in 1837 that elevated any homicide using a Bowie knife to murder and imposed a tax on the sale or transfer of Bowie knives. 1837 Ala. Sess. Laws Act 11, at 7. The same year, Georgia made it unlawful to sell, or offer to sell, or to keep, or have about one's person or elsewhere, Bowie knives and other similar weapons. 1837 Ga. Sess. Laws Act of Dec. 25, 1837, at 90-91. Mississippi banned fighting in cities or towns using Bowie knives or other deadly weapons, provided that if anyone was killed as a result, the attacker would be charged with murder and would assume the debts of the victim, and banned carrying a Bowie knife or other deadly weapons in

---

[3] The Bowie knife laws cited herein are compiled in the Addendum, part "A".

a "rude, angry, or threatening manner" in the presence of three or more persons. 1837 Miss. Sess. Laws Act of May 13, 1837, at 290-92. In 1838, Florida imposed a tax on the sale of Bowie knives and other weapons. 1838 Fla. Sess. Laws. Act 24, at 36. Tennessee banned selling or importing Bowie knives, wearing Bowie knives concealed, or drawing Bowie knives from under clothes. 1838 Tenn. Sess. Laws Act CXXXVII, at 200-01. Virginia banned habitually or generally keeping or carrying about one's person Bowie knives or other deadly weapons. 1838 Va. Sess. Laws Act 101, at 76. In 1839, Alabama banned the concealed carry of Bowie knives and other deadly weapons. 1839 Ala. Sess. Laws Act 77, at 67.

Second Amendment scholars have said that this period constituted a "panic over the Bowie knife." David B. Kopel, Clayton E. Cramer, and Joseph Edward Olson, *Knives and the Second Amendment*, 47 U. Mich. J. L. Reform 167, 179 (Fall 2013) ("America's first period of knife control was in 1837-1840, when the nation experienced a panic over the Bowie knife and the Arkansas Toothpick.").

> The most feared weapon of the 1830s was not a firearm, but the Bowie knife. The Bowie knife (and its first cousin, the Arkansas toothpick) was . . . a knife blade typically eight to twelve inches long, designed for close range fighting. *Niles' National Register,* the preeminent national weekly newspaper of the period, carried a series of articles in 1836-1838 that quickly established the Bowie knife in the national consciousness as a weapon especially suited to killing[.]

Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic*, at 87 (1999). Bowie knives were considered a particularly dangerous weapon because of the

physical damage they could cause in a fight. *Id.* at 187 ("[I]t made a bloody mess of a person because of the size of its blade. . . . [T]he Bowie Knife was a relatively gruesome weapon."). But more importantly, it was also considered one of the favored weapons of criminals. In *Aymette v. State*, 21 Tenn. 154 (1840), an influential pre-*Heller* case, the Tennessee Supreme Court noted that the Bowie knife was "efficient only in the hands of the robber and the assassin," *id.* at 158, and that it was used by "desperadoes" and "ruffians," *id.* at 159. The same court later noted:

> The design of the statute was to prohibit the wearing of bowie-knives, and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by **truculent and evil-disposed persons** but too often ended in assassination.

*Haynes v. State*, 24 Tenn. 120, 122 (1844) (emphasis added). The West Virginia Supreme Court noted that Bowie knives, among other similar weapons, were "usually employed in brawls, street fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and desperadoes[.]" *State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891).

Even after the 1830s, states continued to enact bans or restrictions on Bowie knives. California enacted a law in 1855 providing that if anyone fought a duel using a Bowie knife or other dangerous weapon and someone died, the survivor would be imprisoned for 1 to 7 years and assume the debts of the victim. 1855

16

Cal. Sess. Laws Act CXXVII, at 152-53. That same year, Louisiana banned carrying a concealed Bowie knife or other dangerous weapon. 1855 La. Sess. Laws Act 120, at 148. In 1859, Indiana banned anyone, not a traveler, who carried a Bowie knife or other deadly weapon concealed or openly with the intent of injuring his fellow man. 1859 Ind. Sess. Laws Act LXXVIII, at 129. Ohio banned carrying a concealed Bowie knife or other dangerous weapon. 1859 Ohio Sess. Laws Act of Mar. 18, 1859, at 56-57. Nevada enacted a law in 1861 providing that anyone who fights in a duel with a Bowie knife or other dangerous weapon and kills his antagonist would be guilty of murder. 1861 Nev. Sess. Laws Act XXVIII, at 61. In 1868, Kansas prohibited anyone not engaged in any legitimate business, under the influence of intoxicating drink, or who has ever borne arms against the United States, from carrying a Bowie knife or other deadly weapon. 1868 Kan. Sess. Laws Act 31, at 378.

In 1870, Louisiana enacted a law banning Bowie knives or other dangerous weapons, concealed or unconcealed, on election day when the polls were open. 1870 La. Sess. Laws Act 100, at 159. Texas made it unlawful to carry any Bowie knife or other dangerous weapon, concealed or unconcealed, on any election day, during the hours polls were open, within half a mile of the place of election. 1870 Tex. Sess. Laws Act LXXVIII, at 139. In 1871, Texas made it illegal for any person to carry about his person, saddle, or in his saddle bags, any Bowie knife or

17

other weapon. 1871 Tex. Sess. Laws Act XXXIV, at 25. In 1873, Nebraska banned carrying a weapon or weapons concealed on or about one's person, such as a Bowie knife or other dangerous weapon. 1873 Neb. Sess. Laws Act 58, at 724. West Virginia gave justices of the peace the power to arrest people if, from their own observation or upon information of others, they had good reason to believe a person was habitually carrying concealed weapons, such as Bowie knives and other dangerous weapons. 1873 W.V. Sess. Laws Act CCXXVI, at 709. In 1874, Missouri made it illegal to carry into any church or place of religious worship, or any school-room, or into any place where people may be assembled for educational, literary or social purposes, or any election precinct on any election day, or any court-room, or any other public assemblage of persons, a Bowie knife or other deadly weapon. 1874 Mo. Sess. Laws Act of Mar. 26, 1874, at 43. Arkansas enacted a law in 1875 prohibiting the wearing or carrying of any Bowie knife or other deadly weapon, with certain exceptions. 1875 Ark. Sess. Laws Act of Feb. 16, 1875, at 156. Virginia banned Bowie knives and other dangerous weapons in any place of public worship or on Sundays. 1875 Va. Sess. Laws Act 124, at 102. In 1877, Missouri made it illegal, in the presence of one or more persons, to exhibit a Bowie knife or other deadly weapon in a "rude, angry, or threatening manner[.]" 1877 Mo. Sess. Laws Act of April 28, 1877, at 240. In 1878, Mississippi made illegal the carrying concealed, in whole or in part, of

Bowie knives or other deadly weapons, with certain exceptions. 1878 Miss. Sess. Laws Act XLVI, at 175. Mississippi also made it illegal for any student of any university, college, or school, to carry these weapons concealed, in whole or in part. *Id.* at 176. In 1879, North Carolina made it unlawful for any person, except upon one's own premises, to carry concealed any Bowie knife or other deadly weapon. 1879 N.C. Sess. Laws Act 127, at 231.

In 1882, West Virginia banned the carry about one's person of any Bowie knife or other dangerous or deadly weapon. 1882 W.V. Sess. Laws Act CXXXV, at 421. In 1884, Virginia banned the carry about one's person, hid from common observation, of any Bowie knife or any weapon of like kind. 1884 Va. Sess. laws Act 143, at 180. In 1886, Maryland banned the concealed carry of Bowie knives and other deadly or dangerous weapons, except for conservators of the peace entitled or required to carry such weapons as a part of official equipment. 1886 Md. Sess. Laws Act 375, at 602. In 1890, Oklahoma banned the concealed carry, on or about one's person, saddle, or saddle bags, of Bowie knives and other such weapons. 1890 Okla. Sess. Laws Act 25, art. 47, § 2, at 495. Vermont prohibited carrying a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, and prohibited having a Bowie knife or other dangerous or deadly weapon in one's possession while a member of and in attendance upon any school. 1892 Vt. Sess. Laws Act 85, at 95. In 1893, Rhode

Island prohibited the wear or carry in the state of Bowie knives or similar weapons, concealed upon one's person, except for officers or watchmen. 1893 R.I. Sess. Laws Act 1180, at 231-32.

During the same time period, states also started banning other weapons beyond Bowie knives that were associated with criminals. States enacted general "deadly" or "dangerous" weapon statutes that included several types of weapons. A "slungshot" is a maritime tool consisting of a weight, or "shot," affixed to the end of a long cord. *Slungshot*, Wikipedia, https://en.wikipedia.org/wiki/Slungshot (last visited July 28, 2022). It is properly used to cast a line from one location to another, such as from ship to shore. *Id.* "They were widely used by criminals and street gang members in the 19th century as they had the advantage of being easy to make, silent, and very effective, particularly against an unsuspecting opponent. This gave them a dubious reputation, similar to that of switchblade knives in the 1950s, and they were outlawed in many jurisdictions." *Id.* Cane-swords, sword-canes, or swordsticks are canes containing hidden blades within them. *Swordstick*, Wikipedia, https://en.wikipedia.org/wiki/Swordstick (last visited July 28, 2022). Metal or brass knuckles are pieces of metal shaped to fit around knuckles. *Brass knuckles*, Wikipedia, https://en.wikipedia.org/wiki/Brass_knuckles (last visited July 28, 2022). They are "[d]esigned to preserve and concentrate a punch's force by directing it toward a harder and smaller contact area, . . . result[ing] in increased

tissue disruption, including an increased likelihood of fracturing the intended target bones on impact." *Id.* Billy clubs, billies, or batons are roughly cylindrical clubs made of wood, rubber, plastic, or metal, carried as a compliance tool and defensive weapon by law enforcement, correctional staff, security guards, and military personnel. *Baton (law enforcement)*, Wikipedia, https://en.wikipedia.org/wiki/Baton_(law_enforcement) (last visited July 28, 2022). However, "[s]ome criminals use batons as weapons because of their simple construction and easy concealment. The use or carrying of batons or improvised clubs by people other than law enforcement officers is restricted by law in many counties." *Id.* "The terms blackjack, cosh, and sap refer to any of several short, easily concealed club weapons consisting of a dense (often lead) weight attached to the end of a short shaft, used as a bludgeon. These weapons work by transferring kinetic energy to the dense core, via the handle, during the swing." *Id.*

State statutes banned or restricted these additional "deadly" or "dangerous" weapons,[4] often in the same statutes as Bowie knives but also in different statutes. In 1837, Georgia made it unlawful to sell, or offer to sell, or to keep, or have about their person or elsewhere, "Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or

---

[4] The deadly and dangerous weapons laws cited herein are compiled in the Addendum, part "B".

defence, pistols, dirks, **sword canes**, spears, &c." 1837 Ga. Sess. Laws Act of Dec. 25, 1837, at 90-91 (emphasis added). Mississippi banned fighting in cities or towns using "any rifle, shot gun, sword, **sword cane**, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon[,]" provided that if anyone was killed as a result, the attacker would be charged with murder and would assume the debts of the victim, and banned carrying "any dirk, dirk knife, bowie knife, sword, **sword cane**, or other deadly weapon" in a "rude, angry, or threatening manner" in the presence of three or more persons. 1837 Miss. Sess. Laws Act of May 13, 1837, at 290-92 (emphasis added). In 1838, Florida imposed a tax on "dirks, pocket pistols, **sword canes**, or bowie knives[.]" 1838 Fla. Sess. Laws. Act 24, at 36 (emphasis added). In 1849, New York prohibited manufacturing, causing to be manufactured, selling, exposing, keeping for sale or gift, or parting with "**slung shot[s]**." 1849 N.Y. Sess. Laws Act 278, at 403 (emphasis added). Later the same year, Vermont prohibited "**slung shot[s]**" based on the same terms as New York's law. 1849 Vt. Sess. Laws Act 36, at 26 (emphasis added).

In 1850, Massachusetts imposed penalties for anyone who was arrested and found armed with a "**slung shot**" or who manufactures, causes to be manufactured, sells, or exposes for sale, a "**slung shot**." 1850 Mass. Sess. Laws Act 194, at 401 (emphasis added). In 1851, Pennsylvania prohibited the wilful and malicious carrying of "any pistol, gun, dirk knife, **slung shot**, or deadly weapon" in the

borough of York. 1851 Pa. Sess. Laws Act 239, at 382 (emphasis added). In 1859, Indiana banned anyone, not a traveler, who carried "any dirk, pistol, bowie-knife, dagger, **sword in cane**, or any other dangerous or deadly weapon" concealed or openly with the intent of injuring his fellow man. 1859 Ind. Sess. Laws Act LXXVIII, at 129 (emphasis added). Massachusetts extended its law restricting slungshots to "**metallic knuckles**, **billies** or any other weapons of like dangerous character[.]" 1859 Mass. Sess. Laws Act 199, at 357 (emphasis added). In 1861, Nevada prohibited persons having, carrying, or procuring from another person "any dirk, dirk knife, sword, **sword-cane**, pistol, gun, or other deadly weapon," in the presence of two or more persons, from drawing or exhibiting, in a rude, angry, and threatening manner, not in necessary self-defense, or using it in any fight or quarrel. 1861 Nev. Sess. Laws Act XXVIII, at 62 (emphasis added). In 1864, California banned the concealed carry of "any dirk, pistol, **sword in cane**, **slungshot**, or other dangerous or deadly weapon[.]" 1864 Cal. Sess. Laws Act CXXVIII, at 115 (emphasis added). In 1866, New York prohibited the use or attempted use, concealed carry, or willful and furtive possession of a "**slungshot**, **billy**, sand club or **metal knuckles**, and any dirk or dagger (not contained as a blade of a pocket-knife), or **sword-cane** or air-gun[.]" 1866 N.Y. Sess. Laws Act 716, at 810-11 (emphases added). In 1868, Florida passed a law that penalized being arrested while armed or having on one's person a "**slung shot**, **metallic**

**knuckles**, **billies**, or other dangerous weapon[.]" 1868 Fla. Sess. Laws Act 1,637, at 95 (emphasis added). Florida also prohibited the manufacture, causing to be manufactured, sale, or exposure for sale, of "**slung shot[s]**, or **metallic knuckles**[.]" *Id.* (emphasis added).

In 1871, Texas made it illegal for any person to carry about his person, saddle, or in his saddle bags, "any pistol, dirk, dagger, **slung-shot**, **sword-cane**, spear, **brass-knuckles**, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense[.]" 1871 Tex. Sess. Laws Act XXXIV, at 25 (emphasis added). In 1872, Wisconsin prohibited going armed with a concealed "dirk, dagger, sword, pistol, or pistols, revolver, **slung-shot**, **brass knuckles**, or other offensive and dangerous weapon[.]" 1872 Wis. Sess. Laws Act 7, at 17 (emphasis added). In 1873, Alabama banned carrying concealed about one's person "**brass knuckles**, **slung shot**, or either weapon of like kind or description[.]" 1872-1873 Ala. Sess. Laws Act 86, at 130 (emphasis added). In 1874, Missouri made it illegal to carry into churches, schools, assemblies for educational, literary or social purposes, election precincts on any election day, or courtrooms "any kind of fire-arms, bowie-knife, dirk, dagger, **slung-shot**, or other deadly weapon[.]" 1874 Mo. Sess. Laws Act of Mar. 26, 1874, at 43 (emphasis added). In 1875, Arkansas prohibited the wearing or carrying of "any pistol of any kind whatever, or any dirk, butcher or bowie knife, or **a sword or spear in a cane**,

**brass or metal knucks**, or razor, as a weapon," except subject to certain exceptions. 1875 Ark. Sess. Laws Act of Feb. 16, 1875, at 156 (emphasis added). Indiana prohibited drawing or threatening to use any "pistol, dirk, knife, **slung-shot**, or any other deadly or dangerous weapon[.]" 1875 Ind. Sess. Laws Act XVII, at 62 (emphasis added). Pennsylvania prohibited concealed carrying within the commonwealth "any fire-arms, **slung-shot**, **handy-billy**, dirk-knife, razor or any other deadly weapon[.]" 1875 Pa. Sess. Laws Act 38, at 33 (emphasis added). In 1877, Missouri made it illegal, in the presence of one or more persons, to exhibit "any kind of firearms, bowie knife, dirk, dagger, **slung shot** or other deadly weapon" in a "rude, angry, or threatening manner[.] 1877 Mo. Sess. Laws Act of April 28, 1877, at 240 (emphasis added). New Hampshire imposed penalties on anyone who was arrested and found armed with or having on one's person "**slung shot**, **metallic knuckles**, **billies**, or other dangerous weapons[.]" 1877 N.H. Sess. Laws Act LII, at 38 (emphasis added).

In 1878, Mississippi made illegal the carrying concealed, in whole or in part, of "any bowie knife, pistol, **brass knuckles**, **slung shot** or other deadly weapon of like kind or description," with certain exceptions. 1878 Miss. Sess. Laws Act XLVI, at 175 (emphasis added). Mississippi also made it illegal for any student of any university, college, or school, to carry these weapons concealed, in whole or in part. *Id.* at 176. In 1879, Illinois made illegal to carry concealed weapons, or in a

threatening manner display "any pistol, knife, **slungshot**, **brass[,] steel[,] or iron knuckles**, or other deadly weapon[.]" 1879 Ill. Sess. Laws Act of May 24, 1879, at 114-15 (emphasis added). In 1879, North Carolina made it unlawful for any person, except upon one's own premises, to carry concealed "any pistol, bowie-knife, dirk, dagger, **slung-shot**, loaded cane, **brass, iron or metallic knuckles**, or other deadly weapon of like kind." 1879 N.C. Sess. Laws Act 127, at 231 (emphasis added). Tennessee made it unlawful for any person to carry, publicly or privately, "any dirk, razor concealed about his person, **sword cane**, spanish stilletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand, or loaded cane, **slung-shot**, **brass knucks**[.]" 1879 Tenn. Sess. Laws Act CLXXXVI, at 231 (emphasis added). In 1880, South Carolina banned carrying a pistol, dirk, dagger, **slung shot**, **metal knuckles**, razors, or other similar deadly weapon usually used for the infliction of personal injury, concealed about his person[.]" 1880 S.C. Sess. Laws Act 362, at 448 (emphasis added). In 1881, Illinois prohibited possessing, selling, giving, loaning, hiring, bartering, or offering to do so, "any **slung-shot** or **metallic knuckles**, or other deadly weapon of like character[.]" 1881 Ill. Sess. laws Act of April 16, 1881, at 73 (emphasis added). In 1882, West Virginia banned the carry about one's person of "any revolver or other pistol, dirk, bowie knife, razor, **slung shot**, **billy**, **metalic or other false**

**knuckles**, or any other dangerous or deadly weapon of like kind or character[.]" 1882 W.V. Sess. Laws Act CXXXV, at 421 (emphasis added). In 1884, Virginia banned the carry about one's person, hid from common observation, of "any pistol, dirk, bowie-knife, razor, **slung-shot**, or any weapon of the like kind[.]" 1884 Va. Sess. Laws Act 143, at 180 (emphasis added).

In 1885, Oregon made it unlawful for any person to carry concealed about one's person "any revolver, pistol, or other firearm, or any knife (other than an ordinary pocket-knife), or any dirk or dagger, **slungshot** or **metal knuckles**, or any instrument by the use of which injury could be inflicted upon the person or property of any other person." 1885 Or. Sess. Laws Act of Feb. 18, 1885, at 33 (emphasis added). In 1886, Maryland banned the concealed carry of "any pistol, dirk-knife, bowie-knife, **slung-shot**, **billy**, sand-club, **metal knuckles**, razor or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted)," except for conservators of the peace entitled or required to carry such weapons as a part of one's official equipment. 1886 Md. Sess. Laws Act 375, at 602 (emphasis added). In 1887, Michigan made it unlawful for any person, except officers of the peace and night-watches, to go armed with "a dirk, dagger, sword, pistol, air-gun, stiletto, **metallic knuckles**, **pocket-billie**, sand-bag, skull-cracker, **slung-shot**, razor, or other offensive and dangerous weapon or instrument concealed upon his person." 1887 Mich. Sess. Laws Act 129, at 144 (emphasis added). In 1890,

27

Oklahoma banned the concealed carry, on or about one's person, saddle, or saddle bags, of "any pistol, revolver, bowie knife, dirk, dagger, **slung-shot**, **sword cane**, spear, **metal knuckles**, or any other kind of knife or instrument manufactured or sold for the purpose of defense[.]"  1890 Okla. Sess. Laws Act 25, art. 47, § 2, at 495 (emphasis added).  Oklahoma also banned the carry upon or about one's person of "any pistol, revolver, bowie knife, dirk knife, loaded cane, **billy**, **metal knuckles**, or any other offensive or defensive weapon."  *Id.* (emphasis added).  In 1893, Rhode Island prohibited the wear or carry in the state of "any dirk, bowie knife, butcher knife, dagger, razor, **sword in cane**, air gun, **billy**, **brass or metal knuckles**, **slung shot**, pistol or fire arms of any description, or other weapons of like kind and description, concealed upon one's person[,]" except for officers or watchmen.  1893 R.I. Sess. Laws Act 1180, at 231-32 (emphasis added).

States continued to restrict such weapons into the 20th century.[5]  In 1909, New Jersey banned the concealed carry of "any revolver, pistol, firearm, bludgeon, **blackjack**, **knuckles**, sand-bag, **slung-shot** or other deadly, offensive or dangerous weapon, or any stiletto, dagger or razor or any knife with a blade five inches in length or over[.]"  1909 N.J. Sess. Laws Act 17, at 34 (emphasis added).  In 1915,

---

[5] *Bruen* allows the consideration of 20th century laws as long as they are not contradicted by earlier evidence from the Founding Era.  *Bruen*, 142 S. Ct. at 2154 n.28.

North Dakota banned the concealed carry of any "**black-jack**, **sling-shot**, **billy**, sand club, sand bag, bludgeon, **metal knuckles**, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol, or other dangerous fire arm[.]" 1915 N.D. Sess. Laws Act 83, at 96 (emphasis added). In 1917, California banned the manufacture or possession of "any instrument or weapon of the kind commonly known as a **blackjack**, **slungshot**, **billy**, sandclub, sandbag, bludgeon, . . . **metal knuckles** . . . dirk or a dagger[.]" 1917 Cal. Sess. Laws Act 145, at 221 (emphasis added). In 1917, Minnesota banned the manufacture or sale of "any **slung-shot**, sand-club, or **metal knuckles**" or the use, concealed carry, or possession of those weapons or "any dagger, dirk, knife, pistol, or other dangerous weapon[.]" 1917 Minn. Sess. Laws Act 243, at 354 (emphasis added).

What all these diverse weapons had in common was that they were popular among criminals and often used in criminal activity. These weapons constituted "the criminal's arsenal." Section 12020 of the California Penal Code (later re-enacted and currently located in Section 22210) prohibited manufacture, causing to be manufactured, import, keeping for sale, offering or exposing for sale, giving, lending, or possessing "any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, [s]awed off shotgun, or metal knuckles[.]" *People v. Satchell*, 489 P.2d 1361, 1371 n.21 (Cal. 1971), overruled

29

on other grounds by *People v. Flood*, 957 P.2d 869 (Cal. 1998). "California courts have concluded that in enacting section 12020, the Legislature intended to outlaw instruments normally used for criminal purposes." And "the Second Amendment 'does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes. . . .'" *Id.* at 1333 (quoting *Heller I*, 554 U.S. at 625). "This court has stated that the purpose of the Legislature in enacting section 12020 was to outlaw the possession of 'weapons common to the criminal's arsenal.' This purpose proceeds from the recognition that persons who possess the specialized instruments of violence listed in the section are ordinarily persons who intend to use them in violent and dangerous enterprises." *Satchell*, 489 P.2d at 1371 (citations and omitted). "The purpose [of section 12020] undoubtedly was to outlaw instruments which are ordinarily used 'for criminal and improper purposes' and so we have in the act 'a partial inventory of the arsenal of the 'public enemy,' the 'gangster[.]'" *People v. Mulherin*, 35 P.2d 174, 175-76 (Cal. Ct. App. 1934) (citations omitted). "[T]here is impressed upon slungshots, sandbags, black-jacks, and metal knuckles the indubitable indicia of criminal purpose. To every person of ordinary intelligence these instruments are known to be the tools of the brawl fighter and cowardly assassin and of no beneficial use whatever to a good citizen or to society." *People v. Ferguson*, 18 P.2d 741, 742 (Cal. Ct. App. 1933). *See also People v. Grubb*, 408 P.2d 100 (Cal. 1965) ("The Legislature obviously

sought to condemn weapons common to the criminal's arsenal; it meant as well 'to outlaw instruments which are ordinarily used for criminal and unlawful purposes.'"); *People v. Canales*, 55 P.2d 289, 290 (Cal. Ct. App. 1936) ("[T]he purpose [of section 12020] being to outlaw instruments which are ordinarily used for criminal and unlawful purposes.").

Similarly, in construing a New York statute that outlawed attempting to use, carrying, or possessing "any instrument or weapon of the kind commonly known as a slungshot, billy, sand club or metal knuckles . . . or a dagger, dirk, or dangerous knife[,]" the New York Court of Appeals held:

> The evidence and the well-understood character of slungshots, billies, sandbags, and brass knuckles make it evident that the Legislature were entirely justified in regarding them as dangerous and foul weapons seldom used for justifiable purposes but ordinarily the effective and illegitimate implements of thugs and brutes in carrying out their unlawful purposes. For instance a standard dictionary defines a slungshot as 'a metal ball of small size with a string attached used by ruffians for striking.'

*People v. Persce*, 97 N.E. 877, 878 (N.Y. 1912). The New York court further noted that "the act in question relates to instruments which are ordinarily used for criminal and improper purposes[.]" *Id.* at 879.

Hawai'i enacted its own deadly weapons statutes at around the same time period.[6] In 1833, King Kamehameha III (also known as Kauikeaouli) issued a decree banning sailors from having dangerous weapons on shore:

> A Law Respecting Stabbing with a Knife and
> Carrying Instruments of Death
>
> Many **evil minded persons** belonging to the shipping, having while on shore **committed various criminal acts with knives**, etc. to the general danger of life and limb,
> It is therefore hereby made known to all persons whatsoever, That if any person or persons are hereafter found on shore with a **knife, sword-cane, or any other dangerous weapon** in his or their possession, he or they shall be immediately seized and taken to the fort; and unless good cause be shown for having such dangerous weapon, he or they shall for every such offense pay a fine of ten dollars, or receive twenty-five lashes on the back.

*Translation of the Constitution and Laws of the Hawaiian Islands, Established in the Reign of Kamehameha III*, at 162-63 (1842) (reprinting Act of Nov. 12, 1833) (emphases added).

In 1852, the Legislative Council of the Hawaiian Kingdom passed a deadly weapons statute:

> Any person not authorized by law, who shall carry, or be found armed with, any **bowie-knife**, **sword-cane**, pistol, air-gun, **slung-shot** or **other deadly weapon**, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense

---

[6] The Hawai'i laws cited herein are compiled in the Addendum, part "C".

> before any District Magistrate, unless good cause be shown for having
> such dangerous weapons[.]

1852 Haw. Sess. Laws Act of May 25, 1852 (emphasis added). This statute

remained in effect through the Hawaiian Kingdom, the Republic of Hawai'i, and

into the early days of the Territory of Hawai'i. *See* Revised Laws of Hawai'i §

3089 (1905). Hawaii's modern Deadly Weapons statute, which currently remains

in effect as Section 134-51, was enacted in 1937. *See* 1937 Haw. Sess. Laws Act

123, §§ 1-2 at 165. It prohibited "any dirk, dagger, blackjack, slu[n]g shot, billy,

metal knuckles, pistol, or other deadly or dangerous weapon[,]" and it still

prohibits the same weapons today. *See* Haw. Rev. Stat. § 134-51(a).

Clearly, Hawaii's ban on butterfly knives is part of a historical tradition of

banning weapons associated with criminals and criminal activity that has abundant

historical analogues both in the continental United States and in Hawai'i. At least

34 states banned, taxed, or otherwise restricted weapons associated with criminals

and criminal activity from the 1830s to the early 20th century, during which the

total number of states ranged from 26 (in 1837) to 48 (in 1912).

The central considerations in comparing modern regulations to historical

analogues are "how and why" the respective laws burden the Second Amendment.

Here, the "how" part of the analysis is satisfied. The historical laws banned, taxed,

or otherwise restricted weapons associated with criminals and criminal activity.

Some of the laws specifically banned types of knives or bladed weapons, such as

Bowie knives and sword-canes, while some banned other weapons popular with criminals, like slingshots and brass knuckles. These laws served to deprive criminals of the weapons in their "arsenals." This is clearly analogous to what Section 134-53 accomplishes as well.

The "why" of the analysis is satisfied too. By banning, taxing, or otherwise restricting these weapons, the historical laws prevented criminals from using these weapons and protected law-abiding, responsible citizens from having these weapons used against them. These weapons were associated with "ruffians" and "desperadoes" and not with law-abiding, responsible citizens. Therefore, the ultimate purpose of these laws was to protect public safety. Hawaii's ban on butterfly knives in Section 134-53 was intended to do the same thing.

## C.     Section 134-53 Is Valid Because It Was Designed to Ensure that Law-Abiding, Responsible Citizens Rather than Criminals Can Possess Weapons.

Section 134-53 is also valid under the approach taken in footnote 9 of *Bruen*. In footnote 9, the Court noted that regulations that are "designed to ensure" that "law-abiding, responsible citizens" can exercise their Second Amendment rights are valid, as long as they "contain only 'narrow, objective, and definite standards'" and are not "put toward abusive ends[.]" *Bruen*, 142 S. Ct. at 2138 n.9. The Court also recognized that the Second Amendment is not a "regulatory straightjacket." *Id.* at 2133.

34

Butterfly knives are closely associated with criminals and criminal activity. The legislative history of Section 134-53, as well as its connection to the ban on switchblades and general dangerous or deadly weapon statutes, both in Hawaii and other states, clearly indicate that butterfly knives are banned because they are associated with criminals and criminal activity. By definition, criminals are not "law-abiding, responsible citizens." Therefore, under footnote 9 of *Bruen*, Section 134-53 is valid. Section 134-53 is "designed to ensure" that criminals cannot obtain butterfly knives, not to impair the self-defense needs of "law-abiding, responsible citizens."

"Law-abiding, responsible citizens" have ample access to other forms of self-defense, including firearms, other knives, other folding knives, and any other instruments not otherwise illegal. The only weapon banned by Section 134-53 is the butterfly knife as specifically defined in that statute. Butterfly knives are "a mere subset of a type of arms (knives) that is itself peripheral to self-defense or home security." *Murillo*, 347 P.3d at 290. In fact, one could consider butterfly knives to be merely a subset of a subset (folding knives) of a class of arms (knives). Section 134-53 does not ban an entire class of arms, such as the class consisting of all knives. *See Heller I*, 554 U.S. at 628 (disapproving a ban on handguns because it "amounts to a prohibition of an entire class of 'arms'"). It does not even ban all folding knives. It only bans knives specifically defined as

"having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both[.]"  It does not affect handguns (the "quintessential self-defense weapon") in any way.  *See id.* at 629.  Furthermore, there is no evidence that ordinary people use butterfly knives for self-defense.

Section 134-53 contains "narrow, objective, and definite standards." Butterfly knives are specifically defined in Section 134-53 as "a knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both[.]"  There is no room for discretion in this standard.  This standard also cannot be "put toward abusive ends[.]"  *See Bruen*, 142 S. Ct. at 2138 n.9.  If a person violates the statute, that person may be prosecuted.  There is no discretion to be abused, such as by imposing "lengthy wait times" or "exorbitant fees[.]"  *Id.*

## D.  Standing and Ripeness Issues Also Support Dismissing this Case.

While preparing their response to the Court's request for supplemental briefing, Defendants also discovered possible standing and ripeness issues in this case.  "Questions of standing and ripeness may be raised and considered for the first time on appeal, including sua sponte."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009).  In a pre-enforcement challenge to a criminal statute, the Complaint must allege facts establishing that "the plaintiffs have articulated a

'concrete plan' to violate the law," that "the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," or that there is a "history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). Absent such allegations, no subject matter jurisdiction exists. "A general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan." *Id*.; *cf. Antonyuk v. Bruen*, 1:22-cv-0734 (GTS/CFH), 2022 WL 3999791, *15-*18 (N.D.N.Y. Aug. 31, 2022) (rejecting plaintiff's allegations that "he 'desires,' 'wants,' 'wishes' or 'would like'" to carry firearm). Plaintiffs in the present case have alleged merely that they "desire[]" or "wish[]" to "purchase" or "own" butterfly knives, *see* ER156 (¶86), ER157 (¶¶93, 95, 96, 98, 101), or that "[b]ut for Hawaii law," they "would acquire, possess, carry" or "use" butterfly knives, *see* ER157 (¶94, 102). This is not sufficient under Ninth Circuit precedents.

## E.  Other Possible Arguments by Plaintiffs

Plaintiffs are likely to argue that Defendants have waived their historical arguments because they did not address them in their Answering Brief. However, it is well settled that the Ninth Circuit "may consider new arguments on appeal if the issue arises because of an intervening change in law." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 543 (2013). Under the prior law, which had previously

been accepted in virtually every Circuit, courts frequently declined to decide the first half of the two-part test. Instead, they would assume the first half without deciding it and proceed to the second half, which applied means-ends scrutiny. *See, e.g.*, *Pena v. Lindley*, 898 F.3d 969, 976-77 (9th Cir. 2018); *Worman v. Healey*, 922 F.3d 26, 30, 36 (1st Cir. 2019). The District Court in the present case did exactly that. May 13, 2020 Order, ER025-ER026. Defendants should not be penalized for making the arguments that they did, which were valid under the law at the time.

However, now that *Bruen* has eliminated the second half of the analysis, Defendants should be allowed to more fully argue the historical analysis, as clarified and supplemented by the principles in *Bruen*. *Bruen* explained how to conduct the "text and history" analysis, that "how and why" are the central considerations, and that protecting "law-abiding, responsible citizens" using "narrow, objective, and definite standards" that are not "abusive" is another concern. These matters were not established prior to *Bruen*, and Defendants should be allowed to argue them now. It makes no sense for courts to change the law, and then prevent litigants from arguing based on the new legal principles.

Plaintiffs are also likely to argue that butterfly knives are no different from and no more dangerous than ordinary folding knives, such as pocket knives. Therefore, they will argue, the State cannot ban butterfly knives without banning

38

pocket knives as well.  However, as argued in more detail in Defendants'

Answering Brief, which is incorporated herein by reference, there are significant

differences between butterfly knives and ordinary pocket knives.  *See* Answering

Brief, at 38-43.  Butterfly knives can be deployed with one hand, their blades can

be locked into place, they are designed to be used as weapons, they are threatening

and intimidating when deployed, and they were becoming increasingly popular

with criminal gang members.  Indeed, these attributes are likely the reason why

butterfly knives became popular among criminal gangs.  Ordinary pocket knives

do not share these attributes.

## V.    CONCLUSION

For these reasons, Defendants respectfully request that this Court affirm the

constitutionality of Section 134-53.  In the alternative, this Court could also

remand this case to the District Court, notwithstanding the ruling of the motions

panel, if it feels that this case needs further factual or historical development.

DATED:  Honolulu, Hawaiʻi, September 19, 2022.

 s/ Robert T. Nakatsuji
ROBERT T. NAKATSUJI
First Deputy Solicitor General

Attorney for Defendants-Appellees HOLLY
T. SHIKADA and WILLIAM OKU, JR.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  No. 20-15948

I am the attorney or self-represented party.

**This brief contains  9,553  words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[X] complies with the length limit designated by court order dated Aug. 18, 2022.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Robert T. Nakatsuji                         **Date** September 19, 2022
*(use "s/[typed name]" to sign electronically-filed documents)*

40

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED:  Honolulu, Hawai'i, September 19, 2022.

 s/ Robert T. Nakatsuji

ROBERT T. NAKATSUJI
First Deputy Solicitor General

Attorney for Defendants-Appellees HOLLY
T. SHIKADA and WILLIAM OKU, JR.