IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

UNITED STATES OF AMERICA

v.                                                          PE:22-CR-00104-DC

(1) JOSE GOMEZ QUIROZ

## MEMORANDUM OPINION

This Court faces a predicament similar to Plato's allegory of the cave. There are the known knowns: a defendant was convicted of buying a gun while under indictment; after the Supreme Court's recent ruling in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, that defendant asks this Court to reconsider the constitutionality of his statute of conviction. The known unknowns: whether a statute preventing a person under indictment from receiving a firearm aligns with this Nation's historical tradition of firearm regulation. And the unknown unknowns: the constitutionality of firearm regulations in a post-*Bruen* world.

There are no illusions about this case's real-world consequences—certainly valid public policy and safety concerns exist. Yet *Bruen* framed those concerns solely as a historical analysis. This Court follows that framework.

### BACKGROUND

On June 9, 2020, Jose Gomez Quiroz ("Defendant") was indicted in a Texas state court for burglary, a second-degree felony.[1] Defendant subsequently failed to appear for a hearing on the burglary charge and was indicted almost a year later for jumping bail/failing to appear, a third-degree felony. In late 2021, while both charges were pending, Defendant

---

[1] Doc. 23-1. *see* Tex. Penal Code § 30.02(c)(2).

attempted to buy an M1911, Semi Auto .22 caliber firearm from a local firearms dealer. To obtain the weapon, Defendant denied he was under indictment for a felony when filling out the Bureau of Alcohol, Tobacco, Firearms, and Explosives' ("ATF") Firearms Transaction Record form (Form 4473). Because the National Instant Criminal Background Check System ("NICS") returned a delayed response, Defendant waited seven days and then picked up the firearm on December 30, 2021. But less than a week later, the NICS informed ATF of Defendant's illegal firearm purchase.

Defendant was federally charged in March 2022 with two counts: (Count 1) making a false statement during the purchase of a firearm under 18 U.S.C. § 922(a)(6), and (Count 2) the illegal receipt of a firearm by a person under indictment under 18 U.S.C. § 922(n). A jury convicted him of both counts. One week after his conviction, Defendant moved to set aside the verdict pursuant to Rule 29 of the Federal Rules of Criminal Procedure and for this Court to reconsider his previous motion to dismiss because of the United States Supreme Court's recent ruling in *Bruen*.

Defendant's motion hinges on the constitutionality of § 922(n) because if the provision is unconstitutional, then Defendant's false statement during the purchase of the firearm is immaterial.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 29(c), "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." If, as in this case, the jury returned a guilty

verdict, "the court may set aside the verdict and enter an acquittal."[2] The standard for reviewing the sufficiency of the evidence "focuses on 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[3]

A motion for reconsideration "calls into question the correctness of a judgment." Indeed, according to the United States Court of Appeals for the Fifth Circuit, a motion for reconsideration "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." Instead, it merely allows "a party to correct manifest errors of law or fact or to present newly discovered evidence."[4] A motion for reconsideration may, however, also allow a party to bring an intervening change in the controlling law to the Court's attention.[5] That is the case here.

The Supreme Court's ruling in *Bruen*[6] changed the applicable framework for analyzing firearm regulations under the Second Amendment. Defendant's conviction rests on the constitutionality of § 922(n). Thus, this Court takes up Defendant's Motion for Reconsideration.

## DISCUSSION

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be

---

[2] Fed. R. Crim. P. 29(c)(2).
[3] *United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011) (quoting *Jackson v. Va.*, 443 U.S. 307, 319 (1979)).
[4] *Templet v. Hydro Chem, Inc.*, 367 F.3d 473, 478 (5th Cir. 2004).
[5] *See Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567-68 (5th Cir. 2003).
[6] 142 S. Ct. 2111 (2022).

infringed."[7] In *Heller*, the Supreme Court held that the Second Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."[8] And just last term, in *Bruen*, the Supreme Court held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."[9]

## I. The Supreme Court in *Bruen* laid out a new standard for courts to use when analyzing firearm regulations.

Before *Bruen*, courts of appeals had "coalesced around a "two-step" framework" when assessing Second Amendment claims, combining a historical analysis with means-end scrutiny.[10] For the first step, the court would establish the Second Amendment's original scope through a historical analysis.[11] If the regulated conduct fell outside the Amendment's original scope, "the analysis can stop there; the regulated activity is categorically unprotected."[12] But if not outside the Amendment's scope or "inconclusive," the court would proceed to step two.[13]

In step two, a court would generally analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right."[14] If the "core" Second Amendment right—self-defense in one's home—was burdened, the court would apply strict scrutiny.[15] Otherwise, it would apply intermediate scrutiny, considering

---

[7] U.S. Const. Amend. II.
[8] *D.C. v. Heller*, 554 U.S. 570 (2008).
[9] *Bruen*, 142 S. Ct. at 2122.
[10] *Id.* at 2125.
[11] *E.g.*, *United States v. Focia*, 869 F.3d 1269, 1285 (CA11 2017).
[12] *United States v. Greeno*, 679 F.3d 510, 518 (CA6 2012).
[13] *E.g.*, *Kanter v. Barr*, 919 F.3d 437, 441 (CA7 2019).
[14] *Id.*
[15] *Kolbe v. Hogan*, 849 F.3d 114, 133 (CA4 2017).

whether the Government has shown that the regulation is "substantially related to the achievement of an important governmental interest."[16]

But in *Bruen*, Justice Thomas stated the two-step approach was "one step too many."[17] In its place, Justice Thomas enumerated a new standard courts must follow:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[18]

So the threshold question is whether the Second Amendment's plain text covers Defendant's conduct.

## II. *Bruen*'s First Step: "receiving" a firearm under the Second Amendment's plain text.

The right to "keep and bear arms" shall not be infringed. Defendant's pivotal conviction was under 18 U.S.C. § 922(n), which makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to … *receive* any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

Yet from the jump, the Government seems to misread *Bruen*. The Government first frames Defendant's conduct as "buying a gun *while under felony indictment*."[19] *Bruen*'s first step, however, requires only that "the Second Amendment's plain text cover the *conduct*." And the prohibited conduct under § 922(n) is "receipt" of a firearm—nothing more. By adding

---

[16] *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (CA2 2012).
[17] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).
[18] *Id.* at 2129–30.
[19] (emphasis added)

"while under felony indictment" to the conduct, the Government conflates *Bruen*'s first step with its second.

To illustrate, take 18 U.S.C. § 922(g)'s proscription against felons possessing firearms. The conduct is possession—which the Government admits falls under "keep."[20] Therefore, whether the Government can restrict that specific conduct for a specific group would fall under *Bruen*'s second step: the historical justification for that regulation. So too under § 922(n); the Second Amendment's plain text must cover "receipt" of a firearm. *Bruen*'s second step would analyze "persons under indictment."[21] So the issue becomes whether "keep and bear arms" encompasses "receipt."

The Government next argues for a rigid, sterile reading of "keep and bear arms." Quoting *Heller*, the Government notes that to "keep arms" means to "have weapons" or "possess" and to "bear arms" means to "carry."[22] So anything not "having," "possessing," or "carrying" weapons is excluded and thus, the Government argues, receiving a firearm falls outside the Second Amendment right to "keep and bear arms."[23]

Yet the plain meaning of the verbs "have" or "possess" include the act of receipt. For example, "to have" means "to be in possession of . . . *something received*."[24] Therefore, "to have weapons" would encompass the past receipt and the current possession of those weapons.

---

20 Doc. 77 at 8–9.
21 *See Kanter v. Barr*, 919 F.3d 437, 451–52 (7th Cir. 2019) (Barrett, J. dissenting)
22 Doc. 77 at 8–9.
23 *Id.*
24 *Have*, OXFORD ENGLISH DICTIONARY (3d ed. 2015).

And logically, excluding "receive" makes little sense. To receive something means "to take into . . . one's *possession*."[25] How can one possess (or carry) something without first receiving it? Receipt is the condition precedent to possession—the latter is impossible without the former. Taking the Government's argument at face value would also lead to an absurd result. Indeed, if receiving a firearm were illegal, but possessing or carrying one remained a constitutional right, one would first need to break the law to exercise that right. The Government is asking in effect to banish gun rights to Hotel California's purgatory: "You can check out any time you like, but you can never leave."[26]

In that same vein, the Government doesn't dispute that there is no evidence that Defendant had a gun before buying the firearm in question.[27] So even if § 922(n) doesn't prevent "possession," by preventing receipt it effectively prevents Defendant's constitutional possession.

*Bruen*'s first step asks a strictly textual question: does the Second Amendment's plain text cover the conduct? Without a doubt the answer here is yes. The Second Amendment's plain text does cover "receipt" and the Constitution presumptively protects such conduct. Thus, § 922(n)'s constitutionality turns on whether prohibiting persons under indictment from receiving a firearm is consistent with the Nation's historical tradition of firearm regulation.

## III.    *Bruen*'s second step: the historical analysis.

Next, the Government must justify its regulation through a historical analysis. To do so, the Government's historical inquiry must show that § 922(n) is consistent with the

---

[25] *Receive*, OXFORD ENGLISH DICTIONARY (3d ed. 2015).
[26] EAGLES, *Hotel California*, *on* HOTEL CALIFORNIA (Asylum Records 1976).
[27] Doc. 78 at 4 (Defendant's Reply); Doc. 77 (Government's Response).

historical understanding of the Second Amendment.[28] If a challenged regulation addresses a "general societal problem that has persisted since the 18th century," this historical inquiry is "straightforward."[29] But other regulations may require a "more nuanced" approach.[30] In those cases, courts can reason by analogy. which involves finding a historical analogue that is "relatively similar" to the modern regulation.[31] As dictated by *Bruen* the Court will initially lay out § 922(n)'s history.

### A. Under indictment: the Federal Firearms Act of 1938 to present.

Section 922(n)'s history begins in 1938, when Congress passed the Federal Firearms Act ("FFA").[32] The FFA prohibited "individuals under indictment for, or convicted of, a crime of violence from shipping or transporting any firearms or ammunition in interstate commerce."[33] The Act only covered those under indictment in federal court and "crimes of violence" was commonly understood to include only those offenses "ordinarily committed with the aid of firearms."[34]

According to legislative history, Congress implemented the FFA to combat roaming criminals crossing state lines.[35] Without federal laws, ex-convicts would simply cross state lines to circumvent conditions of probation or parole.[36] The FFA's main goal then was to "eliminate the guns from the crooks' hands, while interfering as little as possible with the

---

[28] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).
[29] *Id.* at 2131.
[30] *Id.*
[31] *Id.*
[32] 5 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed).
[33] *Id.*
[34] C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 702 (2009).
[35] *United States v. Platt*, 31 F. Supp. 788, 790 (S.D.Tex.1940) (citing Record of Hearings on H.R. 9066 Before the House Committee on Ways and Means, 73d Congress).
[36] *Id.*

law-a-biding citizen."[37] In Congress's eyes, those under indictment for, or convicted of, a crime of violence had already "demonstrated their unfitness to be entrusted with such dangerous instrumentalities."[38]

Almost 25 years later, in 1961, Congress amended the FFA to cover "all individuals under indictment, regardless of the crime they were accused of."[39] Congress also removed the "crimes of violence" language, replacing it with "crime punishable by imprisonment for a term exceeding one year."[40]

Congress expanded gun regulations yet again with the Gun Control Act of 1968 ("GCA").[41] Key amendments included defining "indictment" to mean "an indictment . . . in *any* court," thus adding persons indicted under state law.[42] In full, the GCA criminalized receipt of a firearm or ammunition "by any person ... who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."[43] In 1986, Congress combined all prohibitions against persons under indictment into what is now § 922(n)'s current form.

### B. Analogizing felons-in-possession.

The Government analogizes regulations prohibiting felons from possessing firearms with those prohibiting receipt of a firearm by persons under indictment. According to the Government, § 922(g)(1)'s prohibitions on the possession of firearms by felons "has exactly

---

[37] S.Rep. No. 82, 75th Cong., 1st Sess. 2 (1937).
[38] *Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942).
[39] *See* Act of Oct. 3, 1961, Pub.L. No. 87–342, 75 Stat. 757 (repealed).
[40] *Id.* § 2.
[41] Gun Control Act of 1968. Pub.L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. § 921 et seq.).
[42] *Id.* 82 Stat. 1216 (defining indictment as "an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted" (emphasis added)).
[43] *Id.* 82 Stat. 1219–20.

the same historical pedigree as § 922(n)'s restriction on felony indictees."[44] Yet the Government fails to explain why regulations enacted less than a century years ago count as "longstanding."

With nothing further, the Government's argument can be boiled down to the following syllogism:

(1)     felon-in-possession laws have the same history as § 922(n);

(2)     *Heller* endorsed felon-in-possession laws as constitutional;

(3)     Therefore, § 922(n) is constitutional.

The first problem with this argument is it's a logical fallacy. Sharing a history with felon-in-possession laws makes § 922(n) constitutional in the same way a dog is a cat because both have four legs.

The second problem is that *Heller*'s endorsement of felon-in-possession laws was in dicta. Anything not the "court's determination of a matter of law pivotal to its decision" is dicta.[45] Dicta is therefore "entitled to little deference because they are essentially ultra vires pronouncements about the law."[46] Or, as Francis Bacon put it, dicta is only the "vapours and fumes of law."[47]

The last, and most significant problem with the Government's argument is that it lacks historical analysis from the Second Amendment's ratification, much less anything pre-1938. "Constitutional rights are enshrined with the scope they were understood to have *when*

---

[44] Doc. 77 at 14.

[45] Bryan A. Garner, et al., The Law of Judicial Precedent 44 (2016) (quoting *Black's Law Dictionary* 849 (Bryan A. Garner ed., 10th ed. 2014).

[46] *Id.*

[47] *Id.* (quoting Francis Bacon, "The Lord Keeper's Speech in the Exchequer" (1617) in *2 The Works of Francis Bacon* 477, 478 (Basil Montagu ed., 1887)).

*the people adopted them*."[48] Consequently, the Government omitted the "critical tool of constitutional interpretation."[49]

> i.   *The state's power to disarm in the early colonies.*

The Court therefore will conduct its own historical inquiry in the Government's absence, starting with the law preceding the Second Amendment's adoption in 1791. But this Court "must be careful when assessing evidence concerning English common-law rights" because "[t]he common law, of course, developed over time."[50] And with this cautious inquiry, the Court finds one contextual clue: not what laws the colonies retained from their English roots, but what they excluded.

English law had a long history of disarming citizens for any reason or no reason at all.[51] For example, Parliament granted officers of the Crown the power to disarm any person they judged "dangerous to the peace of the Kingdom."[52] Or in 1688, Parliament disarmed Catholics because of their faith.[53]

Yet even while still under English rule, the colonies' attitude toward disarming individuals diverged from its English roots. Indeed, when Virginia disarmed all citizens who refused to take an allegiance test, it did so only partially, allowing citizens to keep "such necessary weapons as shall be allowed him by order of the justices of the peace at their

---

[48] *D.C. v. Heller*, 554 U.S. 570, 634–635 (2008) (emphasis added).

[49] *Id.* at 605.

[50] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2136 (2022).

[51] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 155 (2007).

[52] *Id.*

[53] "An Act for the Better Securing the Government by Disarming Papists and reputed Papists," 1 William and Mary, c. 15 (1688).

court, for the defense of his house and person."[54] So even "traitors" unwilling to swear allegiance to the Crown retained their weapons in colonial America.

Leading up to the Second Amendment's adoption, the colonies "consistently refrained from exercising such a power over citizens."[55] As one historian wrote, after he searched all existing printed session laws of the first fourteen states year by year from 1607 to 1815, he couldn't find "a single instance in which these jurisdictions exercised a police power to prohibit gun ownership by members of the body politic."[56]

> ii. *State Conventions when ratifying the Constitution.*

More evidence can be gleaned from the state conventions ratifying the Constitution. In February 1788, the Massachusetts Convention was the first to recommend amendments with its ratification.[57] John Hancock and Samuel Adams proposed several amendments that eventually appeared in the First, Second, and Fourth Amendments. One such amendment proposed that the Constitution "be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms."[58]

Massachusetts wasn't the only state, as New Hampshire copied nine of Massachusetts' proposals almost verbatim, while adding three of its own.[59] One of the three

---

[54] 1 George I, stat. 2, c. 13 (1714); and "An Act for Disarming Papists and Reputed Papists, refusing to take the oaths to the Government," (1756), Hening, Statutes at Large, 7:35.
[55] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 157 (2007).
[56] *Id.* at 142.
[57] 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665, 672–75 (1971).
[58] *Id.* at 674–75, 681.
[59] *Id.* at 761.

involved the right to keep and bear arms: "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion."[60]

> iii.    *The state's power to disarm leading up to 1938.*

Until federalized by the FFA, prohibiting possession of a firearm, even by those convicted of violent crimes, was a rare occurrence. For instance, it wasn't until 1886 that a state court ruled on a firearm regulation that regulated "the condition of a person—rather than directly regulating his manner of carrying."[61] There, in *Missouri v. Shelby*, the Supreme Court of Missouri upheld a ban on carrying a deadly weapon while intoxicated.[62]

And even though other state courts eventually ruled on laws regulating the condition of a person,[63] very few states prohibited felons—or any other type of person for that matter—from possessing a firearm. Indeed, by the mid-1920s, only six states had laws banning concealed carry by someone convicted of a crime involving a concealed weapon.[64] And zero states banned possession of long guns based on a prior conviction.[65]

Whether this Nation has a history of disarming felons is arguably unclear—it certainly isn't clearly "longstanding." And what's even more unclear—and still unproven—is a historical justification for disarming those indicted, but not yet convicted, of any crime.

## C.  Analogizing Massachusetts' surety laws to § 922(n).

---

[60] *Id.*

[61] C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 711 (2009).

[62] 2 S.W. 468 (Mo. 1886).

[63] *See, e.g., State v. Kerner*, 107 S.E. 222 (N.C. 1921) (upholding ban on carrying a deadly weapon while intoxicated); *State v. Hogan*, 58 N.E. 572, 572, 575-76 (Ohio 1900) (upholding a ban on carrying a firearm by "a tramp").

[64] C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 708 (2009). (New York is not included in the six because New York's Sullivan Law automatically revoked one's concealed carry license upon a felony conviction).

[65] *Id.*

In another analogy closer to § 922(n), the Government argues that Massachusetts'
mid-19th century surety laws outlined in *Bruen* are a historical example of restricting gun
rights for those accused but not convicted of wrongdoing.[66] The 1795 surety laws required a
person "reasonably likely to 'breach the peace,' and who, standing accused, could not prove
a special need for self-defense, to post a bond before publicly carrying a firearm."[67] The
Government also claims that those surety statutes burdened Second Amendment rights
"more directly" than § 922(n)'s prohibitions.[68] Yet this argument ignores the rest of Justice
Thomas's analysis.

Justice Thomas dismisses the contention that surety laws were a severe restraint as
having "little support in the historical record."[69] Surety laws were "not meant as any degree
of punishment."[70] And there's little evidence that such laws were regularly enforced.[71]
Indeed, the handful of cases highlighted by Justice Thomas from Massachusetts and the
District of Columbia all involved "black defendants who may have been targeted for
selective or pretextual enforcement."[72]

The Government also argues that the surety laws provide an imperfect but similar
analogue to § 922(n).[73] But not only do Massachusetts' mid-19th century surety laws fail to
support the Government, they actively cut against the Government's assertions. In *Bruen*,
Justice Thomas highlighted the "straightforward" historical method employed in *Heller*: "If

---

[66] Doc. 77 at 16.
[67] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2148 (2022).
[68] Doc. 77 at 17.
[69] *Bruen*, 142 S. Ct. at 2149.
[70] *Id.* (quoting W. Blackstone, Commentaries on the Laws of England 249 (1769)).
[71] *Id.*
[72] *Id.*; *see* R. Leider, Constitutional Liquidation, Surety Laws, and the Right To Bear Arms 15–17, in *New Histories of Gun Rights and Regulation* (J. Blocher, J. Charles & D. Miller eds.) (forthcoming).
[73] Doc. 77 at 17.

earlier generations addressed [a general societal problem that has persisted since the 18th century], but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional."[74]

Much like § 922(n), Massachusetts' surety laws addressed the societal fear that those accused—like those under indictment—would "make an unlawful use of [their firearm]."[75] Yet surety laws addressed that fear through means "materially different" than § 922(n).[76] Rather than completely restrict the accused's constitutional right, surety laws permitted the accused to prove a special self-defense need. And if they couldn't, the accused needed only to post a money bond for no more than six months to keep their firearms.

In contrast, § 922(n) restricts a person's right to receive a firearm indefinitely after indictment by a grand jury—which is not an adversarial proceeding.[77] And as the Government admits, an "indictee cannot overcome § 922(n)'s restriction by posting a bond."[78] Thus, the existence of Massachusetts' surety laws—addressing a general societal problem through materially different means—serves only as more evidence that § 922(n) departs from this Nation's historical tradition of firearm regulation.

## IV.    Other historical analogies.

The Court points to an important distinction here—§ 922(n) varies from the challenged regulations in *Heller* and *Bruen*. Both *Bruen* and *Heller* dealt with regulations restricting "where" someone can keep and bear arms. In contrast, § 922(n) restricts "who" may keep and bear arms. Yet *Bruen* "decides nothing about *who* may lawfully possess a

---

[74] *Bruen*, 142 S. Ct. at 2131.
[75]  *See* A View of the Constitution of the United States of America 126 (2d ed. 1829))
[76] *See Bruen*, 142 S. Ct. at 2131.
[77] *See* Section III.A. *infra*.
[78] Doc. 77 at 17.

firearm."[79] Indeed, *Bruen*'s first step mentions only "conduct." So as this Court reasoned above, "who" may keep and bear arms is relegated to step two.

And if relegated to step two, the Government must prove that restricting rights for a specific group (e.g., those under indictment or felons) adheres to this Nation's historical tradition. There lie Plato's unknown unknowns.

If the Government must prove a historical tradition for every regulation restricting a specific subgroup, *Bruen*'s framework creates an almost insurmountable hurdle. For one thing, one could easily imagine why historical analogies from the 18th century would be difficult to find. For example, if one lived more than a day's journey from civilization, a firearm was not only vital for self-defense—it put food on the table. Indeed, whether fending off wild animals or hunting, a firearm was a necessary survival tool. That is why disarming someone was likely unthinkable at the time—no firearm in the wilderness meant almost certain death.

So finding similar historical analogies is an uphill battle because of how much this Nation has changed. Society, population density, and modern technologies are all examples of change that would make something unthinkable in 1791 a valid societal concern in 2022. But the only framework courts now have is *Bruen*'s two-step analysis.

That said, this Court believes there are other historical analogies that neither the Government nor Defense explore. As stated, *Bruen* and *Heller* dealt with regulations restricting where someone may keep and bear arms and unlike the challenged regulations in *Bruen* and Heller, § 922(n) restricts "who" may keep and bear arms. Under the Second

---

[79] *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (emphasis added).

16

Amendment, the "who" imbued with the right to keep and bear arms is "the people"—a term of art. Thus, the historical inquiry should be whether there is a historical tradition of excluding those under indictment from "the people."

Both *Heller* and *Bruen* note that the Second Amendment is not the only constitutional provision that reserves rights or powers to the people. For example, the First Amendment's Assembly–and–Petition Clause prevents Congress from making laws abridging "the right of the people peaceably to assemble." The Fourth Amendment protects the right of "the people . . . to be free from unreasonable searches and seizures." Or § 2 of Article I, which provides that "the people" will choose members of the House.

And just like the Second Amendment, the above provisions' reservation of rights or powers for "the people" are not absolute. Indeed, there is a long history of the Government regulating those rights—including restriction on who can exercise that right. Thus, the history of excluding specific groups from rights and powers of "the people" in other constitutional contexts can provide useful analogies.

## A.  Restrictions on the power of "the people" to vote in Section 2, Article I.

Section 2, Article I of Constitution states, "the House of Representatives shall be composed of Members chosen every second Year by the People of the several States." Put simply, it's the right of the people to vote. This enumerated power of "the people," however, doesn't provide an analogy to § 922(n); those under indictment can still vote. But states have excluded specific groups from "the people," for instance, those convicted of a crime.

State laws restricting voting rights for those convicted of certain crimes are not a recent vintage, states have done so since the founding. In fact, Kentucky's 1792 Constitution

stated, "[l]aws shall be made to exclude from . . . suffrage those who thereafter be convicted of bribery, perjury, forgery, or other high crimes and misdemeanors."[80] Vermont's Constitution followed one year later, authorizing the removal of voting rights from those engaged in bribery or corruption during elections.[81] As of 2022, only two states and the District of Columbia do not restrict felons' voting rights.[82]

## B. Regulating the rights of "the people" to assemble under the First Amendment.

The First Amendment's Assembly-and-Petition Clause also furnishes a helpful analogy. The First Amendment states, "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the government for a redress of grievances." The "very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably."[83] But this right is not absolute—the Supreme Court has excluded groups from the people's right of assembly.

In *De Jonge v. Oregon*, the Supreme Court declared the right to peaceful assembly "equally fundamentally" with other First Amendment clauses.[84] There, De Jonge was charged under a state criminal syndicalism statute after speaking at a Communist party meeting.[85] Although the objectives of the Communist Party are heinous, the Supreme Court

---

[80] Kentucky Const. art. VIII § 1.2 (1792).
[81] Vermont Const. Ch. II § 34 (1793).
[82] State Voting Laws & Policies for People with Felony Convictions, BRITANICA (as of August 1, 2022) State Voting Laws & Policies for People with Felony Convictions - Felon Voting - ProCon.org.
[83] *United States v. Cruikshank*, 92 U.S. 542, 352 (1875).
[84] 299 U.S. 353, 364 (1937).
[85] *Id.* at 359.

held that De Jonge "still enjoyed his personal right . . . to take part in a peaceable assembly having a lawful purpose."[86]

Yet the Supreme Court also highlighted the right of assembly "without incitement to violence or crime."[87] Indeed, much like the right to keep and bear arms, the First Amendment's right to assembly can be abused to incite violence or crime. Thus, legislation protecting against such abuses would be constitutional if "made only against the abuse."[88] The rights themselves may not be curtailed.[89]

The Supreme Court has also held that the Government may restrict the right to assembly when there's a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order."[90] Prior restraints against such dangers, however, incur a heavier burden.

In the Second Amendment context, however, restrictions against those already convicted of a crime, for example, would not be a prior restraint—they have already been found guilty in a constitutionally sufficient proceeding. Likewise, the right of the people doesn't protect violent actors or criminals. But that is not the case for those merely under indictment. Indeed, excluding those under indictment from the right of the people to keep and bear arms would operate much like prior restraints in the First Amendment concept.

---

[86] *Id.* at 365.
[87] *Id.*
[88] *Id.* at 364.
[89] *Id.* at 365.
[90] *Cantwell v. State of Connecticut*, 310 U.S. 296, 308 (1940).

"[A] free society prefers to punish the few who abuse rights of [the people] after they break the law than to throttle them and all others beforehand."[91]

In sum, this Court does not rehash all constitutional interpretations since 1791, and although not a perfect fit, the "rights of the people" in other contexts can supply useful comparisons. And as seen above, this Nation does have a historical tradition of excluding specific groups from the rights and powers reserved to "the people" in those contexts. But unlike the historical tradition of excluding felons or violent actors from the rights of "the people," little evidence supports excluding those under indictment in any context.

## V.  Courts should be skeptical of § 922(n) for other reasons.

This Court is skeptical that the Government here, or in any other court, could defend § 922(n)'s constitutionality. Not only does the historical record lack the clear evidence needed to justify this regulation, § 922(n) evokes constitutional scrutiny in other ways.

### A.  Grand Jury Proceedings.

The nature of grand jury proceedings is one such area that casts a shadow of constitutional doubt on § 922(n). Some feel that a grand jury could indict a [burrito] if asked to do so.[92] The freewheeling nature of such proceedings stems from the Supreme Court holding that (1) the rules of evidence don't apply,[93] (2) evidence barred by the Fourth Amendment's exclusionary rule may be heard,[94] and (3) the grand jury may rely on evidence

---

[91] *Collin v. Smith*, 578 F.2d 1197, 1207 (7th Cir. 1978) (citing *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

[92] *In re Grand Jury Subpoena of Stewart*, 545 N.Y.S.2d 974, 977 n.1 (N.Y.Cnty.Sup.Ct.1989), *aff'd as modified*, 548 N.Y.S.2d 679 (1st Dep't 1989) ("This skepticism was best summarized by the Chief Judge of [New York] in 1985 when he publicly stated that a Grand Jury would indict a 'ham sandwich'").

[93] *Costello v. United States*, 350 U.S. 359, 362–63 (1956) ("[N]either the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act.")

[94] *United States v. Calandra*, 414 U.S. 338, 354 (1974).

obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination.[95] Simply put, "[a] grand jury investigation is not an adversarial process."[96]

The Fifth Amendment guarantees the right to a grand jury indictment for federal felonies.[97] But the right to a grand jury indictment is not always applicable to state court proceedings.[98] So because an indictment under § 922(n) means either a state or federal indictment,[99] a defendant indicted for a state felony could lose the right to buy a firearm without the case ever reaching a grand jury.

The Government argues here that it has always been able "to impose substantial liberty restrictions on indicted defendants."[100] To support that claim, the Government lists detentions or conditions of pretrial release as examples.[101] Why the Government believes those examples support its argument is unclear; detention hearings have substantial procedural safeguards. For one thing, at a detention hearing, the defendant may request the presence of counsel; testify and present witnesses; proffer evidence; and cross-examine other witnesses appearing at the hearing.[102] Grand jury proceedings have none of these safeguards. Detention hearings also occur at a different stage in the proceeding—often after indictment. And even if restricting a defendant's right to possess a firearm as a condition of pretrial

---

[95] *Lawn v. United States*, 355 U.S. 339 (1958).

[96] *United States v. Jones*, 160 F.3d 641, 646 (10th Cir. 1998) (citing United States v. Sells Eng'g, Inc., 463 U.S. 418, 430 (1983)).

[97] U.S. Const. Amend. V. ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury").

[98] *Hurtado v. People of State of Cal.*, 110 U.S. 516 (1884).

[99] § 922(n)

[100] Doc. 77 at 15.

[101] *Id.*

[102] *United States v. Laurent*, 861 F. Supp. 2d 71, 91 (E.D.N.Y. 2011) (citing 18 U.S.C. § 3142(f)).

release is constitutional—an issue which this Court does not consider here—that doesn't also make § 922(n)'s restrictions in the indictment stage constitutional.

In line with procedural concerns, the Court notes in passing that the expansion of gun rights by the Supreme Court in *Bruen* might also implicate procedural due process under the Fifth Amendment. Courts that have analyzed due process and § 922(n) did so pre-*Bruen*. If the right to keep and bear arms inside and outside the home is so clear, removing that right would likely require the same constitutional procedural safeguards that the Supreme Court has bestowed on other rights. But this Court need not analyze those issues here.

### B. The historical disarmament of specific groups.

Another reason that § 922(n) warrants skepticism is the historical misappropriation of law to pretextually and unlawfully disarm unfavored groups. The Supreme Court noted such historical uses against blacks in both *Bruen* and *McDonald v. City of Chicago*.[103] After the Civil War, "systematic efforts" were made to disarm blacks from obtaining, possessing, or carrying a firearm.[104] For example, an 1833 Florida statute authorized "white citizen patrols to seize arms found in the homes of slaves and free blacks, and provided that blacks without a proper explanation for the presence of the firearms be summarily punished, *without benefit of a judicial tribunal*."[105] Another example would be the aftermath of the Cincinnati race riots in 1841. The day after the riot was quelled, all blacks were disarmed.[106] And the day after that,

---

[103] 561 U.S. 742 (2010).
[104] *Id.* at 771.
[105] Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 338 (1991) (emphasis added) (citing Act of Feb. 17, 1833, ch. 671, §§ 15, 17, 1833 Fla. Laws 26, 29).
[106] *Id.* at 342.

white rioters ransacked the now-defenseless black residential district.[107] That pretextual disarmament wrenched away black residents' "individual right to self-defense"—"the central component" of their Second Amendment right.[108]

The Government cites the Seventh Circuit's reasoning in *United States v. Yancy*[109] to argue legislatures have long had the right to disarm "unvirtuous citizens."[110] *Yancy*'s reasoning on "unvirtuous citizens" quotes an influential 1868 constitutional treatise, which stated constitutional rights did not apply to "the idiot, the lunatic, and the felon."[111] But what's omitted is how blacks were treated the same:  "Pistols old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of *lunatics*."[112]

### C. Past courts interpreted § 922(n)'s constitutionality under the collective-right view the Supreme Court rejected in *Heller*.

One last issue that gives this Court pause is that the question whether the right to keep and bear arms was a collective right or an individual right wasn't answered until the Supreme Court in *Heller* held that the Second Amendment bestowed an individual right. So courts interpreting the constitutionality of what is now § 922(n) would erroneously invoke the collective-right view that *Heller* resoundingly rejected. For example, just four years after the FFA's enactment, the First Circuit in *Cases v. United States* upheld the FFA's regulation of those under indictment, or convicted of, "crimes of violence" using the collective-right

---

[107] *Id.*
[108] *D.C. v. Heller*, 554 U.S. 570, 599 (2008).
[109] *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010).
[110] Doc. 77 at 14.
[111] *Yancey*, 621 F.3d at 685 (citing Thomas M. Cooley, A Treatise on Constitutional Limitations 29 (Boston, Little Brown & Co. 1868)).
[112] S. Exec. Doc. No. 43, 39th Cong., 1st Sess., 8 (1866) (emphasis added).

view.[113] The First Circuit, invoking neither history nor precedent, held that a person has no right under the Second Amendment unless he is "a member of a[ ]military organization" or uses his weapon "in preparation for a military career," thus "contributing to the efficiency of the well regulated militia."[114]

Another example that same year was the Third Circuit's decision in *United States v. Tot*.[115] There, the court also upheld the FFA's "crimes of violence" disability, noting that the Second Amendment "was not adopted with individual rights in mind," and the FFA "[did] not infringe upon the preservation of the well regulated militia protected by the Second Amendment."[116]

Thus, the FFA's regulations were found constitutional under the collective-right view later dismantled by *Heller*. And § 922(n)'s historical prohibitions were limited to the much-narrower "crimes of violence" disability. So if comparing the FFA's "crimes of violence" limitation to § 922(n)'s far broader coverage—which includes non-violent felonies and state indictments—it's doubtful § 922(n) would be constitutional under the individual-rights view *Heller* enumerated.

The Court notes the above concerns not to bolster its conclusion, but to highlight how *Bruen* changed the legal landscape. The *Bruen* Court made the constitutional standard "more explicit" to eliminate "asking judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions.'"[117] *Bruen* did not, however, erase societal and

---

[113] 131 F.2d 916 (1st Cir. 1942).
[114] *Id.* at 923.
[115] 131 F.2d 261 (3d Cir. 1942).
[116] *Id.* at 266–67.
[117] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130, 2134 (2022) (quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 790–91 (2010).

public safety concerns—they still exist—even if *Bruen*'s new framework prevents courts from making that analysis. As stated above, the new standard creates unknown unknowns, raising many questions. This Court does not know the answers; it must only try to faithfully follow *Bruen*'s framework.

## CONCLUSION

The Second Amendment is not a "second class right."[118] No longer can courts balance away a constitutional right. After *Bruen*, the Government must prove that laws regulating conduct covered by the Second Amendment's plain text align with this Nation's historical tradition. The Government does not meet that burden.

Although not exhaustive, the Court's historical survey finds little evidence that § 922(n)—which prohibits those under felony indictment from obtaining a firearm—aligns with this Nation's historical tradition. As a result, this Court holds that § 922(n) is unconstitutional.[119]

It is therefore **ORDERED** that Defendant's Motion to Reconsider is **GRANTED**. (Docs. 73 and 74). The indictment is **DISMISSED**.

It is so **ORDERED**.

SIGNED this 19th day of September, 2022.

_____
DAVID COUNTS
UNITED STATES DISTRICT JUDGE

---

[118] *McDonald*, 561 U.S. at 780.

[119] The Court need not answer whether § 922(n) is unconstitutional as applied to Defendant because the statute is unconstitutional on its face. The Court also need not reach Defendant's Motion for Acquittal under Rule 29(c).