No. 20-15948

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ANDREW TETER and JAMES GRELL,

*Plaintiffs - Appellants*,

v.

HOLLY T. SHIKADA, in her Official Capacity as the Attorney General
of the State of Hawaiʻi and WILLIAM OKU, JR., in his Official Capacity
as the State Sheriff Division Administrator

*Defendants - Appellees.*

---

On Appeal from the United States District Court for the District of Hawaiʻi
Honorable Alan C. Kay, Senior United States District Judge
(Civil No. 19-cv-00183-ACK-WRP)

---

### SUPPLEMENTAL AMICUS CURIAE BRIEF OF
### EVERYTOWN FOR GUN SAFETY
### IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

PAMELA W. BUNN
WENDY F. HANAKAHI
Dentons US LLP
1001 Bishop Street, 18th Floor
Honolulu, HI 96813
Telephone:  (808) 524-1800
Email:  pam.bunn@dentons.com
        wendy.hanakahi@dentons.com

JANET CARTER
WILLIAM J. TAYLOR, JR.
Everytown Law
450 Lexington Avenue #4184
New York, New York 10017
Telephone:  (646) 324-8215
Email:    wtaylor@everytown.org

# CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety Action Fund ("Everytown for Gun Safety" or "Everytown") has no parent corporations. It has no stock, and hence, no publicly held company owns 10% or more of its stock.

09500000\010040\122390493\V-2

## TABLE OF CONTENTS

**Page(s)**

INTEREST OF AMICUS CURIAE ..........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT ..........................................................................................................2

    A.        Plaintiffs Have Failed To Establish that Butterfly Knives Are Protected "Arms" ..................................................................2

    B.        The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ........................................................................6

    C.        The State Has Established a Long Tradition of Regulating Especially Dangerous Knives and Other Weapons Associated with Crime .............................................14

CONCLUSION .....................................................................................................18

09500000\010040\122390493\V-2

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Davenport v. Washington Educ. Ass'n*,
551 U.S. 177 (2007)................................................................17

*District of Columbia v. Heller*,
554 U.S. 570 (2008)..........................................................*passim*

*Drummond v. Robinson Township*,
9 F.4th 217 (3d Cir. 2021) ...........................................................7

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ...................................................7, 12

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) .....................................................17

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018)..........................................................7

*Hunters United for Sunday Hunting v. Pennsylvania Game Comm'n*,
28 F. Supp. 3d 340 (M.D. Pa. 2014)...............................................4

*Kennedy v. Bremerton Sch. Dist.*,
142 S. Ct. 2407 (2022)...................................................................3

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...............7, 11, 16, 17

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) .........................................................8

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022).....................................................*passim*

*Peruta v. County of San Diego*,
824 F.3d 919 (9th Cir. 2016) (en banc) ........................................8

*Silvester v. Harris*,
843 F.3d 816 (9th Cir. 2016) ....................................................7, 8

09500000\010040\122390493\V-2

*United States v. Greeno*,
   679 F.3d 510 (6th Cir. 2012) .................................................................7

*Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) ..............................................................8

*Young v. Hawaii*,
   992 F.3d 765 (9th Cir. 2021) (en banc) ...........................................7, 8

**Other Authorities**

A. Amar, *The Bill of Rights: Creation and Reconstruction* (1998)..................10, 11

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13
   Charleston L. Rev. 205 (2018) ......................................................12, 16

K. Lash, *Respeaking the Bill of Rights: A New Doctrine of
   Incorporation*, 97 Ind. L.J. 1439 (2022)........................................10, 11

K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of
   Incorporation* (Jan. 15, 2021) (manuscript, at 2),
   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917
   (now published at 97 Ind. L.J. 1439)...........................................10, 11

Joseph Blocher, *Hunting and the Second Amendment*, 91 Notre Dame
   L. Rev. 133 (2015) ...............................................................................4

## INTEREST OF AMICUS CURIAE

Amicus curiae Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the nation, including over 27,000 in Hawai'i. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of twenty children and six adults in Newtown, Connecticut.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Everytown files this amicus brief in support of Defendants-Appellees (the "State") to address three methodological points in connection with *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). *First*, on the initial, textual inquiry of the *Bruen* framework, the burden is on Plaintiffs to establish that butterfly knives are protected "arms" within the meaning of the Second Amendment, and they have failed to carry that burden. *Second*, analysis of "the Nation's historical tradition of firearm regulation," *id.* at 2130, should center on 1868, not 1791. *Third,* the long history of regulating both bladed weapons and weapons connected to criminal

---

[1] All parties consent to this brief's filing and no party's counsel authored it in whole or part. Apart from Everytown, no person contributed money to fund its preparation or submission.

activity that the State has set out, *see* State's Suppl. Br. 14-34, amply establishes the constitutionality of Hawai'i's law, and Plaintiffs' arguments about the number of laws a government must produce to establish a historical tradition are inconsistent with *Bruen*.

## ARGUMENT

### A.    Plaintiffs Have Failed To Establish that Butterfly Knives Are Protected "Arms"

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. First, the court must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

The burden on the initial, textual inquiry is on the plaintiff. Plaintiffs do not contest this. *See* Pls.' Suppl. Br. 4-13. Nor would it make sense for them to do so, for two reasons. *First*, *Bruen* itself makes the burden allocation clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of constitutional litigation—the Court would have said that the presumption exists from the outset. *Second*, placing

2

the initial burden on the plaintiff accords with the Court's approach to other constitutional issues. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) ("Under this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]").

Plaintiffs have failed to satisfy their burden under *Bruen*'s textual inquiry, because they have failed to establish that butterfly knives are among the "arms" that the Second Amendment protects. To fall within the Second Amendment's text, *Heller* established that a weapon must not only be a "bearable arm" or "[w]eapon[] of offence," but must also be one "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 581-82, 625 (2008).[2] *Bruen* has further refined that requirement to focus on common use for the lawful purpose of self-defense.[3] But even without that further refinement, Plaintiffs have

---

[2] Specifically, *Heller* began with dictionary definitions of "arms," including as "[w]eapons of offence, or armour of defence" and observed that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 581-82. But it then made clear that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625; *see also id.* at 627 (noting that "M-16 rifles and the like" may be banned).

[3] *Bruen* did not spell out the textual inquiry with respect to "Arms" in detail, because New York did not dispute either that the "people" in that case ("two ordinary, law-abiding, adult citizens") or the arms they sought to use ("handguns")

not carried their burden, because they have not established that butterfly knives are commonly used for *any* lawful purpose.[4]

Plaintiffs seek to divert attention from this failure by arguing that "*knives* are 'bearable arms' commonly possessed for 'lawful purposes.'" Pls.' Suppl. Br. 6 (emphasis added). But Hawai'i's challenged law does not prohibit "knives"; it prohibits only butterfly knives. Plaintiffs never even *attempt* to establish that

---

fell within the Second Amendment's text. *See* 142 S. Ct. at 2134. But in applying that test, the Court's articulation—"[n]or does any party dispute that handguns are *weapons 'in common use' today for self-defense*," *id.* (emphasis added)—indicated that the "arms" the Second Amendment covers are those commonly used for self-defense. This limitation coheres with *Bruen*'s emphasis that "individual self-defense is the central component of the Second Amendment right." 142 S. Ct. at 2133 (cleaned up). While the Second Amendment might encompass other activities attendant to that self-defense right—such as training with, in order to maintain proficiency in the use of, a common self-defense weapon—nothing in *Heller* or *Bruen* requires enlarging the constitutional text to encompass weapons commonly used only for leisure or food-sourcing activities, like performing tricks, collecting, recreational target shooting, or hunting. *See also, e.g.*, *Hunters United for Sunday Hunting v. Pennsylvania Game Comm'n*, 28 F. Supp. 3d 340, 346 (M.D. Pa. 2014) (finding "no legal support for Plaintiffs' argument that Second Amendment protections extend to recreational hunting"); Joseph Blocher, *Hunting and the Second Amendment*, 91 Notre Dame L. Rev. 133, 137 (2015) ("[T]he case for Second Amendment coverage of hunting and recreation is tenuous."); *cf.* Trevor Brown, *History: The Disputed Origins of the Butterfly Knife*, BLADE (Oct. 22, 2018), https://blademag.com/knife-history/history-the-disputed-origins-of-the-butterfly-knife (one of Plaintiff's sources, attributing butterfly knives' rising popularity to trick performance).

[4] In fact—and although not its burden—the State has shown that butterfly knives are strongly associated with *unlawful* activity. *See, e.g.*, State's Suppl. Br. 13-14 (describing legislative history and district court testimony connecting butterfly knives and gang activity).

4

butterfly knives are commonly used or possessed for self-defense (or any other lawful purpose); every discussion of current or historical commonality in their brief is in connection with knives, swords and daggers, or "edged weapons." *See id.* at 5-10. The same was true in the district court, where Plaintiffs adduced no "empirical evidence about the popularity of butterfly knives, including to what extent they are possessed on a national scale," though they provided "some, mostly anecdotal, evidence that butterfly knives are quite popular in certain villages in the Philippines." ER9-10; *see also* ER32.[5] Instead, the district court explained, the Plaintiffs "shift their focus to the popularity of knives generally." *Id.* As the court correctly observed, this is "unpersuasive" because "[t]he popularity of an all-encompassing class of weapon (the knife, or even the folding knife) is immaterial when only one narrow subset of the class (the butterfly knife) is banned here." *Id*.

In their supplemental filing, the closest Plaintiffs come to connecting butterfly knives to *Heller*'s and *Bruen*'s textual analysis is their assertion that "[b]utterfly knives have long been used for self-defense." Pls.' Suppl. Br. 10-11. But *common* use by law-abiding citizens for self-defense, not *long* use in specialized martial arts,

---

[5] As for evidence that the butterfly knife is commonly used for self-defense in the United States, Plaintiffs' expert in the district court appeared only to have a single, anecdotal example of a self-defensive use in this country, occurring in 1982 and based on observations reported to him by his sister, the details of which shifted between two versions of his report. *Compare* ER90, *with* ER131.

is what *Heller* and *Bruen* require. And even if the two questionable blog posts on which Plaintiffs rely had supported a relevant proposition, they cannot possibly be sufficient to carry Plaintiffs' evidentiary burden.[6]

Because Plaintiffs have the burden to establish that butterfly knives are protected "arms" under the text of the Second Amendment and have failed to carry that burden, this Court should affirm the grant of summary judgment to the State at the first step of *Bruen*'s framework. No inquiry into historical regulation is necessary.

## B. The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

---

[6] The posts provide no information about their authors' qualifications or expertise and almost no sourcing. Moreover, the "Blade HQ" blog does not even mention self-defense, and the "Legionary: Dangerous but Disciplined" blog is equivocal about whether the butterfly knife is even useful as a self-defense weapon. *See Butterfly Knives, Are They Good for Self-Defense?*, Legionary, https://legionary.com/butterfly-knives-are-they-good-for-self-defense/ (noting that butterfly knives "have more points of failure if needed to use quickly in a high stress situation"); *see also* ER132-33 (Plaintiffs' expert noting that one step in opening involves a "very precarious grip in a chaotic self-defense situation which leaves the defender susceptible to dropping the knife").

09500000\010040\122390493\V-2

Several circuits reached this conclusion in analyzing the tradition of firearm regulation at the historical step of the Second Amendment framework that applied prior to *Bruen*.[7] *See Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)).[8]

---

[7] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

[8] Plaintiffs mistakenly claim that this Court "repeatedly held" that "courts must look to the Colonial era in order to find historical traditions under step one" of the pre-*Bruen* framework. Pls.' Suppl. Br. 18 (citing *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (en banc), and *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). The statements that a Founding-era history could be *sufficient* to uphold a law "without further analysis" does not mean that it was *necessary*, particularly since

09500000\010040\122390493\V-2

*Bruen* does not alter that conclusion for cases, like this one, challenging a state or local law. It expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because the public understanding "for all relevant purposes" in the case before it was the same in both 1791 and 1868). Moreover, it concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Bruen*, 142 S. Ct. at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

---

*Silvester* relied for its standard on *Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc), which upheld a California law at step one after surveying "the history relevant to both the Second Amendment *and its incorporation by the Fourteenth Amendment*," *id.* at 929 (emphasis added), including late-19th-century materials, *see id.* at 936-39—and *Young*, in turn, relied on *Silvester*. Nor do *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), or *Wrenn v. District of Columbia*, 864 F.3d 650, 668 (D.C. Cir. 2017), advance Plaintiffs' position. *Moore* cited a passage in *McDonald* saying that the standards against the state and federal governments should be the same, but that merely flags the issue that *Bruen* acknowledged before leaving open the question whether the 1868 or 1791 understanding should control, and thus *Moore*'s reference to 1791 has no remaining force after *Bruen*. And *Wrenn*, as a case against the District of Columbia, would need to have foreseen *Bruen*'s effort to reconcile originalism with the requirement of a single standard for the state and federal governments in order to have engaged with the 1868-versus-1791 question.

8

For the reasons set out in the State's brief, this Court should uphold Hawai'i's law whether it focuses on the founding era or the Reconstruction era. *See* State's Suppl. Br. 14-34. But if this Court prefers to settle the issue the Supreme Court left open now, it should conclude that 1868 is the correct focus.

To begin with, in a case involving a state or local law, that focus is the only way to answer the originalist question: how did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the understanding changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." K. Lash, *Respeaking the Bill of Rights:*

*A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But if the scope of each enumerated right must be the same as against the state and federal governments, *see Bruen*, 142 S. Ct. at 2137, then originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this issue: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And then it cited two scholars who support the 1868 view, and none who supports 1791. *See id.* (citing A. Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)). On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal

government.[9] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), of the understanding of the right to keep and bear arms around 1868. *See id.* at 770-78. It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-

---

[9] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

11

meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Plaintiffs' position on this issue is unclear. *Compare* Pls.' Suppl. Br. 14, 19 (insisting on "Colonial era" and "*circa* 1791"), *with id.* at 13, 21 (contemplating laws up to 1868 and acknowledging that Court left issue open). To the extent that the "Colonial era" assertions represent Plaintiffs' view, Plaintiffs misread *Bruen* for the reasons just set out. Those assertions are also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of "sensitive places" restrictions. There, the Court indicated that adequate restrictions on guns in legislative assemblies, polling places, and courthouses exist in "18th- *and 19th-century*" laws to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[10]

---

[10] *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36 (2018) (citing no 19th-century laws); *id.* at 244-47 (citing 1873 Texas law and 1874 decision upholding 1870 Georgia law; article also cites 1870 Louisiana and 1874 and 1886 Maryland laws in same section, at 245); Br. for Independent Institute as Amicus Curiae, *Bruen*, No. 20-843, at 11-17 ("Br. for Indep. Inst.") (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: … [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg., No. 20-843, at 8:2-17.

In sum, the historical inquiry should focus on the period around 1868, not 1791. And 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history (including 20th-century history) that *contradicts* the

---

Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But that still permits consideration of such evidence when *consistent* with earlier evidence. Indeed, the Court emphasized that "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting James Madison).

### C. The State Has Established a Long Tradition of Regulating Especially Dangerous Knives and Other Weapons Associated with Crime

The State has set out dozens of historical laws from the 1830s through the 1910s prohibiting or restricting the carry, use, or sale of bowie knives and of other weapons associated with criminal activity, including sword canes, dirks, slung shots, billy clubs, and metal knuckles. *See* State's Suppl. Br. 14-34; *see also* Everytown Br. 17-19. These laws amply demonstrate that Hawai'i's law "is consistent with the Nation's historical tradition" of weapon regulation. *Bruen*, 142 S. Ct. at 2130.

Plaintiffs' arguments to the contrary have no merit. At the outset, they appear to claim that this Court may dismiss as many as fifteen historical laws as "outliers," because, Plaintiffs assert, that is what *Bruen* did. *See* Pls.' Suppl. Br. 14-15 & n.8. That is not correct. In fact, *Bruen* rejected reliance on six of the laws Plaintiffs list not because they were too few, but because it disagreed with New York's

interpretation. *See* 142 S. Ct. at 2142, 2145.[11] Of the remaining nine laws, it rejected reliance on five territorial laws because (among other reasons) they were "temporary," applied to "miniscule" populations, and were contrary to "the overwhelming evidence of an otherwise enduring American tradition," *see Bruen*, 142 S. Ct. at 2154-55; dismissed two state laws for *sui generis* reasons;[12] and dismissed the remaining two state laws (from Texas and West Virginia) as "contradict[ing] the overwhelming weight of other evidence," *id.* at 2153 (cleaned up). In this case, by contrast, there is no evidence (let alone "overwhelming" evidence) of an "enduring American tradition" of protecting the keeping or bearing of butterfly knives.

Even *Bruen*'s tentative statement of "doubt" that three colonial regulations "could suffice to show a tradition," *Id.* at 2142, should not be given undue weight in light of the Court's discussion of the historical laws justifying "sensitive places." Specifically, *Bruen* "assume[d] it settled" that three kinds of locations—legislative

---

[11] Contrary to Plaintiffs' claim that *Bruen* said it would have rejected reliance on all six of these laws as inadequate "even if" it had agreed with New York's interpretation, *see* Pls.' Suppl. Br. 15 n.8, the Court in fact said only that it "*doubt[ed]*" that "*three* colonial regulations could suffice to show a tradition of public-carry regulation." *Bruen*, 142 S. Ct. at 2142 (first emphasis added).

[12] *See id.* at 2155-56 (dismissing 1881 Kansas statute that "instructed cities" of a certain size to pass ordinances prohibiting public carry, but did not do so itself, and would in any event only have applied to 6.5% of Kansas's population); *id.* at 2147 (dismissing 1821 Tennessee law in light of later Tennessee case).

assemblies, polling places, and courthouses—"were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133. But the sources the Court cited for that historical record identified only two laws naming legislative assemblies and two naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. 11-12.[13] Moreover, according to the authors on whom the Court relied, prohibitions on guns in schools—which *Heller*, *McDonald*, and *Bruen* all endorsed[14]—"have very weak historical lineage." Kopel & Greenlee, 13 Charleston L. Rev. at 289 (arguing that the only historical prohibitions "appear in a few states in the late nineteenth and early twentieth centuries"). In light of *Bruen*'s sensitive places analysis, therefore, a small handful of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.

---

[13] The Court also noted that it was "aware of no disputes regarding the lawfulness of such prohibitions." 142 S. Ct. at 2133. To the extent that Plaintiffs might claim that this observation played a substantive part in the Court's analysis, that should be rejected out of hand. Absence of dispute—much less the Supreme Court's *lack of awareness* of dispute—cannot conjure into existence "this Nation's historical tradition of firearm regulation," particularly when the Court was clear that the burden to demonstrate that tradition falls on the government. *See id.* at 2126.

[14] *See Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786; *Bruen*, 142 S. Ct. at 2133; *see also id.* at 2162 (Kavanaugh, J., concurring)

16

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically-supported policy choices. *See generally Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (explaining that "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment"); *cf., e.g.*, *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts] … unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions.").

Nevertheless, to the extent that *Bruen* leaves open any questions about how much historical evidence is required to establish a relevant tradition, this Court need

09500000\010040\122390493\V-2

not define that standard here, given the extensive historical record the State has set out.[15]

## CONCLUSION

The judgment of the district court should be affirmed.

DATED:  Honolulu, Hawaiʻi, September 26, 2022.

<div style="margin-left: 40%;">

s/ Wendy F. Hanakahi

PAMELA W. BUNN
WENDY F. HANAKAHI
Dentons US LLP

JANET CARTER
WILLIAM J. TAYLOR, JR.
Everytown Law

Attorneys for Amicus Curiae
EVERYTOWN FOR GUN SAFETY

</div>

---

[15] Plaintiffs' efforts to attack that historical record fall short. Among other errors, Plaintiffs are wrong to claim that historical bowie-knife regulations are limited to prohibitions on carrying such knives concealed. *See* Pls.' Suppl. Br. 19-21. For example, laws from the 1830s in Georgia, Tennessee, Alabama and Florida either directly prohibited the sale of bowie knives in the state or effectively curtailed their sale through prohibitive taxes. *See* State's Suppl. Br. 14-15; Everytown Br. 17. And prohibitions on manufacturing, selling, using and/or possessing a range of weapons associated with criminal activity appeared in at least thirteen states between the 1830s and 1927. *See* State's Suppl. Br. 21-29; Everytown Br. 18-19.

18

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  20-15948

I am the attorney or self-represented party.

**This brief contains**  4,764  **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Wendy F. Hanakahi  **Date** September 26, 2022
*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

Form 8                                                                 Rev. 12/01/2018

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2022, I caused the foregoing supplemental amicus brief to be filed electronically with the Clerk of the Court of the U.S. Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users and will be served by the Appellate CM/ECF system.

DATED:  Honolulu, Hawai'i, September 26, 2022.

<div style="text-align: right">

s/ Wendy F. Hanakahi
PAMELA W. BUNN
WENDY F. HANAKAHI
Dentons US LLP

JANET CARTER
WILLIAM J. TAYLOR, JR.
Everytown Law

Attorneys for Amicus Curiae
EVERYTOWN FOR GUN SAFETY

</div>