IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.  CRIMINAL ACTION NO. 2:22-cr-00097

RANDY PRICE

MEMORANDUM OPINION AND ORDER

The question before the court is whether 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms, and 18 U.S.C. § 922(k), which prohibits possession of a firearm with an altered, obliterated, or removed serial number, are constitutional after the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). After considering the arguments presented here, I find that Section 922(g)(1) is constitutional, but I find that Section 922(k) is not. For the following reasons, Mr. Price's motion to dismiss the indictment against him is **GRANTED** as to Count Two and **DENIED** as to Count One.

I. BACKGROUND

On July 16, 2019, officers with the Charleston Police Department conducted a traffic stop on Mr. Price's vehicle for having an improper display of registration. [ECF No. 23, at 2]. Through that stop, officers discovered a pistol in Mr. Price's vehicle with an obliterated serial number. *Id.* At the time he allegedly possessed the pistol, Mr.

Price had been convicted in Ohio of the felony offenses of involuntary manslaughter and aggravated robbery. [ECF No. 1, at 1]. Mr. Price was indicted by grand jury on May 3, 2022, for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count One) and for possession of a firearm with an obliterated serial number in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B) (Count Two). [ECF No. 1, at 1–3].

II. **LEGAL STANDARD**

Under Federal Rule of Criminal Procedure 12, the court should dismiss criminal charges in an indictment "where there is an infirmity of law in the prosecution[,]" such as when the statute charged is unconstitutional. *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). Mr. Price makes a facial challenge to Section 922(g)(1) and Section 922(k). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Until recently, federal courts uniformly applied at least intermediate scrutiny to firearms laws and conducted a means-end analysis to determine whether the state's interest in the regulation was sufficient to overcome whatever burden the law placed on one's Second Amendment right. *See, e.g.*, *United States v. Carter*, 669 F.3d 411 (4th Cir. 2012). In *Bruen*, however, the Supreme Court of the United States determined that all of the lower courts had been incorrect in applying means-end scrutiny. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Rather than

2

balancing any government interest, no matter how important the interest may be in our modern society, the Supreme Court reaffirmed what it said in *Heller*: "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008)) (emphasis in original). Because the Second Amendment was adopted in 1791, only those regulations that would have been considered constitutional then can be constitutional now.

As other districts have recognized, "*Bruen* transformed and left uncharted much of the legal landscape." *United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900, at *1 (W.D. Tex. Oct. 3, 2022). Nevertheless, the Supreme Court provided the following mandate:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Bruen*, 142 S. Ct. at 2126 (internal citations omitted).

The Second Amendment to the United States Constitution states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

## III. DISCUSSION

In his motion to dismiss, Mr. Price argues that the conduct prohibited by 18 U.S.C. §§ 922(g)(1) and 922(k) is protected by the plain text of the Second Amendment and was unregulated in 1791. [ECF No. 12]. Relying on the Supreme Court's holding in *Bruen*, Mr. Price argues that these statutes are facially unconstitutional. In response, the Government argues that historically, the Second Amendment's protections do not extend to possession of firearms by convicted felons, and undisturbed "Supreme Court precedent does not cast doubt on laws imposing conditions and qualifications on the commercial sale of firearms, including a prohibition on the obliteration of serial numbers." [ECF No. 17, at 1]. In addition, the Government argues that the statutes are "sufficiently analogous to historical regulations to be deemed longstanding" and cites to historical evidence supporting the tradition of keeping firearms out of the hands of dangerous people, such as convicted felons. *Id.* at 6–10.

### A. 18 U.S.C. § 922(k)

Because no other court has yet addressed it post-*Bruen*, I first consider whether the statute charged in Count Two of the Indictment, 18 U.S.C. § 922(k), is constitutional.

Section 922(k) states, in pertinent part,

> It shall be unlawful for any person knowingly to transport . . . in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess . . . any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at

any time, been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(k).

1.

The threshold question is whether Section 922(k) prohibits conduct that is protected by the plain text of the Second Amendment. *Bruen*, 142 S. Ct. at 2126. The Government argues that it does not because the requirement that firearms bear serial numbers is, in its view, a "commercial regulation" that does not "infringe" on one's right to keep and bear arms. The Government's argument relies mainly on its contention that no relevant Supreme Court precedent casts "doubt on laws imposing conditions and qualifications on the *commercial sale* of arms." [ECF No. 17, at 1 (emphasis supplied)]. In his concurring opinion in *Bruen*, Justice Kavanaugh explained that the Court did not intend "to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms". *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). This idea is rooted in *Heller* and *McDonald*—precedent that *Bruen* reaffirmed—which also left commercial regulations untouched. 554 U.S. at 626–27; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). This makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession.

Importantly though, the statute at issue here is not a commercial regulation. Rather, 18 U.S.C. § 923(i) is the commercial regulation that requires manufacturers to place serial numbers on firearms: "Licensed importers and manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the

5

weapon . . . each firearm imported or manufactured by such importer or manufacturer."[1,2] Other commercial regulations may well require that any firearm sale only involve firearms bearing a manufacturer's serial number. Section 922(k) goes farther. It criminalizes the mere *possession* of a firearm after a serial number is removed, obliterated, or altered in any way, whether or not the firearm is then placed into commerce.

Assume, for example, that a law-abiding citizen purchases a firearm from a sporting goods store. At the time of the sale, that firearm complies with the commercial regulation that it bear a serial number. The law-abiding citizen takes the firearm home and removes the serial number. He has no ill intent and never takes any otherwise unlawful action with the firearm. Contrary to the Government's argument that Section 922(k) does not amount to an "infringement" on the law-abiding citizen's Second Amendment right, the practical application is that while the law-abiding citizen's possession of the firearm was originally legal, it became illegal only because the serial number was removed. He could be prosecuted federally for his possession of it. That is the definition of an infringement on one's right to possess a firearm.

Now, assume that the law-abiding citizen dies and leaves his gun collection to his law-abiding daughter. The daughter takes the firearms, the one with the removed

---

[1] 26 U.S.C. § 5842(a) is a similar commercial regulation requiring manufacturers of certain types of firearms such as machine guns and short barreled shotguns, known as NFA firearms, to "identify each firearm . . . by a serial number."
[2] I only presume this commercial regulation to be constitutional and do not undertake further analysis here because the statute at issue is not a commercial regulation.

6

serial number among them, to her home and displays them in her father's memory. As it stands, Section 922(k) also makes her possession of the firearm illegal, despite the fact that it was legally purchased by her father and despite the fact that she was not the person who removed the serial number. These scenarios make clear that Section 922(k) is far more than the mere commercial regulation the Government claims it to be. Rather, it is a blatant prohibition on possession. The conduct prohibited by Section 922(k) falls squarely within the Second Amendment's plain text.

### 2.

Having found that Section 922(k) does implicate conduct that is protected by the Second Amendment, the statute is presumptively unconstitutional unless the Government can show that "it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. This analysis is constrained by the Supreme Court's definition of "historical tradition" as the time of the founding and ratification of the Second Amendment in 1791. According to *Bruen*, "[h]istorical evidence that long predates [the ratification] . . . may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Likewise, the Court cautions that lower courts "must also guard against giving postenactment history more weight than it can rightly bear," by only considering those postenactment sources that help "determine *the public understanding* of [the Second Amendment]" at the time of its ratification. *Id.* (emphasis and alteration in original) (citation omitted).

Taking those instructions together, the crux of the historical inquiry is to determine the understanding of the right at the time it was enshrined in the Constitution. Any modern regulation that does not comport with the historical understanding of the right is to be deemed unconstitutional, regardless of how desirable or important that regulation may be in our modern society.

**a.**

Prior to *Bruen*, courts considering the constitutionality of Section 922(k) found that the requirement that a serial number not be removed was a minimal burden on lawful gun owners compared to the value serial numbers provide to society. *See, e.g.*, *United States v. Marzzarella*, 595 F. Supp. 596, 602–03 (W.D. Pa. 2009). Specifically, by requiring serial numbers and "channeling the sales of firearms through federally licensed dealers," *id.* at 602, who keep a record of those sales, the Gun Control Act on the whole helps to keep firearms out of the hands of "individuals whose possession of them would be contrary to the public interest," *Huddleston v. United States*, 415 U.S. 814, 824 (1974). And, the Third Circuit explained, "It is no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes. When a firearm is stolen, determining this chain is difficult and when serial numbers are obliterated, *it is virtually impossible.*" *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992) (emphasis supplied). Certainly, the usefulness of serial numbers in solving gun crimes makes Section 922(k) desirable for our society. But the Supreme Court no longer permits such an analysis.

Under *Bruen*, I am limited to considering whether Section 922(k) is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Where the regulation confronts a longstanding "perceived societal problem" that the founders could have addressed but either did not address or addressed through "materially different means," the regulation is unconstitutional. *Id.* at 2131. On the other hand, where the societal problem addressed by the regulation is "unprecedented," such that it would have been "unimaginable at the founding" or is based on "dramatic technological changes," the approach may be more nuanced. *Id.* at 2132. In those instances, the Government may point to an analogous regulation[3] in the relevant historical tradition as evidence that the modern regulation is constitutional. In either case, the burden is on the Government to establish the constitutionality of Section 922(k). *See, e.g., id.* at 2135, 2138 ("We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-clause requirement. . . . [It] is therefore

---

[3] The Court's discussion of what constitutes an "analogous regulation" is curious. The Court explains that lower courts should look to two metrics to determine whether a modern regulation is "relevantly similar": "how and why the regulations burden a law-abiding citizen's" Second Amendment right. *Bruen*, 142 S. Ct. at 2132–33. As the dissent notes, "[i]ronically, the only two 'relevan[t]' metrics that the Court does identify are 'how and why' . . . . In other words, the Court believes that the most relevant metrics of comparison are a regulation's means (how) and ends (why)—even as it rejects the utility of means-end scrutiny." *Id.* at 2179 (Breyer, J., dissenting). Still, the Court insists that I am no longer permitted to "assess the costs and benefits of firearms restrictions" or conduct an "'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Bruen*, 142 S. Ct. at 2129 (citations omitted). That being the case, I am hard pressed to determine what types of historical regulations may be "relevantly similar" to Section 922(k)'s prohibition on possession of a firearm without a serial number. It seems to me that the only types of analogous regulations would be those that required firearm owners to keep an identifiable mark on their firearm and never change or remove that mark, with criminal penalties levied against violators. I am not presented with evidence that any such regulation existed, nor has my research uncovered any.

9

unconstitutional."). Courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the Government's] burden." *Id.* at 2150.

b.

To properly frame my analysis, I begin by exploring the "societal problem" Section 922(k) was intended to address. It is undisputed that serial numbers were not required, or even in common use, in 1791. Rather, serial numbers arose only with the advent of the mass production of firearms. *See* Thomas Henshaw, *The History of Winchester Firearms 1866–1992* ix (6th ed. 1993) (listing the first recorded serial number on a Winchester firearm as appearing in 1866); National Park Service, *Firearm Serial Numbers*, https://www.nps.gov/spar/learn/historyculture/firearm-serial-numbers.htm (last visited Oct. 11, 2022) (stating that no serial numbers appeared on Springfield Armory weapons until 1865). The first legal requirement for serial numbers did not appear until 1934 when Congress passed the National Firearms Act. Pub. L. No. 73-474, § 8(a), 48 Stat. 1236, 1239 (1934). That requirement only applied to certain firearms, such as machine guns and short-barreled rifles. The first precursor to Section 922(k) appeared in the Federal Firearms Act of 1938 and made it unlawful "for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered." Pub. L. No. 75-785, § 2(i), 52 Stat. 1250, 1251 (1938).

Serial numbers were not broadly required for all firearms manufactured and imported in the United States until the passage of the Gun Control Act of 1968. Pub.

10

L. 90-351, § 902, 82 Stat. 197, 232 (1968) ("Licensed importers and licensed manufacturers shall identify . . . each firearm imported or manufactured."). Congress described the Gun Control Act as an Act "[t]o assist State and local governments in reducing incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes." *Id.* at 197. Courts have noted that its purpose was to create "a comprehensive scheme to regulate the movement of firearms," *Mobley,* 956 F.2d at 453, "to keep firearms away from persons Congress classified as potentially irresponsible and dangerous . . . ." *Barrett v. United States*, 423 U.S. 212, 218 (1976). At that time, what is now Section 922(k) was Section 922(i). Like the Federal Firearms Act, that section made it "unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm the importer's or manufacturer's serial number of which has been removed, obliterated, or altered." Gun Control Act of 1968, Pub. L. 90-351, § 902, 82 Stat. 197, 231 (1968). Notably, these prohibitions were only on transporting, shipping, or receiving firearms—that is to say, when the firearms were in the stream of commerce.

Even in 1968 there was no prohibition on mere possession of a firearm that had the serial number altered or removed. In fact, it was not until the Crime Control Act of 1990 that Section 922 was amended to insert "or *to possess* or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce." Pub. L. No. 101-647, § 2202(b), 104 Stat. 4789, 4856 (1990). A

11

review of the legislative history provides little insight into the problem Congress hoped to address in making this change, but earlier versions containing the same proposed change suggest that Congress intended to "broaden [the Bureau of Alcohol, Tobacco, and Firearm's] jurisdiction to attack the black market in firearms by redefining the interstate nexus as it relates to stolen firearms and firearms with obliterated serial numbers." *Comprehensive Violent Crime Control Act of 1989: Hearing on H.R. 2709 Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 101st Cong., 2d Sess. 143 (Mar. 6, 1990).

Given this history, the "societal problem[s]" addressed by Section 922(k) appear to be crime, including crime involving stolen firearms, and assisting law enforcement in solving crime. It is difficult to imagine that this societal problem did not exist at the founding. While firearms then were not the same as firearms today, there certainly were gun crimes that might have been more easily investigated if firearms had to be identifiable by a serial number or other mark. The Government has presented no evidence, and the court is not aware of any, that any such requirement existed in 1791. And, insofar as the Gun Control Act was intended to keep firearms out of the hands of those who might commit crimes with them, there is evidence, as I discuss later, that the founders addressed that problem through materially different means. According to *Bruen,* that the societal problem addressed by Section 922(k) was likely in existence at the founding but not addressed by similar means "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2130.

12

Even assuming the societal problem addressed by the regulation is "unprecedented," such that it would have been "unimaginable at the founding" or is based on "dramatic technological changes," *id.* at 2132, it is the Government's burden to show that there were analogous regulations at the time to support Section 922(k)'s constitutionality. In an attempt to meet its burden, the Government argues broadly that there is a historical tradition of "restricting the *types* of weapons that can be possessed," and that "there is a general historical practice of imposing 'conditions and qualifications on the commercial sale of arms.'" [ECF No. 17, at 12–13 (quoting *Heller*, 544 U.S. at 627)]. As I have already held, Section 922(k) is not a commercial regulation because it criminalizes possession even after a firearm is out of the stream of commerce. Evidence of historical commercial regulations is therefore inapposite.

As for its argument that restrictions on certain types of weapons are constitutional, the Government starts and stops by explaining that the Court in *Heller* acknowledged three permissible limits: the firearms must be "bearable arms" to receive protection, the arms must not be "dangerous or unusual weapons," and the arms must be kinds in "common use." [ECF No. 17, at 12–13]. The Government makes no attempt to explain how any of these limits are analogous to Section 922(k)'s prohibition on possessing a firearm without a serial number, and I find no apparent analogue.

Firearms with no serial number are just as "bearable" as the same firearm with a serial number, and there is no "common use" issue here as the presence or lack of a serial number makes no difference with respect to whether the type of weapon is

13

commonly used. Finally, I can find no authority for the idea that a firearm without a serial number would meet the historical definition of a dangerous or unusual firearm. In fact, as the Government points out, the *commercial* requirement that a serial number be placed on a firearm "does not impair the use or functioning of a weapon in any way." [ECF No. 17, at 12 (quoting *Marzzarella*, 614 F.3d at 94)]. The mechanics of the firearm—with or without a serial number—are the same.

A firearm without a serial number in 1791 was certainly not considered dangerous or unusual compared to other firearms because serial numbers were not required or even commonly used at that time. While I recognize there is an argument, not made by the Government here, that firearms with an obliterated serial number are likely to be used in violent crime and therefore a prohibition on their possession is desirable, that argument is the exact type of means-end reasoning the Supreme Court has forbidden me from considering. And the founders addressed the "societal problem" of non-law-abiding citizens possessing firearms through "materially different means"—felon disarmament laws like Section 922(g)(1). *Bruen*, 142 S. Ct. at 2131. Under *Bruen*, this is "evidence that [the] modern regulation is unconstitutional." *Id.*

### 3.

The burden falls on the Government to "affirmatively prove that its firearms regulation is part of the [or analogous to a] historical tradition that delimits the outer

14

bounds of the right to keep and bear arms." *Id.* at 2127. The Government has not done so here, and I have no choice but to find 18 U.S.C. § 922(k) unconstitutional.

### B. 18 U.S.C. § 922(g)(1)

I will next consider whether the statute charged in Count One of the Indictment, 18 U.S.C. § 922(g)(1), is constitutional post-*Bruen.*

Section 922(g)(1) states in pertinent part, "It shall be unlawful for any person— (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; . . . to . . . transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm . . . ." 18 U.S.C. § 922(g)(1).

#### 1.

Under *Bruen*, I must first determine whether the Second Amendment's plain text covers the conduct at issue. While the Government argues that based on the Court's repeated reference to "law-abiding citizens" in *Bruen*, "the Second Amendment does not extend to possession of firearms by convicted felons," I find that proposition relevant to the second prong of Second Amendment analysis. [ECF No. 17, at 7]; *see* 142 S. Ct. at 2131 (stating that Second Amendment protects "the right of law-abiding, responsible citizens to use arms for self-defense").

The Supreme Court in *Bruen* placed emphasis on individual conduct and instructed the court to look at "the Second Amendment's plain text" to determine whether the Constitution presumptively protects that conduct. 142 S. Ct. at 2126. The "textual elements" of the Second Amendment's operative clause— "the right of the people to keep and bear Arms, shall not be infringed"—"guarantee the individual

15

right to possess and carry weapons in case of confrontation." *Id.* at 2134 (citing *Heller*, 554 U.S. at 592). The plain text of the Second Amendment does not include "a qualification that Second Amendment rights belong only to individuals who have not violated any laws." *See United States v. Jackson*, No. CR-22-59-D, 2022 WL 3582504, at *2 (W.D. Okla. Aug. 19, 2022). As such, I find that Mr. Price's conduct is covered by the plain text of the Second Amendment.

### 2.

I next consider whether the Government has established that Section 922(g)(1) is consistent with the United States' historical tradition of firearm regulation. As has every other district court to address the question in the wake of *Bruen*, I conclude that Section 922(g)(1) is constitutional.

Justice Thomas opens *Bruen* by expressly reaffirming the holdings of the Supreme Court's recent Second Amendment cases, which defined the right to bear arms as belonging to "law-abiding, responsible citizens."

> In *District of Columbia v. Heller*, and *McDonald v. Chicago*, we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, *law-abiding* citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, *law-abiding* citizens have a similar right to carry handguns publicly for their self-defense. We too agree . . . .

*Bruen*, 142 S. Ct. at 2122 (emphasis supplied) (citations omitted). Consistent with that definition, the Court cautioned in *Heller* that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626. The Court described such prohibitions as "presumptively

16

lawful" and falling within "exceptions" to the protected right to bear arms. *Id.* at 627 n.26, 635. In *McDonald*, a plurality of the Court repeated its "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626). In *Bruen*, Justices Alito, Kavanaugh, and Roberts—who all joined the majority opinion—repeated in their concurring opinions that their intent was to leave undisturbed government regulations that prohibit people who have been convicted of felonies from carrying firearms. 142 S. Ct. at 2157, 2161 (Alito, J., concurring) (Kavanaugh, J., concurring).

In keeping with *Heller* and *McDonald*, Justice Thomas was similarly careful to state throughout *Bruen* that the Second Amendment protects "the right of *law-abiding*, responsible citizens to use arms for self-defense." *See id.* at 2122, 2131, 2133, 2134, 2138, 2150, 2155 (emphasis supplied); [ECF No. 17, at 7]. The Government reasons that the Court's reaffirmation of its precedent in *Heller* and *McDonald*, in addition to Justice Thomas' emphasis that the Second Amendment protects the rights of "law-abiding" citizens, demonstrates the Court's recognition of the exclusion of felons from the protection of the Second Amendment—even though the plain text of the Second Amendment covers their conduct in possessing firearms.

To be sure, much of the language quoted by the Court in *Bruen*, both in the majority and the concurring opinions, is dicta, and courts are "not bound by dicta or separate opinions of the Supreme Court." *Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 406 (4th Cir. 2005). Nevertheless, the Fourth Circuit has repeatedly

17

instructed that "[w]e routinely afford substantial, if not controlling deference to dicta from the Supreme Court," "particularly when the supposed dicta is recent and not enfeebled by later statements." *Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021) (internal citations omitted); *Manning v. Caldwell*, 930 F.3d 264, 281 (4th Cir. 2019) (en banc); *McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181 n.2 (4th Cir. 2012) ("[W]e cannot simply override a legal pronouncement endorsed . . . by a majority of the Supreme Court.").

Relying on the same dicta in the wake of *Bruen*, at least nine federal district courts have rejected constitutional challenges to Section 922(g)(1). *See, e.g.*, *United States v. Jackson*, No. CR 21-51 (DWF/TNL), 2022 WL 4226229, at *2 (D. Minn. Sept. 13, 2022) (upholding Section 922(g)(1) for similar reasons as those stated here and remarking that "[w]hile Jackson would like this Court to scrutinize the history of felon-in-possession statutes, such examination is unnecessary at this time."); *United States v. King*, No. 21-CR-255 (NSR), 2022 WL 5240928 (S.D.N.Y. Oct. 6, 2022); *United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States v. Siddoway*, No. 1:21-CR-00205-BLW, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); *United States v. Collette*, No. MO:22-CR-00141-DC, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022); *United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022); *United States v. Hill*, No. 21CR107 WQH, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Cockerham*, No. 5:21-CR-6-DCB-FKB, 2022 WL 4229314 (S.D. Miss. Sept. 13, 2022); *United States v. Burrell*, No. 21-20395, 2022 WL 4096865 (E.D. Mich. Sept. 7, 2022);

18

*United States v. Ingram*, No. CR 0:18-557-MGL-3, 2022 WL 3691350 (D.S.C. Aug. 25, 2022).

I do not find it necessary to engage in the historical analysis test articulated in *Bruen* as to 18 U.S.C. § 922(g)(1).[4] Rather, I am convinced that the Supreme Court left generally undisturbed the regulatory framework that keeps firearms out of the hands of dangerous felons through its decision in *Bruen* by reaffirming and adhering to its reasoning in *Heller* and *McDonald*. Mr. Price essentially argues that *Bruen* should be taken to "cast doubt on longstanding prohibitions on the possession of firearms by felons," which is a marked departure from *McDonald* and *Heller* that was specifically not taken by the Supreme Court in *Bruen*. Cf. *McDonald*, 561 U.S. at 786; *Heller*, 554 U.S. at 626.

---

[4] The Government provided several pages of citations to the historical record that have been relied upon by other courts in upholding 18 U.S.C. § 922(g)(1) as constitutional, which went largely unrebutted by Mr. Price in his Reply. I find that even if the Supreme Court intended for courts to reexamine felon-in-possession statutes, the Government has met its burden of proving that Section 922(g)(1) fits comfortably within the nation's longstanding tradition of disarming unvirtuous or dangerous citizens. [ECF No. 17, at 6–10 (citing *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous."); *United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) ("[H]istorical evidence support[s] the notion that government could disarm individuals who are not law-abiding members of the political community."); *Binderup v. Att'y Gen. U.S. of Am.*, 836 F.3d 336, 349 (3d Cir. 2016) ("The view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era."); *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (recognizing "a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens"); *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019) ("[F]elons were not historically understood to have Second Amendment rights."); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ("Many of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime [in the eighteenth century]." (citing Stephen P. Halbrook, *The Founders' Second Amendment* 273 (2008))); Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868) (explaining that some classes of people were "almost universally excluded" from exercising certain civic rights, including "the felon, on obvious grounds"))].

19

**3.**

In keeping with Justice Thomas' insistence that "law-abiding" citizens are protected by the Second Amendment, Section 922(g)(1)—which aims to ensure that those bearing arms are law-abiding, responsible citizens—accords with the Second Amendment. As such, Mr. Price's motion to dismiss the indictment against him is **DENIED** as to 18 U.S.C. § 922(g)(1).

## IV. CONCLUSION

For the foregoing reasons, Mr. Price's motion to dismiss the indictment [ECF No. 12] is **GRANTED** as to Count Two and **DENIED** as to Count One. Count Two of the Indictment [ECF No. 1] is **DISMISSED**. The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: October 12, 2022

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE