# The History of Bans on Types of Arms Before 1900

Davidᴮ. Kopel[*]
Joseph G.S. Greenlee[**]

## Table of Contents

Introduction ................................................................................3

I. English history ...........................................................................6
A. Arms Bans in England ............................................................ 6
B. Repeating Firearms in England ............................................ 10
  1. The Kalthoff Repeating Rifle .............................................. 11
  2. The Lorenzoni repeating handguns and rifles ..................... 12

II. The Colonial Period and Early Republic ....................................... 13
A. The English Colonies ........................................................... 14
B. New Sweden ...................................................................... 17
C. New Netherland ................................................................. 18
D. Arms Mandates in Colonial America ...................................... 20
  1. Who was required to keep or bear arms? ............................ 21
  2. Types of mandatory arms .................................................. 24
  3. Repeating Arms ............................................................... 37
E. Cannons ........................................................................... 40
F. Overview .......................................................................... 44

III. Nineteenth Century Advances in Arms ...................................... 47
A. James Madison and James Monroe, the founding fathers of modern firearms
  ............................................................................... 48

[*] Adjunct Professor Constitutional Law, University of Denver, Sturm College of Law; Senior Fellow, University of Wyoming College of Law, Firearms Research Center; Research Director, Independence Institute, Denver, Colorado; Adjunct Scholar, Cato Institute, Washington, D.C. http://davekopel.org.

[**] Director of Constitutional Studies, FPC Action Foundation, Las Vegas, Nevada; Policy Advisor for Legal Affairs, Heartland Institute, Arlington Heights, Illinois; http://josephgreenlee.org. The authors would like to thank Connor Cheadle for research assistance.

1

B. The American system of manufacture ...................................... 49
C. The revolution in ammunition ................................................ 50
D. Advances in repeating arms ................................................... 52
E. Continuing advances in firearms were well-known to the Founders  57
F. Perspective................................................................................. 59

IV. Firearms bans in the 19th Century ........................................... 60
A. Georgia ban on handguns, Bowie knives, and other arms ...... 61
B. Tennessee ban on many handguns .......................................... 62
C. Arkansas ban on many handguns, and Bowie knives ............. 62
D. Florida licensing law for repeating rifles and handguns ........ 63

V. Bowie Knives ................................................................................ 67
A. The history of Bowie knives and Arkansas toothpicks............ 70
   1. What is a Bowie knife?......................................................... 70
   2. What is an Arkansas toothpick? .......................................... 72
   3. The crime in the Arkansas legislature ................................ 72
B. Survey of Bowie knife statutes ............................................... 74

VI. Other weapons .......................................................................... 110
A. Daggers, dirks, and other sharp weapons ............................ 111
   1. Daggers and dirks ............................................................. 111
   2. Sword canes...................................................................... 113
   3. Spears................................................................................ 116
   4. Razors................................................................................116
   5. Butcher knives .................................................................. 117
   6. Swords............................................................................... 118
B. Slungshots and other flexible impact weapons ................... 118
   1. Slungshots and colts ........................................................ 121
   2. Slingshots.......................................................................... 132
   3. Sand Clubs........................................................................134
   4. Blackjacks.......................................................................... 135
   5. Billies vs. Billy clubs ......................................................... 136
B. Rigid impact weapons ........................................................... 137
1. Knuckles.............................................................................. 137
2. Loaded Canes....................................................................... 141
D. Cannons................................................................................. 141

VII. Doctrinal Analysis .................................................................. 144
A. Summary of possession or sales bans ................................... 144

B. Modern doctrines.......................................................... 148
  1. Dangerous and unusual ........................................ 148
  2. How many jurisdictions make a tradition? ......................... 152
C. Application of history and modern doctrine to particular types of laws   156
  1. Arms that are not firearms or blades .................................. 156
  2. Modern semiautomatic firearms and magazines ............... 157
  3. Minors…………………………............................................... 161
  4. Penalties for criminal misuse ............................................ 162

Conclusion.................................................................................163

# Introduction

This Article describes the history of bans on particular types of arms in America, through 1899. It also describes arms bans in England until the time of American independence. Arms encompassed in this article include firearms, knives, swords, blunt weapons, and many others. While arms advanced considerably from medieval England through the nineteenth-century United States, bans on particular types of arms were rare.

The U.S. Supreme Court's decision *New York State Rifle & Pistol Association v. Bruen* instructed lower courts to decide Second Amendment cases "consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."[1] *Bruen* examined the legal history of restrictions on the right to bear arms through 1899.[2] This Article focuses on one aspect of the legal history of the right to *keep* arms: prohibitions on particular types of arms.

Part I describes prohibitions on possession of firearms and other arms in England. The launcgay, a type of light lance for horsemen, was banned, as were small handguns, although the handgun ban was widely ignored. A class-based

---

[1] N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2126–27 (2022) (discussing District of Columbia v. Heller, 554 U.S. 570 (2008)).

[2] The further from the Founding, the less useful the legal history. While the Court did address some laws from the late nineteenth century, laws after 1900 were pointedly not examined: "We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

handgun licensing law was apparently little enforced. While most firearms were single-shot, repeating firearms existed for centuries in England, with no special restrictions.

Part II covers America from the colonial period through the Early Republic. No colonial law banned any particular arm. The Dutch colony New Netherland came the closest when it limited the number of flintlocks colonists could bring into the colony, in an effort to quash the trading of flintlocks to Indians. In the British colonies, there were many laws requiring most people, including many women, to possess particular types of arms. The Article is the first to provide a complete, item-by-item list of every mandated arm. Some private individuals owned repeating (multi-shot) firearms and cannons, but such arms were far too expensive for a government to mandate individual possession.

As summarized in Part III, the nineteenth century was the greatest century before or since for firearms technology and affordability. When the century began, an average person could afford a single-shot flintlock musket or rifle. By the end of the century, an average person could afford the same types of firearms that are available today, such as repeaters with semiautomatic action, slide action, lever action, or revolver action. Ammunition had improved even more.

The rest of the article describes nineteenth century laws forbidding particular types of arms. Part IV examines the four prohibitory laws on particular types of firearms: Georgia (most handguns), Tennessee and Arkansas (allowing only "Army & Navy" type handguns, *i.e.* large revolvers), and Florida (race-based licensing system for Winchesters and other repeating rifles).

Part V turns in depth to the most controversial arm of nineteenth-century America: the Bowie knife. Sales were banned in a few states, and possession was punitively taxed in a few others. The mainstream approach, adopted in most states, was to ban concealed carry, to forbid sales to minors, or to impose extra punishment for criminal misuse. As Part V explains, Bowie knife laws usually applied to other weapons too.

Part VI summarizes the nineteenth century laws about the various other arms. These are other sharp weapons (such as dirks, daggers, and sword canes), flexible impact arms (such as slungshots and blackjacks), rigid impact arms (such as brass knuckles), and cannons. Possession bans were rare, whereas laws on concealed carry, sales to minors, or extra punishment for misuse were more common.

4

Part VII applies modern Second Amendment doctrine to the legal history presented in the Article. It suggests that some arms prohibitions and regulations may be valid, but bans on modern semiautomatic rifles and magazines are not.

If this Article described only possession bans for adults, it would be very short. Besides outright bans on possession, the Article also describes laws that that forbade sales or manufacture. These are similar to possession bans, at least for future would-be owners.[3] Even with sales or manufacture bans included, this Article would still be very short. For all arms *except* firearms,

---

[3] A sales ban that allows existing owners to continue possession is not as intrusive as a ban on all possession. But because a sales ban is a ban on new possession, it should be analyzed as a similar to a prohibition, rather than a regulation, as the Ninth Circuit explained in *Jones v. Bonta*:

> [E]ven though this is a commercial regulation, the district court's historical analysis focused not on the history of commercial regulations specifically but on the history of young adults' right to keep and bear arms generally. *See* [*Jones v. Becerra*, 498 F. Supp. 3d 1317, 1325–29 (S.D. Cal. 2020)]. The district court was asking the right question.

> "Commerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017). We have assumed without deciding that the "right to possess a firearm includes the right to purchase one." *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017). And we have already applied a similar concept to other facets of the Second Amendment. For example, "[t]he Second Amendment protects 'arms,' 'weapons,' and 'firearms'; it does not explicitly protect ammunition." [*Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014)]. Still, because "without bullets, the right to bear arms would be meaningless," we held that "the right to possess firearms for protection implies a corresponding right" to obtain the bullets necessary to use them. *Id.* (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).

> Similarly, without the right to obtain arms, the right to keep and bear arms would be meaningless. *Cf. Jackson*, 746 F.3d at 967 (right to obtain bullets). "There comes a point . . . at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself." *Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1097, 194 L. Ed. 2d 256 (Thomas, J., concurring in the judgment) (quoting *Hill v. Colorado*, 530 U.S. 703, 745, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000) (Scalia, J., dissenting)). For this reason, the right to keep and bear arms includes the right to purchase them. And thus laws that burden the ability to purchase arms burden Second Amendment rights.

*Jones v. Bonta*, 34 F.4th 704, 715–16 (9th Cir. 2022).

the Article describes nonprohibitory regulations. Thus, this Article includes a comprehensive list of all regulations—such as concealed carry bans, limits on sales to minors, or extra punishment for use in a crime—that applied to any of the nonfirearm arms discussed in the Article. This Article is the first to provide a full list of all colonial, state, and territorial restrictions on these arms.

We also list some local restrictions, such as by a county or municipality, but we have not attempted a comprehensive survey of the thousands of local governments.

## I.  ENGLISH HISTORY

According to *Bruen*, old English practices that ended long before American independence are of little relevance.[4] The only applicable English precedents are those that were adopted in America and continued up through the Founding Era.[5] For prohibition of particular types of arms, there are no such English precedents. Section A describes what prohibitions did exist at some point in England. Section B describes the availability of repeating arms, which were expensive, in England and the Continent.

### A. Arms Bans in England

In 1181, King Henry II enacted the Assize of Arms, which required all his free subjects to be armed, except for Jews, who were forbidden to have armor.[6] The Assize grouped people into wealth categories. Every male in a particular category had to have certain quantities of particular types of arms and armor—

---

[4]

> English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution. . . . Sometimes, in interpreting our own Constitution, 'it is better not to go too far back into antiquity for the best securities of our liberties,' *Funk* v. *United States*, 290 U. S. 371, 382, 54 S. Ct. 212, 78 L. Ed. 369 (1933), unless evidence shows that medieval law survived to become our Founders' law.

*Bruen*, 142 S. Ct. at 2136 (brackets omitted).

[5] "A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice." *Id.* at 2136.

[6] 27 Henry II, art. 3 (1181).

6

no more and no less.[7] The Assize was prohibitory in that a person could only own the specified arms and armor for his particular income group. The 1181 Assize was more concerned with armor than with weapons, and was not prescriptive about ownership of swords, knives, bows, or blunt weapons.[8]

The Assize of Arms was replaced in 1285 by the Statute of Winchester, under Edward I.[9] It required all males in certain income groups to have *at least* particular quantities of arms and armor.[10] The Statute of Winchester created

---

[7]

> Let every holder of a knight's fee have a hauberk, a helmet, a shield and a lance. And let every knight have as many hauberks, helmets, shields and lances, as he has knight's fees in his demesne.
>
> Also, let every free layman, who holds chattels or rent to the value of 16 marks, have a hauberk, a helmet, a shield and a lance. Also, let every layman who holds chattels or rent worth 10 marks an "aubergel" and a headpiece of iron, and a lance.
>
> Also, let all burgesses and the whole body of freemen have quilted doublets and a headpiece of iron, and a lance.
>
> . . .
>
> Any burgess who has more arms than he ought to have by this assize shall sell them or give them away, or in some way alienate them to such a man as will keep them for the service of the lord king of England. And none of them shall keep more arms than he ought to have by this assize.
>
> Item, no Jew shall keep in his possession a shirt of mail or a hauberk, but he shall sell it or give it away or alienate it in some other way so that it shall remain in the king's service.
>
> . . .
>
> Item, the justices shall have proclamation made in the counties through which they are to go that, concerning those who do not have such arms as have been specified above, the lord king will take vengeance, not merely on their lands or chattels, but their limbs.

27 Henry II, art. 3 (1181), *in* ENGLISH HISTORICAL DOCUMENTS 448 (David Douglas & G.W. Greenaway eds., 2d ed. 1981).

[8] We use the distinct terms "arms" and "armor" in the modern sense; a knife is an "arm" and a Kevlar vest is "armor." In medieval England, and early nineteenth century America, the two terms were not so different; the one often included the other.

[9] 13 Edward I, ch. 6 (1285), *in* 1 STATUTES OF THE REALM 97–98 (1800).

[10]

> It is commanded, That every Man have in his house Harness for to keep the Peace after the antient Assise; that is to say, Every Man between fifteen years of age, and sixty years, shall be assessed and sworn to Armor according to the quantity of their Lands and Goods; that is to wit, [from] Fifteen Pounds Lands,

only mandatory minima for arms, not maxima.[11] Persons could own whatever quantity they chose above the minima, and they could also own arms that were not mandatory for their income group.

In 1383, King Richard II outlawed the possession of "launcegays."[12] The ban was restated the following decade after its lack of enforcement led to a "great Clamour."[13] Launcegays were a type of light spears, "occasionally used as a dart," and considered "offensive weapons."[14] The heavier war lance was not prohibited.

---

and Goods Forty Marks, an Hauberke, [a Breast-plate] of Iron, a Sword, a Knife, and an Horse; and [from] Ten Pounds of Lands, and Twenty Marks Goods, an Hauberke, [a Breast-plate of Iron,] a Sword, and a Knife; and [from] Five Pound Lands, [a Doublet,] [a Breast-plate] of Iron, a Sword, and a Knife; and from Forty Shillings Land and more, unto One hundred Shillings of Land, a Sword, a Bow and Arrows, and a Knife; and he that hath less than Forty Shillings yearly, shall be sworn to [keep Gis-armes,] Knives, and other [less Weapons]; and he that hath less than Twenty Marks in Goods, shall have Swords, Knives, and other [less Weapons]; and all other that may, shall have Bows and Arrows out of the Forest, and in the Forest Bows and [Boults.]

*Id.* (Brackets in original of *English Historical Documents*).

[11] *Id.*

[12]

It is ordained and assented, and also the King doth prohibit, That from henceforth no Man shall ride in Harness within the Realm, contrary to the Form of the Statute of Northampton thereupon made, neither with Launcegay within the Realm, the which Launcegays be clearly put out within the said Realm, as a Thing prohibited by our Lord the King[.]

7 Richard II, ch. 13 (1383), *in* 2 STATUTES OF THE REALM 35 (1816).

[13]

Our Lord the King, considering the great Clamour made to him in this present Parliament, because that the said Statute is not holden, hath ordained and established in the said Parliament, That the said Statutes shall be fully holden and kept, and duly executed; and that the said Launcegayes shall be clear put out upon the Pain contained in the said Statute of Northampton, and also to make Fine and Ransom to the King.

20 Richard II, ch. 1 (1396–97), *in* 2 STATUTES OF THE REALM 93 (1816).

[14] GEORGE CAMERON STONE, A GLOSSARY OF THE CONSTRUCTION, DECORATION AND USE OF ARMS AND ARMOR IN ALL COUNTRIES AND IN ALL TIMES 410 (1999) ("LANCE-AGUE, LANCEGAYE. A light lance, occasionally used as a dart. It was carried in place of the war lance in the 14th century; the latter, at the time, was about fourteen feet long and very heavy."); NATHAN BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY BEING ALSO AN INTERPRETER OF HARD WORDS (2d ed. 1724) ("LAUNCEGAYS, Offensive Weapons prohibited and disused.").

8

There were many English laws based on class rule. For example, a 1388 statute from the notorious Richard II forbade servants and laborers from carrying swords and daggers, except when accompanying their masters.[15] During the late seventeenth century, until the Glorious Revolution of 1688, laws against hunting by commoners were interpreted so as to make firearms possession illegal for most of the population; the bans were often evaded.[16]

A 1541 statute from King Henry VIII outlawed handguns less than one yard in length and arquebuses and demihakes (types of shoulder guns) less than three-fourths of a yard in length. Additionally, people with an annual income below 100 pounds were prohibited from possessing any handgun, crossbow, arquebus, or demihake without a license.[17] Licenses were granted at discretion, as a reward from one's superiors.[18]

No license was needed by inhabitants of market towns or boroughs, anyone with a house more than two furlongs (440 yards) outside of town, persons who lived within five miles of the coasts, within 12 miles of the Scottish border, or

---

[15] 12 Richard II ch. 6 (1388).

[16] NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY, E. GREGORY WALLACE, & DONALD E. KILMER, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY 2136–38 (Aspen Publishers, 3d ed. 2021).

[17]

> [T]hat noe pson or psons of what estate or degree he or they be, excepte he or they in their owne right or in the right of his or their Wyeffe to his or their owne uses or any other to the use of any suche pson or psons, have landes tente fees annuyties or Office to the yerely value of one hundred pounde, from or after the laste daye of June next comynge, shall shote in any Crosbowe handgun hagbutt or demy hake, or use or kepe in his or their houses or elswhere any Crosbowe handgun hagbut or demy hake, otherwise or in any other manner then ys hereafter in this Present Acte declared. . . .

> [N]o pson or psons, of what estate or degree soever he or they be, from or after the saide laste daye of June shall shote in carye kepe use or have in his house or els where any handgune other then suche as shalbe in the stock and gonne of the lenghe of one hole Yarde, or any hagbutt or demyhake other then suche as shalbe in the stock and gune of the lenghe of thre quarters of one Yarde. . .

33 Henry VIII, ch. 6, §1 (1541), *in* 3 STATUTES OF THE REALM 832 (1817).

Hackbut is an archaic spelling of arquebus, a type of long gun. A demihake was a short hackbut. JOHNSON ET AL., *supra* note 16, at 2116–17.

[18] The Tudor monarchs handed out many licenses—including to commoners whom the king wanted to reward, and to nobles to allow their servants to be able to use the arms outside the home. LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 65–73 (2016).

on various small islands.[19] The Henrican 1541 statute "[g]radually . . . fell into disuse. Soon, only the £ 100 qualification was enforced. . . ."[20] The law was obviously contrary to *Heller* and is no precedent for today.[21]

In 1616, King James I outlawed dags—a type of small handgun.[22] As he noted, they were already technically illegal (due to the minimum barrel length rule from Henry VIII), but the law was being disregarded.[23] So was James's new order against dags.[24]

We are unaware of any evidence that launcegays were ever an issue in colonial America. We are likewise unaware of any American source recognizing the Henry VIII or James I handgun laws at all, let alone being applicable in America.

## B. Repeating Firearms in England

In the words of Harold Peterson, Curator for the National Park Service, and one of the twentieth century's greatest experts on historic arms, "The desire for . . . repeating weapons is almost as old as the history of firearms, and there were numerous attempts to achieve this goal, beginning at least as early as the opening years of the 16th century."[25]

The first known repeating firearms date to between 1490 and 1530; when fired, they shot ten bullets in succession with a single trigger pull.[26] King Henry VIII (reigned 1509–1547) owned a similar firearm.[27] The first known

---

[19] Henry VIII, ch. 6 (1541).

[20] ROBERT HELD, THE AGE OF FIREARMS: A PICTORIAL HISTORY 65 (1956).

[21] *Bruen*, 142 S. Ct. at 2141 n.10 (noting that the last attempted prosecutions, which failed, were in 1693).

[22] A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols (R. Barker printer 1616).

[23] *Id.*

[24] SCHWOERER, *supra* note 18, at 182.

[25] HAROLD L. PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA 1526–1783, at 215 (1956).

[26] M.L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492–1792, at 50 (1980). The ammunition was stored in a revolving cylinder. *Id.*

[27] W.W. GREENER, THE GUN AND ITS DEVELOPMENT 81–82 (9th ed. 1910).

10

repeater capable of firing more than 10 shots was invented around 1580; it could fire 16 consecutive rounds.[28]

The above firearms shot all their bullets with a single trigger press, one after another. In the next century, technological improvements allowed the user to fire one bullet at time, and then press the trigger again whenever he chose to take the next shot.

"Successful systems" of repeating arms "definitely had developed by 1640, and within the next twenty years they had spread throughout most of Western Europe and even to Moscow."[29] "[T]he two principal magazine repeaters of the era" were "the Kalthoff and the Lorenzoni. These were the first guns of their kind to achieve success."[30]

### 1. The Kalthoff Repeating Rifle

"The Kalthoff repeater was a true magazine gun. In fact, it had two magazines, one for powder and one for balls. The earliest datable specimens that survive are two wheel-lock rifles made by Peter Kalthoff in Denmark in 1645 and 1646."[31] "[T]he number of charges in the magazines ran all the way from six or seven to thirty."[32]

Kalthoff repeaters "were undoubtedly the first magazine repeaters ever to be adopted for military purposes. About a hundred flintlock rifles of their pattern were issued to picked marksmen of the Royal Foot Guards and are believed to have seen active service during the siege of Copenhagen in 1658, 1659, and again in the Scanian War of 1675–1679."[33]

---

[28] LEWIS WINANT, FIREARMS CURIOSA 168–70 (1955); *16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM, May 10, 2014, http://bit.ly/2tngSDD. The gun used superposed loads—that is, each round stacked on top of another.

[29] HAROLD L. PETERSON, THE TREASURY OF THE GUN 229 (1962).

[30] *Id.*

[31] *Id.* The wheellock was invented by Leonardo da Vinci in the late 16th century. Vernard Foley, *Leonardo and the Invention of the Wheellock*, SCIENTIFIC AM., Jan. 1998, at 96. "When a wound-up steel wheel was released, the serrated wheel struck a piece of iron pyrite. A shower of sparks would ignite the powder in the pan. The wheellock mechanism is similar to the ignition for today's disposable cigarette lighters." JOHNSON ET AL., *supra* note 16, at 2151. The wheel-lock was superior to its predecessor, the matchlock, because it could be kept always ready for sudden use and was more reliable, albeit much more expensive. *Id.*

[32] PETERSON, THE TREASURY OF THE GUN, *supra* note 29, at 230.

[33] *Id.*

11

Kalthoff-type repeaters "spread throughout Europe wherever there were gunsmiths with sufficient skill and knowledge to make them, and patrons wealthy enough to pay the cost."[34] There were nineteen known gunsmiths, and perhaps others, who "made such arms in an area stretching from London on the west to Moscow on the east, and from Copenhagen south to Salzburg."[35]

## 2. The Lorenzoni repeating handguns and rifles

"The Lorenzoni also was developed during the first half of the Seventeenth Century."[36] It was a magazine-fed Italian repeating pistol that "used gravity to self-reload."[37] In being able to self-reload, Lorenzonis are similar to semiautomatic firearms. The Lorenzonis' ammunition capacity was typically around seven shots. The gun's repeating mechanism quickly spread throughout Europe and to the American colonies, and the mechanism was soon applied to rifles as well.[38]

On July 3, 1662, famed London diarist Samuel Pepys wrote about seeing "a gun to discharge seven times, the best of all devices that ever I saw, and very serviceable, and not a bawble; for it is much approved of, and many thereof made."[39] Abraham Hill patented the Lorenzoni repeating mechanism in London on March 3, 1664.[40] The following day, Pepys wrote about "several people [] trying a new-fashion gun" that could "shoot off often, one after another, without trouble or danger, very pretty."[41] It is believed that Pepys was referring to a Lorenzoni-style firearm in his March 4, 1664 entry,[42] and perhaps he also was in his 1662 entry.

---

[34] *Id.*

[35] *Id.*

[36] *Id*

[37] MARTIN DOUGHERTY, SMALL ARMS VISUAL ENCYCLOPEDIA 34 (2011)

[38] PETERSON, THE TREASURY OF THE GUN, *supra* note 29, at 232.

[39] 4 THE DIARY OF SAMUEL PEPYS 258 (Henry B. Wheatley ed., 1893).

[40] The patent was for a "gun or pistol for small shot carrying seven or eight charges of the same in the stock of the gun. . . ." CLIFFORD WALTON, HISTORY OF THE BRITISH STANDING ARMY. A.D. 1660 TO 1700, at 337 (1894).

[41] 7 PEPYS, *supra* note 39, at 61.

[42] PETERSON, THE TREASURY OF THE GUN *supra* note 29, at 232.

12

Despite Hill's patent, "[m]any other English gunsmiths also made guns with the Lorenzoni action during the next two or three decades."[43] Most notably, famous English gunsmiths John Cookson and John Shaw adopted the Lorenzoni action for their firearms. So did "a host of others throughout the 18th century."[44]

"The Kalthoff and Lorenzoni actions . . . were probably the first and certainly the most popular of the early magazine repeaters. But there were many others. Another version, also attributed to the Lorenzoni family, boasted brass tubular magazines beneath the forestock . . . Guns of this type seem to have been made in several parts of Europe during the Eighteenth Century and apparently functioned well."[45] No English law before 1776, or, for that matter, in the following two hundred years, made any distinction regarding repeating firearms.[46]

## II. The Colonial Period and Early Republic

This Part describes the arms rights, arms mandates, and most common arms in the American colonies and Early Republic. According to *Bruen*, colonial laws are relevant to the extent that they show a wide tradition that existed when the Second Amendment was ratified.[47]

Sections A–C describe the arms prohibitions of the British, Dutch, and Swedish colonies within the future thirteen original United States.

Section D lists the types of arms that were so common in America that colonial governments could mandate their ownership. Arms possession mandates applied to militiamen, to some women, and to some men who were exempted from militia duty.

Sections E and F describe the prevalence of repeating arms and cannons, which were far too expensive for mandatory general ownership. There were no

---

[43] *Id.*

[44] Peterson, Arms and Armor in Colonial America, *supra* note 25, at 215.

[45] Peterson, The Treasury of the Gun, *supra* note 29, at 233.

[46] In 1871 an annual tax was imposed for persons who wanted to carry handguns in public, and in 1920 a licensing system for handgun and rifle possession was introduced. Neither law distinguished single-shot guns from repeaters. Johnson et al., *supra* note 16, at 2168–69.

[47] *Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.") (emphasis in original).

13

laws against private ownership of such arms. Section G summarizes the situation in the United States at the time of the ratification of the Second Amendment.

## A. The English Colonies

The 105 colonists who set sail on December 20, 1606, to establish the first permanent English settlement in North America, embarked with express and perpetual rights granted by the Royal Charter of King James I. Among the perpetual rights was to bring "sufficient Shipping, and Furniture of Armour, Weapons, Ordinance, Powder, Victual, and other things necessary for the said Plantations and for their Use and Defence there."[48] There were no restrictions on the types of arms they could bring or import.

The arms rights had been granted to the Virginia Company in perpetuity by the 1606 charter issued by King James I, and reiterated in a 1609 charter. The rights applied to all settlers of the Virginia Colony. The Virginia Charter was the first written arms rights guarantee for Englishmen; back in England, the first written guarantee would not come until the 1689 English Bill of Rights.[49]

The 1620 Charter of New England gave the inhabitants the same rights, including arms rights, as the Virginia colony.[50] Like the Virginia Charter, the

---

[48] 7 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3783, 3786 (Francis Newton Thorpe ed., 1909); RICHARD MIDDLETON, COLONIAL AMERICA: A HISTORY, 1565–1776, at 48 (3d. ed. 2002) (2003 reprint).

The 105 colonists included "some 35 gentlemen, an Anglican minister, a doctor, 40 soldiers, and a variety of artisans and laborers." *Id.*

A previous attempt in 1585 to establish a colony at Roanoke Island, North Carolina, had failed.

[49] 1 Wm. & Mary, sess. 2, ch. 2 (1689).

[50] The New England Charter declared that it was lawful for

our loving Subjects, or any other Strangers who become our loving Subjects," to "att all and every time and times hereafter, out of our Realmes or Dominions whatsoever, to take, load, carry, and transports in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there.

Charter of New England contained no restrictions on the types of arms. Instead, the only limitation was for persons specifically found to be dangerous.[51]

The 1606 Virginia Charter covered such a vast territory that it is a founding legal document of all the original 13 states, plus West Virginia, Kentucky, and Maine.[52] Similarly, the 1620 Charter of New England is a founding legal document of the New England states (except Vermont), Pennsylvania, New York, and New Jersey.[53]

To encourage immigration to America, all emigrants from England "and every of their children" born in America were guaranteed "all Liberties, Franchises and Immunities . . . as if they had been abiding and born, within this our Realm of *England*, or any other of our said Dominions."[54] Subsequent colonial charters often declared that American colonists had the rights of Englishmen.[55] So in addition to the express arms guarantees in the early colonial charters, the colonists were protected by the 1689 English Bill of

---

3 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, *supra* note 48, at 1834–35. For the New England and Virginia colonies, such imports and exports were untaxed for the first seven years. *Id.* at 1835, 3787–88.

[51] "Provided always, that none of the said Persons be such, as shall hereafter be specially restrained by Us, our Heirs or Successors." 7 *id.* at 3786 (Virginia Charter); 3 *id.* at 1834–35 (New England Charter).

[52] Before becoming separate states, West Virginia and Kentucky were part of Virginia, and Maine part of Massachusetts.

[53] 1 *id.* at iv–xiii.

[54] 7 *id.* at 3788 (Virginia, 1606); 3 *id.* at 1839 (New England, 1620) (slight differences in phrasing and spelling).

The colonists who sailed to establish the New England colony, unlike their Virginia predecessors, included many families, and thus women and children. MIDDLETON, *supra* note 48, at 70. In New England, where "[m]ost couples . . . raised large families, with between five and seven children commonly surviving to adulthood," providing the population growth that made the colonies viable. *Id.* at 89. "Twenty thousand people came to New England in the 1630s; thereafter the flow slowed to a trickle. The natural population increase, however, caused the number of towns in Massachusetts to grow from twenty-one in 1641 to thirty-three by 1647." *Id.*

[55] *See* 1 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, *supra* note 48, at 533 (Connecticut); 2 *id.* at 773 (Georgia); 3 *id.* at 1681 (Maryland); 3 *id.* at 1857 (Massachusetts Bay); 5 *id.* at 2747 (Carolina, later divided into North and South Carolina); 6 *id.* at 3220 (Rhode Island).

Rights, which secured the right of "the subjects which are Protestants [to] have arms for their defence."[56]

All colonies except Pennsylvania required that arms be kept in most homes.[57] In addition to militia statutes, which typically covered males ages 16 to 60, many people not in the militia had to have the same arms as militiamen. As described *infra*, the nonmilitia mandates applied to men exempt from militia duties because of occupation (*e.g.*, doctors), infirmity, or advanced age. Arms possession mandates sometimes applied to heads of households, including women. Besides that, arms carrying was often mandatory, and to comply with a carry mandate, a person at least had to have access to arms.

There were no prohibitions on any particular type of arm, ammunition, or accessory in any English colony that later became an American State. The only restriction in the English colonies involving specific arms was a handgun and knife carry restriction enacted in Quaker-owned East New Jersey in 1686.[58]

Today's New Jersey was once part of New Netherland. New Netherland was not subdivided into different colonies. After the English seized New Netherland from the Dutch in 1664, East Jersey, West Jersey, and New York were created as separate colonies. The 1684 East Jersey restriction on carry was in force at most eight years, and was not carried forward when East Jersey merged with West Jersey in 1702.[59] That law imposed no restriction on the possession or sale of any arms.

---

[56] English Bill of Rights, 1 William & Mary, sess. 2, ch. 2 (1689) ("The subjects which are protestants may have arms for their defence suitable to their conditions and as allowed by law.")

[57] Pennsylvania did not have a militia mandate until the adoption of the 1776 state constitution following Independence. PA. CONST. of 1776, § 5; 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682-1801, at 77 (1903) (enacted 1777). During the French & Indian War, in 1755, the colonial legislature had enacted a statute for voluntary militia companies. 5 *Id.* at 197 (1898).

[58] The East Jersey law forbade the concealed carry of "any Pocket Pistol, Skeines [Irish-Scottish dagger], Stilladoes [stilettos], Daggers or Dirks, or other unusual or unlawful Weapons." Further, no "Planter" (frontiersman) could "Ride or go Armed with Sword, Pistol, or Dagger," except when in government service or if "Strangers" (*i.e.* travelers). 23 THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW-JERSEY 289–90 (1758).

[59]

By 1694, East New Jersey provided that no slave "be permitted to carry any gun or pistol . . . into the woods, or plantations" unless their owner

## B. New Sweden

New Sweden existed from 1638 to 1655. It included parts of the future states of Delaware, New Jersey, Maryland, and Pennsylvania. Its core was the region around the lower Delaware River and the Delaware Valley, which separates New York from New Jersey. The area abounded in excellent locations for trade with Indians. In the course of trading, the colonists often sold firearms and cannons to Indians.

At the time, the Swedish Empire ruled Finland, and Finns constituted a large portion of New Sweden's settlers. A substantial subpopulation of the Finnish settlers were the Savo-Karelians, who, unlike many newcomers to North America, already had extensive experience inhabiting wooded frontiers and trading with indigenous peoples, namely the Lapps. In the New World, the Savo-Karelian Finns learned more woodcraft from the Delaware Indians. "On no other part of the colonial American frontier was such rapid and comprehensive acceptance of Indian expertise in hunting and gathering achieved."[60] The Finns hunted with flintlock rifles and shotguns, and many settlers were capable of manufacturing and repairing their own arms.[61]

We are aware of no law in New Sweden against the possession of any type of arm, ammunition, or accessory. Rather, the New Swedes used modern firearms (flintlocks) and cannons. Having friendly relations with nearby Indians, they traded these arms freely with them.

The Dutch Republic conquered New Sweden in 1655, assimilating it into New Netherland. The Dutch hoped the Swedes would continue to immigrate because "the Swedish people are more conversant with, and understand better

---

accompanied them. [An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 341 (2d ed. 1881)]. If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence. Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey. See 1 Nevill, Acts of the General Assembly of the Province of New-Jersey (1752). At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment. *Bruen*, 142 S. Ct. at 2144.

[60] TERRY G. JORDAN & MATTI E. KAUPS, THE AMERICAN BACKWOODS FRONTIER: AN ETHICAL AND ECOLOGICAL INTERPRETATION 232 (1988).

[61] *See id.* at 222–24.

than any other nation . . . hunting and fowling."[62] When the English gained control of the region a decade later, they too acknowledged the Finns' unique and welcome backwoods expertise.[63]

## C. New Netherland

New Netherland stretched from Cape Henlopen (on the south side of the Delaware Bay) north to Albany, New York, and eastward to Cape Cod (in far southeastern Massachusetts). The colony included parts of present-day New York, New Jersey, Connecticut, and Delaware, in addition to small outposts that the colony claimed in Rhode Island and Pennsylvania.[64] New Netherland was part of the Dutch Republic, an industrial powerhouse that led the world in arms manufacturing. Dutch arms earned a reputation for reliability and affordability, and often made their way to America.[65]

The West India Company—a Dutch chartered company of merchants— founded New Netherland in 1624 and ruled it autocratically. The founding of New Netherland being motivated by commerce, the colonists soon began trading firearms.[66] This caused a problem that would last as long as the colony itself because their customers were often Indians who threatened the colony's existence.[67]

In 1639, "the Director General and Council of New Netherland hav[ing] observed that many persons . . . presumed to sell to the Indians in these parts, Guns, Powder and Lead, which hath already caused much mischief," made it "most expressly forbidden to sell any Guns, Powder or Lead to the Indians, on

---

[62] 2 JOHN R. BRODHEAD, DOCUMENTS RELATIVE TO THE COLONIAL HISTORY OF THE STATE OF NEW-YORK PROCURED IN HOLLAND, ENGLAND, AND FRANCE 242 (E. B. O'Callaghan ed., 1858).

[63] JORDAN & KAUPS, *supra* note 60, at 150.

[64] CHARLES MCLEAN ANDREWS, COLONIAL SELF-GOVERNMENT: 1652–1689, at 74 (1904).

[65] *See* DAVID J. SILVERMAN, THUNDERSTICKS: FIREARMS AND VIOLENT TRANSFORMATION OF NATIVE AMERICA 25 (2016); H. Ph. Vogel, *The Republic as an Arms Exporter 1600-1650*, *in* THE ARSENAL OF THE WORLD: THE DUTCH ARMS TRADE IN THE SEVENTEENTH CENTURY 13–21 (Jan Peit Puype & Macro van der Hoeven eds., B.J. Martens, G. de Vries & Jan Peit Puype trans., 1996) (Dutch edition 1993).

[66] SILVERMAN, *supra* note 65, at 96–98.

[67] *See generally* Shaun Sayres, *"A Dangerous Liberty": Mohawk-Dutch Relations and the Colonial Gunpowder Trade, 1534–1665*, Master's Thesis in History, U. of N.H. (2018), https://scholars.unh.edu/cgi/viewcontent.cgi?article=2173&context=thesis.

pain of being punished by Death."[68] In 1645, having been "informed with certainty, that our enemies [the Indians] are better provided with Powder than we," New Netherland reaffirmed the death penalty for "all persons . . . daring to trade any munitions of War with the Indians," and required vessels to obtain permission to travel with munitions, to ensure that they were not secretly engaging in such trade.[69] This prohibition was renewed in 1648.[70]

New Netherland continued to wrestle with the problem of colonists providing arms to Indians in the 1650s. A 1652 ordinance established another ban on the trading of firearms from "[p]rivate persons" to Indians.[71] But the ordinance "is not among the Records, and seems, indeed, not to have been very strictly enforced."[72] Indeed, in 1653, New Netherland's Directors noted that the colony's Director General had "been obliged . . . to connive somewhat in regard to the" trading ban; they instructed him "to deal herein with a sparing hand, and take good care that through this winking no more ammunition be sold to the Indians than each one has need of for the protection of his house and for obtaining the necessaries of life, so that this cruel and barbarous Nation may not be able, at any time, to turn and employ their weapons against ourselves there."[73] The Director General and his Council did not deal sparingly enough; instead they personally profited from the Indian arms trade, a 1656 law pointed out. [74]

---

[68] LAWS AND ORDINANCES OF NEW NETHERLAND, 1638-1674, at 18–19 (E. B. O'Callaghan ed., 1868).

[69] *Id.* at 47.

[70] *Id.* at 101.

[71] *Id.* at 128.

[72] *Id.*

[73] *Id.*

[74]

> [T]he Director General and Council of New Netherland are to their regret informed and told of the censure and blame under which they are lying among Inhabitants and Neighbors on account of the non-execution of their previously enacted and frequently renewed Edicts . . . some not only presuming that the Director General and Council connive with the violators, but even publicly declaring that the Director General and Council aforesaid have made free the importation and trade in Contraband which, for that reason, is carried on with uncommon licentiousness and freedom.

*Id.* at 236–37.

Consequently, "the previously enacted Edicts against the importation and sale either to Christians or Natives of any kind of Munitions of War" were "revive[d] and renew[ed]," with "the following amplification":

> That henceforth no person, of what nation or quality soever he may be, shall be at liberty to bring into the Country for his own or ship's use any sort of Snaphance or Gunbarrels, finished or unfinished, not even on the Company's permit, save only, according to order, one Carbine, being a firelock of three to three and a half feet barrel and no longer.[75]

In addition to limiting the number of flintlocks colonists could bring into the colony, the law targeted the smuggling of arms by requiring all private ships to submit to searches "both on their arrival and departure."[76]

In 1664, after the Duke of York's English forces conquered New Netherland with ease, New Netherland became the British colony of New York.[77]

The one-flintlock law of 1656 is the only a restriction on a particular type of arm in what would become the original thirteen American states. It was enacted out of desperation at the end of a futile decades-long attempt to restrict gun sales to adversaries who threatened the colony's survival. The law did not ban any colonist from possessing flintlocks or limit how many they could own; it limited the number they could bring into the colony. No English colony enacted a similar restriction. The one-flintlock import limit vanished upon the British takeover of New Netherland.

### D. Arms Mandates in Colonial America

Subsection 1 describes who was required to possess or carry arms. Subsection 2 lists the various types of arms whose possession was mandatory. In colonial America, "the gun was more abundant than the tool. It furnished daily food; it maintained its owner's claims to the possession of his homestead

---

[75] *Id.* Another 1656 law "forb[ade] the admission of any Indians with a gun or other weapon, either in this City or in the Flatland, into the Villages and Hamlets, or into any Houses or any places." *Id.* at 235.

[76] *Id.* at 237–38.

[77] CARL P. RUSSELL, GUNS ON THE EARLY FRONTIERS 10 (1957).

among the aboriginal owners of the soil; it helped to win the mother country's wars for possession of the country as a whole."[78]

## 1. Who was required to keep or bear arms?

The most common age for militia service in the colonies was 16 to 60 years of age. Typical militia statutes required militia-eligible males to own at least one cutting weapon (such as a sword or bayonet) and at least one firearm.[79]

Many colonies also required ownership by people who were *not* in the militia. These included males with occupational exemptions from the militia and males who were too old for militia service.[80] No state authorized female service in the militia, but several—Massachusetts, Maryland, Virginia, New Hampshire, Vermont, and Connecticut—at least sometimes required females to have the same arms as militiamen.[81] Like males who were militia-exempt

---

[78] 1 CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 1 (1910).

[79] *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U.L.J. 495, 533–89 (2019).

[80] For example, Delaware exempted certain occupations from routine militia service, but still ordered them to be armed and ready to serve in an emergency:

> [A]ll Justices of the Peace, Physicians, Lawyers, and Millers, and Persons incapable through Infirmities of Sickness or Lameness, shall be exempted and excused from appearing to muster, except in Case of an Alarm [an attack on the locality]: They being nevertheless obliged, by this Act, to provide and keep by them Arms and Ammunition as aforesaid, as well as others. And if an Alarm happen, then all those, who by this Act are obliged to keep Arms as aforesaid . . . shall join the General Militia.

LAWS OF THE GOVERNMENT OF NEW-CASTLE, KENT AND SUSSEX UPON DELAWARE 176–77 (1741).

[81] In order of enactment:

Maryland: "every housekeeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within *his her or their house* able to bear armes one Serviceable fixed gunne of bastard muskett boare," plus, a pound of gunpowder, four pounds of shot, and firearms ignition accessories. 1 ARCHIVES OF MARYLAND 77 (enacted 1639) (William Hand Browne ed., 1885) (emphasis added).

Virginia: "ALL persons except negroes to be provided with arms and ammunition or be fined at pleasure of the Governor and Council." WILLIAM WALLER HENING, 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 226 (1823) (enacted 1639).

because of age or occupation, armed females were part of their communities' emergency defense. Whenever a small town was attacked, everybody who was able would fight as needed, including women, children, and the elderly.[82]

---

Massachusetts: "all inhabitants." 2 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 134 (Nathaniel B. Shurtleff ed. 1853) (enacted 1645). *Cf. id.* at 99 (requiring arms training for children of both sexes, ages 10–16).

Rhode Island: "that every Inhabitant of the Island above sixteen or under sixty years of age, shall always be provided with a Musket," a pound of gunpowder, twenty bullets, a sword, and other accessories. *Acts and Orders of 1647, in* COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION: A DOCUMENTARY HISTORY 183–84 (Donald S. Lutz ed., 1998).

Connecticut: "all persons that are above the age of sixteene yeares, except magistrates and church officers, shall beare arms . . . ; and every male person within this jurisdiction, above the said age, shall have in continuall readines, a good muskitt or other gunn, fitt for service, and allowed by the clark of the band." 1 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 542–43 (J. Hammond Trumbull ed., 1850) (enacted 1650).

New Hampshire: every "Householder" to have musket, bandoliers, cartridge box, bullets, powder, cleaning tools, and a sword. 2 LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD 285 (Albert Stillman Batchellor ed., 1904) (enacted 1718).

Vermont: "every listed soldier and other householder" must have a firearm, a blade weapon, gunpowder, bullets, and cleaning equipment. VERMONT STATE PAPERS, BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT; TOGETHER WITH THE JOURNAL OF THE COUNCIL OF SAFETY, THE FIRST CONSTITUTION, THE EARLY JOURNALS OF THE GENERAL ASSEMBLY, AND THE LAWS FROM THE YEAR 1779 TO 1786, INCLUSIVE 307 (1823).

[82] *See* STEVEN C. EAMES, RUSTIC WARRIORS: WARFARE AND THE PROVINCIAL SOLDIERS ON THE NEW ENGLAND FRONTIER, 1689-1748, at 28–29 (2011).

As *Heller* observed, "Many colonial statutes required individual arms-bearing for public-safety reasons."[83] Colonies required arms carrying to attend church,[84] public assemblies,[85] travel,[86] and work in the field.[87]

The carry mandates referred to a "man" or "he," except in Massachusetts, which mandated carry by any "person."[88] They did not require that the individual carry of a specific type of firearm, and sometimes allowed a sword instead of a firearm. Nor did they require that the carrier personally own the firearm; the statutes presumed that a person engaged in the listed activities would have ready access to a firearm.

---

[83] *Heller*, 554 U.S. at 601.

[84] Proceedings of the Virginia Assembly, 1619, in LYON GARDINER TYLER, NARRATIVES OF EARLY VIRGINIA, 1606-25, at 273 (1907) (enacted 1619); 1 HENING, *supra* note 81, at 198 (1632); VIRGINIA LAWS 1661-1676, at 37 (1676) (enacted 1665); THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 102 (William Brigham ed., 1836) (enacted 1656) (Apr. 1 through Nov. 30, militiamen only); *id.* at 115 (1658) (changing Apr. 1 to Mar. 1); *id.* at 176 (1675) (year-round); 3 ARCHIVES OF MARYLAND, *supra* note 81, at 103 (1642); 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 95–96 (J. Hammond Trumbull ed. 1850) (enacted 1643); RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649, at 131–32 (Charles J. Hoadly ed., 1857) (enacted 1644) (New Haven was a separate colony from Connecticut until 1662); DAVID J. MCCORD, 7 STATUTES AT LARGE OF SOUTH CAROLINA 417–19 (1840) (enacted 1740, re-enacted 1743) (militiamen only); 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA, Part 1, at 137–40 (Allen D. Candler ed., 1904) (enacted 1770, militiamen only).

[85] 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (Nathaniel B. Shurtleff ed., 1853) (enacted 1637); 2 *id.* at 38 (1638 repeal of 1637 law; replaced in 1643 with instruction for each town's militia head to "appoint what armes to bee brought to the meeting houses on the Lords dayes, & other times of meeting."); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (John Russell Bartlett ed., 1856) (enacted 1639) ("none shall come to any public Meeting without his weapon").

[86] 1 HENING, *supra* note 81, at 127 (Virginia, 1623); *id.* at 173 (1632); 1 MASS. BAY RECS. at 85 (1631, travel to Plymouth); *id.* at 190 (1636) ("travel above one mile from his dwelling house, except in places wheare other houses are neare together"); 1 RECORDS OF THE COLONY OF RHODE ISLAND at 94 (1639) ("noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword"); 3 ARCHIVES OF MARYLAND at 103 (1642) ("any considerable distance from home").

[87] 1 HENING, *supra* note 81, at 127 (Virginia, 1624); *id.* at 173 (1632).

[88] 1 Mass. Bay Recs. at 190 (1637, meetings), repealed the next year, 1 Mass. Bay Recs. at 190; 1 *id.* at 85 (travelers, 1631), 1 *id.* at 190 (travelers, 1636).

## 2. Types of mandatory arms

The statutes that required the keeping of arms—by all militia and some nonmilitia—indicate some of the types of arms that were so common during the colonial period that it was practical to mandate ownership. Collectively, the colonial statutes mandated ownership of a wide range of arms.

We will list the different types of mandated arms, starting with cutting weapons.

### Knives, swords, and hatchets

- *Backsword.*[89] "A kind of sabre. A sword having a straight, or very slightly curved, single-edged blade."[90]
- *Bayonet.*[91] A knife attached to the muzzle of a gun.[92]
- *Broad Sword.*[93] "A sword with a straight, wide, single-edged blade. It was the military sword of the 17th century" and "also the usual weapon of the common people."[94]

---

[89] 2 BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, Part 2, at 14 (Arthur Vollmer ed., 1947) (Connecticut 1650).

[90] STONE, *supra* note 14, at 84 ("Back Sword").

[91] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 176, 177 (1775), 205 (1775), 256 (1784); Part 3 (Delaware), at 28 (1785); Part 4 (Georgia), at 7 (1755, 57 (1765), 80 (1773), 122 (1778); Part 5 (Maryland), at 102 (1756); Part 6 (Massachusetts), at 200 (1758), 223 (1776); 231 (1776-7); 246 (1781); Part 7 (New Hampshire), at 82 (1776), 104, 105 (1780), 116 (1780); Part 8 (New Jersey), at 12 (1713), 16 (1722), 20 (1730), 25, 26, 27 (1746), 33, 34, 37 (1757), 41 (1777), 64 (1779), 70 (1781); Part 9 (New York), at 267 (1778), 271 (1778), 311 (1782), 326 (1783); Part 12 (Rhode Island), at 37 (1705), 39 (1718), 90 (1767), 99 (1774), 184 (1781), 197 (1781), 201 (1781), 203 (1781), 204, 206 (1793), 217, 219 (1798); Part 13 (South Carolina), at 9 (1703), 24 (1721), 40 (1747), 67 (1778); Part 14 (Virginia), at 78 (1723), 105 (1738), 146, 150 (1755), 206, 210 (1757), 258, 274, 277 (1775), 306 (1775), 322, 323 (1777).

[92] *See* STONE, *supra* note 14, at 107 ("Bayonet").

[93] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 8 (New Jersey), at 81 (1781); Part 9 (New York), at 311 (1782); Part 10 (North Carolina, at 21 (1756), 29 (1760), 35 (1764), 42 (1766), 52 (1774).

[94] STONE, *supra* note 14, at 150–51.

- *Cutlas, Cutlass, Cutlace*.[95] "A broad curving sword; a hanger; used by soldiers in the cavalry, by seamen, etc."[96]
- *Cutting-Sword*.[97] A category of "short, single-edged" swords, which included cutlasses and hangers.[98]
- *Hanger*.[99] "A short broad sword, incurvated towards the point."[100]
- *Hatchet*.[101] "A small ax with a short handle, to be used with one hand."[102] A popular substitute for a sword.[103]
- *Jack-knife*.[104] A folding pocket-knife, with blades ranging from three to twelve inches.[105]

---

[95] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 131 (1741); Part 8 (New Jersey), at 41, 45 (1777); Part 10 (North Carolina), at 11 (1746), 39 (1766), 49 (1774); Part 13 (South Carolina), at 68 (1778).

[96] 1 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated) ("Cutlas"); *see also* STONE, *supra* note 14, at 198 ("a family of backswords.")

[97] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 6 (Massachusetts), at 223 (1776), 231 (1776-7); Part 14 (Virginia), 78 (1723), 105 (1738), 145, 146 (1755), 150, 151 (1755), 211 (1757).

[98] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 79–80.

[99] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 4 (Georgia), at 122 (1778); Part 5 (Maryland), at 91 (1756); Part 7 (Maryland), at 105 (1780); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 227 (1764), 243 (1772), 252 1775); Part 10 (North Carolina), at 10 (1746), 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 12 (Rhode Island), at 204, 206 (1793), 217 (1798).

[100] 1 WEBSTER, *supra* note 96, (unpaginated).

[101] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 4 (Georgia), at 7, 35 (1755), 69 (1765), 80, 109 (1773), 122 (1778); Part 6 (Massachusetts), at 133 (1689), 199 (1758), 223 (1776), 231 (1776-7); Part 7 (New Hampshire); 31 (1692), 82 (1776), 117 (1780); Part 8 (New Jersey), at 10 (1693); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24 (1721), 40, 52 (1747).

[102] 1 WEBSTER, *supra* note 96, (unpaginated).

[103] *See* PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 87–88.

[104] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 6 (Massachusetts), at 223 (1776); Part 7 (New Hampshire), at 82 (1776).

[105] GEORGE G. NEUMANN, SWORDS & BLADES OF THE AMERICAN REVOLUTION 231 (3d ed. 1991).

- *Rapier*.[106] "A sword especially designed for thrusting and provided with a more or less elaborate guard."[107]
- *Scabbards*.[108] "The sheath of a sword."[109]
- *Scimeter, scymiter, simeter, semeter, cimeter*.[110] "The strongly curved Oriental sabre."[111]
- *Sword*.[112] "An offensive weapon worn at the side, and used by hand either for thrusting or cutting."[113]
- *Tomahawk*.[114] "An Indian hatchet."[115]

---

[106] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702).

[107] STONE, *supra* note 14, at 524–26.

[108] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 6 (Massachusetts), at 200 (1758), 223 (1776), 246 (1781), 263 (1789); Part 7 (New Hampshire), at 82 (1776), 104 (1780).

[109] 2 WEBSTER, *supra* note 96, (unpaginated).

[110] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 14 (Virginia), at 59 (1701).

[111] STONE, *supra* note 14, at 545 ("Scymiter, Scimeter"). "Guard" means a handguard, a barrier between the handle and the blade.

[112] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 5 (1638), 12 (1650), 18 (1658), 28 (1673), 30 (1673), 44 (1677), 46 (1687), 60, 61, 63 (1702), 92, 94, 95 (1715), 123, 124, 129 (1741), 131, 138 (1741), 150, 151, 156 (1754), 256 (1784); Part 4 (Georgia), at 57 (1765), 80 (1773), 122 (1778); Part 5 (Maryland), at 6 (1638), 17 (1678), 25 (1681), 32 (1692), 39 (1695), 42 (1699), 51 (1704), 66 (1715), 91 (1756); Part 6 (Massachusetts), at 21 (1643), 25 (1643), 29 (1645), 39 (1647), 59 (1649), 68 (1658), 86, 91 (1671), 100, 105 (1672), 129 (1685), 133 (1689), 139 (1693); Part 7 (New Hampshire), at 12, 13 (1687), 31 (1692), 52 (1718), 82 (1776), 105 (1780); Part 8 (New Jersey), at 5 (1675); 8 (1682), 12 (1713), 16 (1722), 20 (1730), 25, 27, 30 (1746), 33, 35, 37 (1757), 41, 45 (1777); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 52, 53 (1702), 80 (1721), 89, 90 (1724), 116 (1739), 118 (1739), 134 (1743), 148, 150 (1744), 164, 165 (1746), 188 (1755), 227, 229 (1764), 243, 245 (1772), 252, 255 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 7 (1715), 10, 13 (1746), 19 (1754), 26 (1760), 32 (1764), 39 (1766), 49 (1774), 123 (1781); Part 11 (Pennsylvania), at 10, 14 (1676), 16 (1676); Part 12 (Rhode Island), at 3 (1647), 26 (1701), 34, 37 (1705), 42 (1718), 90, 95 (1767), 204, 206 (1793), 217, 219 (1798); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24, 31 (1721), 40 (1747); Part 14 (Virginia), at 48 (1684), 50 (1684), 65, 66 (1705), 211 (1757), 277 (1775), 322 (1777), 424 (1784).

[113] 2 WEBSTER, *supra* note 96, (unpaginated).

[114] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 6 (Massachusetts), at 223 (1776), 231 (1776-7); Part 7 (New Hampshire), at 82 (1776); Part 8 (New Jersey), at 41 (1777), 70 (1781); 10 (North Carolina), at 57 (1777), 62 (1777), 69 (1778); Part 13 (South Carolina), at 68 (1778); Part 14 (Virginia), at 274 (1775), 322 (1777).

[115] 2 WEBSTER, *supra* note 96, (unpaginated).

*Pole arms*

- *Halberd, Halbard, Halbart*.[116] "[A] polearm bearing an axehead balanced by a break or fluke and surmounted by a sharp point."[117]
- *Half-Pike*.[118] "A small pike carried by officers."[119]
- *Lance*.[120] "A spear, an offensive weapon in form of a half pike, used by the ancients and thrown by the hand. It consisted of the shaft or handle, the wings and the dart."[121]
- *Partisan*.[122] "A broad-bladed pole arm usually having short, curved branches at the base of the blade."[123]
- *Pike*.[124] "A military weapon consisting of a long wooden shaft or staff, with a flat steel head pointed; called the spear."[125]

---

[116] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 14 (Virginia), at 151 (1755), 211 (1757). Some towns and counties were required to provide halberds. *See e.g.*, BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 3 (Delaware), at 5 (1741), 14 (1756), 22 (1757); Part 6 (Massachusetts), at 49 (1653), 68 (1658), 80 (1669), 88 (1671), 102 (1672), 130 (1685), 135 (1690), 143 (1693), 168 (1738), 170 (1742), 201 (1758); Part 7 (New Hampshire), at 57 (1718); Part 11 (Pennsylvania), at 12 (1676); Part 14 (Virginia), at 277 (1775).

[117] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 93; *see also* STONE, *supra* note 14, at 275 ("Halbard, Halbart, Halberd").

[118] THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, FROM 1665 TO 1678, at 208 (J. Hammond Trumbull ed., 1852) (1673 Connecticut); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 7 (New Hampshire), at 105 (1780).

[119] 1 WEBSTER, *supra* note 96, (unpaginated).

[120] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 52 (1702).

[121] 2 WEBSTER, *supra* note 96, (unpaginated).

[122] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 14 (Virginia), at 151 (1755).

[123] STONE, *supra* note 14, at 484 ("Partizan").

[124] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 25 (1666), 46 (1687); Part 6 (Massachusetts), at 22 (1643), 86 (1671), 100 (1672); Part 9 (New York), at 4 (1694), 16 (1691), 53 (1702).

[125] 2 WEBSTER, *supra* note 96, (unpaginated).

- *Spontoon, Espontoon.*[126] A six-foot-long pole arm.[127] Sometimes "spontoon" was used interchangeably with "half-pike," but "spontoon" sometimes described a more decorative type.[128]

*Firearms*

- Bastard muskets[129] "In military affairs, bastard is applied to pieces of artillery which are of an unusual make or proportion."[130] Bastard muskets were shorter and lighter than typical muskets.
- *Caliver.*[131] "A kind of handgun, musket or arquebuse."[132]
- *Carbine.*[133] "A short gun or fire arm, carrying a ball of 24 to the pound, borne by light horsemen, and hanging by a belt over the left shoulder. The barrel is two feet and a half long, and sometimes furrowed."[134]

---

[126] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 7 (New Hampshire), at 105 (1780); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 14 (Virginia), at 424 (1784).

[127] *See* NEUMANN, *supra* note 105, at 191.

[128] *See* PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 286–87.

[129] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 30 (1673), 60 (1702); 92 (1715); Part 5 (Maryland), at 6 (1638); Part 6 (Massachusetts), at 41 (1647), 45 (1647), 56 (1660), 86 (1671), 129 (1685), 139 (1693); Part 7 (New Hampshire), at 52 (1718).

[130] 1 WEBSTER, *supra* note 96, (unpaginated).

[131] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 30 (1673); Part 6 (Massachusetts), at 124 (1677).

[132] 2 WEBSTER, *supra* note 96, (unpaginated).

[133] 2 The Public Records of the Colony of Connecticut, From 1665 to 1678, at 207 (J. Hammond Trumbull ed., 1852) (1673 Connecticut); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 28 (1673), 30 (1673), 46 (1687)**,** 57 (1696), 60 (1702), 92 (1715), 124 (1741), 131 (1741), 151 (1754), 202 (1775); Part 5 (Maryland), at 17 (1678), 25 (1681), 32 (1692), 39 (1695), 42 (1699), 51 (1704), 66 (1715), 91 (1756); Part 6 (Massachusetts), at 59 (1660), 91 (1671), 105 (1672), 116 (1675), 132 (1685), 139 (1693); Part 7 (New Hampshire), at 13 (1688), 52 (1718); Part 8 (New Jersey), at 30 (1746), 45 (1777); Part 9 (New York), at 5 (1694), 16 (1691), 47 (1710), 53 (1702), 80 (1721), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 21 (1756), 29 (1760), 35 (1764), 42 (1766), 52 (1774), 75 (1778); Part 11 (Pennsylvania), at 14, 16 (1676); Part 12 (Rhode Island), at 29 (1701), 45 (1730), 95 (1767); Part 13 (South Carolina), at 31 (1721); Part 14 (Virginia), at 50 (1684), 65, 66 (1705), 78 (1723), 105 (1738), 145 (1755).

[134] 1 WEBSTER, *supra* note 96, (unpaginated).

- Case of pistols.[135] Handguns were often sold in matched pairs. A "case of pistols"—sometimes called a "brace of pistols"—is such a pair.[136]
- *Firelock*.[137] "A musket, or other gun, with a lock, which is discharged by striking fire with flint and steel."[138] Today, commonly called a flintlock. As of the late eighteenth, all modern firearms were flintlocks.
- *Fowling piece*.[139] "A light gun for shooting fowls."[140]
- *Fusee, fuse, fuze, fuzee, fusil*.[141] "[A] light, smoothbore shoulder arm of smaller size and caliber than the regular infantry weapon."[142]

---

[135] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 46 (1687), 92 (1715), 131 (1741), 151 (1754), 256 (1784); Part 6 (Massachusetts), at 139 (1693); Part 8 (New Jersey), at 30 (1746); 45 (1777); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 188 (1755), 227 (1764), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 13 (1746), 21 (1756), 29 (1760), 35 (1764), 42 (1766), 52 (1774), 75 (1778); Part 12 (Rhode Island), at 45 (1730); Part 14 (Virginia)), at 65, 66 (1705), 78 (1723), 105 (1738), 145, 150 (1755).

[136] Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 WILLAMETTE L. REV. 699, 709, 719 (2008).

[137] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 18 (1656), 60 (1702), 92 (1715), 123, 129 (1741), 131, 138 (1741), 150, 156 (1754), 236 (1780); Part 3 (Delaware), at 2, 3 (1741), 28 (1785); Part 5 (Maryland), at 6 (1638), 102 (1756); Part 6 (Massachusetts), at 25 (1643), 124 (1677), 139 (1693), 255 (1781); Part 7 (New Hampshire), at 52 (1718), 116 (1780); Part 8 (New Jersey), at 5 (1675), 8 (1682); Part 9 (New York), at 267 (1778), 271 (1778), 282 (1779), 287 (1780), 310 (1782), 326 (1783); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 14 (Virginia), at 65 (1705), 78 (1723), 146, 150 (1755), 206, 211 (1757), 274 (1775), 322 (1777).

[138] 1 WEBSTER, *supra* note 96 (unpaginated).

[139] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 4 (Georgia), at 146 (1784).

[140] 1 WEBSTER, *supra* note 96 (unpaginated).

[141] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 3 (Delaware), at 11 (1756), 17 (1757); Part 4 (Georgia), at 146 (1784); Part 7 (New Hampshire), at 105 (1780); Part 8 (New Jersey), at 12 (1713), 16, 18 (1722), 20 (1730), 25, 26, 27 (1746), 33, 35, 37 (1757); Part 9 (New York), at 16 (1691), 46 (1702), 52 (1702), 80 (1721), 90 (1724), 118 (1739), 136 (1743), 150 (1744), 164 (1746), 188 (1755), 229 (1764), 245 (1772), 255 (1775); Part 10 (North Carolina), at 13 (1746); Part 12 (Rhode Island), at 42 (1718), 90 (1767), 99 (1744), 206 (1793), 219 (1798); Part 13 (South Carolina), at 30, 32 (1721); Part 14 (Virginia), at 59 (1701), 65 (1705), 78 (1723), 105 (1738).

[142] GEORGE C. NEUMANN, BATTLE WEAPONS OF THE AMERICAN REVOLUTION 19 (2011).

- *Matchlock*.[143] "[T]he lock of a musket which was fired by a match."[144] The standard firearm of the early seventeenth century. During the century Americans shifted from matchlocks to flintlocks (a/k/a firelocks), which were more reliable and faster to reload.
- *Musket*.[145] "The term 'musket' has always referred to a heavy military gun. In the 16th an 17th century it was a matchlock."[146] "Later the name came to signify any kind of a gun used by regular infantry."[147]
- *Pistol*.[148] "A small fire-arm, or the smallest fire-arm used, differing from a musket chiefly in size. Pistols are of different lengths, and borne by

---

[143] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 8 (1638), 14 (1650), 18, 19 (1656), 30 (1673); Part 5 (Maryland), at 6 (1638); Part 6 (Massachusetts), at 2 (1631), 25 (1643), 29 (1645), 34 (1645), 39 (1647), 86 (1671); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 3 (1647).

[144] 2 WEBSTER, *supra* note 96 (unpaginated).

[145] 2 The Public Records of the Colony of Connecticut, From 1665 to 1678, at 207 (J. Hammond Trumbull ed., 1852) (1673 Connecticut); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 5 (1638), 12 (1650), 28 (1673), 30 (1673), 46 (1687), 60 (1702), 92 (1715), 256 (1784); Part 3 (Delaware), at 2 (1741), 3 (1741), 11 (1756), 17 (1757); Part 4 (Georgia), at 6 (1755), 80 (1773), 146 (1784); Part 5 (Maryland), at 6 (1638); Part 6 (Massachusetts), at 2 (1631), 10 (1634), 25 (1643), 29 (1645), 39 (1646), 45 (1647), 56 (1660), 86 (1671), 116 (1675-6), 124 (1677), 129, 131 (1685), 139 (1693); Part 7 (New Hampshire), at 12 (1687), 52 (1718), 104 (1780); Part 8 (New Jersey), at 25, 27 (1746), 12 (1713), 18 (1722), 20, 23 (1730), 33, 35, 37 (1757), 41 (1777), 64 (1779), 70 (1781); Part 9 (New York), at 16 (1691), 4 (1694), 46 (1702), 52 (1702), 80 (1721), 90 (1724), 117 (1739), 136 (1743), 150 (1744), 164 (1746), 180 (1746), 188 (1755), 229 (1764), 245 (1772), 255 (1775), 271, 273 (1778), 282 (1779), 233 (1780), 310, 311 (1782), 326 (1783); Part 12 (Rhode Island), at 3 (1647), 22 (1677), 26 (1701), 42 (1718), 147 (1779), 184 (1781), 204 (1793), 217 (1798); Part 13 (South Carolina), at 40 (1747), 67 (1778); Part 14 (Virginia), at 59 (1701), 65 (1705), 78 (1723), 105 (1738), 258 (1775), 306 (1775), 312 (1775), 424 (1784).

[146] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 14.

[147] STONE, *supra* note 14, at 461 ("Musquet, Musket"). Stone notes that the musket was originally "a matchlock gun too heavy to be fired without a rest, therefore the smallest of cannon. As many cannon were given the names of birds and animals, this was called a musket, the falconer's name for the male sparrow hawk, the smallest of hawks." *Id.*

[148] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 57 (1696); Part 4 (Georgia), at 74 (1766); Part 5 (Maryland), at 17 (1678), 25 (1681), 32 (1692), 39 (1695), 42 (1699), 51 (1704), 66 (1715), 91 (1756); Part 6 (Massachusetts), at 91 (1671), 105 (1672), 132 (1685); Part 8 (New York), at 81 (1781); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 52, 53 (1702); Part 10 (North Carolina) at 123 (1781); Part 11 (Pennsylvania), at 14, 16 (1676);

horsemen in cases at the saddle bow, or by a girdle. Small pistols are carried in the pocket."[149]

- *Rifle*.[150] "A gun about the usual length and size of a musket, the inside of whose barrel is rifled, that is, grooved, or formed with spiral channels."[151]
- *Snaphaunce*.[152] "During the 17th century, *snaphaunce* commonly referred to any flintlock system."[153]

*Armor*

In the usage of the time, "arms" included missile weapons (*e.g.* guns, bows, cannons), cutting weapons (*e.g.* knives, swords, bayonets), and blunt impact weapons (*e.g.* clubs, slingshots, canes). As *Heller* explained, "arms" also included armor: "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'"[154] Also cited in *Heller*, Samuel Johnson's and Thomas Sheridan's dictionaries defined "arms" as "weapons of offence, or armour of defence."[155] Also cited was the first dictionary

---

Part 12 (Rhode Island), at 29 (1701), 95 (1676), 206 (1793), 219 (1798); Part 13 (South Carolina), at 31 (1721); Part 14 (Virginia), at 59 (1701), 150 (1755), 419 (1782).

[149] 2 WEBSTER, *supra* note 96, (unpaginated).

[150] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 4 (Georgia), at 146 (Georgia 1784); Part 8 (New Jersey), at 41 (1777), 70 (1784); Part 9 (New York), at 310 (1782); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 13 (South Carolina), at 68 (1778); Part 14 (Virginia), at 258 (1775), 274 (1775), 306 (1775), 322 (1777), 425 (1784).

[151] 2 WEBSTER, *supra* note 96, (unpaginated).

[152] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 6 (Massachusetts), at 124 (1677).

[153] NEUMANN, *supra* note 105, at 8; *see also* RICHARD M. LEDERER, JR., COLONIAL AMERICAN ENGLISH 216 (1985) ("snaphance (*n.*) A flintlock.").

[154] *Heller*, 554 U.S. at 581 (quoting 1 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1771)).

[155] 1 SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE 107 (4th ed.); T. SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796) (slightly different capitalization in Sheridan).

of *American* English, by Noah Webster, defining "arms" as "Weapons of offense, or armor for defense and protection of the body."[156]

As described in Part 1.A., England's 1181 Assize of Arms mandated ownership of certain armor and also restricted types of armor by economic class. No armor restrictions existed in America.

- *Breastplate.*[157] "A plate, or set of plates, covering the front of the body from the neck to a little below the waist."[158]
- *Buff coat.*[159] "A heavy leather coat . . . . originally made of buffalo leather."[160] "It was a long skirted coat, frequently without a collar."[161]
- *Corslet.*[162] "Originally it meant leather armor . . . . [l]ater its meaning was strictly plate armor for the body only."[163]

---

[156] 1 WEBSTER, *supra* note 96, (unpaginated).

The *Heller* Court relied on Johnson, Sheridan, and Webster in its analysis of the Second Amendment's text. For Johnson, *see Heller,* 554 U.S. at 581 ("arms"), 582 ("keep"), 584 ("bear"), 597 ("regulate"). For Sheridan, *see id.* at 584 (defining "bear"). For Webster, *see id.* at 581 ("arms"), 582 ("keep"), 584 ("bear"), 595 ("militia").

[157] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 46 (1687); Part 7 (New Hampshire), at 13 (1687); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 227 (1764), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), 29 (1760), 35 (1764), 41–42 (1766), 52 (1774); Part 12 (Rhode Island), 45 (1718), 206 (1793), 219 (1798); Part 14 (Virginia), at 65 (1705), 78 (1723), 105 (1738), 145, 150 (1755).

[158] STONE, *supra* note 14, at 143.

[159] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 6 (Massachusetts), at 78 (1666), 95 (1671), 107 (1672).

[160] STONE, *supra* note 14, at 152.

[161] *Id.*

[162] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 6 (Massachusetts), at 29 (1646), 56 (1660), 86 (1671), 100 (1672); THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY 1665, at 14 (J. Hammond Trumbull ed., 1850) (1637, "Harteford 21 Coslets, Windsor 12, Weathersfeild 10, Agawam 7"); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2, at 7–8 (Connecticut, 1638, "corseletts or cotton coates": Wyndsor (12), Hartford (20), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3); *id.* at 13–14 (Connecticut, 1650, "cotton coates or corseletts": Wyndsor (9), Hartford (12), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3).

[163] STONE, *supra* note 14, at 192 ("Corselet, Corslet").

- *Cotton coat*.[164] "A thick cotton coat which covered part of the arms and thighs, made in one piece," which protected against arrows.[165]
- *Crupper*.[166] "The armor for the hind quarters of a horse."[167]
- *Helmet*.[168] "Generally any headpiece, specifically the open headpiece of the time of the Norman conquest."[169]
- *Pectoral*.[170] "A covering for the breast, either defensive or ornamental."[171]
- *Quilted coat*.[172] "Armor made of several thicknesses of linen, or other cloth, quilted or pour-pointed together."[173]

---

[164] A 1638 act required Connecticut towns to keep "corseletts" or "cotton coates": Wyndsor (12), Hartford (20), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3). BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 7–8. A 1642 act ordered 90 coats "basted with cotton wooll and made defensive against Indean arrowes; Hartford 40, Wyndsor 30, Wethersfield 20." *Id.* at 10. A 1650 act required Connecticut towns to keep "cotton coates" or "corseletts": Wyndsor (9), Hartford (12), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3). *Id.* at 13–14.

[165] Walter Hough, *Primitive American Armor*, *in* ANNUAL REPORT OF THE BOARD OF REGENTS THE SMITHSONIAN INSTITUTION 647 (1895).

[166] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 46 (1687); Part 7 (New Hampshire), at 13 (1687); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 227 (1764), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 29 (1760), 35 (1764), 42 (1766), 52 (1774); Part 12 (Rhode Island), 45 (1718), 206 (1793), 219 (1798); Part 14 (Virginia), at 65 (1705), 78 (1723), 105 (1738), 145, 150 (1755).

[167] STONE, *supra* note 14, at 195 ("Crupper, Croupiere Bacul").

[168] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 256 (1784); Part 6 (Massachusetts), at 29 (1646) ("head peeces"), 56 (1660) ("head peece"), 86 (1671) ("head piece"), 100 (1672) ("head-piece").

[169] STONE, *supra* note 14, at 289.

[170] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 60 (1702).

[171] STONE, *supra* note 14, at 492.

[172] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 6 (Massachusetts), at 78 (1666), 95 (1671), 107 (1672).

[173] STONE, *supra* note 14, at 520 ("Quilted Armor").

*Ammunition*

Of course ammunition and gunpowder were mandatory. While many laws required owning certain quantities of gunpowder and ammunition, some required specific types of ammunition.

- *Buck shot*.[174] Multiple large pellets often used for deer hunting.[175]
- *Swan shot, Goose shot*.[176] "Large shot, but smaller than buckshot, used for hunting large fowl, small game, and occasionally used in battle."[177]

*Accessories*

Mandatory accessories included tools for carrying or loading ammunition, and for cleaning or repairing firearms.

- *Bandoleer*.[178] "A large leathern belt, thrown over the right shoulder, and hanging under the left arm; worn by ancient musketeers for sustaining their fire arms, and their musket charges, which being put into little wooden cases, and coated with leather, were hung, to the number of twelve, to each bandoleer."[179]

---

[174] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 6 (Massachusetts), at 223, 228 (1776); Part 7 (New Hampshire), at 82 (1776).

[175] R.A. STEINDLER, THE FIREARMS DICTIONARY 250 (1970) (the largest shotgun pellets are "small & large buck shot").

[176] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 10 (North Carolina), at 8 (1715), 10 (1746), 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 13 (South Carolina), 68 (1778); Part 14 (Virginia), at 59 (1701).

[177] MARK M. BOATNER III, ENCYCLOPEDIA OF THE AMERICA REVOLUTION 1085 (3d ed. 1994) ("Swan Shot").

[178] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 5 (1650).

[179] 1 WEBSTER, *supra* note 96, (unpaginated) ("Bandoleers").

- *Worm*.[180] A corkscrew-shaped device attached to the end of a ramrod that is used for cleaning and for extracting unfired bullets and other ammunition components from firearms.[181]
- *Horn, Powderhorn*.[182] "A horn in which gunpowder is carried by sportsmen."[183] Most horns came from cattle, rams, or similar animals.[184]
- *Rest*.[185] "A staff with a forked head to rest the musket on when fired, having a sharp iron ferule at bottom to secure its hold in the ground."[186]

---

[180] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 18 (1656), 60 (1702), 92 (1714), 123 (1741), 131 (1741), 150 (1754); Part 3 (Delaware), at 11 (1756), 17, 18 (1757); Part 4 (Georgia), at 7 (1755), 57 (1765), 80 (1773), 122 (1778); Part 6 (Massachusetts), at 25 (1643), 41 (1645), 45 (1647), 56 (1649), 86 (1671), 129 (1685), 139 (1693), 223 (1776), 246 (1781), 263 (1789); Part 7 (New Hampshire), at 52 (1718), 82 (1776), 104 (1780); Part 8 (New Jersey), at 5 (1758), 8 (1758), 41 (1777), 64 (1779), 70 (1781); Part 10 (North Carolina), at 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 147 (1779), 191 (1781); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24 (1721), 40 (1747), 68 (1778).

[181] GEORGE C. NEUMANN & FRANK J. KRAVIC, COLLECTOR'S ILLUSTRATED ENCYCLOPEDIA OF THE AMERICAN REVOLUTION 264 (1975); STEINDLER, *supra* note __, at 278; LEDERER, JR., *supra* note __, at 246 ("wormer").

[182] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 18 (1656), 166 (1758), 169 (1759); Part 4 (Georgia), at 6 (1755), 57, 69 (1765), 80, 109 (1773), 122 (1778), 146 (1784); Part 6 (Massachusetts), at 133 (1689), 199 (1758), 229 (1776), 250 (1781); Part 7 (New Hampshire), at 31 (1692); Part 8 (New Jersey), at 5 (1758), 8 (1682), 12 (1713), 16, 18 (1722), 20, 23 (1730), 25, 27 (1746), 33, 34, 37 (1757); Part 9 (New York), at 271 (1778), 310 (1782); Part 10 (North Carolina), at 57 (1777), 62 (1777), 69 (1778), 101 (1781); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 13 (South Carolina), at 24 (1721), 40 (1747), 52 (1747); Part 14 (Virginia), at 323 (1777).

[183] 1 WEBSTER, *supra* note 96, (unpaginated).

[184] RAY RILING, THE POWDER FLASK BOOK 13 (1953).

[185] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 5 (1638), 12 (1650), 18 (1656); Part 6 (Massachusetts), at 25 (1643), 29 (1645), 86 (1671); Part 5 (Maryland), at 6 (1638); Part 12 (Rhode Island), at 3 (1647).

[186] 2 F. W. FAIRHOLT, COSTUME IN ENGLAND: A HISTORY OF DRESS TO THE END OF THE EIGHTEENTH CENTURY 293 (H. A. Dillon ed., 4th ed. 1910) ("Musket-Rest"); *see also* STEPHEN BULL, ENCYCLOPEDIA OF MILITARY TECHNOLOGY AND INNOVATION 184 (2004) ("[A] forked pole about four feet in length").

- *Shot bag*.[187] This term may refer to a charger or to a bag for carrying bullets.[188]
- *Scourer*.[189] A ramrod.[190]
- *Charger*.[191] A bulb-shaped flask for carrying powder, attached to metal components that release a premeasured quantity of the powder.[192]
- *Priming wire, Picker*.[193] Used to clean the flashpan and the touch hole (the small hole where the fire from the priming pan connected with the main powder charge).[194]

---

[187] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 18 (1656), 166 (1758), 169 (1759); Part 4 (Georgia), at 69 (1765), 80 (1773); Part 9 (New York), at 271 (1778), 310 (1782); Part 10 (North Carolina), at 57 (1777), 62 (1777), 69 (1778), 101 (1781); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 13 (South Carolina), at 24 (1721), 40 (1747); Part 14 (Virginia), at 258, 274 (1775), 306 (1775), 323 (1777).

[188] RILING, *supra* note __, at 256–57, 430–31; JIM MULLINS, OF SORTS FOR PROVINCIALS: AMERICAN WEAPONS OF THE FRENCH AND INDIAN WAR 43–44 (2008).

[189] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 18 (1656); Part 6 (Massachusetts), at 41 (1645), 45 (1647), 86 (1671), 100 (1672); Part 11 (Pennsylvania), at 10 (1676).

[190] CHARLES JAMES, AN UNIVERSAL MILITARY DICTIONARY 791 (4th ed. 1816).

[191] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 18 (1656); Part 7 (New Hampshire), at 31 (1692); Part 11 (Pennsylvania), at 10 (1676).

[192] STONE, *supra* note 14, at 563.

[193] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 18 (1656), 60 (1702), 92 (1715), 123 (1741), 131 (1741), 150 (1754), 256 (1784); Part 3 (Delaware), at 11 (1756), 17, 18 (1757), 28 (1785); Part 4 (Georgia), at 7 (1755), 57 (1765), 80 (1773), 122 (1778); Part 6 (Massachusetts), 41 (1645), 86 (1671), 100 (1672), 129 (1685), 139 (1693), 223 (1776), 246 (1781), 263 (1789); Part 7 (New Hampshire), at 52 (1718), 82 (1776), 104 (1780); Part 8 (New Jersey), at 5 (1675), 41 (1777), 64 (1779), 70 (1781); Part 10 (North Carolina), at 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 147 (1779), 191 (1781), 211 (1793), 230 (1798); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24 (1721), 40 (1747), 68 (1778).

[194] NEUMANN & KRAVIC, *supra* note __, at 264.

- *Cartridge Box.*[195] A box for storing and carrying cartridges.[196]

In America, unlike England, militiamen were never required to own bows and arrows. By the time that immigration to America began, the age of the bow was passing away. Only Massachusetts, which always valued education highly, required girls and boys to be taught archery. A 1645 statute ordered "that all youth within this jurisdiction, from ten years old to the age of sixteen years, shall be instructed . . . in the exercise of arms," including "small guns, half-pikes, bows and arrows &c."[197]

### D. Repeating Arms

Repeating arms, while too expensive to mandate, were available and owned throughout the colonies.[198] In the mid-1600s, many repeaters used a revolving cylinder that was rotated by hand.[199] "Beginning about 1710 commerce brought wealth to some of the merchants in the northern Colonies, and with other

[195] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 2 (Connecticut), at 123 (1741), 131 (1741), 150 (1754); Part 3 (Delaware), at 2, 3 (1741), 11 (1756), 17 (1757), 28 (1785); Part 4 (Georgia), at 6 (1755), 57 (1765), 122 (1778), 146 (1784); Part 6 (Massachusetts), at 131 (1685), 133 (1689), 139 (1693), 223 (1776), 231 (1776), 246 (1781), 255 (1781), 263 (1789); Part 7 (New Hampshire), at 12 (1687), 52 (1718), 82 (1776), 104 1780), 116 (1780); Part 8 (New Jersey), at 8 (1682), 12 (1713), 16, 18 (1722), 20, 22 (1730), 25, 27, 30 (1746), 33, 35, 37 (1757), 41, 45 (1777); Part 9 (New York), at 4 (1694), 16 (1691), 52, 53 (1702), 80 (1721), 90, 91 (1724), 118 (1739), 136 (1743), 150 (1744), 154 (1746), 164 (1746), 180 (1746), 188 (1755), 230 (1764), 245 (1772), 252, 255 (1775), 267 (1778), 271, 273 (1778), 282 (1779), 310, 311 (1782), 326 (1783); Part 10 (North Carolina), at 11 (1746), 19, 21 (1756), 39 (1766), 49 (1774), 101, 108 (1781); Part 12 (Rhode Island), at 206 (1793), 219, 230 (1798); Part 13 (South Carolina), at 9 (1703), 16 (1707), 24 (1721), 40 (1747); Part 14 (Virginia), at 65, 66 (1705), 78 (1723), 105 (1738), 145, 146, 150 (1755), 206, 210 (1757), 274 (1775), 322, 323 (1777), 425 (1784).

[196] RILING, *supra* note __, at 483. "Cartouche" is the French word for "cartridge." Cartouche boxes were used for carrying paper cartridges; these contained the bullet and a measured quantity of gunpowder, wrapped in paper. *Id.*

[197] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 6 (Massachusetts), at 26, 31 (1645).

[198] "A few repeating arms were made use of in a military way in America." 1 SAWYER, *supra* note 78, at 28–29. For example, there is "record that [Louis de Buade de] Frontenac in 1690 astonished the Iroquois with his three and five shot repeaters." *Id.* at 29.

[199] *See, e.g.*, 2 *id.* at 5 (six-shot flintlock); CHARLES EDWARD CHAPEL, GUNS OF THE OLD WEST 202–03 (1961) (revolving snaphance).

luxuries fancy firearms began to be in demand."[200] European repeaters were imported into America.[201] Two New England gunsmiths manufactured Lorenzoni-style firearms.[202] A third, John Pim, also made repeating arms. A 1722 observer of a demonstration of one of Pim's repeaters was impressed, for the gun "loaded but once" "was discharged eleven times following, with bullets, in the space of two minutes, each which went through a double door at fifty yards' distance."[203]

The most common American repeaters of the early 18th century were probably the Lorenzoni variants known as Cooksons.[204] Mimicking the Lorenzoni system, John Cookson of London invented the Cookson repeater in the latter half of the 17th century.[205] A Cookson repeater with a 10-round magazine, "believed to have found its way into Maryland with one of the early English colonists," "form[ed] perhaps the capstone of the collection of arms in the National Museum at Washington, D.C."[206]

A Boston gunsmith also named John Cookson, thought to be related to the English gunsmith of the same name, manufactured repeaters in America. The American Cookson advertised a 9-shot repeater in the Boston Gazette on April 12 and 26, 1756: "made by John Cookson and to be sold at his house in Boston: a handy gun . . . having a Place convenient to hold 9 Bullets, and Powder for 9 Charges and 9 Primings; the said gun will fire 9 Times distinctly, as quick, or as slow as you please . . . ."[207] "[T]his type of repeating flintlock popular in England from the third quarter of the 17th century, was known and manufactured in Massachusetts early in the 18th century."[208]

---

[200] 1 SAWYER, *supra* note 78, at 31.

[201] *See supra* note 38.

[202] PETERSON, THE TREASURY OF THE GUN, *supra* note 29, at 232.

[203] Samuel Niles, A Summary Historical Narrative of the Wars in New England, *in* 5 MASSACHUSETTS HISTORICAL SOCIETY COLLECTIONS, 4th ser., at 347 (1837).

[204] *See* PETERSON, THE TREASURY OF THE GUN, *supra* note 29, at 230 ("Many Americans call[ed] this [Lorenzoni] type of magazine repeater a Cookson because the first such gun to receive attention in this country bore the name of the English gunsmith John Cookson.").

[205] *Id.* at 231–32.

[206] *The Cookson Gun and the Mortimer Pistols*, AMERICAN RIFLEMAN, vol. 63, at 3, 4 (Sep. 29, 1917).

[207] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 215.

[208] *Id.*

In 1777, the Continental Congress ordered one hundred rifles from Joseph Belton,[209] who had informed the Congress that his rifles could "discharge sixteen, or twenty [rounds], in sixteen, ten, or five seconds."[210] Belton demonstrated one such rifle before leading military officers (including General Horatio Gates and Major General Benedict Arnold) and scientists (including David Rittenhouse); they verified that "[h]e discharged Sixteen Balls loaded at one time."[211] The deal fell through when Belton demanded what the Congress deemed "an extraordinary allowance."[212] The Continental Congress simply could not afford to purchase very expensive firearms that required so much high-skill labor to make the intricate parts of a repeater. The U.S. Congress that in 1789 sent the Second Amendment to the States for ratification included men who had served in the Continental Congress, and who were therefore well aware that 16-shot repeaters were possible, albeit very expensive.

Belton later tried to sell his invention to the British. The British had already had their own fast-shooting guns. The Ferguson Rifle "fired six shots in one minute" in a government test on June 1, 1776.[213] The Royal Navy's 1779 Nock volley gun seven barrels (six outer barrels around a center barrel) that fired simultaneously.

When the Second Amendment was ratified, the state-of-the-art repeater was the Girandoni air rifle. It could consecutively shoot 21 or 22 rounds in .46 or .49 caliber, utilizing a tubular spring-loaded magazine.[214] Although an air gun, the Girandoni was ballistically equal to a powder gun.[215] It could take an elk with one shot.[216] At the time, "there were many gunsmiths in Europe producing compressed air weapons powerful enough to use for big game

---

[209] Report of the Continental Congress (May 3, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 324 (Worthington Chauncey Ford ed., 1907).

[210] Letter from Joseph Belton to the Continental Congress (Apr. 11, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, at 123 (1957).

[211] Letter from Joseph Belton to the Continental Congress (Jul. 10, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, *supra* note 210, at 139.

[212] Report of the Continental Congress (May 15, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, *supra* note 209, at 361.

[213] ROGER LAMB, AN ORIGINAL AND AUTHENTIC JOURNAL OF OCCURRENCES DURING THE LATE AMERICAN WAR 309 (1809).

[214] JAMES B. GARRY, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012).

[215] JOHN PLASTER, THE HISTORY OF SNIPING AND SHARPSHOOTING 69–70 (2008).

[216] JIM SUPICA, ET AL., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

hunting or as military weapons."[217] The Girandoni was invented for the Austrian army around 1779; 1,500 were issued to sharpshooters and remained in service for 25 years, including in the Napoleonic Wars.[218] Isaiah Lukens of Pennsylvania manufactured Girandoni rifles,[219] as dud "many makers in Austria, Russia, Switzerland, England, and various German principalities."[220]

Meriwether Lewis is believed to have acquired from Lukens the Girandoni rifle that he famously carried on the Lewis and Clark Expedition.[221] Lewis mentioned it in his journal twenty-two times. Sixteen times, Lewis was demonstrating the rifle to impress various Native American tribes encountered on the expedition—often "astonishing" or "surprising" them,[222] and making the point that although the expedition was usually outnumbered, the smaller group could defend itself.[223]

### E. Cannons

Cannons were manufactured and privately owned in colonial America. When the Quaker-dominated Pennsylvania legislature would not fund a militia in 1747, Benjamin Franklin and some friends arranged a lottery to purchase some cannons and borrowed other cannons from New York.[224] During

---

[217] GARRY, supra note 214, at 91.

[218] GERALD PRENDERGHAST, REPEATING AND MULTI-FIRE WEAPONS 100–01 (2018); GARRY, supra note 214, at 91–94.

As a testament to the rifle's effectiveness, "[t]here are stories that Napoleon had captured air riflemen shot as terrorists, making it hard to recruit men for the air rifle companies." Id. at 92.

[219] Nancy McClure, Treasures from Our West: Lukens Air Rifle, BUFFALO BILL CENTER FOR THE AMERICAN WEST, Aug. 3, 2014, https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/.

[220] GARRY, supra note 214, at 99.

[221] Id.

[222] See e.g., 6 MERIWETHER LEWIS & WILLIAM CLARK, THE JOURNALS OF THE LEWIS & CLARK EXPEDITION at 233 (Gary Moulton ed. 1983) (Jan. 24, 1806, entry) ("My Air-gun also astonishes them very much, they cannot comprehend it's shooting so often and without powder; and think that it is great medicine which comprehends every thing that is to them incomprehensible.").

[223] See generally id. (13 vols.).

[224] 1 JAMES PARTON, LIFE AND TIMES OF BENJAMIN FRANKLIN 267 (1864). The authors thank Clayton Cramer for bringing this example to our attention.

the French and Indian War, Georgia's legislature authorized militia officers to impress privately owned cannons for use by the militia.[225]

On the frontiers, cannons were kept to defend fortified buildings, such against attacks by Indians, the French, or Spanish. In a seaport, the greatest concern might be resistance to bombardment by an enemy fleet.

In December 1774, when tensions with Great Britain were rising towards war, a meeting of "Freeholders and other Inhabitants of the Town," chaired by revolutionary firebrand Samuel Adams, complained that "a Number of Cannon, the Property of a respectable Merchant in this Town were seized & carried off by force" by the British.[226]

As during the French & Indian war, private contributions of cannons to the common cause were necessary. In New Jersey in September 1777, Brigadier-General Forman lent the state militia his personal "three Pieces of Field Artillery." These would establish a militia artillery company.[227]

A Pennsylvania law to disarm "disaffected" persons authorized militia officers to "take from every such person" various weapons. The listed weapons listed were apparently common enough that some members of the public possessed them: "any cannon, mortar, or other piece of ordinance, or any blunderbuss, wall piece, musket, fusee, carbine or pistols, or other fire arms, or any hand gun; and any sword, cutlass, bayonet, pike or other warlike weapon."[228]

In 1783, Boston passed a fire-prevention law forbidding citizens who kept cannons in their home or outbuildings from keeping them loaded with gunpowder.[229] Any "cannon, swivels, mortars, howitzers, cohorns, fire-arms, bombs, grenades, and iron shells of any kind" that were stored loaded with

---

[225] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 89, Part 4 (Georgia), at 24 (1755).

[226] BOSTON GAZETTE, Jan. 2, 1775.

[227] 1776-1777 N.J. Acts 107, ch. 47.

[228] 1779 Pa. Laws 193, sec. 5.

[229] 1783 Mass. Acts 218, ch. 13.

The law also applied to firearms. According to *Heller*, "That statute's text and its prologue, which makes clear that the purpose of the prohibition was to eliminate the danger to firefighters posed by the 'depositing of loaded Arms' in buildings, give reason to doubt that colonial Boston authorities would have enforced that general prohibition against someone who temporarily loaded a firearm to confront an intruder (despite the law's application in that case)." 554 U.S. at 631–32.

gunpowder could be confiscated and "sold at public auction" back to private individuals.[230]

At sea, privately owned cannons were especially important. As long as there had been American vessels, some merchant or other civil ships carried cannons for protection against pirates.

Under longstanding international law, governments during wartime issued letters of marque and reprisal.[231] The letters authorized privately owned ships, *privateers*, to attack and capture the military or commercial ships of the enemy.[232] The captured property (*prizes*) would be divided among the privateer's crew and owners, according to contract. Typically, prizes were put up for auction in a friendly port. A captured ship might be kept by the privateers, or sold.

Naval combat at the time used cannon fire, so anyone issued a letter of marque or reprisal would have to buy a significant numbers of cannons to cannons his civil vessel into a warship for offensive use.

In the American Revolution, the Massachusetts Bay Colony was the first to issue letters of marque and reprisal, in November 1775.[233] The Continental Congress followed suit later that month.[234]

---

[230] *Id.*

[231] To be precise, a letter of marque authorizes the holder to enter enemy territory. A letter of reprisal authorizes the holder to transport a captured prize to the holder's nation.

Cases on letters of marque and reprisal include Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64 (1800); Bas v. Tingy, 4 U.S. (4 Dall.) 37 (1800) (Quasi-War with France); Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116 (1812); The Thomas Gibbons, 12 U.S. (8 Cranch) 421 (1814) (War of 1812); *Prize Cases*, 7 U.S. (2 Black) 635 (1862) (Civil War).

For legal history, a leading survey is Theodore M. Cooperstein, *Letters Of Marque And Reprisal: The Constitutional Law And Practice Of Privateering*, 40 J. MAR. L. & COM. 221 (2009) (including a thorough bibliography of authorities).

[232] *See* ERIC J. DOLIN, REBELS AT SEA: PRIVATEERING IN THE AMERICAN REVOLUTION (2022). Capturing a military ship happened only rarely. A privateer had a much better chance of outgunning an enemy merchant ship.

[233] An Act & Resolve for Encouraging the Fixing out of Armed Vessels, Mass. Gen. Ct., Nov. 1, 1775; DOLIN at 11.

[234] 3 J. Cont. Cong. 373 (Nov. 25, 1775); 4 J. Cont. Cong. 229-30 (Mar. 23. 1776).

During the war, the number of American privateers far exceeded the combined number of warships of the Continental Navy and the State naval militias. Every privateer, by definition, was armed at private expense.[235]

Operating up and down the Atlantic seaboard, in the British West Indies, and even off the West African coast, American privateers were rarely strong enough to engage a British navy warship. Instead, they massively damaged British commercial shipping. The captured prizes—including gunpowder, firearms, and silver—were crucial to the American war effort.[236] The privateers did not win the war by themselves; the war could not have been won without them.[237]

The U.S. Constitution grants Congress the powers to "grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water."[238] The congressional power is predicated on the existence of ships that can be outfitted with privately-purchased cannon, and of small arms for seamen, such as firearms and swords.

---

[235] Acquiring at private expense was achieved by purchase in the United States, often with shareholder financing, or by seizure from enemy vessels.

Privateers frequently sought investors for outfitting a ship, in exchange for a share of the prize. Among such investors were George Washington and Robert Morris. *See* FORREST MCDONALD, WE THE PEOPLE 38, 43 (1968) (Washington); Francis R. Stark, *The Abolition of Privateering and the Declaration of Paris*, in 8 STUDS. IN HIST., ECON. & PUB. L. 343 (1897) (Morris).

[236] Dolin at xix.

[237] In the words of Secretary of the Navy John Lehman (1981–87):

> From the beginning of the American Revolution until the end of the War of 1812, America's real naval advantage lay in its privateers. It has been said that the battles of the American Revolution were fought on land, and independence was won at sea. For this we have the enormous success of the American privateers to thank even more than the continental Navy.

JOHN LEHMAN, ON SEAS OF GLORY, HEROIC MEN, GREAT SHIPS, AND EPIC BATTLES OF THE AMERICAN NAVY 41–42 (New York: The Free Press, 2001).

[238] U.S. CONST., art. I, § 8. Pursuant to the text, the power to grant such letters lies in the federal legislative branch, not the executive, although the former may delegate to the latter. *See* William Young, *A Check on Faint-Hearted Presidents: Letters of Marque and Reprisal*, 66 WASH. & LEE L. REV. 895, 905–06 (2009).

A unified national approach to international war being necessary, the Constitution restricts State international warfare, including issuing letters of marque and reprisal. U.S. CONST., art. I, § 10.

Wartime privateering aside, cannons were outfitted on commercial ships for protection against pirates. A peacetime 1789 newspaper advertisement in Philadelphia touted a store "where owners and commanders of armed vessels may be supplied, for either the use of small arms or cannon, at the shortest notice."[239] The ad was published again in 1799.[240]

The freedom Americans always enjoyed to possess the arms of one's choosing was reflected in Ira Allen's defense when he was seized by British forces in 1796 while transporting 20,000 muskets and 24 "field pieces" (cannons and other artillery) from France to America. Allen said the arms were for Vermont's militia, whereas the British suspected he planning to arm a Canadian revolt against the British. He was prosecuted in Britain's Court of Admiralty. At trial, the idea of one individual possessing 20,000 arms was received with skepticism. Allen retorted that in America, "[a]rms and military stores are free merchandise, so that any who have property and choose to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government."[241] The arms were restored to Allen.[242]

## F. Overview

The Revolution had started when Americans resisted with arms the Redcoats' attempt to confiscate arms at Lexington and Concord on April 19, 1775. Before that, the British had banned the import of firearms and gunpowder into the colonies,[243] prevented Americans from accessing arms

---

[239] Edward Pole, *Military laboratory, at No. 34, Dock street near the Drawbridge, Philadelphia: where owners and commanders of armed vessels may be supplied, for either the use of small arms or cannon, at the shortest notice, with every species of military store*. Phil. ia, 1789, https://www.loc.gov/item/rbpe.1470090a/.

[240] GAZETTE OF THE UNITED STATES, AND PHILADELPHIA DAILY ADVERTISER, July 1, 1799, p.2, https://chroniclingamerica.loc.gov/lccn/sn83025881/1799-07-01/ed-1/seq-2/.

[241] IRA ALLEN, PARTICULARS OF THE CAPTURE OF THE OLIVE BRANCH, LADEN WITH A CARGO OF ARMS 403–04 (1798).

[242] *Id.*

[243] King George III imposed an embargo on arms and gunpowder imports on October 19, 1774. 5 ACTS OF THE PRIVY COUNCIL OF ENGLAND, COLONIAL SERIES, A.D. 1766-1783, at 401 (Burlington, Can.: TannerRitchie Pub., 2005) (James Munro & Almeric Fitzroy eds., 1912). Secretary of State Lord Dartmouth sent a letter that day "to the Governors in America,"

stored in town magazines,[244] and confiscated arms and ammunition.[245] During the Revolution the British government devised a plan for the permanent disarmament of the Americans after an American surrender.[246]

announcing "His Majesty's Command that [the governors] do take the most effectual measures for arresting, detaining, and securing any Gunpowder, or any sort of arms and ammunition, which may be attempted to be imported into the Province under your Government. . . ." Letter from Earl of Dartmouth to the Governors in America, Oct. 19, 1774, *in* 8 DOCUMENTS RELATIVE TO THE COLONIAL HISTORY OF THE STATE OF NEW YORK 309 (1857). The order, initially set to expire after six months, was "repeatedly renewed, remaining in effect until the Anglo-American peace treaty in 1783." David B. Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 297 (2012).

[244] For example, Massachusetts's Royal Governor Thomas Gage "order'd the Keeper of the Province's Magazine not to deliver a kernel of powder (without his express order) of either public or private property. . . ." JOHN ANDREWS, LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON 19–20 (Winthrop Sargent ed., 1866); *id.* at 39 ("a Guard of soldiers is set upon the Powder house at the back of ye. Common, so that people are debar'd from selling their own property."); Letter from Thomas Gage to Earl of Dartmouth, Nov. 2, 1774, *in* 1 AMERICAN ARCHIVES, 4th ser., at 951 (Peter Force ed., 1843) (Gage stating that he issued "an order to the Storekeeper not to deliver out any Powder from the Magazine, where the Merchants deposit it.").

[245] *See* O.W. Stephenson, *The Supply of Gunpowder in 1776 in* 30 THE AMERICAN HISTORICAL REVIEW 272 (J. Franklin Jameson ed., 1925) ("Within a few hours of the time when the minute-men faced the redcoats on Lexington green and at Concord bridge, Governor Dunmore, down in Virginia, laid hold of the principal supplies in the Old Dominion."); Brown, *supra*, at 298 ("the American Revolution was nearly precipitated in Virginia on the night of April 20–21[, 1775], for in Williamsburg Gov. Dunmore had ordered the Royal Marines to remove the colony gunpowder supply from the magazine. As in Massachusetts the plan was discovered and the militia called to arms. . . . Lord Dunmore . . . placated the irate populace by making immediate restitution for the powder."). The British had wanted to confiscate arms door-to-door, but Governor Gage deemed it too dangerous a proposition. Extract of a Letter from Governor Gage to the Earl of Dartmouth, Dec. 15, 1774, *in* 1 AMERICAN ARCHIVES, *supra* note 244, 4th. Ser., at 1046 ("Your Lordship's idea of disarming certain Provinces, would doubtless be consistent with prudence and safety; but it neither is or has been practicable, without having recourse to force, and being master of the Country.").

[246] Colonial Under Secretary of State William Knox presented the plan to disarm Americans:

> The Militia Laws should be repealed and none suffered to be re-enacted, & the Arms of all the People should be taken away . . . nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence.

45

Naturally, after facing the threat of disarmament and thus certain destruction, America's Founders were extremely protective of the right to arms. Before, during, and after the Revolution, no state banned any type of arm, ammunition, or accessory. Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787.[247] Instead, the discussions about arms during the ratification of the Constitution and the Bill of Rights centered on ensuring that the people had enough firepower to resist a tyrannical government. There is no evidence that any of the Founders were concerned about individuals having too much firepower. After a long, grueling war against the world's strongest military, limiting individuals' capabilities was not a concern.

Americans' hostility to any limit on their ability to resist a tyrannical government was demonstrated by their response to a Pennsylvania order—issued while the States were debating the Constitution—directing lieutenants of the militia "to collect all the public arms" to "have them repaired" and then reissued.[248] "Public arms" were firearms owned by a government and given to militiamen who could not afford to purchase a firearm themselves.[249]

---

William Knox, *Considerations on the Great Question, What Is Fit to be Done with America, Memorandum to the Earl of Shelburne*, *in* 1 SOURCES OF AMERICAN INDEPENDENCE: MANUSCRIPTS FROM THE COLLECTIONS OF THE WILLIAM L. CLEMENTS LIBRARY 176 (Howard Peckham ed., 1978).

[247] As far as we know, only one person has ever claimed the contrary. That person is President Joseph Biden, who has repeatedly stated that when the Second Amendment was ratified, people could not possess cannons. He has repeated the claim despite repeated debunking by factcheckers. *See* Glenn Kessler, *Biden's False Claim that the 2nd Amendment Bans Cannon Ownership*, WASHINGTON POST, June 28, 2021, https://www.washingtonpost.com/politics/2021/06/28/bidens-false-claim-that-2nd-amendment-bans-cannon-ownership/; D'Angelo Gore, *Biden Repeats False Claims at Gun Violence Meeting*, FACTCHECK.ORG, Feb. 7, 2022, https://www.factcheck.org/2022/02/biden-repeats-false-claims-at-gun-violence-meeting/; Louis Jacobson, *Joe Biden's dubious claim about Revolutionary War cannon ownership*, POLITIFACT, June 29, 2020, https://www.politifact.com/factchecks/2020/jun/29/joe-biden/joe-bidens-dubious-claim-about-revolutionary-war-c/.

[248] 33 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 739 (John Kaminski et al. eds., 2019).

[249] David B. Kopel & Stephen P. Halbrook, *Tench Coxe and the Right to Keep and Bear Arms in the Early Republic*, 7 WM. & MARY BILL RTS J. 347 (1999) (describing public arms programs of the Jefferson and Madison administrations).

Pennsylvanians fiercely opposed the recall. Even though militiamen were free to acquire whatever personal arms they could afford, they denounced the order as "a temporary disarming of the people."[250] They suggested that "our Militia . . . may soon be called to defend our sacred rights and privileges, against the despots and monarchy-men" who supported the order.[251]

Because "the people were determined not to part with" and "refused to deliver up the arms," the Pennsylvania government "cancelled the order."[252] If the people threatened armed resistance to the government's attempt to temporarily recover its own arms, an attempt to ban any privately owned arms would have been met with even greater opposition.

Firearms and cutting weapons were ubiquitous in the colonial era, and a wide variety existed of each. Repeating arms and cannons were freely owned by those who could afford them. The historical record up to 1800 provides no support for general prohibitions on any type of arms or armor.

## III. Nineteenth Century Advances in Arms

This Part describes how the nineteenth century brought the greatest advances in firearms before or since. The century began with the single-shot muzzleloading blackpowder muskets and ended with semiautomatic pistols employing detachable magazines and centerfire ammunition with modern smokeless powder. Then Part IV will examine the lawmaking response to those changes, which was very small.

Here in Part III the technological changes are summarized. Many of the advances detailed below had already been invented long before 1791, as described in Parts I.B. and II.D. But firearms incorporating these advances were quite expensive. Compared to single-shot firearms, repeating firearms require closer fitting of their more intricate parts. As of 1750, firearms

---

[250] An Old Militia Officer of 1776, Philadelphia Independent Gazetteer, Jan. 18, 1788, *in* 33 Documentary History, *supra* note 248, at 740.

[251] Philadelphia Freeman's Journal, Jan. 23, 1788, *in* 33 Documentary History, *supra* note 248, at 741.

[252] Philadelphia Independent Gazetteer, Apr. 30, 1788, *in* 34 Documentary History, *supra* note 248, at 1266.

manufacture was a craft industry.[253] Firearms were built one at time by a lone craftsman or perhaps in a workshop.[254] The labor cost of building an advanced firearm was vastly higher than for a one-shot musket, rifle, or handgun.[255]

Advanced firearms were made possible by the American industrial revolution. That revolution created machine tools—tools that make other tools.[256] Thanks to machine tools, the number of human labor hours to manufacture advanced firearms plunged, while machinists prospered.[257]

### A. James Madison and James Monroe, the founding fathers of modern firearms

U.S. Representative James Madison is well-known as the author of the Second Amendment and the rest of the Bill of Rights. What is not well-known is how his presidency put the United States on the path to mass production of high-quality affordable firearms.

Because of weapons procurement problems during the War of 1812, President Madison's Secretary of War James Monroe (who would later succeed Madison as President) proposed a program for advanced weapons research and production at the federal armories, which were located in Springfield, Massachusetts, and Harpers Ferry, Virginia. The Madison-Monroe program was to subsidize technological innovation.[258] It was enthusiastically adopted with the support of both the major parties in Congress: the Madison-Monroe

---

[253] JOHNSON ET AL., *supra* note 16, at 2210. Some of this Part is based on *The Evolution of Firearms Technology from the Sixteenth Century to the Twenty-first Century*, which is Chapter 23 in JOHNSON ET AL., *supra* note 16. Much more detail about the technological developments described in this Part is presented in that chapter, available online at http://firearmsregulation.org/www/FRRP3d_CH23.pdf.

[254] *Id.*

[255] *Id.* at 2199.

[256] *Id.* at 2208–14.

[257] *See* FELICIA JOHNSON DEYRUP, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870, at 217 app'x A, tbl. 1 (1948) (from 1850 to 1940, average annual wages in the arms industry always exceeded wages in overall U.S. industry, sometimes by large margins).

[258] ROSS THOMSON, STRUCTURES OF CHANGE IN THE MECHANICAL AGE: TECHNOLOGICAL INNOVATION IN THE UNITED STATES 1790-1865, at 54-59 (2009).

Democratic-Republicans, and the opposition Federalists.[259] Generous federal arms procurement contracts, had long lead times and made much of the payment up-front, so that manufacturers could spend several years setting up and perfecting their factories.[260] The program succeeded beyond expectations, and helped to create the American industrial revolution.

## B. The American system of manufacture

The initial objective was interchangeability, so that firearms part damaged in combat could be replaced by functional spare parts. If there are two damaged firearms found after a battle, and their parts could be combined into one functional firearm, that was the first step. After that would come higher rates of factory production. And after that, it was hoped, production at lower cost than artisanal production. Achieving these objectives for the more intricate and closer-fitting parts of repeating firearms would be even more difficult.

To carry out the federal program, the inventors associated with the federal armories first had to invent machine tools. Consider for example, the wooden stock of a long gun. The back of the stock is held against the user's shoulder. The middle of the stock is where the action is attached. (The action is the part of the gun containing the moving parts that fire the ammunition.) For many guns, the forward part of the stock would contain a groove to hold the barrel. Making a stock requires many different cuts of wood, few of them straight. The artisanal gunmaker would cut with hand tools such as saws and chisels. Necessarily, one artisanal stock would not be precisely the same size as another.

To make stocks faster and more uniformly, Thomas Blanchard invented 14 different machine tools. Each machine would be set up for one particular cut. As the stock was cut, it would be moved from machine to machine. By mounting the stock to the machine tools with jigs and fixtures, a manufacturer could ensure that each stock would be placed in precisely the same position in the machine as the previous stock. The mounting was in relation to a bearing — a particular place on the stock that was used as a reference point. To check that the various parts of the firearm, and the machine tools themselves, were

---

[259] JOHNSON ET AL., *supra* note 16, at 2209.

[260] *Id.*

consistent, many new gauges were invented.[261] What Blanchard did for stocks, John H. Hall, of the Harpers Ferry Armory, did for other firearms parts.

Hall shipped some of his machine tools to Simeon North, in Connecticut. In 1834, Hall and North made interchangeable firearms. This was the first time that geographically separate factories had made interchangeable parts.[262]

Because Hall "established the efficacy" of machine tools, he "bolstered the confidence among arms makers that one day they would achieve in a larger, more efficient manner, what he had done on a limited scale. In this sense, Hall's work represented an important extension of the industrial revolution in America, a mechanical synthesis so different in degree as to constitute a difference in kind."[263]

The technological advances from the federal armories were widely shared among American manufacturers. By mid-century, what had begun as the mass production of firearms from interchangeable parts had become globally known as "the American system of manufacture"—a system that encompassed sewing machines, and, eventually typewriters, bicycles, and automobiles.[264]

Springfield, in western Massachusetts on the Connecticut River, had been chosen for the federal armory in part because of its abundance of waterpower and for the nearby iron ore mines. Many private entrepreneurs, including Colt and Smith & Wesson, made the same choice. The Connecticut River Valley became known as the Gun Valley. It was the Silicon Valley of its times, the center of industrial revolution.[265]

## C. The revolution in ammunition

The gunpowder charge in a gun's firing chamber must be ignited by a primer. Before 1800, the primer was a small quantity of gunpowder in the gun's firing pan. The gunpowder in the firing pan was connected to the main powder charge in the firing chamber via a small opening, the touch-hole. In a flintlock, the priming powder in the firing pan is ignited by a shower of sparks from flint

---

[261] DEYRUP, *supra* note 257, at 97–98; THOMSON, *supra* note 258, at 56–57.

[262] THOMSON, *supra* note 258, at 58; MERRITT ROE SMITH, HARPERS FERRY ARMORY AND THE NEW TECHNOLOGY: THE CHALLENGE OF CHANGE 212 (1977).

[263] SMITH, *supra* note 262, at 249.

[264] *See, e.g.*, DAVID R. MEYER, NETWORKED MACHINISTS: HIGH-TECHNOLOGY INDUSTRIES IN ANTEBELLUM AMERICA 81–84, 252–62, 279–80 (2006).

[265] *Id.* at 73–103, 229–80.

striking steel. In the older matchlock guns, the powder charge was ignited by the lowering of a slow-burning hemp cord to touch the firing pan. In either system, the user pressed the trigger to start the process.

Then in 1807, the percussion cap was invented. It was a primer made of chemical compounds, known as fulminate. The percussion cap sat on a nipple next to the firing chamber. When the user pressed the trigger, a hammer would strike the fulminate. The explosion would then ignite the gunpowder charge. Percussion ignition was faster and far more reliable than priming pan ignition.[266] Percussion cap guns "shot harder and still faster than the best flintlock ever known."[267]

The bullets of 1791 were spheres. That is why a unit of ammunition today is still called "a round." In the early nineteenth century, conoidal bullets were invented. These are essentially the same type of bullets used today. The shape is far more aerodynamically stable, allowing longer shots with much better accuracy. The flat back of the bullet helped to prevent the expanding gas of the gunpowder explosion from exiting the barrel before the bullet did. As the result, the gas gave the bullet a stronger push, imparting more energy and making the bullet more powerful.[268]

In 1846, modern metallic cartridge ammunition was invented. Instead of the bullet, gunpowder, and primer being three separate items to insert into a firearm one at a time, ammunition was now a single unit, the cartridge. The bullet, gunpowder, and primer were all contained in a metal case.[269]

An initial result of the cartridge was to make breechloading possible. Instead of loading from the front of the barrel (the *muzzle*), a firearm could be loaded from near the trigger. Even a novice could quickly learn to shoot nine shots a minute from the single-shot breechloading Sharps' rifle, brought to market in 1850.[270]

The combination of the modern cartridge and breechloading ammunition greatly facilitated the development of repeating firearms, as will be described in the next section.

---

[266] J.F.C. FULLER, ARMAMENT AND HISTORY 113 (Da Capo Pr. 1998) (1945).

[267] HELD, *supra* note 20, at 171.

[268] JOHNSON ET AL., *supra* note 16, at 2127.

[269] GREENER, *supra* note 27, at 773; DEYRUP, *supra* note 257, at 28; HELD, *supra* note 20, at 183–84.

[270] *Sharps' Breech-loading Patent Rifle*, SCIENTIFIC AMERICAN, Mar. 9, 1850.

The final major development in ammunition was the invention of a new type of gunpowder in 1884. Previously, all gunpowder had been "blackpowder," the same product the Chinese had first formulated in the 900s.[271] In the West ever since the 1400s, blackpowder had always been improving, with changes in the ratio of ingredients and refinements in the shapes of individual grains of powder.[272] Then in 1884 came white powder (a/k/a smokeless powder), with an entirely different formulation.[273] Smokeless powder burned far more efficiently, imparting much more power to bullets.[274] White, smokeless powder is still the gunpowder in use today, with continuing refinements.

### D. Advances in repeating arms

During the nineteenth century, repeating arms became some of America's most popular arms.

In 1821, the *New York Evening Post* lauded New Yorker Isaiah Jennings for inventing a repeater, "importan[t], both for public and private use," whose "number of charges may be extended to fifteen or even twenty . . . and may be fired in the space of two seconds to a charge."[275] "[T]he principle can be added to any musket, rifle, fowling piece, or pistol" to make it capable of firing "from

---

[271] The ingredients of blackpowder are sulfur, charcoal, and saltpeter. JOHNSON ET AL., *supra* note 16, at 2126, 2225.

[272] *See, e.g.*, ARTHUR PINE VAN GELDER & HUGO SCHLATTER, HISTORY OF THE EXPLOSIVES INDUSTRY IN AMERICA (Ayer 2004) (1927).

[273] Insoluble nitrocellulose, soluble nitrocellulose, and paraffin. JOHNSON ET AL., *supra* note 16, at 2225.

[274] GREENER, *supra* note 27, at 560.

[275] *Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822, *in* 59 ALEXANDER TILLOCH, THE PHILOSOPHICAL MAGAZINE AND JOURNAL: COMPREHENDING THE VARIOUS BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES, AND COMMERCE 467 (Richard Taylor ed., 1822).

two to twelve times."[276] "About 1828 a New York State maker, Reuben Ellis, made military rifles under contract on the Jennings principle."[277]

In the 1830s, the popular pepperbox handguns were introduced. These pistols had multiple barrels that could fire sequentially; four to eight barrels were most common.[278] That same decade, the Bennett and Haviland Rifle used the same concept as the pepperbox. It had 12 individual barrels that fired sequentially.[279]

Revolvers were introduced in the 1830s by Samuel Colt. They fire repeating rounds like the pepperbox but use a rotating cylinder rather than rotating barrels.

With a simple modification by the user, a Colt revolver could function like a modern semiautomatic pistol with a detachable magazine. After emptying a six-round cylinder, a user could remove the cylinder in a few seconds and replace it with a preloaded cylinder. And after that, with another fresh cylinder.

Pin-fire revolvers with capacities of up to 21 rounds entered the market in the 1850s.[280] So did the Walch 12-Shot Navy Revolver, with each of its six chambers holding two rounds that fired separately. It was used in the Civil War and made its way to the western frontier.[281] In 1866, the 20-round Josselyn belt-fed chain pistol debuted. Some later chain pistols had greater capacities.[282]

---

[276] *Id.* The writer added:

> As a sporting or hunting gun, its advantages are not less important. It enables the sportsman to meet a flock with twice the advantage of a double barrel gun, without any of its incumbrances, and it enables the hunter to meet his game in any emergency. The gun has been shown to many different officers of our army and navy, and has been highly approved of, and indeed no one who has seen a fair trial of its powers has ever been able to find an objection to it.

*Id.* at 468.

[277] LEWIS WINANT, FIREARMS CURIOSA 174 (Odysseus 1996) (1955).

[278] JACK DUNLAP, AMERICAN BRITISH & CONTINENTAL PEPPERBOX FIREARMS 148–49, 167 (1964); LEWIS WINANT, PEPPERBOX FIREARMS 7 (1952).

[279] NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 711 (9th ed. 2007).

[280] SUPICA ET AL., supra note 202, at 48–49; WINANT, PEPPERBOX FIREARMS, *supra* note 278, at 67–70.

[281] CHAPEL, *supra* note 199, at 188–89.

[282] WINANT, FIREARMS CURIOSA, *supra* note 277, at 204, 206.

Alexander Hall's rifle with a 15-round rotating cylinder was introduced in the 1850s.[283] In 1851, Parry Porter created a rifle with a 38-shot canister magazine. The Porter Rifle could fire 60 shots in 60 seconds.[284] In 1855, Joseph Enouy invented a 42-shot Ferris Wheel pistol.[285]

An 1855 alliance between Daniel Wesson (later, of Smith & Wesson) and Oliver Winchester led to a series of famous lever-action repeating rifles. First came the 30-shot Volcanic Rifle, which an 1859 advertisement boasted could be fired 30 times within a minute.[286]

While the pepperbox or revolver handguns sold well, none of the above repeating long guns were particularly successful commercially, in part of because of reliability problems. Then came the 16-shot Henry Rifle in 1861. Tested at the Washington Navy Yard in 1862:

> 187 shots were fired in three minutes and thirty-six seconds (not counting reloading time), and one full fifteen-shot magazine was fired in only 10.8 seconds . . . hits were made from as far away as 348 feet, at an 18-inch-square target. . . . It is manifest from the above experiment that this gun may be fired with great rapidity.[287]

"Advertisements claimed a penetration of eight inches at one hundred yards, five inches at four hundred yards, and power to kill at a thousand yards."[288]

"[F]ueled by the Civil War market, the first Henrys were in the field by mid-1862."[289] Indeed, the most famous testimonial for the Henry came from Captain James M. Wilson of the 12th Kentucky Cavalry, who used a Henry Rifle to kill seven of his Confederate neighbors who broke into his home and ambushed his family. Wilson praised the rifle's 16-round capacity: "When attacked alone by seven guerillas I found it [the Henry rifle] to be particularly

---

[283] FLAYDERMAN, *supra* note 283, at 713, 716.

[284] *A New Gun Patent*, ATHENS (Tenn.) POST, Feb. 25, 1853, http://bit.ly/2tmWUbS (reprinted from N.Y. Post); 2 SAWYER, *supra* note 78, at 147.

[285] WINANT, FIREARMS CURIOSA, *supra* note 277, at 208.

[286] HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 26–27 (1952).

[287] R.L. WILSON, WINCHESTER: AN AMERICAN LEGEND 11–12 (1991).

[288] PETERSON, THE TREASURY OF THE GUN, *supra* note 29, at 240.

[289] *Id*. at 11.

useful not only in regard to its fatal precision, but also in the number of shots held in reserve for immediate action in case of an overwhelming force."[290] Soon after, Wilson's entire command was armed with Henry rifles.[291]

The Henry evolved into the 18-shot Winchester Model 1866, which was touted as having a capacity of "eighteen charges, which can be fired in nine seconds."[292] Another advertisement contained pictures of Model 1866 rifles underneath the heading, "Two shots a second."[293] "[T]he Model 1866 was widely used in opening the West and, in company with the Model 1873, is the most deserving of Winchesters to claim the legend 'The Gun That Won the West.'"[294] Over 170,000 Model 1866s were produced. Then came the Winchester Model 1873, whose magazine ranged from 6 to 25.[295] Over 720,000 Model 1873s were produced by 1919.[296]

Separate from the Winchester and Henry patents was the 1873 Evans Repeating Rifle. With an innovative rotary helical magazine (like a modern drum magazine), it held 34 rounds. The Evans had some commercial success, although far from the level of the Winchesters.[297]

The Henry rifle had appeared during the Civil War, and its improved version, the 1866 Winchester, during Reconstruction, in the same year that Congress sent the Fourteenth Amendment to the States for ratification. During Reconstruction, no government in the United States attempted prohibit the possession of any particular type of firearm. Rather, the major gun control controversy of the time was efforts to prevent the freedmen in the former Confederate states from having firearms at all, or only having them

---

[290] H.W.S. Cleveland, Hints to Riflemen 181 (1864).

[291] Andrew L. Bresnan, *The Henry Repeating Rifle*, Rarewinchesters.com, Aug. 17, 2007, https://www.rarewinchesters.com/articles/art_hen_00.shtml.

[292] Louis A. Garavaglia & Charles G. Worman, Firearms of the American West 1866-1894, at 128 (1985). The Winchester 1866 was made in a variety of calibers. Only the smallest caliber could hold 18 rounds.

[293] Peterson, The Treasury of the Gun, *supra* note 29, at 234–35.

[294] *Id.* at 22.

[295] Arthur Pirkle, Winchester Lever Action Repeating Firearms: The Models of 1866, 1873 & 1876, at 107 (2010).

[296] Flayderman, *supra* note 283, at 306–09.

[297] Dwight Demeritt, Maine Made Guns & Their Makers 293–95 (rev. ed. 1997); Flayderman, *supra* note 283, at 694.

with a special license.[298] These restrictions were rebuffed by the Second Freedmen's Bureau Act, the Civil Rights Act, and then the Fourteenth Amendment.[299]

The final quarter of the nineteenth century saw more iconic Winchesters, namely the Model 1886, and then the Model 1892, made legendary by Annie Oakley, and later by John Wayne.[300] These arms had a capacity of 15 rounds.[301] Over a million were produced from 1892 to 1941.[302]

The first commercially successful repeating long guns, the Henrys and Winchesters, had been lever actions. After firing one round, the user moves a lever down and then up to eject the empty metal case and reload a fresh cartridge into the firing chamber. Pump action guns came next; to eject and reload, the user pushes and then pulls the sliding fore-end of the gun, located underneath the barrel. The most famous pump-action rifle of the nineteenth century was the Colt Lightning, introduced in 1884. It could fire 15 rounds.[303]

In bolt action guns, discussed below, the user moves the bolt's handle in four short movements: back, up, down, forward. For semiautomatic rifles, no manual steps are needed to eject the empty shell and reload the next cartridge. The semiautomatic can be fired as fast as the user can press the trigger. Each press of the trigger fires one new shot. The Lorenzoni pistols of the eighteenth century and the Girandoni rifle of the Founding Era had the same capability, although their internal mechanics were not the same as a semiautomatic.

The first functional semiautomatic firearm was the Mannlicher Model 85 rifle, invented in 1885.[304] Mannlicher introduced new models in 1891, 1893, and 1895.[305] Additionally, numerous semiautomatic handguns utilizing detachable magazines were introduced before the turn of the century,

---

[298] *McDonald v. City of Chicago*, 561 U.S. 742, 771 (2008).

[299] *Id.* at 773–75.

[300] *Model 1892 Rifles and Carbines*, WINCHESTER REPEATING ARMS, http://bit.ly/2tn03IN.

[301] *Id.*

[302] FLAYDERMAN, *supra* note 283, at 307–12.

[303] *Id.* at 122.

[304] U.S. NAVY SEAL SNIPER TRAINING PROGRAM 87 (2011).

[305] JOHN WALTER, RIFLES OF THE WORLD 568–69 (3rd ed. 2006).

including the Mauser C96,[306] Bergmann Simplex,[307] Borchardt M1894,[308] Borchardt C-93,[309] Fabrique Nationale M1899,[310] Mannlicher M1896 and M1897,[311] Luger M1898 and M1899,[312] Roth-Theodorovic M1895, M1897, and M1898,[313] and the Schwarzlose M1898.[314] Many of these were issued with magazines greater than 10 rounds, including Luger's M1899, which could be purchased with 32-round magazines.[315]

### E. Continuing advances in firearms were well-known to the Founders

While the Founders could not foresee all the specific advances that would take place in the nineteenth century, the Founders were well aware that firearms were getting better and better.

Tremendous improvements in firearms had always been part of the American experience. During the seventeenth century, the American colonists had switched from matchlocks to flintlocks far sooner than Europeans had. Unlike matchlocks, flintlocks can be kept always-ready. There is no smoldering hemp cord to give away the location of the user. Flintlocks are much more reliable than matchlocks, and all the more so in adverse weather. They are also simpler and faster to reload.[316]

The Theoretical Lethality Index (TLI), which will be discussed further in the next section, is a measure of a weapon's effectiveness in military combat. The TLI of a seventeenth century musket is 19 and the TLI of an eighteenth

---

[306] DOUGHERTY, *supra* note 37, at 84.

[307] *Id.* at 85.

[308] *Springfield Armory Museum – Collection Record*, REDISCOV.COM, http://ww2.rediscov.com/spring/VFPCGI.exe?IDCFile=/spring/DETAILS.IDC,SPECIFIC=9707,DATABASE=objects.

[309] Leonardo Antaris, *In the Beginning: Semi-Automatic Pistols of the 19th Century*, AMERICAN RIFLEMAN, Jan. 4, 2018.

[310] *Id.*

[311] *Id.*

[312] *Id.*

[313] *Id.*

[314] *Id.*

[315] JEAN-NOEL MOURET, PISTOLS AND REVOLVERS 126–27 (1993); SUPICA at 86.

[316] JOHNSON ET AL., *supra* note 16, at 2189–90; GREENER, *supra* note 27, at 66–67; CHARLES C. CARLTON, THIS SEAT OF MARS: WAR AND THE BRITISH ISLES 1585-1746, at 171–73 (2011).

century flintlock is 43.[317] So the transition of firearm type in the American colonies more than doubled the TLI. There is no reason to believe that the American Founders were ignorant of how much better their own firearms were compared to those of the early colonists.

As described in Part II.E, repeating arms had been manufactured in America since the 1700s. Founders who had served in the Continental Congress knew of Joseph Belton's 16-shot repeaters. Likewise, the 22-shot Girandoni famously carried by Lewis & Clark was no secret, and it had been invented in 1779.

The founding generation was especially aware of one of the most common firearms of their time, the Pennsylvania-Kentucky rifle. The rifle was invented by German and Swiss immigrants in the early eighteenth century. It was created initially for the needs of frontiersmen who might spend months on a hunting expedition in the dense American woods. "What Americans demanded of their gunsmiths seemed impossible": a rifle that weighed ten pounds or less, for which a month of ammunition would weigh one to three pounds, "with proportionately small quantities of powder, be easy to load," and "with such velocity and flat trajectories that one fixed rear sight would serve as well at fifty yards as at three hundred, the necessary but slight difference in elevation being supplied by the user's experience.[318] "By about 1735 the impossible had taken shape" with the creation of the iconic Pennsylvania-Kentucky rifle.[319]

As for the most common American firearm, the smoothbore (nonrifled) flintlock musket, there had also been great advances. To a casual observer, a basic flintlock musket of 1790 looks very similar to flintlock musket of 1690. However, improvements in small parts, many of them internal, had made the best flintlocks far superior to their ancestors. For example, thanks to English gunsmith Henry Nock's 1787 patented flintlock breech, "the gun shot so hard and so fast that the very possibility of such performance had hitherto not even been imaginable."[320]

The Founders were well aware that what had been impossible or unimaginable to one generation could become commonplace in the next. With the federal armories advanced research and development program that began

---

[317] TREVOR DUPUY, THE EVOLUTION OF WEAPONS AND WARFARE 92 (1984).

[318] HELD, *supra* note 20, at 142.

[319] *Id.*

[320] *Id.* at 137.

in the Madison administration, the U.S. government did its best to make the impossible possible.

## F. Perspective

In the early nineteenth century, the finest maker of flintlock shotguns was Old Joe Manton of London. A "strong, plain gun" from Manton cost hundreds of dollars. By 1910, a modern shotgun, "incomparably superior, especially in fit, balance, and artistic appearance" to Manton's cost about ten dollars.[321]

Military historian Trevor Dupuy created a "Theoretical Lethality Index" (TLI) to compare the effectiveness of battlefield weapons from ancient times through the twentieth century.[322] While the TLI was never intended describe weapon utility in civilian defense situations, such as against home invaders, it is a usable rough estimate for community defense situations, such as militia use. According to Dupuy, the TLI of an 18th century flintlock (the common service arm of the American Revolution) was 43.[323] The TLI of the standard service arm 112 years after the Second Amendment was ratified—the 1903 Springfield bolt-action magazine-fed rifle—is 495.[324] Dupuy did not calculate a TLI for late twentieth century firearms. Using Dupuy's formula, Kopel calculated the TLI for two modern firearms: an AR semiautomatic rifle is 640, and a 9mm semiautomatic handgun is 295.[325]

---

[321] CHARLES ASKINS, THE AMERICAN SHOTGUN 21–22 (1910). Ten dollars in 1913 is approximately equal to $250 today. Three hundred dollars in 1913 would be over $7,000 today.

[322] TREVOR DUPUY, THE EVOLUTION OF WEAPONS AND WARFARE (1984).

[323] *Id.* at 92.

[324] *Id.* The U.S. Army's 1903 adoption of a bolt-action rifle as the standard service arm slightly outlies this Article's focus on law before 1900. However, the Springfield 1903 was, due to congressional politics, a belated imitation of what other leading militaries had already been doing. For example, the British had adopted the bolt action magazine-fed Lee-Metford rifle in 1888. The German army adopted the Mauser Gewehr 98 in 1898.

[325] David Kopel, *The Theoretical Lethality Index is useful for military history but not for gun control policy*, REASON.COM/VOLOKH CONSPIRACY, Nov. 1, 2022.

A modern mid-power handgun, such as 9mm, is far superior to a flintlock long gun of the late 1700s in reliability and rate of fire. But handguns have much shorter barrels than long guns. As a result handguns, even the best modern ones, have lesser range than rifles. While the difference usually does not matter for personal defense, longer range is often very important in military combat, such as militia use. Hence the modern handgun's rating far below modern rifles in the combat-oriented TLI.

Again, the TLI has nothing do with personal defense. An AR rifle is not always twice as good as a 9mm pistol for defense against a rapist or home invader. The modern rifle might be better or worse than the modern handgun, depending on other circumstances.

For militia utility, the 11-fold advance from the single-shot flintlock to the magazine-fed bolt action rifle of 1903 is enormous. The founding generation did not precisely predict the Springfield bolt action or its 11-fold improvement over the long guns of the founding period. The Founders did do all they could to make that improvement take place.

As firearms historian Robert Held wrote in 1957, "the *history* of firearms" came to an end in the late nineteenth century.[326] Although manufacturing quality has always been improving, and design refinements have been made, in the twentieth century there were no major innovations in firearms. The firearms you can own today are just improved and more affordable versions of types that your great-great grandparents could have bought in 1895. The exception is optics, thanks to lasers (now broadly affordable) and handheld computers integrated with scopes (for long range hunting accuracy).

During the nineteenth century, bans on particular types of firearms were rare. As will be described in the next Part, there were four state statutes that aimed at particular firearms. Three of them covered handguns, old and new; one of them aimed at repeating rifles.

## IV. FIREARMS BANS IN THE 19TH CENTURY

This Part describes bans on particular types of firearms in the nineteenth century. The discussion also notes some Bowie knife legislation that was enacted along with some of the handgun laws. Bowie knives will be discussed in much more detail in Part V.

---

[326] HELD, *supra* note 20, at 186 ("Although the age of firearms today thrives with ten thousand species in the fullest heat of summer, the *history* of firearms ended between seventy and eighty years ago. There has been nothing new since, and almost certainly nothing will come hereafter."). According to Held, any modern bolt-action is "essentially" an updated version of the Mauser bolt-actions of the 1890s or the Mannlicher bolt-actions of the 1880s. "All lever-action rifles are at heart Henrys of the early 1860s," and all semi-automatics "descend from" the models of the 1880s. *Id.* at 185.

### A. Georgia ban on handguns, Bowie knives, and other arms

Between 1791 and the beginning of the Civil War in 1861, there was one law enacted against acquiring particular types of firearms. An 1837 Georgia statute made it illegal for anyone "to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere" any:

> Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks,[327] sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.[328]

Horse pistols were the only type of handgun not banned in Georgia. These were large handguns, usually sold in a pair, along with a double holster that was meant to be draped over a saddle. They were too large for practical carry by a person who was walking.

At the time, there was no right to arms in the Georgia Constitution. In 1846, the Georgia Supreme Court held the statute unconstitutional.[329] The Court explained that the Second Amendment stated an inherent right, and nothing in the Georgia Constitution had ever authorized the state government to violate the right.[330] For all the weapons, including handguns, the ban on concealed carry was upheld, while the sales ban, possession ban, and open carry ban were held unconstitutional.[331] The U.S. Supreme Court's 2008 *District of Columbia v. Heller* extolled *Nunn* because the "opinion perfectly captured the way in which the operative clause of the Second Amendment

---

[327] A fighting knife originally created in Scotland. HAROLD L. PETERSON, DAGGERS & FIGHTING KNIVES OF THE WESTERN WORLD 60 (1968).

[328] 1837 Ga. Laws 90, sec. 1. Although section 1 of the act was prohibitory, Section 4 contained an exception allowing open carry of some of the aforesaid arms, not including handguns: "*Provided, also*, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view…" The same section also allowed vendors to sell inventory they already owned, through the next year.

[329] Nunn v. State, 1 Ga. 243 (1846).

[330] *Id.* at 250–51.

[331] *Id.* at 251.

furthers the purpose announced in the prefatory clause."[332] *Nunn* was a leader among the many antebellum state court decisions holding that a right enumerated in the U.S. Bill of Rights was protected against state infringement.[333]

### B. Tennessee ban on many handguns

After the end of Reconstruction, the white supremacist legislature of Tennessee in 1879 banned the sale "of belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols"—that is, large handguns of the sort carried by military officers, artillerymen, cavalrymen, etc. These big and well-made guns were already possessed in quantity by former Confederate soldiers. The army & navy handguns were more expensive than smaller pistols. The ban was upheld under the Tennessee state constitution because it would help reduce the concealed carrying of handguns.[334]

### C. Arkansas ban on many handguns, and Bowie knives

Arkansas followed suit with a similar law in 1881. That law also forbade the sale of Bowie knives, dirks (another type of knife), sword-canes (a sword concealed in a walking stick), and metal knuckles. In a prosecution for the sale of a pocket pistol, the Arkansas Supreme Court rejected a constitutional defense. The statute was "leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person. It does not abridge the constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare."[335]

The 1868 Arkansas Constitution's right to arms, still in effect, states, "The citizens of this State shall have the right to keep and bear arms for their common defence."[336] Similarly, the right to arms provision of the Tennessee

---

[332] *Heller*, 554 U.S. at 612.

[333] *See* Jason Mazzone, *The Bill of Rights in Early State Courts*, 92 MINN. L. REV. 1 (2007); AKHIL REED AMAR, THE BILL OF RIGHTS 145–56 (1998) (discussing "the Barron contrarians").

[334] State v. Burgoyne, 75 Tenn. (7 Lea) 173 (1881).

[335] Dabbs v. State, 39 Ark. 353, 357 (1885).

[336] ARK. CONST. of 1868, art. I, § 5 (retained in 1874 Ark. Const.).

Constitution, as adopted in 1870 and still in effect, states, "the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime."[337]

In both states, the "common defense" language was interpreted by the courts as protecting an individual right of everyone, but only for militia-type arms. Such arms included the general types of handguns used in the U.S. military. When Congress was drafting the future Second Amendment, there was a proposal in the Senate to add similar "common defence" language. The Senate rejected the proposal.[338]

Whatever the merits of the state courts' interpretations of the state constitutions, the Tennessee and Arkansas statutes are unconstitutional under the Second Amendment. The U.S. Supreme Court in *Heller* repudiated the notion that the Second Amendment is for only military-type arms. Dick Heller's 9-shot .22 caliber revolver was certainly not a military-type handgun.[339]

### D. Florida licensing law for repeating rifles and handguns

The closest historic analogue to twenty-first century bans on semiautomatic rifles is an 1893 Florida statute that required owners of Winchesters and other repeating rifles to apply for a license from the board of county commissioners.[340] In 1901 the law was extended to also include handguns.[341] As amended, "Whoever shall carry around with, or have in his manual possession, in any county in this State, any pistol, Winchester rifle, or other repeating rifle, without having a license from the county commissioners of the

---

[337] TENN. CONST. of 1870, art. I, § 26.

[338] Senate Journal, 1st Cong., 1st Sess. 77 (Sept. 9, 1789).

[339] Dick Heller's particular handgun, a single action Buntline revolver manufactured by High Standard, is identified at Plaintiffs' Motion for Summary Judgment, Exhibit A, Parker v. District of Columbia, 311 F. Supp. 2d 103 (D.D.C. 2004), https://web.archive.org/web/20111117110734/http://www.gurapossessky.com/news/parker/documents/SJExhibitA.pdf.

[340] 1893 Fla. Laws 71, ch. 4147.

[341] 1901 Fla. Laws 57, ch. 4928.

respective counties of this State," should be fined up to $100 or imprisoned up to 30 days.[342]

The county commissioners could issue a two-year license only if the applicant posted a bond of $100.[343] The commissioners were required to record "the maker of the firearm so licensed to be carried, and the caliber and number of the same."[344] The bond of $100 was exorbitant. It was equivalent to over $3,400 today.[345]

A 1909 case involved Giocomo Russo's petition for a writ of mandamus against county commissioners who had refused his application for a handgun carry license.[346] Based on his name, Russo may have been an Italian immigrant. At the time, Italians were sometimes considered to be in a separate racial category. When Russo applied, the county commissioners said that they only issued licenses to applicants whom they knew personally, and they did not think the applicant needed to carry a handgun.[347] Russo argued that the licensing statute was unconstitutional.[348]

The Florida Supreme Court denied Russo's petition for a writ of mandamus.[349] According to the court, there were two possibilities: 1. If the statute is constitutional, then mandamus to the county commissioners would be incorrect, because they acted within their legal discretion. 2. If the statute is unconstitutional, then mandamus would be improper, because a writ of mandamus cannot order an official to carry out an unconstitutional statute.[350] Either way, Russo was not entitled to a writ of mandamus.[351] Pursuant to the

---

[342] *Id.* Codified at REVISED GENERAL LAWS OF FLORIDA, § 7202–03 (1927).

[343] *Id.*

[344] *Id.*

[345] Fed. Reserve Bank of Minneapolis, Consumer Price Index 1800, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1800-. 2022=884.6. 1893=27. 1901= 25. Avg. = 26.

[346] State v. Parker, 57 Fla. 170, 49 So. 124 (1909).

[347] *Id.* at 171–72.

[348] *Id.*

[349] *Id.* at 173.

[350] *Id.*

[351] *Id.*

doctrine of constitutional avoidance, the court declined to opine on the statute's constitutionality.[352]

Decades later, a case arose as to whether a handgun in an automobile glovebox fit within the statutory language, "on his person or in his manual possession."[353] By 5–2, the Florida Supreme Court held that it did not; no license was necessary to carry a handgun or repeating rifle in an automobile.[354] A four Justice majority granted the defendant's petition for habeas corpus because of the rule of lenity: in case of ambiguity criminal statutes should be construed narrowly.[355]

Justice Rivers H. Buford concurred with the four-Justice majority opinion.[356] His opinion went straight to the core problem with the statute.

Born in 1878, Buford had worked from ages 10 to 21 in Florida logging and lumber camps. In 1899, at the suggestion of a federal judge who owned a logging camp, Buford began the study of law. He was admitted to the Florida bar the next year. In 1901, he was elected to the Florida House of Representatives. Later, he was appointed county prosecuting attorney, elected state's attorney for the 9th district, and elected state attorney general. He was appointed to the Florida Supreme Court in 1925.[357] As of 1923, "His principal diversion is hunting."[358]

The Florida Constitution of 1885 had provided: "The right of the people to bear arms in defence of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."[359]

Concurring, Justice Buford wrote that the statute should be held to violate the Florida Constitution and the Second Amendment:

---

[352] *Id.* at 172–73.

[353] Watson v. Stone, 148 Fla. 516, 518 (1941).

[354] *Id.* at 522–23.

[355] *Id.* at 517–23.

[356] *Id.* at 523–24.

[357] 3 HISTORY OF FLORIDA: PAST AND PRESENT 156 (1923); *Justice Rivers Henderson Buford*, FLORIDA SUPREME COURT, https://supremecourt.flcourts.gov/Justices/Former-Justices/Justice-Rivers-Henderson-Buford.

[358] 3 HISTORY OF FLORIDA, *supra* note 357, at 156.

[359] Fla. Const. of 1885, art. I, § 20.

I concur in the judgment discharging the relator because I think that Section 5100, R.G.S., § 7202, C.G.L., is unconstitutional because it offends against the Second Amendment to the Constitution of the United States and Section 20 of the Declaration of Rights of the Constitution of Florida.

Proceedings in habeas corpus will lie for the discharge of one who is held in custody under a charge based on an unconstitutional statute. [citations omitted]

The statute, supra, does not attempt to prescribe the manner in which arms may be borne but definitely infringes on the right of the citizen to bear arms as guaranteed to him under Section 20 of the Declaration of Rights of the Florida Constitution.[360]

He explained the history of the exorbitant licensing laws of 1893 and 1901:

I know something of the history of this legislation. The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and there had never been, within my knowledge, any effort to enforce the provisions of this statute as to white people,

---

[360] *Watson*, 148 Fla. at 523–24.

because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested.[361]

Justice Buford had described some of the changed societal conditions underlying the 1893 and 1901 enactments. There may have been additional factors involved. Repeating rifles had been around for decades.[362] By the 1880s, manufacturing improvements had made such rifles affordable even for some poor people. Blacks were using such rifles to drive off lynch mobs, such as in famous 1892 incidents in Paducah, Kentucky and Jacksonville, Florida.[363]

In sum, the nineteenth century history of firearms bans is not helpful for justifying prohibitions on semiautomatic rifles. The only pre-1900 statutory precedent for such a law is Florida in 1893, and it is dubious. Before that, there were three prior sales prohibitions that covered many or most handguns. One of these was held to violate the Second Amendment, and the other two are plainly unconstitutional under *Heller*. Accordingly, renewed attention is being given to precedents involving Bowie knives, which we will examine next.

## V. BOWIE KNIVES

Starting in 1837, many states enacted legislation about Bowie knives. Defending Maryland's ban on many modern rifles, state Attorney General Brian Frosh argues that nineteenth century laws about Bowie knives provide a historical analogy to justify the present ban.[364] Prohibitory laws for adults, however, were exceptional. As with firearms, sales bans or bans on all manner of carrying existed, but were rare.

---

[361] *Id*. at 524.

[362] *See* text at notes 286–303.

[363] In Jacksonville,

> [W]hen a white man, having been killed by a negro, and threats of lynching the prisoner from the Duval County Jail being made, a large concourse, or mob of negroes, assembled around the jail and defied and denied the sheriff of the county ingress to the building. This mob, refusing to disburse upon the reading of the riot act by the sheriff, he called for assistance from the militia to aid him in enforcing the laws.

REPORT OF THE ADJUTANT-GENERAL FOR THE BIENNIAL PERIOD ENDING DECEMBER 31, 1892, at 18, *in* [Florida] *Journal of the Senate* (1893); NICHOLAS J. JOHNSON, NEGROES AND GUN: THE BLACK TRADITION OF ARMS 110–12 (2014).

[364] Supplemental Brief for Appellees, *Bianchi v. Frosh* (No. 21-1255) (4th Cir.),

Section A explains the definition and history of Bowie knives, and of a related knife, the Arkansas toothpick. Part B is a state-by-state survey of all Bowie knife legislation in the United States before 1900.

Among the 221 state or territorial statutes with the words "Bowie knife" or "Bowie knives," only 5 were just about Bowie knives (along with their close relative, the Arkansas toothpick). Almost always, Bowie knives were regulated the same as other knives that were well-suited for fighting against humans and animals—namely "dirks" or "daggers." That same regulatory category frequently also included "sword-canes." About 98 percent of statutes on "Bowie knives" treated them the same as various other blade arms. Bowie knives did not set any precedent for a uniquely high level of control. They were regulated the same as a butcher's knife.

Bowie knives and many other knives were often regulated like handguns. Both types of arms are concealable, effective for defense, and easy to misuse for offense.

For Bowie knives, handguns, and other arms, a few states prohibited sales. The very large majority, however, respected the right to keep and bear arms, including Bowie knives. These states allowed open carry while some of them forbade *concealed* carry. In the nineteenth century, legislatures tended to prefer that people carry openly; today, legislatures tend to favor concealed carry. Based on history and precedent, legislatures may regulate the mode of carry, as the U.S. Supreme Court affirmed in *Bruen*.[365]

Besides regulating the mode of carry, many states restricted sales to minors. They also enacted special laws against misuse of arms.

Of the 221 state or territorial statutes cited in this article, 115 come from just 5 states: Mississippi, Alabama, Georgia, Virginia, and North Carolina. This is partly because these were the only states whose personal property tax statutes specifically included "Bowie knife" in their lists of taxable arms, along with other knives, such as "dirks."

Before delving into the Bowie knife laws, here is a glossary of the arms types that often appear in the same statutes as Bowie knives:

*Bowie knife.* This was the marketing and newspaper term for old or new models of knives suitable for fighting, hunting, and utility. There was no

---

[365] *Bruen*, 142 S. Ct. 2150 ("The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. . . . States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.").

common feature that distinguished a "Bowie knife" from older knives. For example, a "Bowie knife" could have a blade sharpened on only one edge, or on two edges. It could be straight or curved. It might or might not have a handguard. There was no particular length.[366]

*Arkansas toothpick*. A loose term for some Bowie knives popular in Arkansas.[367]

*Dagger*. A straight knife with two cutting edges and a handguard.

*Dirk*. Small stabbing weapons, with either one or two sharpened edges.[368] Originally, a Scottish fighting knife with one cutting edge.[369] Many nineteenth century laws forbade concealed carry of "dirks" and/or "daggers." The statutory formula of "bowie knife + (dirk and/or dagger)" covered many knives well-suited for defense or offense. The category does not include pocket knives.

*Sword-cane*. A sword concealed in a walking stick. Necessarily with a slender blade.

*Slungshot*. The original slungshot was a nautical tool, a rope looped on both ends, with a lead weight or other small, dense item at one end.[370] It helps sailors accurately cast mooring lines and other ropes.[371] A slungshot rope that is shortened to forearm length and spun rapidly is an effective blunt force weapon.[372] As will be detailed in Part VI.B.1, many slungshots were made of leather instead of rope, intended for use as weapons, and very easily concealed.

*Colt*. Similar to a slungshot.[373]

*Knucks, knuckles*. Linked rings or a bar, often made of metal, with finger holes. They make the fist a more potent weapon. Laws about knuckles are also detailed in part VI.

*Revolver*. A handgun in which the ammunition is held in a rotating cylinder.

---

[366] *See* text at notes __.

[367] *See* text at notes __.

[368] "Dirks in America were small stabbing weapons, usually small daggers but sometimes single edged." Mark Zalesky, publisher of *Knife Magazine*, email to David Kopel, Nov. 19, 2022.

[369] Peterson, Daggers & Fighting Knives of the Western World, *supra* note 327, at 60.

[370] *See* text at notes __.

[371] *See* text at notes __.

[372] *See* text at notes __.

[373] 1 Shorter Oxford English Dictionary 444 ("4. A short piece of weighted rope used as a weapon").

*Pistol.* Often a generic term for handguns. Sometimes used to indicate non-revolvers, as in a law covering "pistols or revolvers."

## A. The history of Bowie knives and Arkansas toothpicks

### 1. What is a Bowie knife?

The term "Bowie knife" originated after frontiersman Col. Jim Bowie used one at a famous "Sandbar Fight" on the lower Mississippi River near Natchez, Mississippi, on September 19, 1827.

The knife had been made by Rezin Bowie, Jim's brother. According to Rezin, the knife was intended for bear hunting. He stated, "The length of the knife was nine and a quarter inches, its width one and a half inches, single-edged, and blade not curved."[374] Nothing about the knife was novel.

The initial and subsequent media coverage of the Sandbar Fight was often highly inaccurate.[375] As "Bowie knife" entered the American vocabulary, manufacturers began labeling all sorts of large knives as "Bowie knives." Some of these were straight (like Rezin's) and other had curved blades. Rezin's knife was single-edged, but some "Bowie knives" were double-edged. Rezin's knife did not have a clip point, but some so-called "Bowie knives" did. Likewise, some had crossguards (to protect the user's hand), and others did not. "Bowie knife" was more a sloppy marketing term than a description of a particular type of knife—just as some people today say "Coke" to mean many kinds of carbonated beverages. (The difference is that true "Coke" products, manufactured by the Coca-Cola Company, do exist; there never was a true "Bowie knife," other than the one used at the Sandbar Fight.) Manufacturers slapped the "Bowie knife" label on a wide variety of large knives that were well-suited for hunting and self-defense. In words of knife historian Norm Flayderman, "there is no one specific knife that can be exactingly described as a Bowie knife."[376]

From the beginning, laws about "Bowie knives" have been plagued by vagueness. For example, a Tennessee statute against concealed carry applied to "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon

---

[374] R.P. Bowie, *Letter to the Editor*, PLANTER'S ADVOCATE, Aug. 24, 1838, *reprinted in* MARRYAT, 1 A DIARY IN AMERICA, WITH REMARKS ON ITS INSTITUTIONS 291 (1839).

[375] *See id.* at 289–91.

[376] NORM FLAYDERMAN, THE BOWIE KNIFE: UNSHEATHING AN AMERICAN LEGEND 490 (2004).

that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick. . . ."[377]

When Stephen Hayes was prosecuted for concealed carry, the witnesses disagreed about whether his knife was a Bowie knife.[378] One said it was too small and slim to be a Bowie knife and would properly be called a "Mexican pirate-knife."[379] The jury found Haynes innocent of wearing a Bowie knife but guilty on a second charge "of wearing a knife in shape or size resembling a bowie-knife."[380] Note the disjunctive "form, shape *or* size." On appeal, the Tennessee Supreme Court agreed that the legislature could not declare "war against the name of the knife."[381] A strict application of the letter of the law could result in injustices, "for a small pocket-knife, which is innocuous, may be made to resemble in form and shape a bowie-knife or Arkansas tooth-pick."[382] The court affirmed the conviction, held that the statute must be construed "within the spirit and meaning of the law," and relied on the judge and jury to make the decision as a matter of fact.[383]

---

[377] 22 Tenn. Gen. Assemb. Acts 200, ch. 137.

[378] Haynes v. State, 24 Tenn. (5 Hum.) 120, 120–21 (1844).

[379] *Id.* at 121.

[380] *Id.*

[381] *Id.* at 122.

[382] *Id.*

[383] *Id.* at 122–23.

Similarly, a North Carolina law prohibited carrying "concealed about his person any pistol, bowie knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knuckles, or razor, or other deadly weapon of like kind." Defendant argued that his butcher's knife was not encompassed by the statute. He argued that the statute applied to weapons "used only for purposes offensive and defensive." The North Carolina Supreme Court disagreed, for such an interpretation would allow concealed carry of "deadly weapons of a very fatal type; as for example, a butcher's knife, a shoe knife, a carving knife, a hammer, a hatchet, and the like." Defendant had argued that a broad interpretation would

> embrace small and large pocket knives, and like useful practical things that men constantly carry in their pockets and about their persons, and are more or less deadly instruments in their character. The answer to this is, that these things are not ordinarily carried and used as deadly weapons, but for practical purposes, and the ordinary pocket knife cannot be reckoned as per se a deadly weapon; but it would be indictable to so carry them for such unlawful purpose if deadly in their type and nature. If one should carry a pocket knife, deadly in

### 2. *What is an Arkansas toothpick?*

As for "Arkansas Toothpick," Flayderman says that it was mainly another marketing term for "Bowie knife."[384] But he notes that some Mississippi tax receipts, and some other writings, expressly distinguish an "Arkansas Toothpick" from a "Bowie knife."[385]

Mark Zalesky, publisher of *Knife Magazine*, explains:

> The idea of the "Arkansas toothpick" being a large dagger seems to stem from Raymond Thorp's 1948 book *Bowie Knife* (Thorp actually did some good research, but much of the book is complete nonsense); *The Iron Mistress* novel and movie in 1951/52; and the subsequent interest in Bowie, Crockett, the Alamo etc. during the 1950s and early 1960s. You are dealing with a definition that has changed over the years.[386]

But as of 1840, "Most evidence supports the idea that 'Arkansas toothpick' was originally a 'frontier brag' of sorts, a casual nickname for any variety of bowie knife but particularly types that were popular in Arkansas." [387]

### 3. *The crime in the Arkansas legislature*

The sandbar fight had taken place in 1827. Jim Bowie died on March 6, 1836, as one of the defenders of the Alamo. In 1840, he would become the namesake of Bowie County, the northeasternmost in Texas. According to Zalesky, "we first see the term 'Bowie knife' beginning to come into use in 1835 and by mid-1836 it was everywhere. It is clear that such knives existed before the term for them became popular."[388]

---

its character, as a weapon of assault and defense, he would be indictable, just as he would be if he carried a dirk or dagger.
State v. Erwin, 91 N.C. 545, 546–48 (1884).

[384] FLAYDERMAN, THE BOWIE KNIFE, *supra* note at __, at 265–74.

[385] *Id.*

[386] Mark Zelesky, email to David Kopel, Nov. 10, 2022.

[387] Mark Zelesky, email to David Kopel, Nov. 19, 2022.

[388] Mark Zelesky, email to David Kopel, Nov. 19, 2022.

The first legislation about Bowie knives, from Mississippi and Alabama in mid-1837, may have been a response to a continuing problem of criminal misuse. Legislative attention to the topic was surely intensified by an infamous crime in late 1837, which may have helped lead to the enactment of several laws in succeeding weeks. Historian Clayton Cramer explains:

> Two members of the Arkansas House of Representatives turned from insults to Bowie knives during debate as to which state official should authorize payment of bounties on wolves. Speaker of the House John Wilson was president of the Real Estate Bank. Representative J.J. Anthony sarcastically suggested that instead of having judges sign the wolf bounty warrants, some *really* important official should do so, such as the president of the Real Estate Bank.
>
> Speaker Wilson took offense and immediately confronted Anthony, at which point both men drew concealed Bowie knives. Anthony struck the first blows, and nearly severed Wilson's arm. Anthony then threw down his knife (or threw it at Wilson), then threw a chair at Wilson. In response, Wilson buried his Bowie knife to the hilt in Anthony's chest (or abdomen, depending on the account), killing him. "Anthony fell, exclaiming, 'I'm a dead man,' and immediately expired."[389] "The Speaker himself fell to the floor, weak from loss of blood. But on hands and knees he crawled to his dead opponent, withdrew his Bowie, wiped it clean on Anthony's coat, replaced it in its sheath, and fainted."[390] While Wilson was expelled from the House, he was acquitted at trial, causing "the most intense indignation through the entire State."[391]

---

[389] Quoting WILLIAM F. POPE, EARLY DAYS IN ARKANSAS 225 (Dunbar H. Pope ed., 1895); *The Murder in Arkansas*, 54 NILES' NATIONAL REGISTER 258 (June 23, 1838).

[390] RAYMOND W. THORP, BOWIE KNIFE 4 (1991).

[391] Clayton Cramer, email to David Kopel, Nov. 2022, quoting and citing POPE, *supra* note __, at 225–26; THORP, *supra* note __, at 1–5; *General Assembly*, ARKANSAS STATE GAZETTE, Dec. 12, 1837, at 2 (expulsion two days later); *The trial of John Wilson . . .*, SOUTHERN RECORDER (Milledgeville, Ga.), Mar. 6, 1838; *The Murder in Arkansas*, NILES' NATIONAL REGISTER, *supra*.

## B. Survey of Bowie knife statutes

Section B surveys every Bowie knife statute enacted by any American state or territory in the nineteenth century. Jurisdictions are discussed chronologically, by date of first enactment.

In the footnotes, a cite to an enacted statute also includes a string cite of re-enactments of the same statute, such as part of a recodification of the criminal code.

*Mississippi* (1837).

The first "Bowie knife" law was enacted by Mississippi on May 13, 1837. The statute punished three types of misuse of certain arms: "any rifle, shot gun, sword cane, pistol, dirk, dirk knife, bowie knife, or any other deadly weapon."[392]

It was forbidden to use such arms in a fight in a city, town, or other public place.[393] It became illegal to "exhibit the same in a rude, angry, and threatening manner, not in necessary self defence."[394] Finally, if one of the arms were used in a duel and caused a death, the duelist would be liable for the debts owed by the deceased.[395] All these provisions would later be enacted by some other states.

Another Bowie knife law was also signed on May 13 by Governor Charles Lynch. The state legislature's incorporation of the town of Sharon empowered the local government to pass laws "whereby . . . the retailing and vending of ardent spirits, gambling, and every species of vice and immorality may be suppressed, together with the total inhibition of the odious and savage practice of wearing dirks, bowie knives, or pistols."[396] Similar language appeared in the incorporation of towns in 1839 and 1840.[397]

---

[392] 1837 Miss. L. pp. 291–92.

[393] *Id.*

[394] *Id.*

[395] *Id.*

[396] 1837 Miss. Laws 294.

[397] 1839 Miss. Laws 385, ch. 168, p. 385 (Emery); 1840 Miss. Laws 181, ch. 111 (Hernando).

74

Starting in 1841, the state annual property tax included "one dollar on each and every Bowie Knife."[398] The tax was cut to fifty cents in 1850.[399] But then raised back to a dollar, and extended to each "Arkansas tooth-pick, sword cane, duelling or pocket pistol."[400] In the next legislature, pocket pistols were removed from the tax.[401]

When the Civil War came, the legislature prohibited "any Sheriff or Tax-Collector to collect from any tax payer the tax heretofore or hereafter assessed upon any bowie-knife, sword cane, or dirk-knife, and that hereafter the owner of any howie-knife, sword-cane or dirk-knife shall not be required to give in to the tax assessor either of the aforesaid articles as taxable property."[402] That was a change for before, when tax collectors were allowed to confiscate arms from people who could not pay the property tax.[403]

After the Confederacy surrendered, the legislature was still controlled by Confederates, and an arms licensing law for the former slaves was enacted.

> [N]o freeman, free negro or mulatto, not in the military service of the United States Government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife, and on conviction thereof, in the county court, shall be punished by fine, not exceeding ten dollars, and pay the costs of such proceedings, and all such arms or ammunition shall be forfeited to the informer, and it shall be the duty of every civil and military officer to arrest any freedman, free negro or mulatto found with any such arms or ammunition, and cause him or her to be committed for trial in default of bail.[404]

---

[398] 1841 Miss. Laws 52, ch. 1; 1844 Miss. Laws 58, ch. 1.

[399] 1850 Miss. Laws 43, ch. 1.

[400] 1854 Miss. Laws 50, ch. 1.

[401] 1856–57 Miss. Laws 36, ch. 1 ("each bowie knife, dirk knife, or sword cane").

[402] 1861–62 Miss. Laws 134, ch. 125 (Dec. 19, 1861).

[403] Alabama's system of confiscating arms for unpaid taxes and then selling them at public auction is described *infra*.

[404] 1865 Miss. L. ch. 23, pp. 165-66.

75

As detailed in Justice Alito's opinion and Justice Thomas's concurrence in *McDonald v. Chicago*, laws such as Mississippi's prompted Congress to pass the Second Freedmen's Bureau Bill, the Civil Rights Act, and the Fourteenth Amendment, all with the express intent of protecting the Second Amendment rights of the freedmen.[405]

After the war, the Auditor of Public Accounts had to "furnish each clerk of the board of supervisors" with a list of taxable property owned by each person. This included "pistols, dirks, bowie-knives, sword-canes, watches, jewelry, and gold and silver plate."[406]

Concealed carry was outlawed for "any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description."[407] There was an exception for persons "threatened with, or having good and sufficient reason to apprehend an attack."[408] Also excepted were travelers, but not "a tramp."[409] Sales to minors or to intoxicated persons were outlawed.[410] A father who permitted a son under 16 to carry concealed was criminally liable.[411] Students at "any university, college, or school" could not carry concealed.[412]

The forbidden items for concealed carry were expanded in 1896: "any bowie knife, dirk knife, butcher knife, pistol, brass or metalic knuckles, sling shot, sword or other deadly weapon of like kind or description."[413] Two years later, the legislature corrected the spelling of "metallic," and provided that the jury "may return a verdict that there shall be no imprisonment," in which case the judge would impose a fine.[414]

*Alabama* (1837).

---

[405] 561 U.S. 742 (2010).

[406] 1871 Miss. Laws 819–20; 1876 Miss. Laws 131, 134, ch. 104; 1878 Miss. Laws 27, 29, ch. 3; 1880 Miss. Laws 21, ch. 6; 1892 Miss. Laws 194, 198, ch. 74; 1894 Miss. Laws 27, ch. 32; 1897 Miss. Laws 10, ch. 10.

[407] 1878 Miss. Laws 175–76, ch. 46.

[408] *Id.*

[409] *Id.*

[410] *Id.*

[411] *Id.*

[412] *Id.*

[413] 1896 Miss. Laws 109–10, ch. 104.

[414] 1898 Miss. Laws 86, ch. 68.

The legislature imposed a $100 per knife tax on the sale, transfer, or import of any "Bowie-Knives or Arkansaw Tooth-picks," or "any knife or weapon that shall in form, shape or size, resemble" them. The $100 tax was equivalent to about $2,600 dollars today.[415]

Additionally, if any person carrying one "shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought."[416]

Then in 1839 Alabama outlawed concealed carry of "any species of fire arms, or any bowie knife, Arkansaw tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon."[417] An 1856 statute prohibited giving a male minor a handgun or bowie knife.[418]

According to the U.S. Supreme Court's analysis of the historical record, concealed carry bans are constitutionally unproblematic, as long as open carry is allowed. Or vice versa. The American legal tradition of the right to arms allows the legislature to regulate the mode of carry.[419]

The exorbitant $100 transfer tax was replaced with something less abnormal. The annual state taxes on personal property included $2 on "every bowie knife or revolving pistol."[420] Even that amount was hefty for a poor person. As the defense counsel in an 1859 Texas case examined *infra* had pointed out, a person who could not afford a firearm could buy a common butcher knife (which fell within the expansive definition of "Bowie knife") for no more than 50 cents.[421] As described next, the cost of manufacturing a high-quality Bowie knife was a little less than $3, which approximately implies a

---

[415] Fed. Reserve Bank of Minneapolis, *supra* note __ (2022=884.6. 1837 = 34).

[416] ACTS PASSED AT THE CALLED SESSION OF THE GENERAL ASSEMBLY OF THE STATE OF ALABAMA 7 (Tuscaloosa: Ferguson & Eaton, 1837) (June 30, 1837).

[417] ACTS PASSED AT THE ANNUAL SESSION OF THE GENERAL ASSEMBLY OF THE STATE OF ALABAMA 67–68 (Tuscaloosa: Hale & Eaton, 1838 [1839]) (Feb. 1, 1839).

[418] ACTS OF THE FIFTH BIENNIAL SESSION OF THE GENERAL ASSEMBLY OF ALABAMA, HELD IN THE CITY OF MONTGOMERY, COMMENCING ON THE SECOND MONDAY IN NOVEMBER, 1855, at 17 (1856).

[419] *Bruen*, 142 S. Ct. at 2150.

[420] 1851-52 Ala. Laws 3, ch. 1.

[421] Cockrum v. State, 24 Tex. 394, 395–96 (1859) ("A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.").

retail price around $6. Whether a knife cost 50 cents or 6 dollars, an annual $2 tax likely had an effect in discouraging ownership, as the tax was so high in relation to the knife's value. The cumulative annual taxes on the knife would far exceed the knife's cost.

The legislature having aggressively taxed Bowie knives, there were not enough of them in Alabama when the Civil War began in 1861. The legislature belatedly recognized that the militia was under-armed. In military crisis, the legislature appropriated funds for the state armory at Mobile to manufacture Bowie knives:

> Whereas there is a threatened invasion of our State by those endeavoring to subjugate us; and whereas there is a great scarcity of arms, and the public safety requires weapons to be placed in the hands of our military, therefore
>
> . . . [S]ix thousand dollars . . . is hereby appropriated . . . to purchase one thousand Bowie-knife shaped pikes [similar to a spear], and one thousand Bowie knives for the use of the 48th regiment, Alabama militia.[422]

The Governor was authorized to draw further on the treasury, as he saw appropriate, "to cause arms of a similar, with such improvements as he may direct, to be manufactured for any other regiment or battalion of militia, or other troops."[423]

If Alabama legislatures starting in 1837 had not suppressed the people's acquisition of militia-type knives, then the 1861 wartime legislature might not have been forced to divert scarce funds to manufacture Bowie knives for the militia. The men and youth of Alabama militia could have just armed themselves in the ordinary course of affairs, buying large knives for themselves for all legitimate uses.

The legislature had appropriated $6,000 to buy 2,000 Bowie knives and pikes. This works out to $3 manufacturing cost per knife or pike.

A little later, a wartime tax of 5% on net profits was imposed on many businesses, including "establishments for manufacturing or repairing shoes,

---

[422] 1861 Ala. Laws 214-15, ch. 22 (Nov. 27, 1861).

[423] *Id.*

harness, hats, carrigos [horse-drawn carriages], wagons, guns, pistols, pikes, bowie knives."[424]

After Reconstruction ended, an 1881 concealed carry ban applied to "a bowie knife, or any other knife, or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or any air gun."[425] "[E]vidence, that the defendant has good reason to apprehend an attack may be admitted in the mitigation of the punishment, or in justification of the offense."[426]

Throughout the nineteenth century, and all over the United States, grand and petit juries often refused to enforce concealed carry laws against defendants who had been acting peaceably. The statute attempted to address the problem: "grand juries . . . shall have no discretion as to finding indictments for a violation of this, act . . . if the evidence justifies it, it shall be their duty to find and present the indictment."[427] To make the law extra-tough, "the fines under this act shall be collected in money only" (rather than allowing payment by surrender of produce, livestock, personal chattels, etc.).[428]

Shortly after the end of the Civil War, the unreconstructed white supremacist legislature had enacted a harsh property tax, designed to disarm poor people of any color. It was $2 on "all pistols or revolvers" possessed by "private persons not regular dealers holding them for sale."[429] For "all bowie-knives, or knives of the like description," the tax was $3.[430] If the tax were not paid, the county assessor could seize the arms.[431] To recover the arms, the owner had to pay the tax plus a 50% penalty.[432] After 10 days, the assessor could sell the arms at auction.[433]

Later, the arms seizure provisions were removed, and the tax reduced to levels for other common household goods. "All dirks and bowie knives, sword

---

[424] 1862 Ala. Laws 8, ch. 1.

[425] 1880–81 Ala. Laws 38–39, ch. 44.

[426] *Id.*

[427] *Id.*

[428] *Id.*

[429] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.

[430] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.

[431] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.

[432] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.

[433] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.

canes, pistols, on their value, three-fourths of one percent; and fowling pieces and guns, on their value, at the rate of seventy-five cents on the one hundred dollars."[434]

State law provided that county assessors could require a person to disclose under oath the taxable property he owned, by answering questions such as "What is the value of your household and kitchen furniture, taxable library, jewelry, silverware, plate, pianos and other musical instruments, paintings, clocks, watches, gold chains, pistols, guns, dirks and bowie-knives . . ."[435] The tax rate was 3/4 of 1% of the value.[436]

The tax was cut in 1882 to 55 cents per hundred dollars of value.[437] Then raised to 60 cents for inter alia, "all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and jennets and race horses; all hogs, sheep and goats."[438]

Separately, the legislature imposed occupational taxes. At the time, state sales taxes were rare, and the occupational tax levels sometimes approximated the amount that a vendor might have collected in sales taxes. "For dealers in pistols, bowie knives and dirk knives, whether the principal stock in trade or not, twenty-five dollars."[439] Finally, in 1898, the license for pistol, bowie, and dirk sellers become $100.[440] Separately, there was a $5 tax for wholesale dealers in pistol and rifle cartridges, raised to $10 for dealers in towns of 20,000 or more.[441] The wholesale license also authorized retail sales.[442]

---

[434] 1874-75 Ala. Laws 6, ch. 1.

[435] 1875-76 Ala. Laws 46, ch. 2; 1876-77 Ala. Laws 4, ch. 2.

[436] 1875-76 Ala. Laws 46, ch. 2; 1876-77 Ala. Laws 4, ch. 2.

[437] For "silverware, ornaments and articles of taste, pianos and other musical instruments, paintings, clocks, gold Furniture, and silver watches, and gold safety chains; all wagons or other vehicles; all mechanical tools and farming implements; all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and-jennets, and race horses; all hogs, sheep and goats."1882 Ala. Laws 71, ch. 61.

[438] 1884 Ala. Laws 6, ch. 1.

[439] 1874 Ala. Laws 41, ch. 1. *See also* 1875-76 Ala. Laws 82, ch. 1 ($50); 1886 Ala. Laws 36, ch. 4 (adding "pistol cartridges"); 1892 Ala. Laws 183, ch. 95 ($300, "provided that any cartridges whether called rifle or pistol cartridges or by any other name that can be used in a pistol shall be deemed pistol cartridges within the meaning of this section").

[440] 1898 Ala. Laws 190, ch. 9036.

[441] *Id.*

[442] *Id.*

State legislative revisions to municipal charters gave a municipality the power "to license dealers in pistols, bowie-knives and dirk-knives."[443]

*Georgia* (1837).

The legislature in 1837 declared:

> that it shall not be lawful for any merchant or vender of wares or merchandize in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere any . . . Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.[444]

The Georgia Supreme Court held all of the law to violate the Second Amendment, except a section outlawing concealed carry.[445]

---

[443] 1878 Ala. Laws 437, ch. 314 (Uniontown); 1884 Ala. Laws 552, ch. 314 (Uniontown) (adding dealer in "brass knuckles"; "the sums charged for such licenses" may "not exceed the sums established by the revenue laws of the State. . . ."); 1884-85 Ala. Laws 323, ch. 197 (Tuscaloosa) ("to license and regulate pistols or Shooting galleries, the game of quoits, and all kind and description of games of chance played in a public place; . . . and dealers in pistols, bowie-knives and shotguns or fire arms, and knives of like kind or description") (unusually broad, not repeated for other charters); 1888 Ala. Laws 965, ch. 550 (Faunsdale); 1890 Ala. Laws 764, ch. 357 (Uniontown); 1890 Ala. Laws 1317, ch. 573 (Decatur) (to license dealers in "pistols, or pistol cartridges, bowie knives, dirk knives, whether principal stock in trade or not, $100.00."); 1892 Ala. Laws 292, ch. 140 (Demopolis) (same as Decatur); 1894 Ala. Laws 616, ch. 345 (Columbia) (same); 1894-95 Ala. Laws 1081, ch. 521, p. 1081 (Tuskaloosa) (to license and collect an annual tax on "gun shops or gun repair shops" and "dealers in pistols or pistol cartridges or bowie knives or dirk knives."); 1896 Ala. Laws 71, ch. 62 (Uniontown) ("to license . . . dealers in pistols, bowie knives, dirk knives or brass knuckles"); 1898-99 Ala. Laws 1046, ch. 549 (Fayette) (maximum dealer license fee shall not exceed "Pistols, pistol cartridges, bowie knives, dirk knives, whether principal stock in trade or not, $50.00"); 1898 Ala. Laws 1102, ch. 566 (Uniontown) (same as previous Uniontown charter); 1898 Ala. Laws 1457, ch. 704 (Uniontown) (same).

[444] ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED IN MILLEDGEVILLE AT AN ANNUAL SESSION IN NOVEMBER AND DECEMBER, 1837, at 90–91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837).

[445] *Nunn*, 1 Ga. 243.

After the November 1860 election of Abraham Lincoln, with a secession crisis in progress, the Georgia legislature forbade "any person other than the owner" to give "any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for purpose of offence or defence."[446] The act was not be construed to prevent "owners or overseers from furnishing a slave with a gun for the purpose of killing birds, &c., about the plantation of such owner or overseer."[447]

An 1870 statute forbade open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of justice, or any general election ground or precinct, or any other public gathering," except for militia musters.[448]

The old 1837 statute against concealed carry was updated in 1882 to eliminate the exception for "horsemen's pistol."[449] Thus, concealed carry remained illegal with "any pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense."[450] Any "kind of metal knucks" was added in 1898.[451]

Furnishing "any minor" with "any pistol, dirk, bowie knife or sword cane" was outlawed in 1876.[452]

A $25 occupational tax was enacted in 1882 for "all dealers in pistols, revolvers, dirk or Bowie knives."[453] The tax was later raised to $100, adding dealers of "pistol or revolver cartridges."[454] Then the tax was reduced to $25.[455] But raised back to $100 in 1890.[456] In 1892, "metal knucks" were added, and

---

[446] 1860 Ga. Laws 56–57, ch. 64.

[447] *Id.*

[448] 1870 Ga. Laws 421, ch. 285; 1879 Ga. Laws 64, ch. 266 (creating law enforcement officer exception).

[449] 1882-83 Ga. Laws 48-49, ch. 93.

[450] *Id.*

[451] 1898 Ga. Laws 60, ch. 106.

[452] 1876 Ga. Laws 112, ch. 128 (O. no. 63).

[453] 1882-83 Ga. Laws 37, ch. 18.

[454] 1884-85 Ga. Laws 23, ch. 52; 1886 Ga. Laws 17, ch. 54.

[455] 1888 Ga. Laws 22, ch. 123.

[456] 1890 Ga. Laws 38, ch. 131.

the ammunition expanded to "shooting cartridges."[457] The tax was cut to $25 in 1894.[458]

The state property tax statute required taxpayers to disclose all sorts of personal and business property, including by answering, "What is the value of your guns, pistols, bowie knives and such articles."[459] The same question was included in the municipal charter for the town of Jessup.[460] And in the new charter for Cedartown.[461]

*South Carolina* (1838).

The legislature received a "petition of sundry citizens of York, praying the passage of a law to prevent the wearing of Bowie Knives, and to exempt managers of elections from militia duty." A member "presented the presentment of the Grand Jury of Union District, in relation to carrying Bowie knives, and retailing spirituous liquors." The knife and liquor issues were referred to the Judiciary Committee.[462]

The legislature did not enact any law with the words "bowie knife" in 1838, or in the nineteenth century.

*Tennessee* (1838).

Like Georgia, Tennessee enacted Bowie knife legislation just a few weeks after the nationally infamous December crime on the floor of the Arkansas House of Representatives.

In January 1838, the Tennessee legislature statute forbade sale or transfer of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick."[463]

---

[457] 1892 Ga. Laws 25, ch. 133.

[458] 1894 Ga. Laws 21, ch. 151; 1896 Ga. Laws 25, ch. 132; 1898 Ga. Laws 25, ch. 150 (changing ammunition to "shooting cartridges, pistol or rifle cartridges").

[459] 1884 Ga. Laws 30, ch. 457; 1886 Ga. Laws 26, 28, ch. 101; 1888 Ga. Laws 261, ch. 103; 1889 Ga. Laws 993, ch. 640.

[460] 1888 Ga. Laws 261, ch. 103.

[461] 1889 Ga. Laws 993, ch. 640.

[462] 1838 S.C. Acts (Journal to the Proceedings) 29, 31.

[463] ACTS PASSED AT THE FIRST SESSION OF THE TWENTY-SECOND GENERAL ASSEMBLY OF THE STATE OF TENNESSEE: 1837-8, 200–01 (Nashville: S. Nye & Co., 1838) (Jan. 21, 1838).

Further, if a person "shall maliciously draw or attempt to draw" such a concealed knife "for the purpose of sticking, cutting, awing, or intimidating any other person," the person would be guilty of a felony.[464] Whether the carrying was open or concealed, if a person in "sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony."[465] Civil officers who arrested and prosecuted a defendant under the act would receive a $50 per case bonus; the Attorney General would receive $20 for the same, to be paid by the defendant.[466]

The concealed carry ban was upheld against a state constitution challenge.[467] The court said that the right to arms was an individual right to keep militia-type arms, and a Bowie knife would be of no use to a militia.[468]

In *Day v. State*, the 1838 law against drawing a Bowie knife was applied against a victim who had drawn in immediate self-defense.[469] Upholding the conviction the Tennessee Supreme Court noted that laws against selling and carrying Bowie knives were "generally disregarded in our cities and towns."[470] Likewise, a post-Reconstruction statute, allowed carrying only of Army or Navy type pistols.[471] When a person's "life had been threatened within the previous hour by a dangerous and violent man, who was in the wrong," the

---

[464] *Id.*

[465] *Id.*

[466] *Id.*

[467] Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840).

[468] *Id.* at 158 ("These weapons would be useless in war. They could not be employed advantageously in the common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution.").

[469] Day v. State, 37 Tenn. (5 Sneed.) 496 (1857).

It seems that during an altercation between the defendant and Bacon, at the house of the latter, the defendant was ordered by Bacon to leave the house, which he did, Bacon following him to the door, with a large bottle in his hand. While Bacon was standing upon the door-step, the defendant approached him and, laying his left hand upon Bacon's shoulder, told him not to rush upon him, at the same time drawing a large knife from beneath his vest, which he held in his right hand behind him, but made no effort to use.

*Id.* at 496–97.

[470] *Id.* at 499.

[471] Text at notes __.

victim carried a concealed pistol that was not an Army or Navy type.[472] The conviction was upheld, citing *Day v. State*.[473]

The legislature in 1856 forbade selling, loaning, or giving any minor "a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife."[474] The act "shall not be construed so as to prevent the sale, loan, or gift to any minor of a gun for hunting."[475]

In October 1861, after Tennessee had seceded from the Union, all the laws against importing, selling, or carrying "pistols, Bowie knives, or other weapons" were suspended for the duration of the war.[476]

In 1869, the legislature forbade carrying any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people."[477]

*Virginia* (1838).

A few weeks after the Arkansas legislative crime, Virginia made it illegal to "habitually or generally" carry concealed "any pistol, dirk, bowie knife, or any other weapon of the like kind."[478] If a habitual concealed carrier were prosecuted for murder or felony, and the weapon had been removed from concealment within a half hour of the infliction of the wound, the court had to formally note the fact.[479] Even if the defendant were acquitted or discharged, he could be prosecuted within a year for the unlawful carry.[480] Or alternatively, in the original prosecution, a jury that acquitted for the alleged violent felony still had to consider whether the defendant was a habitual carrier, drew within

---

[472] *Coffee v. State*, 72 Tenn. (4 Lea.) 245, 246 (1880).

[473] *Id.*

[474] 1855-56 Tenn. Pub. Acts 92, ch. 81.

[475] *Id.*

[476] 1861 Tenn. Pub. Acts 16–17, ch. 23.

[477] 1869-70 Tenn. Pub. Acts 23-24, ch. 22.

[478] ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, PASSED AT THE SESSION OF 1838, at 76-77 (Richmond: Thomas Ritchie, 1838) (Feb. 3, 1838).

[479] *Id.*

[480] *Id.*

the half-hour period, and if so, convict the defendant of the concealed carry misdemeanor.[481]

The law was simplified in 1847 to simply provide a fine for habitual concealed carry by "[a]ny free person," with "one moiety of the recovery to the person who shall voluntarily cause a prosecution for the same."[482]

An 1881 statute forbade concealed carry, even if not habitual, of "any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind."[483]

Whether or not concealed, carrying "any gun pistol, bowie-knife, dagger, or other dangerous weapon to a place of public worship" during a religious meeting was forbidden in 1869.[484] So was carrying "any weapon on Sunday, at any place other than his own premises, except for good and sufficient cause."[485]

After the Civil War, the state property tax law included in the list of taxable items of personal property: "The aggregate value of all rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind."[486] There was an exception for arms issued by the state "to members of volunteer companies."[487]

The legislature in 1890 forbade selling "to minors under sixteen years of age" any "cigarettes or tobacco in any form, or pistols, dirks, or bowie knives."[488]

*Florida* (1838).

Two months after the Arkansas homicide, the Florida legislature supplemented an 1835 statute against concealed carry in general. The new

---

[481] *Id.*

[482] 1847 Va. Acts 110; 1870 Va. Acts 510, ch. 349.

[483] 1881 Va. Acts 233, ch. 219; 1883-84 Va. Acts 180, ch. 144 (1884); 1896 Va. Acts 826, ch. 745 (allowing "the hustings judge of any husting court" to issue one-year concealed carry permits).

[484] 1875 Va. Acts 102, ch. 124; 1877 Va. Acts 305, ch. 7.

[485] 1875 Va. Acts 102, ch. 124; 1877 Va. Acts 305, ch. 7.

[486] 1874 Va. Acts 282–83, ch. 239; 1875 Va. Acts 164, ch. 162; 1881 Va. Acts 499, ch. 119; 1883 Va. Acts 563, ch. 450; 1889 Va. Acts 19, ch. 19; 1889 Va. Acts 200, ch. 244; 1893 Va. Acts 931, ch. 797.

[487] 1874 Va. Acts 282–83, ch. 239; 1875 Va. Acts 164, ch. 162; 1881 Va. Acts 499, ch. 119; 1883 Va. Acts 563, ch. 450; 1889 Va. Acts 19, ch. 19; 1889 Va. Acts 200, ch. 244; 1893 Va. Acts 931, ch. 797.

[488] 1889-90 Va. Acts 118, ch. 152; 1893-94 Va. Acts 425-26, ch. 366.

statute provided that any person who wants to "vend dirks, pocket pistols, sword canes, or bowie knives" must pay an annual $200 tax.[489] Any individual who wants to carry one openly must pay a $10 tax.[490] The county treasurer must give the individual a receipt showing that the open carry tax has been paid.[491]

After the Civil War, a new Black Code forbade "any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge of Probate of the county."[492] The applicant needed "the recommendation of two respectable citizens of the county, certifying to the peaceful and orderly character of the applicant."[493] A person who informed about a violation could keep the arms.[494] Violators of the statute "shall be sentenced to stand in the pillory for one hour, or be whipped, not exceeding thirty-nine stripes, or both, at the discretion of the jury."[495]

There were no published Florida statutory compilations from 1840 until 1881. By then, the 1838 tax law ($200 annually for vendors; $10 for open carry), had been replaced with a $50 occupational license tax for vendors.[496] The merchant license tax was raised to $100 in 1889 for vendors of "pistols, bowie knives, or dirk knives."[497] Additionally, The "merchant, store-keeper, or dealer" could not sell the items "to minors."[498] The tax was cut to $10 in 1893, but extended to cover sellers of "pistols, Springfield rifles [the standard U.S. Army rifle], repeating rifles, bowie knives or dirk knives."[499]

---

[489] 1838 Fla. Laws 36, ch. 24 (Feb. 10, 1838).

[490] *Id.*

[491] *Id.*

[492] 1865 Fla. Laws 25, ch. 1466.

[493] *Id.*

[494] *Id.*

[495] *Id.*

[496] 1 DIGEST OF THE LAWS OF THE STATE OF FLORIDA, FROM THE YEAR ONE THOUSAND EIGHT HUNDRED AND TWENTY-TWO, TO THE ELEVENTH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND EIGHTY-ONE INCLUSIVE 873 (James F. McClellan, comp.) (1881) (Fla. ch. 174, § 24, item 14).

[497] 1889 Fla. Laws 6, ch. 3847 (2d reg. sess.); 1891 Fla. Laws 9, ch. 4010 (3d regular sess.).

[498] 1889 Fla. Laws 6, ch. 3847 (2d reg. sess.); 1891 Fla. Laws 9, ch. 4010 (3d regular sess.).

[499] 1893 Fla. Laws 18, ch. 4115 (4th regular sess.); 1895 Fla. Laws 14, ch. 4322 (5th regular sess.).

*North Carolina* (1840).

In 1840, North Carolina prohibited "any free Negro, Mulatto, or free Person of Colour" to "wear or carry about his or her person, or keep in his or her house, any Shot-gun, Musket, Rifle, Pistol, Sword, Dagger or Bowie-knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions."[500] An 1846 statute forbade "any slave" to receive "any sword, dirk, bowie-knife, gun, musket, or fire-arms of any description whatsoever, or any other deadly weapons of offence, or any lead, leaden balls, shot, powder, gun cotton, gun flints, gun caps, or other material used for shooting."[501] There were exceptions if "a slave" with "written permission" from a "manager" were picking up items for the manager, or if the items were "to be carried in the presence of such manager."[502]

The state property tax laws covered Bowie knives and other arms. The arms were tax-exempt if the owner did not use or carry them:

> on all pistols (except such as shall be used exclusively for mustering, and also those kept in shops and stores for sale) one dollar each; on all bowie knives, one dollar each; and dirks and sword canes, fifty cents each; (except such as shall be kept in shops and stores for Sale) Provided, however, that only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner. . . .[503]

In the arms licensing law for free people of color, the Black Code continued to treat Bowie knives like firearms. "If any free negro shall wear or carry about his person, or keep in his house, any shot-gun, musket, rifle, pistol, sword, dagger, or bowie-knife," he shall be guilty of a misdemeanor, unless he had

---

[500] 1840 N.C. Sess. Laws 61, ch. 30–31.

[501] 1846 N.C. Sess. Laws 107, ch. 42.

[502] *Id.*

[503] 1850 N.C. Sess. Laws 243, ch. 121. *See also* 1856-57 N.C. Sess. Laws 34, ch. 34 (raising the tax on dirks and sword canes to 65 cents); 1866 N.C. Sess. Laws 33–34, ch. 21, § 11 (one dollar on "every dirk bowie-knife, pistol, sword-cane, dirk-cane and rifle cane (except for arms used for mustering and police duty) used or worn about the person of any one during the year"; tax did not "apply to arms used or worn previous to the ratification of this act").

been issued a one-year license from the court of pleas and quarter-sessions.[504] When the Civil War drew near, the legislature repealed the licensing law, and forbade "any free negro" to "wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot."[505]

An 1877 private act banned concealed carry in Alleghany County, under terms similar to what would be enacted statewide in 1879.[506] The statewide statute outlawed concealed carry of "any pistol, bowie knife, dirk, dagger, slungshot, loaded cane, brass, iron or metallic knuckles or other deadly weapon of like kind," "except when upon his own premises."[507]

An 1893 statute made it illegal to "in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot."[508] A loaded cane had a hollowed section filled with lead.[509] It is a powerful impact weapon.[510]

As the legislature revised municipal charters, it specified what sorts of arms-related taxes the municipality could impose. There was much variation, and sometimes the legislature set maxima.[511]

---

[504] 1856 N.C. Sess. Laws 577, ch. 107, § 66.

[505] 1860–61 N.C. Sess. Laws 68, ch. 34 (Feb. 23, 1861).

[506] 1877 N.C. Sess. Laws 162–63, ch. 104.

[507] 1879 N.C. Sess. Laws 231, ch. 127.

[508] 1893 N.C. Sess. Laws 468–69, ch. 514.

[509] *See* Part VI.C.2.

[510] *Id.*

[511] In chronological order: Wilmington: to tax "every pistol gallery . . . on all pistols, dirks, bowie-knives or sword-canes, if worn about the person at any time during the year." 1860 N.C. Sess. Laws 219–20, ch. 180. Charlotte: $50 on "every pistol, bowie-knife, dirk, sword-cane, or other deadly weapons worn upon the person, except a pocket knife, without special permission of the board of aldermen." 1866 N.C. Sess. Laws 63, ch. 7, § 19. Salisbury: "on all pistols, except when part of stock in trade, a tax not exceeding one dollar; on all dirks, bowie-knives and sword canes, if worn about the person at any time during the year, a tax not exceeding ten dollars." 1868 N.C. Sess. Laws 202, ch. 123. Lincolnton: $5 for worn weapons. 1870 N.C. Sess. Laws 73, ch. 32. Lumberton: Can tax "pistols, dirks, bowie knives or sword canes" as seen fit. 1873 N.C. Sess. Laws 279, ch. 7; 1883 N.C. Sess. Laws 808, ch. 89 (Lumberton recharter); Asheville: anyone "selling pistols, bowie knives, dirks, slung shot, brass knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars." 1883 N.C. Sess. Laws 872, ch. 111. Waynesville: like Asheville, but $40. 1885 N.C. Sess. Laws 1097, ch.

*Washington territory* (1854).

Similar to 1837 Mississippi, the Washington Territory provided a criminal penalty for, "Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon . . ."[512]

*California* (1855).

California adopted a more elaborate version of the 1837 Mississippi law that if a person killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon," the duelist would have to pay the decedent's debts.[513] The duelist would also be liable to the decedent's family for liquidated damages.[514]

*Louisiana* (1855).

---

127. Reidsville: $25 "On every pistol, bowie-knife, dirk, sword-cane, or other deadly weapon, except carried by officers in the discharge of their duties." 1887 N.C. Sess. Laws 885, ch. 58, § 50. Rockingham: to tax pistols, dirks, bowie knives, or sword canes. 1887 N.C. Sess. Laws 988, ch. 101. Hickory: $50 on sellers; "sling-shots" replaces "slung shot." 1889 N.C. Sess. Laws 956, ch. 238. Marion: $25 on every "pistol, bowie-knife, dirk, sword-cane or other deadly weapon, except carried by officers in discharge of their duties." 1889 N.C. Sess. Laws 836, ch. 183, § 27. Mount Airy: $10 on open carry of "a pistol, bowie-knife, dirk, sword-cane or other deadly weapon, except guns, shot-guns, and rifles for shooting game." Wadesborough: "on all pistols, dirks, bowie-knives, or sword-canes." 1891 N.C. Sess. Laws 705, ch. 26. Columbus: same. 1891 N.C. Sess. Laws 902, ch. 101. Buncombe: same. 1891 N.C. Sess. Laws 1423, ch. 327. Asheville: $500 on vendors selling "pistols, bowie-knives, dirks, slung-shots, brass or metallic knuckles, or other deadly weapons of like character." 1895 N.C. Sess. Laws 611, ch. 352. Morven: "on all pistols, dirks, bowie knives, or sword canes." 1897 N.C. Sess. Laws 115–16, ch. 71. Lilesville: same. 1897 N.C. Sess. Laws 237, ch. 130. Mount Airy: $75 on "every vendor or dealer in pistols and other deadly weapons." 1897 N.C. Sess. Laws 154, ch. 90. Salisbury: same $500 as Asheville. 1899 N.C. Sess. Laws 503, ch. 186. Monroe: Same, but $100. 1899 N.C. Sess. Laws 968, ch. 352. Manly: tax "on all pistols, dirks, bowie knives or sword canes." 1899 N.C. Sess. Laws 766, ch. 260.

[512] 1854 Wash. Sess. Laws 80, ch. 2; 1859 Wash. Sess. Laws 109, ch. 2; 1862 Wash. Sess. Laws 284, ch. 2; 1869 Wash. Sess. Laws 203–04, ch. 2; 1873 Wash. Sess. Laws 186, ch. 2.

[513] 1855 Cal. Stat. 152–53, ch. 127.

[514] *Id.*

90

The legislature banned concealed carry of "pistols, bowie knife, dirk, or any other dangerous weapon."[515]

During Reconstruction, when election violence was a major problem, the legislature forbade carry of "any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed weapon" within a half-mile of a polling place when the polls were open, or within a half-mile of a voter registration site on registration days.[516]

Giving a person "under age of twenty-one years" any "any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person" was forbidden.[517]

*New Hampshire* (1856).

Like all of the Northeast, New Hampshire in mid-century had no interest in Bowie knife laws. But Bowie knives did appear in a legislative resolution that considered Bowie knives and revolvers to be effective for legitimate defense.

On May 19, 1856, U.S. Sen. Charles Sumner (R-Mass.) delivered one of the most famous speeches in the history of the Senate, "The Crime Against Kansas."[518] Among the crimes he described, pro-slavery settlers in the Kansas Territory were trying to make Kansas a slave territory, by attacking and disarming anti-slavery settlers, in violation of the Second Amendment. Sumner turned his fire on South Carolina Democrat Andrew Butler:

> Next comes the Remedy of Folly . . . from the senator from South Carolina, who . . . thus far stands alone in its support. . . . This proposition, nakedly expressed, is that the people of Kansas should be deprived of their arms.
>
> . . .
>
> Really, sir, has it come to this? The rifle has ever been the companion of the pioneer, and, under God, his tutelary protector against the red man and the beast of the forest. Never was this

---

[515] 1855 La. Acts 148, ch. 120; 1898 La. Acts. 159, ch. 112 (same).

[516] 1870 La. Acts 159–60, ch. 100; 1873 La. Acts. 27, ch. 98.

[517] 1890 La. Acts 39, ch. 46.

[518] SPEECH OF HON. CHARLES SUMNER, IN THE SENATE OF THE UNITED STATES, 19TH AND 20TH, MAY 1856.

efficient weapon more needed in just self-defence than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached. And yet, such is the madness of the hour, that, in defiance of the solemn guaranty, embodied in the Amendments of the Constitution, that "the right of the people to keep and bear arms shall not be infringed," the people of Kansas have been arraigned for keeping and bearing them, and the senator from South Carolina has had the face to say openly, on this floor, that they should be disarmed — of course, that the fanatics of Slavery, his allies and constituents, may meet no impediment. Sir, the senator is venerable . . . but neither his years, nor his position, past or present, can give respectability to the demand he has made, or save him from indignant condemnation, when, to compass the wretched purposes of a wretched cause, he thus proposes to trample on one of the plainest provisions of constitutional liberty.[519]

That wasn't even close to the worst that Sumner said about Brooks that day. Most notably, he compared Butler to Don Quixote:

The senator from South Carolina has read many books of chivalry, and believes himself a chivalrous knight, with sentiments of honor and courage. Of course he has chosen a mistress to whom he has made his vows, and who, though ugly to others, is always lovely to him ; though polluted in the sight of the world, is chaste in his sight; — I mean the harlot Slavery.[520]

Three days later, Butler's nephew, U.S. Rep. Preston Brooks (D-S.C.) snuck up behind Sumner while he working at his desk on the Senate floor and assaulted him with a cane.[521] He nearly killed Sumner, who was not able to resume his Senate duties for two and a half years.[522] The assault was widely

---

[519] *Id.* at 64–65.

[520] *Id.* at 9.

[521] *See* Gregg M. McCormick, Note, *Personal Conflict, Sectional Reaction: The Role of Free Speech in the Caning of Charles Sumner*, 85 Tex. L. Rev. 1519, 1526–27 (2007).

[522] *See id.* at 1527.

applauded in the South.[523] The attack symbolized a broader problem: In the slave states, the law and the mobs suppressed any criticism of slavery, lest it inspire slave revolt.[524] Even in free states, abolitionist speakers were attacked by mobs.[525]

In response, the New Hampshire legislature on July 12 passed a resolution "in relation to the late acts of violence and bloodshed by the Slave Power in the Territory of Kansas, and at the National Capital."[526] As one section of the resolution observed, it was becoming difficult for people to speak out against slavery unless they were armed for self-defense:

> Resolved, That the recent unmanly and murderous assaults which have disgraced the national capital, are but the single outbursts of that fierce spirit of determined domination which has revealed itself so fully on a larger field, and which manifests itself at every point of contact between freedom and slavery, and which, if it shall not be promptly met and subdued, will render any free expression of opinion, any independence of personal action by prominent men of the free States in relation to the great national issue now pending, imprudent and perilous, unless it shall be understood that it is to be backed up by the bowie-knife and the revolver.[527]

Despised as Bowie knives and revolvers were by some slave state legislatures, New Hampshire recognized that the First Amendment is backed up by the Second Amendment, as a last resort.

---

[523] *See id.* at 1529–33.

[524] *See id.* at 1519–20 ("Prior to the Sumner-Brooks affair, the suppression of abolitionist mailings, the Congressional Gag Rule, the murder of Reverend Lovejoy, and suppression of antislavery speech in the Kansas Territory served as concrete examples of slavery's threat to Northern rights.").

[525] *See, e.g., McDonald*, 561 U.S. at 846 (Thomas, J., concurring) ("Mob violence in many Northern cities presented dangers as well."); Michael Kent Curtis, *The Fraying Fabric of Freedom: Crisis and Criminal Law in Struggles for Democracy and Freedom of Expression*, 44 TEX. TECH. L. REV. 89, 102 (2011) ("In the North, mobs disrupted abolitionist meetings and destroyed the presses of anti-slavery newspapers.").

[526] 1856 N.H. Laws 1781–82, ch. 1870.

[527] *Id.*

*Texas* (1856).

If a person used a "bowie knife" or "dagger" in manslaughter, the offense "shall nevertheless be deemed murder, and punished accordingly." A "bowie knife" or "dagger" were defined as "any knife intended to be worn upon the person, which is capable of inflicting death, and not commonly known as a pocket knife."[528]

The Texas Supreme Court upheld the law in *Cockrum v. State*.[529] Under the Second Amendment and the Texas Constitution right to arms and the Second Amendment, "The right to carry a bowie-knife for lawful defense is secured, and must be admitted."[530] However, extra punishment for a crime with a Bowie knife did not violate the right to arms.[531]

In the chaotic years after the Civil War, the legislature prohibited carrying "any gun, pistol, bowie-knife or other dangerous weapon, concealed or unconcealed," within a half mile of a polling place while the polls are open.[532]

Then came one of the most repressive anti-carry law enacted by an American state in the nineteenth century. It did not apply to long guns. It did apply to "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense."[533] Both open and concealed carry were forbidden.[534] The exceptions were "immediate and pressing" self-defense, or in

---

[528] Tex. Penal Code arts. 611–12 (enacted Aug. 28, 1856), *in* 1 A DIGEST OF THE GENERAL STATUTE LAWS OF THE STATE OF TEXAS: TO WHICH ARE SUBJOINED THE REPEALED LAWS OF THE REPUBLIC AND STATE OF TEXAS (Williamson S. Oldham & George W. White, comp.) 458 (1859). *See also* art. 493 (doubling penalty for assault with intent to murder, if perpetrated with "a bowie knife, or dagger"); 1871 Tex. Gen. Laws 20, ch. 26 (doubling penalty for perpetrator "in disguise").

[529] 24 Tex. 394 (1859).

[530] *Id.* at 402.

[531] *Id.* at 403. "Such admonitory regulation of the abuse must not be carried too far. It certainly has a limit. For if the legislature were to affix a punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a prohibition of the right." *Id.*

[532] 1870 Tex. Gen. Laws 139, ch. 73.

[533] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[534] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

a person's home or business, or travelers with arms in their baggage.[535] Another section of the bill banned all firearms, plus the arms previously listed, from many places, including churches, all public assemblies, and even "a ball room, social party, or social gathering."[536] The Act did not apply in any county proclaimed by the Governor "as a frontier county, and liable to incursions of hostile Indians."[537]

The Texas Supreme Court upheld the handgun carry ban in 1872.[538] According to the court, the statutory exceptions to the carry ban (travelers, or in response to a specific threat, or in militia service) sufficiently allowed the exercise of the right to bear arms.

The court stated that the Texas right to arms protected only arms that "are used for purposes of war," such as "musket and bayonet . . . the sabre, holster pistols and carbine . . . the field piece, siege gun, and mortar, with side arms [military handguns]."[539] In contrast, the Constitution did not cover arms "employed in quarrels and broils, and fights between maddened individuals," such as "dirks, daggers, slungshots, swordcanes, brass-knuckles and bowie knives."[540]

In 1889, written consent of a parent, guardian, "or someone standing in lieu thereof" was required to give or sell to a minor a pistol, "bowie knife or any other knife manufactured or sold for the purpose of offense of defense," and various other weapons.[541] The statute did not apply to long guns.[542]

*New Mexico* (1858).

The territory's first Bowie knife law outlawed giving "to any slave any sword, dirk, bowie-knife, gun, pistol or other fire arms, or any other kind of

---

[535] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[536] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[537] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[538] English v. State, 35 Tex. 473 (1872).

[539] *Id*. at 476.

[540] *Id*. at 475. The Texas court was plainly wrong that Bowie knives are not used in warfare. *See* text at notes __.

[541] 1887 Tex. Gen. Laws 221–22, ch. 155.

[542] *Id*.

deadly weapon of offence, or any ammunition of any kind suitable for fire arms."[543] Slavery in New Mexico was usually in the form of peonage.[544] The Comanche and Ute Indians, among others, brought captives from other tribes to the territory and sold them to buyers of all races.[545]

Concealed and open carry were prohibited in 1859. The scope was expansive:

> any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called . . .[546]

New Mexico was part of a pattern: legislative enthusiasm for Bowie knife laws was greatest in slave states. After slavery was abolished by the 13th Amendment in December 1865, the most oppressive Bowie knife controls and gun controls were enacted in areas where slavery had been abolished by federal action, rather than by choice of the legislature before the Civil War.

An 1887 statute forbade almost all carry of Bowie knives and other arms.[547] It applied to defined "deadly weapons":

> all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards [small, thin daggers], butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed

---

[543] 1856 N.M. Laws 68, ch. 26.

[544] *See* ANDRÉS RESÉNDEZ, THE OTHER SLAVERY: THE UNCOVERED STORY OF INDIAN ENSLAVEMENT IN AMERICA (2016).

[545] *See id.*

[546] 1859 N.M. Laws 94–96; 1864-65 N.M. Laws 406–10, ch. 61.

Territorial statues were published bilingually. The arms list in Spanish: "ninguna pistola de cualesquiera clase que sea, ni bowie knife (cachillo de cinto) [*s.i.c.* cuchillo, lit., belt knife] Arkansas toothpick, daga española, huracana, ó cualesquiera otra arma mortifera de cualesquiera clase ó descripcion."

[547] 1886-87 N.M. Laws 55–58, ch. 30.

canes: as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted . . .[548]

A person carrying a deadly weapon was not allowed to "insult or assault another."[549] Nor to unlawfully "draw, flourish, or discharge" a firearm, "except in the lawful defense of himself, his family or his property."[550]

The law forbade carrying "either concealed or otherwise, on or about the settlements of this territory."[551] The statute defined a "settlement" as anyplace within 300 yards of any inhabited house.[552] The exceptions to the carry ban were:

in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family, or property, the same being then and there threatened with danger . . .[553]

Travelers could ride armed through a settlement.[554] If they stopped, they had to disarm within 15 minutes, and not resume until the eve of departure.[555] Hotels, boarding houses, saloons, and similar establishments had to post bilingual copies of the Act.[556]

Law enforcement officers "may carry weapons . . . when the same may be necessary, but it shall be for the court or the jury to decide whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons are punished. . . ."[557]

*Ohio* (1859).

---

[548] *Id.*

[549] *Id.*

[550] *Id.*

[551] *Id.*

[552] *Id.*

[553] *Id.*

[554] *Id.*

[555] *Id.*

[556] *Id.*

[557] *Id.*

97

Without limiting open carry, the legislature prohibited concealed carry of "a pistol, bowie knife, dirk, or any other dangerous weapon."[558] The jury must acquit if it were proven that the defendant was "engaged in pursuit of any lawful business, calling, or employment, and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property, or family…"[559]

*Kentucky* (1859).

"If any person, other than the parent or guardian, shall sell, give, or loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt [similar to a slungshot], cane-gun, or other deadly weapon which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars."[560]

In 1891, an occupational license tax was enacted: "To sell pistols," $25. "To sell bowie-knives, dirks, brass-knucks or slung-shots," $50.[561]

*Indiana* (1859).

Except for travelers, no concealed carry of "any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon."[562] Open carry of such weapons was unlawful, if "with the intent or avowed purpose of injuring his fellow man."[563]

It was forbidden in 1875 to give any person "under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person."[564] Or to give such person pistol ammunition.[565]

*Nevada* (1861).

---

[558] 1859 Ohio Laws 56–57.

[559] *Id.*

[560] 1859 Ky. Acts 245, ch. 33.

[561] 1885 Ky. Acts 154, ch. 1233; 1891 Ky. Acts 346, ch. 103 (Nov. 11, 1892); 1891-92 Ky. Acts 1001, ch. 217 (June 9, 1893).

[562] 1859 Ind. Acts 129, ch. 78; 1881 Ind. Acts 191, ch. 37.

[563] *Id.*

[564] 1875 Ind. Acts 59, ch. 40.

[565] *Id.*

If a person fought a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon," and killed his opponent or anyone else, the killing was murder in the first degree.[566]

*Idaho territory* (1863).
    Like Nevada.[567]

*Montana territory* (1864).
    No concealed carry "within any city, town, or village" of "any pistol, bowie-knife, dagger, or other deadly weapon."[568] Duelists who kill using "a rifle, shot-gun, pistol, bowie-knife, dirk, small sword, back-sword, or other dangerous weapon" are guilty of murder.[569]

*Colorado territory* (1867).
    No concealed carry "within any city, town or village" of "any pistol, bowie-knife, dagger or other deadly weapon."[570]

*Arizona territory* (1867).
    Split from the New Mexico Territory in 1863, the new Arizona Territory did not copy New Mexico's 1859 comprehensive carry ban. Instead, the laws targeted misuse. Anyone "who shall in the presence of two or more persons, draw or exhibit" any "dirk, dirk knife, bowie knife, pistol, gun, or other deadly weapon," "in a rude, angry or threatening manner, not in necessary self defence" was guilty of a crime.[571] So was anyone "who shall in any manner unlawfully use the same in any fight or quarrel."[572]
    Carrying "maliciously or with design therewith, to intimidate or injure his fellow-man," was specifically forbidden for everyone "in the Counties of Apache

---

[566] 1861 Nev. Stat. 61.

[567] 1863 Ida. Sess. Laws 441, ch. 3; 1864 Ida. Sess. Laws 303–04, ch. 3.

[568] 1864-65 Mont. Laws 355.

[569] 1879 Mont. Laws 359, ch. 4; 1887 Mont. Laws 505, ch. 4.

[570] 1867 Colo. Sess. Laws 229, ch. 22; 1876 Colo. Sess. Laws 304, ch. 24; 1881 Colo. Sess. Laws 74 (post-statehood); 1885 Colo. Sess. Laws 170; 1891 Colo. Sess. Laws 129 ("any pistol, revolver, derringer, bowie-knife, razor, dagger, sling-shot or other deadly weapon").

[571] 1867 Ariz. Sess. Laws 21; 1875 Ariz. Sess. Laws 101.

[572] *Id.*

and Graham, over the age of ten years."[573] The arms were "any dirk, dirk-knife, bowie-knife, pistol, rifle, shot-gun, or fire-arms of any kind."[574]

Reenacting the statute against drawing a gun in a threatening manner, the 1883 legislature added a proviso against persons "over the age of ten and under the age of seventeen years" carrying concealed or unconcealed "any dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol" in any city, village, or town.[575] Concealed carry of those same arms in a city, village, or town was forbidden for everyone in 1887.[576] And then everywhere in 1893, for "any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife or weapon except a pocket-knife not manufactured and used for the purpose of offense and defense."[577]

In 1889 Arizona enacted an open carry ban in "any settlement town village or city," for any "firearm, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense."[578] Arriving travelers could carry for the first half hour, or on the way out of town.[579] Hotels had to post notices about the no carry rule.[580] Carry was also forbidden at public events, and even at some private social gatherings.[581]

*Illinois* (1867).

The legislature's revision of the municipal charter of Bloomington allowed the town "To regulate or prohibit" concealed carry of "any pistol, or colt, or slung-shot, or cross knuckles, or knuckles of brass, lead or other metal, or bowie-knife, dirk-knife, dirk or dagger or any other dangerous or deadly weapon."[582]

---

[573] 1883 Ariz. Sess. Laws 21–22, ch. 19.

[574] *Id.*

[575] 1883 Ariz. Sess. Laws 65–66, ch. 36.

[576] 1887 Ariz. Sess. Laws 726, ch. 11.

[577] 1893 Ariz. Sess. Laws 3, ch. 2.

[578] 1889 Ariz. Sess. Laws 30–31, ch. 13.

[579] *Id.*

[580] *Id.*

[581] *Id.*

[582] 1867 Ill. Laws 650.

Only a "father, guardian or employer" or their agent could give a minor "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character."[583]

*Kansas* (1868).

No carrying of "a pistol, bowie-knife, dirk or other deadly weapon" by any "person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States."[584]

No furnishing of "any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind"[585] "Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor."[586]

*West Virginia* (1868).

An 1868 statute copied Virginia's law against "habitually" carrying a concealed "pistol, dirk, bowie knife, or weapon of the like kind."[587] Justices of the Peace had a duty to enforce the statute.[588]

Then in 1882, West Virginia adopted a law similar to the Texas carry ban of 1871.[589] Without restricting carry of long guns, it broadly outlawed carrying pistols, Bowie knives, and numerous other arms.[590] Among the exceptions were that the person had "good cause to believe he was in danger of death or great

---

[583] 1881 Ill. Laws 73.

[584] 1868 Kan. Sess. Laws 378, ch/ 31.

[585] 1883 Kan. Sess. Laws 159, ch. 55.

[586] *Id.*

[587] Code of West Virginia Comprising Legislation to the Year 1870, ch. 148, p. 692.

[588] 1872-73 W.V. Acts 709, ch. 226, *in* CONSTITUTION AND SCHEDULE ADOPTED IN CONVENTION AT CHARLESTON, APRIL 9TH, 1872 (Charleston, W.V.: John W. Gentry, 1874).

[589] 1882 W.V. Acts 421–22, ch. 135.

[590] *Id.*

bodily harm."[591] Additionally, there was a prohibition on selling or furnishing such arms to a person under 21.[592]

The West Virginia Supreme Court of Appeals in *State v. Workman* upheld the statute, because the arms protected by the Second Amendment:

> must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets—arms to be used in defending the State and civil liberty—and not to pistols, bowie-knives, brass knuckles, billies, and such other weapons as are usually employed in brawls, street-fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the State.[593]

*Maryland* (1870).

Any person who was arrested in Baltimore, brought to the station house, and found to be carrying "any pistol, dirk, bowie knife," various other weapons, "or any other deadly weapon whatsoever" would be fined 3 to 10 dollars.[594]

It became illegal in 1872 in Annapolis to carry concealed "any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron, or other metal knuckles, or any other deadly weapon."[595]

A ban on carrying "with the intent of injuring any person," was enacted in 1886 for "any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous of deadly weapon of any kind whatsoever, (penknives excepted)."[596]

*District of Columbia* (1871).

The Legislative Assembly of the District of Columbia prohibited concealed carry of "any deadly or dangerous weapons, such as daggers, air-guns, pistols,

---

[591] *Id.*

[592] *Id.*

[593] State v. Workman, 14 S.E. 9, 11 (W. Va. 1891).

[594] 1870 Md. Laws 892, ch. 473. Reenactments, changes in the fine amount: 1874 Md. Laws 243–44, ch. 178; 1884 Md. Laws 249–50, ch. 187; 1890 Md. Laws 606–07, ch. 534; 1898 Md. Laws 533.

[595] 1872 Md. Laws 56–57, ch. 42.

[596] 1886 Md. Laws 602, ch. 375.

bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles."[597]

In 1892, Congress enacted a similar statute for D.C., with additional provisions.[598] It prohibited concealed carry of the same weapons as 1871, plus "blackjacks."[599] A concealed carry permit valid up to one month could be issued by any Judge of Police Court, with "proof of the necessity," and a bond.[600]

Open carry was lawful, except "with intent to unlawfully use."[601] The statute was not to be construed to prevent anyone "from keeping or carrying about his place of business, dwelling house, or premises" the listed arms, or from taking them to and from a repair place.[602]

Giving a deadly weapon to a minor was forbidden.[603] Vendors had to be licensed by Commissioners of the District of Columbia.[604] The license itself was "without fee," but the licensee could be required to post a bond.[605] Sellers had to keep a written list of purchasers, which was subject to police inspection.[606] Weekly sales reports to the police were required.[607]

*Nebraska* (1873).

No concealed carry of weapons "such as a pistol, bowie-knife, dirk, or any other dangerous weapon."[608] As in Ohio, there was a "prudent man" defense.[609]

A revised municipal charter for Lincoln made it unlawful in the city to carry "any concealed pistol, revolver, dirk, bowie knife, billy, sling-shot, metal

---

[597] 1 THE COMPILED STATUTES IN FORCE IN THE DISTRICT OF COLUMBIA, INCLUDING THE ACTS OF THE SECOND SESSION OF THE FIFTIETH CONGRESS, 1887–89 (William Stone Albert & Benjamin G. Lovejoy, comps.) 178, § 119 (1894) (citing Leg. Assem., July 20, 1871).

[598] 27 Stat. 116–17, ch. 159 (July 13, 1892).

[599] *Id.*

[600] *Id.*

[601] *Id.*

[602] *Id.*

[603] *Id.*

[604] *Id.*

[605] *Id.*

[606] *Id.*

[607] *Id.*

[608] 1873 Neb. Laws 724; 1875 Neb. Laws 3; 1899 Neb. Laws 349, ch. 94.

[609] 1873 Neb. Laws 724; 1875 Neb. Laws 3; 1899 Neb. Laws 349, ch. 94.

knuckles, or other dangerous or deadly weapons of any kind."[610] The city's police were authorized to arrest without a warrant a person found "in the act of carrying" concealed "and detain him."[611]

*Missouri* (1874).

Concealed carry was forbidden in many locations:

> [A]ny church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings, called under the militia law of this state, having concealed about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon…[612]

This was similar to the 1871 Texas statute, but unlike Texas, it applied only to concealed carry.

Like states from 1837 Mississippi onward, Missouri forbade the exhibit of "any kind of firearms, bowie knife, dirk, dagger, slung shot or other deadly weapon, in a rude, angry or threatening manner, not in the necessary defence of his person, family or property."[613]

The exhibiting statute and the concealed carry statute were combined in 1885.[614] The new law also forbade carrying the listed weapons when intoxicated or under the influence.[615] Providing one of the arms to a minor "without the consent of the parent or guardian" was outlawed.[616]

*Arkansas* (1874).

---

[610] 1895 Neb. Laws 209–10.

[611] *Id.*

[612] 1874 Mo. Laws 43; 1875 Mo. Laws 50–51.

[613] 1877 Mo. Laws 240.

[614] 1885 Mo. Laws 140.

[615] *Id.*

[616] *Id.*

Antebellum Arkansas had legislation against concealed carry, but not specifically about Bowie knives.

The 1874 election was the first in which the voting rights of former Arkansas Confederates were fully restored.[617] They elected Democratic majorities and ended Reconstruction.[618] In 1875, the new state legislature banned the open or concealed carry of "any pistol of any kind whatever, or any dirk, butcher or Bowie knife, or sword or spear in a cane, brass or metal knucks, or razor, as a weapon."[619]

The next year, the state Supreme Court heard a case of a man who had been convicted of carrying a pocket revolver.[620] In *Fife v. State*, the Arkansas court quoted with approval a recent Tennessee case stating that the state constitution right to arms covered,

> Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the Legislature.[621]

The Arkansas court continued: "The learned judge might well have added to his list of war arms, the sword, though not such as are concealed in a cane."[622] The pocket pistol not being a war arm, the defendant's conviction was upheld.[623] Needless to say, *Fife*'s protection of "the rifle of all descriptions"

---

[617] *Civil War through Reconstruction, 1861 through 1874*, THE ENCYCLOPEDIA OF ARKANSAS HISTORY & CULTURE, http://www.encyclopediaofarkansas.net/encyclopedia/entry-detail.aspx?entryID=388.

[618] *Id.*

[619] 1874-75 Ark. Acts 156–57 (Feb. 16, 1875).

[620] Fife v. State, 31 Ark. 455, 455–56 (1876).

[621] *Id.* at 460.

[622] *Id.*

[623] *Id.* at 461.

makes *Fife* and the 1875 statute poor precedents for today's efforts to outlaw common rifles.

Two years later, a conviction for concealed carry of "a large army size pistol" was reversed:[624]

> [T]o prohibit the citizen from wearing or carrying a war arm . . . [was] an unwarranted restriction upon [the defendant's] constitutional right to keep and bear arms.
>
> If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege."[625]

The legislature responded in 1881 with a new statute against the sale or disposition of "any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy."[626] As discussed *supra*, the 1881 Arkansas statute might have been consistent with the state constitution, but it is contrary to modern Second Amendment doctrine.[627]

*Wisconsin* (1874).

Some municipal charters enacted or amended by the Wisconsin legislature included provisions authorizing localities to regulate or prohibit concealed carry "of any pistol or colt, or slung shot, or cross knuckles, or knuckles of lead,

---

[624] Wilson v. State, 33 Ark. 557, 560 (1878).

[625] *Id.*

[626] 1881 Ark. Acts 191–92, ch. 96 § 3. The carry ban in section 1 was phrased slightly differently from the quoted sales ban in section 3. The section 1 carry ban applied to "or a sword, or a spear in a cane." The section 1 carry ban could, in isolation, be read as a banning all sword carry. Whereas section 3 is only about concealed swords—that is swords/spears in a cane.

The best reading of the statute as whole is application to sword canes, and not to ordinary swords. A ban on sword sales or open carry would have directly defied the Arkansas Supreme Court's recent *Wilson* decision. Such defiance seems unlikely, since the legislature was adjusting the law (by allowing open carry of Army & Navy handguns) to comply with the Arkansas Supreme Court ruling.

[627] Text at notes __.

brass or other metal, or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon."[628]

*Wyoming* (1882).

As in other states, it was unlawful to "exhibit any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapon in a rude, angry or threatening manner not necessary to the defense of his person, family or property."[629]

*Oklahoma territory* (1890).

Oklahoma had a confusing statute, although what matters for present purposes is that the law applied to "any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense."[630] Section 1 forbade anyone to "carry concealed on or about his person, or saddle bags" the aforesaid arms, which do not include long guns.[631] Section 2 made it illegal "to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon."[632] Unlike section 1, section 2 applied to carry in general, not just concealed carry.[633] Whereas the residual term of section 1 was anything "manufactured or sold for the purpose of defense," the section 2 residual was

---

[628] 1874 Wis. Sess. Laws 184, ch. 4 (Milwaukee); 1875 Wis. Sess. Laws 471, ch. 262 (Green Bay); 1876 Wis. Sess. Laws 218, ch. 4 (Platteville); 1876 Wis. Sess. Laws 737, ch. 313 (Racine); 1877 Wis. Sess. Laws 367, ch. 5 (New London); 1878 Wis. Sess. Laws 119–20, ch. 112 (Beaver Dam); 1882 Wis. Sess. Laws 309, ch. 92 (Lancaster); 1882 Wis. Sess. Laws 524, ch. 169 (Green Bay); 1883 Wis. Sess. Laws 713, ch. 183 (Oshkosh); 1883 Wis. Sess. Laws 990, ch. 341 (La Crosse); 1883 Wis. Sess. Laws 1034, ch. 351 (Nicolet); 1885 Wis. Sess. Laws 26, ch. 37 (Kaukana); 1885 Wis. Sess. Laws 753, ch. 159 (Shawano); 1885 Wis. Sess. Laws 1109, ch. 227 (Whitewater); 1887 Wis. Sess. Laws 336, ch. 124 (Sheboygan); 1887 Wis. Sess. Laws 1308, ch. 161 (Clintonville); 1887 Wis. Sess. Laws 754, ch. 162 (La Crosse); 1887 Wis. Sess. Laws 1308, ch. 409 (Berlin); 1891 Wis. Sess. Laws 699, ch. 123 (Menasha); 1891 Wis. Sess. Laws 61, ch. 23 (Sparta); 1891 Wis. Sess. Laws 186, ch. 40 (Racine).

[629] 1882 Wyo. Sess. Laws 174, ch. 81; 1884 Wyo. Sess. Laws 114, ch. 67.

[630] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[631] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[632] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[633] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

107

"any other offensive or defensive weapon."[634] What the difference was is unclear. Section 3 banned sales of the aforesaid items to minors.[635] The statute affirmed the legality of carrying long guns for certain purposes, such as hunting or repair.[636]

*Iowa* (1887).

There was no state legislation on Bowie knives in the nineteenth century, notwithstanding the California Attorney General's claim in a brief that "Iowa banned their possession, along with the possession of other 'dangerous or deadly weapon[s],' in 1887."[637]

*Michigan* (1891).

A charter revision allowed the town of Saginaw to make and enforce laws against concealed carry of "any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag [a small bag with a handle; used as an impact weapon], false knuckles [same as metal knuckles, but could be made of something else], or other dangerous weapon."[638]

*Vermont* (1891).

---

[634] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[635] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[636] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[637] Defendant's Supplemental Brief in Response to the Court's Order of September 26, 2022, *Duncan v. Bonta*, at 41–42 (Case No. 17-cv-1017-BEN-JLB) (S.D. Cal. Nov. 10, 2022). The brief's cite is Declaration of Robert Spitzer, p. 24, electronic page no. 163 of 230, available at https://michellawyers.com/wp-content/uploads/2022/11/2022-11-10-Dec-of-Robert-Spitzer-ISO-Defendants-Supp-Brief-re-Bruen.pdf. The Declaration reproduces without comment an 1887 Council Bluffs municipal ordinance making it illegal to "carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms" and many other weapons, including Bowie knives. The California Attorney General reads "or found in his possession" as a ban on possession in the home. In context, the more appropriate reading would be for concealed carrying that did not involve wearing the weapon, for example, carrying in a bag. If the Council Bluffs government really meant something as monumental as outlawing all firearms in the home, the ordinance would be a very oblique way of saying so.

[638] 1891 Mich. Pub. Acts 409, ch. 257; 1897 Mich. Pub. Acts 1030, ch. 465.

Sand bags are discussed in Part VI.B.3, knuckles in Part VI.C.1.

No possession "while a member of and in attendance upon any school," of "any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon."[639]

*Rhode Island* (1893).

No concealed carry of "any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy [club], brass or metal knuckles, slung shot, pistol or fire arm of any description, or other weapon of like kind of description."[640]

*Local ordinances on Bowie knives.*

As described above, state legislative enactments of municipal charters sometimes authorized a municipality to regulate Bowie knives, usually by taxation of dealers or owners, or by prohibition of concealed carry. Additionally, there were Bowie knife laws that were simply enacted by municipalities, without any need for state action. Here is a list of such laws, taken from the Declaration of Robert Spitzer as an expert supporting a California arms prohibition statute.[641] The cities are in alphabetical order by state. The year is often the year of publication of the municipal code, and not necessarily the date of enactment. All the ordinances covered Bowie knives and various other weapons.

Against concealed carry: Fresno, California (1896); Georgetown, Colorado (1877); Boise City, Idaho (1894); Danville, Illinois (1883); Sioux City, Iowa (1882); Leavenworth, Kansas (1863); Saint Paul, Minnesota (1871); Fairfield, Nebraska (1899); Jersey City, New Jersey (1871) (and no carrying of "any sword in a cane, or air-gun"); Memphis, Tennessee (1863).[642]

No carrying: Nashville, Tennessee (1881); Provo City, Utah territory (1877).[643]

Against hostile display: Independence, Kansas (1887).[644]

Against carry with intent to do bodily harm: Syracuse, New York (1885).[645]

---

[639] 1891 Vt. Acts & Resolves 95, ch. 85.

[640] 1893 R.I. Pub. Laws 231, ch. 1180.

[641] Spitzer, *supra* note ___,

[642] *Id.* at 10, 19, 21, 23–25, 35–36, 43, 45, 66.

[643] *Id.* at 68, 70.

[644] *Id.* at 26–27.

[645] *Id.* at 51.

109

Extra punishment if carried by someone who breached the peace or attempted to do so: Little Rock, Arkansas (1871);[646] Denver, Colorado (1886).[647]

No sales or loans to minors by a "junk-shop keeper or pawnbroker . . . without the written consent of the parent or guardian of such minor." Fresno, California (1896).[648]

## VI. OTHER WEAPONS

This Part covers restrictions on arms other than firearms or Bowie knives. Most of these restrictions were enacted in statutes that also covered Bowie knives, so the statutes were quoted in Part V. Here in Part VI, we will repeat the citations, but rarely quote at length.

The arms covered in this Article are in two broad classes. *Missile weapons* send a projectile downrange. Firearm, bows, and cannons are missile weapons. *Impact weapons* strike an adversary while being held by the user. Knives and swords are impact weapons, as are clubs, blackjacks, and slungshots.[649]

Section A covers sharp weapons that are not Bowie knives. The main categories are "daggers and dirks." Also included in Section A are sword canes, spears, swords, butcher knives, razors, and swords.

Section B addresses flexible impact weapons. That is, handheld weapons with a heavy tip and a flexible body, meant to be swung. The most important of these, in terms of number of laws enacted, is the slungshot. Section B also covers colts, blackjacks, sand clubs, sand bags, and billies. Additionally, Section B addresses slingshots; although they are missile weapons, they are sometimes confused with slungshots, including perhaps in statutes.

Section C covers rigid impact weapons. These are brass knuckles, knuckles made from other materials, and loaded canes (hollow canes filled with lead).

 Section D deals with cannons.

---

[646] *Id.* at 7.

[647] *Id.* at 7, 13.

[648] *Id.* at 10.

[649] Some weapons can cross over from one category to another. A firearm can be used as a club, and a knife can be thrown as a missile. A spear can be thrown as a missile or held while striking in close combat.

A. Daggers, dirks, and other sharp weapons

*1. Daggers and dirks*

Dirks are fighting knives. They can come in a variety of sizes and shapes. We start with a list of every Bowie knife statute that also included dirks. If daggers were included in a statute, along with Bowie knives and dirks, a parenthetical so notes.

As previously described, an 1837 Georgia ban on sale and open carry of dirks was held to violate the Second Amendment, whereas a ban on concealed carry was upheld.[650] But a similar law was enacted in Arkansas in 1881. Other laws were:

No possession by "any slave." North Carolina (1846); New Mexico Terr. (1858).

No possession by black people; licenses for black people. Mississippi (1865); Florida (1865).

Extra punishment for misuse or carrying with malign intent. Mississippi (1837); California (1855); Indiana (1859); Nevada (1861); Idaho (1863); Montana (1864); Arizona Terr. (1867); Missouri (1873) (also daggers); Wyoming Terr. (1882) (also daggers); Maryland (1883); D.C. (1892).

No concealed carry. Alabama (1838); Virginia (1838) (if "habitually") (1881); Louisiana (1855, 1898); Ohio (1856); Indiana (1859) (also daggers); West Virginia (1868) ("habitually"); Montana (1864) (in towns); Maryland 1872 (for Annapolis); D.C. (1871, 1892) (also daggers); Georgia (1873); Nebraska (1873); Missouri (1873) (certain locations) (also daggers); North Carolina (1877) (for one county), 1879 (statewide) (both also for daggers), (1884)[651]; Arizona (1883, by persons 10–16 in towns) (1887) (everyone in towns), 1893 (generally, adding daggers); Rhode Island (1893) (also daggers); Mississippi (1896).

No open or concealed carry in certain locations. Tennessee (1869) (horse races); Georgia (1870) (churches, court houses); Louisiana (1870, 1873) (polling places); Vermont (1891) (schools) (also daggers).

No carry while intoxicated. Missouri (1873).

---

[650] Nunn v. State, *supra.*

[651] 1883-1884 Va. Acts 180, ch. 143. *Note: For some of the statutes that also covered Bowie knives, we do not in the present version of the manuscript include a series of footnotes directing the reader to the particular footnote and text from the Bowie knife statutes catalogued in Part V.*

No carry, with a few exceptions. Texas (1871) (daggers); Arkansas (1874, 1881); West Virginia (1882); N.M. Terr. (1887) (also "all kinds of daggers" plus "poinards," which are a type of small, slim dagger); Ariz. Terr. (1889) (in towns) (also daggers); Oklahoma Terr. (1890) (also daggers).

Specific property or vendor taxes. Florida (1835, 1881, 1889, 1893); North Carolina 1850, 1856–57, 1866); Alabama (1865–66, 1866–67, 1875-76, 1877–78, 1882, 1884, 1898); Mississippi (1871, 1876, 1878, 1880, 1892, 1894, 1897); Virginia (1874, 1875, 1881, 1883, 1889, 1893); Georgia (1882, 1884, 1886, 1888, 1892); Kentucky (1891).

Authorizing certain municipalities to license and tax vendors. North Carolina (1860–99); Illinois (1867) (also daggers); Wisconsin (1874–91) (allowing concealed carry bans) (also daggers); Alabama (1878–98).

Exemption from seizure for unpaid property taxes. Mississippi (1861).

Restricting sales to minors. Tennessee (1856); Indiana (1875); Illinois 1881 (transfers only by father, guardian, employer); West Virginia (1882); Kansas (1882) (also banning possession by minors); Missouri (1885) (parental consent); Florida (1889); Texas (1889) (parental permission) (also daggers); Oklahoma (1890) (also daggers); Virginia (1890); Louisiana (1890); D.C. (1892); North Carolina (1893).

The next list is Bowie knife statutes that also included daggers, but not dirks:

Free blacks need a license to carry or possess. N.C. (1856).

Free blacks may not carry or possess. N.C. (1861).

Extra punishment for misuse. Texas (1856).

No concealed carry. Montana Terr. (1864); Colorado Terr. (1867) (state reenactments in 1876, 1885, 1891).

No open or concealed carry in certain locations. Virginia (1869) (religious meetings).

No open or concealed carry generally, with a few exceptions. N.M. Terr. (1859) ("Spanish dagger").

The following laws about dirks or daggers were enacted in statutes that did not mention Bowie knives:

No carry. Harrisburg, Pennsylvania (1873) ("dirk-knife").[652]

---

[652] 1873 Pa. Laws 735–36.

No concealed carry. Wisconsin (unless with reasonable cause) (1872) (dirk or dagger);[653] South Carolina (1880) (dirk or dagger);[654] (1897) (dirk or dagger);[655] Oregon (1885) (dirk or dagger);[656] Michigan (1887) (dirk or dagger).[657]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866) ("dirk or dagger (not contained as a blade of a pocket knife)").[658]

Sureties could be required for carry if the carrier had previously threatened to breach the peace. Oregon (1853) (dirk or dagger);[659] Wisconsin (1878) (dirk or dagger).[660]

On the whole, whatever combination of "bowie knives," "dirks," and "daggers" that a statute mentioned by name may not have been of great practical importance. Statutes that mentioned at least two of the three often had a catchall that included other "dangerous weapons." So if a statute said "Bowie knives, dirks, and other dangerous weapons," the statute might be applied to carrying a dagger.

This possibility would be less likely in property tax or vendor tax statutes, which did not typically include catchalls. Thus, a person who owned a dagger might not be liable for a property tax applicable to "bowie-knives and dirks."

## 2. Sword canes

Except as noted, all these laws also applied to Bowie knives.

Sales ban. Georgia (1837). Held to violate the Second Amendment. Arkansas (1881).[661]

---

[653] 1872 Wis. Sess. Laws 17, ch.7.

[654] 1880 S.C. Acts 447–48, no. 362.

[655] 1897 S.C. Acts 423, no. 251.

[656] 1885 Or. Laws 33.

[657] 1887 Mich. Pub. Acts 144, No. 129.

[658] 1866 N.Y. Laws 1523, ch. 716.

[659] 1853 Or. Laws 220, ch. 17.

[660] REVISED STATUTES OF THE STATE OF WISCONSIN, PASSED AT THE EXTRA SESSION OF THE LEGISLATURE COMMENCING JUNE 4, 1878, AND APPROVED JUNE 7, 1878, at 1121, ch. 196, sec. 4834 (1878).

[661] 1881 Ark. Acts 191, ch. 96. See note ___ for why we read the statute as a ban on spear canes and sword canes, not swords in general.

No giving to "any slave." N.M. Terr. (1859).

No giving to "any slave or free person of color." Georgia (1860).[662]

No possession or carry by "any free negro." North Carolina (1861).[663]

No concealed carry. Georgia (1852);[664] D.C. (1871, 1892); Ariz. Terr. (1891);[665] Oklahoma (1890,[666] 1893[667]); R.I. (1893).[668]

No concealed carry except for travelers. Kentucky (1813, Bowies not included);[669] Indiana (1820,[670] 1831,[671] 1843,[672] 1859,[673] 1881,[674] Bowies added in 1881); Arkansas (1837, 1881); Georgia (1852,[675] 1883,[676] 1898[677] (Bowies in1883 and 1898)); California (1863,[678] 1864,[679] Bowies in neither); Nevada (1867).[680]

---

662 1860 Ga. Laws 56, No. 64.

663 1860-1861 N.C. Sess. Laws 68, ch. 34.

664 1851-1852 Ga. Laws 269, no. 165.

665 1893 Ariz. Terr. Laws 3, no. 2.

666 1890 Okla. Sess. Laws 495, art. 47, sec. 1.

667 1893 Okla. Terr. Laws 503, art. 45, sec. 3.

668 1893 R.I. Laws 231–32, ch. 1180.

669 1812 Ky. Acts 100, ch. 89.

670 1819 Ind. Acts 39, ch. 23.

671 1831 Ind. Acts 192, ch. 26, sec. 58.

672 1843 Ind. Acts 982, ch. 53, sec. 107.

673 1859 Ind. Acts 129, ch. 78, sec. 1.

674 1881 Ind. Acts 191, ch. 37, sec. 82.

675 1851–1852 Ga. Laws 269, No. 165.

676 1882–1883 Ga. Laws 49, No. 93.

677 1898 Ga. Laws 60, No. 106.

678 1863 Cal. Stat. 748.

679 1864 Cal. Stat. 115, ch. 128.

680 1867 Nev. Stat. 66, ch. 30.

No carry in most circumstances. Tennessee (1821,[681] 1870,[682] 1879 ("sword cane" or "loaded cane");[683] Texas (1871[684], 1887[685], 1889[686]) (1887 and 1889 including bowies); Arkansas (1875),[687] 1881;[688] N.M. Terr. 1887; Ariz. Terr. (1889) ("within any settlement, town, village or city") (including Bowies);[689] Idaho (1889) ("any city, town or village").[690]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866).[691]

No transfer to minors. Georgia (1876) (including Bowies);[692] Oklahoma (1890,[693] 1893[694]); Texas (1897) (parental permission) (including Bowies).[695]

Special taxation. Mississippi (1854,[696] 1856–57,[697] 1865 (including bowies),[698] 1871, 1876, 1878, 1880, 1892, 1894, 1897); N.C. (1858–59,[699] 1866[700], 1887,[701] 1889,[702] 1898,[703] including Bowies).

---

[681] 1821 Tenn. Laws 15, ch. 13.

[682] 1870 Tenn. Laws 55, ch. 41.

[683] 1879 Tenn. Laws 231, ch. 86.

[684] 1871 Tex. Gen. Laws 25, ch. 34, sec. 1–2

[685] 1887 Tex. Gen. Laws 7.

[686] 1889 Tex. Gen. Laws 33, ch. 37.

[687] 1874–75 Ark. Acts 156.

[688] 1881 Ark. Acts 191, ch. 96.

[689] 1889 Ariz. Terr. Laws 30, No. 13, sec. 1.

[690] 1888 Ida. Laws 23, sec. 1.

[691] 1866 N.Y. Laws 1523, ch. 716.

[692] 1876 Ga. Laws 112 ch. 128.

[693] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[694] 1893 Okla. Terr. Laws 503, art. 45, sec. 3.

[695] 1897 Tex. Gen. Laws 221, ch. 155.

[696] 1854 Mich. Pub. Acts 50, ch. 1.

[697] 1856-1857 Mich. Pub. Acts 36.

[698] 1867 Miss. Laws 412, ch. 317.

[699] 1858-1859 N.C. Sess. Laws 35–36, ch. 25.

[700] 1866-1867 N.C. Sess. Laws 63.

[701] 1887 N.C. Sess. Laws 885, ch. 58.

[702] 1889 N.C. Sess. Laws 836, ch. 183.

[703] 1897 N.C. Sess. Laws 154, ch. 90.

115

Authorizing municipal regulation: N.C. (1860–99) (various laws allowing taxes on sales, carrying, or possession).

### 3. Spears

Sales and concealed carry ban. Georgia (1837). Sales ban held to violate the Second Amendment, concealed carry ban upheld.

No carry. Texas (1871) (unless carried openly with reasonable cause);[704] Arkansas ("spear in a cane") (1881).[705]

No concealed carry. Georgia (1852);[706] Arizona Terr. (1889) ("within any settlement, town, village, or city," unless with reasonable cause),[707] (1893);[708] Oklahoma Terr. (1890).[709]

No transfer to minors. Oklahoma Terr. (1890).[710]

### 4. Razors

During the nineteenth century, men shaved with straight-edge razors. These consisted of a single straight blade, sharpened on one edge. Often, the blade could fold into the handle, like a pocket-knife.

No concealed carry. D.C. (1871, 1892) ("razors, razor-blades"); Maryland (1872) (Annapolis), (1886, 1890); Tennessee (1879); South Carolina (1880, 1887, 1897); Virginia (1881, 1884,[711] 1896); Illinois (1881);[712] North Carolina (1883); Michigan (1887); Colorado (1891); Rhode Island (1893).

No carry in most circumstances. Arkansas (1875, 1881); West Virginia (1882) (exception for peaceable citizen with good cause).

---

[704] 1871 Tex. Gen. Laws 25, ch. 34.

[705] 1881 Ark. Acts 191. No. 96.

[706] 1851-52 Ga. Laws 269, No. 165.

[707] 1889 Ariz. Terr. Laws 30.

[708] 1893 Ariz. Terr. Laws 3, No. 2, sec.1.

[709] 1890 Okla. Terr. Laws 495, art. 47, sec. 1.

[710] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[711] 1883-1884 Va. Acts 180, ch. 143.

[712] 1881 Ill. Laws 74.

Carry limited to self-defense. Maryland (1894).[713]

West Virginia in the late nineteenth century prohibited carrying handguns and many other weapons (but not long guns) in public in most circumstances. In a case where a train passenger sued a railroad for facilitating his arrest for carrying a razor, the state supreme court explained:

> The razor was undoubtedly added to this section on account of the proneness of the Americanized African to carry and use the same as a deadly weapon. To such the razor is what the machete is to the Cuban. It is his implement of livelihood in time of peace, and his weapon of destruction in time of war. This is matter of common report. . . . The excuse given by the plaintiff, that he was carrying such razor to shave himself while in the country, is not a legal one. Such an excuse might be given by every person thus carrying a razor, and, if allowed as sufficient, would render the law of no affect.[714]

### 5. Butcher knives

No concealed carry. Mississippi (1888,[715] 1898);[716] Rhode Island (1893).[717]

No carry in most circumstances. Arkansas (1837,[718] 1875);[719] N.M. Terr. (1887).

No carry to public assemblies or gatherings. Texas (1870).

---

[713] An 1874 Maryland law forbade the carry of "any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon" in Kent, Queen Anne's, or Montgomery counties. 1874 Md. Laws 366.

[714] Claiborne v. Chesapeake & O. Ry. Co., 46 W.Va. 363, 370–71 (1899).

[715] 6 THE LAWS OF TEXAS 1822-1897, at 63 (H. P. N. Gammel ed., 1898).

[716] 1896 Miss. Laws 109, ch. 104.

[717] 1893 R.I. Laws 231–32, ch. 1880, sec. 1.

[718] REVISED STATUTES OF THE STATE OF ARKANSAS, ADOPTED AT THE OCTOBER SESSION OF THE GENERAL ASSEMBLY OF SAID STATE, A. D. 1837, at 280 (William Mck. Ball & Sam C. Roane ed., 1838).

[719] 1875 Ark. Acts 156.

*6. Swords*

Banning carry. Idaho (1889) ("any city, town or village").[720]

Extra punishment for use in a crime. California (1855) ("small-sword, back-sword" used in a duel); Nevada (1861) (same as California); Mont. Terr. (1864) (a homicide in a duel with a "small sword, back-sword" is murder).

## B. Slungshots and other flexible impact weapons

This section describes a variety of weapons that are obscure to the twenty-first century reader. Although there are many books describing the history of firearms and knives, there is only one book on the history of flexible impact weapons, Robert Escobar's *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons*.[721] "At their most basic, they are all small, concealable, flexible and weighted bludgeons," he explains.[722]

It is extremely easy to make such a weapon at home. For example, take a sock and put some pocket change or a few tablespoons of sand or dirt in the toe.[723] Grasp the sock by the other end. You now have a flexible impact weapon. You can swing it and strike whoever is attacking you.

---

[720] 1888 Ida. Laws 23, sec. 1.

[721] ROBERT ESCOBAR, SAPS, BLACKJACKS AND SLUNGSHOTS: A HISTORY OF FORGOTTEN WEAPONS (2018). "[T]ry to find a group of weapons used as broadly as our was or for as long while having as little written about it." *Id.* at 241.

Proper techniques of defensive use are detailed in MASSAD AYOOB, FUNDAMENTAL OF MODERN POLICE IMPACT WEAPONS (1996).

[722] ESCOBAR, *supra* note __, at 9.

[723] Should you be alone in the outdoors and decide that you need a weapon, you can turn "your socks, or wrapped up shirt, into an impromptu sand-club" by adding dirt. "Throw in a rock or two if they are handy and you're even more prepared." *Id.* at 21.

Some examples of improvised flexible impact weapons, for good or ill:

During the 1863 anti-draft riots in New York City, two criminals, apparently taking advantage of the fact that the police were busy trying to suppress the riots, ordered two women to vacate their home within a day, or else the criminals would burn it. In defense, the women "tied stout cords to heavy lead fishing sinkers . . . What these amounted to, ironically, were crude versions of the slung-shot so highly favored by the New York thugs themselves." JAMES MCCAGUE, THE SECOND REBELLION: THE STORY OF THE NEW YORK CITY DRAFT RIOTS OF 1863, at 155 (1968).

118

With these weapons, a blow to the head could be fatal, but usually not. A blow anywhere else on the body was unlikely to be lethal.[724] As Escobar explains:

> these objects were not designed to inflict maximum damage. You do not put a soft or semi-soft covering on a weapon to increase its destructive capabilities nor do you make its striking surface smooth when it could be angular. You also don't use loads like lead powder, shot or sand instead of solid metal . . . [T]he lead pod inside most saps and jacks is about the size of a spoon head so there is little margin for errors if you want to maximize the impact.[725]

The vagueness of the term "Bowie knife"—which does not consistently describe any particular type of knife—was discussed in Part V.A. Definitions

---

In 1861, an English sailor fashioned a "slung shot" from "four revolver bullets" with "some paper round them" and attached to "a lanyard." Adolphus Manton, in PROCEEDINGS OF THE CENTRAL CRIMINAL COURT, 25th November 1861, at 78, reprinted at ref. no. t18611125-55 (Cent. Crim. Ct., London, Nov. 25, 1861), *in* The Proceedings of the Old Bailey, 1674-1913, www.oldbaileyonline.org.

During the eighteenth century, English criminals often used a "stocking filled with sand or lead shot." Rictor Norton, *St. Giles's Footpads & James Dalton's Gang: Footpads & Street Robbers*, *in* The Georgian Underworld: A Study of Criminal Subcultures in Eighteenth-Century England (website), http://rictornorton.co.uk/gu09.htm.

A leader of a women's auxiliary during the 1936–37 auto workers strike in Flint, Michigan, recalled, "we all carried a hard-milled bar of soap in one pocket and a sock in the other. That way, we couldn't be charged with carrying a weapon. But if somebody was creating trouble on the picket line, we'd slip that bar of soap into the sock and swing that sock very fast and sharp. It was as good as a blackjack." STRIKING FLINT: GENORA (JOHNSON) DOLLINGER REMEMBERS THE 1936-37 GENERAL MOTORS SIT-DOWN STRIKE AS TOLD TO SUSAN ROSENTHAL (1995), web reprint available at

https://www.marxists.org/history/etol/newspape/amersocialist/genora.htm#women.

In 2018, organized crime leader Whitey Bulger was transferred to the general prison population, and within hours was murdered by another inmate with "a lock in a sock." Bulger v. Hurwitz, 2023 WL 2335958 at *2 (4th Cir. Mar. 3, 2023).

[724] "Many police departments allowed head shots only in cases where deadly force was deemed necessary." ESCOBAR, *supra* note __, at 232.

[725] *Id.* at 237.

of categories of flexible impact weapons are even more confusing.[726] The meaning "depends on the year, who you ask(ed); and what country or part of the country you occupy when asked."[727] The "deliciously sloppy usages of the past" make it difficult to determine what particular type of flexible impact weapon is being discussed in historical sources.[728]

Escobar's book provides an appendix of definitions, which he calls "more art than science," an effort to put "a sensible framework over the whole mess."[729] According to Escobar, "[s]aps and jacks" were shorthands "for everything except slingshots."[730]

Whatever the term used for a particular flexible impact weapon, the class as a whole has the following characteristics:

- Non-lethal except for a blow to the head. Even then, less likely to be lethal than a firearm or knife strike to the head.

---

[726] "Perhaps because they thrived outside of polite society, their names are colorful, sometimes comical, and never really used consistently." *Id.* at 11. Various names were "slungshot, blackjack, jack, jacksap, billyjack, slapjack, flat sap, spoon sap, slap-stick, slapper, zapper, slock, sand-club, sandbag, billet, billie, convoy, cosh, life-preserver, persuader, starter, bum starter, priest, fish priest, Shanghai tool, monkey fist, Sweet William, joggerhead, beavertail." *Id.*

[727] *Id.* at 12. Changes in usage are nothing new. As of the eighteenth and early nineteenth centuries, a "gun" meant a long gun; handguns were called "pistols." Later, "gun" came to encompass everything that fired a bullet. Today, and in the twentieth century, "pistol" is sometimes used as a synonym for handgun, although the more precise meaning is a semiautomatic handgun, as distinct from a revolver.

[728] *Id.* at 17.

[729]

> If you're thinking everything mentioned in this appendix must have made research a complete nightmare, you are correct. It was difficult enough to find references to any of our terms and the fun only began then. . . . I was not . . . interested in proposing a codified way of this for book but instead wanted to put a sensible framework over the whole mess that goes with the modern meanings of the terms while still honoring the past. In short, it's more art than science . . .

*Id.* at 226–27.

[730] *Id.* at 11.

120

- Exceptionally compact and easy to conceal, because they are flexible.[731] Unlike firearms or knives, which are rigid.
- Silent, like blade arms, and unlike firearms.
- Unlikely to cause surface bleeding, unlike firearms or blades.

We now turn to the flexible impact weapons led to the most legislation in the nineteenth century, the slungshot.

## 1. Slungshots and colts

The "slungshot was a tool turned weapon."[732] In the original slungshot, one end of the rope is wound around a lead weight, or other small, dense item.[733] Sailors use slungshots to cast mooring lines and other ropes over water. Resources on a ship at sea are very finite, and slungshots are easy to construct.[734] Definitionally, "slungshot" has been more stable than its flexible weapon cousins.[735]

---

[731] "Saps and jacks remain half hidden even when openly brandished." *Id.* at 11. A sap has the stopping power of a billy club, "but in a much smaller package. [For a law enforcement officer] This made it an ideal backup in case you lost your bafa ton in a scuffle or while running." *Id.* at 73.

[732] *Id.* at 39.

[733] "A weight, usually hard loaded, tied to the end of a rope or similar material which swings freely. The end was often a sling, presumably indicating a common linguistic link between it, the ancient sling and the slingshot." *Id.* at 14. "[A]t heart just a small round weight surrounded by a clever knot", "It was tied so that one or two ends of the rope trail away from the ball shaped knot, providing material for the handle. A common additional feature once weaponized was a loop at the opposite end of the load so the entire contraption could be secured to the wrist. The original purpose" "was to allow one to cast a line across open water." *Id.* at 41.

[734] One could be made with a "bit of rope, cloth, sand, fishing weights and more." *Id.* at 44.

[735] "Slungshots are always called slungshots and clubs . . . generally called clubs." *Id.* at 133.

"The term appears common in the mid-19th century and *usually* describes the right weapon or at least something close to it." *Id.* at 226.

> Still you can unsurprisingly encounter instances where it is used to describe our entire subject matter and more (like brass knuckles). The most important note on slungshot as a term is that once into modernity but prior to the late 19th century it is written about very often while our other terms are almost

The term slungshot, however, was applied to many items that had nothing to do with nautical affairs or ropes. Many slungshots were manufactured from leather and hardly looked like sailors' tools.

Compared to other flexible impact weapons, "slungshots are the clear champion in terms of pure impact. One strike to the head, without regard to particular target, usually results in the immediate cessation of hostility in the opponent or defense in the victim. Whether or not full unconsciousness does mercifully come, the person is usually incapacitated and in for unpleasant long term effects. So it hits harder. . . ."[736] "One reason is simply the length. Both saps and blackjacks are normally less than 10 inches long."[737] A slungshot could be 22 inches.[738] The slungshot "provided the reach of a substantial club while fitting easily inside a pocket. Unlike a club, knife or brass knuckles, it could be held in a closed hand completely unseen while being ready to instantly lash out. This was very likely a factor in the slungshot's later popularity with street criminals."[739] Compared to other impact weapons, "The slungshot was even more suited for a sneak attack. With its long coiled shaft/handle and small load taking up little space in a pocket, it could be quickly unleashed and strike a man from a much greater distance than a sap or jack."[740]

A variety of slungshot, known as a "life-preserver" was popular with burglars in Victorian England. Besides the advantage of concealability, they were "less lethal for dealing with interruptions; murder only being a way of increasing police attention after the fact."[741]

---

non-existent. That's good in that eytmologists say that sap and blackjack only started later, it's bad in that we don't know if that means any kind of sap would have been called a slungshot back then or that the slungshot configuration was simply much more popular in those days.

*Id.*

[736] *Id.* at 45.

[737] *Id.*

[738] CLIFFORD W. ASHLEY, THE ASHLEY BOOK OF KNOTS (1944)

[739] ESCOBAR, *supra* note __, at 44.

[740] *Id.* at 233.

[741] *Id.* at 76.

Attorney Abraham Lincoln's most famous case was the Almanac Trial of 1858. According to the charges, one evening around midnight Duff Armstrong fatally hit James Metzger in the head with a "slung-shot," made of "a copper ball covered with lead, sewn into a leather bag and

Slungshots were popular with criminals for obvious reasons, but they were also carried at least sometimes by the law-abiding. An 1863 cartoon from the English humor magazine *Punch*, titled "Going Out to Tea in the Suburbs," shows a "society outing" of men and women "armed to the teeth," with "the life-preserver" as "the most common choice in the arsenal."[742] The cartoon, subtitled "A Pretty State of Things for 1862," portrays in exaggerated fashion the public response to the garroting scare of 1862.[743]

According to a historian of New Orleans life during Reconstruction, the "people fairly bristled with lethal weaponry: revolvers, pepperbox pistols, dirks, bowie knives and slung-shots—a private arsenal concealed in the pockets and waist bands of respectable gentlemen and proletarian thugs alike."[744]

According to Escobar, "Court records of the 1800's have many cases of civilians (e.g. neither professional criminal nor cop) using slungshots, etc."[745] But "[a]t least in the incidents combed for this book, a man bringing one out after being threatened comes up rarely. As a reminder, the slungshot is particularly well suited to the sneak attack as it is not seen until it hits and does so from a surprising distance."[746] A "man avenging himself for a perceived slight to his honor via a possibly deadly sucker punch with these comes up quite a bit."[747]

In sum, "It's clear they were often carried by criminals with ill intent but also by men who just wanted to be ready to defend (or I guess avenge)

---

attached to a strap." A witness who had been about 150 feet away claimed he could clearly identify Armstrong as the perpetrator because the moon was full that night. Lincoln won an acquittal by producing an almanac showing that the moon was at quarter phase, and about to set. JOHN EVANGELIST WALSH, MOONLIGHT: ABRAHAM LINCOLN AND THE ALMANAC TRIAL (2000).

[742] ESCOBAR, *supra* note __, at 78.

[743] "Going Out to Tea in the Suburbs," PUNCH'S ALMANACK FOR 1863 (Jan.-June); Andy Croll, *Who's afraid of the Victorian underworld?* THE HISTORIAN 30, 34 (Winter 2004).

[744] Dennis C. Rousey, *Black Policemen in New Orleans During Reconstruction* in A QUESTION OF MANHOOD: A READER IN U.S. BLACK MEN'S HISTORY AND MASCULINITY, vol. 2 THE 19TH CENTURY: FROM EMANCIPATION TO JIM CROW 85, 89 (Darlene Clark Hine & Earnestine Jenkins eds., 2001).

[745] ESCOBAR, *supra* note __, at 131.

[746] *Id.* at 74.

[747] *Id.*

themselves. Granted, it looks like men with short fuses who were more prone to break the law via assault than your average Joe."[748]

Slungshot laws are different from the laws on other arms that have been discussed above. Starting in 1849, eight states and one territory outlawed sales and manufacture. Vermont (1849);[749] New York (1849),[750] (1881),[751] (1884),[752] 1889);[753] Massachusetts (1850),[754] (1882);[755] Kentucky (1855);[756] Florida (1868,[757] 1893);[758] Dakota Terr. (1877),[759] (1883);[760] Illinois (1881);[761] Minnesota (1886);[762] Pennsylvania (1889).

Illinois also prohibited possession. Vermont prohibited possession for interpersonal use, and Maryland did the same for carrying. The laws still

---

[748] *Id.* at 75.

[749] 1849 Vt. Acts & Resolves 26.

[750] 1849 NY Laws 403, ch. 278.

[751] 1881 N.Y. Laws 102.

[752] 3 THE REVISED STATUTES, CODE AND GENERAL LAWS OF THE STATE OF NEW YORK 3330 (Clarence F. Birdseye ed., 1890).

[753] 1889 N.Y. Laws 167, ch. 140.

[754] 1850 Mass. Acts 401, ch. 194, sec. 2.

[755] THE PUBLIC STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS, ENACTED NOVEMBER 19, 1881; TO TAKE EFFECT FEBRUARY 1, 1882, at 1163 (1886).

[756] 1855 Ky. Acts 96, ch. 636. This restriction was restated the following year. 1856 Ky. Acts 97, ch. 636.

[757] DIGEST OF THE LAWS OF THE STATE OF FLORIDA, FROM THE YEAR ONE THOUSAND EIGHT HUNDRED AND TWENTY-TWO, TO THE ELEVENTH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND EIGHTY-ONE, INCLUSIVE 403 (James F. McClellan ed., 1881).

[758] 1893 Fla. Laws 52.

[759] 1877 N.D. Laws 794, ch. 38, sec. 455.

[760] 1883 Dakota Terr. Laws 1211, sec. 456.

[761]

> That whoever shall have in his possession, or sell, give or loan, hire or barter, or whoever shall offer to sell, give, loan, hire or barter, to any person within this state, any slung-shot or metallic knuckles, or other deadly weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor, and upon conviction shall be fined in any sum not less than ten dollars ($10) nor more than two hundred dollars ($200).

1881 Ill. Laws 73.

[762] THE PENAL CODE OF THE STATE OF MINNESOTA TO TAKE EFFECT JANUARY 1, A. D. 1886, at 127 (1885).

124

allowed use as tool, such as for nautical purposes.[763] The Kentucky sales ban was repealed later in the century.[764]

The nine jurisdictions that with sales bans are the most for any weapon in America in the nineteenth century. Only metallic knuckles, discussed in Part VI.C.1, came close.

Most jurisdictions did not ban slungshot sales. The majority approach was similar to Bowie knives:

No giving to "any slave or free person of color," except by "the owner." Georgia (1860).[765]

No concealed carry. California (1864);[766] Nevada (1867);[767] Wisconsin (1872);[768] Alabama (1873);[769] Illinois (1881);[770] North Carolina (1877, Alleghany County; 1879 statewide); Dakota Terr. (1877);[771] Mississippi (1878); South Carolina (1880);[772] Virginia (1884);[773] Missouri (1885);[774] Arizona Terr.

---

[763] The first section of the Vermont statute made it a misdemeanor to manufacture or transfer a slungshot. The second section made it a felony to "carry, or be found in the possession of, use or attempt to use, as against any other person, any instrument, or weapon, of the kind usually known as a slung shot."1849 Vt. Acts & Resolves 26. The felony punishment for violating the second section suggests that it referred to possessing or carrying the slungshot for the purpose of using it against another person.

The Maryland law forbade concealed carry of slungshots and open carry if done "with the intent or purpose of injuring any person." 1886 Md. Laws ch. 395.

The Vermont and Maryland laws apparently intended to outlaw all use of slungshots in fighting, while still allowing use as a nautical tool and for similar purposes.

[764] Text at notes *infra*.

[765] *Note: For some of the statutes that also covered Bowie knives, we do not in the present version of the manuscript include a series of footnotes directing the reader to the particular footnote and text from the Bowie knife statutes catalogued in Part V.*

[766] 1864 Cal. Stat. 115, ch. 128.

[767] 1867 Nev. Stat. 66, ch. 30.

[768] 1872 Wis. Sess. Laws 17, ch. 7.

[769] 1873 Ala. Laws 130–31, no. 87.

[770] 1881 Ill. Laws 73.

[771] 1877 N.D. Laws 794, ch. 38, sec. 456.

[772] THE GENERAL STATUTES AND THE CODE OF CIVIL PROCEDURE OF THE STATE OF SOUTH CAROLINA, ADOPTED BY THE GENERAL ASSEMBLY OF 1881–82, at 699 (1882).

[773] 1883-1884 Va. Laws 180, ch. 143.

[774] 1 THE REVISED STATUTES OF THE STATE OF MISSOURI 854 (1889).

(1887) (in towns) (1893) (in general); Oregon (1885);[775] Arizona (1887);[776] Michigan (1887);[777] Rhode Island (1893);[778] Maryland (1894) (unless reasonable cause);[779] District of Columbia (1899).[780]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866,[781] 1884)[782]; Minnesota (1891).[783]

No open or concealed carry in most circumstances. N.M. Terr. (1859, 1887); California (1863);[784] Texas (1871) (without reasonable cause);[785] Harrisburg, Pennsylvania (1873);[786] Tennessee (1879);[787] West Virginia (1882); Dakota Terr. (1883);[788] Ariz. Terr. (1889) (in towns); Arizona Terr. (1889) ("within any settlement, town, village, or city," unless with reasonable cause).[789]

No carry to public assemblies or gatherings. Texas (1871);[790] Missouri (1885).[791]

Ban on carry with intent to injure. Maryland (1882).

---

[775] 1 The Codes and General Laws of Oregon 977 (William Lair Hill ed., 1887).

[776] Revised Statutes of Arizona 726 (1887).

[777] 3 The General Statutes of the State of Michigan 3800 (Andrew Howell ed., 1890).

[778] 1893 R.I. Laws 231–32, ch. 1180.

[779] 1894 Md. Laws 834.

[780] 1899 U.S. Stat. 1270, ch. 429, sec. 117.

[781] 1866 N.Y. Laws 1523, ch. 716.

[782] 3 The Revised Statutes, Code and General Laws of the State of New York 3330 (Clarence F. Birdseye ed., 1890).

[783] 2 General Statutes of the State of Minnesota, In Force January 1891, at 517 (1891).

[784] 1863 Cal. Stat. 115–16, ch. 128.

[785] 1871 Tex. Gen. Laws 25.

[786] 1873 Pa. Laws 735–36.

[787] 1879 Tenn. Pub. Acts 231, ch. 86, sec. 1.

[788] 1883 Dakota Terr. 1211, sec. 456.

[789] 1889 Ariz. Terr. Laws 30.

[790] 2 A Digest of the Laws of Texas: Containing the Laws in Force, and the Repealed Laws on which Rights Rest, From 1754 to 1874, at 1323 (George W. Paschal ed., 4th ed. 1874).

[791] 1 The Revised Statutes of the State of Missouri 854 (1889).

Sales to minors. Kentucky (1859) (parental permission); Indiana (1875); West Virginia (1882); Kansas (1882) (also banning possession by minors); Missouri (1885) (under 21);[792] New York (1889) (18, unless police magistrate consents);[793] Oklahoma (1890) (under 21);[794] Texas (1897, parental consent).

Limiting carry by young people. Nevada (1881) (under 18),[795] Nevada (1885) (under 21);[796] Ariz. Terr. (1883, ages 10-16, in towns).

Specific taxation. Kentucky (1891) (occupational tax for vendors).

Authorizing municipalities to regulate. Illinois (1867) (Bloomington, concealed carry, "colt, or slung-shot"); Wisconsin (1874–91) (concealed carry, "colt, or slung shot"); Michigan (1891) (Saginaw, concealed carry).

No possession. Illinois (1881).[797]

In the nineteenth century, "colt" seems to have been an alternative term for "slungshot." The Shorter Oxford English Dictionary defines a "colt" as "4. A short piece of weighted rope used as a weapon, *spec. (Naut.)* a similar instrument used for corporal punishment, *slang*, M18."[798]

An 1855 Kentucky prohibiting slungshot sales also applied to two other types of arms:

> That any person or persons who may hereafter be found guilty of vending, buying, selling, or doling in the weapons popularly known as colts, brass knuckles, slung-shots, or any imitation or substitute therefor, shall forfeit or pay 25 dollars.[799]

The Kentucky ban on sale of "colts," stayed on the books for several decades, and was eventually replaced with a ban only on sales to minors, plus a tort

---

[792] *Id.*

[793] 1899 N.Y. Laws 1341, ch. 603.

[794] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[795] 1881 Nev. Stat. 143.

[796] 1885 Nev. Stat. 51.

[797] 1881 Ill. Laws 73.

[798] 1 Shorter Oxford English Dictionary 444.

[799] 1855 Ky. Acts 96, ch. 636. This restriction was restated the following year. 1856 Ky. Acts 97, ch. 636.

cause of action for anyone injured with the listed weapons as a result of an illegal sale.[800]

In short, the laws for slungshots/colts are the most restrictive of any of the weapons examined in this article. Most jurisdictions that chose to regulate followed the typical course for other weapons—such as concealed carry bans or limits on sales to minors. As for bans on carry in general, there are of course the usual suspects, namely some of the jurisdictions that also banned open handgun carry, and likewise banned carrying most other weapons, while still allowing long gun open carry. However, the Dakota Territory banned slungshot carry, and Dakota was not among the jurisdictions that banned handgun carry.

More importantly, there were nine states or territories that at some point banned manufacture or sale, and two of them banned possession. This is

---

[800] One might guess that "colts" referred to the revolvers produced by Colt's Manufacturing Co., in New Haven, Conn. The Colt's revolvers were not the first revolvers, which had been around for two centuries. Repeating (multishot) handguns were even older. Since the 1830s, repeating handguns known as "pepperboxes" had been widely available to middle class consumers. Their typical ammunition capacity was four to eight bullets, although some models went as high as twenty-four. *See* text at notes __.

The first models of Samuel Colt's revolver handguns were introduced in the late 1830s, and by the mid-1850s improved models had become a major commercial success. They were lighter weight and more reliable than pepperboxes or any other previous type of repeating handgun. Protected by a patent that did not expire until 1857, they faced no competition in the category of high-quality modern revolver.

The theory that the Kentucky legislature was taking aim at the Colt's revolvers is buttressed by the late nineteenth century version of the statute, which changed the spelling to "Colt's."

By the time Kentucky's revised statute changed "colts" to "Colt's," and banned sales only to minors, the Colt's Manufacturing revolver patent was expired; there were many companies selling high-quality modern revolvers at affordable prices. At that point, a sales restriction on Colt's revolvers only would have made no sense, although perhaps similar revolvers could be said to be covered by "or any imitation of substitute therefor."

Even so, in the latter nineteenth century a Kentucky ban on revolvers "similar" to Colt's would be the opposite of gun control efforts of the time in other states. As discussed in Part IV.B. & C., those were bans on the most concealable handguns, and they exempted large handguns ("Army and Navy" models) like the Colt's.

We suggest that the 1855 Kentucky statute was not about handguns. If the successor statutes were, they were anomalous to the extent that they singled out large handguns for stricter regulations than small handguns.

substantially more than the number that imposed such restrictions on any other arm in the nineteenth century.

We reviewed every pre-1900 case on Westlaw with the words "slungshot," "slung shot," or "slung-shot." Few of them are instructive on right to arms law. Some involve some other weapon, such as a gun or knife, and simply quote a statute that also mentions slungshots.[801] Many involve homicides or assaults, a defendant of course could not raise the right to arms.[802] A few involved whether a municipality had the power to enact an ordinance.[803] Two cases involved sailors who carried slungshots, and the courts did not consider the

---

[801] *See*, *e.g.*, State v. Seal, 47 Mo. App. 603 (1892) (defendant convicted of "exhibiting a gun in a rude, angry and threatening manner"; statute also applied to slungshots); People v. Izzo, 60 Hun. 583, 39 N.Y. St. Rep. 166, 14 N.Y.S. 906 (1st Dept. 1891) (conviction for carrying a concealed dagger with intent to use in a crime reversed because of improper testimony; statute also applied to slungshots).

[802] *See*, *e.g.,* State v. Marshall, 35 Or. 265, 57 P. 902 (1899) (insanity defense for assault with a slungshot); People v. Turner, 118 Cal. 324. 50 P. 537 (1897) (cross-examination of victim who identified defendant as perpetrator of assault with a slungshot); People v. Wyman, 15 Cal. 70 (1860) (upholding conviction of manslaughter for stabbing victim in the ribs; victim's nose had been broken, and a physician testified that the break was not caused by a knife, and "might have been made a slungshot, a round stick, or possibly with the fist"); State v. Melton, 102 Mo. 683, 15 S.W. 139 (1891) (claim of self-defense not supported by the facts); State v. Fowler, 52 Iowa 103, 2 N.W. 983 (1879) (admissibility of witness testimony in support of self-defense); State v. Yeaton, 53 Me. 125 (1865) (refused entrance to an event at a private school, defendants assaulted the school personnel with slungshots); People v. Casey, 72 N.Y. 393 (1872) (defendant convicted of assault with a sharp weapon; indictment had also mentioned "certain knife, pistol, slung-shot, billy and club"; jury conviction of sharp weapon was implausible, since evidence showed a bludgeon and not a cut, but defendant's attorney had failed to object below); People v. Emerson, 6 N.Y.Crim.R. 157, 20 N.Y.St.Rep. 155 N.Y.S. 374 (Sup. Ct. N.Y. County 1888) (defendant convicted of running an illegal lottery; prosecution was correctly allowed to introduce testimony about the nature of "a lottery policy," just as other cases allow testimony about "the nature and description of a weapon commonly known as a 'slungshot,' or, under section 508, what is an instrument adapted or commonly used for the commission of burglary, etc.").

[803] *See*, *e.g.* Collins v. Hall, 92 Ga. 411, 17 S.E. 622 (1893) (municipality did not have the power to enact on concealed carry ban on various arms, including slungshots); Ex parte Caldwell, 138 Mo. 233, 39 S.W. 761 (1897) (municipal law imposing fine for carrying concealed weapons was consistent with city charter; defendant's weapon not specified, but ordinance included slungshots).

slungshots to indicate anything nefarious about the sailors' characters.[804] In a lawsuit about a "rough and abusive" passenger who had been struck by a train employee with a slungshot and ejected from a slow-moving train for not paying the fare, an Illinois appellate court ruled that the trial court had improperly excluded evidence that the train employee had legitimate defensive purposes for carrying a "billy or slungshot" (terms that the court used interchangeably).[805]

The one case that addressed the constitutionality of slungshot laws in depth was the 1871 *English v. State*, which upheld the recently enacted state statute against public carry of handguns and many other arms, while allowing long gun carry.[806] As for the Second Amendment right to bear arms, the Texas Supreme Court held that arms protected were the types of arms useful in a militia:

> Arms of what kind? Certainly such as are useful and proper to an armed militia. The deadly weapons spoken of in the statute are pistols, dirks, daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives. Can it be understood that these were contemplated by the framers of our bill of rights? Most of them are the wicked devices of modern craft.
>
> . . .

---

[804] Gardner v. Bibbins, 1 Blatchf. & H. 356, 9 F.Cas. 1159 (S.D.N.Y. 1833) ("He produces the evidence of a laborer, to prove that the libellant was in possession of a slung-shot on shore, which might have been used as a dangeous weapon . . . but he does not pretend, in his own deposition, that he ever regarded those circumstances as importing any danger to him or to the vessel."); Smith v. U.S., 1 Wash. Terr. 262 (1869) ("The evidence excluded appears to have been offered for the purpose of showing that Butler . . . 'had a slung-shot on board the bark Marinus at the time of the affray.' It nowhere appears in the evidence that Butler, at the time of the affray, was making an assault upon the prisoner, or attempting or threatening to make any.").

[805] Chicago, B. & Q.R. Co. v. Boger, 1 Ill. App. 472 (1877) ("The appellant offered to prove by the witness that a short time before he had had trouble with roughs and confidence men jumping on the train as it was passing out of the city, where he had been attacked by them, and that he carried the billy for his personal protection against any future assault. We think this evidence should have been admitted to the jury.").

[806] English v. State, 35 Tex. 473 (1871).

To refer the deadly devices and instruments called in the statute "deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous. No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit. The word "arms" in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms.

The terms dirks, daggers, slungshots, sword-canes, brass-knuckles and bowie knives, belong to no military vocabulary. Were a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline.[807]

The Texas State Constitution right to arms guaranteed "the right to keep and bear arms in the lawful defense of himself or the state, under such regulations as the legislature may prescribe."[808] The language authorizing regulations in the 1866 Constitution was a change from the 1845 statehood constitution, and the 1836 Constitution of the Republic of Texas.[809] However, the court held that "arms" in the Texas Constitution meant the same thing as in the Second Amendment.

The carry ban was a reasonable regulation: "We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his

---

[807] *Id.* at 474, 476–77.

[808] Tex. Const. of 1868, art. I, § 13: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the legislature may prescribe."

[809] Tex. Const. of 1845, art. I, § 13: "Every citizen shall have the right to keep and bear arms in the lawful defence of himself or the State." Tex. Const. of 1836, Declaration of Rights, § 14: "Every citizen shall have the right to bear arms in defence of himself and the republic. The military shall at all times and in all cases be subordinate to the civil power."

person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[810] As for Texans' preferences for carrying arms, that came from the pernicious Spanish influence on the state—which had once been part of New Spain, and later part of the United States of Mexico:

> A portion of our system of laws, as well as our public morality, is derived from a people the most peculiar perhaps of any other in the history and derivation of its own system. Spain, at different periods of the world, was dominated over by the Carthagenians, the Romans, the Vandals, the Snevi, the Allani, the Visigoths, and Arabs; and to this day there are found in the Spanish codes traces of the laws and customs of each of these nations blended together into a system by no means to be compared with the sound philosophy and pure morality of the common law.[811]

### 2. Slingshots

Slingshots are entirely different from slungshots. A slungshot is an impact weapon, and a slingshot is a missile weapon. The first slingshot law does not appear until 1872, the next one 1886, and the remainder in the 1890s. According to Escobar, "we don't know if 'slingshot' was a confused attempt to outlaw slungshots, but it's a good guess."[812]

Today we think of actual slingshots as children's toys, as famously carried by mischievous cartoon character Dennis the Menace. Dennis was not inclined to "malicious mischief," but if he had been, the expected result would have been a broken window or a dead bird. However, a slingshot can also be a formidable weapon.

---

[810] *English*, 35 Tex. at 478–79.

[811] *Id.* at 480.

[812] ESCOBAR, *supra* note __, at 105.

In the legions of classical Rome, the legionnaire solider was expected to be proficient with a sling and a rock. Every Roman soldier carried a sling. So if a soldier's sword were lost or broken in combat, he could still use the sling.[813]

The Bible story of the young shepherd David killing the giant Goliath with a sling reflects the typicality of slings as combat weapon in ancient times.[814]

To be sure, a "slingshot" is not a "sling." But a powerful slingshot hurling a rock is certainly a weapon that can be, and has been, used for hunting, for defense, and for offense.

The following statutes restricted "slingshots." Whether they were meant to apply to slungshots or to slingshots is unknown.

No concealed carry. Wisconsin (1887),[815] Mississippi (1896),[816] (1898);[817] Maryland (1872) (in Annapolis);[818] Washington (1886);[819] Colorado (1891);[820] South Carolina (1897).[821]

No sales to minors. North Carolina (1893).

Authorizing municipal regulation. Michigan (1891) (Saginaw, concealed carry); Nebraska (1895) (Lincoln, concealed carry).

If the laws applied to actual slingshots, they fit into the mainstream established by Bowie knife laws. There were no prohibitions on possession, open carry, or sales to adults. If the laws applied to slungshots, they add to the total of states with standard restrictions, rather than prohibitions on sales.

---

[813] Heather Pringle, *Ancient Slingshot Was as Deadly as a .44 Magnum: An excavation in Scotland shows that Roman soldiers used lead ammo with lethal accuracy*, Nat'l Geographic, May 23, 2017, https://www.nationalgeographic.com/history/article/ancient-slingshot-lethal-44-magnum-scotland.

[814] 1 Samuel 17.

[815] 1887 Wis. Sess. Laws 1308, ch. 4.

[816] 1896 Miss. Laws 109–10, ch. 104.

[817] 1898 Miss. Laws 86, ch 68.

[818] 1872 Md. Laws 57, ch. 43.

[819] 1885–86 Wash. Terr. Laws 81–82.

[820] 1891 Colo. Sess. Laws 129.

[821] 1897 S.C. Acts 423, no. 251.

133

### 3. Sand Clubs

A sand club is a small bag of sand attached to a short handle.[822] A sand club is also called a "sand bag" or "sandbag." If a sand club is filled with something other than sand, such as lead pellets, it might be called a "blackjack" or a "sap." All these clubs were often carried by law enforcement officers.

One advantage for either law enforcement or criminal use is that a sand club does not leave a mark on the target.[823] The "ability here outstrips that of saps, jacks, slungshots and all their variations" because of the soft load.[824]

The sand club "might be the only easily adjustable impact weapon known to man. . . If you want up its destructive capabilities . . . just add water. Wet sand weighs more."[825]

The only specific state laws we found on these arms were bans on carry with intent to injure. Maryland (1882) ("sand-club"); Michigan (1891) (Saginaw, concealed carry, "sand bag").

---

[822] "A long sausage-shaped bag of sand used as a weapon." ERIC PARTRIDGE, A DICTIONARY OF SLANG AND UNCONVENTIONAL ENGLISH (1971). *See also* ESCOBAR, *supra* note __, at 19 ("a sand-club, formed by filling an eel-skin with sand"), quoting 1 THE LONDON MEDICAL RECORD 576 (Ernest Abraham Hart ed., 1873) (describing an 1871 homicide in San Francisco).

Like other flexible impact weapons other than the slungshot, a sand club is sometimes called a "sap." For example, in a 1983 case,

> Officer Casey testified that at first he thought the object, which was very common in the North Park area of Pittsburgh, was a "sap." That is, a sock filled with sand that when swung, according to the officer, was "almost a stone, and [if] you hit somebody in the side of the head or temple with it, you'll kill him. It's a very effective weapon."

Commonwealth v. Hook, 313 Pa. Super. 1, 459 A.2d 379, 384 n.2 (1983) (Popovich, J., dissenting).

[823] ESCOBAR, *supra* note __, at 19, 21.

[824] *Id.* at 21.

[825] *Id.*

*4. Blackjacks*

Blackjack laws begin to appear in the last quarter of the nineteenth century. The dating indicates that the statutes were referring to the modern blackjack.[826]

The "classic modern blackjack" is "a coil spring body with cylindrical shaped head and a hard load. As such this focuses the impact into a small area and loses the soft sap's lower peak force distribution."[827] The "blackjack" is distinct from the broader, earlier nineteenth century use of "jack" to refer to all sorts of flexible impact weapons.

The blackjack became "a police constant for about 100 years."[828] "Policemen's uniforms in the U.S. had a special pocket where they were stored."[829] Theodore Roosevelt carried one when he was Police Commissioner of New York City, and when he was President of the United States.[830]

Blackjacks were favored by law enforcement officers for the same reasons that officers like saps and jacks in general:

> [E]ven in the days when law enforcement had much freer rein than today, stabbing a suspect with a knife you technically should or should not have had on you was going to be a problem. Shooting him would be even more complicated. By process of elimination we can understand how saps became the go to backup tool for an officer. At least you were already officially issued a club . . . In this way saps came to straddle that unique middle ground between law and lawless that was their place for so long.[831]

---

[826] *Id.* at 85. But confusingly, "Later authors apparently then applied the term retroactively to all kinds of saps. . . ." *Id.* In San Francisco, "unlike elsewhere," "the term slungshot" was "applied almost universally" to blackjacks. *Id.* at 101.

[827] *Id.* at 127. Yet "there were modern blackjacks with other methods of construction," according to very early twentieth century order forms, and some of these variants were still being made in the 1970s. *Id.*

[828] *Id.* at 135.

[829] *Id.* at 11.

[830] R.L. WILSON & GREGORY C. WILSON, THEODORE ROOSEVELT: OUTDOORSMAN 138 (1971).

[831] ESCOBAR, *supra* note __, at 105–06.

Starting in 1881, New York banned sale or manufacture, with a police exemption that Roosevelt used.[832] The New York law was eccentric. Other jurisdictions that specifically regulated blackjacks imposed lesser restrictions.

No concealed carry. North Carolina (Alleghany County, 1877),[833] statewide (1879);[834] Maryland (1886);[835] D.C. (1892); Rhode Island (1893);[836] Maryland (1894) (unless reasonable cause).[837]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866);[838] Michigan (1887).[839]

No carry. Tennessee (1879);[840] Oklahoma (1890,[841] 1893[842]).

Limiting Sales to Minors. Oklahoma (1890,[843] 1893[844]); New York (1889).[845]

### 5. Billies vs. Billy clubs

A "billy" or "billie" can be confusing. They are not the same as a "billy club." "A policeman's old fashioned billy club was usually a solid piece of turned hardwood."[846] In contrast, "the words billie and billet were used for saps and blackjacks in particular from the late nineteenth century to early in the 20th century."[847]

---

[832] 1881 N.Y. Laws 102; 1884 N.Y. Laws 46, ch. 46, § 7; 1889 N.Y. Laws 167, ch. 140; 1899 N.Y. Laws 1341, ch. 603.

[833] 1876-1877 N.C. Sess. Laws 162–63, ch. 104.

[834] 1879 N.C. Sess. Laws 231, ch. 127.

[835] 1866 Md. Laws 602, ch. 375.

[836] 1893 R.I. Laws 231–32, ch. 1880, sec. 1.

[837] 1894 Md. Laws 834 (1894).

[838] 1866 N.Y. Laws 1523, ch. 716.

[839] 1887 Mich. Acts 144, No. 129.

[840] 1879 Tenn. Pub. Acts 231, ch. 86, sec. 1.

[841] 1890 Okla. Terr. Laws 495.

[842] 1893 Okla. Terr. Laws 503.

[843] 1890 Okla. Terr. Laws 495.

[844] 1893 Okla. Terr. Laws 503.

[845] 1889 N.Y. Laws 167, ch. 140.

[846] ESCOBAR, *supra* note __, at 9.

[847] *Id.* at 226. *See id.* at 3 (Describing a 1910 hardware store catalogue: "Notice that the sap and blackjacks are just called billies." The slungshot has a separate heading.).

Specific laws were as follows:

Ban on carry with intent to injure. Maryland (1882) (billy).

No concealed carry. Rhode Island (1893) (billy), Michigan (1897).[848]

No carry, with some exceptions. Okla. Terr. (1890) (billy).

Authorizing municipal regulation. Michigan (1891) (Saginaw, concealed carry, "billie");[849] Nebraska (1895) (Lincoln, concealed carry, billy).

## C. Rigid impact weapons

### 1. Knuckles

Knuckles are devices attached to one's second through fifth fingers to make the fist a more powerful weapon. They can be made of brass, other metals, or non-metallic material.[850]

Abraham Lincoln's friend, the lawyer Ward Hill Lamon, served as his bodyguard for Lincoln's midnight train ride into Washington, D.C., to assume the presidency. Lamon carried a pair of "fine pistols, a huge bowie knife, a black-jack, and a pair of brass knuckles."[851]

Six states banned sales, and some of them also banned manufacture. Vermont (1849);[852] Massachusetts (1850);[853] Kentucky ("brass knuckles"

---

[848] 1897 Mich. Acts 1030, sec. 15.

[849] 1891 Mich. Acts 409, no. 257.

[850] Knuckles are "fashioned from a single piece of metal." ESCOBAR, *supra* note __, a 9. They are descendants of the *cestus*, a glove worn by Greek and Roman boxers, sometimes loaded with a weight. *Id.* at 199; *cf.* VIRGIL, THE AENEID, book 5 ("The gloves of death—with seven distinguished folds Of tough bulls' hides; the space within is spread With iron or heavy loads of lead."), *in* 14 THE WORKS OF JOHN DRYDEN (1808) (Dryden's translation of the Aeneid).

[851] HAROLD HOLZER, LINCOLN PRESIDENT-ELECT: ABRAHAM LINCOLN AND THE GREAT SECESSION WINTER 1860-1861, at 391 (2008).

[852] 1849 Vt. Acts & Resolves 26.

[853] 1850 Mass. Acts 401, ch. 194.

1856);[854] Florida ("metallic knuckles") (1868,[855] 1893);[856] New York ("metal knuckles") (1881,[857] 1889,[858] 1899);[859] Arkansas (1881) ("metal knuckles").

The Kentucky ban was later repealed.[860] Only Illinois outlawed possession for adults (1881,[861] 1893).[862] Kansas included knuckles in the long list of arms, other than rifles and shotguns, for which possession by minors was forbidden (1882).

The majority approach was nonprohibitory:

No concealed carry. D.C. (1871) ("brass or other metal knuckles"); Maryland 1872 (for Annapolis, "brass, iron, or other metal knuckles"); Wisconsin (unless with reasonable cause) ("brass knuckles") (1872);[863] Alabama ("brass knuckles") (1873);[864] North Carolina (1877, Alleghany County, "brass, iron or metallic knuckles") (1879, statewide); Mississippi (1878, 1896,[865] 1898[866] "brass or metallic knuckles"); Washington Terr. (1886);[867] Michigan (1887);[868] Arizona Terr. (1893) ("brass knuckles, or other knuckles of metal");[869] Rhode Island (1893) ("brass or metal knuckles"); South Carolina (1897).[870]

Carrying concealed created a presumption that the weapon was being carried for use against another person. Illinois ("steel or iron knuckles")

---

[854] 1856 Ky. Acts 96, ch. 636.

[855] 1868 FL Laws 95, ch. 7, sec. 11.

[856] 1893 FL Laws 52, ch. 4124.

[857] 1881 N.Y. Laws 102.

[858] 1889 N.Y. Laws 167, ch. 140.

[859] 1899 N.Y. Laws 1341, ch. 603.

[860] Text at notes *supra*.

[861] 1881 Ill. Laws 73.

[862] 1893 Ill. Laws 477–78.

[863] 1872 Wis. Sess. Laws 17, ch.7.

[864] 1873 Ala. Laws 130–31, no. 87.

[865] 1896 Mich. Pub. Acts 109, ch. 104.

[866] 1898 Mich. Pub. Acts 86, ch. 68.

[867] 1885-86 Wash. Terr. Laws 82.

[868] 1887 Mich. Pub. Acts 144, no. 129.

[869] 1893 Ariz. Sess. Laws 3, no 2.

[870] 1897 S.C. Acts 450–52, no. 251.

(1874,[871] 1879);[872] New York ("metal knuckles") (1866,[873] 1881);[874] South Carolina ("metal knuckles") (1880).[875]

No carry in most circumstances. Texas (1871) ("brass-knuckles"); Arizona Terr. 1889 ("brass knuckles" "within any settlement, town, village or city"); (1889);[876] Okla. Terr. (1890) ("metal knuckles").

No carry by minors. Ariz. Terr. (1883) ("brass-knuckles," ages 10–16, in towns).

No sales to minors. Indiana (1875) ("knucks"); Kansas (1882) (also banning possession by minors, "brass knuckles"); West Virginia (1882); Texas (1897) (parental permission, "knuckles made or any metal or hard substance"). No transfer to minors. Oklahoma (1890).[877] No sales to a minor without written consent of a police magistrate. New York (1889).[878]

Authorizing municipal regulation. Illinois (1867) (Bloomington, concealed carry, "cross knuckles, or knuckles of brass, lead or other metal"); Wisconsin (1874–91) (concealed carry, "cross knuckles, or knuckles of lead, brass or other metal"); Michigan (1891) (Saginaw, concealed carry, "false knuckles" [non-metallic]); Nebraska (1895) (Lincoln, concealed carry, "metal knuckles").

License required to sell. South Carolina ("metal knuckles") (1891).[879]

While the statutes varied in what kind of "knuckles" were illegal, a Texas court ruled that "brass knuckles" encompassed knuckles made of steel or other materials.[880]

Throughout this article we have focused on laws that named specific weapons. However, it should be recognized that many laws, particularly those

---

[871] 1874 Ill. Laws 360, ch. 38, sec. 56.

[872] REVISED STATUTES OF THE STATE OF ILLINOIS, 1880, at 365 (Harvey B. Hurd ed., 1880).

[873] 1866 N.Y. Laws 1523, ch. 716.

[874] 1881 N.Y. Laws 102.

[875] 1880 S.C. Acts 448, no. 362.

[876] 1889 Ariz. Terr. Laws 30.

[877] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[878] 1889 NY Laws 167, ch. 140.

1893 Fla. Laws 51, 52, ch. 4124.

Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind, usually known as slung shot, or metallic knuckles, shall be punished by imprisonment not exceeding three months, or by Penalty.

[879] 1891 S.C. Acts 1101–02, no. 703.

[880] Harris v. State, 22 Tex. App. 677, 3 S.W. 477 (1887).

involving public carry, had catch-all phrases such as "other deadly weapon." These laws might encompass weapons not named in the statute. Such a law against concealed carry in Missouri was held to encompass "a pair of brass knucks."[881]

Consistent with the express text of the Missouri state constitution, the Missouri Court of Appeals said that concealed carry of knuckles was not part of the right to arms.[882] Alabama's statute against concealed carry had an exception for carrying a firearm or knife with good reason to apprehend an attack. Defendant had indisputably been carrying knuckles because of danger of imminent attack, but his conviction was upheld, because the statutory exception allowing concealed carry did not include knuckles. The Alabama Supreme Court held that the trial court

> did not err in ruling that this provision did not embrace brass knuckles, slung-shots, or weapons of like kind. . . . The carrying concealed of a barbarous weapon of this class, which is usually the instrument of an assassin, and an index of a murderous heart, is absolutely prohibited by section 3776 of the Criminal Code of this state. The law does not recognize it as a weapon of self-defense.[883]

---

[881] State v. Hall, 20 Mo. App. 397 (1886) (statute prohibited concealed carry of "fire arms, bowie knife, dirk, dagger, slungshot, or other deadly weapon").

[882] A St. Louis ordinance forbade concealed carry without a permit of "cross-knuckles, or knuckles of lead, brass or other metal." "In the constitution the citizen has many priceless rights guaranteed to him; but unluckily for appellant, the 'right' to carry concealed in his hip pocket knuckles of brass, a weapon of dangerous and deadly character, is not a 'right' protected by any constitutional guaranty." City of St. Louis v. Vert, 84 Mo. 204, 209 (1884); Mo. Const. of 1875, art. II, § 17 ("[T]he right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons.").

[883] Bell v. State, 89 Ala. 61, 8 So. 133 (1890).

*2. Loaded Canes*

A loaded cane has a hollowed section filled with lead.[884] It is a powerful impact weapon.[885]

No concealed carry. N.C. 1877 (Alleghany County),[886] 1879 (statewide).[887]

No carry in most circumstances. Tennessee (1821,[888] 1870,[889] 1879 ("sword cane" or "loaded cane");[890] Oklahoma Terr. (1893).[891]

No disposing to a minor. N.C. (1879).[892]

## D. Cannons

As detailed in Part II.F, the laws of the colonial and Founding laws presumed personally owned cannons. Under the Constitution, cannons were necessary so that Congress could "grant Letters of Marque and Reprisal."[893] Such letters were granted during the War of 1812.[894] Cannons were advertised for sale in an 1813 newspaper ad in Newport, Rhode Island, one of America's busiest seaports.[895]

---

[884] Harry Schenawolf, *Loaded Cane – How Revolutionary War Officers and Gentlemen Protected Themselves from Drunken Soldiers and Muggings*, REVOLUTIONARY WAR J., June 28, 2019, https://www.revolutionarywarjournal.com/loaded-cane-how-revolutionary-war-officers-and-gentlemen-dealt-with-drunken-soldiers-and-riff-raff/.

[885] *Id.*

[886] 1877 N.C. Sess. Laws 162–63, ch. 104.

[887] 1879 N.C. Sess. Laws ch. 127, p. 231.

[888] 1821 Tenn. Pub. Acts 15, ch. 13.

[889] 1870 Tenn. Pub. Acts 55, ch. 41.

[890] 1879 Tenn. Pub. Acts 231, ch. 86.

[891] 1893 Okla. Sess. Laws 503, art. 45.

[892] 1893 N.C. Sess. Laws 468–69, ch. 514.

[893] U.S. CONST., art. I, § 8.

[894] 2 Stat. 755 (1812). The privateers "were of incalculable benefit to us, and inflicted enormous damage" on Great Britain. THEODORE ROOSEVELT, THE NAVAL WAR OF 1812, at 416 (1882).

[895] *The Rhode-Island Republican. [volume]* (Newport, R.I.), June 10, 1813, https://chroniclingamerica.loc.gov/lccn/sn83025561/1813-06-10/ed-1/seq-4/.

An international declaration in 1856 prohibited signatory nations from issuing letters of marque and reprisal.[896] The United States chose not to join. During the Civil War, the Confederacy issued letters of marque and reprisal.[897] The Spanish-American War of 1898, like previous naval wars, generated cases about the ownership of prizes.[898]

On the land, legislation provided rules for cannon owners.

The 1881 Pennsylvania legislature made it a misdemeanor to "knowingly and willfully sell" to buyers "under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon."[899] By implication, sales of cannons to persons 16 and over was legal.

Most cannon laws nineteenth-century cannon laws prevented people from firing cannons in certain locations, typically public ones. In 1844, Ohio forbade anyone to "fire any cannon . . . upon any public street or highway, or nearer than ten rods to the same," "except in case of invasion by a foreign enemy or to suppress insurrections or mobs, or for the purpose of raising drowned human bodies, or for the purpose of blasting or removing rocks."[900]

Other localities also prevented people from firing cannons in certain locations. Northern Liberties Township, Pennsylvania (1815),[901] Cincinnati,

---

[896] Paris Declaration respecting Maritime Law, art. 1 (1856) ("Privateering is and remains abolished."). Later, the United States announced it would comply with the Declaration, even the U.S. has never formally joined the Declaration.

[897] COOPERSTEIN, *supra* note __, at 246. Congress in 1863 passed and President Lincoln signed a law authorizing privateering for three years, but no letters were granted. *See* 12 Stat. 758 (1863); Nicholas Parrillo, *The De-Privatization of American Warfare: How the U.S. Government Used, Regulated, and Ultimately Abandoned Privateering in the Nineteenth Century*, 19 YALE J.L. & HUMANITIES 1, 72–73 (2007).

[898] The Paquete Habana, 175 U.S. 677 (1900) (applying customary international law that coastal fishing vessels may not be seized).

For contemporary arguments in favor of issuing letters of marque and reprisal against pirates around Somalia, see Todd Emerson Hutchins, Comment, *Structuring a Sustainable Letters of Marque Regime: How Commissioning Privateers Can Defeat The Somali Pirates*, 99 CALIF. L. REV. 819 (2011); Joshua Stauba, *Letters of Marque: A Short-Term Solution to an Age Old Problem*, 40 J. MAR. L. & COM. 261 (2009).

[899] 1881 Pa. Laws 111, no. 124.

[900] 1844 Ohio Laws 17, sec. 1.

[901] A DIGEST OF ACTS OF ASSEMBLY, RELATING TO THE INCORPORATED DISTRICT OF THE NORTHERN LIBERTIES 94 (1847) ("within the regulated parts . . . in said township, without permission from the president of the board of commissioners").

Ohio (1828),[902] Jersey City, New Jersey (1843),[903] St. Louis, Missouri (1843),[904] Detroit, Michigan (1848),[905] Dayton, Ohio (1855),[906] Peoria, Illinois (1856),[907] 1869),[908] Chicago, Illinois (1861),[909] San Francisco, California (1869)[910] Meriden, Connecticut (1869),[911] Dover, New Hampshire (1870),[912] Little Rock,

---

[902] ACT INCORPORATING THE CITY OF CINCINNATI, AND THE ORDINANCES OF SAID CITY NOW IN FORCE 43 (1828) ("within the limits of said city"); *id.* at 43–44 ("It shall not be lawful for any person or persons having charge or being on board of any boat upon the Ohio river . . . to cause any cannon . . . to discharge its contents towards the city").

[903] ORDINANCES OF JERSEY CITY 9 (1844) ("within this city . . . unless in defense of his property or person").

[904] THE REVISED ORDINANCES OF THE CITY OF SAINT LOUIS, REVISED AND DIGESTED BY THE FIFTH CITY COUNCIL 304 (1843) ("within the city").

[905] THE REVISED CHARTER AND ORDINANCES OF THE CITY OF DETROIT 199 (1855) ("within this city, unless by permission of the Mayor or two Aldermen").

[906] LAWS AND GENERAL ORDINANCES OF THE CITY OF DAYTON 229 (1862) ("within the bounds of the building lots, or cemetery ground in this city, or within one hundred yards of any public road, within this corporation, except by permission of council").

[907] THE CITY CHARTER, WITH THE SEVERAL LAWS AMENDATORY THERETO, AND THE REVISED ORDINANCES, OF THE CITY OF PEORIA, ILLINOIS 168 (James M. Cunningham ed., 1857) ("in said city, without permission from the mayor or city marshal").

[908] THE CITY CHARTER AND THE REVISED ORDINANCES OF THE CITY OF PEORIA, ILLINOIS 254 (James M. Cunningham ed., 1869) ("in said city, without permission from the mayor or superintendent of police").

[909] 1861 Ill. Private Laws 144, sec. 78 ("within the city limits . . . without permission from the mayor or common council").

[910] THE GENERAL ORDERS OF THE BOARD OF SUPERVISORS, CITY AND COUNTY OF SAN FRANCISCO 13 (1869) ("within that portion of this city and county lying between Larkin and Ninth Streets and the outer line of the streets forming the water-front, except by special permission").

[911] THE CHARTER AND BY-LAWS OF THE CITY OF MERIDEN 135 (1875) ("within the limits of said city").

[912] THE CHARTER, WITH ITS AMENDMENTS AND THE GENERAL ORDINANCES OF THE CITY OF DOVER 32 (1870) ("within the compact part of any town").

143

Arkansas (1871),[913] Martinsburg, West Virgnia (1875),[914] La Crosse, Wisconsin (1881),[915] Lynchburg, Virginia (1887),[916] and Lincoln, Nebraska (1895).[917]

These regulations indicate both that private citizens possessed cannons and that they were common enough to place limitations on where they could be fired.

The obvious dangers of firing a cannon in town are justifications for the discharge restrictions. The near-complete absence of any other restrictions in the nineteenth century might be explained by great rarity of use of cannons in crime. Cannons are typically fixed in a single location, such as a rooftop. If wheeled, they must be slowly moved by draft animals. It would seem very difficult for criminals to make any use of them.[918]

## VII. Doctrinal Analysis

### A. Summary of possession or sales bans

American bans on possession or sale to adults of particular arms from 1607 through 1899 are uncommon. For firearms, the bans are:

---

[913] A Digest of the Laws and Ordinances of the City of Little Rock 231 (George E. Dodge & John H. Cherry eds, 1871) ("No person shall fire or discharge any cannon . . . without permission from the may which permission shall limit the time of such firing, and shall be subject to be revoked by the mayor at any time after it has been granted.").

[914] Ordinances and By-laws of the Corporation of Martinsburg, Berkeley Co., West Virginia 25 (1875) ("within such parts of the town which are or shall be laid out into lots, or within two hundred yards of said limits").

[915] Charter and Ordinances of the City of La Crosse 202 (1888) ("within the limits of the city of La Crosse, without having first obtained written permission from the mayor").

[916] The Code of the City of Lynchburg, Va 116 (Thomas D. Davis ed., 1887) ("in the city" or "within one hundred yards of any dwelling-house without the consent of the owner or occupant of such house").

[917] 1895 Neb. Laws 238, art. 26, sec. 8 ("in any street, avenue, alley, park, or place, within the corporate limits of the city").

[918] Mortars are a different story. They are short tubes and man-portable. The rear sits on the ground and the front is elevated by legs, such as a bipod. Some of the above laws also covered mortars. The absence of legislative attention, other than discharge restrictions for inappropriate places, may, as with cannons, be the result of the rarity of criminal use. We guess that few criminals were interested in bombarding fortified buildings.

- Georgia (1837), all handguns except horse pistols. Held unconstitutional in *Nunn v. State*.
- Tennessee (1879) and Arkansas (1881). Bans on sales of concealable handguns. Based on militia-centric interpretations of the state constitutions, the laws did not ban the largest and most powerful revolvers, namely those like the Army or Navy models.
- Florida (1893). Discretionary licensing and an exorbitant licensing fee for repeating rifles. The law was "never intended to be applied to the white population" and "conceded to be in contravention of the Constitution and non-enforceable if contested."

For some nonfirearms arms, Illinois enacted a possession ban, and several others enacted sales bans:

- Bowie knife. Sales bans Georgia, Tennessee, and later in Arkansas. Georgia ban held to violate the Second Amendment. Prohibitive transfer or occupational vendor taxes in Alabama and Florida, which were repealed. Personal property taxes at levels high enough to discourage possession by poor people in Mississippi, Alabama, and North Carolina.
- Dirk. Georgia (1837) (held to violate Second Amendment), Arkansas (1881).
- Sword cane. Georgia (1837), held to violate the Second Amendment. Arkansas (1881).
- Slungshot or "colt." Sales bans in nine states or territories. The Kentucky ban was later repealed. Illinois also banned possession.
- Metallic knuckles. Sales bans in six states, later repealed in Kentucky. Illinois also banned possession.
- Sand club or blackjack. New York (1881).

B. The constitutional and racial background of possession or sales bans

The legal background of the laws was very different than it is today. The Supreme Court in *Barron v. Baltimore* had said that the Bill of Rights was not binding on the states;[919] some state courts, which Akhil Amar calls "the *Barron*

---

[919] 32 U.S. 2 (7 Pet.) 43 (1833)

contrarians," had taken a different view. These include the Georgia Supreme Court in *Nunn v. State*, which used the Second Amendment to overturn a statute prohibiting handguns, Bowie knives, and various other arms.

After the Civil War, the Fourteenth Amendment was ratified, with express congressional intent to make the Bill of Rights, specifically including the Second Amendment, enforceable against the States, as among the "privileges or immunities of citizens of the United States."[920] But the U.S. Supreme Court mostly nullified the Privilege or Immunities Clause in the *Slaughterhouse Cases*.[921] The Court's decisions in *United States v. Cruikshank*[922] and *Presser v. Illinois*[923] had seemed to many to affirm the *Slaughterhouse* approach specifically for Second Amendment rights.

The idea that the Fourteenth Amendment's Due Process Clause might "incorporate" individual elements in the Bill of Rights did not appear until the Court's 1897 incorporation of the Fifth Amendment Takings Clause in *Chicago, Burlington & Quincy Railroad Company v. Chicago*.[924] It took the Court until the 1920s to begin "selective incorporation" of parts of the First Amendment, until the 1940s to begin incorporating the criminal law and procedure provisions of Amendments Four, Five, Six, and Eight, until 2010 to incorporate the Second Amendment,[925] and 2019 to incorporate the Excessive Fines Clause of the Eighth Amendment.[926] So in the nineteenth century, reasonable legislators might believe they had no obligation to respect anything in the U.S. Bill of Rights, including the Second Amendment.

Many states had their own state constitution guarantees of the right to keep and bear arms.[927] But New York did not, and that is a partial explanation of its eccentric ban on the sale or manufacture of blackjacks and sand clubs.[928]

---

[920] *McDonald*, 561 U.S. at 838–60 (Thomas, J., concurring).

[921] 83 U.S. (16 Wall.) 36 (1873).

[922] 92 U.S. (2 Otto ) 542 (1875).

[923] 116 U.S. 252 (1886).

[924] 166 U.S. 226 (1897).

[925] McDonald v. City of Chicago, 561 U.S. 742 (2010).

[926] Timbs v. Indiana, 139 S.Ct. 682 (2019).

[927] *See* JOHNSON ET AL., *supra* note 16, at 791–804 (texts of all state guarantees, and years of enactment).

[928] In 1909, the legislature enacted a statutory Bill of Rights, including a verbatim copy of the Second Amendment. N.Y. Civil Rights L., § 4; 1909 N.Y.L. ch. 14. As a mere statute, it could not override any other statute the legislature chose to enact.

The other most prohibitive states were Tennessee and Arkansas, with their bans on sales of all handguns except the most powerful ones, the Army & Navy type revolvers. Both states also banned sales of Bowie knives, and Arkansas did the same for sword canes. In both states, the supreme courts had interpreted the state constitutional right to arms as solely applicable to militia-suitable arms.

Even with a militia-centric premise, the behavior of the Tennessee and Arkansas legislatures and courts was incorrect. The Tennessee Supreme Court in *Aymette* had upheld a statute against Bowie knives on the grounds that such knives are not militia-type arms. The Civil War decisively proved the opposite, and the Tennessee legislature suspended the Bowie knife law for the duration of the war. During the war, the Alabama legislature, having used property taxes to discourage Bowie ownership, had to pay for manufacturing Bowie knives of the state militia.

Overall, restrictions on the right to keep and bear arms in the nineteenth century were most frequent in slave states that later became the Jim Crow states. The modern precedential value of these white supremacy laws may be limited.[929]

This does not mean that all nineteenth century arms control laws were entirely racist. Even in the slave/Jim Crow states, laws that disarmed poor whites as well as blacks were enacted.[930]

Further, Massachusetts in the nineteenth century had a state constitution right to arms.[931] The right was interpreted to protect the rights of everyone to own and carry arms, and the interpretations did not claim that only militia-

---

[929] *See* Justin W. Aimonetti & Christian Talley, *Race, Ramos, and the Second Amendment Standard of Review,* 107 VA. L. REV. ONLINE 193 (2021) (arguing that Jim Crow gun control laws are not valid precedents today).

[930] For example, the laws in some southeastern states imposed relatively high annual property taxes on owning Bowie knives or handguns. The Tennessee and Arkansas bans on sales of handguns other than the Army & Navy models favored people who could afford the largest and most powerful handguns. Many former officers of the Confederate military had retained their service handguns; then as now, military officers tend to be disproportionately from the better-educated and wealthier classes. So were cavalrymen, which is to say men who could afford to bring their own horse to military service. A former Confederate infantry private likely retained his service musket, but he would not necessarily be able to afford the most expensive type of modern handguns.

[931] Mass. Const. of 1780, pt. 1, art. XVII.

type arms were protected.[932] Massachusetts was a leading anti-slavery state, and by the end of the nineteenth century, it was the only state that had *not* outlawed at least some interracial marriages.[933] Anti-racist Massachusetts was an early adopter of a ban on sales of slungshots and brass knuckles.

### C. Modern doctrines

#### 1. Dangerous and unusual

The *Heller* case cited a litany of precedents for the prohibition of carrying certain arms. Some of the sources called such arms "dangerous and unusual" and others said "dangerous or unusual."[934] From these precedents, *Heller*

---

[932] *See, e.g.*, Commonwealth v. Murphy, 44 N.E. 138 (Mass. 1896) (upholding ban on armed parades without advancing permission, citing to state cases that states may regulate the mode of carry); Commonwealth v. Blanding, 3 Pick. 304 (Mass. 1825) ("The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction.)

[933] PEGGY PASCOE, WHAT COMES NATURALLY: MISCEGENATION LAW AND THE MAKING OF RACE IN AMERICA (2010).

[934] *Heller* at 627, citing, in order: 4 WILLIAM BLACKSTONE, COMMENTARIES *148–49 (1769) ("The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton, 2 Edw. III. c.3. upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour."); 3 THE WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) ("In some cases, there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people."); JOHN A. DUNLAP, THE NEW-YORK JUSTICE 8 (1815) ("It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people."); CHARLES HUMPHREYS, COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822) ("Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land, which is punishable by forfeiture of the arms, and fine and imprisonment. But here it should be remembered, that in this country the constitution guarranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily."); 1 WILLIAM OLDNALL RUSSELL, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271–72 (2d ed. 1831) ("as where people arm themselves with dangerous and unusual weapons; in such a manner as will naturally cause a terror to the people; which is said to have been always an

extrapolated a rule that the government may forbid possession (not just carrying) of arms that are dangerous *and* unusual.[935]

*Bruen*, noting some of the many nineteenth-century laws against concealed carry, inferred the principle that governments may regulate the *manner* of carry.[936] That is, the government may require that carry be open rather than concealed (in compliance with nineteenth century sensibilities), or the government may require that carry be concealed rather than open (in compliance with modern sensibilities in some areas). As for the jurisdictions that prohibited *all* modes of handgun carry, the Court dismissed them as outliers.[937]

---

offence at common law, and is strictly prohibited by several statutes."); Henry J. Stephen, Summary of the Criminal Law 48 (1840) ("Riding or going armed with dangerous or unusual Weapons" is "[b]y statute of Northampton, 2 Edw. III, c. 3, . . . a misdemeanor, punishable with forfeiture of the arms and imprisonment during the king's pleasure."); Ellis Lewis, An Abridgment of the Criminal Law of the United States 64 (1847) ("where persons openly arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, an affray may be committed without actual violence."); Francis Wharton, A Treatise on the Criminal Law of the United States 726 (2d ed. 1852) ("there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute [Statute of Northampton]."); *State v. Langford*, 10 N.C. 381, 383–84 (1824) ("there may be an affray when there is no actual violence: as when a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said always to have been an offence at common law, and is strictly prohibited by statute."); *O'Neill v. State*, 16 Ala. 65, 67 (1849) ("It is probable, however, that if persons arm themselves with deadly or unusual weapons for the purpose of an affray, and in such manner as to strike terror to the people, they may be guilty of this offence, without coming to actual blows."); *English v. State*, 35 Tex. 473, 476–77 (1872) ("Blackstone says, the offense of riding or going round with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."); *State v. Lanier*, 71 N.C. 288, 289 (1874) ("The elementary writers say that the offence of going armed with dangerous or unusual weapons is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same to be the common law in *State* v. *Huntley*, 3 Ired. 418.").

[935] *Heller*, 554 U.S. at 627 (emphasis added).

[936] "The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. . . . States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." *Bruen*, 142 S. Ct. at 2150.

[937] *See* Part VII.B.2, *infra*.

We can synthesize two subrules from *Heller*'s dangerous and unusual rule and from *Bruen*'s modes of carry rule. Subrule 1: the types of arms for which possession can be prohibited can include those for which carry in every mode was historically prohibited. Subrule 2: in applying subrule 1, outlier jurisdictions that banned all modes of handgun carry are low-value precedents. For example, the 1871 Texas and 1890 Oklahoma Territory laws against almost all carrying of handguns are of little value in assessing the constitutional status of other arms that were also prohibited from carry in those jurisdictions. The subrules provide some additional structure for "dangerous and unusual," and reduce judicial temptation to use the phrase for epithetical jurisprudence.[938]

As *Bruen* points out, just because a weapon might have been considered "dangerous and unusual" at one point in time does not prevent it from becoming "common" later, in which case it becomes protected. *Bruen* articulates this rule in response to claims that handguns had been considered dangerous and unusual in the colonial period:

> Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." [*Heller*] *Id.*, at 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.[939]

The *Bruen* argument above is *arguendo*. Handguns were never "dangerous and unusual." To the contrary, they were mandatory militia arms for officers and horsemen, who were expected to bring their own handguns to militia service.[940]

---

[938] *Cf.* Joseph H. Drake, Note, *Epithetical Jurisprudence and the Annexation of Fixtures*, 18 MICH. L. REV. 405 (1919-1920) (creating the phrase); Jerome Frank, *Epithetical Jurisprudence and the Work of the Securities and Exchange Commission in the Administration of Chapter X of the Bankruptcy Act*, 18 N.Y.U. L.Q. REV. 317 (1941) (popularizing it).

[939] Bruen, 142 S. Ct. at 2143.

[940] *See* Part II.D.

As described in Part III.D, firearms with ammunition capacities over ten rounds were never considered "dangerous and unusual" in the nineteenth century. However, during the alcohol prohibition era of the 1920s and early 1930s, six states enacted laws that limited ammunition capacity in certain contexts, albeit less severely than prohibitory twenty-first century laws.[941] If it were to be argued that these restrictions from the days of Prohibition were permissible at the time as "dangerous and unusual" laws, that argument could no longer be applied today. Today (unlike in 1690), Americans own over one hundred million handguns, and today (unlike in 1929), they own hundreds of millions of magazines with capacities over 10 rounds.[942]

---

[941] 1927 R.I. Pub. Laws 256, §§ 1, 4 (banning sales of guns that fire more than 12 shots semi-automatically without reloading); 1927 Mich. Pub. Acts ch. 372, § 3 (prohibiting sale of firearms "which can be fired more than sixteen times without reloading"); 1933 Minn. Laws ch. 190 (prohibiting the "machine gun," and including semi-automatics "which have been changed, altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers"); 1933 Ohio Laws 189, 189 (license needed for semi-automatics with capacity of more than 18); 1933 Cal. Stat., ch. 450 (licensing system for machine guns, defined to include semi-automatics actually equipped with detachable magazines of more than ten rounds); 1934 Va. Acts ch. 96, §§ 1(a), 4(d) (regular sess.) (defining machine guns as anything able to fire more than 16 times without reloading, and prohibiting possession for an "offensive or aggressive purpose"; presumption of such purpose when possessed outside one's residence or place of business, or possessed by an alien; registration required for "machine gun" pistols of calibers larger than .30 or 7.62 mm).

All these laws were later repealed. See David B. Kopel, *The History of Firearms Magazines and of Magazine Prohibition*, 78 ALBANY L. REV. 849, 864–66 (2015) (Michigan repeal in 1959; R.I. limit raised to 14 and .22 caliber exempted in 1959, full repeal in 1975; Ohio limit raised to 32 and .22 caliber exempted in 1971, full repeal in 2014, statute had not applied to sale of magazines, but only to unlicensed insertion of a magazine into a firearm); 1963 Minn. Sess. L. ch. 753, at 1229 (defining "machine gun" as automatics only); 1965 Stats. of Calif., ch. 33, at 913 ("machine gun" fires more than one shot "by a single function of the trigger"); 1975 Va. Acts, ch. 14, at 67 (defining "machine gun" as automatics only); 1979 N.C. Sess. Laws 1230, ch. 895, § 1 (eliminating licensing for pump guns).

[942] "48.0% of gun owners – about 39 million individuals – have owned magazines that hold over 10 rounds (up to 542 million such magazines in total" and "approximately 171 million handguns." William English, PhD, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned, at 1–2 (May 13, 2022), https://bit.ly/3HaqmKv.

## 2. *How many jurisdictions make a tradition?*

*Bruen* offers some guidelines for how the government can carry its burden of proof to demonstrate a "historical tradition of firearm regulation" necessary to uphold a law.[943] *Bruen* held that "the historical record compiled by respondents does not demonstrate a tradition" of restricting public handgun carry.[944] Here is list of the (insufficient) sources cited by advocates of the notion that the right to "bear Arms" can be prohibited or can be limited only to persons whom the government believes have shown a "special need." For some of these sources, the Court was not convinced by the advocates' characterization of the laws, but the Court addressed them *arguendo*:[945]

- Two colonial statutes against the carrying of dangerous and unusual weapons (1692 Massachusetts, 1699 New Hampshire).[946]
- One colonial law restricting concealed carry for everyone and handgun carry for "planters," a/k/a frontiersmen (1686 East Jersey).[947]
- Three late-18th-century and early-nineteenth-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee).[948]
- Two nineteenth-century common-law offenses for going armed for a wicked or terrifying purpose (1843 North Carolina, 1849 Alabama).[949]
- Four statutory prohibitions on handgun carry (1821 Tennessee,[950] 1870 Tennessee,[951] 1871 Texas (without reasonable cause),[952] 1887 West Virginia (without good cause).[953]

---

[943] *Bruen*, 142 S. Ct. at 2130.

[944] *Id.* at 2138.

[945] *Id.* at 2144 ("even if" the government's reading were correct, the record would not justify the challenged regulation).

[946] *Id.* at 2142–43. Like many of the "dangerous and unusual" laws cited by *Heller*, these laws intended to prohibit "bearing arms to terrorize the people." *Id.* at 2143.

[947] *Id.* at 2143.

[948] *Id.* at 2144–45.

[949] *Id.* at 2145–46.

[950] *Id.* at 2147.

[951] *Id.* at 2153. This law was interpreted by courts, however, as allowing the carry of "large pistols suitable for military use." *Id.*

[952] *Id.* at 2153.

[953] *Id.*

- One state statute against going armed to the terror of the public (1870 South Carolina).
- Eleven nineteenth-century surety statutes, requiring that a person found by a court to have threatened to breach the peace must post a bond in order to continue carrying. (1836 Massachusetts,[954] 1870 West Virginia,[955] and "nine other jurisdictions"[956]).
- Two Western territory laws banning handgun carry (1869 New Mexico,[957] 1881 Arizona).[958]
- Two Western territory laws banning the carry of any arms in towns, cities, and villages (1875 Wyoming,[959] 1889 Idaho.)[960]
- One Western territory law banning all handgun carry and most long-gun carry (1890 Oklahoma).[961]
- One Western State law instructing large cities to ban all carry (1881 Kansas).[962]

So the general rule seems to be: In any given time period, it is possible to find several jurisdictions that in some way prohibited the exercise of the right to bear arms. But even the aggregate of jurisdictions with prohibitory laws is insufficient to overcome the mainstream approach of respecting the right to bear arms.

Let us put aside the Court's *arguendo* treatment of tendentious claims, such as assertions that laws against carrying dangerous and unusual weapons to terrify the public were actually prohibitions on peaceable defensive carry. For laws that actually did prohibit peaceable carry in many circumstances, there are:

---

[954] *Id.* at 2148–50.

[955] *Id.* at 2152–53.

[956] *Id.* at 2148. "'[U]nder surety laws . . . everyone started out with robust carrying rights" and only those reasonably accused [of creating fear of an injury or breach of the peace] were required to show a special need in order to avoid posting a bond." *Id.* at 2149 (quoting *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017).

[957] *Id.* at 2154.

[958] *Id.*

[959] *Id.*

[960] *Id.*

[961] *Id.*

[962] *Id.* at 2155–56.

- East Jersey, which for a few years in the late seventeenth century prohibited any form of handgun carry by "planters" (frontiersmen).
- Tennessee in 1821, but later the state supreme court and state statute acknowledged the right to open carry of Army & Navy revolvers (the best and most powerful handguns of the time). Texas 1871 and West Virginia 1887. All three state supreme courts at the relevant time interpreted their state constitutional rights to arms as militia-centric.
- Two Western Territories with general prohibitions on defensive handgun carry, and three with prohibitions on such carry in towns. All the territorial restrictions were later repudiated by statehood constitutions and jurisprudence thereunder.[963]
- A Kansas state legislature instruction for large towns to ban handgun carry, which most towns apparently ignored.

From this list, we might cull even further, by eliminating the state laws that were upheld only because the relevant state constitutions were interpreted as militia-centric (in contrast to *Heller*'s interpretation of the Second Amendment). We could also cull the territorial laws that were repudiated by the people of the territories as soon as they could form their own constitutions. The list of precedential carry bans is thus reduced to "half a colony" for eight years (East Jersey),[964] and one state instruction to local governments that was ignored (Kansas). That leaves carry bans with only two feeble precedents relevant to the Second Amendment.

Our analysis indicates that *Bruen* was correctly decided, there being very few good precedents for general bans on bearing arms. However, we did not write the *Bruen* opinion. Justice Thomas's list of precedents, not ours, is legally controlling. That list shows that even substantial handfuls of restrictive minority precedents are insufficient to overcome the text of the Second Amendment.

On the other hand, some advocates suggest that *Bruen*'s long list of insufficient precedents does not provide the controlling rule. Rather, they say

---

[963] JOHNSON ET AL., *supra* note 16, at 517–18.

[964] *Bruen*, 142 S. Ct. at 2144 ("At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.").

that one of our articles does. In discussing the use of historical analogies, Justice Thomas's opinion cited with approval a legal history article we had written about the "sensitive places" doctrine. The doctrine is based on *Heller*'s statement that bearing arms can be prohibited in "sensitive places such as schools and government buildings."[965] Our article had surveyed the history of locational limits on bearing arms, and *Bruen* cited the article:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018). . . . We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment.[966]

This suggests that "relatively few" precedents may be needed for "uncontested" laws. Perhaps this is particularly true for laws that simply affect the fringe of a right (putting a few places off-limits for bearing arms) as opposed to laws with broader restrictions. Certainly there was lots of litigation in the nineteenth century challenging various restrictions on keeping and bearing firearms and knives, including the cases described in Parts IV and V.[967]

---

[965] 554 U.S. at 626.

[966] *Id.* at 2133. It is correct that bans on polling places were not contested. The ban on courthouses was in fact contested, and, in our view, correctly upheld. *See* State v. Hill, 53 Ga. 472, 477–78 (1874):

> [T]he right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.

[967] *See* David B. Kopel, *The First Century of Right to Arms Litigation*, 14 GEORGETOWN J.L. & PUB. POL'Y 127 (2016).

### D. Application of history and modern doctrine
to particular types of laws

*1. Arms that are not firearms or blades*

If we are going to count historical precedents as rigorously as *Bruen* did, then it is not clear that even the most prohibitory laws from the nineteenth century—the bans on slungshot sales and manufacture in nine states or territories—cannot clear the hurdle. Nor can such laws be retroactively justified under *Heller* and *Bruen* as covering "dangerous and unusual" weapons. We do not have manufacturing data, but it seems unlikely that slungshots and knuckles were so rare as to be considered "unusual."

However, another part of *Heller* may provide the means of reconciliation. The "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . ."[968] Based on Escobar's overview, legitimate defensive carry of slungshots was not common; carry by people who were not professional criminals was mainly geared to fast revenge for insults, rather than for protection against violent attack. Some of the judicial remarks quoted in Part VI are, while not conclusive, supportive of this interpretation.

This approach distinguishes slungshots and knuckles from blackjacks, which were highly favored by law enforcement officers. Some modern courts have ruled that evidence of widespread law enforcement use is powerful evidence that a type of arm *is* "typically possessed by law-abiding citizens for lawful purposes." These were recognized to include electric weapons, such as stun guns or tasers, in Justice Alito's concurrence in *Caetano v. Massachusetts*

---

[968] *Heller*, 554 U.S. at 625.

and by the Michigan Court of Appeals.[969] The Connecticut Supreme Court took the same approach for "police batons."[970]

Our analysis of nongun, nonblade arms is tentative. While the history of flexible impact weapons is told only in a single book, recently published, there is no similar scholarship of which we are aware regarding knuckles.[971] This Article being the only post-*Heller* article to examine flexible and rigid impact weapons, we do not claim to have resolved every legal issue. We do point out that, as with Bowie knives, the mainstream historical American approach was nonprohibitory.

### 2. Modern semiautomatic firearms and magazines

The most controversial bans on particular arms today are possession or sales bans on semiautomatic rifles and magazines with capacities over 10 or (less often) 15 rounds. These are unsupported by history for several reasons. First, "[d]rawing from" America's "historical tradition," the Supreme Court has held that "the Second Amendment protects" arms that are "'in common use at the time.'"[972] Thus, in *Heller*, the Court held that because "handguns are the most popular weapon chosen by Americans" and therefore in common use, "a complete prohibition of their use is invalid."[973] Concurring in Caetano—a *per curiam* reversal of case that upheld a stun gun prohibition—Justices Alito and

---

[969] Caetano v. Massachusetts, 577 U.S. 411, 419 (2016) (Alito, J., concurring) (noting that Massachusetts "allows law enforcement and correctional officers to carry stun guns and Tasers, presumably for such purposes as nonlethal crowd control. Subduing members of a mob is little different from 'suppress[ing] Insurrections,' a traditional role of the militia"); People v. Yanna, 297 Mich. App. 137, 145, 824 N.W.2d 241, 245 (2012) ("By some reports, nearly 95 percent of police departments in America use Tasers" so there is "there is 'no reason to doubt that the majority of Tasers and stun guns are used only for lawful purposes").

[970] State v. DeCiccio, 315 Conn. 79, 105 A.3d 165, 200 (2014) ("expandable metal police batons, also known as collapsible batons, are instruments manufactured specifically for law enforcement use as nonlethal weapons. Furthermore, the widespread use of the baton by the police, who currently perform functions that were historically the province of the militia; see, e.g., D. Kopel, "The Second Amendment in the Nineteenth Century," 1998 BYU L.Rev. 1359, 1534; demonstrates the weapon's traditional military utility"). The court also relied on military use to hold that "dirk knives" are Second Amendment arms. 105 A.3d at 192–93.

[971] A Westlaw search for law journal articles with "knuckles" in the title yielded no results.

[972] *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).

[973] *Heller*, 554 U.S. at 529.

Thomas reasoned that because "stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment."[974]

As for the ever-shifting category of so-called "assault weapons," "about 24.6 million individuals – have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total)."[975] The best estimate for magazines over 10 rounds is 542 million, owned by 48 percent of gun owners.[976] The firearms and magazines are unquestionably in common use; according to the Court's interpretation of legal history, they cannot be banned.

Being common arms, the firearms and magazines cannot be treated as "dangerous and unusual weapons." A weapon that is "unusual" is the antithesis of a weapon that is "common." So an arm "in common use" cannot be dangerous *and* unusual.[977] The Supreme Court *per curiam* in *Caetano* did not address dangerousness of stun guns because the Court had already determined that the lower court's "unusual" analysis was flawed.[978] Concurring, Justices Alito and Thomas elaborated:

> As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous."[979]

---

[974] 136 S.Ct. at 1033 (Alito, J., concurring).

[975] English, *supra* note __, at 2; David B. Kopel, *Defining "Assault Weapons"*, THE REGULATORY REV (Univ. of Pennsylvania), Nov. 14, 2018 ("assault weapon" bills have encompassed almost every type of firearm, other than machine guns), https://www.thegreview.org/2018/11/14/kopel-defining-assault-weapons/.

[976] English, *supra* note __, at 24–25.

[977] See *Friedman v. City of Highland Park, Illinois*, 784 F.3d, 406, 409 (7th Cir. 2015) (if "the banned weapons are commonly owned … then they are not unusual.").

[978] 136 S. Ct. at 1028.

[979] *Id*. at 1031 (Alito, J., concurring) (emphasis in original).

As some of the most popular arms in America,[980] semiautomatic rifles and magazines cannot be "dangerous and unusual."

None of the above analysis of the rules from pre-*Bruen* cases is new, nor was most of it disputed even by lower courts that upheld bans pre-*Bruen*. The courts agreed that semiautomatic firearms and standard magazines are "in common use," or they assumed commonality *arguendo*. The courts upheld the bans by applying interest-balancing, which *Bruen* forbids.[981]

What this Article demonstrates is that such a ban cannot be rescued by historical analogy. In considering analogies, *Bruen* states that there are "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."[982] "How" means: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense."[983] "Why" means: "whether that burden is comparably justified."[984]

As Part IV showed, the history of nineteenth century bans on particular types of firearms is close to nil. Likewise, as described in Part II, the only colonial analogy was the New Netherland limit on flintlock quantity, and that briefly existing law disappeared when New Netherland was assimilated into the American colonies, where there were zero laws against particular types of arms.[985]

The 1837 Georgia ban on most handguns, and on "Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears" was held in 1846 to violate the Second Amendment in *Nunn v. State*. Being much

---

[980] The number of AR rifles (just one type of "assault weapon") is larger than the "total U.S. daily newspaper circulation (print and digital combined) in 2020 . . . 24.3 million" for weekdays. *See Newspapers Fact Sheet,* Pew Research Center (June 29, 2021), https://pewrsr.ch/3CNXFS0.

[981] *See*, *e.g.*, Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011) ("Heller II"); New York State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242 (2d Cir. 2015); Worman v. Healey, 922 F.3d 26 (1st Cir. 2019).

[982] *Bruen*, 142 S. Ct. at 2132–33. In *Bruen*'s analysis, *Heller* and *McDonald* declared that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citing McDonald, 561 U.S. at 767).

[983] *Id.*

[984] *Id.*

[985] Part II.A (English colonies), Part II.C (New Netherland).

159

closer to the Founding than are post-Reconstruction enactments, *Nunn* is powerful precedent.

The 1879 Tennessee and 1881 Arkansas laws against the sale of handguns smaller than the Army & Navy models, and bans on the sale of certain blade arms, were validated under state court decisions that held the state constitution right to arms to be applicable only to militia-type arms.

Even if those precedents controlled the Second Amendment, which they do not, they did not ban guns because they were supposedly too powerful, as modern rifles and magazines are sometimes claimed to be. To the contrary, the Tennessee and Arkansas laws banned concealable firearms that were, being smaller, *less* powerful than the large, state-of-art revolvers that were recognized to be constitutionally protected. So the Tennessee and Arkansas laws against small, concealable handguns have a very different "why" than bans on modern rifles and rifles.

Indeed, modern prohibition advocates point to similarities between modern AR semiautomatic rifles and modern military automatic rifles such as the M16 and M4. The prohibitionist argument thus concedes the very strong militia suitability of AR rifles. That makes prohibition unconstitutional under every nineteenth century case precedent, including the ones that upheld bans on certain arms. The unanimous judicial view of the time was that, at the least, no government could outlaw militia-suitable arms.

The only arguable nineteenth-century statutory precedent for bans on modern rifles and magazines is Florida's 1893 licensing law for Winchesters and other repeating rifles. That law was conceded to be unconstitutional and was "never intended to be applied to the white population."

Bans on modern rifles and magazines cannot be rescued by diverting attention away from the legal history of firearms law, and instead pointing to laws about other arms. Dozens of state and territorial legislatures enacted laws about Bowie knives, as well as dirks and daggers. Prohibitory laws for these blades are fewer than the number of bans on carrying handguns, and *Bruen* found the handgun laws insufficient to establish a tradition constricting the Second Amendment.

As for other nonblade impact weapons, the sales and manufacture bans in a minority of states for slungshots and knuckles could be considered as

involving arms "not typically possessed by law-abiding citizens for lawful purposes."[986]

Other flexible impact arms, most notably blackjacks, certainly were "typically possessed by law-abiding citizens for lawful purposes," especially law enforcement officers. Likewise, modern semiautomatic rifles and standard magazines are also highly preferred by today's law enforcement officers.

For blackjacks and sand clubs, only one state, New York, enacted a sales and manufacture ban. That came at a time when the legislature was unencumbered by a Second Amendment enforceable against the states or by a state constitutional right to arms. As *Bruen* teaches, a lone eccentric state does not create a national legal tradition.

For every arm surveyed in this article, the mainstream American legal tradition was to limit the mode of carry (no concealed carry), to limit sales to minors (either with bans or requirements for parental permission), and/or to impose extra punishment for crime.

The fact that most states banned concealed carry of Bowie knives is not a precedent to criminalize the home possession of modern rifles and magazines.

### 3. Minors

Restrictions on transfers of particular arms to minors were numerous. In two previous articles, we provided the legal history of age-based firearm restrictions.[987] In the present article, we have described many age restrictions for other arms, in Parts V and VI.

Some of those restrictions listed an age, while others simply said "minor." The distinction may be important today, regarding laws that prohibit arms for young adults ages 18–20, who today are legally recognized as adults. Similarly, if an 1870 law had limited the exercise of a civil right only to "voters," that law today would not be a good precedent for restricting the civil rights of women, although it might still be a good precedent for restricting the right for non-citizens.

The following laws, in chronological order of first enactment, restricted sales of at least one type of arm based on age; some of them also restricted

---

[986] *Heller*, 554 U.S. at 625.

[987] Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, *supra* note __; David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119 (2018).

nonsale transfers: Alabama (1856, male minor), Tennessee (1856, minor), Kentucky (1859, minor, parental permission), Indiana (1875, age 21), Georgia (1876, minor), Illinois (parent or employer consent, age 18), West Virginia (1882, age 21), Kansas (1883, minor, also banning possession), Missouri (1885, minor parental consent), Texas (1889, minor, parental consent), Florida (1889, minor), Louisiana (1890, age 21), New York (1889, consent of police magistrate), Oklahoma Terr. (1890, age 21), Virginia (1890, "minor under sixteen years of age"), D.C. (1892, minor), North Carolina (1893, minor). A few laws limited carry based on age: Nevada (1881, no concealed carry, age 18) (1883, raised to 21), Arizona Terr. (1883, ages 10 to 16, no carry in towns).

Only Kansas criminalized possession of a regulated arm based on age. None of the age restrictions applied to rifles or shotguns. Moreover, the first laws come over 60 years after the Second Amendment, and only three of them precede the Fourteenth Amendment. According to *Bruen*, "late-19th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."[988] Earlier evidence shows that in the colonial and founding eras, no age-based firearm restrictions applied to 18-to-20-year-olds, and as part of the militia, they were required to possess a wide array of firearms, edged weapons, and accoutrements.[989] Thus, whatever may be concluded from analogies to statutory precedents, modern restrictions on long gun acquisition by young adults ages 18 to 20 are constitutionally dubious, and bans on possession appear indefensible.

### 4. Penalties for criminal misuse

As described in Parts V and VI, there were also many laws imposing extra penalties of use of particular arms in violent crimes. We have not surveyed the colonial criminal codes to look for analogues. Certainly there was a longstanding tradition in common law, sometimes codified in statutes, creating a separate crime for breaches of the peace involving weapons.[990]

---

[988] 142 S.Ct. at 2154 n.28.

[989] Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, *supra* note __, at 533–89.

[990] *See*, *e.g.*, David B. Kopel & George A. Mocsary, *Errors of Omission: Words Missing from the Ninth Circuit's Young v. State of Hawaii*, 2021 U. Ill. L. Rev. Online 172, 174–83 (May 13, 2021).

For the most part, the search of precedents is unnecessary. Perpetrating criminal homicides, armed robberies, or armed burglaries is not conduct that is protected by the Second Amendment. Violent crimes with firearms, Bowie knives, or other arms harm "the security of a free State."[991] Likewise, the First Amendment freedom of speech does not protect verbal or written conspiracies in restraint of trade, in violation of antitrust laws.[992]

## CONCLUSION

According to the Supreme Court's *Bruen* decision, the Second Amendment's textual "unqualified command" about "the right to keep and bear arms" is not violated by established traditions in our legal history for regulation of the right. No bans on types of arms from English legal history are relevant to

---

[991] U.S. Const. Amend. II. "Such admonitory regulation of the abuse must not be carried too far. It certainly has a limit. For if the legislature were to affix a punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a prohibition of the right." Cockrum v. State, 24 Tex. 394, 403 (1859) (upholding law imposing extra punishment for use of a Bowie knife in manslaughter).

Beyond the scope of this Article are extra penalties for possessing arms while committing a nonviolent crime. For example, body armor is a Second Amendment "arm." *See Heller* 554 U.S. at 581 (quoting dictionary definitions of "arms" that include "armour for defence" or "any thing a man wears for his defence"). Laws that punished arms possession in the course of a crime even if the possession had nothing to do with a crime might raise constitutional problems. A bill introduced in the U.S. Senate in 1999 would have imposed a sentence enhancement of up to 36 months for committing any crime while using body armor—for example, if the proprietor of a liquor store, who always wore body armor for protection from robbers, filled out his tax forms at work and cheated on the taxes. S. 254, § 1644, U.S. Sen., 106th Cong., 1st Sess. (1999) (Sen. Lautenberg); David B. Kopel & James Winchester, *Unfair and Unconstitutional: The New Federal Juvenile Crime and Gun Control Proposals*, Independence Institute Issue Paper no. 3-99, Part VIII (June 3, 1999).

Today's U.S. Sentencing Guidelines impose a two-step (up to 36 months) sentence enhancement for possessing a firearm during a drug trafficking crime. The only exception is if the defendant can show that any connection of the gun to the crime was "clearly improbable." U.S.S.G. § 2D1.1(b)(1) Cmt. 11. One federal district court recently held that there was "a substantial question" for appellate review as to whether the "clearly improbable" standard is consistent "with the nation's traditions of firearm regulation." United States v. Alaniz, No. 1:21-cr-00243-BLW, 2022 WL 4585896, *3 (D. Ida. Sept. 29, 2022).

[992] *See, e.g.*, Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949) (First Amendment does not "make it . . . impossible ever to enforce laws against agreements in restraint of trade").

Second Amendment analysis under *Bruen*, for none were adopted in America. During the colonial period and the Founding Era, there were no bans in the English colonies or the new nation on types of arms.

Under *Bruen*, the nineteenth century is relevant to the extent that it informs the original meaning.[993] Thus, legal history close to the Founding is most important, and the latter part of the century much less so.[994] Based on this Article's survey of all state and territorial laws until 1900, bans on the sale or possession of any type of arm are eccentricities that do not overcome the plain text of the Second Amendment. Punitive taxation of some arms existed in three southeastern states, but these laws did not create a national tradition. Bans on concealed carry were very common, and under *Heller* and *Bruen* have been expressly stated to be constitutional, as long as open carry was allowed. (Or vice versa.) The jurisdictions that entirely banned carry of Bowie knives, daggers, or other arms are almost entirely the same as those that banned handgun carry. *Bruen* held that these repressive jurisdictions did not establish a tradition allowing a general ban on carrying handguns. The same reasoning shows the unconstitutionality of prohibiting both open and concealed carry of other Second Amendment arms.

In contrast, there were many American jurisdictions that limited sales to minors or imposed enhanced punishment for misuse of certain weapons. For at least some weapons, there is an established American tradition in favor of such laws.

As described in Part III, firearms improved more in the nineteenth century than in any century before or since. Although repeating arms had been around for centuries, during the nineteenth century they became affordable to an average consumer. The semiautomatic handgun with detachable magazines became common starting in 1885. Despite the amazing technological progress

---

[993] *Bruen*, 142 S. Ct. at 2136 ("when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.") (quoting *Heller*, 554 U. S., at 634–35 (emphasis added in *Bruen*); *id.* at 2132 (the Second Amendment's "meaning is fixed according to the understandings of those who ratified it").

[994] *Id.* at 2137 ("*Heller*'s interest in mid- to late-19th-century commentary was secondary. . . . In other words, this 19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established'" by earlier evidence. (quoting Gamble v. United States, 139 S. Ct. 1960, 1975–76 (2019)); *Heller*, 554 U.S. at 614 ("discussions [that] took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.").

during the century, only one American statute—a racist Florida law from 1893—treated repeating firearms worse than other firearms. Indeed, the two most repressive handgun laws from the Jim Crow period—Tennessee (1879) and Arkansas (1881)—privileged the most powerful repeating handguns above lesser handguns. American legal history from 1606 to 1899 provides no precedent for special laws against semiautomatic firearms or against magazines.