

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

March 14, 2024

Molly C. Dwyer, Clerk
United States Court of Appeals
 for the Ninth Circuit
James R. Browning Courthouse
95 7th Street
San Francisco, CA 94103

> Re:   *Teter v. Lopez* (No. 20-15948)

Dear Ms. Dwyer:

I write concerning the recent decision in *Ocean State Tactical, LLC v. Rhode Island*, No. 23-1072, 2024 WL 980633 (1st Cir. Mar. 7, 2024), affirming the denial of a preliminary injunction against Rhode Island's ban on large-capacity magazines. The opinion bears directly on the centrality of self-defense to the Second Amendment and the proper approach to historical, analogical reasoning under *Bruen*. *See* Reh'g Pet. 5-16.

*Ocean State* correctly recognized that courts must "compar[e] the 'burden on the right of armed self-defense' imposed by the new regulation to the burden imposed by historical regulations" and then "turn to the 'why,' comparing the justification for the modern regulation to the justification for historical regulations." 2024 WL 980633 at *4 (quoting *Bruen*, 597 U.S. at 29).

The First Circuit properly looked to "how a regulation actually burdens the right of armed self-defense, not how it might be imagined to impose such a burden." *Id.* On the record before it, the court found that "civilian self-defense rarely—if ever—calls for" large-capacity magazines, noting plaintiffs had identified just a single example. *Id.* Appellants here have similarly identified just one arguable example of butterfly knives being used for self-defense—one occurring outside the United States. *See* Reh'g Pet. 10-11.

Hogan Lovells US LLP is a limited liability partnership registered in the state of Delaware. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Alicante Amsterdam Baltimore Berlin Beijing Birmingham Boston Brussels Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Munich New York Northern Virginia Paris Philadelphia Riyadh Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Warsaw Washington, D.C. Associated Offices: Budapest Jakarta Shanghai FTZ. Business Service Centers: Johannesburg Louisville. For more information see www.hoganlovells.com

The court then turned to why legislatures had historically regulated other weapons—including banning sawed-off shotguns and machineguns and imposing "severe restrictions" on Bowie knives—and limited gunpowder storage. *Ocean State*, 2024 WL 980633, at *4-8. The First Circuit noted that, like Rhode Island, those historical legislatures were motivated to suppress weapons popular among criminals and safeguard citizens from "risks posed by the aggregation of" ammunition. *Id.* at *8.

*Ocean State* correctly recognized that, in looking for historical analogues, a court should not limit its examination to regulations that imposed the very same restriction on a physically similar weapon. The First Circuit's reasoning thus reinforces Hawaiʻi's argument that this Court should treat the "severe restrictions" historically imposed on Bowie knives, slung shots, dirks, and daggers as appropriate analogues for its modern restrictions on butterfly knives. *Id.* at *5; see* Hawaiʻi Supp. Br. 14-34; Reh'g Pet. 12-16.

Respectfully submitted,

/s/ Neal Kumar Katyal
Neal Kumar Katyal

*Counsel for Defendants-Appellees Anne E. Lopez and Darryl Ng*

cc: All counsel of record (via CM/ECF)

# EXHIBIT A

2024 WL 980633
Only the Westlaw citation is currently available.
United States Court of Appeals, First Circuit.

OCEAN STATE TACTICAL, LLC, d/b/
a Big Bear Hunting and Fishing Supply;
Jonathan Hirons; James Robert Grundy; Jeffrey
Goyette; Mary Brimer, Plaintiffs, Appellants,
v.
State of RHODE ISLAND; Colonel Darnell S.
Weaver, in his official capacity as the Superintendent
of the Rhode Island State Police; Peter F. Neronha,
in his official capacity as the Attorney General for
the State of Rhode Island, Defendants, Appellees.

No. 23-1072
|
March 7, 2024

**Synopsis**
**Background:** Gun owners and firearms dealer brought action challenging constitutionality of state law prohibiting possession of large capacity magazines (LCMs) capable of holding more than ten rounds of ammunition, claiming law violated the Second Amendment, Fifth Amendment's Takings Clause, and Fourteenth Amendment's Due Process Clause. The United States District Court for the District of Rhode Island, John J. McConnell, Jr., Chief Judge, 646 F.Supp.3d 368, denied plaintiffs' motion for preliminary injunction. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Kayatta, Circuit Judge, held that:

law negligibly burdened Second Amendment right of armed self-defense;

historical tradition of regulating arms used for self-defense had tolerated burdens on Second Amendment right that were no less than the, at most, negligible burden of having to use more than one magazine to fire more than ten shots;

justification for law was analogous to justifications for laws that formed Nation's historical tradition of firearm regulation;

plaintiffs were unlikely to succeed on merits of claim that law was a physical taking;

plaintiffs were unlikely to succeed on merits of claim that law was a regulatory taking;

plaintiffs were unlikely to succeed on merits of claim that law was impermissibly retroactive; and

plaintiffs were unlikely to succeed on merits of claim that law was impermissibly vague.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. John J. McConnell, Jr., U.S. District Judge]

**Attorneys and Law Firms**

Matthew D. Rowen, with whom Paul D. Clement, Erin E. Murphy, Mariel A. Brookins, Clement & Murphy, PLLC, Michael A. Kelly, and Kelly Souza & Parmenter P.C. were on brief, for appellants.

Christopher Renzulli on brief for National African American Gun Association, Inc., Asian Pacific American Gun Owners Association, DC Project Foundation, Inc., Operation Blazing Sword, Inc., Gabriela Franco, and Liberal Gun Club, amici curiae.

Athanasia O. Livas, Peter A. Patterson, David H. Thompson, and Cooper & Kirk, PLLC on brief for National Shooting Sports Foundation, Inc., amicus curiae.

Sarah W. Rice, Assistant Attorney General, Rhode Island, with whom Peter F. Neronha, Attorney General, Rhode Island, Keith Hoffmann, Special Assistant Attorney General, Rhode Island, and Samuel Ackerman, Special Assistant Attorney General, Rhode Island were on the brief, for appellees.

Andrea Joy Campbell, Attorney General, Massachusetts, Julia Green, Assistant Attorney General, Massachusetts, Grace Gohlke, Assistant Attorney General, Massachusetts, on brief for Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois,

Maryland, Michigan, Minnesota, New Jersey, New York, Oregon, Pennsylvania, Vermont, Washington, and Wisconsin, amici curiae.

Janet Carter, William J. Taylor, Jr., Eleuthera O. Sa, and Everytown Law on brief for Everytown for Gun Safety, amicus curiae.

Timothy C. Hester, Daniel Weltz, Rachel Bercovitz, Covington & Burling LLP, Douglas N. Letter, Shira Lauren Feldman, Esther Sanchez-Gomez, and Ciara Wren Malone on brief for Brady Center to Prevent Gun Violence, Giffords Law Center to Prevent Gun Violence, and March for Our Lives, amici curiae.

Before Kayatta, Selya, and Gelpí, Circuit Judges.

**Opinion**

KAYATTA, Circuit Judge.

**\*1** In response to proliferating mass shootings across the country, the Rhode Island General Assembly enacted House Bill 6614, the Large Capacity Feeding Device Ban of 2022 ("HB 6614" or "LCM ban"). The legislation amended Rhode Island's Firearms Act to prohibit possession of certain large capacity feeding devices or magazines ("LCMs"), defined as those that hold more than ten rounds of ammunition. R.I. Gen. Laws § 11-47.1-3. As a result, all owners of LCMs were required to (a) permanently modify their LCMs to accept no more than ten rounds; (b) sell them to a firearms dealer; (c) remove them from the state; or (d) turn them into law enforcement. Id.

Four gun owners and a registered firearms dealer joined as plaintiffs to file this lawsuit, alleging that HB 6614 violates the United States Constitution. In due course, the district court considered and denied plaintiffs' motion to preliminarily enjoin enforcement of HB 6614. Ocean State Tactical, LLC v. Rhode Island ("Ocean State"), 646 F. Supp. 3d 368, 373 (D.R.I. 2022).

After hearing plaintiffs' appeal, we now affirm the district court's denial of the preliminary injunction, finding that plaintiffs have not shown a sufficient likelihood of success on the merits of their claims. Our reasoning follows.

**I.**

For nearly a century, Rhode Island has banned possession of certain items "associated with criminal activity." In 1927, the state's General Assembly proscribed machine guns [1] and silencers. 1927 R.I. Pub. Laws 256. In 1956, it banned armor-piercing bullets, R.I. Gen. Laws § 11-47-20.1, bombs, and bombshells. Id. § 11-47-21. In 2018, it prohibited bump stocks. Id. § 11-47-8.1. And on June 21, 2022, the legislature passed HB 6614, adding LCMs to this list of items that most Rhode Islanders may not possess.[2] Ocean State, 646 F. Supp. 3d at 372.

[1] The 1927 law defined "machine gun" as any automatic weapon, or any semiautomatic weapon which shoots more than twelve shots semiautomatically without reloading.

[2] The possession ban exempts certain law enforcement officers, retired law enforcement officers, and members of the armed services. Id. § 11-47.1-3(b)(2)-(3). The ban also excepts from its reach tubes that can hold exclusively .22 caliber ammunition. Id. § 11-47.1-2(2).

Rhode Island defines an LCM as

> a magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device which is capable of holding, or can be readily extended to hold, more than ten (10) rounds of ammunition to be fed continuously and directly therefrom into a semiautomatic firearm.

R.I. Gen. Laws § 11-47.1-2(2). By holding multiple rounds of ammunition, magazines enable shooters to fire repeatedly without reloading. While some firearms have "fixed" magazines that are integral to the frame, "most modern semi-automatic firearms" use detachable magazines. Ocean State, 646 F. Supp. 3d at 376. When a magazine is detachable, it can be removed and replaced with another fully loaded magazine, "much as an extra battery pack gets swapped in and out of a battery-operated tool." Id. at 375.

**\*2** HB 6614 includes a grace period of 180 days within which to comply with the ban. R.I. Gen. Laws § 11-47.1-3(b)(1). The legislation punishes the possession of LCMs after the

grace period with up to five years in prison. Id. § 11-47.1-3(a); Ocean State, 646 F. Supp. 3d at 373.

Before the grace period ended, plaintiffs sued the State of Rhode Island, its Attorney General, and its Superintendent of State Police (collectively "the State" or "Rhode Island") in federal district court, claiming that HB 6614 violated the Second Amendment, Fifth Amendment's Takings Clause, and Fourteenth Amendment's Due Process Clause. Plaintiffs sought a declaration that the LCM ban was unconstitutional, and moved for a preliminary injunction against its enforcement while this lawsuit proceeded. After considering the parties' arguments and numerous declarations from expert witnesses, the district court denied the preliminary injunction primarily on the basis that plaintiffs were unlikely to succeed on any of their constitutional claims. See Ocean State, 646 F. Supp.3d at 373-74. Plaintiffs timely appealed.

## II.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The movant's likelihood of success on the merits is the "main bearing wall" of our analysis. W Holding Co. v. AIG Ins. Co. - Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014).

We review the denial of a preliminary injunction for abuse of discretion. Together Emps. v. Mass Gen. Brigham Inc., 32 F.4th 82, 85 (1st Cir. 2022). Under that deferential standard, "[w]e review the district court's factual findings for clear error" and "its legal conclusions de novo." Id. The parties dispute whether the district court's findings of "legislative facts for its own analyses" are subject to clear error review, but resolution of this dispute makes no difference to the outcome of this appeal. Finally, we may "affirm [the district court's] decision on any basis supported by the record and the law." Lydon v. Loc. 103, Int'l Bhd. of Elec. Workers, 770 F.3d 48, 53 (1st Cir. 2014).

In concluding that plaintiffs were unlikely to succeed on any of their constitutional claims, the district court reasoned that HB 6614 did not violate the Second Amendment because plaintiffs failed to prove that "LCMs are 'Arms' within the meaning of the Second Amendment's text." Ocean State, 646 F. Supp. 3d at 374. It then found that HB 6614 was consistent with the Fifth Amendment as a valid use of the police power, and posed no vagueness or retroactivity problems under the Fourteenth Amendment. Id. As to the effect of any injunction on the public interest, the district court determined that the LCM ban promotes public safety because, "in a mass shooting incident every pause to reject a spent magazine and load a new one represents the opportunity to preserve a specific life -- or more than one." Id. at 401. And because that same "momentary interruption" to plaintiffs "is not the kind of irreparable harm required for a preliminary injunction to issue," the district court ultimately concluded that "the State is entitled to enforcement" of its LCM ban.[3] Id. at 400-01.

3  Both parties construe the district court's opinion as requiring the State to "ensur[e] that any forfeited magazines be retained in a safe manner so that they may be returned to their owners if a permanent injunction is granted in the future." Id. at 400. The State does not challenge this requirement.

**\*3** Plaintiffs do not argue on appeal that the balance of irreparable harms and the effect on the public interest mandate an injunction even if their claims are not likely to succeed on the merits. Rather, defining the harm as the denial of a constitutional right, and the public interest as disfavoring such a denial, they rest their appeal on the argument that they are likely to prevail on the merits of at least one of their constitutional claims. We focus our review accordingly.

## III.

### A.

To assess plaintiffs' claim that Rhode Island's LCM ban violates the Second Amendment, we proceed in the manner directed by the Supreme Court in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), and most recently in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022). Under that approach, we first consider whether "the Second Amendment's plain text covers" the possession of LCMs. Bruen, 597 U.S. at 17, 142 S.Ct. 2111. If it does, we then consider whether Rhode Island's ban is "consistent with this Nation's historical tradition of firearm regulation" and thus permissible under the Second Amendment. Id.

As to the first consideration, we find it unnecessary on this appeal to decide whether the district court erred in deeming LCMs outside the realm of "arms" protected by the plain text of the Second Amendment. Instead, we assume that LCMs are "arms" within the scope of the Second Amendment and proceed to consider whether HB 6614 is consistent with our history and tradition.

Plaintiffs contend that because firearms capable of firing more than ten rounds without reloading "are nothing new" and have at times been unregulated, Rhode Island's ban is at odds with tradition. To support this position, they point out that some multi-shot firearms existed in the late 1700s, and others were more common by the mid-to-late 1800s in the form of the Henry and Winchester rifles. But as plaintiffs concede, today's semiautomatic weapons fitted with LCMs are "more accurate and capable of quickly firing more rounds" than their historical predecessors. And they are substantially more lethal.

More importantly, we find in the record no direct precedent for the contemporary and growing societal concern that such weapons have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible. This is unsurprising, given evidence that "the first known mass shooting resulting in ten or more deaths" did not occur in this country until 1949. [4] Oregon Firearms Fed'n, Inc. v. Brown, 644 F. Supp. 3d 782, 803 (D. Or. 2022). Likewise, "[a]t the Founding, there was no comparable problem of gun violence at schools." [5]

4  The record suggests that mass shootings have become more frequent and more deadly. See James Densley & Jillian Peterson, Editorial, We Analyzed 53 Years of Mass Shooting Data. Attacks Aren't Just Increasing, They're Getting Deadlier, L.A. Times (Sept. 1, 2019), https://perma.cc/TV49-J74J (noting that, as of the study's publication in 2019, 20% of mass shootings in approximately the last fifty years had occurred within the last five years, and 33% of those since 2010).

5  Joseph Blocher & Eric Ruben, Originalism-by-Analogy and Second Amendment Adjudication, 133 Yale L.J. 99, 156 (2023). (detailing the precipitous rise in school shootings from "eleven shootings a decade ago" to "ninety-three shootings during the 2020-2021 school year").

Concern about the increasing frequency of LCM-aided mass shootings today prompted the Rhode Island legislature to pass HB 6614. [6] And since the record contains no evidence that American society previously confronted -- much less settled on a resolution of -- this particular concern, we have no directly on-point tradition on which to rely in determining whether Rhode Island's ban is consistent with our history and tradition.

6  See Press Release, Rhode Island Gen. Assembly, Assembly Approves Large-Capacity Magazine Ban (June 14, 2022), https://perma.cc/B4LX-PNLR ("High-capacity magazines have enabled mass shooters to commit the most devastating, appalling, and most lethal attacks on the public in recent decades. With this bill, we are finally saying we will not tolerate these dangerous weapons.").

**\*4** This lack of directly on-point tradition does not end our historical inquiry, but it does affect our mode of analysis. The Supreme Court has instructed that cases like this one "implicating unprecedented societal concerns ... may require a more nuanced approach" to historical analysis. Bruen, 597 U.S. at 27, 142 S.Ct. 2111. To that end, it has cautioned that we not limit our consideration to whether Rhode Island's law is "a dead ringer for historical precursors" or has "a historical twin." Id. at 30, 142 S.Ct. 2111. We must instead employ "analogical reasoning" to determine whether historical analogues are "relevantly similar." Id. at 28, 142 S.Ct. 2111 (quoting C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)).

"Relevantly similar" in what sense? The Supreme Court provides the answer. We must train our attention on two comparisons: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 29, 142 S.Ct. 2111 (emphasis added). First, we consider the "how," comparing the "burden on the right of armed self-defense" imposed by the new regulation to the burden imposed by historical regulations. Id. at 29, 142 S.Ct. 2111. Second, we turn to the "why," comparing the justification for the modern regulation to the justification for historical regulations. Id.

**B.**

### 1.

To gauge how HB 6614 might burden the right of armed self-defense, we consider the extent to which LCMs are actually used by civilians in self-defense. The answer supplied by the record in this case is that civilian self-defense rarely -- if ever -- calls for the rapid and uninterrupted discharge of many shots, much less more than ten. Plaintiffs claim that 39 million Americans have (at some time) owned at least one magazine holding more than ten rounds. But while any self-defense fusillade of more than ten rounds would surely beget publicity, plaintiffs' expert can point only to a single 2015 news article reporting that a victim of an attempted robbery in Texas emptied a 12-round clip when shooting two assailants two and seven times, respectively. [7]

[7] G. Halek, Houston Concealed Carriers Unload on Armed Muggers -- Why We Travel in Packs, Concealed Nation (Dec. 21, 2015), https://perma.cc/X33S-89KZ.

More recently, Edward Troiano, the Chief of the Rhode Island Bureau of Criminal Identification and Investigation, conducted a review of self-defense incidents in Rhode Island in which semiautomatic firearms were discharged, and unearthed no incidents "in which a civilian has ever fired as many as 10 rounds in self-defense." Troiano's finding is consistent with our prior observation in Worman v. Healey that the record in that case revealed not "a single example of a self-defense episode in which ten shots or more were fired." 922 F.3d 26, 37 (1st Cir. 2019). It also aligns with determinations of our sister circuits that "most homeowners only use two to three rounds of ammunition in self-defense," Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J., 910 F.3d 106, 121 n.25 (3d Cir. 2018), and that the use of more than ten bullets in self-defense is "rare." Kolbe v. Hogan, 849 F.3d 114, 127 (4th Cir. 2017). [8]

[8] Each of these three cases was abrogated by Bruen, but Bruen did not call into question courts' observations about the actual use of LCMs. We have also considered the fact that a weapon can be "used" in self-defense by way of threat, even if it is not actually fired. But plaintiffs claim no plausible scenario in which a threat has proved less effective because the brandished weapon could only fire ten rounds at once without reloading.

Given the lack of evidence that LCMs are used in self-defense, it reasonably follows that banning them imposes no meaningful burden on the ability of Rhode Island's residents to defend themselves. True, one could imagine Hollywood-inspired scenarios in which a homeowner would need to fend off a platoon of well-armed assailants without having to swap out magazines. But we read Bruen as requiring us to ascertain how a regulation actually burdens the right of armed self-defense, not how it might be imagined to impose such a burden. And even if we were to consider imagined burdens in our analysis, we would certainly accord them little weight. Otherwise, the assessment of how a regulation burdens the right of armed self-defense would always find a substantial burden.

### 2.

**\*5** Having considered how HB 6614 burdens -- or more accurately, does not burden -- the right of armed self-defense, we next consider for comparison purposes the burdens imposed by the regulation of other arms throughout our history, as Bruen requires. That historical regulation includes bans on sawed-off shotguns, which the Supreme Court has deemed unprotected by the Second Amendment, see United States v. Miller, 307 U.S. 174, 177, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), restrictions on machine guns, most of which have been effectively banned nationally since 1986, see 18 U.S.C. § 922(o), and even the severe restrictions placed on Bowie knives by forty-nine states and the District of Columbia in the nineteenth century once their popularity in the hands of murderers became apparent. [9]

[9] See, e.g., 1893 R.I. Pub. Laws 231; 1837 Ala. Laws 7, No. 11 § 2; 1837 Ga. Laws 90, § 1; 1837-1838 Tenn. Pub. Acts 200-01, §§ 1-2; 1838 Fla. Laws 36, No. 24, § 1; 1838 Va. Acts 76, ch. 101; 1839 Ala. Acts 67, ch. 77; 1881 Ark. Acts 191-92, No. 96 § 1; 1882 W. Va. Acts 421-22, ch. 135 § 7; Ariz. Rev. Stat. Ann. § 385 (1901).

In each instance, it seems reasonably clear that our historical tradition of regulating arms used for self-defense has tolerated burdens on the right that are certainly no less than the (at most) negligible burden of having to use more than one magazine to fire more than ten shots.

**C.**

Having determined that HB 6614 likely imposes very little -- if any -- burden on the right of armed self-defense as compared to the burdens imposed on that right by its historical predecessors, we now turn to considering "why" Rhode Island enacted HB 6614. At this step, Bruen directs us to consider the extent to which the justification for Rhode Island's LCM ban is analogous to justifications for the laws that form "this Nation's historical tradition of firearm regulation." 597 U.S. at 17, 142 S.Ct. 2111.

**1.**

Rhode Island justifies HB 6614 as a reasoned response by its elected representatives to a societal concern: that the combination of modern semiautomatic firearms and LCMs have produced a growing and real threat to the State's citizens, including its children. Mass shootings have of late "become a weekly -- and sometimes daily -- event." Ocean State, 646 F. Supp 3d at 393. And in those shootings, semiautomatic firearms equipped with LCMs "have been the weapons of choice." Worman, 922 F.3d at 39.

The record indicates that such weapons have indeed been deployed in many of the "deadliest mass shootings in recent history." Id. It also provides insight as to why: Semiautomatic firearms fitted with LCMs are highly effective weapons of mass slaughter. They are designed to "shoot multiple human targets very rapidly," and to "allow the shooter to spray-fire from the hip position." Ocean State, 646 F.Supp.3d at 394 (quoting Heller v. District of Columbia, 670 F.3d 1244, 1262-63 (D.C. Cir. 2011)). Citing the testimony of emergency physician Dr. Megan Ranney, the district court detailed how this ability to "spray a crowd with bullets results in more injuries per person." Id. at 395. The ensuing "cases with multiple bullet wounds are more complex, have a higher likelihood of injury that requires surgical intervention, and have a higher likelihood of death in the emergency department." Id.

Plaintiffs offer testimony that a practiced shooter can switch out a spent magazine for a full one in a mere 2-3 seconds. They claim that "[s]uch a miniscule difference in practical fire rate would be unlikely to have any appreciable effect on lethality." Were this so, it would reinforce the conclusion that the ban likely imposes no meaningful burden on the right of armed self-defense. And even if it is so, experts for the State testified that even momentary pauses for a magazine change have historically provided opportunities for "citizens or law enforcement [to] intervene." [10] They likewise cite instances in which mass-shooting survivors were able to run for cover "in the few pauses where the shooter reloaded." [11] Surveying the evidence, the district court "[found] as fact that in those two or three seconds a child -- or two children, or even three -- may escape the fire of a mad person." Id. at 394.

[10] Consider the 2011 shooting in Tucson, Arizona that wounded U.S. Representative Gabby Giffords and killed six people including Chief Judge John Roll of the U.S. District Court for the District of Arizona. There, the shooter "was able to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before bystanders could disarm him as he changed magazines. Every one of those rounds hit an individual."

[11] For example, in Newtown, Connecticut, "nine children were able to escape while the gunman paused to change out a thirty-round magazine." Similarly, survivors of the 2017 Las Vegas mass shooting were able to run out of harm's way while the shooter reloaded.

**\*6** Statistical evidence supports these anecdotal findings, confirming that magazine capacity directly corresponds to lethality. The State submitted expert testimony that, without extended magazines -- defined as magazines holding more than 10 rounds -- "semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms." But "with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms."

**2.**

Having assessed Rhode Island's justification for its LCM ban, we must now compare it to the justifications for HB 6614's historical analogues. First, consider the rationale for excluding sawed-off shotguns [12] from Second Amendment protection. Congress began regulating sawed-off shotguns in 1934, after they became popular with the "mass shooters of their day" -- notorious Prohibition-era gangsters like Bonnie Parker and Clyde Barrow. [13] There is no doubt that these regulations are constitutional: Plaintiffs concede that sawed-

off shotguns "are permissibly prohibited arms due to their dangerous and unusual nature," and the Supreme Court has affirmed that Second Amendment protection does not extend to such "dangerous and unusual" weapons. Heller, 554 U.S. at 627, 128 S.Ct. 2783.

12  A sawed-off shotgun is a shotgun with a barrel length of less than 18 inches (shorter than that of a regular shotgun), regardless of whether it has been shortened with a saw. See Sawed-Off Shotgun, Merriam-Webster.com Dictionary, https://perma.cc/UA7J-BFH8; Is a Shotgun a Firearm Subject to the NFA?, Bureau of Alcohol, Tobacco, Firearms and Explosives (Jan. 30, 2020), https://perma.cc/J7V7-7MYZ. The shorter barrel makes them easier to conceal but considerably less precise in aim. See United States v. Amos, 501 F.3d 524, 531 (6th Cir. 2007) (McKeague, J., dissenting).

13  See National Firearms Act of 1934, ch. 757, 48 Stat. 1236 (codified as amended at 26 U.S.C. §§ 5801-72); Ronald G. Shafer, They Were Killers with Submachine Guns. Then the President Went After Their Weapons, Wash. Post (Aug. 9, 2019), https://perma.cc/PW9V-LF6R.

Sawed-off shotguns may well be less effective at accomplishing mass murder -- and more conducive to self-defense -- than are semiautomatic rifles fitted with LCMs. As the State explains, standard "shotguns ... are not semiautomatic because they require manual intervention before they are ready to fire again." And as Congress noted while comparing the lethality of shotguns and semiautomatic weapons, shotguns "typically have much smaller magazine capabilities -- from 3-5" and those magazines cannot be replaced as quickly. H.R. Rep. No. 103-489, at 19 (1994). Thus, while a sawed-off shotgun might be easier to wield in a self-defense situation due to its shorter barrel, shotguns cannot unleash the torrents of "spray-fire" into a crowd that makes the combination of semiautomatic weapons and LCMs so deadly. See Ocean State, 646 F. Supp. 3d at 394-95 (recounting the testimony of emergency-medicine expert Dr. Megan Ranney).

For an even older example, consider the justification for curtailing access to the Bowie knife, a distinctive weapon with a "longer blade[ ] designed expressly for fighting, rather than hunting or utility." Its features made it "well-suited to cutting or stabbing" and other violent crime in the nineteenth century.

At that time, Bowie knives were considered more dangerous than firearms; the Texas Supreme Court explained that, "[t]he gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least .... The bowie-knife differs from these in its device and design; it is the instrument of almost certain death." Cockrum v. State, 24 Tex. 394, 402 (1859).

**\*7** The record demonstrates that, when the country experienced a "nationwide surge of homicides" in the nineteenth century, states reacted by "passing laws severely restricting access to certain dangerous weapons," including Bowie knives. These restrictions were nearly ubiquitous: From the beginning of the 1830s through the early twentieth century, the District of Columbia and every state except New Hampshire passed laws restricting Bowie knives. [14] As they had with sawed-off shotguns, legislators responded to a growing societal concern about violent crime by severely restricting the weapons favored by its perpetrators, even though those same weapons could conceivably be used for self-defense.

14  Robert J. Spitzer, Understanding Gun Law History After Bruen: Moving Forward by Looking Back, 51 Fordham Urb. L.J. 57, 93-94 (2023).

Consider, too, an additional category of weapons that the Supreme Court has deemed outside the ambit of the Second Amendment: "weapons that are most useful in military service." Heller, 554 U.S. at 627, 128 S.Ct. 2783. These weapons, which include "M-16 rifles and the like ... may be banned." Id.; see also 18 U.S.C. § 922(o). Although the Court did not explicitly detail why such weapons are excepted from Second Amendment protection, one can infer the answer: They are more dangerous, and no more useful for self-defense, than a normal handgun or rifle.

By contrast, the Supreme Court opined that handguns cannot be banned in part because they are "the quintessential self-defense weapon." Heller, 554 U.S. at 629, 128 S.Ct. 2783. In so doing, the Court detailed several reasons why handguns are more conducive to self-defense than long guns, which include M-16s and many of the weapons that accept LCMs. Handguns, they reasoned, are "easier to store in a location that is readily accessible in an emergency," "easier to use for those without the upper-body strength to lift and aim a long gun," and "can be pointed at a burglar with one hand while the other hand dials the police." Id.

There is no question that semiautomatic weapons fitted with LCMs much more closely resemble the proscribable "M-16 rifles and the like" than they do traditional handguns. Id. at 627, 128 S.Ct. 2783. As the Seventh Circuit recently observed, the AR-15 (a semiautomatic weapon frequently used in combination with LCMs) "is almost the same gun as the M[-]16 machinegun." Bevis v. City of Naperville, 85 F.4th 1175, 1195 (7th Cir. 2023). Indeed, the two weapons "share the same core design, and both rely on the same patented operating system." Id. at 1195-96.

Additionally, LCMs minimize one of the few meaningful differences that do exist between M-16s and semiautomatic weapons: rate of fire. M-16s have a higher fire capacity than AR-15s, but LCMs can greatly reduce the need to reload, allowing shooters to fire many rounds in a shorter amount of time. Id. at 1197. Thus, LCMs enable semiautomatic weapons to function even more like their proscribable automatic counterparts: Both M-16s and semiautomatic firearms equipped with LCMs can rapidly hit very many human targets. And while empirically this is not a useful feature for self-defense, it is presumably conducive to combat in war zones. [15]

[15] We do not consider in this opinion whether a state may ban semiautomatic weapons themselves.

Finally, there exists one founding-era tradition that provides an especially apt analogy to Rhode Island's LCM ban, as it involves both an analogous societal concern and an analogous response to that concern. Recall that the Rhode Island General Assembly passed HB 6614 to address growing societal concern about mass killings by lone individuals. To mitigate that risk, the legislature required its citizens to break down the size of the containers (magazines) used to store and feed ammunition.

**\*8** Founding-era society faced no risk that one person with a gun could, in minutes, murder several dozen individuals. But founding-era communities did face risks posed by the aggregation of large quantities of gunpowder, which could kill many people at once if ignited. In response to this concern, some governments at the time limited the quantity of gunpowder that a person could possess, and/or limited the amount that could be stored in a single container. See, e.g., 1784 N.Y. Laws 627 (preventing "Danger Arising from the Pernicious Practice of Lodging Gun Powder" by limiting individuals to 28 pounds of gunpowder apiece, which they were required to separate into four different canisters). [16]

[16] For additional, similar gunpowder storage laws from the founding era, see 1798-1813 R.I. Pub. Laws 85; Act of Dec. 6, 1783, chap. 1059, 11 Pa. Stat. 209; 1786 N.H. Laws 383-84; 1806 Ky. Acts 122 § 3.

It requires no fancy to conclude that those same founding-era communities may well have responded to today's unprecedented concern about LCM use just as the Rhode Island General Assembly did: by limiting the number of bullets that could be held in a single magazine. Indeed, HB 6614 is more modest than founding-era limits on the size of gun-powder containers in that it imposes no limits on the total amount of ammunition that gun owners may possess.

As the foregoing examples illustrate, our nation's historical tradition recognizes the need to protect against the greater dangers posed by some weapons (as compared to, for example, handguns) as a sufficient justification for firearm regulation. [17] This exact justification stands behind HB 6614.

[17] For a collection of historical state restrictions on dangerous weapons, see Repository of Historical Gun Laws, Duke Ctr. for Firearms Law, https://perma.cc/562R-7FJX.

### D.

In sum, the burden on self-defense imposed by HB 6614 is no greater than the burdens of longstanding, permissible arms regulations, and its justification compares favorably with the justification for prior bans on other arms found to pose growing threats to public safety. Applying Bruen's metrics, our analogical reasoning very likely places LCMs well within the realm of devices that have historically been prohibited once their danger became manifest.

### E.

Plaintiffs nevertheless offer three main critiques of this reasoning. We address these critiques in turn.

### 1.

First, plaintiffs argue that whether people actually use LCMs in self-defense is irrelevant to the extent of HB 6614's burden on Rhode Islanders. Since "most people fortunately never have to fire their firearms for self-defense," the argument goes, what matters is whether citizens possess LCMs "for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." Bruen, 597 U.S. at 32, 142 S.Ct. 2111. Bruen, though, directs us in no uncertain terms to assess the burden imposed by modern gun regulations "on the right of armed self-defense." Id. at 29, 142 S.Ct. 2111. Depriving citizens of a device that is virtually never used in self-defense imposes less of a burden on that right than does banning a weapon that is, in fact, traditionally used in self-defense.

**2.**

Second, plaintiffs try to distinguish HB 6614 from our tradition of permissible arms regulations by pointing out that LCMs are owned by millions of Americans and are thus not "unusual." Recall that the Supreme Court has held that some weapons (such as sawed-off shotguns) can be banned because the Second Amendment does not authorize "the carrying of dangerous and unusual weapons." Heller, 554 U.S. at 627, 128 S.Ct. 2783 (internal quotations omitted). Plaintiffs distort this characterization to insist that LCMs can only be banned if they are "highly unusual in society at large." Id. at 625, 128 S.Ct. 2783.

**\*9** It defies reason to say that legislatures can only ban a weapon if they ban it at (or around) the time of its introduction, before its danger becomes manifest. The Supreme Court has made clear that the Second Amendment is no "regulatory straightjacket." Bruen, 597 U.S. at 30, 142 S.Ct. 2111. Law advances more slowly than the technology it regulates, but must nonetheless be able to respond when the ramifications of a technological development become more apparent over time. See, e.g., Kyllo v. United States, 533 U.S. 27, 35, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (decrying a "mechanical interpretation" of the Fourth Amendment that would leave today's citizens "at the mercy of advancing technology"); see also National Firearms Act of 1934, ch. 757, Pub. L. No. 73-474, 48 Stat. 1236 (federally regulating machine guns for the first time, even though they had existed in similar form for fifty years). [18]

| [18] | The Machine Gun: Its History, Development and Use: A Resource Guide, Library of Cong. (Sept. 2, 2022), https://perma.cc/5EZH-DS8Q. |

Plaintiffs' proposed popularity test contravenes case law in addition to logic. While the Supreme Court has indeed identified a "historical tradition of prohibiting the carrying of dangerous and unusual weapons," it has not held that states may permissibly regulate only unusual weapons. Bruen, 597 U.S. at 21, 142 S.Ct. 2111 (internal quotations omitted). Nor has it intimated that a weapon's prevalence in society (as opposed to, say, the degree of harm it causes) is the sole measure of whether it is "unusual."

While the Supreme Court has noted the common selection of handguns for self-defense in the home, it has not suggested that the constitutionality of arms regulations is to be determined based on the ownership rate of the weapons at issue, regardless of its usefulness for self-defense. [19] See Heller, 554 U.S. at 628-29, 128 S.Ct. 2783. Miller's determination that sawed-off shotguns fall outside the realm of Second Amendment protection, for example, contains no hint that the court somehow assumed that few people owned such weapons before they were banned. See generally 307 U.S. 174, 59 S.Ct. 816.

| [19] | Even if widespread ownership was a valid source of constitutional validity, plaintiffs only assert that about ten percent of Americans have owned LCMs. |

The closest arguable support for plaintiffs' preferred rule -- that a weapon cannot be banned once a large number of people own it even if that number is a small fraction of the general population -- comes from a concurring opinion in Caetano v. Massachusetts, 577 U.S. 411, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016). Writing for himself and Justice Thomas, Justice Alito pointed out that the stun guns at issue had already been purchased by "[h]undreds of thousands of ... private citizens" making them "widely owned and accepted as a legitimate means of self-defense across the country." Id. at 420, 136 S.Ct. 1027 (Alito, J., concurring in the judgment) (internal quotations omitted). For that reason, according to Justice Alito, "Massachusetts' categorical ban of such weapons ... violate[d] the Second Amendment." Id.

Here, plaintiffs argue in part that LCMs likewise cannot be banned because the number of LCMs owned by Americans today "dwarfs the number [of weapons at issue] in Caetano." This argument treats the concurring opinion as if it were binding authority. It also elides a critical difference between

stun guns and LCMs that bears heavily on the justification for any ban: Stun guns were specifically designed as non-lethal weapons, making them far less dangerous than semiautomatic firearms.[20] Despite plaintiffs' fixation on the ownership rates of LCMs, such statistics are ancillary to the inquiry the Supreme Court has directed us to undertake.

[20] See Eugene Volokh, Nonlethal Self–Defense, (Almost Entirely) Nonlethal Weapons, and the Rights to Keep and Bear Arms and Defend Life, 62 Stan. L. Rev. 199, 204 (2009).

### 3.

**\*10** Plaintiffs' final critique would, if correct, render meaningless that same Court-directed inquiry: They contend that any "laws first enacted long after ratification" -- including those passed in the late nineteenth century -- "come too late to provide insight" into the meaning of the Second Amendment. Bruen, 597 U.S. at 37, 142 S.Ct. 2111.

The Supreme Court has indeed indicated that "founding-era historical precedent" is of primary importance for identifying a tradition of comparable regulation. Id. at 27, 142 S.Ct. 2111. But it has also relied upon "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." Heller, 554 U.S. at 605, 128 S.Ct. 2783. The Court has likewise left open the possibility that "late-19th-century evidence" and "20th-century historical evidence" may have probative value if it does not "contradict[ ] earlier evidence." Bruen, 597 U.S. at 66 n.28, 142 S.Ct. 2111.

We are therefore unpersuaded by plaintiffs' assertion that the laws regulating sawed-off shotguns, Bowie knives, and M-16s provide no insight into our "Nation's historical tradition of firearm regulation." Id. at 17, 142 S.Ct. 2111. After all, if plaintiffs were correct on this point, then it would follow that those laws must themselves violate the Second Amendment. And because not even plaintiffs claim that those laws are invalid, we see no reason why those same laws cannot provide insight as apt historical precursors with which to compare HB 6614's burden and justification, as Bruen directs us to do. Id. at 29, 142 S.Ct. 2111.

\* \* \*

Rhode Island was confronted with a societal concern regarding the frequency with which LCMs are facilitating mass murder. The concern is unprecedented and growing, and could not have been confronted -- let alone resolved -- by our founders. In response, the state passed a law that places no meaningful burden on the right of self-defense as actually practiced. The justification for the law is a public safety concern comparable to the concerns justifying the historical regulation of gunpowder storage and of weapons like sawed-off shotguns, Bowie knives, M-16s and the like. The analogical "how" and "why" inquiry that Bruen calls for therefore strongly points in the direction of finding that Rhode Island's LCM ban does not violate the Second Amendment.

Common sense points in the same direction. It is fair to assume that our founders were, by and large, rational. To conclude that the Second Amendment allows banning sawed-off shotguns, Bowie knives, and M-16s -- but not LCMs used repeatedly to facilitate the murder of dozens of men, women, and children in minutes -- would belie that assumption. Accordingly, it should not be surprising that Bruen's guidance in this case leads us to conclude that HB 6614 is likely both consistent with our relevant tradition of gun regulation and permissible under the Second Amendment.

### IV.

Plaintiffs also fail to show a likelihood of prevailing on their Fifth Amendment takings claim. The Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005). In addition to these "physical" takings, the Court has recognized "regulatory takings" when a regulation "denies all economically beneficial or productive use" of the property. Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015–16, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Nonetheless, it has established that a property owner can expect "the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers." Id. at 1027, 112 S.Ct. 2886.

**\*11** HB 6614 required all owners of LCMs to choose one of four options within 180 days of the law's passage: They could (a) permanently modify their LCMs to accept ten rounds or

fewer of ammunition; (b) sell them to a federally licensed firearms dealer or out-of-state resident; (c) transfer them out-of-state; or (d) turn them in to law enforcement. R.I. Gen. Laws § 11-47.1-3. The statute does not provide for payment in the event of forfeiture, and offers no exceptions for any magazines that cannot be converted to lower capacity.

Plaintiffs argue that, by dispossessing owners of their LCMs (whether through transfer, forfeiture, sale, or alteration), HB 6614 effects a physical taking. Consequently, to plaintiffs, the State has an obligation to pay just compensation, no matter the justification for the law. Plaintiffs point to Horne v. Department of Agriculture, 576 U.S. 350, 135 S.Ct. 2419, 192 L.Ed.2d 388 (2015), in which the Court held that a requirement that raisin growers grant the government possession and title to a certain percentage of raisins constituted a physical taking, and Loretto v. Teleprompter Manhattan CATV Corp., where the Court held that a mandated physical invasion of a landlord's real property for the permanent installation of cable-television devices constituted a physical taking. 458 U.S. 419, 436-37, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Plaintiffs argue that HB 6614 effects a similar taking. We disagree. Both Horne and Loretto involved the government necessarily occupying, taking title to, or physically possessing the relevant item. Here, by contrast, LCM owners have the option to sell, transfer, or modify their magazines. HB 6614 does not effect a physical taking just because Rhode Island offered to assist LCM owners with the safe disposal of their soon-to-be-proscribed weapons.

Plaintiffs do not argue that HB 6614 deprives LCM owners of all "economically beneficial or productive use" of their magazines, as would be required to show a regulatory taking. See Lucas, 505 U.S. at 1015–16, 112 S.Ct. 2886. Nor could they. The only thing they may not do is continue to possess them without modification in the state of Rhode Island. We find this regulation to be the very type of use restriction that property owners must "necessarily expect[ ] ... from time to time" as states legitimately exercise their police powers. Id. at 1027, 112 S.Ct. 2886.

In short, HB 6614 likely effects neither a physical taking nor a regulatory taking. As such, we affirm the district court's holding that plaintiffs have failed to show a likelihood of success on their Fifth Amendment claims.

V.

Finally, we are unpersuaded by plaintiffs' claim that HB 6614 violates the Fourteenth Amendment. Plaintiffs contend that Rhode Island's law violates due process for two reasons: first because it has "retroactive effects" and second because it is impermissibly vague. We briefly discuss each claim in turn.

A.

First, plaintiffs argue that HB 6614 violates their due process rights because it is "obviously retroactive." A statute is considered retroactive if it "attaches new legal consequences to events completed before its enactment." Landgraf v. USI Film Prod., 511 U.S. 244, 269-70, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

Here, plaintiffs contend that the law does so by "reach[ing] back to long-closed, lawful transactions and render[ing] their result illegal." But HB 6614 does not impose new liability back to the date of purchase -- the "lawful transactions" to which plaintiffs are presumably referring. And even if possession -- rather than purchase -- of an LCM were the operative "event" for our retroactivity analysis, the "legal consequence" contained in the law did not "attach" until six months after its passage. We therefore do not see how HB 6614 could possibly be considered retroactive.

B.

\*12 Plaintiffs further argue that, since the law does not define "[p]ermanent[ ] modifi[cation]" or "ammunition," see R.I. Gen. Laws § 11-47.1-2, "people of ordinary intelligence" may not "understand whether their actions will result in adverse consequences" under the law.

We trust that Rhode Island gun owners are much more intelligent than plaintiffs posit and are familiar with what ammunition is, for example. Nor is the concept of modifying a magazine a puzzler. A simple Google search of "modify magazines ten rounds" yields reams of products and instructional videos designed to help users "make [their] magazines state compliant" by limiting their capacity to fit ten or fewer rounds.[21] While Google is hardly a legal test, these results indicate that a large number of people have figured

out what conduct the statute (and others like it) prohibits, and what modifications are necessary to comply. Plaintiffs' facial vagueness argument borders on the frivolous.

21    See, e.g., Level Up Tactical, How to Make Your Magazines State Compliant for Under $7 Each, YouTube (Jun. 7, 2019), https://perma.cc/N9CR-PSSE. The video specifically provides instructions on how to "permanently" modify an LCM by epoxying to it a ten-round limiter. We find that a person of ordinary intelligence would understand epoxying something to be within the ordinary meaning of modifying it permanently.

## VI.

We need go no further. Plaintiffs' failure to demonstrate a likelihood of success on the merits of their claims sinks their attempt to require the district court to issue a preliminary injunction. New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). We therefore affirm the judgment of the district court, denying the request for a preliminary injunction.

**All Citations**

--- F.4th ----, 2024 WL 980633

End of Document     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.    12