# In the United States Court of Appeals for the Ninth Circuit

---◆---

ANDREW TETER AND JAMES GRELL,

*Plaintiffs-Appellants,*

v.

ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII AND DARRYL NG, IN HIS OFFICIAL CAPACITY AS THE STATE SHERIFF DIVISION ADMINISTRATOR,

*Defendants-Appellees.*

---◆---

Appeal from the United States District Court
for the District of Hawaii
No. 19-cv-00183-ACK-WRP (Hon. Alan C. Kay)

---◆---

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

---◆---

JOSEPH G.S. GREENLEE
  *Counsel of Record*
ERIN M. ERHARDT
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

Counsel for *Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

The National Rifle Association of America has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF AUTHORITIES ................................................... iii

STATEMENT OF *AMICUS CURIAE* ..................................... 1

CONSENT TO FILE .................................................... 1

SUMMARY OF ARGUMENT ................................................ 2

ARGUMENT .......................................................... 4

   I.   *Heller* held that the Second Amendment extends, prima facie, to all bearable arms—including butterfly knives ........................... 4

  II.  Hawaii has not proven that butterfly knives are either dangerous or unusual, and it must prove both to justify its ban ... 5

     A.  The determination of whether a weapon is "dangerous and unusual" must occur in the historical analysis. ............... 6

     B.  Hawaii shoulders the burden of proving that butterfly knives are *both* dangerous *and* unusual. .................... 8

     C.  Hawaii failed to prove that butterfly knives are either dangerous *or* unusual. ................................. 10

 III.  There is a robust tradition of possessing knives throughout American history, and no tradition of banning knives. ............... 13

     A.  There is a strong tradition of possessing knives—including folding pocketknives—in American history. ............... 14

     B.  There is a no tradition of banning the possession of knives in American history. ................................. 19

CONCLUSION ....................................................... 23

CERTIFICATE OF COMPLIANCE ........................................ 24

CERTIFICATE OF SERVICE ........................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Aymette v. State,*
21 Tenn. 154 (1840) ....................................................... 21, 22

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) ................................................ 5, 8, 9, 14

*Com. v. Caetano,*
470 Mass. 774 (2015) ............................................................ 8

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .................................................... *passim*

*Fife v. State,*
31 Ark. 455 (1876) .............................................................. 21

*Friedman v. City of Highland Park, Ill.,*
577 U.S. 447 (2015) ............................................................ 10

*Fyock v. Sunnyvale,*
779 F.3d 991 (9th Cir. 2015) .......................................... 10, 12

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
597 U.S. 1 (2022) ...................................................... *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
804 F.3d 242 (2d Cir. 2015) ................................................. 4

*Nunn v. State,*
1 Ga. 243 (1846) ........................................................... 19, 20

*State v. Delgado,*
692 P.2d 610 (Or. 1984) ..................................................... 11

*Virginia v. Black,*
538 U.S. 343 (2003) .............................................................. 5

**Constitutional Provisions**

U.S. CONST. amend. II ................................................................ *passim*

**Statutes and Regulations**

1837 Ga. Laws 90 ................................................................... 19

1838 Tenn. Pub. Acts 200 ........................................................ 20

1852 Ga. Laws 269 ................................................................. 20

1881 Ark. Acts 192 ................................................................ 21

Haw. Rev. Stat. § 134-53 ........................................................ 12

**Other Authorities**

BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, vol. 2 (Arthur Vollmer ed., 1947) .................. 18

BLACK'S LAW DICTIONARY (6th ed. 1990) .................................... 5

Kopel, David B. & Greenlee, Joseph G.S., *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. (forthcoming 2024) ........ 17, 22

Kopel, David B., et al., *Knives and the Second Amendment*, 47 U. MICH. J.L. REFORM 175 (2013) .................................... 11

Neumann, George G., SWORDS & BLADES OF THE AMERICAN REVOLUTION (1973) .................................................... *passim*

## STATEMENT OF *AMICUS CURIAE*[1]

The National Rifle Association of America ("NRA") is America's oldest civil rights organization and is widely recognized as America's foremost defender of Second Amendment rights. It was founded in 1871 by Union generals who, based on their experiences in the Civil War, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA has approximately 4.2 million members, and its programs reach millions more. The NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement.

The NRA has an interest in this case because the right to possess one's preferred arms for self-defense—including butterfly knives—is essential to the right to keep and bear arms.

## CONSENT TO FILE

All parties consented to the filing of this brief.

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *Amicus* and its members contributed money intended to fund its preparation or submission.

## SUMMARY OF ARGUMENT

The Second Amendment's plain text covers all instruments that constitute bearable arms. Because butterfly knives are bearable arms, Hawaii can justify its prohibition on the possession of butterfly knives only by demonstrating that the prohibition is consistent with our nation's historical tradition of regulation.

Under our nation's historical tradition, a weapon may not be banned unless it is "dangerous and unusual." There are two important considerations in determining whether a weapon is "dangerous and unusual." First, this determination must occur in a court's historical analysis, not in the plain text analysis. Second, the government shoulders the burden of proving that the banned weapon is *both* dangerous *and* unusual. Hawaii has not demonstrated that butterfly knives have uniquely dangerous propensities, nor has it provided any information regarding their possession or use by law-abiding citizens. Thus, Hawaii failed to prove that butterfly knives are either exceptionally dangerous or unusual, let alone both.

The unconstitutionality of Hawaii's ban is further supported by the tradition of knife possession and regulation throughout American

history. Starting in the earliest colonial days, Americans regularly kept and carried knives, especially belt knives, daggers, dirks, and jack-knives—the last of which are folding pocketknives analogous to butterfly knives. These knives were all commonly possessed throughout the colonial and founding eras by both civilians and militiamen, and they were all used in the Revolutionary War. This tradition is especially significant when considered in light of the absence of historical prohibitions on knife possession.

No prohibition on the possession of any type of knife existed in the colonial or founding eras. Only one state in the 19th century banned the possession of any particular knife, and the law imposing that ban was held to violate the Second Amendment. Two states outlawed the transfer—but not the possession—of certain knives. Neither of these laws applied to pocketknives. Moreover, two regulations cannot establish a tradition, especially when one of them was enacted in the late 19th century. Additionally, the supreme courts of both states had interpreted their state constitutional arms right as protecting only militia-suitable arms. Therefore, Hawaii's ban on butterfly knives contradicts our nation's tradition of regulation and violates the Second Amendment.

**ARGUMENT**

## I. *Heller* held that the Second Amendment extends, prima facie, to all bearable arms—including butterfly knives.

The Supreme Court set forth "the standard for applying the Second Amendment" in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. 1, 24 (2022).

The initial inquiry under *Bruen*, therefore, is a plain text analysis. The Court conducted the plain text analysis in *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008).

As for "Arms" in the Second Amendment's text, the *Heller* Court concluded that "the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*, even those that were not in existence at the time of the founding." *Id.* at 582 (emphasis added).

Thus, "[*Heller*] identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015); *see also Virginia v. Black*, 538 U.S. 343, 369

(2003) (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part) (defining "prima facie evidence" as "sufficient to establish a given fact" and "if unexplained or uncontradicted . . . sufficient to sustain a judgment in favor of the issue which it supports") (quoting BLACK'S LAW DICTIONARY 1190 (6th ed. 1990)).[2] Hawaii has not rebutted the fact that butterfly knives are bearable arms.

Because butterfly knives are bearable arms, they are protected by the Second Amendment, and Hawaii can justify its ban only "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

## II. Hawaii has not proven that butterfly knives are either dangerous or unusual, and it must prove both to justify its ban.

"A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., joined by Thomas, J., concurring). Indeed, "the historical tradition of

---

[2] In *Cuomo*, the Second Court held unconstitutional a ban on a pump-action rifle because the state focused exclusively on semiautomatic weapons and "the presumption that the Amendment applies remain[ed] unrebutted." 804 F.3d at 257 n.73.

prohibiting the carrying of 'dangerous and unusual weapons'" is the *only* historical tradition the Supreme Court has identified that supports banning a particular weapon. *Heller*, 554 U.S. at 627.

There are two important considerations in determining whether a weapon is "dangerous and unusual." First, this determination must occur in a court's historical analysis, not in the plain text analysis. Second, the government shoulders the burden of proving that the banned weapon is *both* dangerous *and* unusual.

### A. The determination of whether a weapon is "dangerous and unusual" must occur in the historical analysis.

*Heller* made clear that the consideration of whether a weapon is "dangerous and unusual" must occur under the historical analysis of the Court's test. First, the *Heller* Court referred to "the *historical tradition*" of regulating "dangerous and unusual weapons." *Id.* at 627 (emphasis added); *see also Bruen*, 597 U.S. at 47 (explaining that the *Heller* Court was "[d]rawing from this historical tradition" of restricting "dangerous and unusual weapons" in holding that the Second Amendment protects arms "'in common use at the time,' as opposed to those that 'are highly unusual in society at large'") (quoting *Heller*, 554 U.S. at 627).

Second, the *Heller* Court considered that "historical tradition" in its own historical analysis. After completing its plain text analysis of the Second Amendment, 554 U.S. at 576–600, the Court began focusing on historical tradition, including "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," *id.* at 605. Only after considering "Postratification Commentary," *id.* at 605–10, "Pre–Civil War Case Law," *id.* at 610–14, "Post–Civil War Legislation," *id.* at 614–16, "Post–Civil War Commentators," *id.* at 616–19, and Supreme Court precedents, *id.* at 619–26, did the Court identify the "historical tradition" of regulating "dangerous and unusual weapons," *id.* at 627. What is more, the Court identified that traditional regulation in the same paragraph as other "longstanding" regulations, *id.* at 626–27, while promising to "expound upon the *historical justifications* for" those regulations another time, *id.* at 635 (emphasis added). Thus, the Supreme Court clearly demonstrated that courts must consider whether a weapon is "dangerous and unusual" in the historical prong of the analysis.

**B.    Hawaii shoulders the burden of proving that butterfly knives are *both* dangerous *and* unusual.**

*Bruen* makes clear that under the historical prong of its Second Amendment test, the government bears the burden of justifying the law. *See, e.g.*, *Bruen*, 597 U.S. at 17, 24, 33–34, 38–39, 60, 70. Therefore, to justify its ban on butterfly knives, Hawaii must prove that butterfly knives are "dangerous and unusual."

To be sure, the Supreme Court requires that a weapon be *both* dangerous *and* unusual to be banned—in other words, it is a conjunctive test. The Court demonstrated this in *Caetano*, while the concurrence stated it explicitly.

The *Caetano* Court summarily reversed and remanded the Massachusetts Supreme Judicial Court's opinion upholding a ban on stun guns. The Massachusetts court upheld the stun gun ban because it found that the ban fell within the "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Caetano*, 577 U.S. at 412 (quoting *Com. v. Caetano*, 470 Mass. 774, 778 (2015)). The Supreme Court rejected this holding. Yet after determining that the Massachusetts court's analysis of whether stun guns were "unusual" was flawed, the Supreme Court declined to consider whether stun guns

qualified as exceptionally "dangerous." 577 U.S. at 412. If the "dangerous and unusual" test were not a conjunctive test, the Court would have proceeded to consider whether stun guns are exceptionally dangerous, because that might have justified the Massachusetts court's holding. But the *Caetano* Court did not, because it is indeed a conjunctive test, and the ban failed at the "unusual" analysis.

Justice Alito, joined by Justice Thomas, emphasized precisely this point in a concurring opinion:

> As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous." . . . If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous.

*Id.* at 417–18 (Alito, J., joined by Thomas, J., concurring) (citing *Heller*, 554 U.S. at 636).

Justice Thomas, who authored the *Bruen* opinion, joined by Justice Scalia, who authored the *Heller* opinion, provided additional confirmation that if either the dangerous or unusual element is not satisfied, the arm cannot be banned. Dissenting from a denial of certiorari, the Justices noted that because the banned arms in that case

were common, and thus not unusual, they were protected arms—whether the arms were exceptionally dangerous did not matter since they were not unusual:

> *Heller* asks whether the law bans types of firearms commonly used for a lawful purpose. . . . Roughly five million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons.

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 136 S. Ct. 447, 449 (2015) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) (citations omitted) (emphasis added).

### C. Hawaii failed to prove that butterfly knives are either dangerous *or* unusual.

Hawaii has failed to show that butterfly knives are either exceptionally dangerous or unusual.

All weapons are "dangerous." But to be banned under *Heller*'s "dangerous and unusual" standard, the weapon at issue must have "uniquely dangerous propensities." *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015). Hawaii has not shown that butterfly knives have any such propensities.

Hawaii claims that the "combination" of four factors—"concealability, quick deployment, deployment with one hand, and intimidation—make butterfly knives uniquely dangerous in comparison to regular knives." Answering Br. at 23. None of these factors, nor the combination thereof, is unique to butterfly knives, as opposed to any other folding pocketknife. And folding pocketknives have been popular with both civilians and militias in America since the colonial era. *See State v. Delgado*, 692 P.2d 610, 613–14 (Or. 1984); *see also infra* Part III.A.

Indeed, features such as concealability, quick deployment, and the ability to use the weapon with one hand are the same features that make folding knives—like handguns—optimal for self-defense.[3] As the *Heller* Court noted, a handgun is advantageous for home defense because it "can be pointed at a burglar with one hand while the other hand dials the police." 554 U.S. at 629. The same is true for butterfly knives.

---

[3] In fact, "[m]any experts believe that a butterfly knife is the strongest and safest folding knife because the blade cannot fold closed inadvertently on the operator so long as the operator has a firm grasp on the handles." David B. Kopel, et al., *Knives and the Second Amendment*, 47 U. MICH. J.L. REFORM 175, 179 (2013).

Moreover, Hawaii conceded at the district court that "common folding knives are just as concealable and open faster than butterfly knives." Defs.' Reply in Supp. of Mot. for Summ. J., ECF No. 57 at 5, *Teter v. Connors*, No. 1:19-cv-00183-ACK, 460 F. Supp. 3d 989 (D. Haw. 2020). This concession undermines Hawaii's claim that the concealability and speed of deployment of butterfly knives are uniquely dangerous features justifying a ban.

Hawaii has not shown that butterfly knives are more dangerous than any other type of folding pocketknife that remains legal to purchase and possess in Hawaii.

Similarly, Hawaii has not shown that butterfly knives are unusual. Hawaii has provided no information regarding "whether the weapon is commonly possessed by law-abiding citizens for lawful purposes." *Fyock*, 779 F.3d at 997. Rather, it relies on legislative testimony from the passage of Haw. Rev. Stat. § 134-53 that butterfly knives were popular among minors, gangs, and criminals. *See* Answering Br. at 25–26. But testimony regarding the criminal misuse of a weapon says nothing about whether that weapon is commonly possessed by law-abiding citizens. *See*

*Heller*, 554 U.S. at 682 (Breyer, J., dissenting) (emphasizing that handguns "are the overwhelmingly favorite weapon of armed criminals").

Hawaii also notes that only one "relatively obscure" form of martial arts—Escrima—uses butterfly knives and posits that butterfly knives, like Escrima, must too be "relatively obscure." Answering Br. at 24–25. But the possession of butterfly knives is not limited to practitioners of Escrima or any other martial art—one's popularity is not dependent on the other's.

In fact, butterfly knives are currently legal to purchase and possess in the vast majority of U.S. states. Yet Hawaii has provided no information regarding their possession or use—or lack thereof—by law-abiding citizens.

Thus, Hawaii has not carried its burden of demonstrating that butterfly knives are either exceptionally dangerous or unusual, let alone both.

## III. There is a robust tradition of possessing knives throughout American history, and no tradition of banning knives.

Because Hawaii failed to prove that butterfly knives are either dangerous or unusual, and "[a] weapon may not be banned unless it is *both* dangerous *and* unusual," *Caetano*, 577 U.S. at 417 (Alito, J., joined

by Thomas, J., concurring), Hawaii's butterfly knife ban violates the Second Amendment. This is further supported by the specific tradition of knife possession and regulation throughout American history.

A. **There is a strong tradition of possessing knives— including folding pocketknives—in American history.**

Starting in the earliest colonial days, Americans regularly kept and carried knives. They maintained this practice throughout and beyond the founding era.

"Knives and daggers were personal necessities to the early American. They served him in a wide variety of uses, including cleaning game, home chores, fighting, trading with the Indians, and as cooking-eating utensils." George G. Neumann, SWORDS & BLADES OF THE AMERICAN REVOLUTION 227 (1973).

Most knives in the colonial and founding eras could be classified as a belt knife, dagger, dirk, or jack-knife. The belt knife, "a single-edged blade (with or without a false edge), designed primarily for cutting," was used "as both a tool and a weapon" and "could whittle, carve, skin, chop stab, and scalp." *Id.* at 227, 228. "The longer sizes are generally thought of as 'riflemen's knives'—since with the rifle and tomahawk they constituted the frontiersman's basic equipment." *Id.* at 228. The blades

"often reached 12 or more inches," but smaller variations "with blades of 5 to 6 inches were also popular." *Id.* A third variation, "with a 3 to 4-inch blade," was known as a "patch cutter." *Id.* The dagger, with its "symmetrical tapering blade having at least two edges," was "[d]eveloped for fighting" and "most effective as a thrusting and stabbing weapon." *Id.* at 227. The dirk initially "denoted an even-tapering blade similar to the dagger, with only one edge sharpened," but near "the end of the American Revolution the term began to describe short naval side arms mounting either dagger or knife blades." *Id.* The jack-knife was a folding pocketknife, with blades ranging from three to twelve inches. *Id.* at 231. These were sometimes referred to as "pocket knives," "clasp knives," "spring knives," or "folding knives." *Id.*

In 17th-century America, "these short-edged weapons had very real importance." *Id.* at 227. "The prevailing practice stressed daggers for the skilled fighting man and knives for everyday use." *Id.* Thus, while "military men emphasized the dagger, most colonists carried knives for their daily needs—utilizing both fixed and folding blades." *Id.* "Contemporary records list ship cargoes with thousands of 'long knives' and jackknives," with most imports apparently arriving "from England,

France, Germany, and Low Countries." *Id.* at 228. Because knives served as essential weapons for defense, tools for everyday tasks, and "an important commodity in trading with the Indians," historical sources frequently "mention their employment" in America "through the 1600s." *Id.* at 227–28.

At the turn of the 18th century, "farmers and tradesmen continued to carry the belt knife and dagger," but as the century progressed, "more and more adopted the pocket knife for personal use" to "the point where they became almost universal accessories." *Id.* at 228, 231. The "majority of gentlemen" along the Atlantic Coast "adopted the new fashion of wearing a small sword," while "along the frontier . . . the belt knife and dagger remained common accessories." *Id.* at 228. In the southern colonies, dirks were especially popular, in large part due to the significant number of Scottish settlers. "The dirk was a personal weapon to them. It was usually carried in civilian life and commonly supplied by the soldier himself[.]" *Id.* at 230. "It was also the practice by many Scots to carry a small companion knife to the dirk." *Id.* at 231. This companion knife, called a "sgian dubh" (meaning, "black knife"), was commonly carried in

a shirt sleeve in the early 18th century but became more commonly carried in the "top of the stocking" by the late 18th century. *Id.*

Militiamen in colonial America always depended on knives and other edged weapons. Even as firearms became increasingly reliable, "for close combat the soldier's ultimate reliance remained with his bladed secondary arm—the bayonet, sword, belt axe, or knife." *Id.* at 14. Throughout both the colonial and founding eras, militiamen were required to keep and bear a variety of edged weapons, including backswords, bayonets, broad swords, cimiters, cutlasses, cutting-swords, hangers, hatchets, rapiers, swords, tomahawks, halberds, lances, partisans, pikes, and spontoons. David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. at 25–28 (forthcoming 2024)[4] (defining each weapon and providing the many militia laws that required them).

Additionally, jack-knives, daggers, and dirks were all widely used during the Revolutionary War. Jack-knives "were apparently used by a great majority of soldiers to serve their numerous personal needs." Neumann, SWORDS & BLADES, at 231. Massachusetts, New Hampshire,

---

[4] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197.

and New York required militiamen to keep and bear jack-knives during the war. *Id.* at 20, 231; 2 BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, Part 6 (Massachusetts), at 223 (Arthur Vollmer ed., 1947); *id.* Part 7 (New Hampshire), at 82. "Daggers were apparently 'unofficial' weapons of the American Revolution. The pocket knife and rifleman's knife are mentioned in surviving regulations, but the dagger seems to have found most of its use as an individual's personal weapon." Neumann, SWORDS & BLADES, at 229. "Many Americans, especially the militia, fought without bayonets in the Revolution, and a number of them apparently substituted the belt dagger as their 'close up' weapon.'" *Id.* As for dirks, "[m]any appear to have been used during the War for Independence by colonists of Scotch background, as well as by Scottish units in the British Army." *Id.* at 230.

Additionally, "[m]any innovations were attempted prior to 1783," including "spring-folding blades, knife and sword bayonets, locking spring clips, [and] spear points," but they were not commonly used during the war. *Id.* at 31. Nevertheless, the "belt knife and dagger continued to be popular in America for at least 80 years after the Revolution." *Id.* at 230.

In sum, knives were commonly possessed throughout the colonial and founding eras by both civilians and militiamen. This tradition is especially significant when considered in light of the absence of historical knife prohibitions, discussed next.

## B. There is a no tradition of banning the possession of knives in American history.

No prohibition on the possession of any type of knife existed in the colonial or founding eras.

In the 19th century, only one state banned the possession of any particular knife, and the law imposing that ban was held to violate the Second Amendment. In 1837, Georgia forbade the possession, carry, or sale of "Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c. . . . save such pistols as are known and used, as horseman's pistols, &c." 1837 Ga. Laws 90. Hawkins Nunn was convicted of violating this law by "having and keeping about his person, and elsewhere, a pistol[.]" *Nunn v. State*, 1 Ga. 243, 247 (1846). The Supreme Court of Georgia held the law unconstitutional, ruling that the Second Amendment protects the right "to keep and bear arms *of every description*" and that only the concealed

carry of those arms may be prohibited. *Id.* at 251 (emphasis added).[5] In response, the 1837 law was expressly repealed and replaced with a law forbidding the concealed carry of the same arms that had been prohibited by the 1837 law—but, consistent with *Nunn*, the new law did not prohibit the possession, sale, or open carry of those arms. 1852 Ga. Laws 269.[6]

Two states outlawed the transfer of certain knives, but not their possession. Tennessee in 1838 prohibited the sale of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick[.]" 1838 Tenn. Pub. Acts 200. And Arkansas in 1881 forbade the transfer of

---

[5] *Nunn* is sometimes read as striking down only the ban on carrying pistols openly. But in order to "dispose finally of this case," and order that "the judgment of the court below must be reversed, and the proceeding quashed," the court had to invalidate Nunn's conviction for "having" the pistol as well. *Nunn*, 1 Ga. at 245, 247, 251. Indeed, it would be nonsensical for the court to hold the ban on openly carrying pistols unconstitutional without holding the ban on possessing pistols unconstitutional. Rather, the *Nunn* court held "that portion of the statute which entirely forbids [the pistol's] use" unconstitutional, except for the concealed carry ban, which it deemed "valid." *Id.* at 251.

[6] This law forbade the concealed carry of "any pistol (except horseman pistols,) dirk, sword in a cane, spear, bowie knife, or any other kind of knives manufactured and sold for the purpose of offence and defence[.]" 1852 Ga. Laws 269.

"any dirk or bowie knife, or a sword or a spear in a cane[.]" 1881 Ark. Acts 192.

These laws cannot establish a tradition of regulation. First, only Georgia's law could arguably be interpreted as applying to pocketknives—*i.e*, knives analogous to butterfly knives—and that law was held unconstitutional. This provides evidence that Hawaii's ban is also unconstitutional. *Bruen* explained that if "analogous regulations . . . were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 597 U.S. at 27. Second, the Tennessee and Arkansas laws are too few to establish a tradition. *Bruen* rejected the proposition that "*three* colonial regulations could suffice to show a tradition." *Id*. at 46. Surely two regulations—including one late-19th-century regulation—cannot either; *see id*. at 66 ("[L]ate-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."). Third, the supreme courts of both Tennessee and Arkansas had interpreted their state constitutional right to arms as solely applicable to militia-suitable arms. *Aymette v. State*, 21 Tenn. 154, 158 (1840); *Fife v. State*, 31 Ark. 455, 460–61 (1876); *see also Heller*, 554 U.S.

at 613 (*Aymette*'s "odd reading of the right is, to be sure, not the one we adopt").

The most common approach to regulating knives throughout the 19th century was to restrict the manner in which they could be carried, restrict sales to minors, or impose extra punishment for criminal misuse. Kopel & Greenlee, *The History of Bans on Types of Arms Before 1900*, at 195. But these lesser restrictions cannot justify a complete ban on possession. *Bruen* drew a sharp distinction between a carry prohibition and lesser carry restrictions by dismissing as analogs surety laws, statutes regulating the manner of carry (*e.g.*, prohibiting concealed carry while allowing open carry), and the common-law offenses of affray or going armed to the terror of the public. 597 U.S. at 60 ("None of these historical limitations . . . approach New York's . . . because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms"); *see also id.* at 39 n.9 (seemingly approving of "'shall-issue' licensing regimes" for handgun carry while invalidating may-issue regimes that might prohibit "law-abiding, responsible citizens from exercising their Second Amendment right to public carry") (quotation omitted).

Because there is no tradition of prohibiting the possession of any knives, let alone pocketknives, Hawaii's ban on butterfly knives contradicts our nation's tradition of regulation and violates the Second Amendment.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
  *Counsel of Record*
ERIN M. ERHARDT
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Cir. R. 29-2(c)(3) because this brief contains 4,404 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on March 28, 2024, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amicus Curiae*