## ON REHEARING EN BANC

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4609**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellant,

v.

RANDY PRICE,

        Defendant – Appellee.

-------------------------------

DISTRICT OF COLUMBIA; CALIFORNIA; COLORADO; CONNECTICUT; DELAWARE; HAWAII; IDAHO; ILLINOIS; MAINE; MARYLAND; MASSACHUSETTS; MICHIGAN; MINNESOTA; NEW JERSEY; NEW MEXICO; NEW YORK; NORTH CAROLINA; OHIO; OREGON; PENNSYLVANIA; RHODE ISLAND; WASHINGTON; THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS; EVERYTOWN FOR GUN SAFETY; BRADY; MARCH FOR OUR LIVES,

        Amici Supporting Appellant.

---

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Joseph R. Goodwin, District Judge. (2:22-cr-00097-1)

---

Argued: March 20, 2024                      Decided: August 6, 2024

---

Before DIAZ, Chief Judge, and WILKINSON, NIEMEYER, KING, GREGORY, AGEE, WYNN, THACKER, HARRIS, RICHARDSON, QUATTLEBAUM, RUSHING, HEYTENS, BENJAMIN, and BERNER, Circuit Judges.

───────────

Reversed and remanded by published opinion. Judge Wynn wrote the majority opinion, in which Chief Judge Diaz, Judge Wilkinson, Judge King, Judge Thacker, Judge Harris, Judge Heytens, Judge Benjamin, and Judge Berner joined. Judge Niemeyer wrote an opinion concurring in the judgment. Judge Agee wrote an opinion concurring in the judgment. Judge Quattlebaum wrote an opinion concurring in the judgment, in which Judge Rushing joined. Judge Gregory wrote a dissenting opinion. Judge Richardson wrote a dissenting opinion.

───────────

**ARGUED:** William Andrew Glaser, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Lex A. Coleman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellee. **ON BRIEF:** Kenneth A. Polite, Jr., Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William S. Thompson, United States Attorney, Jennifer Rada Herrald, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellant. Wesley P. Page, Federal Public Defender, Jonathan D. Byrne, Appellate Counsel, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellee. Janet Carter, William J. Taylor, Jr., EVERYTOWN LAW, New York, New York, for Amicus Everytown for Gun Safety. Shira Lauren Feldman, BRADY, Washington, D.C.; Ciara Wren Malone, MARCH FOR OUR LIVES, New York, New York; John Graubert, Sarah Suwanda, Kendall T. Burchard, Washington, D.C., Priya Sundaresan Leeds, COVINGTON & BURLING LLP, San Francisco, California, for Amici Brady and March for Our Lives. Karl A. Racine, Attorney General, Caroline S. Van Zile, Solicitor General, Ashwin P. Phatak, Principal Deputy Solicitor General, Arjun P. Ogale, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Rob Bonta, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California, for Amicus State of California. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Anne E. Lopez, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAII, Honolulu, D.C., for Amicus State of Hawaii. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Edward E. Manibusan, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE

NORTHERN MARIANA ISLANDS, Saipan, Northern Mariana Islands, for Amicus Commonwealth of the Northern Mariana Islands. Hector Balderas, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico, for Amicus State of New Mexico. Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Amicus State of North Carolina. Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. Lawrence G. Wasden, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IDAHO, Boise, Idaho, for Amicus State of Idaho. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Maura Healey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Matthew J. Platkin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Dave Yost, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Amicus State of Ohio. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Josh Shapiro, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF PENNSYLVANIA, Harrisburg, Pennsylvania, for Amicus Commonwealth of Pennsylvania. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington.

WYNN, Circuit Judge:

Randy Price was charged in a two-count indictment with possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k), and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). After the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), Price moved to dismiss the indictment in its entirety, arguing that both statutes were facially unconstitutional. The district court denied his motion to dismiss as to the count charging him with a violation of § 922(g)(1) but granted it as to the count charging him with a violation of § 922(k), finding that the analysis required under *Bruen* rendered § 922(k) an impermissible restriction on the Second Amendment right to keep and bear arms. The Government appealed the dismissal.

This appeal thus presents us with a single question: Is § 922(k), which bans the possession of a firearm with a removed, obliterated, or altered serial number, facially unconstitutional in light of the framework *Bruen* requires us to apply to Second Amendment challenges? We conclude that the conduct regulated by § 922(k) does not fall within the scope of the right enshrined in the Second Amendment because a firearm with a removed, obliterated, or altered serial number is not a weapon in common use for lawful purposes. Accordingly, we reverse the dismissal of the § 922(k) count in Price's indictment and remand for further proceedings.

I.

On May 3, 2022, Price was charged in a two-count indictment with possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k), and

possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), after police recovered a handgun with an obliterated serial number from his vehicle during a traffic stop. Price filed a motion to dismiss the indictment against him, arguing that both provisions of § 922 with which he was charged were unconstitutional following the Supreme Court's decision in *Bruen*. The Government opposed the motion.

The district court granted in part and denied in part Price's motion. It held that *Bruen* did not render § 922(g)(1)'s ban on possession of firearms by felons unconstitutional and denied the motion as to that count of the indictment. However, because it concluded that the conduct prohibited by § 922(k) was protected by the Second Amendment and because it could not find a historical tradition of firearm regulation consistent with § 922(k), it granted the motion to dismiss the count charging Price with a violation of § 922(k). This appeal by the Government followed.

## II.

We have jurisdiction over this interlocutory appeal pursuant to 18 U.S.C. § 3731, which provides in relevant part that the Government may appeal from an "order of a district court dismissing an indictment . . . as to any one or more counts." 18 U.S.C. § 3731; *see United States v. Wills*, 234 F.3d 174, 176 (4th Cir. 2000) (exercising jurisdiction pursuant to § 3731 where one count of a two-count indictment was dismissed); *United States v. Oakar*, 111 F.3d 146, 149 (D.C. Cir. 1997) (similar).

We review a district court's decision to grant a motion to dismiss an indictment de novo. *United States v. Wass*, 954 F.3d 184, 187 (4th Cir. 2020)

III.

Section 922(k) provides, in relevant part, that "[i]t shall be unlawful for any person knowingly . . . to possess . . . any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce."[1] 18 U.S.C. § 922(k). Price argues that enforcement of this provision violates the Second Amendment. We disagree. To explain why, we begin by establishing the framework under which we analyze Second Amendment challenges.

Following the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008)—which held that the Second Amendment confers an individual right to possess and carry weapons for self-defense—courts throughout the country, including the Fourth Circuit, routinely applied a two-step framework to analyze challenges alleging infringement of that individual right. *Bruen*, 597 U.S. at 17.

At step one of the post-*Heller* framework, courts analyzed whether the challenged law regulated activity that fell within the scope of the Second Amendment right to bear arms as "originally understood." *Id.* at 18 (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)); *see United States v. Chester*, 628 F.3d 673, 680–81 (4th Cir. 2010), *abrogated by Bruen*, 597 U.S. 1. If a court concluded that the activity fell within that scope, then at

---

[1] Firearms were not required to be manufactured with serial numbers until 1968. *See* Gun Control Act of 1968, Pub. L. No. 90-618, §§ 102, 201, 82 Stat. 1213, 1223, 1230. Thus, an individual in possession of a pre-1968 firearm that never bore a serial number is not in violation of § 922(k).

step two, it analyzed "how close the law [came] to the core of the Second Amendment right and the severity of the law's burden on that right." *Bruen*, 597 U.S. at 18 (quoting *Kanter*, 919 F.3d at 441); *see Chester*, 628 F.3d at 682.

In *Bruen*, the Supreme Court rejected courts' post-*Heller*, two-step framework as involving "one step too many." *Bruen*, 597 U.S. at 19. Although the Court held that step one of that framework was "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history," it rejected the means-end approach of step two. *Id.* Instead of applying means-end scrutiny to determine whether a challenged regulation passes constitutional muster, *Bruen* set forth a new framework under which courts must now analyze Second Amendment challenges: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. More recently, in *United States v. Rahimi*, the Supreme Court further clarified that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024).

*Bruen* thus establishes a new "two-step evaluation." *Id.* at 1928 (Jackson, J., concurring); *accord id.* at 1932–33 (Thomas, J., dissenting). First, we must ask whether the Second Amendment's plain text covers the conduct at issue. If not, that ends the inquiry: the Second Amendment does not apply. *Cf. Bevis v. City of Naperville*, 85 F.4th 1175, 1197 (7th Cir. 2023) (noting that its conclusion that the arms at issue were not

protected by the Second Amendment was sufficient to resolve the constitutional question but nonetheless continuing to the second step of the analysis), *cert denied sub nom. Harrel v. Raoul*, No. 23-877, 2024 WL 3259606 (U.S. July 2, 2024). But if it does, then, second, we must ask whether the Government has justified the regulation as consistent with the "principles that underpin" our nation's historical tradition of firearm regulation. *Rahimi*, 144 S. Ct. at 1898. Because we conclude below that Price's challenge falters at step one, we need only address what is required at that phase of the analysis.

Price argues that our inquiry at step one is extremely narrow: that, at least in this case, the only relevant question is whether the regulation criminalizes "keep[ing] and bear[ing]" any "Arms." U.S. Const. amend. II. But that argument does not accord with the text of the Second Amendment, nor with the analysis put forth in *Heller*, *Bruen*, and *Rahimi*.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *Id.* The phrase "keep and bear Arms" cannot be divorced from the text that immediately precedes it—"the right of the people." This right of the people, as *Heller* made clear, is to be interpreted based on the scope of the historical right "inherited from our English ancestors." *Heller*, 554 U.S. at 599–601 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). And *Heller* further cautioned that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."

*Id.* at 626; *e.g.*, *id.* at 620 (noting that in 1875 the Court described the "right protected by the Second Amendment as 'bearing arms for a lawful purpose'" (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1875))); *id.* at 626–27 (noting that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms"); *accord Rahimi*, 144 S. Ct. at 1897 ("At the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers. Some jurisdictions banned the carrying of 'dangerous and unusual weapons.' Others forbade carrying concealed firearms." (citations omitted)).

Most relevant here, *Heller* concluded that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. That is, the Court recognized that an "important limitation on the right to keep and carry arms" existed regarding the "sorts of weapons protected." *Id.* at 627. Drawing on its opinion in *United States v. Miller*, 307 U.S. 174 (1939), the Court recognized that a limitation on the types of weapons protected was supported by the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U.S. at 627 (cleaned up).

In *Miller*, the Supreme Court considered whether a federal ban on the possession or use of a shotgun with a barrel of less than eighteen inches violated the Second Amendment. *Miller*, 307 U.S. at 178. The Court concluded that "[i]n the absence of any evidence"

showing that a short-barreled shotgun had any "reasonable relationship to the preservation or efficiency of a well regulated militia," it "[could ]not say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* And it further concluded that "[c]ertainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense." *Id.*

Considering this language, the *Heller* Court concluded that *Miller*'s holding was based on a conclusion that "the *type of weapon at issue* was not eligible for Second Amendment protection" and that *Miller* thus stood "for the proposition that the Second Amendment right . . . extends only to certain types of weapons." *Heller*, 554 U.S. at 622–23. However, it noted that *Miller* lacked a detailed analysis of the precise types of weapons to which the Second Amendment extends. *Id.* at 623–24. The Court thus undertook that analysis itself. *Id.* at 624–26.

First, the Court acknowledged that *Miller*'s reference to "ordinary military equipment" might be read as an indication that the Second Amendment protects "only those weapons useful in warfare." *Id.* at 624 (quoting *Miller*, 307 U.S. at 179). But it flatly rejected such a reading, noting that it would render the National Firearms Act's restrictions on machineguns, which were certainly useful in warfare, seemingly unconstitutional. *Id.* Instead, the *Heller* Court concluded that *Miller*'s reference to ordinary military equipment could only be properly understood in tandem with the language that followed: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* (quoting *Miller*, 307 U.S. at 179).

10

Thus, the Court reasoned that *Miller*'s reference to ordinary military equipment was best understood as meaning that the Second Amendment extends only to weapons useful to a Founding-era militia—"arms in common use at the time for lawful purposes like self-defense."[2] *Id.* (cleaned up). So, *Miller* stood for the proposition "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns"—a proposition *Heller* adopted as "accord[ing] with the historical understanding of the scope of the [Second Amendment] right." *Id.* at 625.

Nothing in *Bruen* abrogated *Heller*'s extensive discussion of the contours of the scope of the right enshrined in the Second Amendment. In fact, *Bruen* confirmed that the limitations on the Second Amendment right identified by *Heller* are inherent in the meaning of "the right of the people" and should be addressed at the first step of its new framework.

Again, *Bruen*'s first step requires us to evaluate whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. The *Bruen* Court asked three questions to resolve this inquiry: (1) whether the petitioners were "part of the people

---

[2] The *Heller* Court acknowledged one criticism of this reading of *Miller*, noting that "[i]t may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause." *Heller*, 554 U.S. at 627. But the Court rejected this criticism as undermining its reading of the scope of the Second Amendment right, noting that while "[i]t may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society . . . [,] the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Id.* at 627–28.

whom the Second Amendment protects"; (2) whether the weapons regulated by the challenged regulation were "in common use" for a lawful purpose, in that case, "self-defense"; and (3) whether the Second Amendment protected the petitioners' "proposed course of conduct." *Id.* at 31–32 (cleaned up).

The Court in *Bruen* focused on the third of these inquiries, and for good reason—there was no dispute in that case that the petitioners, "two ordinary, law-abiding, adult citizens," were among the people protected by the Second Amendment, and neither party disputed that the weapons regulated by the challenged regulation—handguns—were in common use for self-defense. *Id.* But by engaging in these inquiries at step one, *Bruen* made clear that the limitations on the scope of the Second Amendment right identified in *Heller* are inherent in the text of the amendment. *Cf. United States v. Avila*, 672 F. Supp. 3d 1137, 1143 n.1 (D. Colo. 2023) ("Each of these questions address interpretive issues relating to different 'textual elements'—'the people,' 'Arms,' and 'keep and bear,' respectively—of what the Supreme Court calls the Second Amendment's 'operative clause.'" (quoting *Bruen*, 597 U.S. at 31–32)); *Rahimi*, 144 S. Ct. at 1923 (Kavanaugh, J., concurring) (noting that *Heller* "indicated that . . . the Second Amendment attaches only to weapons 'in common use'").

We thus reject Price's argument that we are barred from considering the historical limitations on the scope of the right at step one of the framework set forth in *Bruen*. A plain reading of *Heller* and *Bruen* leads us to the opposite conclusion: we can *only* properly apply step one of the *Bruen* framework by looking to the historical scope of the Second

Amendment right.[3] *Id.* at 1897 (majority opinion) (citing historical limitations on the "right

secured by the Second Amendment," and noting that "[i]n *Heller*, our inquiry into the

---

[3] Our second colleague in dissent and two of our concurring colleagues would consider the historical limits on the Second Amendment right only at *Bruen*'s second step. *See* Second Dissenting Op. at 64–67; First Concurring Op. at 28; Third Concurring Op. at 40. Two of these separate opinions quote the *Heller* Court's statement that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. But, in context, this statement was meant only to reject the "bordering on . . . frivolous" argument that "only those arms in existence in the 18th century are protected by the Second Amendment." *Id.*; *see also Rahimi*, 144 S. Ct. at 1898 (noting that it would be "mistaken" to "apply[] the protections of the right only to muskets and sabers"). This statement was not meant to define "Arms," as used in the Second Amendment, as any weapon that one might conceivably pick up and carry. Instead, the meaning of "Arms" within the Second Amendment can only be defined by reference to history; here, the historical context of the "traditional militia." *Heller*, 554 U.S. at 624.

Our third concurring colleague takes a different path to reach this conclusion, noting that because the *Bruen* Court "invoked the common-use concept as it scoured a historical record" at step two, the common-use limitation is confined to step two. Third Concurring Op. at 45. But the *Bruen* Court only referenced the common-use limitation at its second step as it was rejecting the respondents' argument that seventeenth-century restrictions on handgun possession—laws that were likely permissible because handguns were, at the time, not in common use—were sufficiently analogous to the challenged law at issue in that case. *Bruen*, 597 U.S. at 47. In rejecting the relevance of such laws, it noted that such laws only emphasized the point it "already acknowledged in *Heller*": "the Second Amendment *protects only* the carrying of weapons that are those 'in common use at the time.'" *Id.* (emphasis added). Accordingly, the Court was not relegating the common-use limitation to step two, it was merely noting that historical laws supported the inherent limitations on the right it had already recognized: the Second Amendment does not merely *permit* regulation of some weapons, it "does not protect" weapons "not typically possessed by law-abiding citizens for lawful purposes" at all. *Heller*, 554 U.S. at 625.

Because defining the word "Arms" within its historical context leads us to conclude that some weapons are excluded from Second Amendment protection entirely, and because, as discussed below, the weapons regulated by § 922(k) are so excluded, we need not perform the lengthy step-two analysis undertaken by the *Bruen* Court. Such analysis is necessary only if the Second Amendment "presumptively guarantees" the right to engage in the conduct regulated by a challenged law. *Bruen*, 597 U.S. at 33. Once conduct is

scope of the right began with 'constitutional text and history'" (first quoting *Heller*, 554 U.S. at 626, and then quoting *Bruen*, 597 U.S. at 22)); *accord id.* at 1912 (Kavanaugh, J., concurring) (explaining how history should be used to interpret "vague constitutional text").

## IV.

Having explained the inquiry required by *Bruen*'s first step, we now turn to applying it in the present case. Because it is outcome determinative here, we focus our analysis on *Bruen*'s second step-one inquiry: whether the weapons regulated by § 922(k) are in common use for a lawful purpose.[4]

---

presumptively protected, a law is constitutional only if it has a "relevantly similar" "historical analogue." *Rahimi*, 144 S. Ct. at 1901–02 (quoting *Bruen*, 597 U.S. at 29–30). But where, as here, a weapon falls outside the plain text of the Second Amendment, there is no such presumption of protection and we thus need not parse every arguably similar historical regulation.

[4] In focusing on this inquiry, we do not mean to imply that Price's possession of a firearm with an obliterated serial number would otherwise fall within the scope of the right protected by the Second Amendment. We recognize that, as a convicted felon, Price is likely not one of the "law-abiding" citizens the *Bruen* Court easily concluded were among "'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31–32. But we are also cognizant that there remain open questions at both the first and second steps of the *Bruen* analysis: whether a person with a felony conviction (or a particular kind of felony conviction, like a conviction for a violent crime) may be included within "the people" for purposes of the Second Amendment; and if so, whether they can nevertheless be disarmed consistent with the nation's historical tradition of firearm regulation. The answers to these questions post-*Bruen* are the subject of disagreement among the circuits and will require further analysis post-*Rahimi*. *Compare Range v. Att'y Gen.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc) (concluding that an individual with a nonviolent felony conviction remained within "the people" and could not be disarmed consistent with the historical tradition of firearm regulation), *vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024), *and United States v. Duarte*, 101 F.4th 657, 691 (9th Cir.) (same), *reh'g en banc granted*, _ F. 4th _, 2024 WL 3443151 (9th Cir. July 17, 2024), *with Vincent*

*v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023) (concluding that *Bruen* did not abrogate the Tenth Circuit's precedent that the felon-in-possession ban was presumptively lawful and rejecting the need for individual, as-applied inquiries for nonviolent felons), *vacated*, No. 23-683, 2024 WL 3259668 (U.S. July 2, 2024), *and United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) (concluding that historical disarmament of dangerous people supported the felon-in-possession ban and rejecting the need for "an individualized determination of dangerousness as to each person in a class of prohibited persons"), *vacated*, No. 23-6170, 2024 WL 3259675 (U.S. July 2, 2024).

And while this Court recently determined that the federal felon-in-possession ban, 18 U.S.C. § 922(g)(1), is *facially* constitutional because it has a "plainly legitimate sweep," *United States v. Canada*, 103 F.4th 257, 258 (4th Cir. 2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)), we declined to opine on the open questions regarding as-applied challenges and nonviolent felons. Because the answers to these questions do not affect the outcome here, we similarly leave them for another day.

Our second concurring colleague, however, faults us for failing to decide that Price falls within § 922(g)(1)'s plainly legitimate sweep and, having so concluded, for failing to base our holding on the notion that "if [Price] can be constitutionally prohibited from possessing *any* firearm without running afoul of the Second Amendment, then he can surely be constitutionally prohibited from possessing a discrete subset of firearms—namely, firearms with obliterated serial numbers—without running afoul of it too." Second Concurring Op. at 37. Our colleague frames this as the simpler path, but we disagree. Were we to take the path our colleague urges, we would be deciding only the question of whether a law banning *felons* from possessing firearms with obliterated serial numbers is constitutional. For the reasons stated in *Canada*, such a law targeting felons would have a "plainly legitimate sweep." But that is not the law Congress enacted via § 922(k). Instead, § 922(k) bans all individuals from possessing firearms with obliterated serial numbers. And—understanding that § 922(k) is not limited to felons—both the parties and the district court have addressed whether § 922(k) is facially constitutional. Thus, our second concurring colleague would have us ignore the question that is squarely presented in this case and instead cast about for an alternate theory that would leave the district courts with no more guidance than *Canada* already provides.

Our colleague's suggested path is problematic for another reason. Price was *also* charged with a violation of § 922(g)(1). Were we to conclude that only the version of § 922(k) as rewritten by our colleague is constitutional, we would be imposing double criminal liability on Price for a single reason—as a person with felony status, he possessed a single firearm. In other words, § 922(g)(1) would essentially become a lesser-included offense of § 922(k), raising *Blockburger* questions. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("[W]here the same act or transaction constitutes a violation of two

We know from Supreme Court precedent that short-barreled shotguns and machineguns are not in common use for a lawful purpose but handguns—"the quintessential self-defense weapon"—are. *Heller*, 554 U.S. at 629; *see id.* at 625 (discussing *Miller*, 307 U.S. at 179). Still, the Supreme Court has not elucidated a precise test for determining whether a regulated arm is in common use for a lawful purpose. And we are the first circuit court to resolve the constitutionality of § 922(k) after *Bruen*.[5]

---

distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."). The path we take to uphold § 922(k) avoids these uncharted, and unbriefed, waters.

[5] In unpublished opinions, the Sixth and Eleventh Circuits have considered challenges to defendants' convictions for violating § 922(k) but, reviewing only for plain error, have concluded the statute was not "clearly unconstitutional under current law." *United States v. Ramadan*, No. 22-1243, 2023 WL 6634293, at *3 (6th Cir. Oct. 12, 2023); *see United States v. Lopez*, No. 22-13036, 2024 WL 2032792 (11th Cir. May 7, 2024) (same). Numerous district courts have also considered this question post-*Bruen*. All but the district court below have concluded that § 922(k) is constitutional. *See United States v. Reyna*, No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) (finding that the conduct regulated by § 922(k) is not within the scope of the Second Amendment because firearms with obliterated serial numbers are not in common use for a lawful purpose); *United States v. Avila*, 672 F. Supp. 3d 1137(D. Colo. 2023) (same); *United States v. Holton*, 639 F. Supp. 3d 704 (N.D. Tex. 2022) (finding that the conduct regulated by § 922(k) is not within the scope of the Second Amendment and that, even if it was, the statute is consistent with the Nation's historical tradition of firearm regulation); *United States v. Tita*, No. RDB-21-0334, 2022 WL 17850250 (D. Md. Dec. 22, 2022) (same); *United States v. Serrano*, 651 F. Supp. 3d 1192 (S.D. Cal. 2023) (same); *United States v. Bradley*, No. 2:22-cr-00098, 2023 WL 2621352 (S.D. W. Va. Mar. 23, 2023) (same); *United States v. Walter*, No. 3:20-cr-0039, 2023 WL 3020321 (D.V.I. Apr. 20, 2023) (same); *United States v. Trujillo*, 670 F. Supp. 3d 1235 (D.N.M. 2023) (same); *United States v. Patton*, No. 4:21CR3084, 2023 WL 6230413 (D. Neb. Sept. 26, 2023) (same); *United States v. Dangleben*, No. 3:23-MJ-0044, 2023 WL 6441977 (D.V.I. Oct. 3, 2023) (same); *United States v. Dixson*, No. S2-4:21CR0054 AGF (JSD), 2023 WL 7102115 (E.D. Mo. Oct. 26, 2023) (same); *United States v. Sing-Ledezma*, _ F. Supp. 3d _, 2023 WL 8587869 (W.D. Tex. Dec. 11, 2023) (same); *United States v. Alberts*, No. CR

In 2010—before *Bruen*—the Third Circuit analyzed how *Miller* and *Heller* applied to firearms with obliterated serial numbers.[6] *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *abrogated by Bruen*, 597 U.S. 1, *as recognized in Range v. Att'y Gen.*, 69 F.4th 96, 100 (3d Cir. 2023) (en banc), *vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024). In relevant part, the Third Circuit analyzed whether a firearm with an obliterated serial number is a dangerous and unusual weapon by comparing it to the short-barreled shotgun at issue in *Miller*. The court observed that "[t]he District Court could not identify, and [the defendant] does not assert, any lawful purpose served by obliterating a serial number on a firearm." *Id.* at 95. It further noted that there was "no compelling reason why a law-abiding citizen would prefer an unmarked firearm" because

---

23-131-BLG-SPW, 2024 WL 1486145 (D. Mont. Apr. 5, 2024) (same); *United States v. Ortiz*, No. 3:22-cr-0020, 2024 WL 1554868 (D.V.I. Apr. 10, 2024) (same); *United States v. Brabham*, No. 1:21-CR-342, 2024 WL 3165467 (M.D. Pa. June 24, 2024); *United States v. Banks*, No. CR 24-25, 2024 WL 3251725 (E.D. Pa. June 21, 2024) (finding that it is likely that the conduct regulated by § 922(k) is not within the scope of the plain text of the Second Amendment but that even if it was, it was consistent with the Nation's historical tradition of firearm regulation); *United States v. Sharkey*, 693 F. Supp. 3d 1004 (S.D. Iowa 2023) (finding that § 922(k) is consistent with the Nation's historical tradition of firearm regulation without analyzing whether it regulates conduct covered by the Second Amendment's text); *United States v. Barnes*, No. CR 23-12, 2024 WL 3328593 (D. Del. July 8, 2024) (same); *United States v. Cherry*, No. 19-122-1, 2024 WL 263926 (E.D. Pa. Jan. 24, 2024) (considering § 922(k)'s constitutionality in the context of a 28 U.S.C. § 2255 motion and concluding § 922(k) is consistent with the Nation's historical tradition of firearms regulation).

[6] Section 922(k) also criminalizes possession of a firearm with a "removed" or "altered" serial number, but we focus here on firearms with obliterated serial numbers because that is how the indictment described the firearm found in Price's vehicle.

unmarked firearms have value "primarily for persons seeking to use them for illicit purposes." *Id.* We find these aspects of its opinion persuasive.

That said, the Third Circuit was not convinced that firearms with obliterated serial numbers were entirely analogous to the prototypical example of an unprotected weapon— the short-barreled shotgun—because, it reasoned, "[w]hile a short-barreled shotgun is dangerous and unusual in that its concealability fosters its use in illicit activity, *it is also dangerous and unusual because of its heightened capability to cause damage*." *Id.* (emphasis added). By contrast, while arms with obliterated serial numbers were dangerous because of their likelihood to be used illicitly, they were nonetheless "no more damaging than a marked firearm" when used. *Id.* For that reason, the Third Circuit court moved to the second step of the pre-*Bruen* analysis, assuming without deciding that § 922(k) placed some burden on an individual's Second Amendment right. *Id.*

Price would have us reach the same impasse as the Third Circuit: that while arms with obliterated serial numbers are preferable to criminals because of their concealability, they are functionally no different from serialized arms. And Price argues that, to the extent any bearable arms are excepted from the Second Amendment's protection, such exception applies only to weapons that are exceptionally dangerous because of their function. So, in his view, any arguable exception to the Second Amendment is based solely on dangerousness of function and thus does not apply to the arms regulated by § 922(k).

We reject Price's view of the scope of the Second Amendment. To the extent the court in *Marzzarella* was unable to conclude that firearms with obliterated serial numbers were categorically unprotected, that was because it misread *Heller* as directing courts to

look only to a weapon's dangerousness, rather than also to whether it is commonly used for a lawful purpose.

We focus our analysis as to whether a weapon is protected on whether it is in common use for a lawful purpose, not solely on its functionality.[7] Under this test, if we conclude that a weapon is not in common use for a lawful purpose, it can be permissibly excluded from the Second Amendment's protection based on the *tradition* of regulating "dangerous and unusual" arms. *Heller*, 554 U.S. at 627; *cf. United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (applying *Heller* and concluding that "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for

---

[7] Our second colleague in dissent disagrees, arguing that functionality is the only relevant metric and that "whether a gun has or lacks a serial number does not change how the gun operates as a weapon so that it is more effective for one purpose or another." Second Dissenting Op. at 72–73. While we agree that whether a firearm bears a serial number does not change its rate of fire, for example, we cannot agree that firearms with obliterated serial numbers are no more effective "for one purpose or another." As the second dissent admits, firearms without serial numbers are more effective if one's purpose is to not have the government track their firearm. *Id.* at 78. Thus, because a weapon's nonfunctional characteristics can nevertheless impact the purposes for which it is used, such characteristics are relevant to our analysis.

For a similar reason, we disagree with our first colleague in dissent who, like us, locates the common-use inquiry at *Bruen*'s step one. *See* First Dissenting Op. at 56. Contrary to our colleague's characterization, it is not our view that "any change to a firearm," *id.* at 57, would exclude it from the scope of "Arms" to which the Second Amendment applies. Only changes that produce a weapon that is no longer in common use for a lawful purpose are relevant. For example, if a red or green firearm is no more likely to be used in crimes than a black or grey one, such a weapon would still qualify as a constitutionally protected Arm. But here, where the modification to the firearm makes it more useful in crime, such modification is relevant to our analysis.

individual use"). In other words, while historical tradition regarding the regulation of dangerous weapons *supports* a limitation on the scope of the Second Amendment right, a weapon must be in common use for a lawful purpose to be protected by that right.

Thus, the Supreme Court has directed us to determine whether a weapon's common purpose is a lawful one—such as self-defense—or one that would be unlawful for ordinary citizens to engage in—such as concealing the commission of crimes, as with short-barreled shotguns, or waging war, as with machineguns. This is an inquiry that courts are equipped to apply consistently. For example, if available, courts can look to statistics regarding weapons commonly used in crimes versus weapons commonly chosen by law-abiding citizens for self-defense. And courts can also, as the Supreme Court did in *Heller*, apply common sense and consider whether there are any reasons a law-abiding citizen would want to use a particular weapon for a lawful purpose. *See Heller*, 554 U.S. at 629 ("There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police."). If no common-sense reasons exist for a law-abiding citizen to prefer a particular type of weapon for a lawful purpose like self-defense, and no evidence suggests that law-abiding citizens nonetheless commonly choose the weapon for lawful uses, then courts can conclude that the weapon is not in common use for lawful purposes.

Of course, a weapon's dangerousness is not unrelated to whether it is in common use for a lawful purpose. The powerful and unpredictable nature of a sawed-off shotgun

20

contributes to why it would be an unlikely choice for a law-abiding citizen to use for self-defense, and the lethality of a machinegun has led the Supreme Court to conclude that such weapons are best suited for war, not self-defense. As Judge Wilkinson's good opinion in *Bianchi v. Brown* makes clear, a weapon being extraordinarily dangerous is certainly a *relevant* factor when evaluating whether that weapon is protected by the Second Amendment. *Bianchi v. Brown*, No. 21-1255, slip op. at 21–22 (4th Cir. Aug. 6, 2024) (discussing the weapons the Supreme Court has determined fall beyond the Second Amendment's scope and noting that that "[w]hat brings [them] together, and what separates them from the handgun, is their ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection. As such, they are weapons most suitable for criminal or military use"). But we reject dangerousness of functionality as the sole *determinative* factor. Put another way, in our view, the Third Circuit in *Marzzarella* failed to reach a firm conclusion on whether firearms with obliterated serial numbers are categorically excluded from the Second Amendment's scope because of its mistaken belief that it needed to conclude *both* that a firearm with an obliterated serial number was not in common lawful use *and* that it was functionally more dangerous than other weapons. While the second conclusion is relevant, only the first conclusion is required.

The question before us is thus whether firearms with obliterated serial numbers are in common use for lawful purposes. On that point, we agree with the Third Circuit that there is "no compelling reason why a law-abiding citizen" would use a firearm with an obliterated serial number and that such weapons would be preferable only to those seeking

to use them for illicit activities. *Marzzarella*, 614 F.3d at 95. This is the same common-sense reasoning applied by the Supreme Court in *Heller*.

Further, there is no evidence before us that law-abiding citizens nonetheless choose these weapons for lawful purposes like self-defense.[8] In fact, the opposite appears to be true—firearms with obliterated serial numbers are not common at all. A 2023 report from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") noted that less than three percent of the firearms submitted by law enforcement agencies to the ATF for tracing between 2017 and 2021 had an obliterated serial number. Bureau of Alcohol, Tobacco, & Firearms, U.S. Dep't of Just., National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis Volume Two pt. 3, at 5 (2024), https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-

---

[8] We recognize that *Heller* can be read as suggesting that self-defense is not the only lawful purpose for which an individual might want to keep and bear a firearm. *Cf. Heller*, 554 U.S. at 599 (noting both "self-defense" and "hunting" as reasons Founding-era Americans likely valued the right to keep and bear arms). But *Bruen* emphasized that "individual self-defense 'is the *central component*' of the Second Amendment right." *Bruen*, 597 U.S. at 29 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)). Thus, it is not clear what weight we give a weapon's potential to be used for non-self-defense, but still lawful, purposes. *Cf. Bevis*, 85 F.4th at 1192 ("Both Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense. That is not to say that there are no other lawful uses for weapons—sporting uses, collection, and competitions come to mind as examples. But the constitutional protection exists to protect the individual right to self-defense, and so that will be our focus."). But because there is no evidence before us that firearms with obliterated serial numbers are useful for *any* lawful purpose, self-defense or otherwise, we decline to speculate whether a weapon not in common use for self-defense but in common use for other purposes might still be protected by the Second Amendment.

and-traced-us/download [https://perma.cc/7LTX-ZDVG].[9] Of course, this statistic relates only to those firearms seized by law enforcement agencies. But if firearms with obliterated serial numbers are not even in common use for criminal purposes—the only scenario in which we can conceive a reason to prefer such weapons[10]—then we think it fair to conclude that such arms are not in common use for lawful purposes. Thus, we conclude that § 922(k)'s regulation of such arms does not implicate the Second Amendment.

We find the hypothetical example offered by the district court to conclude otherwise to be unpersuasive. The district court evoked a hypothetical "law-abiding citizen" who legally purchases a firearm bearing a serial number and then removes the serial number with "no ill intent." *United States v. Price*, 635 F. Supp. 3d 455, 460 (S.D.W. Va. 2022). When this hypothetical law-abiding citizen dies, he leaves his gun collection to his similarly law-abiding daughter, who—aware that the firearm has an obliterated serial number[11]—displays it in her father's memory. *Id.* The district court concluded that both its

---

[9] "[W]e may take judicial notice of governmental reports." *United States v. Doe*, 962 F.3d 139, 147 n.6 (4th Cir. 2020) (citing *United States v. Cecil*, 836 F.2d 1431, 1452 (4th Cir. 1988)).

[10] The second dissent characterizes us as ignoring the "customs of the American people" in favor of the "speculations of federal judges." Second Dissenting Op. at 78. Had there been evidence presented in this litigation that it is customary for law-abiding individuals to prefer firearms with obliterated serial numbers, we would, of course, factor such evidence into our analysis. But neither the second dissent nor Price have been able to offer any such evidence.

[11] The district court's hypothetical requires that the citizen's daughter knew the firearm she inherited had an obliterated serial number, as an individual must know of the alteration to be convicted of a violation of § 922(k). *See United States v. Haywood*, 363 F.3d 200, 206 (3d Cir. 2004) (collecting cases); *United States v. Santiago*, 344 F. App'x

hypothetical law-abiding citizen and the citizen's daughter would be in violation of § 922(k) despite engaging in conduct "squarely within the Second Amendment's plain text." *Id.* So, the court reasoned, § 922(k) prohibits conduct protected by the Second Amendment, failing the first step of the *Bruen* analysis.

In so concluding, the district court noted that "while the law-abiding citizen's possession of the firearm was originally legal, it became illegal only because the serial number was removed," thus infringing on the citizen's right to possess a firearm. *Id.* But the illegal conduct is not the possession of the firearm qua firearm: it is the possession of a firearm *with an obliterated serial number*. Firearms that are originally lawfully purchased are not somehow imbued with constitutional coverage no matter what happens after they leave the dealer. Regardless of any originally lawful nature, a shotgun becomes contraband once its barrel is modified to be less than eighteen inches. The fact that such contraband was created using an originally lawful item is irrelevant.

Another hypothetical example further illustrates this point. Imagine a handgun—the admittedly quintessential self-defense weapon—has been modified such that the grip is made of illegally imported ivory. To accept Price's view of § 922(k)—that an otherwise

---

847, 851 (4th Cir. 2009) (per curiam) ("To establish a violation of § 922(k), the Government must prove, beyond a reasonable doubt, that [the defendant]: (1) knowingly possessed the firearm, and (2) had knowledge that the serial number of the possessed firearm had been removed, obliterated, or altered.").

constitutional[12] restriction on the obliteration of a serial number becomes unconstitutional when applied to a firearm—we would also have to accept that the Government's ability to regulate this illegally imported ivory was voided once that ivory was attached to a firearm. We do not believe *Bruen* compels such a startling result. Just like an obliterated serial number, a grip made of illegally imported ivory bears no relationship to the lawful use of the weapon, would be unquestionably unlawful in other contexts, and produces a weapon that is not in common use for a lawful purpose. The Government does not lose its ability to regulate ivory, or a serial number, merely because it is affixed to a firearm.

The district court's hypothetical is also flawed for another reason: it hinges on the notion that the law-abiding citizen removed the serial number *with no ill intent*. The district court apparently did not consider *what* legitimate motivation it imagines the law-abiding citizen had for removing the serial number, but even if we could dream up such a peculiar scenario, our conclusion would not change. *Heller* and *Bruen* direct us to analyze not only whether a weapon might have some conceivable lawful use, but also whether such use is *common*. *Cf. United States v. Reyna*, No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) ("That a law-abiding citizen *could* use a gun with an obliterated serial number for lawful self-defense isn't evidence that guns with obliterated serial numbers are *typically* used by law-abiding citizens for lawful self-defense." (emphasis added)). And here, because we cannot fathom any common-sense reason for a

---

[12] Price does not raise a First Amendment challenge to § 922(k) or otherwise contend that laws prohibiting the obliteration or alteration of serial numbers on objects other than firearms are unconstitutional.

law-abiding citizen to want to use a firearm with an obliterated serial number for self-defense, and there is no evidence before us that they are nonetheless commonly lawfully used, we conclude that firearms with obliterated serial numbers are not in common use for a lawful purpose and they therefore fall outside the scope of the Second Amendment's protection.

V.

The Supreme Court has made clear that while the Second Amendment protects an individual right to keep and bear arms, certain arms fall outside the scope of that protection. To determine whether a regulated arm is protected by the Second Amendment, we must first ask whether it is in common use for a lawful purpose. Because we conclude that firearms with obliterated serial numbers are not, we conclude they fall outside of the scope of the Second Amendment's protection. Thus, § 922(k)'s regulation of such arms does not violate the Second Amendment. We therefore reverse the decision of the district court and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

NIEMEYER, Circuit Judge, concurring in the judgment:

The defendant, who was charged with violating 18 U.S.C. § 922(k), challenges the constitutionality of that provision under the Second Amendment.

The focus of the provision — the element that distinguishes it from other § 922 offenses — is the possession of a firearm that has had its "serial number removed, obliterated, or altered." Otherwise, as far as § 922(k) is concerned, a person can keep and bear a firearm. As the majority opinion explains, "the illegal conduct is not the possession of the firearm qua firearm: it is the possession of a firearm *with an obliterated serial number*." *Ante* at 24. I thus question whether the provision even implicates the Second Amendment. It does not prohibit generally the possession or carrying of firearms for self-defense. Rather, it effectively aims at preventing the removal and obliteration of serial numbers on firearms, the presence of which furthers important law enforcement interests. And as the majority opinion rightly observes, no "lawful purpose [can be] served by obliterating a serial number on a firearm." *Ante* at 17 (quoting *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010), *abrogated on other grounds by New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *see also ante* at 21. Such a statute is hardly different from a hypothetical one that might prohibit possessing a firearm without having in the home a means to store it safely, which too would not prohibit the possession or carrying of a firearm. As such, it is far from clear that the prohibited conduct even implicates the right to keep and bear arms.

27

Nonetheless, even subjecting § 922(k) to the analysis required by *Bruen* leads inevitably to the conclusion that the statute does not violate the Second Amendment. As the majority holds,

> [B]ecause we cannot fathom any common-sense reason for a law-abiding citizen to want to use a firearm with an obliterated serial number for self-defense, and there is no evidence before us that they are nonetheless commonly lawfully used, we conclude that firearms with obliterated serial numbers are not in common use for a lawful purpose and they therefore fall outside the scope of the Second Amendment's protection. . . . Thus, § 922(k)'s regulation of such arms does not violate the Second Amendment.

*Ante* at 25–26. I agree with this holding. In reaching it, however, the majority employs an analysis that unnecessarily moves the historical component of the *Bruen* test into its first step, contrary to what *Bruen* instructs.

In *Bruen*, the Court held that a New York law governing the process to obtain a license to carry a handgun in public was unconstitutional because the law conditioned the license's issuance on the applicant's demonstrating that he or she had some "special need" that justified carrying a handgun beyond a general interest in self-defense. 597 U.S. at 11–13, 38. Without demonstrating that special need, a citizen in New York could not carry a handgun in public for self-defense. In holding New York's law unconstitutional, the *Bruen* Court began by articulating the applicable test for analyzing a government regulation under the Second Amendment. It stated:

> When the Second Amendment's *plain text* covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's *historical tradition* of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

28

*Id.* at 24 (emphasis added) (cleaned up). The Court thus adopted a two-step text-and-history test for determining whether a regulation violates the Second Amendment.

Explaining the test, the *Bruen* Court noted that at the first step, a court must focus on the *conduct* of the person mounting a Second Amendment challenge and determine whether it is covered *by the text* of the Amendment — "the right of the people to keep and bear Arms." 597 U.S. at 32 (quoting U.S. Const. amend. II). As to the plain meaning of that text, the Court stated that the right to "bear" arms describes "the right to wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready . . . in . . . case of conflict with another person." *Id.* (cleaned up). And it stated that "arms" refers to "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 28 (cleaned up). The *conduct* of possessing or carrying a bearable firearm therefore is presumptively protected by the Second Amendment. That is only the first part of the analysis, however, because, as the Court stressed, the scope of the right protected by the Amendment is "not unlimited." *Id.* at 21 (cleaned up). Thus, when the individual's proposed course of conduct is protected by the Amendment's plain text, the burden shifts to the government to justify *its regulation of that conduct* by showing the regulation's consistency *with historical tradition*. It is this "historical tradition that delimits the outer bounds of the right." *Id.* at 19.

After the Court established and explained the two-step analysis for application of the Second Amendment, it then turned to the New York law and, focusing on *the conduct* regulated, it readily concluded that the "textual" step of the test was satisfied, stating, "The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash

a right to 'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. But that was just the first step in determining the scope of the "right" protected. The second step required New York to demonstrate that there was a historical tradition that justified its requiring a license applicant to demonstrate a special need to carry a handgun beyond the needs of ordinary self-defense. On that step, the Court concluded that New York had shown no "historical tradition limiting public carry only to those . . . who demonstrate a special need." *Id.* at 38. Accordingly, the Court held, *after completing the second step*, that the New York licensing law was unconstitutional.

Were this not clear enough, the Supreme Court again in *United States v. Rahimi*, 602 U.S. __ (2024), reiterated its text-history two-step analysis, distinguishing between *conduct*, which the text addresses, and the *regulation*, which history must justify and on which the government has the burden. Explaining *Bruen*, the *Rahimi* Court stated, "We also clarified that when the Government regulates arms-bearing *conduct*, . . . it bears the burden to 'justify its *regulation*.'" Slip Op. at 6–7 (emphasis added) (quoting *Bruen*, 597 U.S. at 24). And, as *Rahimi* repeated, the way the government carries this burden is by showing that the "challenged regulation fits within" "our 'historical tradition of firearm regulation.'" *Id*. at 6 (quoting *Bruen*, 597 U.S. at 17).

The majority nonetheless loads its historical analysis — from which it determines that because firearms with obliterated serial numbers are "not in common use for a lawful purpose," they fall outside the scope of the Second Amendment right — into step one of *Bruen*, contrary to *Bruen*'s test, as reaffirmed in *Rahimi*. In rationalizing its position, the majority states that at step one, three questions must be answered, one of which is "whether

30

the weapons regulated by the challenged regulation were 'in common use' for a lawful purpose." *Ante* at 12. It then reasons that "[a] plain reading of *Heller* and *Bruen* leads us to the . . . conclusion [that] we can *only* properly apply step one of the *Bruen* framework by looking to the *historical scope* of the Second Amendment right." *Ante* at 12–13 (latter emphasis added). Finally, the majority points to the historical tradition, already recognized by the Supreme Court, of governments' restricting weapons that are not "in common use for a lawful purpose." As it states, the "*historical tradition* regarding the regulation of dangerous weapons *supports* a limitation on the scope of the Second Amendment right," namely that "a weapon must be in common use for a lawful purpose to be protected by that right," a conclusion the majority reaches at step one. *Ante* at 19 (first emphasis added).

In short, while the majority recognizes that historical tradition is the means by which to assess whether § 922(k) is constitutional, it treats that historical analysis as a component of the first step, despite *Bruen* and *Rahimi*'s clear statements that historical analysis falls in step two. In particular, after reviewing the historical tradition of government regulation of firearms and other weapons at some length, the *Bruen* Court concluded, "*Drawing from this historical tradition*, we explained [*in Heller*] that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 47 (emphasis added) (cleaned up). This is the same conclusion reached by the majority, but unlike the Supreme Court's approach, the majority applied it as part of step one. In short, defining the limits on the right protected by the Second Amendment by looking to the historical tradition is the entire function of step two of the *Bruen* test, a step committed to the government to satisfy.

31

Respectfully, I conclude that the majority's shift of the historical tradition to step one is simply wrong.

Nonetheless, I believe that the majority reaches the right conclusion — that a "firearm with a removed, obliterated, or altered serial number is not a weapon in common use for lawful purposes" and thus falls outside "the scope of the right enshrined in the Second Amendment." *Ante* at 4. As *Bruen* pointed out, *Heller* made clear that the Second Amendment protects "only the carrying of weapons that are those 'in common use at the time' as opposed to those that 'are highly unusual in society at large.'" 597 U.S. at 47 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). Based on the publicly available statistics, combined with common sense, the majority was right to conclude that firearms that have had their serial numbers obliterated are rare because the reason people tamper with firearm serial numbers is to make it harder for law enforcement officers to trace their use in criminal activity. Thus, I agree that the weapons regulated by § 922(k) are "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

Accordingly, I concur in the judgment.

AGEE, Circuit Judge, concurring in the judgment:

I agree with the majority in that it reverses the district court's order dismissing Price's § 922(k) charge. However, I reach that result by a different path. In my view, Price's facial challenge to § 922(k) can be, and should be, resolved on a far simpler basis: because Price is a convicted violent felon who may not possess *any* firearm, § 922(k) is not unconstitutional as applied to him. As that fact alone dooms Price's facial challenge, I concur only in the judgment.

To mount a successful facial challenge to a law passed by Congress and signed by the president, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). That is to say, the challenger must demonstrate that the law "is unconstitutional in *all* its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (emphasis added). As the Supreme Court has observed, this is a difficult standard to meet. *See Salerno*, 481 U.S. at 745; *see also United States v. Rahimi*, 602 U.S. --- (2024), slip op. at 8 (applying this standard to a Second Amendment facial challenge to § 922(g)(8)). And Price has not met it here because he cannot demonstrate that § 922(k) is unconstitutional *as applied to him*. *See, e.g.*, *Ulster Cnty. v. Allen*, 442 U.S. 140, 154–55 (1979) ("As a general rule, if there is no constitutional defect in the application of the statute to a [party], he does not have standing to argue that it would be unconstitutional if applied to third parties[.]").

Price is a convicted felon, and a violent felon at that. He has convictions for involuntary manslaughter, aggravated robbery, attempted felonious assault, and domestic violence, among others. As a result of those convictions, § 922(g)(1) prohibits him from

possessing *any* firearm, whether the serial number has been obliterated or not. Thus, so long as that categorical ban is lawful—at least as applied to him—then Price's facial challenge to a narrower prohibition necessarily fails.

There can be no serious dispute that § 922(g)(1)'s categorical prohibition on firearm possession is constitutional as applied to Price. That fact forecloses his defense of Second Amendment protection to being prosecuted under § 922(k).

At the outset, the Supreme Court has emphasized that the Second Amendment protects "the right of *law-abiding, responsible citizens*" to keep and bear arms for self-defense. *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 26 (2022) (emphasis added) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). It has also been careful not to "cast doubt" on the legality of "longstanding prohibitions on the possession of firearms by felons," which the Court expressly identified as "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626, 627 n.26; *accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion); *Bruen*, 597 U.S. at 72 (Alito, J., concurring); *id.* at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring). In fact, the Court just reaffirmed this point in *United States v. Rahimi*, 602 U.S. ---, (2024), providing that "*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home." *Id. (*slip op. at 15). And that *Heller* actually "stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are' presumptively lawful.'" *Id.*

To be sure, following *Bruen* and its clarified two-part test focusing on the Second Amendment's text and historical tradition, some of our sister circuits have held that

34

§ 922(g)(1)'s categorical ban is unconstitutional as applied to certain *nonviolent* felons. *E.g.*, *United States v. Duarte*, 101 F.4th 657, 676–77 (9th Cir. 2024) (holding that the government failed to "prove that it is consistent with this Nation's historical tradition of firearm regulation for Congress to ban permanently, by making it a felony, a *non-violent* offender like Duarte from possessing a firearm even after he has already served his terms of incarceration" (emphasis added) (cleaned up)), *vacated and reh'g granted by* --- F.4th ---, 2024 WL 3443151, at *1 (9th Cir. July 17, 2024); *Range v. Att'y Gen.*, 69 F.4th 96, 98, 103–06 (3d Cir. 2023) (en banc) (holding the same with respect to a defendant who had been previously convicted only of "making a false statement to obtain food stamps"); *cf. Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons."). *But see Vincent v. Garland*, 80 F.4th 1197, 1199–1202 (10th Cir. 2023) (rejecting a nonviolent felon's as-applied challenge to § 922(g)(1) post-*Bruen*); *United States v. Jackson*, 69 F.4th 495, 505–06 (8th Cir. 2023) (same).

But no federal court has accepted the extraordinary claim that § 922(g)(1) is *facially* unconstitutional—that is, unconstitutional in *all* its applications.[1]

And for good reason. As multiple jurists and historians have chronicled, there is a robust historical tradition in this country of prohibiting certain individuals deemed to be

---

[1] Our own Court just recently rejected such a claim. *United States v. Canada*, 103 F.4th 257, 258 (4th Cir. 2024) ("Section 922(g)(1) is facially constitutional because it has a plainly legitimate sweep and may constitutionally be applied in at least some set of circumstances." (cleaned up)).

dangerous from possessing a firearm. *See, e.g.*, *United States v. Perez-Garcia*, 96 F.4th 1166, 1189 (9th Cir. 2024) ("[T]he Anglo-American right to keep and bear arms for self-defense has always coexisted with legislative authority to disarm groups or individuals whose possession of firearms would pose an *unusual danger*, beyond the ordinary citizen, to themselves or others." (emphasis added)); *Duarte*, 2024 WL 2068016, at *15–18, *20 (discussing various founding-era laws disarming certain groups of people, such as British loyalists, based on a perceived threat of violence or rebellion); *Kanter*, 919 F.3d at 454, 458 (Barrett, J., dissenting) ("The historical evidence . . . [shows] that the legislature may disarm those who have demonstrated a *proclivity for violence* or whose possession of guns would otherwise *threaten the public safety*. . . . [F]ounding-era legislatures categorically disarmed groups whom they judged to be a *threat to the public safety*." (emphases added)); Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 Wyo. L. Rev. 249, 265 (2020) ("Like the English, and out of similar concerns of violent insurrections, the colonists disarmed those who might rebel against them. . . . [T]he justification was always that those being disarmed were *dangerous*." (emphasis added)).

The upshot of all this is that even if § 922(g)(1) is unconstitutional as applied to certain, nonviolent felons—and that issue is far from settled—it assuredly is not unconstitutional as applied to Price, an indisputably recidivist violent felon.

That being so, Price cannot succeed in bringing a facial challenge to § 922(k).[2] For if he can be constitutionally prohibited from possessing *any* firearm without running afoul of the Second Amendment, then he can surely be prohibited from possessing a discrete subset of firearms—namely, firearms with obliterated serial numbers—without running afoul of it too.

For this reason, I would not reach the weighty and difficult issues the majority reaches—and decides—today. It is not necessary to do so to resolve this case. And as the Chief Justice has exhorted, "If it is not necessary to decide more to dispose of a case, then it is necessary *not* to decide more." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 348 (2022) (Roberts, C.J., concurring). In deciding more than is necessary to resolve the challenge made here, the majority offers an advisory opinion. And that course runs head-long into Article III's limits on the federal courts' powers, *United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947), as well as the "fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (cleaned up). I would instead reverse the district court's dismissal of the § 922(k) count on the clear ground that Price

---

[2] Price could certainly challenge as a factual matter whether he possessed a firearm, or if he did, whether the serial number of the gun in question was obliterated. These are elements of the § 922(k) crime that the government was required to prove. But Price has not contested either requirement as a factual matter.

has failed to carry his heavy burden of demonstrating that the statute "is unconstitutional in all its applications." *Bucklew*, 587 U.S. at 138.[3] Respectfully, therefore, I concur only in the judgment.

---

[3] The majority wrongly concludes this approach is "problematic" because of Double Jeopardy concerns. *Ante* at 15. That is simply incorrect. The approach taken here does not rewrite or otherwise change the elements needed for a conviction under either statute. Under both the majority's reading and my own, § 922(g)(1) prohibits an individual from being a felon in possession of a firearm, while § 922(k) prohibits an individual from being in possession of a firearm with an obliterated serial number. Because both offenses require proof of an element that the other does not, no violation of the Double Jeopardy Clause has occurred when a defendant is convicted of both offenses. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932).

To illustrate, being a felon in possession of a firearm is *not* an element of a § 922(k) offense. All proof of felon status establishes is that the felon defendant's Second Amendment facial challenge fails as a defense to his prosecution under § 922(k). And, obviously, the Government must prove beyond a reasonable doubt as an element of the § 922(k) charge that the firearm's serial number is obliterated. That clearly is not an element of a § 922(g)(1) charge.

All that this concurrence does is follow the separate principle of standing to bring a facial challenge—observing that a criminal defendant cannot challenge the constitutionality of a statute if the statute has had no "adverse impact on his own rights," based on arguments that the statute may infringe on the constitutional rights of "third parties in hypothetical situations." *Ulster Cnty.*, 442 U.S. at 154–55. And on that point, the Supreme Court has issued clear guidance: if the alleged constitutional defect does not arise with respect to Price, then he lacks standing to bring a facial challenge on behalf of other potential criminal defendants.

QUATTLEBAUM, Circuit Judge, with whom Judge RUSHING joins, concurring in judgment:

When it comes to determining whether regulations violate the Second Amendment, *New York Rifle & Pistol Association v. Bruen* presents both a test and a puzzle. 597 U.S. 1 (2022). The test allocates burdens across two steps. If the Second Amendment's "plain text" covers the individual's conduct, the amendment "presumptively protects that conduct." *Id.* at 24. And if so, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. The puzzle is ascertaining where the amendment's limits— acknowledged in *Bruen* and before—fit into *Bruen*'s two steps.

The limit central to this appeal is common use. The sorts of weapons that the Second Amendment protects are those "in common use at the time." *Id.* at 21 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). That is, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. But, while this limit to the Second Amendment is clear, the puzzle we face is whether to consider it at *Bruen*'s first or second step.

This methodological point matters. *Bruen* seems to burden different parties on each of its two steps. *Bruen* does not specify who bears the burden on the plain text step but confirms that if the plain text does cover the conduct of the person challenging the law, the government "must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. This sequencing

suggests the burden shifts, from the challenger on the first step to the government on the second. In some cases, the burden makes all the difference.

In this case, the majority analyzes common use at *Bruen*'s plain text step, while Judge Richardson in dissent and Judge Niemeyer in concurrence reason that common use falls under *Bruen*'s historical tradition step. Our sister circuits have also splintered on the issue.[1] In my view, common use comes into play on step two. Even so, I would reverse the district court's decision holding 18 U.S.C. § 922(k) unconstitutional because I believe the government has satisfied its burden of establishing that weapons with obliterated serial numbers are not "'in common use' today for self-defense" or other lawful purposes. *Id.* at 32 (quoting *Heller*, 554 U.S. at 627).

## I.

Before articulating or applying rules on common use, we must first solve *Bruen*'s puzzle. Does common use fit into *Bruen*'s first step as a matter of plain text or into *Bruen*'s

---

[1] *Compare Antonyuk v. Chiumento*, 89 F.4th 271, 312 (2d Cir. 2023) (step one), *vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024); *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) (step one), *rev'd*, 144 S. Ct. 1889 (2024), *and United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (step one), *with Teter v. Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023) (step two), *reh'g en banc granted*, *vacated*, 93 F.4th 1150 (9th Cir. 2024) (mem.). *See also Bevis v. City of Naperville*, 85 F.4th 1175, 1198 (7th Cir. 2023) ("There is no consensus on whether the common-use issue belongs at *Bruen* step one or *Bruen* step two.").

second step as a matter of historical tradition? To answer this question, we must understand what "plain text" encompasses.

On one theory, "plain text" implies a limited inquiry on *Bruen*'s first step into definitional sources, saving historical sources for an ultimate determination on the second step. *Id.* at 24. Since common use limits the types of weapons protected, the critical word is "Arms." So, this reading would direct us to ascertain the semantic meaning of "Arms" on *Bruen*'s first step by referring to founding-era dictionaries defining "Arms." And if this reading is correct, our work at step one is easy. *Heller* already explained that eighteenth-century dictionaries defined "Arms" as "weapons of offence, or armour of defence" or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581. Nothing in those definitions limits "Arms" to those in common use for lawful purposes. Thus, *Bruen*'s first step leaves no room for common use if plain text is defined only by dictionaries and other lexical sources that inform semantic meaning.

But *Bruen* is not so simple. *Bruen* alternatively could be read to suggest plain text is based on more than lexical sources. For starters, *Bruen* relied heavily on *Heller*, and *Heller* demonstrated that history informs the entire Second Amendment analysis, including the textual analysis. As *Bruen* recognized, history permeated every part of *Heller*, "[w]hether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation." *Bruen*, 597 U.S. at 22. When *Heller* addressed the scope of the Second Amendment, *Heller* did not rely only on lexicon. Instead, it privileged historical

41

sources of all sorts. To be sure, the Court's interpretation of the word "Arms" leaned most heavily on eighteenth-century dictionaries. *See Heller*, 554 U.S. at 581. But when interpreting "keep and bear," the Court referred not only to those dictionaries but also to other founding-era sources, like treatises and state constitutions. *Id.* at 582–84. After stringing together these "textual elements," *Heller* declared that they codified a preexisting individual right to possess and carry weapons in case of confrontation, and the Court used history dating back to late seventeenth-century England to confirm its reading of the words. *Id.* at 592–95. The Court also surveyed "analogous arms-bearing rights in state constitutions" and history from the drafting of the amendment through the end of the nineteenth century. *Id.* at 600–19. In short, *Heller*'s reliance on varied historical sources and *Bruen*'s reliance on *Heller* suggest that *Bruen* did not contemplate limiting its textual step to lexical sources.

Rather, history has some role to play on both of *Bruen*'s steps. On the first step, history "elucidates how contemporaries understood the text—for example, the meaning of the phrase 'bear Arms.'" *United States v. Rahimi*, 144 S. Ct. 1889, 1925 (2024) (Barrett, J., concurring) (quoting *Heller*, 554 U.S. at 582–92). On the second step, history "also plays the more complicated role of determining the scope of the pre-existing right that the people enshrined in our fundamental law." *Id.* Justice Barrett has called this latter use of history "original contours" history, in that "[i]t looks at historical gun regulations to identify the contours of the right." *Id.* Like Justice Barrett, I believe that *Bruen*'s first step saves room for more than founding-era dictionaries, allowing courts to refer to historical sources to interpret the Second Amendment's text, just as the Supreme Court did in *Heller*.

42

As already discussed, lexicon would not limit "Arms" to weapons in common use, but going beyond lexical sources to interpret the Second Amendment's plain text opens the possibility of considering common use on *Bruen*'s first step.

Nevertheless, further digging unearths additional puzzle pieces that confirm common use falls under step two. In *Bruen*, the Supreme Court described common use as "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 21 (quoting *Heller*, 554 U.S. at 627). "Drawing from this historical tradition," the Court explained, "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 47 (quoting *Heller*, 554 U.S. at 627) (internal citations omitted); *see also id.* at 28 ("Much like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding."). As such, weapons in common use for lawful purposes and "dangerous and unusual weapons" are opposite sides of the same coin. Given that linkage, since the regulation of "dangerous and unusual weapons" is a step two question—and no one questions that—it follows that common use is too.

Also supporting this conclusion is *Heller*'s description of other historically grounded limitations of the Second Amendment. Just before discussing common use, *Heller* mentioned other historically grounded limiting principles. Without purporting to undertake "an exhaustive historical analysis . . . of the full scope of the Second Amendment," *Heller* listed several examples of "presumptively lawful regulatory

measures" including "longstanding prohibitions on the possession of firearms by felons and the mentally ill."[2] 554 U.S. at 626–27 & n.6. *Heller* characterized those longstanding regulations as "presumptively lawful," not conclusively lawful. *Id. Bruen*'s first step presumptively protects conduct covered by the Second Amendment's plain text. *See* 597 U.S. at 24. But, if the plain text does not cover conduct, the Second Amendment does not protect it, full stop. So, if felons and the mentally ill are not among "the people" as a matter of plain text, then "longstanding prohibitions on the possession of firearms by felons and the mentally ill" would be *conclusively* consistent with the Second Amendment. But *Heller* didn't say that. It said such limitations are only *presumptively* consistent with the Second Amendment. *Heller*, 554 U.S. at 626–27 & n.6. To generate a presumption of constitutionality, as opposed to a conclusion of constitutionality, historically justified limiting principles must be left to *Bruen*'s second step. And, since common use is also a historically justified limiting principle, it is also the stuff of step two.

To be fair, the conclusion that common use falls under *Bruen*'s second step must be squared with how *Bruen* applied the common-use principle to a New York licensing regime for the concealed carry of a handgun. *Bruen* discussed common use in the step one, plain text portion of the opinion. There, the Court stated that handguns are "weapons 'in common

---

[2] As another example, *Heller* also referred to "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626–27 & n.6. *Bruen* used such sensitive-place regulations to exemplify the analogical approach it envisioned for determining when a historical tradition is relevantly similar to a modern regulation. *Bruen*, 597 U.S. at 30–31. Thus, *Bruen* implies that sensitive-place regulations are justified by historical tradition at step two, not by plain text at step one.

use' today for self-defense." *Id.* at 32 (quoting *Heller*, 554 U.S. at 627). Why? Candidly, I have no compelling explanation. One possibility might be, as the plaintiffs suggested at oral argument, that the Court referred to this concept just to clear the deck of an undisputed point at the outset regardless of whether it belonged in step one or step two. Under that reading, the reference to common use occurred before the Court did any real step one work. And since common use was not an issue with which the Court was grappling in *Bruen*, we should not place undue weight on the location of that discussion. Another possibility might be that, although the plain definition of "Arms" encompasses more than weapons in common use, weapons in common use are necessarily "Arms." By this understanding, the Court may have referred to common use simply to note that, if there was no question as to this narrower concept, there certainly could be no dispute that the conduct at issue was covered by the Second Amendment's broader plain text.

Whatever reason common use appeared in *Bruen*'s step one discussion, *Bruen* also discussed common use in its step two analysis. There, *Bruen* invoked the common-use concept as it scoured a historical record spanning medieval England to the early twentieth century. It referred to common use to explain why historical laws prohibiting the carrying of weapons then considered dangerous and unusual could not justify current laws restricting the carrying of the same weapons today when they are no longer dangerous and unusual. *See id.* at 47. If *Bruen*'s discussion of common use at step one means that issue must be assessed there, why engage with the issue at step two?

In recent weeks, the Supreme Court has provided another piece to *Bruen*'s puzzle. In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Court applied the *Bruen* test to hold

that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 1903. The Court reasoned that such bans fit within our nation's historical tradition of "preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 1896–97. Without pausing to discuss the Second Amendment's plain text, the *Rahimi* majority used historical tradition to "delineate the contours of the right," *id.* at 1897, and in articulating *Bruen*'s test, it referred only to the second step, *see id.* at 1896 ("In *Bruen*, we explained that when a firearm regulation is challenged under the Second Amendment, the Government must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation." (quoting *Bruen*, 597 U.S. at 24)); *see also id.* at 1898 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."). Though they joined the majority, several Justices emphasized in separate writings that limits on the right to bear arms stem from historical tradition, not the amendment's broad text. *See id.* at 1912–13 (Kavanaugh, J., concurring) (endorsing the use of history "to determine exceptions to broadly worded constitutional rights"); *id.* at 1925 (Barrett, J., concurring) (asserting that the Court uses history to identify the "original contours" of the right to bear arms). Thus, although it did not take up the common use question, *Rahimi* signals, if not confirms, that many of the various principles that limit the Second Amendment's scope stem from historical tradition rather than the amendment's plain text.

In the end, perhaps not all the puzzle pieces are in place. But enough are. Common use—one of the limits on the Second Amendment that the Supreme Court has repeatedly recognized—flows from *Bruen*'s historical tradition second step.

## II.

Since common use is a step two question, the government bears the burden of showing that 18 U.S.C. § 922(k) is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. To do so, the government can and did invoke the historical tradition of regulating dangerous and unusual weapons, which the Supreme Court has repeatedly recognized "fairly support[s]" regulations of weapons not commonly used for lawful purposes. *Id.* at 21 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 625, 627. Since *Bruen* and *Heller* have already derived this limiting principle from historical tradition, the government does not need to replicate the Court's historical spadework. *See Rahimi*, at 1898 ("The law must comport with the *principles* underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" (emphasis added) (quoting *Bruen*, 597 U.S. at 30)). Rather, it need only demonstrate that the historical principle—here, common use—supports § 922(k). Section 922(k) prohibits the possession of firearms with removed, obliterated or altered serial numbers.[3] The critical question, then, is whether the government has carried its burden of establishing that those weapons are not commonly used for lawful purposes.

---

[3] Like the majority, I focus on firearms with obliterated serial numbers.

If common use hinges on hard data alone, the answer is likely no. The government offers no compelling statistics that show how frequently people use guns with obliterated serial numbers for lawful purposes like self-defense. Instead, the government relies on statistics indicating the low frequency with which such guns are used or suspected of being used in crimes and submitted for tracing to the Bureau of Alcohol, Tobacco and Firearms. If guns with obliterated serial numbers are rarely used for unlawful purposes, the government argues, they cannot be commonly used for lawful purposes. From an empirical standpoint, that seems like a stretch to me. I am hard-pressed to see how the data support any conclusions as to the use of such guns for lawful purposes. But, does common use turn on statistical proof?

To be sure, of the various limiting principles that the Court has distilled from historical tradition, common use could, in many cases, be proved or disproved with statistics on the frequency with which a weapon is used. And doing so grounds the decision in a more objective, predictable analytical framework.[4]

---

[4] But to the extent we rely on numbers, methodological questions complicate the task of calculating both a numerator and a denominator. For instance, when do we assess usage—when the challenged regulation is promulgated, when the challenge is made, when the court decides it? Where do we look—at the state from which the challenge originates, across the entire country? Do we focus on gunowners, the adult population, the entire population? And then, even after setting the appropriate parameters, how much usage does it take to make usage "common"? Other cases will require courts to answer these questions. But no matter the answers, for the reasons that follow, it is clear that firearms with obliterated serial numbers are not commonly used for lawful purposes. That conclusion is all it takes to resolve this appeal, and I would save these questions for another day.

48

But the Supreme Court has never said statistical proof is required. In fact, it has said little about how to assess common use. In describing its second step, *Bruen* says only that the government must demonstrate that the regulation is consistent with historical tradition. *See* 597 U.S. at 17 ("[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."); *id.* at 19 ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."); *id.* at 24 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.").

After restating its test, *Bruen* analogized the government's step two burden to its burden in defending laws against First Amendment challenges. To carry the burden of showing that "expressive conduct falls outside of the category of protected speech," "the government must generally point to historical evidence about the reach of the First Amendment's protections." *Id.* at 24–25 (citing *United States v. Stevens*, 559 U.S. 460, 468–71 (2010)). In *Stevens*, the Court reiterated several "historical and traditional categor[ies]" of speech "long familiar to the bar"—including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—that do not receive full First Amendment protection. 559 U.S. at 468–69. While doctrine has developed a set of elements for each of these traditional categories, it has not limited the government to data alone to carry its burden of establishing that one of these categories encompasses the expressive conduct at issue.

49

Returning to the Second Amendment, *Bruen* did not resort to statistical evidence to establish that handguns are "in 'common use' for self-defense today." Instead, it quoted *Heller*'s observation that handguns are "the quintessential self-defense weapon." *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 629). For its part, *Heller* did not support its statement of empirical fact with data either. Rather, *Heller* posited:

> There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

554 U.S. at 629. Elsewhere, *Heller* wrote that handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *Id.* at 628–29 (quoting *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)).[5] These comments seem at least partly rooted in what the Court deemed obvious rather than in data. Following the Supreme Court's lead, I see no reason courts cannot determine absent data whether guns with obliterated serial numbers are in common use for lawful purposes. To me, at least here, logic and common sense are appropriate to consider in assessing whether the government has met its burden.

---

[5] Unlike the Supreme Court, the D.C. Circuit cited a journal article with survey data to support its empirical assertion. *See Parker*, 478 F.3d at 400 (citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 182–83 (1995)). But *Heller* cited *Parker* not the underlying data. That indirect use of data does not suggest that *Heller* requires us to disregard logic and common sense, especially considering *Heller* directly deployed both.

Reliance on more malleable tools, I confess, leaves me a bit queasy. Straying from more concrete evidence might tempt judges to dress their preferred outcomes as flowing from logic or common sense. Both, like beauty, may naturally lie in the eye of the beholder. For two reasons, however, those concerns do not sway me here. One, as already discussed, *Heller* and *Bruen* show us that logic and common sense are appropriate to consider when determining common use. Two, statistics seem particularly inconclusive, and perhaps even unhelpful, in this particular case. To explain, it is unsurprising that the parties produced limited data. After all, can we expect folks voluntarily to disclose that they use outlawed guns? The answer seems to be no, making statistics—aside from those seized in criminal investigations—hard to harvest. So, in this case, I would look beyond statistics to evaluate common use.

Doing so, the government asserts that the predominant reason to possess a gun with an obliterated serial number, as opposed to one with an intact serial number, is to evade law enforcement. After all, as the parties agree, the presence or absence of a serial number has no effect on how a gun functions. "Because a firearm with a serial number is equally as effective as a firearm without one, there would appear to be no compelling reason why a law-abiding citizen would prefer an unmarked firearm. The weapons would then have value primarily for persons seeking to use them for illicit purposes." *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010) (affirming constitutionality § 922(k) during the interregnum of *Heller* and *Bruen*).

In response, Price posits that a person "might possess an unserialized firearm because they received it as a gift" or "for other "innocuous reasons." Resp. Br. at 9. The

dissent adds that a gun owner might wish to avoid Big Brother's watchful eye, even if not to conceal criminal activity. These are fair points, I suppose. But those possibilities do not overcome the government's more persuasive logic. Crediting that logic, the Third Circuit before *Bruen* and a burgeoning brigade of district courts after *Bruen* have all proven unable to "conceive of a lawful purpose for which a person would prefer an unmarked firearm." *Marzzarella*, 614 F.3d at 99; *see also United States v. Reyna*, No. 3:21-cr-41, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022); *United States v. Avila*, 672 F. Supp. 3d 1137, 1143–44 (D. Colo. 2023); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1211 (S.D. Cal. 2023); *United States v. Trujillo*, 670 F. Supp. 3d 1235, 1241 (D.N.M. 2023); *United States v. Walter*, No. 3:20-cr-39, 2023 WL 3020321, at *5 (D.V.I. Apr. 20, 2023); *United States v. Dangleben*, No. 3:23-mj-44, 2023 WL 6441977, at *7 (D.V.I. Oct. 3, 2023); *United States v. Dixson*, No. 4:21-cr-54, 2023 WL 7102115, at *3 (E.D. Mo. Oct. 26, 2023); *United States v. Sing-Ledezma*, --- F. Supp. 3d ---, 2023 WL 8587869, at *3–4 (W.D. Tex. Dec. 11, 2023); *United States v. Alberts*, No. CR 23-131, 2024 WL 1486145, at *4 (D. Mont. Apr. 5, 2024).

What's more, guns with obliterated serial numbers have long been regulated. Since 1938, federal law has made it unlawful for anyone "to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated or altered." Federal Firearms Act of 1938, Pub. L. No. 75-785, § 2(i), 52 Stat. 1250, 1251. Then, in 1968, Congress began to require serial numbers on all guns manufactured in or imported to the United States. Gun Control Act of 1968, Pub. L. No. 90-351, § 902, 82 Stat. 197, 232. Eventually, in 1990, Congress prohibited

*possession* of guns with removed, obliterated, or altered serial numbers. Crime Control Act of 1990, Pub. L. No. 101-647, § 2202(b), 104 Stat. 4789, 4856. Besides those federal laws, forty-one states have outlawed either obliterating serial numbers, possessing guns with an obliterated serial number or both. *See* Brief of the District of Columbia, the States of California, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, and Washington, and the Commonwealth of the Northern Mariana Islands as Amici Curiae in Support of Appellants, *United States v. Price* (No. 22-4609). Considering federal and state governments have long cracked down on the trafficking of guns with obliterated serial numbers, it is hard to imagine that such guns are even commonly available to law-abiding Americans, let alone commonly used for lawful purposes.

Wrapping up, I conclude that the government has "justif[ied] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. It has demonstrated that guns with obliterated serial numbers are not "'in common use' today for self-defense" or other lawful purposes. *Id*. at 24, 32 (quoting *Heller*, 554 U.S. at 627).

III.

For the reasons explained above, not those of the majority, I concur in the majority's conclusion that the district court's decision as to § 922(k) should be reversed and the case remanded.

GREGORY, Circuit Judge, dissenting:

Today, our Court holds that some weapons that are indisputably commonly owned for lawful purposes—handguns, rifles, and shotguns—are not covered under the Second Amendment. In coming to that conclusion, the majority: (1) labels firearms with removed, altered, or obliterated serial numbers as a type of weapon; (2) concludes that type of weapon is not in common use for a lawful purpose; and (3) excludes those weapons from Second Amendment protection based solely on the Amendment's plain text under step one of the framework set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). But nothing in the Second Amendment's text or in the Supreme Court's precedent supports the majority's approach to the analysis required at step one under *Bruen*.

Nevertheless, our Court has decided that 18 U.S.C. § 922(k) is constitutional because the majority cannot fathom why a person would own a firearm with an imperfect serial number for any non-criminal purpose. But "[a] constitutional guarantee subject to future judges' assessments of [what is fathomable] is no constitutional guarantee at all." *Bruen*, 597 U.S. at 22. For fathomability, like beauty, is often in the eye of the beholder. Regrettably, not only does today's decision depart from the analytical framework set forth in *Bruen*, it also could have a disparate impact that may not be apparent.

## I.

The flaws in the majority's analysis begin with its focus on the prohibition identified in § 922(k) as opposed to the Second Amendment right. According to the majority, this case can be resolved at step one of the *Bruen* analysis because the only question before us

54

is "whether firearms with obliterated serial numbers are in common use for lawful purposes." Majority Op. 21. In framing the question in that way, the majority implies that firearms with removed, altered, or obliterated serial numbers are themselves a "type of weapon" based solely on that characteristic. From there, the majority purports to determine the constitutionality of § 922(k) by assessing whether this "new type of weapon" is protected by the Second Amendment. Against that backdrop, the majority points to the lack of evidence that such weapons are commonly owned and their potential use for criminality to conclude that the weapons are not in common use for lawful purposes.

Although the majority's approach is not identical to means-end scrutiny, it nonetheless improperly subjects the Second Amendment right to a type of case-by-case inquiry. Notably, the Supreme Court has rejected that approach and admonished the judiciary for deferring to the legislature's interest balancing in the context of the Second Amendment right. *Bruen*, 597 U.S. at 26 ("But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here"). According to the Supreme Court "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government— the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008) (emphasis in original). It follows that the judiciary cannot assess Second Amendment challenges with reference to its own view of how citizens should exercise their right to bear arms. This is particularly so when determining whether the presumption of constitutional protection applies at step one.

55

Instead, the court's role at step one is limited to determining whether the Second Amendment generally protects the people, the type of weapon, and the proposed course of conduct that § 922(k) covers. That is evinced by the Supreme Court's limited undertaking during its own analysis in *Bruen*. At step one of its *Bruen* analysis, the Supreme Court determined that the Second Amendment generally protected carrying handguns publicly for self-defense. *Bruen*, 597 U.S. at 26. It reached that conclusion without referencing any particular handgun or considering any specific characteristics.

The Supreme Court's decision to conduct a general inquiry in that portion of the opinion suggests the following. First, the Second Amendment's protection presumptively applies at step one if the challenged statute covers people, arms, and conduct generally covered under the Constitution. Second, in determining whether a weapon is an "arm," courts must determine whether the type of weapon is commonly used for lawful purposes. *Id*. at 32–33. Third, "type of weapon" is understood in its ordinary sense—handguns, rifles, and shotguns, for example. A serial number is therefore not relevant to the *Bruen* step one analysis because it does not alter a firearm's type or common use for a lawful purpose. But the majority claims that it does. According to the majority, removing a serial number from a weapon or adding illegal contraband to it "produces a weapon that is not in common use for a lawful purpose." Majority Op. at 24–25. I disagree.

As a threshold matter, the *Bruen* step one inquiry into "types of weapons" is general and therefore does not concern a specific firearm. In other words, a court need not determine whether firearms with any unique characteristic—a particular grip, sight, or stock, for example—are in common use in order for the firearm to be presumptively

56

protected under the Second Amendment. As long as the weapon is of a type in common use (a handgun or rifle, for example) the presumption applies.

Section 922(k) applies to *all* firearms with removed, altered, or obliterated serial numbers. Given its broad reach, it necessarily bans at least some handguns, rifles, and shotguns—types of firearms that we know are in common use for lawful purposes. That fact alone is sufficient for the Second Amendment's protection to presumptively apply at step one in this case. Indeed, the statute even bans firearms with serial numbers that were removed or altered simply by wear and tear, although they were perfectly serialized when purchased. In this way, the statute risks criminalizing the mere passage of time and general use.

Moreover, under the majority's reasoning, any change to a firearm, no matter how minor, would produce a new type of weapon. But the notion that any change to an object produces an entirely new object is simply false. Just as docking a dog's tail does not alter the breed of dog, or trimming a tree does not produce a new genus of tree, the removal of a serial number does not transform a handgun or rifle into a new type of weapon under the *Bruen* step one analysis. Absent any enhancing accessories or functional modifications, a Glock 19 handgun, is a Glock 19 handgun, whether it is shiny or dull, red or green, serialized or not. Categorically banning firearms that are otherwise presumptively protected under the Second Amendment based solely on the condition of their serial number is as logical as concluding that a Schnauzer is not a canine simply because its tail is docked. The only way to make that conclusion tenable is to define canine with reference solely to the condition of a tail.

That is what our Court has chosen to do.  In defining the type of weapon at issue as firearms with removed, altered, or obliterated serial numbers, the majority commits an error that dooms its common use analysis from the very start.  That initial error is only compounded by the majority's later determination that firearms with removed, altered, or obliterated serial numbers are useful only for criminal purposes.  According to the majority, "if firearms with obliterated serial numbers are not even in common use for criminal purposes—the only scenario in which we can conceive a reason to prefer such weapons—then we think it fair to conclude that such arms are not in common use for lawful purposes." Majority Op. at 23.  Not so.

While we do not have data regarding lawful use of firearms without serial numbers, it is well known that certain types of firearms are in common use today.  For example, handguns and rifles, two types of weapons banned under § 922(k), are undoubtedly in common use for self-defense, home defense, hunting, and other lawful purposes.  Given that reality, whether specific handguns and rifles—those with removed, altered, or obliterated serial numbers—are in common use is of no moment at step one.

What's more, even weapons useful for criminal purposes are presumptively protected at step one if they are in common use for lawful purposes.  Handguns, for example, are used in the majority of mass shootings, murders, and suicides in our nation each year. But, because handguns are the type of weapon many Americans choose for self-defense, they are presumptively protected under the Second Amendment. *See Bruen*, 597 U.S. at 47 (stating that handguns are "in fact, 'the quintessential self-defense weapon'" and "indisputably in 'common use' for self-defense today").  It follows then that any weapon of

58

a type in common use for lawful purposes is presumptively protected at step one irrespective of whether the condition of its serial number makes it useful in committing crimes.

That being the case, there is no basis to support the conclusion that all firearms with removed, altered, or obliterated serial numbers are excluded from the right to keep and bear arms based on the Second Amendment's plain text. However, given the error the majority committed at the outset—defining the type of weapon at issue based on § 922(k)'s prohibition—nothing could have saved its step one analysis. Unfortunately, our Court's determination that certain firearms in common use fall outside of the Constitution's protection may have a disparate impact on males of color.

## II.

The unintended consequences of our Court's decision in this case add weight to the albatross of mass incarceration that burdens our nation. African Americans and Hispanic Americans make up most of the population in many of the communities designated as high crime areas. *See* David A. Harris, *Factors for Reasonable Suspicion:  When Black and Poor Means Stopped and Frisked*, 69 Ind. L.J. 659, 677–78 (1994). Although presence in a high crime area alone is insufficient to justify a *Terry* stop, presence combined with another factor, such as "nervous, evasive behavior" or flight (even if unprovoked), constitutes reasonable suspicion sufficient to render the stop constitutional. *Illinois v. Wardlow*, 528 U.S. 119, 124, 127 (2000).

Notably, for some, avoidance of police may evince an act of self-preservation. Indeed, as Justice Stevens put it:

> Among some citizens, particularly minorities and those residing in high
> crime areas, there is also the possibility that the fleeing person is entirely
> innocent, but, with or without justification, believes that contact with the
> police can itself be dangerous, apart from any criminal activity associated
> with the officer's sudden presence. For such a person, unprovoked flight is
> neither "aberrant" nor "abnormal."

*Id*. at 132 (Stevens, J. concurring). That reality may explain why over 60% of the people

stopped and searched in New York City each year from 2003 until 2023 were innocent,

and why Black and Latinx people consistently represented over 50% and 25% of the people

stopped, respectively. *See Stop-and-Frisk Data*, New York Civil Liberties Union (Mar.

14, 2019), https://www.nyclu.org/en/stop-and-frisk-data [https://perma.cc/5HYB-5N9H].

What's more, if convicted of a firearms offense, minority male offenders are more

likely to receive a sentence that includes a term of imprisonment as opposed to probation.

According to a study conducted last year by the United States Sentencing Commission, Black

and Hispanic males convicted of firearms offenses are 40.4% and 29.8%, respectively, less

likely to receive a probationary sentence compared to White males. *See* 2023 Demographic

Differences in Federal Sentencing, U.S. Sent'g Comm'n, at 29. Additionally, when sentenced

for firearms offenses, Black and Hispanic males receive terms of imprisonment that are 2%

and 1.4%, respectively, longer than sentences given to White males. *Id*. at 29.

One can deduce from the aforementioned statistics that Black and Hispanic males

may be disproportionately impacted by § 922(k), as they are more likely to reside in

communities designated as high crime areas and therefore have more frequent negative

police encounters. And that potential disparate impact is made worse by U.S.S.G.

§ 2K2.1(b)(4)(B), which provides for a four-level enhancement when sentencing a

defendant convicted of a firearm offense other than § 922(k) if the firearm had an altered or obliterated serial number.

I use a hypothetical offender convicted of a firearm offense under 18 U.S.C. § 922(a)–(p) who has no more than one prior criminal conviction to illustrate the effect of the enhancement. The United States Sentencing Guidelines suggest a sentencing range of less than a year on the low end (10–16 months) for our hypothetical offender. However, if the firearm has an altered or obliterated serial number, the four-level enhancement increases the minimum recommended sentence to just under two years in prison (21–27 months). If the prior conviction was a felony, a sentence at the low end of the range would require the offender to serve a few months more than a year (15–21 months) at minimum. The minimum recommended term of imprisonment increases by a year (27–33 months) if the serial number on the firearm is not intact. If the offender's prior felony conviction was for a crime of violence or a controlled substance offense, the guidelines advise a minimum sentence of nearly three years (33–41 months) but increases to over four years (52–63 months) with the four-level enhancement. In each scenario, the offender's sentencing range increases simply because the firearm he possessed had an altered or obliterated serial number.

At bottom, mass incarceration is exacerbated by the way communities are policed, conduct is prosecuted, and convictions are punished. We may not know if those who most commonly possess firearms with removed, altered, or obliterated serial numbers are law-abiding citizens or not. But we do know that males of color bear the brunt of § 922 punishments. And our decision today will likely further that injustice. Respectfully, I must dissent.

61

RICHARDSON, Circuit Judge, dissenting:

This case should be an easy win for Randy Price.  The Government wants to punish him for conduct that falls within the plain text of the Second Amendment.  So the Government must demonstrate that its regulation—18 U.S.C. § 922(k)—can be justified by our Nation's historical tradition of firearm regulation.  *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) ("[W]hen the Government regulates arms bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to justify its regulation." (quotation omitted)).  Rather than doing so, however, the Government offers blanket assertions backed by scant evidence and then cobbles together an amalgam of unrelated historical regulations that bear no relevant similarity to the law at issue.  That should resolve it:  The Government has not carried its burden, so the Government loses.

Rather than holding the Government to its burden, today's decision loosens the rules in the Government's favor.  Adopting a limitation that appears nowhere in the Second Amendment's plain text, the majority requires Price to prove that unmarked firearms are in common use for lawful purposes.  It then dismisses Price's challenge by speculating about why a law-abiding citizen would prefer an unmarked firearm and drawing illogical inferences.  This is not how Second Amendment challenges are supposed to proceed.  I thus respectfully dissent.

# I.    Section 922(k) regulates conduct that falls within the plain text of the Second Amendment.

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be

infringed." U.S. Const. amend. II. In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court established a two-step framework for assessing Second Amendment challenges. Price asserts a facial challenge,[1] so *Bruen*'s first step requires him to show that § 922(k)[2] regulates conduct protected by the Second Amendment's plain text. *Id.* at 17, 24; *Rahimi*, 144 S. Ct. at 1907 (Gorsuch, J., concurring); *id.* at 1932–33 (Thomas, J., dissenting). Our inquiry therefore includes three discrete questions: (1) does § 922(k) apply to "the people"?; (2) is a firearm with an obliterated serial number an "Arm"?; and (3) is possession of such a firearm an act of "keep[ing]" or "bear[ing]" arms? *Bruen*, 597 U.S. at 31–32; *see also Bianchi v. Brown*, No. 21-1255, slip op. at 116 (4th Cir. Aug. 6, 2024) (Richardson, J., dissenting).

The answer to each inquiry is yes, so § 922(k) is presumptively invalid under the Second Amendment. The Government does not dispute that the statute applies to the "the people."[3] *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008); *see also Bianchi*, slip op. at 116–17 (Richardson, J., dissenting). Nor does it contest that possessing a firearm is conduct protected by the Second Amendment. *See Rahimi*, 144 S. Ct. at 1897–99; *Heller*,

---

[1] A plaintiff prevails on a facial challenge if he "establish[es] that no set of circumstances exists under which the [challenged statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

[2] Section 922(k) makes it "unlawful for any person knowingly . . . to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce."

[3] The Government concedes that Price is part of "the people," at least for purposes of this appeal.

554 U.S. at 592. What it contests is that a firearm with a removed, obliterated, or altered serial number is an "Arm" within the plain meaning of that term. But in *District of Columbia v. Heller*, the Supreme Court explained that the term "Arms" "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582. A firearm, at risk of stating the obvious, is a bearable arm. *See Rahimi*, 144 S. Ct. at 1897–99 (implicitly determining that § 922(g)(8), which prohibits certain individuals from "possess[ing] . . . any firearm," falls within the plain text of the Amendment); *see also id.* at 1933 (Thomas, J., dissenting) ("It is undisputed that § 922(g)(8) targets conduct encompassed by the Second Amendment's plain text."). And whatever effect the lack of a serial number has on the statute's constitutionality, it does not transform a firearm into something else. Number or no number, a firearm is still a "weapon[] of offense" that can be worn for "defence . . . or use[d] in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (first quoting 1 Samuel Johnson, *Dictionary of the English Language* 106 (4th ed 1773); and then quoting 1 Timothy Cunningham, *A New and Complete Law Dictionary* (1771)). So § 922(k) regulates "Arm[s]" within the plain meaning of the Second Amendment.

The majority does not consider, let alone mention, any of these textual prerequisites. Instead, it contends that Price must prove at *Bruen*'s first step that firearms with obliterated serial numbers are in common use for lawful purposes. Majority Op. at 8–14. In defense of this atextual notion, the majority observes that the Second Amendment's text includes, among other things, the phrase "the right of the people." *Id.* at 8. It also notes that *Heller* found that the right of the people must be interpreted based on its historic scope. *Id.* (citing

64

*Heller*, 554 U.S. at 599–601). And when interpreting *United States v. Miller*, 307 U.S. 174 (1939), *Heller* stated that the "historical understanding of the scope of the right" did not extend to weapons "not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 11 (quoting *Heller*, 554 U.S. at 624–25). From this, the majority concludes that weapons not in common use for lawful purposes fall outside the plain meaning of the words "right of the people," and therefore that any challenger must prove his weapon is in common use before we even proceed to *Bruen*'s second step. *Id.* at 12–14.

I have already explained elsewhere why *Heller* requires the government to prove that a weapon is both dangerous *and* unusual at *Bruen*'s *second* step. *Bianchi*, slip op. at 121–22 (Richardson, J., dissenting). Here, I will add that the majority, like the majority in *Bianchi v. Brown*, No. 21-1255, misunderstands the relationship between the Second Amendment's plain text and our Nation's historical tradition of firearm regulation. Put simply: *Both* of *Bruen*'s steps—text and historical tradition—are used to determine the original scope of the preexisting right. *Compare Bruen*, 597 U.S. at 24 (explaining that when an individual's conduct falls within the plain text of the Amendment, we presume it falls within the right), *with id.* at 31 (using "historical analysis" to identify the "scope" of the Second Amendment right (citation omitted)); *see also Bianchi*, slip op. at 123–24 (Richardson, J., dissenting). Sometimes, we know a person's conduct is unprotected because it isn't even covered by the text. Other times, an individual's conduct does fall within the plain text, but the government nonetheless proves "that its firearm regulation is part of the historical tradition *that delimits the outer bounds of the right to keep and bear*

*arms*." *Bruen*, 597 U.S. at 19 (emphasis added). In both instances, we have determined that the regulation is consistent with the original scope of the right.

With respect to dangerous and unusual weapons, *Bruen* explained that *Heller* derived this limit by "rel[ying] on the historical understanding of the Amendment to demark the limits on the exercise of that right." *Id.* at 21. So while dangerous and unusual weapons are not within the scope of the Second Amendment, it is because history and tradition show that the government can permissibly ban them, not because they fall outside the Amendment's plain text. The majority therefore errs in requiring Price to prove that his weapon is in common use at the plain-text stage.

The Supreme Court's recent decision in *United States v. Rahimi* shows how untenable the majority's position is. Whereas the majority holds that "the limitations on the Second Amendment right . . . are inherent in the meaning of 'the right of the people' and should be addressed at [*Bruen*'s] first step," Majority Op. at 11, the Court in *Rahimi* explicitly stated that the government bears the burden to justify its law any time it "regulates arms-bearing conduct," *Rahimi*, 144 S. Ct. at 1897. In other words, the burden flips to the government—and we transition to *Bruen*'s second step—as soon as the challenger establishes that the regulation covers "arms-bearing conduct."[4] And notably,

---

[4] This explains why the Government's alternative step-one argument fails from the jump. The Government argues that even if § 922(k) covers protected conduct, it does not "infringe" the Second Amendment right because it allegedly imposes a marginal, at most, burden on a person's ability to defend himself. *See* Opening Br. at 18–20. Several district courts have upheld § 922(k) on this basis. *See, e.g.*, *United States v. Holton*, 639 F. Supp. 3d 704, 710–11 (N.D. Tex. 2022); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1210–11 (S.D. Cal. 2023). But as *Rahimi* shows, *Bruen*'s first step does not inquire into the

the Court didn't limit "arms-bearing conduct" to "conduct that historically fell within the traditional scope of the right to keep and bear arms."  Instead, historical limitations on the scope of the right are relevant to establish whether the government is permitted to regulate the "arms-bearing conduct" in the manner it does—the step-two inquiry.  *Id.*

This is supported by what the Court actually did in *Rahimi*.  There, the Court concluded that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 1903.  Put differently, the Court found that the right to keep and bear arms guaranteed by the Second Amendment has a limitation that applies, at least temporarily, when a dangerous person poses a credible threat of future violence.  But although the Court was addressing a historical limitation outlining one facet of the "scope of the Second Amendment," *id.* (quoting *Bruen*, 597 U.S. at 31), it didn't couch that analysis in a step-one interpretation of the word "right" or "people."  Instead, the Court upheld the law in question because "[o]ur tradition of firearm regulation allows the Government" to regulate in the way it had.  *Id.* at 1902.  And it did so by finding that the law at issue there had historical analogues for both its "why" and "how."  *Id.* at 1903.  Those are quintessential step-two questions.  *Id.*; *see also Bruen*, 597 U.S. at 29.

---

magnitude of injury inflicted by a firearm regulation.  Rather, the question is simply whether a law regulates arms-bearing conduct, which § 922(k) does.

67

**II.    The Government has failed to show that § 922(k) is consistent with our Nation's historical tradition of firearm regulation.**

Since § 922(k) regulates protected conduct, the Government must prove that it is consistent with our Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 18; *Rahimi*, 144 S. Ct. at 1897–98. This requires the Government to reason by analogy and establish that § 922(k) is "relevantly similar" to past laws in our regulatory tradition. *Bruen*, 597 U.S. at 29. The central considerations in this inquiry are "how" and "why" a law burdens the Second Amendment right. *Id.* In other words, whether past and present regulations "impose a comparable burden" and "whether that burden is comparably justified" are the central considerations for analogical reasoning. *Id.* Our ultimate objective is to determine "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898; *Bianchi*, slip op. at 123–24 (Richardson, J., dissenting).

The Government offers two buckets of historical analogues to justify § 922(k). First, the Government argues that § 922(k) is analogous to the historical tradition of regulating dangerous and unusual weapons. Second, the Government argues that § 922(k) is analogous to an assortment of inspection and marking statutes and commercial regulations stretching from the colonial to Antebellum periods. The Government claims that these regulations, considered individually or collectively, establish § 922(k)'s constitutionality.

As I explain below, I disagree. The tradition of regulating dangerous and unusual weapons distinguished between classes or types of weapons based on their functional

68

characteristics. But serial numbers are ubiquitous features that have no bearing on a weapon's functionality. So firearms that lack them do not compose a separate class of arms that are dangerous and unusual. Additionally, the Government's analogy fails because the Government did not offer reliable evidence that firearms without a serial number are dangerous and unusual.

Nor do the Government's remaining analogues establish § 922(k)'s historical pedigree. The Government first offers several laws that required inspection and marking of firearms and gunpowder, but these laws targeted meaningfully distinct problems from those addressed by § 922(k). It then puts forth a series of restrictions on firearm and gunpowder trade, yet it offers no evidence that these laws burdened any member of the political community's right to keep or bear arms, and the historic justification for these laws is even more far afield from that of the previous ones. While relevantly similar analogues might exist, the Government has not furnished any here. So I conclude that the Government has not carried its burden of proof at *Bruen*'s second step. *See Bruen*, 597 U.S. at 25 n.6 ("Courts are . . . entitled to decide a case based on the historical record compiled by the parties.").

### A. The Government has not shown that § 922(k) is analogous to historic laws regulating dangerous and unusual weapons.

The Government's primary argument is that § 922(k) is analogous to historical laws regulating dangerous and unusual weapons. According to the Government, firearms with removed, obliterated, or altered serial numbers have no lawful utility and are only used by those intending to engage in unlawful activity. Nor are these arms typically possessed by

law-abiding citizens for lawful purposes. So the Government asserts that § 922(k) bans arms that fall under the tradition of regulating dangerous and unusual weapons.

I agree that history and tradition demonstrate that the government may regulate or ban dangerous and unusual weapons. *See Bianchi*, slip op. at 121–46 (Richardson, J., dissenting). But § 922(k) is not relevantly analogous to this tradition. The tradition stands for the principle that the government can ban the possession or carry of classes of weapons with certain shared functional characteristics if that class of weapons is dangerous and unusual. It does not stand for the principle that the government can ban the possession or carry of *all* weapons that have or don't have certain *non*functional characteristics, even if weapons with those characteristics are unusual. We can see this by working through the relevant precedent and history in reverse-chronological order.

Each time the Supreme Court has discussed or applied this tradition, it has considered whether the banned weapons as a "class" or "type" are dangerous and unusual. *See Miller*, 307 U.S. at 179 ("kind" of weapon); *Heller*, 554 U.S. at 628 ("class of arms"); *id.* at 622–23 ("type of weapon"); *Caetano v. Massachusetts*, 577 U.S. 411, 419 (2016) (Alito, J., concurring) ("the Second Amendment . . . protects such weapons as a class"); *Bruen*, 597 U.S. at 47 ("class of firearms"). And in each case, the class of weapons in question was defined by physical characteristics that impacted the gun's functioning. *See Miller*, 307 U.S. at 175 (analyzing the National Firearms Act's ban on possession of "shotgun[s] having a barrel or barrels of less than 18 inches in length"); *Heller*, 554 U.S. at 574 (analyzing D.C. Code §§ 7-2501.01(12), 7-2502.01(a), 7-2502.02(a)(4) (2001), which banned the possession of "pistols," defined as "any firearm originally designed to

70

be fired by use of a single hand or with a barrel less than 12 inches in length"); *Bruen*, 597 U.S. at 1 (analyzing a New York statute that required a license to carry any "pistol or revolver"); *Caetano*, 577 U.S. at 414 n.1 (Alito, J., concurring) (analyzing a Massachusetts statute that banned any "portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill"); *see also Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1286 n.10 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (analyzing a District of Columbia statute that "bans semi-automatic rifles by listing specific guns that . . . share the characteristics of being a long gun and firing in a semi-automatic manner, and typically have features such as protruding pistol grips"). The Court then asked whether the class of weapons—*i.e.*, weapons with the defined functional characteristics—was dangerous and unusual. *See Miller*, 307 U.S. at 178; *Heller*, 554 U.S. at 628–29; *Bruen*, 597 U.S. at 47; *Caetano*, 577 U.S. at 420 (Alito, J. concurring); *see also Heller II*, 670 F.3d at 1286–87 (Kavanaugh, J., dissenting). Thus, the Court has always assessed whether the banned weapons were dangerous and unusual on a class-wide level, and the Court has always considered classes that were defined by shared functional characteristics.

This makes sense when you look at the tradition the Court is drawing upon. The relevant nineteenth-century cases that undergird the dangerous-and-unusual tradition also addressed statutes that prohibited the possession or carry of classes of weapons defined by functional—not nonfunctional—characteristics. *See Aymette v. State*, 21 Tenn. (2 Hum.) 154, 155 (1840) (prohibiting the concealed carry of "any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall *in form and shape resemble*" such weapon

(emphasis added)); *Fife v. State*, 31 Ark. 455, 461 (1876) (prohibiting "any pistol of any kind whatever" and defining pistol as "a small fire-arm . . . intended to be fired from one hand"); *State v. Workman*, 35 W. Va. 367, 369 (1891) (prohibiting concealed carry of pistols); *State v. Duke*, 42 Tex. 455, 456 (1875) (prohibiting the carry of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, [or] bowie knife," which the court analyzed as applied to a pistol). These cases then determined whether the proscribed class of weapons was dangerous and unusual by assessing whether that class of weapons was particularly useful for unlawful purposes (dangerous) and whether it was uncommon for lawful purposes (unusual). *See Aymette*, 21 Tenn. at 158; *Fife*, 31 Ark. at 461; *Workman*, 35 W. Va. at 373; *Duke*, 42 Tex. at 458; *see also Bianchi*, slip op. at 141–43 (Richardson, J., dissenting).

Putting this all together, we see that history and tradition permit the government to ban the possession or carry of certain classes of weapon, as defined by their shared *functional* features, if those classes are dangerous and unusual. But § 922(k) does not ban the possession of a class of firearms that share certain functional characteristics. Rather, it bans the possession of *all* firearms that share a *non*functional characteristic—having a removed, altered, or obliterated serial number. Serial numbers are ubiquitous and appear on modern firearms of all shapes and sizes. And whether a gun has or lacks a serial number does not change how the gun operates as a weapon so that it is more effective for one

purpose or another.[5]  Instead, it's more like asking whether tan-colored guns are protected by the Second Amendment because black guns are more common.  We might think that there are other reasons why the government can regulate firearm color, but it wouldn't be because the change in color changes the nature of the weapon.  So too for guns with removed, obliterated, or altered serial numbers.  While other historical traditions may justify § 922(k), the tradition of regulating dangerous and unusual weapons doesn't.

But even if a firearm's functionality does not define this tradition, there's a second reason why § 922(k) is not analogous to the regulation of dangerous and unusual weapons. *Bruen* places the burden of proving that a regulation resembles history and tradition on the *government*—the entity restricting liberty protected by the Second Amendment.  *Bruen*, 597 U.S. at 17, 19; *see also Rahimi*, 144 S. Ct. at 1897.  But the Government has made a minimal effort, at best, to show that firearms with removed, obliterated, or altered serial numbers are either dangerous or unusual, let alone both.  Indeed, it devoted only a single paragraph of its opening brief—spanning less than a page—to this question.  And what evidence the Government has offered is outdated, unreliable, and arguably contradictory. Simply put, the Government has not carried its burden of proof.

---

[5] Other courts that otherwise reach a different outcome than I do nonetheless agree with me on this point.  *See Holton*, 639 F. Supp. 3d at 712 ("[T]he presence of a serial number does not impair the use or functioning of a weapon in any way." (quoting *United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010)); *United States v. Reyna*, No. 3:21-CR-41, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) (finding that "the § 922(k) prohibition applies to a class of guns defined solely by a nonfunctional characteristic"); *Serrano*, 651 F. Supp. 3d at 1210.

73

Start with the Government's first piece of evidence. In its panel briefing, the Government's only evidence[6] that § 922(k) prohibits dangerous and unusual weapons was a 1996 law review article which claimed that "[t]here are fundamentally only three reasons to obliterate a serial number: to avoid being tied to a burglary through possession of a firearm whose serial number has been reported to police; to avoid being connected to a crime gun one has purchased legally; and to avoid being identified through [ATF] records as the straw seller, or buyer, of a gun with paperwork on it." David M. Kennedy, Anne M. Piehl & Anthony A. Braga, *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy*, 59 L. & Contemp. Probs. 147, 174–75 (1996). But it's hard to discern how relevant this article is to present circumstances. The study examined usage patterns for Boston youth over five years in the 1990s. *Id.* at 171. It is thus (1) almost three decades old and (2) based on a small subset of young lawbreakers (3) within a single city.[7] And after being confronted with the study's other conclusions at oral

---

[6] The Government also noted the Third Circuit's statement in *United States v. Marzzarella* that "there would appear to be no compelling reason why a law-abiding citizen would prefer an unmarked firearm." 614 F.3d at 95. The majority likewise uses this quotation to its advantage. With respect for our sister circuit, it cited no evidence for this proposition. And the Government cannot meet its burden by citing an unsubstantiated quote from another court. It must establish facts.

[7] Even if this study were probative, its findings are not as clear-cut as the Government presents. For example, the study found that within the pool of studied firearms, those used for substantive crimes were 50% less likely to have an obliterated serial number than those associated with mere possession offenses. Kennedy, Piehl & Braga, *supra*, at 196. Based on this data point, the authors concluded that more serious offenders likely prefer old or stolen guns over those with obliterated serial numbers, while less serious offenders likely acquire arms with obliterated serial numbers for "something other than serious criminal intent," such as fear of violence or self-defense. *Id.* at 175–76.

argument, the Government submitted a Rule 28(j) letter claiming that we cannot extrapolate from some of the study's findings to the larger gun-owning population. *See* ECF No. 84, at 1–2 ("statistics about the subset cannot be extrapolated to the larger gun-owning public").

The majority instead finds solace in the Government's second piece of evidence. In its supplemental en banc briefing, the Government cited a recently created ATF report showing that, between 2017 and 2021, 2.5% of firearms submitted for tracing that could not be traced to a purchaser had partial, incomplete, or obliterated serial numbers. Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Dep't of Just., *National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Gun Intelligence and Analysis*, pt. 3, at 5 (2024). The majority takes this statistic and runs with it. It first relies on it to conclude that firearms with removed, obliterated, or altered serial numbers are not even in common use for *criminal* purposes. Majority Op. at 22–23. It then speculates from this that such arms must not be in common use for lawful purposes, either. *Id.* at 23. Basically, the majority posits that, because even criminals aren't commonly using guns with obliterated serial numbers, law-abiding citizens also must not be using them.

This is a remarkable leap in logic. The majority might be correct that arms with removed, obliterated, or altered serial numbers are not commonly used by criminals. But how can we infer from this fact that such weapons are not in common use for *lawful* purposes? One might naturally assume that law-abiding and law-breaking citizens have

---

This finding seemingly undercuts any claim that firearms without serial numbers are particularly useful for criminal activity.

different needs and own guns for different reasons. I simply do not understand how we could equate the two when determining whether a particular firearm is commonly used.[8]

Furthermore, if arms with removed, obliterated, or altered serial numbers really aren't commonly used by criminals, as the majority seems to think, then doesn't this undercut the idea that such arms are "dangerous," as that term was historically understood? Our historical tradition allows the government to ban classes of weapons—defined by shared functional characteristics—if they are particularly useful for unlawful activity (dangerous) and uncommon for lawful purposes (unusual). *Bianchi*, slip op. at 145–46 (Richardson, J., dissenting). When nineteenth-century courts considered whether a class of weapons was dangerous, an important consideration was whether that class was commonly used by criminals and lawbreakers. *See, e.g.*, *Aymette*, 21 Tenn. at 158 (describing such weapons as those "usually employed in private broils, and which are efficient only in the hands of the robber and the assassin"); *English v. State*, 35 Tex. 473, 475 (1871) (describing such weapons as "those which are employed in quarrels and broils, and fights between maddened individuals"); *Workman*, 35 W. Va. at 373 (describing such weapons as those "usually employed in brawls, street fights, duels, and affrays, and are

---

[8] Even if this statistic supported the asserted claim, any such support is undermined by the report's questionable history. At argument, the Government was asked about inconsistencies or errors in the ATF's report that called its validity into question. *See* Oral Arg. at 1:06:30–1:08:55. After Government counsel discussed the "apparent discrepancy" with the ATF, *see* ECF No. 84, the ATF rescinded and reissued the report with different numbers, *see* ECF No. 86. In a Rule 28(j) letter, Government counsel now claims that the report is accurate. *Id.* We sometimes permit a party, like the Government, to rely on its own reports to support its position. But I would do so only when the report is both reliable and actually supports the asserted claim.

only habitually carried by bullies, blackguards, and desperadoes"). Yet arms lacking serial numbers are functionally no different than arms that have them. And apparently, according to the majority, they are not even commonly used by criminals. If that's right, then they cannot be dangerous and unusual weapons that fall outside the scope of the Second Amendment.[9]

The majority ultimately relies on its self-supported conviction that no law-abiding citizen would prefer an unmarked firearm for lawful purposes. The majority interprets *Heller* to require us to query whether "common-sense reasons exist for a law-abiding citizen to prefer a particular type of weapon for a lawful purpose like self-defense." Majority Op. at 20. But *Heller* established no such thing. Rather, the Court examined the practices of the American people and identified the weapons *they* commonly own for lawful purposes.[10] And though it mentioned several reasons why "the American people"

---

[9] Of course, the majority does not think that a weapon must be dangerous to be banned, so long as it is unusual. *See* Majority Op. at 18–21. But I have already explained why this proposition is false and misreads *Heller*, *Bruen*, and our historical tradition. *See* *Bianchi*, slip op. at 121–46 (Richardson, J., dissenting).

[10] It is true the *Heller* did not explicitly rely on statistics or otherwise cite evidence to support its statement that handguns are "overwhelmingly chosen by American society for th[e] lawful purpose" of self-defense. 554 U.S. at 628. But that is because neither party in that case contested that handguns are in common use for lawful purposes. *See* Brief of Respondent at 46, *Heller*, 554 U.S. 570 (No. 07-290); Reply Brief of Petitioner at 20–22, *Heller*, 554 U.S. 570 (contesting the common-use inquiry generally, but not the idea that handguns are in common use). Moreover, the briefing in *Heller* was replete with empirical evidence for the widespread ownership of and lawful uses for handguns. *See, e.g.*, Amicus Brief of the National Rifle Association and the NRA Civil Rights Defense Fund at 26, *Heller*, 554 U.S. 570 (estimating that private citizens lawfully owned 60–65 million handguns at that time); *see generally* Amicus Brief of International Law Enforcement Educators and Trainers Association et al., *Heller*, 554 U.S. 570 (citing empirical studies

may prefer handguns for self-defense, it clarified that "[w]hatever the reason," the fact of common usage for lawful purposes was enough to make the District of Columbia's handgun ban constitutional. 554 U.S. at 629. *Heller* thus grounded the scope of the Second Amendment in the customs of the American people, not the speculations of federal judges. *Bianchi*, slip op. at 158 (Richardson, J., dissenting).

In the end, I do not know whether or why law-abiding citizens might prefer firearms with removed, obliterated, or altered serial numbers. Don't get me wrong, I could take the majority's tactic and surmise reasons. Maybe some people inherit these weapons from relatives and choose to keep them because of their sentimental value.[11] Or maybe some have no intent to use the firearm to break the law but are still uncomfortable with the government potentially tracking their purchases. After all, many law-abiding citizens prefer to use encrypted messaging platforms and disable location tracking on their cell phones for similar reasons. *See United States v. Chatrie*, No. 22-4489, 2024 WL 3335653, at *43–44 (4th Cir. July 9, 2024) (Wynn, J., dissenting). But whatever the answer is to this

---

for widespread handgun use for self-defense); *see also Heller*, 554 U.S. at 700–01 (Breyer, J., dissenting) (summarizing some of this evidence). Here, by contrast, the extent of and purposes behind ownership of firearms with removed, obliterated, or altered serial numbers are "certainly . . . not within judicial notice," *Miller*, 307 U.S. at 178, so the Government must produce objective evidence that such weapons are not commonly held for lawful purposes, *see Caetano*, 577 U.S. at 420 (Alito, J., concurring); *N.Y. State Rifle & Pistol Ass'n, Inc., v. Cuomo*, 804 F.3d 242, 356 (2d Cir. 2015) (explaining that the common-use inquiry is an "objective and largely statistical" one that considers "subjective motives" of actual gun owners); *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020) (same); *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (same).

[11] Even if a relative obliterated the serial number with ill intent, that would not necessarily mean that the person who ends up possessing it does so with ill intent. *But see* Majority Op. at 23–25.

question, the burden is not on me or Price to provide it. It is the Government's burden, which it must carry by offering something more than mere conjecture. If that's too tall a task for the Government, then maybe it confirms that the tradition of regulating dangerous and unusual weapons was never the right analogue for § 922(k) in the first place.[12]

**B.  The Government's other historic regulations are not analogous to § 922(k).**

Besides the tradition of regulating dangerous and unusual weapons, the Government also points to an assortment of inspection and marking laws and commercial restrictions from before and after the Founding. But none of these regulations justify § 922(k).

The Government's best historical evidence is early state regulations requiring the inspection and marking of gunpowder and firearm barrels. Between 1776 and 1820, five states required gunpowder to be inspected and marked for quality and prohibited the sale of unmarked powder.[13] One state went a step further and prohibited anyone from

---

[12] The majority's ivory-grip hypothetical only underscores this point. The majority may be right that the government can punish individuals for having illegally imported ivory, even if they attach it to a weapon. But surely the majority does not think this is because ivory-plated arms are dangerous and unusual. Rather, we would assess such a restriction by considering, for example, the government's authority to regulate contraband and asking whether that authority historically extended to contraband attached to a weapon.

[13] Act of Oct. 4, 1776, ch. VI, §§ 1, 3, 1776–1777 N.J. Acts 6, 6–7; An Act for the Inspection of Gunpowder, Manufactured Within this State, *in* 8 *Records of the State of Rhode Island and Providence Plantations in New England* 18, 18–19 (1863); Act of Apr. 18, 1795, ch. MDCCCXLVI, § 107, *in* 3 *Laws of the Commonwealth of Pennsylvania, From the Fourteenth Day of October, One Thousand Seven Hundred* 240, 243 (1810); Act of Mar. 1, 1809, ch. 52, §§ 3, 6, *in* 2 *The General Laws of Massachusetts, From the Adoption of the Constitution to February, 1822,* at 198, 199 (1823); Act of June 21, 1820, ch. II, §§ 3–6, *in The Laws of the State of New-Hampshire; with the Constitutions of the United States and of the State Prefixed* 276, 277–78 (1830).

"fraudulently alter[ing] or defac[ing] any mark" placed by an inspector.[14]  Similarly, two states in the early nineteenth century required inspectors to proof and mark firearm barrels and prohibited the sale of unmarked weapons.[15]  Both also prohibited anyone from altering the marks once in place.[16]

To the Government's credit, these laws arguably imposed a "comparable burden" on the right to keep and bear arms as § 922(k) does.  *Bruen*, 597 U.S. at 29.  Like § 922(k), they required firearms and gunpowder to display a government-imposed mark that conveyed certain information.  Of course, only three of them explicitly forbade the alteration of these marks.  And unlike § 922(k), none of them prohibited the mere *possession* of unmarked firearms and gunpowder.  Still, I grant that these laws and § 922(k) may share similar-enough burdens.

Even so, these regulations were not "comparably justified" to § 922(k).  *Id.* at 39.  As the Government notes, § 922(k) exists to help law enforcement recover stolen firearms and trace firearms that have been used in crimes.  Opening Br. at 27; *see also* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 197 ("To assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems

---

[14] Act of Mar. 1, 1809, *supra*, § 6, at 199–200.

[15] Act of Mar. 8, 1805, §§ 1, 3, *in* 3 *The Laws of the Commonwealth of Massachusetts, From November 28, 1770 to February 18, 1807*, at 259, 259–60 (1807); Act of Mar. 10, 1821, ch. CLXII, §§ 1, 3, *in* 2 *Laws of the State of Maine; to Which Are Prefixed the Constitution of the U. States and of Said State* 685, 685 (1821).

[16] Act of Mar. 8, 1805, *supra*, § 4, at 261; Act of Mar. 10, 1821, *supra*, § 4, at 686.

at all levels of government, and for other purposes."). But the historic gunpowder- and firearm-marking laws were enacted for product-quality purposes: They ensured that weapons were effective and did not jeopardize public safety when deployed. For instance, the Pennsylvania statute explained that gunpowder inspection and marking was necessary because some powder was of "inferior qualit[y]" and "its defects [were] not discovered until brought into actual use." Act of Apr. 18, 1795, *supra*, at 240. Similarly, the Massachusetts law explained that barrel proofing and marking were required because otherwise "many [firearms] may be introduced into use which are unsafe, and thereby the lives of the citizens be exposed." Act of Mar. 8, 1805, *supra*, at 259. So these regulations did not "impos[e] similar restrictions for similar reasons" as § 922(k) does and are thus not relevantly similar to it. *Rahimi*, 144 S. Ct. at 1898.

It is no answer to say that these laws and § 922(k) are analogous because they all promote public safety. Basically every firearm regulation aims to reduce the risk of danger to the public in one form or another. If this were the proper level of generality at which to assess a law's justification, then every modern restriction would share a comparable justification with every past one. But we know this is not how the Supreme Court has conducted its analysis. Instead, the Court has focused on more refined government justifications, such as targeting dangerous and unusual weapons, *Heller*, 554 U.S. at 627, limiting the right to those with a special need, *Bruen*, 597 U.S. at 38, or temporarily disarming individuals who threaten physical harm to others, *Rahimi*, 144 S. Ct. at 1903. And it has simultaneously warned against defining a regulation's justification so broadly as to eviscerate its historic roots. *Bruen*, 597 U.S. at 30–31 (explaining that historic

"sensitive places" regulations do not justify declaring whole cities gun-free zones); *cf.* *Rahimi*, 144 S. Ct. at 1903 (rejecting the argument that historic surety and affray laws support disarming those who are not "responsible"). Thus, when reasoning by analogy, our task is to zero in on the particular "problems" a law addresses and determine whether historic regulations addressed analogous problems in an analogous manner. *Rahimi*, 144 S. Ct. at 1898. Here, the justification for historic inspection and marking laws—ensuring firearm effectiveness and safety—is not relevantly similar to the justification for § 922(k)—solving crime.

Besides inspection and marking laws, the Government also analogizes § 922(k) to various colonial regulations on the sale of firearms and gunpowder. Before Independence, several colonies prohibited anyone from selling or providing firearms or ammunition to Native Americans.[17] Similarly, two colonies prohibited the exportation of gunpowder outside their jurisdictions without a license, while one state prohibited the selling of

---

[17] 1 *Records of the Governor and Company of the Massachusetts Bay in New England* 196, 196 (1853); An Act Concerning Trade with the Indians (1650), *in* 1 *Proceedings and Acts of the General Assembly of Maryland, January 1637/8–September 1664*, at 307, 307 (William Hand Browne ed., 1883); Acts of Assembly, Mar. 1657–8, Act XVII, *in* 1 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, From the First Session of the Legislature, in the Year 1619*, at 441, 441 (1823); 1 *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, May, 1665*, at 49, 182 (J. Hammond Trumbull ed., 1850); Act of Oct. 22, 1763, ch. DVI, § 1, *in* 6 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 319, 319–20 (1899).

The Government also claims that Connecticut banned residents from selling firearms outside the colony. But it is unclear whether this restriction was one and the same with Connecticut's prohibition on selling arms to Native Americans or whether this was a separate and broader prohibition. *See* 1 *The Public Records of the Colony of Connecticut*, *supra*, at 138–39, 145–46. And even if the Government were correct, this is the only regulation of its kind that the Government cites.

gunpowder in a major town without a license.[18]  The Government argues that these regulations are analogous to § 922(k) because they imposed *de minimis* burdens on the right to self-defense and were designed to keep weapons out of dangerous hands.

Contrary to the Government's claims, these statutes are not analogous to § 922(k). The Government offers no evidence that these laws burdened the ability of any member of the political community[19] to keep or bear arms.  So even if § 922(k) only imposes a minimal burden, these laws still are not analogous because they imposed no burden at all. Furthermore, like the inspection and marking statutes, they did not share a similar justification to § 922(k):  The government's interest in solving crimes is not relevantly similar to the government's interests in keeping arms away from dangerous people outside

---

[18] Powder § 2 (1645), *in The Colonial Laws of Massachusetts Reprinted From the Edition of 1672*, at 125, 126 (1887) (prohibiting the transportation of gunpowder outside the colony without a license); An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1775), *in* 15 *The Public Records of the Colony of Connecticut*, *supra*, at 191 (prohibiting the exportation of gunpowder outside the colony without a license); An Act Regulating the Storage, Safe Keeping, and Transportation of Gunpowder in the Town of Providence (1821), *in The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City* 47, 48 (1845) (prohibiting the sale of gunpowder within the town of Providence without a license).

[19] Native Americans were not considered a part of the political community—or in other words, were not a part of the "the people"—at the Founding.  *See* Angela R. Riley, *Indians and Guns,* 100 Geo. L.J. 1675, 1685–98 (2012); *see also United States v. Carpio-Leon*, 701 F.3d 974, 978 n.* (4th Cir. 2012).  Similarly, restrictions on exporting gunpowder ensured that gunpowder would not leave the political community and go somewhere else.  The only law that potentially burdened the rights of members of the political community was the city of Providence's prohibition on selling gunpowder without a license.  But though this law burdened the ability to sell gunpowder, the Government provides no evidence that requiring sellers to acquire licenses burdened anyone's ability to *acquire* gunpowder.  And insofar as this law did burden the Second Amendment right, it is an outlier among the Government's other evidence.  *Bruen*, 597 U.S. at 46 (doubting that three colonial regulations, let alone one, could establish a historical tradition).

the polity or ensuring safe transport of highly flammable gunpowder. So these laws and § 922(k) are analogous in neither their "how" nor their "why."[20]

*      *      *

Section 922(k) seems like a sensible policy. But *Bruen* did not instruct us to decide cases based on good vibes. It placed the burden on the government to prove that a challenged regulation has a historical pedigree. Rather than carrying this burden, the Government offers halfhearted and surface-level arguments with the expectation that we will squint and say: "Well, good enough." We should expect more from the government, especially when constitutional liberties are at stake. I thus respectfully dissent.

---

[20] Judge Agee would decide this case (presumably at step two) by holding that Price cannot facially challenge § 922(k) because he is a violent felon. *See* Concurring Op. at 4 (Agee, J., concurring). But whether the Second Amendment allows the government to permanently prohibit felons, or at least violent felons, from possessing arms is a complex textual and historical question that should be resolved in a different case. In our only post-*Bruen* decision on this case, the panel majority declined to engage in a text-and-history analysis of this question. *See United States v. Canada*, 103 F.4th 257, 258–59 (4th Cir. 2024). And the Government has not briefed this issue in this appeal. So I would not reach this complicated question today.

84