# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANDREW TETER and JAMES GRELL<br><br>  Plaintiffs-Appellants,<br><br>v.<br><br>ANNE E. LOPEZ, in her Official Capacity as the Attorney General of the State of Hawaii and DARRYL NG., in his Official Capacity as the State Sheriff Division Administrator,<br><br>  Defendants-Appellees. | No. 20-15948 |

# DECLARATION OF ALAN BECK

**COMES NOW**, Alan Alexander Beck, and declares as follows:

**1.** I am a natural person, an adult male, citizen of the United States of America and resident of the State of California. I reside in San Diego, and I am competent to provide this declaration. If called as a witness in this matter, I would provide the following testimony. I make this declaration based on personal knowledge, except where otherwise stated.

2. All statements made about me in the reply brief this declaration is attached to are true and accurate.

3. I am one of the attorneys representing the Plaintiffs in this matter.

4. Attached to this declaration is my timesheet working on this case since submitting my previous timesheet. It is an accurate representation of the time I have spent in this case since submitting the fee petition.

5. In order to address the undesirability of this case and other issues raised by the State in my response I submit the following background information about this litigation and my previous Second Amendment litigation.

6. My first Second Amendment case, and my first federal case, was *Baker v. Kealoha, et. al.*, 1:11-cv-00528. This was a challenge to Hawaii's concealed carry law as well as the City and County of Honolulu's concealed carry issuance policies. I did this with two other lawyers including Kevin O'Grady.

7. We began that case in 2011 because after *McDonald v. City of Chicago* 561 U.S. 742 (2010), challenges had been filed to concealed carry laws in the other may issue states and we believed Hawaii should not be left out of the national litigation on concealed carry laws. And there were no other lawyers in Hawaii willing to file such a case.

8. Prior to commencing litigation in *Baker*, I reached out to the national Second Amendment groups who were litigating Second Amendment cases and/or

their lawyers and asked them to file a Hawaii case. I was universally ignored or told no.

9. I was also told that Hawaii was not part of the national plan by the largest of these organizations. And that Hawaii would eventually benefit indirectly from the precedent set through California litigation.

10. Considering the fact no other lawyers were willing to file a Second Amendment challenge in Hawaii, we filed *Baker*.

11. I originally had planned for *Baker* to be my only foray into Second Amendment litigation as I had moved back to the mainland and was trying to build my California practice.

12. During the course of litigating *Baker*, I received correspondence from Mr. George Young. Mr. George Young had filed two lawsuits pro se against Hawaii's concealed carry laws after asking 17 lawyers in Hawaii to take his case.[1] Later on, I would I ask him for copies of his prior court cases which he provided me.

13. Mr. Young would go on to file a third case pro se.

---

[1] https://freebeacon.com/politics/meet-native-hawaiian-army-veteran-just-won-major-gun-carry-case/ ("Young began to reach out to local lawyers to see if anybody could help him file a case. When none of the 17 lawyers he contacted would help him, he decided to study constitutional law on his own. In 2008, he filed a case against the state acting as his own lawyer.")

**14.** On Dec. 6, 2012, *Baker v. Kealoha* was argued along with two challenges to California's concealed carry scheme (*Peruta v San Diego* and *Richards v Prieto*).

**15.** Due to working on the *Baker* appeal, I had obtained a basic understanding of appellate practice.

**16.** Shortly after the Ninth Circuit hearing in *Baker*, I found out that Mr. George Young had lost his third case via a motion to dismiss.

**17.** In his third case, he had been dismissed from the trial court on his first pro se complaint without leave to amend and was not allowed to appear in court. Due to this and other factors, I believed he deserved to be represented on appeal.

**18.** I discussed the case with him and we discussed the possibility of an appeal.

**19.** Being a very novice attorney, I didn't feel qualified to handle the appeal on my own. I reached out to my co-counsel in *Baker* and other Hawaii based lawyers. All of whom were unavailable to take Mr. Young's case.

**20.** I then reached out to the various national gun groups that litigate Second Amendment cases to represent Mr. Young. They all declined to represent him.

21. Only after that did I agree to represent Mr. Young on my own at the Ninth Circuit. *See Young v. Hawaii*, No. 12-17808 (9th Cir. 2018). Several years later, Mr. Stamboulieh would join me in Mr. Young's appeal.

22. This experience taught me there was need for a lawyer willing to litigate Second Amendment cases in Hawaii.

23. This is why I decided to continue to litigate cases in Hawaii despite living in California.

24. I had considered the possibility of a challenge to Hawaii's butterfly knife ban for several years prior to this case being filed.

25. I did not feel comfortable litigating a case dealing with a novel issue of constitutional law on my own.

26. However, despite asking multiple attorneys, I was unable to find a Hawaii lawyer willing to work on a butterfly knife case.

27. I also reached out to a variety of national groups. All declined to be involved in a butterfly knife for a variety of reasons including questioning whether knives are protected arms to the fact they were a firearms group, and knives were outside their purvey.

28. Only after becoming acquainted with my co-counsel, Mr. Stamboulieh, who is a Mississippi-licensed lawyer, and him agreeing to join me in this case did I feel comfortable filing this lawsuit.

29. Thus, I am confident that there were no other lawyers in Hawaii or even nationally that would be willing to file this case.

30. The State also references the fact that Attorney Kevin O'Grady practices Second Amendment law in Hawaii. Mr. O'Grady's practice focuses on DUI and military law. Every Second Amendment case he has litigated has been as my co-counsel other than filing amicus briefs in my cases. And during the time period that this case was filed, he was not litigating Second Amendment cases. After *Baker*, he decided to focus almost exclusively on DUI and military law and only in recent years agreed to begin litigating Second Amendment law with me again. Thus, he was unavailable to take Mr. Teter and Mr. Grell's case in 2019 when this litigation began.

31. Apart from attorneys that work with me, there are no other lawyers who currently or at the onset of this case practice(d) Second Amendment plaintiffs-side civil litigation in Hawaii apart from lawyers who serve as local counsel for mainland attorneys.

32. Attached to this declaration is a copy of a report detailing the National Rifle Association spending in Hawaii for the second half of last year. It shows that it spent zero dollars in Hawaii between May 31, 2024, and December 31, 2024. This report was obtained from the following website: https://5cu00252fhawaiiethics.my.site.com/.

33. Thus, while there have been a few cases filed by national groups *recently*, Hawaii remains largely off-limits by the national firearms movement.

34. The State also brings up Ms. Erin Murphy's assistance on one of the briefs filed in this case as evidence this case was not undesirable. Ms. Murphy reached out to me after the State filed their en banc petition and agreed to edit my en banc response because a negative ruling in this case might impact her litigation in *Duncan v. Bonta,* No. 23-55805 which is a case pending before the en banc court that deals with the issue of whether magazines which hold more than ten rounds can be prohibited under the Second Amendment. Her assistance on the en banc response in no way indicates that she would have filed this lawsuit.

35. There were no Hawaiian attorneys or elsewhere willing to take Mr. Teter or Mr. Grell's case.

36. This case, as part of my participation in Second Amendment law, has also been very undesirable because it has been the cause of harassment.

37. Over the years I have received threatening and/or harassing phone calls and messages. I also maintain a professional Facebook page and occasionally receive harassing and/or insulting comments from people who do not believe in Second Amendment rights.

38. I also have been the subject of many insulting and demeaning comments from mainland gun rights supporters and groups. Especially early on in

my career, I received messages and found numerous comments on mainland firearm forums claiming I was unqualified to practice Second Amendment law with the overarching theme that my efforts were not worth the risk of creating bad precedent.

39. This case, as well as Second Amendment litigation in Hawaii, generally is very undesirable and no one was willing to litigate this case other than myself and my co-counsel.

40. The prevailing practice in Hawaii is for lawyers to bill expenses and costs separately from their hourly rate. I have always personally billed expenses separately from my hourly rate and I am well acquainted with several other lawyers' practices and they all bill expenses separately from their hourly rate.

41. Mr. Neal Katyal has been my opposing counsel in three cases. Those cases are *Young v. Hawaii*, No. 12-17808,[2] *Wolford v. Lopez* 23-16164, and this case. I have presented argument against him on two occasions at the Ninth Circuit.

42. Mr. Douglas Letter is my opposing counsel in *Pinales, et al. v. Lopez* 1:24-cv-00496-JAO-WRP.

---

[2] This is the contract between the State of Hawaii and Neal Katyal for the *Young v. Hawaii* en banc appeal. *See* https://hifico.org/wp-content/uploads/2018/11/Katyal-Hawaii-AG-contract.pdf. As demonstrated here, Hawaii agreed to compensate Mr. Katyal and his firm for both "services rendered and costs incurred under" the Agreement and capped its "costs" at $35,000 and attorneys' fees at $150,000. *Id*. at 1-2.

**43.** I have also had many major law firms serve as amicus counsel against my clients' position.

**44.** I do not have support staff, so outside of help from my co-counsel or otherwise noted in the timesheets (such as help from friends), I prepare the briefs without assistance.

45. I also would like to take this time to note that I have always been open to advising my clients to settle if the terms are favorable to them as evidenced by the volume of stipulated injunctions and other settlements I've obtained as shown in my declaration that is attached to the motion for attorney fees. And the State has been on notice of this fact. Most recently, I entered into a stipulated injunction with the State of Hawaii on behalf of my client, Billy Peter, enjoining its prohibition on people owning firearms who live in Hawaii pursuant to the Compact of Free Association the United States has with the island nations of the Federated States of Micronesia, the Republic of Palau, the Republic of the Marshall Islands. *See Billy Peter v. Anne. E. Lopez* 1:24-cv-00508-MWJS-RT Doc. No. [18]. The first time the issue of settlement was raised was in 2014 when I represented a litigant in a challenge to Hawaii's ban on green card holders owning firearms. The State opted not to settle and lost at summary judgment. *See Fotoudis v. City and Cnty. of Honolulu*, 54 F. Supp. 3d 1136 (D. Haw. 2014). In 2020, the State entered into its first stipulated injunction with me when it agreed to end its ban on U.S. National

owning firearms. *See Alanoa Nickel v. Clare E. Connors, et al.* 1:20-cv-00330-JMS-RT Doc. No. [22]. Thus, the State has been on notice for years that it could end this litigation and affirmatively chose to continue this litigation.

46. I've also been willing to forgo litigation if a government entity has a genuine interest in removing its offending policies. Notably, after *Bruen*, I engaged in negotiations with the County of Kauai to reform its firearm policies. And the offending policies were removed without the need for litigation.

47. I am seeking $10,810.85 in attorney fees and expenses for work spent after the filing of the fee petition including this reply brief. I additionally am seeking an upward modifier of 45%. With that modifier included, I am seeking a total of $15,579.44.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed February 24, 2025.

s/Alan Beck<br>Alan Beck

# Expenditure
## OEXP-000008437

**Record Number**
OEXP-000008437

**Organization**
National Rifle Association of America

**Report Year**
2024

**Report Period**
May 1- December 31

**Date Filed**
1/27/2025

**For Lobbying of Legislature**
☐

**For Lobbying of State Agency**
☐

**Name of State Agency**

**Date Amended**

## Expenditures

**Total Prep & Dist of Lobbying Materials**
$0.00

**Total Media Advertising**
$0.00

**Total Fees Paid to Consultants for Svces**
$0.00

**Total Entertainment & Events**
$0.00

**Total Receptions, Meals, Food & Beverages**
$0.00

**Total Gifts**
$0.00

**Total Loans**
$0.00

**Total Interstate Transportation**
$0.00

**Total Compensation Paid to Lobbyists**
$0.00

**Other Disbursements**
$0.00

**Total Expenditures**
$0.00