**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANDREW TETER; JAMES GRELL, | No. 20-15948 |
| *Plaintiffs-Appellants*, | D.C. No. |
| v. | 1:19-cv-00183- |
| | ACK-WRP |
| ANNE E. LOPEZ; DARRYL NG, | |
| *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the District of Hawaii
Alan C. Kay, District Judge, Presiding

Argued and Submitted June 25, 2024
Seattle, Washington

Filed January 22, 2025

Before: Mary H. Murguia, Chief Judge, and Ronald M.
Gould, Jacqueline H. Nguyen, Ryan D. Nelson, Eric D.
Miller, Bridget S. Bade, Daniel P. Collins, Kenneth K. Lee,
Lawrence VanDyke, Gabriel P. Sanchez and Ana de Alba,
Circuit Judges.

Opinion by Judge Miller;
Partial Dissent by Judge VanDyke;
Dissent by Judge Collins

# SUMMARY[*]

## Second Amendment

The en banc court vacated the district court's summary judgment for the Hawaii Attorney General and the Hawaii Sheriff Division Administrator in an action involving a Second Amendment challenge to Hawaii's statute prohibiting butterfly knives, and remanded for further proceedings.

While the litigation was pending, the Hawaii Legislature amended the challenged statute, Hawaii Revised Statutes § 134-53(a). Although the new statute continues to impose some restrictions on butterfly knives, it no longer prohibits them.

The en banc court concluded that section 134-53(a) has been sufficiently altered so as to present a substantially different controversy from the one the district court originally decided. The statutory amendment gave plaintiff everything he hoped to achieve in this litigation. Because no further relief could be granted, the case was moot, and the court lacked Article III jurisdiction. The amended statute does not restrict the acquisition, possession, and use of butterfly knives, except insofar as a different subsection now prohibits their possession or use by someone engaged in the commission of a separate felony or misdemeanor. Nor does the statute prohibit carrying butterfly knives. Although it does prohibit carrying concealed butterfly knives, plaintiff made clear in the district court that he sought the right to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

carry a butterfly knife openly. Under the amended statute, he has that right. On remand, plaintiff may assert whatever claims remain available to him under the new statute.

Dissenting in part, Judge VanDyke agreed with Judge Collins that this case is not moot for the general reasons that Judge Collins provides in his separate dissent. Judge VanDyke concurred in the decision to remand this case for further proceedings but respectfully dissented from that portion of the majority's decision that simply vacated the district court's judgment without taking any additional action directed at the court's prior en banc order ministerially vacating the panel opinion. To discourage parties from using mootness strategically, Judge VanDyke would (1) reinstate the panel opinion by vacating the prior vacatur order, (2) address those legal questions that are indisputably relevant to any possible reformulation of plaintiffs' claims on remand, and (3) remand the matter to the district court for plaintiffs to pursue additional challenges to Hawaii's reformulated butterfly knife law, should they choose to do so.

Dissenting, Judge Collins, joined by Judge Lee, stated that it is the appellees' burden to establish that re-enactment of a similar law cannot reasonably be expected to occur. They have not carried that formidable burden, given that there are strong reasons to suspect that the very lawsuit at hand was the impetus for the legislative amendment. Because this case has not been shown to be moot, Judge Collins would proceed to the merits. On the merits, he would adhere to the views expressed in the panel opinion, including the holding that bladed weapons facially constitute arms within the meaning of the Second Amendment.

## COUNSEL

Alan A. Beck (argued), Law Offices of Alan Beck, San Diego, California; Stephen D. Stamboulieh (argued), Stamboulieh Law PLLC, Olive Branch, Mississippi; for Plaintiffs-Appellants.

Robert T. Nakatsuji (argued), First Deputy Solicitor General; Ryan M. Akamine and Caron M. Inagaki, Deputy Attorneys General; Kalikoonalani D. Fernandes, Deputy Solicitor; Kimberly T. Guidry, Solicitor General; Clare E. Connors and Holly T. Shikada, Attorneys General of Hawaii; Office of the Attorney General Hawaii, Honolulu, Hawaii; Reedy Swanson (argued), Neal K. Katyal, and Dana A. Raphael, Hogan Lovells US LLP, Washington, D.C.; for Defendants-Appellees.

Kevin O'Grady, Law Office of Kevin O'Grady LLC, Honolulu, Hawaii; David T. Hardy, David T. Hardy PC, Tucson, Arizona; for Amicus Curiae Hawaii Firearms Coalition.

Cody J. Wisniewski, Mountain States Legal Foundation, Lakewood, Colorado, for Amicus Curiae Mountain States Legal Foundation.

John W. Dillon, Dillon Law Group APC, Carlsbad, California, for Amici Curiae San Diego County Gun Owners Political Action Committee, Firearms Policy Coalition, and Knife Rights Foundation Inc..

Michael R. Dreeben and David K. Roberts, O'Melveny & Myers LLP, Washington, D.C.; Danielle R. Feuer, O'Melveny & Myers LLP, New York, New York; Wendy F. Hanakahi and Pamela W. Bunn, Dentons US LLP, Honolulu, Hawaii; William J. Taylor Jr., Lisa M. Ebersole, Carina B.

Gryting, and Janet Carter, Everytown Law, New York, New York; for Amici Curiae Gun-Violence Prevention Groups and Policy Researchers.

John D. Echeverria, Deputy Attorney General; Mica L. Moore and Helen H. Hong, Deputy Solicitors General; Michael J. Mongan, Solicitor General; Rob Bonta, Attorney General of California; Los Angeles, California; Kristen K. Mayes, Attorney General of Arizona, Phoenix Arizona; Philip J. Weiser, Attorney General of Colorado, Denver, Colorado; William Tong, Attorney General of Connecticut, Hartford, Connecticut; Kathleen Jennings, Attorney General of Delaware, Wilmington, Delaware; Kwame Raoul, Attorney General of Illinois, Chicago, Illinois; Anthony G. Brown, Attorney General of Maryland, Baltimore, Maryland; Andrea J. Campbell, Attorney General of Massachusetts, Boston, Massachusetts; Dana Nessel, Attorney General of Michigan, Lansing, Michigan; Keith Ellison, Attorney General of Minnesota, St. Paul, Minnesota; Matthew J. Platkin, Attorney General of New Jersey, Trenton, New Jersey; Letitia James, Attorney General of New York, New York, New York; Ellen F. Rosenblum, Attorney General of Oregon, Salem, Oregon; Michelle Henry, Attorney General of Pennsylvania, Harrisburg, Pennsylvania; Peter F. Neronha, Attorney General of Rhode Island, Providence, Rhode Island; Robert W. Ferguson, Attorney General of Washington, Olympia, Washington; Brian L. Schwalb, Attorney General of the District of Columbia, Washington, D.C.; for Amicus Curiae States of California, Arizona, Colorado, Connecticut, Delaware, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Washington, and the District of Columbia.

Daniel M. Gluck, Deputy Corporation Counsel; Dana M. O. Viola, Corporation Counsel; Honolulu City & County Department of the Corporation Counsel, Honolulu, Hawaii, for Amicus Curiae City & County of Honolulu.

Joseph G.S. Greenlee and Erin M. Ernhardt, National Rifle Association of America, Institute for Legislative Action, Fairfax, Virginia, for Amicus Curiae National Rifle Association of America.

Edward A. Paltzik, Serge Krimnus, and Meredith Lloyd, Bochner PLLC, New York, New York, for Amicus Curiae Second Amendment Foundation.

Benjamin E. Lowenthal, Law Office of Benjamin E. Lowenthal, Honolulu, Hawaii, for Amicus Curiae the Office of the Public Defender.

**OPINION**

MILLER, Circuit Judge:

This case involves a Second Amendment challenge to Hawaii's statute prohibiting butterfly knives. While the litigation was pending, the Hawaii Legislature amended the challenged statute. Although the new statute continues to impose some restrictions on butterfly knives, it no longer prohibits them. We conclude that the amended statute is not "substantially similar" to the version originally challenged. *Board of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1197 (9th Cir. 2019) (en banc). This case is therefore moot, and we vacate the district court's judgment. Because "the plaintiff[s] may have some residual claim under the new framework," we remand for further proceedings. *New York State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 339 (2020) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 482 (1990)).

I

A butterfly knife, also known as a "balisong," is a knife with a folding handle that covers the sharp edge of the blade when the knife is closed. Unlike an ordinary pocketknife, a butterfly knife has a handle that is split into two components that rotate in opposite directions to open. This design allows a user to expose the blade of the knife by flipping it open with one hand.

In 1999, the Hawaii Legislature prohibited the possession of butterfly knives. *See* 1999 Haw. Sess. Laws 285, § 1. Specifically, Hawaii Revised Statutes § 134-53(a) (1999) provided: "Whoever knowingly manufactures, sells,

transfers, possesses, or transports in the State any butterfly knife . . . shall be guilty of a misdemeanor."

Andrew Teter is a Hawaii resident who wishes to own butterfly knives. Together with James Grell, a similarly situated Hawaii resident, Teter brought this action in 2018 under 42 U.S.C. § 1983 against the Hawaii Attorney General and the Hawaii Sheriff Division Administrator (collectively, "the Attorney General"), alleging that the ban on butterfly knives in section 134-53(a) violated the Second Amendment. In the complaint, Teter asserted "an as-applied and facial challenge to the applicable Hawaii laws which prevent [Teter] from owning butterfly knives." He sought an injunction against Hawaii's "policies generally banning the acquisition, possession, carrying and use of butterfly knives," as well as a declaration "that the State of Hawaii's ban on the ownership of butterfly knives violates the Second Amendment."

Both parties moved for summary judgment. At a hearing on those motions, the district court observed that our decision in *Peruta v. County of San Diego* foreclosed any Second Amendment challenge to a prohibition on the concealed carrying of butterfly knives. 824 F.3d 919, 942 (9th Cir. 2016) (en banc). Teter agreed that his challenge focused on "the right to possess a butterfly knife in [the] home, as well as the right to carry it openly in public."

The district court granted summary judgment to the Attorney General. The court described Teter's argument as one that the statute is "unconstitutional *only* as applied to law-abiding citizens seeking to possess butterfly knives in their homes or to openly carry them in public." After determining that "the statute does not severely burden the core Second Amendment right," the district court applied

intermediate scrutiny under then-controlling precedent. Because the district court identified a reasonable fit between the statute and the State's substantial interest in public safety, it held that the statute survived intermediate scrutiny.

Teter appealed. While the appeal was pending, the Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). In that case, the Court rejected the approach of applying varying levels of scrutiny to different regulations of arms. *Id.* at 17. It instead held "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and a regulation may be justified only if it "is consistent with this Nation's historical tradition of firearm regulation." *Id.*

A three-judge panel of this court reversed the district court's decision. *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023). Applying *Bruen*, the panel held that "the possession of butterfly knives is covered by the plain text of the Second Amendment." *Id.* at 950. It stated that although the "'problem' of easily concealable, foldable knives being used in crimes" has existed since the 18th century, the Attorney General "cite[d] no analogues in which Congress or any state legislature imposed an outright ban on the possession of pocketknives to remedy this problem near 1791 or 1868." *Id.* at 954 (quoting *Bruen*, 597 U.S. at 26). The panel therefore concluded that section 134-53(a) violated the Second Amendment. *Id.*

The Attorney General petitioned for rehearing en banc. While that petition was pending, Speaker of the Hawaii House of Representatives Scott Saiki introduced House Bill 2342, which proposed various changes to Hawaii's weapons laws, including section 134-53(a). Where the prior version

of section 134-53(a) provided for the punishment of anyone
who "knowingly manufactures, sells, transfers, possesses, or
transports in the State any butterfly knife," Haw. Rev. Stat.
§ 134-53(a) (1999), House Bill 2342 sought to narrow that
prohibition to cover only those who "knowingly carr[y]
concealed on the person in the State any butterfly knife,"
H.B. 2342, 32nd Leg., Reg. Sess. (Haw. 2024) (as
introduced). The bill was referred to the House Committee
on Judiciary and Hawaiian Affairs.

On February 22, 2024, the Committee voted
unanimously to recommend that House Bill 2342 be passed
with an amendment. As amended, the bill proposed to revise
section 134-53(a) to provide: "Whoever knowingly carries
concealed on the person, or in a bag or other container
carried by the person, any butterfly knife shall be guilty of a
misdemeanor." H.B. 2342, 32nd Leg., Reg. Sess. (Haw.
2024) (as reported by the H. Comm. on Judiciary &
Hawaiian Affs.).

The same day, we granted rehearing en banc, thereby
vacating the three-judge panel's opinion. *Teter v. Lopez*, 93
F.4th 1150 (9th Cir. 2024).

On March 5, the Hawaii House of Representatives
passed House Bill 2342 with the amendment proposed by the
Committee. The Hawaii Senate subsequently passed the bill
as well, and on May 13, the Governor signed it into law.
2024 Haw. Sess. Laws 21; *see id.* § 6 (amending section 153-
54). The bill took effect immediately upon its enactment. *Id.*
§ 10.

II

We begin—and end—by considering whether we have
jurisdiction. Article III of the Constitution limits the

jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. Const. Art. III, § 2. We have no authority to "decid[e] legal disputes or expound[] on law in the absence of such a case or controversy." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013).

To permit us to exercise jurisdiction, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot"—and we lack jurisdiction—"if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *Already, LLC*, 568 U.S. at 91 (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009)).

That does not mean "that a defendant may 'automatically moot a case' by the simple expedient of suspending its challenged conduct after it is sued." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Already, LLC*, 568 U.S. at 91). When a defendant has voluntarily ceased its challenged conduct, "[a] controversy may remain to be settled" because "[t]he defendant is free to return to [her] old ways" and may do so once the litigation ends. *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). And as the Supreme Court recently made clear, that is true "for governmental defendants no less than for private ones." *Fikre*, 601 U.S. at 241.

But at the same time, we have held that "the repeal, amendment, or expiration of challenged legislation is generally enough to render a case moot and appropriate for

dismissal." *Board of Trs. of Glazing Health & Welfare Tr.*, 941 F.3d at 1198. After all, in a case such as this one, the defendant is an executive official (here, the Hawaii Attorney General), and a change in the statute results from the actions of an independent branch of government (here, the Hawaii Legislature) rather than from the defendant. *See Chemical Producers & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 879 (9th Cir. 2006) ("[L]egislation is attributed to the legislature alone."), *overruled on other grounds by Board of Trs. of Glazing Health & Welfare Tr.*, 941 F.3d at 1195. The Attorney General has ceased to enforce the challenged law because it no longer exists; whether or not she might wish to resume enforcement, she cannot do so unless the Hawaii Legislature first reenacts it.

The realities of the legislative process—a process requiring coordinated action by a multi-member body representing a diverse array of interests—make it unlikely that a legislature will strategically moot a case only to "return to [its] old ways" when the litigation is over. *W. T. Grant Co.*, 345 U.S. at 632. Specifically, the time and resource constraints of the legislative process, combined with the multiplicity of legislative priorities, suggest that legislatures lack the agility and coordination that would be required to strategically moot litigation. Accordingly, we "presume that the repeal, amendment, or expiration of legislation will render an action challenging the legislation moot, unless there is a reasonable expectation that the legislative body will reenact the challenged provision or one similar to it." *Board of Trs. of Glazing Health & Welfare Tr.*, 941 F.3d at 1199. The presumption can be overcome by showing, for example, that the legislative body has announced its intention to reenact the law at issue. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.

11 (1982). But when the presumption applies, it satisfies the defendant's burden to show that enforcement "cannot 'reasonably be expected to recur.'" *Fikre*, 601 U.S. at 243 (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

Because the Hawaii Legislature amended section 134-53(a) while this litigation was pending, we presume that Teter's challenge to that statute is moot, and we ask whether Teter has rebutted that presumption by establishing that there is "a reasonable expectation that the legislative body is likely to enact the same or substantially similar legislation in the future." *Board of Trs. of Glazing Health & Welfare Tr.*, 941 F.3d at 1197. Hawaii has already passed an amended law, so our inquiry is whether the law as amended is "substantially similar" to the original. *Id.* We assess substantial similarity by reference to the claims advanced in the litigation, asking whether the amended law burdens the plaintiff "in the same fundamental way" as the original. *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993); *see also id.* at 662 n.3.

Section 134-53(a), as amended, does not burden Teter "in the same fundamental way" as the prior statute and therefore is not "substantially similar" in any respect that is relevant to this litigation. The complaint challenged "the applicable Hawaii laws which prevent [Teter] from owning butterfly knives," and it sought a declaration that the State's "ban on the ownership of butterfly knives violates the Second Amendment." The amended statute does not prohibit—or even limit—the ownership of butterfly knives. The complaint further sought an injunction against the State's "policies generally banning the acquisition, possession, carrying and use of butterfly knives." Those

policies also no longer exist: The amended statute does not restrict the acquisition, possession, and use of butterfly knives, except insofar as a different subsection now prohibits their possession or use by someone "engaged in the commission of a separate felony or misdemeanor," Haw. Rev. Stat. § 134-53(b), a prohibition Teter does not challenge. Nor does the statute prohibit carrying butterfly knives. Although it does prohibit carrying *concealed* butterfly knives, Teter made clear in the district court that he sought "the right to carry [a butterfly knife] openly." Under the amended statute, he has that right.

We conclude that section 134-53(a) "has been 'sufficiently altered so as to present a substantially different controversy from the one the District Court originally decided.'" *Northeastern Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 662 n.3 (quoting *id.* at 671 (O'Connor, J., dissenting)). Or, put another way, the statutory amendment gave Teter "everything [he] hoped to achieve" in this litigation. *Chemical Producers & Distribs. Ass'n v. Helliker*, 463 F.3d at 876. Because we can grant no further relief, the case is moot, and we lack Article III jurisdiction. *See Diffenderfer v. Central Baptist Church of Miami, Fla., Inc.*, 404 U.S. 412, 414–15 (1972) (per curiam) (describing "a declaratory judgment that the now repealed [statute] is unconstitutional" as a form of relief that "is, of course, inappropriate now that the statute has been repealed").

Teter resists that conclusion, arguing that two challenges to section 134-53(a) survive its amendment. Neither challenge is properly before us.

First, Teter argues that the amended law effectively prohibits carrying butterfly knives in any manner. That is so,

he says, because "butterfly knives cannot be carried openly in any realistic manner," so a prohibition on concealed carrying amounts to "a de facto ban on the carry of butterfly knives." In support of that assertion, he points to a statement in his expert's declaration that butterfly knives "do not have a clip because it would interfere with manipulating the handles." Teter suggests that a clip is necessary to carry a butterfly knife, but the expert never said that. The expert was not asked to opine on the distinction between concealed carrying and open carrying, and nothing in the expert's declaration establishes that a person could not openly carry a butterfly knife.

Second, Teter argues that even a prohibition on concealed carrying violates the Second Amendment. As we have already explained, Teter expressly waived that theory below. The district court accurately captured Teter's position: The prohibition on butterfly knives was "unconstitutional *only* as applied to law-abiding citizens seeking to possess butterfly knives in their homes or to openly carry them in public." It was not until oral argument before the en banc court that Teter argued that a prohibition on concealed carrying is unconstitutional. We do not consider Teter's newly articulated challenge to the prohibition on carrying concealed butterfly knives.

In saying that these challenges are not properly before us, we do not suggest that they are forever foreclosed. Until the statute was amended, Teter had no reason to develop the record on the distinction between concealed and open carrying; with further factual development, perhaps he could show that openly carrying a butterfly knife is indeed impractical. Likewise, Teter's waiver of a challenge to the ban on concealed carrying might arguably be excused by the change in law that occurred during the pendency of this

appeal. *Cf. Romain v. Shear*, 799 F.2d 1416, 1419 (9th Cir. 1986) (explaining that although we "will generally not consider an issue raised for the first time on appeal," we may do so "when a new issue arises while [the] appeal is pending because of a change in law"). At the time, Teter's position was dictated by controlling circuit precedent establishing that "the Second Amendment does not protect, in any degree, the right of a member of the general public to carry a concealed weapon in public." *Peruta*, 824 F.3d at 942. But that precedent is now subject to reconsideration in light of *Bruen*. *See Baird v. Bonta*, 81 F.4th 1036, 1047 (9th Cir. 2023) (recognizing *Bruen*'s abrogation of *Peruta*).

This is precisely the situation the Supreme Court confronted in *New York State Rifle & Pistol Ass'n v. City of New York*. There, the plaintiffs challenged a New York City rule restricting the transport of firearms, and, during the pendency of the litigation, the City amended its rule. 590 U.S. at 338. The amendment mooted the plaintiffs' "claim for declaratory and injunctive relief with respect to the City's old rule," but the plaintiffs argued "that the new rule may still infringe their rights." *Id.* at 339. The Court explained that the "ordinary practice in disposing of a case that has become moot on appeal is to vacate the judgment with directions to dismiss." *Id.* (quoting *Lewis*, 494 U.S. at 482). But "where the mootness is attributable to a change in the legal framework governing the case, and where the plaintiff may have some residual claim under the new framework that was understandably not asserted previously," a court should instead "vacate the judgment and remand for further proceedings in which the parties may, if necessary, amend their pleadings or develop the record more fully." *Id.* (quoting *Lewis*, 494 U.S. at 482).

We follow that course here and remand without instructions to dismiss. On remand, Teter may assert whatever claims remain available to him under the new statute. We express no view on the appropriate resolution of the Second Amendment issues those claims might present. "[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further." *PDK Labs. Inc. v. United States Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment).

There remains the question whether to vacate the district court's judgment. When a case has become moot, our normal practice is to vacate the judgment. *See New York State Rifle & Pistol Ass'n*, 590 U.S. at 339; *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950); *Chemical Producers & Distribs. Ass'n*, 463 F.3d at 878. Teter asks us to depart from that practice because, under the "equitable tradition of vacatur," it is not always appropriate to vacate "when mootness results from unilateral action of the party who prevailed below." *United States Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994). But the party who prevailed below is the Attorney General, an executive officer. As we have already explained, she did not cause this case to become moot; the Hawaii Legislature did. *See Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 121 (4th Cir. 2000) ("[D]efendant state executive officials are 'in a position akin to a party who finds its case mooted by "happenstance," rather than events within its control.'") (quoting *National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 353 (D.C. Cir. 1997)); *accord Khodara Env't, Inc. ex rel. Eagle Env't L.P. v. Beckman*, 237 F.3d 186, 195 (3d Cir.

2001). The mootness of the case is therefore not attributable to any action of the prevailing party.

Teter suggests that the Hawaii Legislature's amendment of section 134-53(a) represents an effort to manipulate our jurisdiction. We presume "that a legislative body is acting in good faith in repealing or amending a challenged legislative provision." *Board of Trs. of Glazing Health & Welfare Tr.*, 941 F.3d at 1199. Although that presumption is rebuttable, Teter has identified nothing in the record—or anywhere else, for that matter—supporting his assertion that the Legislature amended section 134-53(a) for an improper purpose or that it is likely to reenact the prohibitions that existed when this case began. To the extent that the Legislature was motivated by the panel's decision to adopt a statute that would be more likely to be upheld, we see nothing nefarious in its effort to comply with the Supreme Court's or this court's decisions. *See American Libr. Ass'n v. Barr*, 956 F.2d 1178, 1187 (D.C. Cir. 1992) ("[P]assing legislation designed to repair what may have been a constitutionally defective statute . . . . represents responsible lawmaking, not manipulation of the judicial process."); *see also National Black Police Ass'n*, 108 F.3d at 352. In any event, Teter's opposition to vacatur makes little sense given that Teter *lost* in the district court, so any ongoing effect the judgment might have could only be harmful to him.

The parties shall bear their own costs on appeal.

**VACATED and REMANDED.**

VANDYKE, Circuit Judge, dissenting in part:

When a three-judge panel unanimously and correctly declared Hawaii's complete ban on butterfly knives unconstitutional, *Teter v. Lopez*, 76 F.4th 938, 942, 954–55 (9th Cir. 2023), this circuit responded the way it always does when a Second Amendment claim is vindicated: we called the case en banc. And after the en banc vote played out in all-too-predictable fashion, the Chief Judge issued an administrative order not only granting en banc review, but also vacating the panel's opinion. *Teter v. Lopez*, 93 F.4th 1150 (9th Cir. 2024).

Soon after we took this case en banc, Hawaii narrowed the scope of its butterfly knife prohibition and then argued its amendments mooted plaintiffs' claims. Concluding the amendments allow the very conduct—and conveniently only that conduct—in which plaintiffs sought to engage, the en banc panel now concludes the case is moot and remands for plaintiffs to pursue any residual challenge they may have to the amended law. *See N.Y. State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 339 (2020).

As the en banc proceedings in this case demonstrate, this court's practice of automatically vacating panel opinions upon the grant of rehearing en banc creates perverse incentives for government defendants. By amending their challenged laws only *after* this court grants rehearing en banc, parties like Hawaii can strategically deploy mootness to lock in the effect of our auto-vacatur without the risk of losing on the merits before the en banc court. Such mischief is strikingly like—basically the mirror image of—the kind our *Munsingwear* precedents are designed to discourage.

I agree with Judge Collins that this case is not moot for the general reasons that he provides in his separate dissent. I write separately to state that even if the majority was correct that this case is moot, the remedy that Judge Collins identifies—reinstating the panel's judgment and remanding the case—would still be the proper remedy here. The majority's business-as-usual response to mootness here is woefully inadequate to eliminate the perverse incentives outlined above.

Thus, to *actually* discourage parties from using mootness strategically, I would (1) reinstate the panel opinion by vacating our prior vacatur order, (2) address those legal questions that are indisputably relevant to any possible reformulation of plaintiffs' claims on remand, and (3) remand the matter to the district court for plaintiffs to pursue additional challenges to Hawaii's reformulated butterfly knife law, should they choose to do so. For these reasons, I concur in the decision to remand this case for further proceedings, but I respectfully dissent from that portion of the majority's decision that simply vacates the district court's judgment without taking any additional action directed at our prior order ministerially vacating the panel opinion.

I.

Under *United States v. Munsingwear, Inc.*, vacatur "is commonly utilized … to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences." 340 U.S. 36, 41 (1950). "Vacatur is in order when mootness occurs through … the 'unilateral action of the party [that] prevailed in the lower court.'" *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 71–72 (1997) (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S.

TETER V. LOPEZ 21

18, 23 (1994)). Such vacaturs are meant to prevent procedural gamesmanship from parties hoping to "secur[e] 'a favorable judgment, tak[e] voluntary action that moots the dispute, and then retain[] the benefit of the judgment.'" *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs*., 992 F.3d 742, 753 (9th Cir. 2021) (VanDyke, J., dissenting) (quoting *Arizonans for Off. Eng.*, 520 U.S. at 75).

On the other hand, "[b]oth the Supreme Court and this court have recognized exceptions to this practice if the *party seeking appellate relief* … is the cause of subsequent mootness." *NASD Disp. Resol., Inc. v. Jud. Council of State of Cal.*, 488 F.3d 1065, 1069 (9th Cir. 2007) (citation and internal quotations omitted). The Supreme Court, for example, will not vacate a lower court judgment "[w]here mootness results from settlement" because "the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the extraordinary equitable remedy of vacatur." *U.S. Bancorp*, 513 U.S. at 25. In other words, "if a party lost below, but does something intentional to moot its case while the appeal is pending, you don't need to worry about that losing party deliberately mooting the case" to retain the benefit of a favorable judgment it never had. *City & Cnty. of San Francisco*, 992 F.3d at 753 (VanDyke, J., dissenting).[1]

---

[1] Of course, the mere fact that a party lost below is not always a failproof guarantee that it will have no incentive to strategically moot a case. That is why I suggested in one of my several dissents in the public charge litigation that when an administration abandons its defense of a rule for purposes of political expediency, we should discourage its efforts to engage in "rulemaking-by-collusive-acquiescence" by using *Munsingwear* vacatur. *City & Cnty. of San Francisco*, 992 F.3d at 744, 752–55 (VanDyke, J., dissenting).

Thus, in both the lower court judgments that appellate courts choose to vacate and those they leave in place, it is sufficiently clear that our *Munsingwear* precedents are predominantly motivated by a desire to discourage parties from taking strategic action designed to lock in the effect of a favorable judgment. *See U.S. Bancorp*, 513 U.S. at 24 ("The principal condition to which we have looked is whether the party seeking relief from the judgment below caused the mootness by voluntary action.").

The procedural posture of this case, of course, differs in a few ways from the typical case in which *Munsingwear* vacatur would be in order. For one, *Munsingwear* is usually meant to resolve the equitable problems caused by intervening mootness while the judgment of a lower court is appealed to a higher court. But here, where the mootness has occurred entirely within the confines of the Ninth Circuit as the case passed from the panel into the hands of the en banc court, the panel opinion was not "appealed" to a higher court.

And second, like the cases to which the *U.S. Bancorp* exception to vacatur usually applies, it was Hawaii, the loser before the panel and "the *party seeking [en banc] relief*," that was "the cause of subsequent mootness." *NASD Dispute Resolution*, 488 F.3d at 1069. Usually, such a posture would mean that the equities necessitating *Munsingwear* vacatur do not apply.

There is, however, at least one more unique aspect of this case that, notwithstanding the differences outlined above, weighs strongly in favor of vacatur: this court's curious practice of automatically vacating a panel opinion upon the grant of rehearing en banc. Under normal circumstances, when a case is appealed from district to circuit court or when

the Supreme Court grants review of a circuit court decision through certiorari, the opinion and judgment of the lower court remain in place on appeal. Even if an appellate court grants a temporary reprieve in the form of a stay, such orders do not wholly *vacate* a lower court judgment. Instead, they merely suspend enforcement of that judgment for a time, usually until appellate review is complete. *See, e.g.*, *Ohio v. EPA*, 603 U.S. 279, 300 (2024) ("The applications for a stay … are granted. Enforcement … shall be stayed pending the disposition of the applicants' petitions for review ….").

This court's en banc procedure, however, departs from this usual appellate process. Instead of leaving the results of the three-judge panel in place or even just staying the results pending en banc review, this court has developed a practice of automatically vacating the three-judge panel's opinion in the order granting en banc review. Usually, this task is accomplished in just a few short words—"The three-judge panel opinion is vacated," and nothing else—without citation to any authority upon which the vacatur order is grounded. *See, e.g.*, *Teter*, 93 F.4th at 1150; *see also United States v. Duarte*, 108 F.4th 786 (9th Cir. 2024) (same). The judges who have been drawn for the en banc panel do not vote on whether to vacate the panel opinion—the court just issues a ministerial order under the Chief Judge's name taking the case en banc and vacating the panel opinion. *See, e.g.*, *Teter*, 93 F.4th at 1150.

II.

Before explaining why these circumstances implicate *Munsingwear*, it is worth noting that the absence of any citation supporting our en banc vacaturs is ultimately unsurprising. That is because our vacatur practice (1) is a relatively new addition to our en banc procedure that

(2) until very recently was not explicitly grounded in the plain text of any rule or general order of this circuit and (3) is also arguably inconsistent with our limited en banc model.

First, such vacaturs appear to have a limited historical pedigree. As far as I can tell, we haven't always automatically vacated panel opinions upon the grant of rehearing en banc. In fact, some of our earlier rules carried a strong presumption *against* such vacaturs. Before 1987, for example, our General Orders provided that "[t]he opinion of the three-judge panel *should not be withdrawn* absent exceptional circumstances" (emphasis added). *See, e.g.*, *Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab. v. Cargill, Inc.*, 709 F.2d 616, 619 (9th Cir. 1983) (vacating and withdrawing only after disapproving of the panel opinion on its merits in published opinion). That rule was later modified to provide that "the en banc panel *may* withdraw the panel opinion" "[w]hen the court votes to take a case en banc following the publication of a panel decision," (emphasis added), but even then, vacatur remained discretionary and required a separate decision of the limited en banc panel. *See, e.g.*, *Lear Siegler, Inc., Energy Prods. Div. v. Lehman*, 893 F.2d 205, 208 (9th Cir. 1989) (withdrawing part of a panel opinion after disagreeing with its rationale).

Even after the court began to act directly on panel opinions in the orders granting en banc review, it still stopped short of explicitly requiring vacatur. *See, e.g.*, *In re Schwartz-Tallard*, 774 F.3d 959 (9th Cir. 2014) ("The three-judge panel opinion shall not be cited as precedent by or to any court of the Ninth Circuit."). This "shall not be cited as precedent" language, which has since fallen out of use, was more consistent with our rules than the "opinion is vacated" language we currently employ. When the three-

TETER V. LOPEZ                    25

judge-panel opinion here was vacated, General Order 5.5d, for example, read:

> If a majority of the judges eligible to vote on the en banc call votes in favor of en banc consideration, the Chief Judge shall enter an order taking the case en banc pursuant to Circuit Rule 35-3. The three-judge panel opinion *shall not be cited as precedent* by or to this Court or any district court of the Ninth Circuit, except to the extent adopted by the en banc court.

(emphasis added). Our advisory committee notes included substantially similar language. Circuit Advisory Committee Note 3 to Rule 35-1 to 35-3 ("The three-judge panel opinion shall not be cited as precedent … except to the extent adopted by the en banc court."). And while we have renumbered and revised the relevant advisory committee note to replace the "shall not be cited as precedent" language with a provision explicitly noting that "[t]he three-judge panel opinion is vacated," such changes did not go into effect until December 2024.[2]

   Finally, as a purely practical matter, our automatic vacatur practice also puts the cart before the horse in that it prescribes a certain remedy—vacatur—without any guarantee that the en banc court will disagree with the three-judge panel on the merits. While other circuits auto-vacate panel opinions when granting rehearing en banc, such an approach makes sense when every active judge *both* votes

---

[2] *See* United States Court of Appeals for the Ninth Circuit, *Public Comment Package March 2024* (Mar. 25, 2024), available at: https://www.ca9.uscourts.gov/rules/proposed-rules-and-amendments/.

whether to grant en banc rehearing *and* sits on the en banc panel. *See, e.g.*, 5th Cir. R. 41.3 ("Unless otherwise expressly provided, the granting of a rehearing en banc vacates the panel opinion and judgment of the court and stays the mandate."). But unlike the approach of other circuits, in which the initial en banc vote may presumptively predict the views of the full en banc court, our circuit's unique practice of randomly drawing an eleven-member panel means the en banc panel's views may not always match the full court's initial vote. Even assuming the full court mostly votes to rehear cases to correct perceived errors, our automatic vacatur practice cannot readily account for these potential mismatches between the full court's and the en banc panel's views of the merits.

### III.

But more important than these historical and practical problems with our automatic vacatur practice are the perverse incentives it creates for parties like Hawaii. As noted above, a core function of *Munsingwear* vacatur is "to prevent a party from securing 'a favorable judgment, tak[ing] voluntary action that moots the dispute, and then retain[ing] the benefit of the judgment.'" *City & Cnty. of San Francisco*, 992 F.3d at 753 (VanDyke, J., dissenting) (quoting *Arizonans for Off. Eng.*, 520 U.S. at 75). All one must do is replace "judgment" with "vacatur" in the above-quoted passage, and it perfectly describes the circumstances presented here.

For government defendants trying to rid themselves of adverse panel precedent, playing the panel-erasure game is easy: all they need to do is wait until after they have secured

rehearing en banc,[3] thereby ridding themselves of the panel opinion by automatic vacatur, and then strategically amend challenged laws to moot the plaintiffs' claims. Then, such government defendants can sit back and relax, assured that their amendments will shield them from the risks associated with any en banc reconsideration of the merits. And once the en banc panel compliantly plays along and dismisses the case, the government is then free to reenact the very law the panel only recently declared unconstitutional.

If the government were really thinking hard about it, it could even wait to learn the composition of the en banc panel before making a final decision about whether to moot the case. If the en banc panel draw seems favorable, the government can take the opportunity to continue litigating the en banc proceedings to their conclusion and obtain a favorable decision on the merits. But if the en banc panel draw appears bad from the government's perspective, it can then nullify its downside risk by strategically employing mootness. Heads the government wins, tails the plaintiffs lose. While one could hardly blame government attorneys

---

[3] For cases in the Ninth Circuit where the panel found the Second Amendment violated, this step is usually accomplished simply by filing a petition for rehearing en banc. Our court will bend over backward to handle the rest. Actually, an en banc petition isn't even necessary, since our court is more than willing to sua sponte take such a case en banc even when the government has not requested it. *See, e.g.*, *McDougall v. Cnty. of Ventura*, 26 F.4th 1016 (9th Cir. 2022) (granting en banc rehearing after a sua sponte en banc call). Indeed, if the government does not want a case like this to be taken en banc, it usually isn't enough to simply *not* file an en banc petition. The government has to beg our court not to sua sponte take the case en banc. *See, e.g.*, Order Directing Issuance of the Mandate, *Baird v. Bonta*, No. 23-15016, Dkt. 42 (Nov. 15, 2023) (surviving a sua sponte en banc call only after the government urged the court not to rehear the case en banc).

for deploying a winning gambit so simple to execute, this court should not encourage it.  *See City of New York*, 590 U.S. at 340, 364–70 (Alito, J., dissenting) (lamenting that "the Court permitt[ed] [its] docket to be manipulated in a way that should not be countenanced").

Citing our prior decision in *Board of Trustees of Glazing Health & Welfare Trust v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) (en banc), the majority repeatedly asserts that we must give a government's voluntary cessation of challenged conduct "more solicitude" than voluntary cessation by private parties.  First, as Judge Collins argues in his separate dissent, the Supreme Court's decision in *FBI v. Fikre*, 601 U.S. 234 (2024), is irreconcilable with our court's holding in *Glazing Health*.  And this en banc panel is not bound by *Glazing Health* in any event.  We easily could have reconsidered whether states like Hawaii are entitled to *Glazing Health*'s presumption of regularity (at least in Second Amendment cases) given their well-documented intransigent responses to the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).**[4]**

---

[4] *Cf. State v. Wilson*, 543 P.3d 440, 453–54, 459 (Haw. 2024) ((1) criticizing *Bruen* for its "fuzzy 'history and traditions' test" that "ad-libs a 'history only' standard," "dismantles workable methods, and creates "a dangerous way to look at the federal constitution," (2) asserting that "[h]istory by historians quickly debunked *Heller*'s history," and (3) applying the powerful "spirit of Aloha" to conclude the Hawaii Constitution does not protect "an individual right to keep and bear arms"); *see also* Governor Gavin Newsom, *Governor Newsom Responds to Supreme Court Decision on Concealed Carry* (June 23, 2022), https://www.gov.ca.gov/2022/06/23/governor-newsom-responds-to-supreme-court-decision-on-concealed-carry/

But putting that aside, the issue of whether Hawaii was entitled to "more solicitude" than any other litigant shouldn't make any difference because Hawaii's motivations ultimately should matter very little to the question of how the court should remedy the problems caused by the intervening mootness.    Whether Hawaii intended to strategically moot this case for the reasons described above or not, it has nevertheless taken all the steps necessary to unfairly benefit from our automatic vacatur practice.    Its actions have wiped the record of any judicial declaration that its absolute ban on butterfly knives was unconstitutional, and now that these en banc proceedings have concluded, Hawaii is free to reenact its prior, unconstitutional ban *in toto*—all without so much as a single word of analysis from the en banc court about the underlying merits.

This situation cries out for some sort of equitable vacatur under *Munsingwear*, but the question is: What to vacate? Reflexively vacating the district court judgment as the majority does today does not address the perverse incentives created by our automatic vacatur practice and ironically only perpetuates the kind of problem *Munsingwear* is designed to address.    But we need not artificially limit ourselves to vacating only the district court judgment "[b]ecause [vacatur] is rooted in equity," and thus "the decision whether to vacate turns on 'the conditions and circumstances of the particular case.'"    *Azar v. Garza*, 584 U.S. 726, 729 (2018)

---

(characterizing *Bruen* as "reckless" and "radical" and asserting that his "[a]dministration has been working closely with the Attorney General and the legislature for months" to pass a slate of "16 new gun safety bills" in response).    These statements and many others like them obviously undercut any judicial fiction that all state governments are "acting in good faith" in response to the Supreme Court's Second Amendment jurisprudence.

(per curiam) (citation omitted); *see also Dilley v. Gunn*, 64 F.3d 1365, 1370 (9th Cir. 1995) ("*U.S. Bancorp* makes clear that the touchstone of vacatur is equity.").

To correct the perverse incentives created in circumstances like these, I would simply vacate the order that created those incentives in the first place: our prior vacatur order itself. Doing so would have reinstated the panel opinion, leaving it suitable to "be cited as precedent by or to this Court," General Order 5.5d, and therefore would have removed any incentive to strategically misuse the mootness limitations on this court's Article III jurisdiction in the manner described here.

In addition to correcting the equitable incentives associated with our en banc procedure, reinstating the panel opinion would have had at least two additional ancillary benefits. First, it would have facilitated the special solicitude the majority gives to Hawaii's voluntary cessation. If we must assume that Hawaii "is acting in good faith in repealing or amending" its prior law, *Glazing Health*, 941 F.3d at 1199, then presumably Hawaii would have no objection to reinstating the panel's opinion because, as it argues in its suggestion of mootness, that opinion apparently does not cast doubt on any part of its amended butterfly knife ban. Or to put it more succinctly using the words of a certain former president: "Trust, but verify."

And second, reinstating the panel opinion would have assured that the panel's lengthy and well-reasoned opinion contributed to a developing legal issue that has recently divided courts across the country. *Compare Commonwealth v. Canjura*, 240 N.E.3d 213 (Mass. 2024) (applying *Bruen* to conclude that Massachusetts's ban on carrying switchblade knives violates the Second Amendment), *with*

*Knife Rights, Inc. v. Bonta*, 2024 WL 4224809 (S.D. Cal. Aug. 23, 2024) (reaching the opposite conclusion as to California's ban). "Judicial precedents," after all, "'are not merely the property of private litigants,' but are 'valuable to the legal community as a whole.'" *Dickens v. Ryan*, 744 F.3d 1147, 1148 (9th Cir. 2014) (en banc) (quoting *U.S. Bancorp*, 513 U.S. at 26). We should not "force future panels to duplicate our efforts by re-deciding issues we have already resolved within the contours of [A]rticle III." *Id.*

## IV.

Finally, one might object that by vacating our prior vacatur order and reinstating the panel opinion, the en banc court would be improperly making law in a moot case where it had no jurisdiction to do so. That objection fails for at least two reasons.

To begin, this court has long recognized its authority to take a moot case en banc solely for the purpose of vacating a panel decision. *See United States v. Payton*, 593 F.3d 881, 886 (9th Cir. 2010) (recognizing that the "refusal to vacate the [panel's] decision after it has become moot … leaves open the opportunity to seek an en banc rehearing for the purpose of vacating our decision"). The decision whether to do so, like any other question of *Munsingwear* vacatur, "is within our discretion based on equity." *Dickens*, 744 F.3d at 1148 (quoting *Payton*, 593 F.3d at 885). One of the key factors we look to in exercising such discretion is whether the panel got it right. *Parsons v. Ryan*, 784 F.3d 571, 572 n.1 (9th Cir. 2015) (Ikuta, J., dissenting) ("[W]e can vacate the decision to avoid having the panel's serious misinterpretations of Supreme Court [Second Amendment] jurisprudence become the law of our circuit."). As present circumstances make clear, there is just as much reason to

equitably reinstate a correct panel opinion as there is reason to equitably vacate an erroneous one.

Complementing our ability to take a moot case en banc and vacate it, our court recently reaffirmed that it also has jurisdiction to issue an entire new opinion even after a case becomes moot, provided that opinion explains the reasons for a decision made prior to the event causing mootness. *United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024). *Perez-Garcia* gave four justifications for issuing its opinion notwithstanding the intervening mootness, and each is instructive here.

First, like in *Perez-Garcia*, the *Teter* panel "heard and conclusively resolved the merits of [the] appeal" when "no party dispute[d] that [it] had jurisdiction." *Id.* at 1173. Second, as litigated before the panel, *Teter* also "properly present[ed] questions concerning … specific constitutional rights," and reinstating the panel order would "not take further action on the merits of [plaintiffs'] claims. *Id.* (quoting *Armster v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 806 F.3d 1347, 1355 (9th Cir. 1986)). Third, for all the reasons described above, "equity weighs in favor of" reinstatement, which provides a narrowly tailored solution to a specific procedural problem posed by our en banc practice. *Id.* at 1174. And fourth, the majority's approach will "likely force later panels to duplicate [the panel's] efforts while confronting the exact same issues," an especially salient concern "[i]n light of the extensive and complicated historical analysis the Second Amendment … demands." *Id.*

So if this court has authority to (a) take a moot case en banc and vacate it and (b) issue an opinion in a moot case to explain the basis for a prior order, then it is difficult to see

why we would lack authority to reinstate a previously vacated panel opinion under similar circumstances. We lack the will, but not the authority.

Ultimately, the proper remedy in cases involving this kind of intervening mootness depends entirely on which way a court's default en banc rule points. If, as is currently the case, administratively vacating the panel opinion upon the grant of rehearing en banc is the norm, then restoring the status quo after intervening mootness necessarily requires equitable reinstatement. But if vacatur were not the norm, then the court would have to respond to mootness by considering whether a more traditional *Munsingwear* vacatur was in order. The underlying judicial action and the equitable considerations it is designed to serve are essentially the same no matter which way the default rule points. A wooden jurisdictional rule that countenances only the latter remedy but not the former creates a one-way mootness ratchet that serves no discernible purpose and favors only strategic gamesmanship by government defendants.

V.

For the reasons explained above, this court's "shoot first, ask questions later" approach to panel opinion vacatur creates unique and perverse incentives for government defendants like Hawaii, who can strategically misuse the mootness limitations on our Article III jurisdiction to rid themselves of adverse panel precedent. Whatever Hawaii's motivations for what it did here, our court could and should have mitigated the improper incentives for such mischief— in this and future cases. All it had to do was adopt a presumptive policy of vacating our prior vacatur orders, thereby reinstating the precedential value of the panel's

opinion, whenever an en banc petitioner takes deliberate action that moots a case after rehearing en banc is granted. I respectfully dissent from our failure to do so.

---

COLLINS, Circuit Judge, with whom LEE, Circuit Judge, joins, dissenting:

Judge Lee and I were members of the three-judge panel that unanimously held that Hawaii Revised Statutes § 134-53(a)'s complete ban on the possession of butterfly knives violated the Second Amendment "right of the people to keep and bear Arms." *See Teter v. Lopez*, 76 F.4th 938, 942 (9th Cir. 2023), *vacated on grant of rehearing en banc*, 93 F.4th 1150 (9th Cir. 2024). The State of Hawaii has, at least for now, acquiesced in the bottom-line practical result of that vacated decision because, even as state officials sought and obtained rehearing en banc, the Hawaii Legislature amended the statute to eliminate the "outright ban[]" that was the basis for our judgment invalidating the statute. *Teter*, 76 F.4th at 954. In my view, however, that development does not moot this case, and I therefore respectfully dissent.

With respect to Plaintiffs' specific claim that a *total ban* on butterfly knives violates the Second Amendment, I agree that Hawaii's amendment of the statute eliminates that challenged prohibition and thereby grants Plaintiffs, "outside of litigation," complete relief as to that specific issue. *FBI v. Fikre*, 601 U.S. 234, 240 (2024). But because any such relief to Plaintiffs occurred only through the voluntary action of the appropriate state actors (namely, the Hawaii Legislature), it will moot that claim "only if the *defendant* can show that the practice cannot reasonably be expected to recur." *Id*. at 241 (emphasis added) (simplified).

*Fikre* held that this is a "formidable burden," *id*. (citation omitted), and that "[i]n *all* cases"—even cases, such as *Fikre*, that involve a governmental defendant—"it is the *defendant's burden* to establish that it cannot reasonably be expected to resume its challenged conduct" and to make that showing regardless of "whether the suit happens to be new or long lingering, and whether the challenged conduct might recur immediately or later at some more propitious moment," *id*. at 243 (emphasis added) (simplified). *Fikre* thus squarely overrules our prior caselaw under which we "treat the voluntary cessation of challenged conduct by government officials with more solicitude than similar action by private parties." *Board of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1198 (9th Cir. 2019) (en banc) (simplified); *see also Brach v. Newsom*, 38 F.4th 6, 12–13 (9th Cir. 2022) (en banc) (same). The majority recognizes as much, because it acknowledges that, "as the Supreme Court recently made clear," the principle that a defendant's voluntary cessation of challenged conduct may not be enough to moot a case "is true 'for governmental defendants no less than for private ones.'" *See* Opin. at 11 (quoting *Fikre*, 601 U.S. at 241).

The majority nonetheless insists that voluntary-cessation principles *do* apply differently here, because the relevant governmental actor is the state legislature and not an executive official or an administrative agency. In reaching that conclusion, the majority relies on *Chambers*, in which we adopted and applied a more government-friendly version of the voluntary-cessation doctrine in the context of a legislative repeal. *See Chambers*, 941 F.3d at 1199. But in my view, *Chambers* does not survive *Fikre*.

In *Chambers*, we began by stating that we afford "solicitude" to governmental actors when we apply the

voluntary-cessation doctrine, and we concluded that "*[f]or this reason*, the repeal, amendment, or expiration of challenged legislation is generally enough to render a case moot and appropriate for dismissal." 941 F.3d at 1198 (emphasis added).**[1]**  We then acknowledged that, in two cases, the Supreme Court had nonetheless invoked the voluntary-cessation doctrine in holding that a repeal of the challenged law did *not* moot the dispute in question. *Id*. (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982); *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993)).  We observed that our caselaw construing *City of Mesquite* and *Northeastern Florida* had been inconsistent, with some decisions applying conventional voluntary-cessation standards and others applying a strong presumption that a legislative repeal of the challenged law moots the dispute. *Chambers*, 941 F.3d at 1199.  With little analysis, we then resolved that intra-circuit conflict by adopting what we described as the near-unanimous view of the other circuits, which required "evidence that [the government] plans to or already has reenacted the challenged law or one substantially similar." *Id*. at 1198 (citation omitted).  We therefore held that "legislative actions should not be treated the same as voluntary cessation of challenged

---

[1] In support of this syllogism, we cited three cases, but none of them actually supported it.  Two of them held that the amendment or repeal of the statute in question mooted the dispute, but without considering or even mentioning the voluntary-cessation doctrine (presumably because no party invoked it as a ground for avoiding mootness). *See Burke v. Barnes*, 479 U.S. 361, 363 (1987); *Kremens v. Bartley*, 431 U.S. 119, 127–28 (1977).  In the third case, the only mootness exception invoked was the distinct exception for disputes that are capable of repetition but evading review; voluntary cessation was again not discussed. *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 481–82 (1990).

acts by a private party." *Id*. at 1199.  Rather, we said, "we should assume that a legislative body is acting in good faith in repealing or amending a challenged legislative provision, or in allowing it to expire." *Id*.  We therefore held that, "in determining whether a case is moot, we should presume that the repeal, amendment, or expiration of legislation will render an action challenging the legislation moot, unless there is a reasonable expectation that the legislative body will reenact the challenged provision or one similar to it." *Id*.  We imposed on the party resisting mootness—typically a private plaintiff—the burden to affirmatively show that "there is a reasonable expectation of reenactment." *Id*.

*Chambers* was doubtful as an original matter, because both *City of Mesquite* and *Northeastern Florida* applied ordinary voluntary-cessation principles in holding that the repeals in those cases did not moot the disputes.  *See Northeastern Fla*., 508 U.S. at 661–63; *City of Mesquite*, 455 U.S. at 289–90.  There is no language in either decision suggesting that different voluntary-cessation standards apply to legislative repeals or that the party *resisting* mootness in such a case has an affirmative burden to show a reasonable expectation of re-enactment.    It was the *dissent* in *Northeastern Florida* that argued for a presumption that legislative bodies act in good faith.  *Northeastern Fla.*, 508 U.S. at 677 (O'Connor, J., dissenting).  Notably, in making that argument, the dissent itself conceded that *City of Mesquite* had "required the *government* to establish that it cannot be expected to reenact repealed legislation before [the Court] w[ould] dismiss the case as moot." *Id*. (emphasis added).  Moreover, there is no need for any such special rules governing legislative repeals.  If—as *Chambers* seemed to think—a legislature's repeal is unlikely, in most cases, to have anything to do with attempting to moot a particular

lawsuit, then the government typically should have little difficulty carrying its burden to show that re-enactment of similar legislation "cannot reasonably be expected" to occur. *Fikre*, 601 U.S. at 243.  But *Chambers*' re-allocation of the burden of proof concerning mootness in legislative-repeal cases makes a decisive difference in matters—such as this one—in which there are strong reasons to suspect that the very lawsuit at hand *was* in fact the impetus for the legislative amendment.

In addition to being questionable as an original matter, *Chambers* is further vitiated by *Fikre* in three respects.  First, *Chambers*' presumption that a legislative repeal moots a challenge to the repealed statute rested dispositively on our adherence to the general principle that governmental actors should receive "solicitude" in our application of the voluntary-cessation doctrine.  *Chambers*, 941 F.3d at 1198 (citation omitted).  As I have explained, however, *Fikre* rejected that fundamental premise, squarely holding that the governmental defendant in that case had to satisfy the same "formidable burden" required by settled voluntary-cessation principles.  *Fikre*, 601 U.S. at 241 (citation omitted). Second, in pointing to precedents in which a governmental defendant had failed to "satisf[y] that formidable standard," the Court in *Fikre* specifically cited *City of Mesquite*, thereby further confirming (as I have argued above) that *City of Mesquite* applied the same conventional voluntary-cessation standards that apply in other contexts.  *Id*. at 243. Third, *Fikre* expressly stated that "[i]n all cases," the burden to show whether the challenged conduct can "reasonably be expected" to recur is on "the defendant[]."  *Id*.  *Fikre* thus rules out the burden-shifting we adopted in *Chambers*.

Although the majority expressly reaffirms *Chambers*' rule that a legislative repeal creates a presumption that the

case is moot, the majority does not rely on *Chambers*' discredited view that, with respect to the voluntary-cessation doctrine, governmental defendants should generally be given a "solicitude" that is denied to private defendants. That broader view, as explained earlier, is flatly contrary to *Fikre*, as the majority implicitly recognizes. The majority instead relies on a substitute rationale for the *Chambers* presumption, but it fares no better.

According to the majority, "[t]he realities of the legislative process—a process requiring coordinated action by a multi-member body representing a diverse array of interests—make it *unlikely* that a legislature will strategically moot a case only to return to its old ways when the litigation is over." *See* Opin. at 12 (emphasis added) (simplified). But, as I noted above in discussing *Chambers*, this is simply another way of saying that, in the context of a legislative repeal, a state defendant should ordinarily have little difficulty, as a practical matter, *carrying* the burden of proof imposed on it by the voluntary-cessation doctrine. That predictive judgment provides no basis for creating a special *legal* rule in which the state defendant may invoke a presumption as a substitute for carrying its affirmative burden of proving mootness, thereby shifting the burden of proof to the plaintiff. Yet that is precisely what the majority does when it insists that a state defendant can simply rely on the *Chambers* presumption to "*satisf[y]*," *see* Opin. at 13 (emphasis added), the defendant's "formidable burden" of showing that enforcement of the challenged law "cannot reasonably be expected to recur," *Fikre*, 601 U.S. at 241 (simplified). For the reasons I have explained, that special burden-shifting framework in the legislative context, which the majority reaffirms, cannot be reconciled with *Fikre*.

Accordingly, I conclude that *Fikre* abrogates *Chambers* and that it is the Appellees' burden here to establish that re-enactment of a similar law cannot reasonably be expected to occur. They have not carried that formidable burden in the "Suggestion of Mootness" they filed in this court, which instead relies dispositively on *Chambers*' shifting of the burden. Because this case has not been shown to be moot, I would proceed to the merits.

On the merits, I adhere to the views expressed in the panel opinion, including specifically its holdings that (1) "bladed weapons facially constitute 'arms' within the meaning of the Second Amendment," *Teter*, 76 F.4th at 949; (2) to the extent that Appellees contend that butterfly knives may be proscribed because they fall within the "historical tradition of prohibiting the carrying of dangerous and unusual weapons," *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (simplified), Appellees "bear[] the burden of proof" on that issue, *Teter*, 76 F.4th at 950; and (3) Appellees have failed to carry that burden, *id*. at 954–55. I therefore would reinstate the panel's judgment reversing the district court's judgment and remanding the case.[2] Because the majority does otherwise, I respectfully dissent.

---

[2] That would leave open, for remand, any issue of a possible amendment of the complaint to specifically address whether the amended statute's more narrowly drawn provisions also violate the Second Amendment. I express no view on that point.